1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4  UNITED STATES OF AMERICA,      .
                                  .
5                Plaintiff,       . No. 18-cr-4683-GPC
                                  .
6                v.               . April 30, 2019
                                  . 1:00 p.m.
7  JACOB BYCHAK,                  .
   MARK MANOOGIAN,                .
8  MOHAMMED ABDUL QAYYUM,         .
   PETR PACAS,                    .
9                                 .
                 Defendants.      . San Diego, California
10 . . . . . . . . . . . . . . . .

11              TRANSCRIPT OF MOTION HEARING
12         BEFORE THE HONORABLE GONZALO P. CURIEL
                 UNITED STATES DISTRICT JUDGE
13

14

15 APPEARANCES:

16 For the Plaintiff:     United States Attorney's Office
                          By: MELANIE K. PIERSON, ESQ.
17                             SABRINA FEVE, ESQ.
                          880 Front Street, Room 6293
18                        San Diego, California 92101

19 For the Defendant      Law Office of David W. Wiechert
   JACOB BYCHAK:          By: JESSICA C. MUNK, ESQ.
20                             DAVID W. WIECHERT, ESQ.
                          115 Avenida Miramar
21                        San Clemente, California 92672

22 For the Defendant      Mintz Levin
   MARK MANOOGIAN:        By:  RANDY K. JONES, ESQ.
23                        3580 Carmel Mountain Road, Suite 300
                          San Diego, California 92130

24

25 ///

```
 1   APPEARANCES (CONTINUED):

 2

 3   For the Defendant        Bienert, Miller & Katzman, P.L.C.
     MOHAMMED ABDUL           By:  WHITNEY Z. BERNSTEIN, ESQ.
 4   QAYYUM:                       JAMES RIDDET, ESQ.
                                   THOMAS BIENERT, ESQ.
 5                            903 Calle Amanecer, Suite 350
                              San Clemente, California 92673
 6

 7   For the Defendant        Bird Marella Boxer Wolpert
     PETR PACAS:                Nessim Drooks & Lincenberg
 8                            By:  NAEUN RIM, ESQ.
                              1875 Century Park East
 9                            Suite 2300
                              Los Angeles, California 90067
10

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:          Chari L. Bowery, RPR, CRR
                              USDC Clerk's Office
23                            333 West Broadway, Suite 420
                              San Diego, California 92101
24                            chari_bowery@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

1          SAN DIEGO, CALIFORNIA; APRIL 30, 2019; 1:00 P.M.

2                              -o0o-

3          THE CLERK:  Calling Item Number 1 on the calendar,

4    Case Number 18-cr-4683, U.S.A. v. Defendant Number 1, Jacob

5    Bychak, if I could please have the appearance of the attorney.

6          MS. MUNK:  Good afternoon, Your Honor.  Jessica Munk

7    and Dave Wiechert on behalf of Jacob Bychak, who is present in

8    court.

9          THE COURT:  Good afternoon.

10         THE CLERK:  Defendant Number 2, Mark Manoogian.

11         MR. JONES:  Good afternoon, Your Honor.  Randy Jones

12   on behalf of my client, Mark Manoogian, who is present in

13   court.

14         THE COURT:  Mr. Jones, good afternoon.

15         THE CLERK:  Defendant Number 3, Mohammed Abdul

16   Qayyum.

17         MS. BERNSTEIN:  Good afternoon, Your Honor.  Whitney

18   Bernstein, with Jim Riddet and Tom Bienert, present on behalf

19   of Mr. Qayyum, who is also present before the Court.

20         THE COURT:  Good afternoon.

21         THE CLERK:  And Defendant Number 4, Petr Pacas.

22         MS. RIM:  Good afternoon, Your Honor.  Naeun Rim on

23   behalf of Petr Pacas, who is present in court.

24         THE COURT:  Good afternoon.

25         MS. FEVE:  Good afternoon, Your Honor.  Sabrina Feve

1    and Melanie Pierson for the United States.

2           THE COURT:  Good afternoon to you all.

3       We are here on motions that have been filed over the

4    course of the last couple of months, and I have been reviewing

5    moving papers, supporting papers, cases cited, and at this

6    point, here is what I am prepared to do.

7       With respect to the motion to dismiss indictment on the

8    basis that the charges are void for vagueness and the motion to

9    dismiss indictment for misadvising the grand jury of law, I am

10   prepared to continue that on the Court's own motion to May 30

11   at 1:00 p.m., and at that time, the Court will have sufficient

12   time to review not only the papers but all the cases that are

13   cited.

14      I appreciate that this challenge of this subsection is a

15   question of first impression.  There is no case law on it.  I

16   do anticipate preparing a written order in order to properly

17   address the arguments that have been raised by the parties.

18      And do you have something that you would like to say about

19   that, or you are not available on the 30th?

20           MS. MUNK:  Yes, Your Honor.  I am not available on

21   the 30th.  I am handling this motion for the defense team.  I

22   will be out of the country on vacation.  If we can do that

23   sometime in early June.

24           THE COURT:  I have a number of trials that look like

25   they are going to be going forward in June.  The first date I

1    can give you in June would be June 20th.

2              MS. FEVE:  Your Honor, I am out of the district on

3    June 20.  I am sorry.

4              THE COURT:  That's what happens when you have seven,

5    eight attorneys.

6         What about May 23?

7              MS. MUNK:  Your Honor, unfortunately, I am out on a

8    vacation from the 21st to the 31st.  And the week before that,

9    Mr. Wiechert and myself are going to be in trial up in L.A.

10             THE COURT:  So, when are you going to be back,

11   Ms. Feve?

12             MS. FEVE:  Your Honor, I am only gone the 19th to the

13   21st.

14             THE COURT:  What about the 27th of June?

15             MS. RIM:  Your Honor, I am going to be in trial that

16   week, but I am happy to -- I mean, we can --

17        (Counsel confer.)

18             THE COURT:  Let's see.  Do I understand that --

19             MR. BIENERT:  Your Honor, Thomas Bienert.  I am out

20   of town around that time, and I was doing the dismissal motion.

21        May I just suggest, whenever it is convenient with you

22   today, if, rather than doing this with you, if we all caucus

23   with your clerk, we might be able to come up with -- assuming

24   she knows your windows, I am trying to figure out how we can do

25   that without each of us interrupting when you come up with a

 1    new date.

 2            THE COURT:  We can do that.  And, yes, Kimmi has full

 3    knowledge of when I have trials and everything else.  So I will

 4    ask you to work that out with her.

 5        And the take-away essentially being that there's enough

 6    substance here that the Court wants to make sure it gets it

 7    right, and so I will need additional time for that.

 8            So what I am prepared to address today are

 9    discovery-related motions.  We have a motion for discovery that

10    was filed back in November, and then that was supplemented by a

11    motion for informant discovery.  We have a motion for a bill of

12    particulars, which in some ways is also discovery-related.  And

13    then we have the motion for modification of protective order,

14    which certainly is discovery-related.

15        From what I can tell in my review of all the pleadings, it

16    doesn't look like there are any discovery disputes beyond the

17    request for confidential human source identification

18    information and the request regarding protective order in terms

19    of who to make or allow access to the discovery that is the

20    subject of the motion to modify.

21        But correct me if I'm wrong; are there any other areas of

22    discovery that the Court needs to address at this moment?

23            MS. BERNSTEIN:  Your Honor, I believe one other area

24    of outstanding discovery was relating to the criminal history

25    of the government witnesses and cooperators.  We had requested

1    this on June 25th, both in a meet-and-confer with the

2    government --

3           THE COURT:  June 25?

4           MS. BERNSTEIN:  I am sorry.  January 25th.

5      -- both in a meet-and-confer in the hallway with the

6    government and also in the discovery motion that was filed,

7    which is Document 36.  This is specifically requested, I

8    believe, in Section O, Subsection 6, as well as Section O,

9    Subsection 8, as well as Subsection Q.

10     So we are still requesting and awaiting the criminal

11   history of the cooperating witnesses.

12          THE COURT:  So, when you say "cooperating witnesses,"

13   these are witnesses that the government intends to call at

14   trial, or just any witness who has provided cooperation?

15          MS. BERNSTEIN:  We would like it for any witness that

16   is going to provide cooperation; however, we do know that there

17   are two specific cooperating witnesses.  They have both, I

18   believe, entered guilty pleas as well, pursuant to cooperation

19   addendums, and we believe that criminal history exists for at

20   least one of them if not both of them, and we request that of

21   the government.

22          THE COURT:  So, let me inquire, with respect to those

23   criminal history reports for those two cooperators, has that

24   been provided or is that going to be provided?

25          MS. PIERSON:  Ms. Feve is looking through our index

1    of discovery because it was our understanding that those had

2    been provided for those two a long time ago.  But we will

3    double-check because if they haven't, of course, we intend to

4    provide them.

5            THE COURT:  Right.  Yes.  That would surprise me.  I

6    would expect that that would have been turned over.

7            MS. BERNSTEIN:  Certainly, I apologize if we have

8    missed that.  There's voluminous discovery here.  But if we

9    have missed it, I would just appreciate being redirected to

10   where that is.

11           THE COURT:  Okay.  So it doesn't sound like there's

12   an issue to address; but, to the extent the government has not

13   turned it over, I expect the government will turn over the

14   criminal history reports for these two cooperating individuals.

15   I knowed Dye is one of them.

16       And then, anything else other than what I am getting ready

17   to address?

18           MS. BERNSTEIN:  One other category, Your Honor, would

19   be that we have requested -- and maybe this ties into the

20   motion to amend the protective order, but we requested in a

21   March 25th email to the government that the government produce

22   the requests that the government made to Earth Class Mail, as

23   well as Yahoo, that generated the responses in Production

24   Number 5, which is the production that's at issue with the

25   protective order.

```
 1              THE COURT:  And I think that is further fleshed out
 2    in the motion for a modified protective order.  I did see that
 3    request contained in that pleading.  So we can take that up in
 4    the context of the motion for modified protective order.
 5              MS. BERNSTEIN:  Thank you.
 6              THE COURT:  Anything else?  All right.
 7         So, then, with respect to the identification of --
 8              MS. PIERSON:  Could I just --
 9              THE COURT:  Yes.
10              MS. PIERSON:  With the matter of discovery, I would
11    move the Court right now, orally, to have a limited unsealing
12    order.  There is a 2703(d) order that the government used to
13    obtain the records from Yahoo.  It is under seal.  We would
14    like the Court to unseal it for the limited purposes of us
15    giving it to the defense in this case.  And that would provide
16    them, then, with the Court's order for the Yahoo information
17    that is at issue with the protective order.  So I just ask that
18    you allow it unsealed for that purpose.
19              THE COURT:  Yes.  I will grant that oral motion.
20         And so, then, does that partially respond, then, to the
21    request that was made moments ago?
22              MS. PIERSON:  It should.
23              THE COURT:  And, I guess, half of it, right?  Because
24    some of the materials were received from Yahoo and some other
25    materials were received --
```

```
 1            MS. PIERSON:  Some were obtained from Earth Class
 2   Mail via grand jury subpoena.
 3            THE COURT:  Is there any objection to providing that?
 4            MS. PIERSON:  I have never in my entire career
 5   provided a grand jury subpoena to anyone in any criminal case.
 6   It would surprise me.  Typically, they are entitled to the
 7   records and the custodian of records --
 8            THE COURT:  Yeah, and I thought the request was
 9   directed more at any communications that may have been
10   forwarded to the requested party.
11        Is that right, Ms. Bernstein, versus a grand jury
12   subpoena?
13            MS. BERNSTEIN:  Yes, Your Honor.  I think we were
14   specifically requesting the subpoena and the email requests.  I
15   think we want the ability to review the subpoena that was sent
16   and what was responsive to the subpoena as well as any
17   non-subpoena email request that had been sent to Earth Class
18   Mail, if Yahoo is covered by Ms. Pierson's previous
19   representation.
20            THE COURT:  What is the authority for your request?
21            MS. BERNSTEIN:  May I have a moment?
22            THE COURT:  Yes.
23        (Counsel confer.)
24            MS. RIM:  Your Honor, the purpose of the request --
25   sorry; I am the one who wrote the motion, so I am going to
```

 1   address the issue.

 2       The purpose of the request -- and we have actually

 3   typically seen subpoenas produced along with the responsive

 4   documents that help us identify what was requested and what the

 5   documents are, so that's all we are asking for.  This is the

 6   first time we have learned that this was responsive to a grand

 7   jury subpoena.  We would be satisfied if the government could

 8   just characterize what it requested from the third party so

 9   that we know what we are looking at and what parameters they

10   asked for.

11           THE COURT:  Any objection?

12           MS. PIERSON:  Without looking at the subpoena and

13   researching it, I am not sure that I would have any.  It

14   doesn't seem that I would.  But I need to look at the subpoena

15   to properly answer that question.

16           THE COURT:  Why don't you do that.  I will direct the

17   parties to meet and confer, and if there's no problems or

18   issues, then the government can provide this, and if there are

19   any issues, then I will direct the parties to further address

20   this.

21       With respect to the discovery regarding the CHS, as I

22   understand it, the parties agree that the multi-factor test the

23   Court is to apply is, one, to determine the degree of the

24   informant's involvement in the criminal activity; two, identify

25   the relationship between the defendants' asserted defense and

 1    the likely testimony of the informant; and three, the

 2    government's interest in nondisclosure.

 3         With respect to the first, it does not appear that there

 4    is any information or suggestion that the CHS, who alerted the

 5    government to certain issues that ultimately culminated in

 6    these charges -- there is no suggestion that he was actually

 7    involved in the criminal activity.

 8         With respect to the relationship between an asserted

 9    defense and likely testimony, the only asserted defense that I

10    have seen is one with respect to exploring a good-faith defense

11    which depends upon what the defendants knew.  With respect to

12    that, it is not clear how this CHS would help move this

13    good-faith defense forward.  And so, at this point, I don't

14    find that that factor weighs in favor of disclosure.

15         And as to the government's interest in nondisclosure,

16    while the Court does recognize that it doesn't appear that this

17    individual is someone whose life would be at risk if his

18    identity was made known, certainly individuals such as the CHS,

19    who assist the government, end up on the wrong side of these

20    issues as far as certain people are concerned.

21         So, to the extent that the government wishes to keep this

22    individual's identity confidential, and to the extent that this

23    individual wishes to keep his identity unknown, it seems to the

24    Court that that is a legitimate consideration.  But, most

25    notably, it doesn't appear that there's any real information

1   that the informant was involved in criminal activity or

2   otherwise moves the ball forward as to an asserted defense.

3       So I would be prepared to deny the request for information

4   relating to the CHS, except I am considering having the

5   government disclose whether or not the CHS has a criminal

6   record or was provided compensation, consideration, prior to

7   obtaining the search warrants in this investigation so as to

8   then provide the basis for an assertion that the government did

9   not truthfully reveal relevant information regarding possible

10  motivation for the CHS when they relied somewhat on the CHS's

11  information.  Although, I have reviewed the affidavits, and

12  there's not great weight placed on the CHS with respect to the

13  information that's provided.  It appears that information was

14  provided, and it was followed up by the FBI in a number of

15  ways.

16      So, ultimately, that would be my tentative with respect to

17  CHS information.

18          MS. FEVE:  Your Honor, with regard to your two

19  questions, I can represent -- I will check that it is not in

20  the discovery, but I can represent to the Court that he was

21  not -- the source did not receive compensation and that we are

22  unaware of any criminal history for the CHS.

23          THE COURT:  All right.  So that would be my tentative

24  with respect to disclosure or identification of the

25  confidential human source.

```
 1        Do the defendants wish to be heard?
 2            MS. RIM:  Yes, Your Honor, briefly.  Thank you.
 3        Your Honor, just to lend some context to the case and the
 4   defense, it is not only a good-faith defense that the defense
 5   intends to raise.  Obviously, the central defense here is
 6   whether a misrepresentation was made -- or one of the central
 7   defenses -- to a gentleman named Peter Holden, who was the
 8   owner of Hostwinds, the hosting company that received the
 9   600-dollar payment identified in the wire fraud Counts 2
10   through 5.
11        And we think that's pretty critical here because a similar
12   person, Mr. Tarney, was actually indicted as a co-conspirator
13   and has pled guilty, presumably on the basis that he was aware
14   that the LOAs that he received were allegedly forged.
15        So there is a critical question.  If Mr. Holden is going
16   to be a central witness in the government's case and the
17   government is going to rely on his testimony that he received
18   some type of misrepresentation from one or more defendants, his
19   credibility will be very central.
20        The CHS had communications with Mr. Holden, not just about
21   this incident, but if you look at the timeline, the CHS first
22   contacts the FBI.  And as a reminder, the CHS is a member of
23   Spamhaus.
24            MS. FEVE:  Just make sure, if it's under seal, you
25   didn't disclose what is under seal.
```

1          MR. WIECHERT:  I am not sure --

2          MS. FEVE:  Your Honor, my concern is, and I raised it

3     with the defense, that we submitted a series of documents to

4     the Court under seal.  My understanding is the defense is going

5     to produce a redacted version of their reply brief because they

6     realized they inadvertently disclosed information that was

7     contained in the sealed documents.  And because I don't know

8     what the defense is going to argue, I just want to remind the

9     defense that to the extent their timeline is going to refer to

10    the government's sealed submissions -- if it's just to the

11    discovery and they want to make that clear, that's fine.

12         It is just that one of the challenges here is because we

13    anticipate a redacted brief, I want to make it as clear as we

14    can what briefing the Court is relying on.

15         MS. RIM:  Your Honor, first of all, I just want to

16    clarify.  We did not say -- well, it sort of doesn't matter.  I

17    don't want to get the Court involved in the weeds of this.

18         THE COURT:  More than I already am?

19         MS. RIM:  Yes.

20         We relied on discovery that was produced not pursuant to

21    any protective order.  I believe some excerpts of that was

22    filed under seal with the Court, but my understanding is it is

23    not sealed in the sense that it's not been provided to the

24    defense under any protective order.

25         The thing that we are redacting is, at the request of the

1    prosecution, we agreed to redact the names of some of the

2    witnesses, whom we identified purely to be able to clarify who

3    we are talking about, not to embarrass anybody.  So we are

4    happy to redact those names and just provide the initials.

5        I would like to, in my argument, describe the arguments

6    and the time frames that I referenced in the motion.  It is not

7    going to be redacted because there is no basis for redaction

8    for discovery that is not produced under a protective order.

9        To the extent that the prosecution wants to seal this

10   proceeding, I have no -- I don't know what the basis would be

11   for that, but I don't think there is anyone in here who's not a

12   party or counsel.

13            THE COURT:  Well, let me just go back to something

14   you said a moment ago with respect to, I think, the second

15   prong of this multi-factor test, the relationship between the

16   defendant's asserted defense and the likely testimony of the

17   informant.

18       You were referencing a defense which will focus on the

19   credibility of Holden, who is someone who will testify about

20   certain alleged misrepresentations.  And so, to the extent that

21   I were to accept that that represents a defense, then the next

22   part, that second prong, relates to the likely testimony of the

23   informant.

24       At this point, what I hear is, to put it politely,

25   speculative and conjecture as far as what this individual would

1    have to say about Mr. Holden.

2        Do you have something that lets me know, if this CHS

3    testified, that his likely testimony would advance your attack

4    of Holden?

5            MS. RIM:  Yes, Your Honor.  There are two things.

6    One is the timeline I was just about to explain.  The CHS, who

7    is a member of Spamhaus -- so it's an organization that has an

8    anti-spam agenda, whether it's legal or illegal -- contacts the

9    FBI in June of 2013 and says, "I think there's a company that's

10   hijacking some netblocks."

11       A couple of months later, in October of 2013, he provides

12   to the FBI two LOAs that he says he got from Hostwinds, which

13   is the company Mr. Holden owns, and he says, "These are

14   forged."

15       So he had a communication with Mr. Holden about

16   potentially forged LOAs in October of 2013.  That is one month

17   before the first wire fraud, the date of the first wire fraud

18   count in the indictment.  The date of the first wire fraud

19   count is November 11, 2013.  And then the next -- between

20   November and March of 2014 is when the alleged counts of wire

21   fraud occur.  So those are the dates in which the government is

22   alleging that the defendants somehow deceived Mr. Holden,

23   provided him with LOAs that were allegedly forged and that he

24   received money in order to host them and announce them.

25           Just to clarify, what that means is before any of those

1 transactions, there was a conversation between the informant

2 and Mr. Holden about LOAs that the informant identified to the

3 FBI as forged.

4     After the last alleged wire fraud count, the informant

5 produces to the FBI, in June of 2014, the four LOAs that are

6 the subject of the four counts of indictment of wire fraud, and

7 then he says, "I got these from Pete Holden, and I believe they

8 are forged."

9     So the question is if he had conversations with Mr. Holden

10 before the first transaction and after the last transaction

11 about these letters that may have been forged, then what did

12 Mr. Holden know?  Was there actually misrepresentation?  And

13 who can testify about that to impeach his testimony about it

14 apart from the CHS?  This is the only witness we know of who

15 was in communication with Mr. Holden at the time that these

16 events were going on.  And we believe that we at least have the

17 obligation, in the course of providing effective assistance, to

18 at least interview the informant and to ask questions that

19 perhaps the government may not have asked during its interviews

20 with him.

21     So that's a central part of the argument.  There's some

22 other parts of the argument.  He was also in contact with a

23 former employee of a related company.  And he himself, in

24 interviews -- "he" being the informant -- indicates that this

25 individual has an extreme bias and is very angry at Company A

1  as well as all of Company A's employees.  We need to know why

2  he thinks that.  What statements were made by this former

3  employee to make him think that?  If that former employee is

4  going to testify -- and based on whom the government is

5  representing that person to be, we believe he is going to

6  testify -- evidence that that employee is biased is going to be

7  critical for our defense.

8      So it is all related to our request under Rule 16,

9  *Brady* -- is it *Giglio* or "Jiglio"?  I can never decide.  But

10  that's with respect to the second prong.

11      I want to note with respect to the first prong, about the

12  informant's involvement, Your Honor is right; we are not

13  alleging that the informant was involved in a crime.  But I do

14  want to point out that this is not a drug transaction, it is

15  not a crime that happens on -- you know, in a matter of a few

16  minutes.  These are allegations that spanned conversations and

17  involved misrepresentations that happened over a period of

18  time.  And to some degree, if the informant is talking to the

19  person who's alleged to have been deceived while those

20  transactions are going on, he may not be involved, but he is

21  certainly percipient to relevant information surrounding the

22  incident.

23      As to the third prong, regarding the government's interest

24  in nondisclosure, I believe I said this in the brief, so Your

25  Honor has probably already considered it; but we are certainly

```
 1   willing to agree to a protective order, which we would honor
 2   and not disclose any information publicly.  And we think that
 3   would take care of any interest in nondisclosure.
 4           THE COURT:  All right.  Let me hear from the
 5   government with respect to this description of the CHS, where
 6   he would be able to assist the defense as to Holden.
 7   Evidently, there are these bookend conversations that the CHS
 8   has with Holden with respect to these LOAs.
 9       And what is your position as to whether or not it's
10   relevant what Mr. Holden knew, come June of 2014, when he
11   arrived with these four -- when the CHS arrives with these
12   additional four LOAs?
13           MS. FEVE:  Your Honor, I believe our position is that
14   it is not relevant or material, and I will explain why.
15       The first reason is because there's actually -- I don't
16   believe there is any evidence.  The Court has the same 302 that
17   the defense has that summarizes what we know about the CHS,
18   about the CHS's interaction with Holden.  So the defense is --
19   we have pointed them to that 302, and they are not pointing to
20   anything in that 302 to show that the CHS in fact told Holden,
21   "These LOAs were forged."
22       But I think the more significant aspect is that the
23   government's case does not rest, as the defense appears to
24   believe, on Holden testifying that he did not know they were
25   forged.  My expectation is that Holden is going to testify that
```

```
1    he did not believe it was his job to verify whether or not the
2    LOAs were, in fact, true; that his job was to collect an LOA
3    and to provide it to an entity known as an upstream provider.
4    And that's because Holden did not have the power or authority
5    to transfer IP blocks between registrants.  He was part of a
6    process, and that is why they used him.
7         But Holden's testimony, I believe, will be that he could
8    not himself control whether or not the netblock became
9    functional for the defendants; that his job was to collect the
10   information and pass it on to an upstream provider, who I
11   believe in this case was Cogent.
12        And I believe those materials are with the defense.
13             THE COURT:  And did I see something where a
14   different -- I am not sure what you call it -- not a
15   clearinghouse, but a service provider, had told Company A or
16   the defendants that it was not prepared to, I guess, provide
17   these netblocks or to --
18             MS. FEVE:  Yes.
19             THE COURT:  -- absent further verification?  And then
20   at that point, then, one of the co-defendants said, "You know
21   what?  Let's just go basically to Holden because" --
22             MS. FEVE:  He won't ask any questions.
23             THE COURT:  -- "he won't ask any questions"?
24             MS. FEVE:  Yes.
25             THE COURT:  I guess that was Holden's MO.
```

1    Meanwhile, other companies had a different view if they

2   thought that something was wrong with the authentication or

3   verifications?

4        MS. FEVE:  Other companies interpreted their

5   gatekeeping function differently.

6    But I think that the defense argument for this -- the CHS

7   to have helpful and relevant information, first of all, it has

8   to not be cumulative.  And since there's already evidence that

9   Holden was getting notification from upstream providers who

10  might have pushed back, that there's an argument it's

11  cumulative, that it was not only the CHS -- excuse me -- who

12  was telling Holden, as the defense speculates, that there's a

13  problem with the LOAs; that we also know from the discovery

14  that upstream providers were at times pushing back on the

15  materials provided by Holden to the upstream provider that he

16  got from the conspirators.

17   So, first, I believe there's evidence showing that it is

18  cumulative.  But also, for it to be relevant as far as

19  impeaching Holden, that argument presupposes that Holden is

20  going to take the stand and testify that the misrepresentations

21  to him were material, and that's what we are suggesting, is we

22  don't anticipate that to be his testimony.

23   Furthermore, even if it was, it is still unclear how the

24  CHS -- we would have to call the CHS to potentially impeach

25  him, but that would require Holden to lie on cross-exam, if

1   asked, "Were you ever told by Spamhaus that these LOAs were

2   forged?"

3       If he says, "Yes, they told me," there's no reason to call

4   the CHS because there's no impeachment.

5       Again, whether or not it's admissible, whether or not it

6   would be called, whether or not it's premature, those are

7   relevant issues; but I think the central issue as far as

8   whether or not this particular piece of information is going to

9   give the defense access to information they believe is material

10  or central to their defense is that it has to be material to

11  Peter Holden.  He has to get up on the stand and say, "But for

12  believing every word of this LOA, I would have never done

13  something," and since we don't anticipate him testifying to

14  that, I don't see how the CHS would be relevant.

15              THE COURT:  Let me ask this.  With respect to the

16  likely testimony of the CHS, is there any reason to believe

17  that his testimony would likely be impeaching?

18              MS. FEVE:  No, Your Honor.  That's why we are

19  pointing to the 302s that the defense have to show that

20  there's -- I don't believe there is anything in those 302s, and

21  it is part of why we also submitted it to the Court, so you

22  would have the benefit of access to the same 302, to see -- we

23  don't believe those 302s show there's going to be any useful

24  point of impeachment, but because it was with the defense,

25  before the Court, and we have directed them specifically to

24

 1    that document, it is the opportunity to point to it and help us

 2    understand their theory so if we understand their theory, we

 3    don't have to contest the issue if it's, in fact, persuasive.

 4         THE COURT:  What about this former employee who had

 5    this animus towards Company A and its employees?  I think there

 6    was some suggestion that perhaps this individual would be

 7    called by the government in its case.  Is that true?

 8         MS. FEVE:  He potentially would be called for some

 9    404(b) evidence, but that would all depend on pretrial motions

10    regarding 404(b) for uncharged netblocks.

11         And something to draw the Court's attention to is that

12    when the Court paraphrased the defense argument before issuing

13    its tentative, you relied on their opening brief, which is what

14    the government had an opportunity to respond to in its

15    response.  And their opening brief said that this employee was

16    incredibly important for their defense because he was going to

17    help exonerate the defendants because he was going to provide

18    information showing that they had a good-faith defense.

19         There's been a 180-degree about-face in their reply brief,

20    where they are now saying the person who was going to exonerate

21    them by testifying to their good-faith defense -- they are now

22    saying, "Oh, no.  We must incriminate him because he is

23    unreliable and untrustworthy, and we should be given an

24    opportunity to challenge his credibility."

25         So, the discrepancy between their opening argument and the

1   argument they put forth in their reply brief I submit to the

2   Court is evidence that it is speculative and more of a fishing

3   expedition than of a concrete example to the Court of why that

4   particular individual is essential to their ability to prepare

5   their defense.

6       But taking a step back, as far as this individual, the

7   defendants know who this individual is.  Mr. Pacas worked with

8   him.  So, to the extent that they are saying that only the CHS

9   is aware that there was some bad blood between that individual

10  and any of the former employers of the defendants, I submit

11  that that evidence from the CHS would both be hearsay but also

12  cumulative; whereas, the defendants know from the discovery but

13  also from their own clients that defendants are well aware that

14  there was plenty of bad blood between that particular

15  individual and his former employer.  And the discovery has

16  plenty of documents.

17      In addition, we are -- we have just gotten unsealed, in

18  separate litigation, documents obtained from a consultant

19  retained by their employer.

20          THE COURT:  By "their employer," by Company A?

21          MS. FEVE:  Company A.  And we will prepare those

22  documents for discovery.

23      Those documents will also show to the Court that Company A

24  and Company B were well aware of this individual and that their

25  relationship was negative, to say the least.

1        But it is just to say, again, they do not need the CHS to

2   testify to the fact there was bad blood because, A, it would

3   not be admissible from him because he would only have hearsay;

4   but, B, they already have it, and it's cumulative, both from

5   what their clients know -- again, directing Ms. Rim to the

6   discovery involving her own client and his interactions with

7   the individual who they now say they would need to impeach but

8   who initially they believed would exonerate them.

9        Does that address the Court's questions?

10           THE COURT:  Yes.

11           MS. FEVE:  Thank you.

12           THE COURT:  Any reply?

13           MS. RIM:  Yes, Your Honor.  I am a little bit puzzled

14   by some of the statements.

15        If Mr. Holden gets up on the witness stand and says, "I

16   was lied to by the defendants; I thought these LOAs were

17   totally authentic," who are we going to call to say, "But you

18   said otherwise to the CHS"?

19        The CHS -- you gave him two LOAs that the CHS now says was

20   forged before the transactions at issue, and then you gave him

21   four LOAs that the government alleges were forged after.  And

22   the CHS is in contact with the FBI during this time.  Who is

23   going to testify about that apart from the CHS?  We can't call

24   the FBI agent to say what the CHS told him.  We can't call the

25   government, the prosecution, to testify as to what was just

 1   represented.  The informant is the only person who can be that

 2   witness.

 3        This is not a fishing expedition.  The government

 4   is confusing the questions that we disclosed to the Court we

 5   may ask the CHS, once we have an opportunity to question him,

 6   with the actual hard facts here, which is that they have an

 7   informant who had extensive communications with two very

 8   central witnesses to their case; the person who was allegedly,

 9   either, apparently not deceived or deceived -- either way, the

10   subject for the wire fraud transactions -- and an employee who

11   is going to testify about the relationships between the

12   defendants and the company and who was doing what, which we did

13   brief in our motion.

14        THE COURT:  So let me ask you, with respect to who

15   was deceived, does that relate to just wire fraud, or does that

16   relate to these SPAM Act causes of action or counts as well?

17        MS. RIM:  To some degree, it relates to the CAN-SPAM

18   counts as well, because there's an element of a false

19   representation regarding registration.  Yes.

20        THE COURT:  Representation.

21   So, I know, in your papers, you have characterized the

22   victim as being Mr. Holden; meanwhile, in other documents I

23   have seen, the -- I guess the original owners of these -- if

24   not websites, these -- what would you call it?

25        MS. RIM:  IP netblocks.

```
 1            THE COURT:  Netblocks.  That those were the victims.
 2       To show that there was a false representation wouldn't
 3  require for Mr. Holden to recount that he was a victim,
 4  correct?
 5            MS. RIM:  Your Honor, I think that's a question that
 6  has to be answered.  I don't think I can answer that question.
 7  It is the government's theory in their case.  I am not sure.
 8            THE COURT:  Let me ask, do you believe that you are
 9  required in your case in chief to demonstrate Mr. Holden was a
10  victim?
11            MS. FEVE:  No, Your Honor.
12            THE COURT:  I wouldn't see that that would be a
13  requirement at this point.
14            MS. FEVE:  And this is for the wire fraud or for the
15  CAN-SPAM charge, Your Honor?
16            THE COURT:  Well, certainly for the SPAM, and I am
17  not sure about the wire fraud.  I haven't looked at that very
18  closely.
19       But I kept encountering this language about Mr. Holden as
20  a victim, and it seems like the statute is not directed at
21  Mr. Holden as much as it is to individuals who would end up
22  being the recipients of these emails.  And then if anyone is a
23  victim, it would be the IP person -- the entity that has had
24  their profit accessed through false verifications, so that they
25  would be the victims, but it wouldn't be Holden.
```

29

```
 1            MS. FEVE:  No, Your Honor.  Our theory is not that
 2   Mr. Holden is the victim here.  I think the most obvious
 3   victims are the individuals who were the registrants of these
 4   IP netblocks who had their property used without their consent.
 5   It is -- with regard to the CAN-SPAM Act, there's an argument
 6   that the webmail providers are also potential victims.
 7            THE COURT:  The webmail provider, would that be --
 8            MS. FEVE:  The argument would be that Gmail, because
 9   it had to incur the cost of filtering the spam and was deceived
10   by one of -- in this case, the IP block.  Now, again, that is
11   to say Gmail is a potential victim if you look at the statute.
12   But the victims that we have been focusing on in this case --
13   and that's clear from the discovery -- have been individuals
14   whose identities and property were used without permission.
15            THE COURT:  So I guess I went on -- if not a detour,
16   I am asking these questions because what I am hearing is
17   there's an assertion that Mr. Holden presents himself as a
18   victim because he was fooled on the front end, in 2013, and
19   then later on, in 2014; when, really, was he fooled in 2014,
20   given that he might have been told by the CHS in 2013 that
21   these were false?
22       And then, my question is does that really matter in terms
23   of proving these charges, that in 2014 he did or didn't know?
24            MS. FEVE:  I would refer back to the elements here,
25   and I don't believe that there's an element for either --
```

```
 1              THE COURT:  I don't believe there is either.
 2       And so, to the extent that it is not an element, then that
 3  proposition that you are offering, that the CHS would be able
 4  to show that there was no reliance or that there was no
 5  deception in 2014, it is a nonissue.
 6              MS. RIM:  Your Honor, a misrepresentation is an
 7  element.
 8              THE COURT:  Certainly.
 9              MS. RIM:  I don't know who the misrepresentation
10  would be made to apart from Mr. Holden.  But even if he is
11  going to testify that he knew these LOAs were forged, we do not
12  have a 302 to that effect.  We don't have a statement from him
13  confirming that he is going to testify to that.  I am not
14  questioning the government's representation, but the government
15  doesn't know what Mr. Holden is going to say.
16       We shouldn't have to prove what Mr. Holden is going to say
17  to be able to interview a witness who had extensive
18  communications with what is undoubtedly a central witness in
19  the government's case and who talked to him potentially about
20  the authenticity of these letters as part of our investigation.
21       I don't know what he is going to say today, but by the
22  time he gets on the stand and says something, it is going to be
23  too late for me to say, "Hold on.  Now we know we need this
24  informant's testimony."  We should be able to investigate this
25  now.
```

1          THE COURT:  All right.

2          MS. FEVE:  Your Honor, I would just note two points

3  about defense counsel's argument.  The first is she keeps --

4  she started saying he had extensive communications.  I do not

5  believe any of the 302s support that representation.

6          And the second one is she actually said that he

7  potentially talked to Holden.  Again, if we refer back to the

8  case law, "potentially talked" is not the threshold.  The

9  threshold is that they bear the burden.  If they meet that

10  burden, we then have an in camera hearing.  After we have the

11  in camera hearing, the Court can then decide.  I think that's

12  the proper procedure to fall back on.

13          Even talking about them getting access to his identity

14  jumps ahead one step, which is that first they have to meet the

15  threshold and only then can we do an in camera hearing so the

16  Court can vet the source.

17          THE COURT:  All right.  The Court is prepared to

18  confirm its tentative and deny the request at this time for

19  identifying information regarding the CHS.  The Court finds

20  that there is no indication the CHS was involved in the

21  criminal activity; that the relationship between an asserted

22  defense and the likely testimony is tenuous at best; and the

23  government does have an interest in not disclosing this

24  individual who continues to be relied upon, it appears, by the

25  government in receiving notice of other individuals involved in

1    this type of illegal spam activity.

2         Next we will take up the motion to modify the protective

3    order, and that's a motion to modify the protective order

4    issued on March 6.  And the request is to have the subject

5    discovery provided to Company A and accessible to their law

6    firm, Sheppard Mullin, and outside counsel for Company A.

7         The first question that the Court will take up is

8    procedural, whether or not this is a motion for

9    reconsideration.  The Court doesn't view this as a motion for

10   reconsideration, but the Court invited this motion at the

11   hearing in February.  At that time, the Court was concerned

12   about the release of emails and certain communications to the

13   extent that it contained PII.  At the same time, the Court was

14   of the view that once defense counsel reviewed that

15   information, they would be in a better position to determine

16   whether or not there was, in fact, personal identifying

17   information.

18        Defense counsel has reviewed these materials and asserts

19   that the discovery material consists of copies of letters sent

20   to Company A's compliance department as produced by Earth Class

21   Mail, a digital mailbox service used by Company A that received

22   mail on the company's behalf and sent copies of the mail to

23   them electronically, and, second of all, emails produced by

24   Yahoo marked as spam that appeared to have been received from

25   IP addresses alleged to be associated with Company A.

33

 1          So the defendants assert that this material has already

 2     been received, is in the possession of Company A, and, as such,

 3     there's no point, there's no good cause, in continuing the

 4     protective order that the Court has put in place.

 5          And in their reply to the government's response, the

 6     defendants assert that even the government concedes that the

 7     discovery materials are in Company A's possession and were

 8     received by individuals other than the defendants.

 9          I don't see that to be the case in the government's

10     response, that they concede that the discovery materials are in

11     Company A's possession.  Instead, what I saw in the

12     government's response is that, before the Court relies on

13     defendants' representation that there can be no violation of

14     these third-party privacy interests because Company A already

15     knows their addresses and personal information, the government

16     requests an opportunity to vet this information directly with

17     Company A's outside counsel.

18          Similarly, with regard to the email addresses obtained

19     from Yahoo, defendants can discuss with Company A how it

20     distributed email and the defense can ask Company A to collect

21     and discuss a particular date, time, ad campaign, netblock mail

22     platform, that will direct Company A to the relevant record.

23          So I don't see that the government is conceding.

24          Is that accurate, Ms. Feve, that you are not conceding

25     that this information is already in the possession of

1   Company A?

2        MS. FEVE:  That is correct, Your Honor.  There are

3   one -- there's a handful of documents that are in Company A's

4   possession.

5        THE COURT:  How do you know that?

6        MS. FEVE:  How do I know that?

7    Because the government's discovery to the defendants has

8   Bates stamp numbers at the bottom.  And if the defense looks at

9   the examples you have seen, what you will typically see is the

10  Bates stamp will start with -- and I won't say it out loud, but

11  it's Company A -- and then there will be a dash with what

12  discovery production it is, and then there will be a dash after

13  that, and numbers.

14       THE COURT:  So there's Bates stamps that were applied

15  by Company A?

16       MS. FEVE:  No, Your Honor.

17   To facilitate the defendants' review of the documents,

18  when we Bates stamped the documents, we tried to use the Bates

19  stamp as a pointer to where we collected that information from.

20       THE COURT:  So some of the information that you

21  obtained, you did receive it from Company A?

22       MS. FEVE:  Yes.  Absolutely, Your Honor.  Actually,

23  the vast bulk of what we received is from Company A.

24       THE COURT:  But the subject materials that are at

25  issue in this motion are ones outside of that?

```
 1          MS. FEVE:  So, Your Honor, we took what we got from
 2   Earth Class Mail and we did a -- we did not do an exhaustive
 3   survey.  I can't tell you I looked for every single document
 4   from Earth Class Mail, because there are thousands of documents
 5   from Earth Class Mail.  But what we saw was that there was a
 6   mismatch between what we got from Company A and what we got
 7   from Earth Class Mail.  Both sets of documents that we
 8   collected were provided to the defense, and they should be able
 9   to tell the difference based on the Bates stamp.
10       So when they see certain things that say Company A's
11   parent company -- because they will often sometimes actually
12   see two Bates stamp numbers on there.  There will be the one
13   that we got when we got the original documents from Company A,
14   and then there's the ones that we put on top of it, to make it
15   clear what we were calling it with regard to this case.
16       Does that make sense?
17          THE COURT:  I think so.
18          MS. FEVE:  But, going back to the Court's question,
19   we have the discovery that we got in response to a grand jury
20   subpoena to Company A.  We have the materials we received from
21   Earth Class Mail --
22          THE COURT:  I am sorry.  So the grand jury materials
23   were requested of Company A?
24          MS. FEVE:  Yes.
25          THE COURT:  And then we have the Earth Class Mail --
```

1          MS. FEVE:  Then we have materials from Earth Class

2    Mail.

3         When we compare them, they are not coextensive.

4         That is the reason, while I appreciate the defendants are

5    saying they are, our evidence is they are not.

6         To the extent that we are -- we have made a mistake

7    because of how voluminous the Company A materials are, we are

8    happy to go back to Sheppard Mullin and talk to them because

9    they also have indexes of what they supplied.

10        But at this time, our good-faith belief for the Court is

11   they are not the same, so that is why we got the protective

12   order.

13         THE COURT:  So let me ask defense counsel on that

14   point, why do you believe that everything that has been

15   provided now is in fact in the possession of Company A, given

16   that reported mismatch?

17         MS. RIM:  Your Honor, first, that is partly why we

18   asked for the request that the government made to these

19   companies because we assumed that in the subpoena it would say,

20   "We want the accounts belonging to X, X, X," and those would

21   clarify whether the government was seeking specifically

22   material related to Company A; or, "We want emails from these

23   IPs," which may or may not be associated with Company A.

24         So the other point is that the government acknowledges

25   that this is voluminous material.  We can't sit down and do a

1   matchy-match between what Company A produced and what these

2   third-party companies produced.  It would just take an

3   unreasonable amount of time.  It would be very burdensome.

4       If the government requested material that is obviously

5   already in the possession of Company A because they are

6   requesting materials relating to those accounts, it should

7   be -- it's safe to assume that Company A already has that PII.

8       But even if some of the material is not in Company A's

9   possession, the defense has to confer with Company A to

10  determine whether that is the case.  For example, with the

11  Yahoo emails, these are emails that it looks to me -- I am not

12  sure, but it appears that they are emails that were allegedly

13  sent by Company A.  I believe the government is going to take

14  the position that these were the numerous, numerous emails that

15  were sent by Company A to Yahoo subscribers and Verizon.net

16  subscribers.

17      How can our clients know which of those emails were sent

18  by Company A or not without conferring with Company A?

19      And if the company didn't send these emails, that is going

20  to be very relevant to the defense, which is that these emails

21  were not sent by this company.

22      But the email addresses and the IP addresses from where

23  the emails belong to don't belong to Mr. Pacas; I don't believe

24  they belong to any other defendant.  So there's no way for the

25  defendants to assist counsel in determining where these emails

38

```
 1   came from, and certainly not all of them, unless we speak to
 2   Company A.
 3       It is the same with the Earth Class Mail documents, Your
 4   Honor.  Mr. Pacas was not in the compliance department.  I
 5   believe the government has represented that one defendant was.
 6   I don't know.  But I don't have access to that defendant.  And
 7   there are more than one account within the compliance
 8   department.  We should be able to go to Company A and show them
 9   these documents and say, "What are these, and who sent them,
10   and what does that mean?  Are these compliant with the
11   company's policies?"  Et cetera.
12       So even if there is not a complete overlap, it doesn't
13   change the fact that Company A is material to our investigation
14   of the defense.  And we are not seeking to have the protective
15   order totally eradicated here.  We are just asking the Court to
16   allow us to share it with the central witness in our case for
17   the purposes of investigation for these documents.
18           THE COURT:  So, as I understand it, there's a very
19   limited universe of documents that the government intends to
20   offer at trial.  I don't know if it's 800 or 8,000 or
21   something.
22           MS. PIERSON:  Way less than that.
23           THE COURT:  So these materials, do these fall inside
24   or outside?
25           MS. PIERSON:  Outside.  Outside.
```

1          And I think that this might help clarify for the Court.

2          The Yahoo materials are, like, 845,000 pages, but they are

3    not emails, per se.  There is no content to the email.  There

4    is no date to the email.  There is no subject line to the

5    email.  All it is is a listing of email addresses that received

6    emails.  There is the recipients' email addresses.  It

7    identifies the IP address that was used to send it.  It

8    identifies the name of the sender and the contact email

9    address; in other words, if you were going to unsubscribe from

10   whatever, it's like "admin@domainname.com."  That's all that

11   there is.  There is no content.  There is no date.

12         There would be -- this was material given to the

13   government by Yahoo saying, "We think that these represent

14   possible spam."

15         I can see virtually no way for either side to admit this

16   at trial; however, what I could see was the potential for

17   disaster if we had a Yahoo witness on the stand who says,

18   "Well, we gave the government 845,000 pages of emails back in

19   2013," and then the defense says, "Oh, my God.  We have not

20   seen them."  So we gave them this.

21         And we brought copies of them.  That is why we asked to

22   have the Elmo to be shown.  So if you want to see what these

23   documents look like, it is a string of, you know,

24   JaneDoe@Yahoo.com, IP address, contact@domainname.com; and

25   then the next name, JohnDoe@Yahoo.com, IP address, domain.com.

1    That's all it is.

2             THE COURT:  Are you saying that ultimately you don't

3    believe this is *Brady*, it is not *Giglio*, it is not Rule 16 in

4    the sense that you intend to offer it in your case in chief or

5    that it's material to any defense that has been identified; but

6    that out of an abundance of caution you have turned it over

7    because you obtained it during the course of the investigation

8    and you wanted to avoid a situation where someone from Yahoo

9    was on the witness stand and there was testimony about what

10   they provided, and then the defense ends up screaming, "This is

11   awful" because you received information that was not provided

12   to them?

13            MS. PIERSON:  Exactly.  That's the exact -- why we

14   turned this over.  And we will give them the 2703(d) order so

15   they can see exactly what we asked for there.

16        But I can't see how any of this, given the incomplete

17   nature of the information provided, could be admitted by either

18   party.

19            THE COURT:  So why does this matter?

20            MS. RIM:  Your Honor, it is hard for us to know

21   because we can't investigate it without knowing what these

22   emails are.  It's helpful now that the government has provided

23   some of this information, but it matters because our clients

24   are charged with violating five counts of the CAN-SPAM Act,

25   which, one of the elements is that numerous emails were sent.

1          THE COURT:  And this material has nothing to do with

2     any of these counts?

3          MS. RIM:  Well, the materials apparently show emails

4     that were sent from IP addresses, and that's an element of

5     those CAN-SPAM Act counts, that numerous, voluminous emails

6     were sent from hijacked IPs.

7        So we don't know if they are going to be admitted in the

8     case in chief as an exhibit, but we --

9          THE COURT:  I think we do know.  The government just

10    said they have no intention to offer this.

11       Is that right, Ms. Pierson?

12         MS. PIERSON:  Yes.  That is correct.

13       Would you like me to put one of those up so everybody can

14    know what we are talking about here?

15         THE COURT:  Yes.

16       (Brief discussion off the record.)

17         MS. PIERSON:  Now you can see what the documents look

18    like.

19         THE COURT:  So, I am curious.  How would this in any

20    fashion be intertwined or relate to a defense of this case?

21         MS. RIM:  Well, Your Honor, I think we need to be

22    able to talk to Company A to ask them what this information is.

23         THE COURT:  But, evidently, you have information just

24    like it -- is that correct -- that was obtained from Company A?

25    Or no?

42

```
 1              MS. PIERSON:  No.  No.  This is -- this is what we
 2    got from Yahoo.
 3              THE COURT:  I thought the theory that I heard earlier
 4    from Ms. Feve is there was a mismatch.
 5              MS. PIERSON:  That was Earth Class Mail.  This is
 6    Yahoo.  There's two categories of records.
 7              MS. RIM:  And please correct me if I'm wrong.  My
 8    understanding is that the government is alleging these are
 9    emails sent by Company A to Yahoo users?
10              MS. PIERSON:  This is what Yahoo told us about the
11    documents.  We have not investigated these documents.  We have
12    provided them to you in an abundance of caution in that you
13    might feel that it had some relevance to this case and we did
14    not want to be in a position of having a Yahoo person
15    testify they had given us this information when we didn't give
16    it to you.
17              THE COURT:  So, as far as what is contained on this
18    document, are you certain or reasonably certain that it even
19    relates to the defendants in this case?
20              MS. PIERSON:  We were told by Yahoo that it did.
21        But what we have are hundreds of thousands of personal
22    email addresses -- so-and-so@Yahoo.com, so-and-so@Yahoo.com --
23    which are all real email addresses, which is personal
24    identifying information, which we are seeking to protect with
25    the protective order.  That's what it is about.
```

1          MS. RIM:  But the allegation is that these emails

2     were sent by Company A to these email addresses.  So it's

3     personal identifying information, but it is apparently personal

4     identifying information that Company A already had, and that's

5     why the government requested this information.  And there's no

6     way for us to really understand this without talking to

7     Company A.

8          THE COURT:  So, is that correct, that this

9     information would have been obtained from Company A?

10          MS. PIERSON:  No.  It was obtained from Yahoo.

11          THE COURT:  But the report is that Yahoo received it

12     from Company A?

13          MS. RIM:  Yes.

14          MS. PIERSON:  Yahoo said that they believed the

15     ultimate sender was Company A.

16       What is on here are -- the critical part is the IP

17     address.  And they can go through and look at the IP addresses

18     just like we can and decide whether or not it was an IP address

19     that was ever used by Company A or not, and that can be

20     disclosed all day long.

21       The only thing we don't want disclosed is what comes

22     before the "@Yahoo.com."  But because there are so many of

23     them, we didn't want to take the time to redact it before we

24     provided it to the defendants.  We wanted to simply provide

25     them with the discovery so they could look at it rather than

1    going through and redacting each of those.

2          THE COURT:  So Yahoo believed this came from

3    Company A?

4          MS. PIERSON:  Right.

5          THE COURT:  Do you believe it came from Company A?

6          MS. PIERSON:  We have not investigated that to know

7    the truth or falsity of that.

8          THE COURT:  So, but, at this point, all we have is,

9    then, Yahoo providing this in response to your request for

10   materials that were received from Company A?

11         MS. PIERSON:  For materials that -- that came from

12   certain IP addresses.

13         MS. FEVE:  Your Honor, what the defendants will see

14   when they get the (d) order is that, for a certain date range,

15   we asked for header information pertaining to a list of IP

16   addresses.  We never identified Company A.  What we did is we

17   provided Yahoo with a list of IP addresses.

18      So Yahoo says, "Those IP addresses, for that date range,

19   here is what we have."

20         THE COURT:  So, then, the follow-up is, as far as

21   these IP addresses, does the defense assert these IP addresses,

22   in fact, are ones that belong to or were tied to Company A?

23         MS. RIM:  I believe the government is alleging that,

24   and we need to be able to confirm that by showing the materials

25   to Company A, asking them whether these emails came from which

1    IP addresses and which of those IP addresses belong to

2    Company A.

3        Our clients are not privy to all of the IP addresses the

4    company owned.  There's millions and millions of them.  And the

5    government has already characterized this as being close to a

6    million pages of documents.

7        So we need to, in order to be able to investigate the

8    relevance of this -- and it is not -- Your Honor, I just want

9    to remind everybody that the government has the burden of

10   showing the good cause here, and the central reason why there

11   is no good cause is that these are emails -- the government

12   requested emails from Yahoo that they believe were sent by

13   Company A using IP addresses that the government alleges were

14   controlled by Company A.

15       So I am just not seeing what the basis for excluding

16   Company A is from this discovery when the defense has a clear

17   need to confer with Company A about the relevance of these

18   materials, even if the government is not going to introduce

19   them.  Maybe we want to introduce them.  We don't know yet.

20           THE COURT:  So, here is the salient point in all

21   this, is whether or not it's true that all of this either began

22   or originated with or concluded that it is Company A that is

23   the recipient and, to that extent, then, was or has been in

24   possession of these documents.  If the answer is yes, they were

25   in possession of the documents or have possession, then it is a

1    nonissue.  So I agree with you.  But the million-dollar

2    question is is that true?  And certainly, the government

3    doesn't admit that or acknowledge that.

4         At the same time, especially with respect to these

5    documents from Yahoo, it appears that the government made a

6    request for certain IP addresses that they believe were

7    associated with Company A.

8         Is that correct, Ms. Pierson or Ms. Feve?

9         MS. FEVE:  Your Honor, it was pursuant to our

10   investigation into Company A that we asked for these IP

11   addresses.  But part of what we were doing was vetting

12   information about whether or not there was evidence those IP

13   addresses were controlled by Company A.  Part of doing the

14   investigation was not to incriminate them but to determine what

15   the evidence showed.

16        They are going to get the (d) order, Your Honor, and they

17   are going to see what we asked for.  And, again, they can ask

18   Company A about these IP addresses, which are going to be more

19   relevant than the two lists because they have many, many mail

20   distribution lists; but also, arguably the most helpful field

21   in this discovery is the -- where you see "sender."

22        You are going to see "game department," and then you are

23   going to see almost a parens, where it's going to have

24   "admin@amazingagainst.com."  The domain in that email address,

25   "amazingagainst.com," is going to either be a domain that

1    Company A controlled or didn't.  They are going to know that,

2    and there is no restriction on the defendants' ability to share

3    all of those domain names, as well as all of what we call a

4    "friendly from," which is where you see "game department" in

5    quotes.

6                THE COURT:  No restriction for them to share with --

7                MS. FEVE:  To disclose to Company A, "Did you control

8    amazingagainst.com?  Did you use this IP address?  Did you use

9    the friendly from 'game department'?  Did you have emails

10   called admin@amazingagainst.com?"

11       The only field in this discovery that the government is

12   seeking to protect is the third-party recipient, and the

13   third-party recipient is going to be on many different

14   distribution lists that different people have.  But we, again,

15   do not know at this time what Company A does and doesn't have.

16       We are happy to discuss with them, "Did you believe that

17   you provided us with all of your distribution lists?"  We have

18   not seen it in discovery, and so we have, again, a good-faith

19   belief that at this time we have not seen any evidence that

20   they have these third-party private email addresses.

21       But, again, with regard to the defense's concern that they

22   can't explore their defense, they can explore the domain.  They

23   can explore the friendly from, and they can explore the IP with

24   no restriction on their ability to discuss it.

25                MS. RIM:  Your Honor, the obligation should be on the

1  government to redact each and every recipient's email address

2  from these close to a million pages of discovery if that is

3  what the government's position is going to be.

4      Our position remains that these email addresses apparently

5  were already in the possession of Company A.  That's why they

6  are part of this production.

7      It is critical for us -- I think the government has

8  demonstrated why we have to go to Company A with this to not

9  only determine whether these emails were sent from these IP

10  addresses but to determine whether these domain names did

11  belong to Company A.

12      Even if some of them weren't in the possession of

13  Company A, that is even more relevant because then nobody

14  related to this case is responsible for those emails.

15      The sending of the emails are part of the CAN-SPAM counts,

16  and Ms. Munk just pointed out that even the IP address that's

17  displayed on the screen is the subject of Count 7, which is a

18  CAN-SPAM Act count.

19      So there is no good cause here --

20          THE COURT:  I'm sorry.  What part of this is related

21  to Count 7?

22          MS. MUNK:  Your Honor, what is shown on the Elmo

23  here --

24          MS. PIERSON:  And Your Honor, I marked it as

25  Government's Exhibit 1, so we can talk about it as Government's

1   Exhibit 1.

2          MS. MUNK:  Government's Exhibit 1, the netblock is

3   167.87, and then there's additional numbers.  That is Count 7

4   of the indictment.  So this is absolutely pertinent to our

5   defense here, and this goes to the central issue of the case.

6       Just to add to what co-counsel said, Your Honor, it is

7   unreasonable for us, as a defense, to have to go through

8   845,000 pages, presumably, I guess, on the phone with

9   Company A, to go through each domain name, whether or not they

10  had it.

11      If the government wants to redact the email addresses,

12  then they should redact the email addresses.  But, essentially,

13  we want to be able to give these documents to the company for

14  them to let us know what exactly is going on here, and we don't

15  know.  Our clients did not send emails, so we have to go to

16  Company A.

17          THE COURT:  The Court's view is that, to the extent

18  that this is already in the possession of Company A, then

19  there's no good cause; that these materials are materials that

20  the defense has good reason to want to review and consider

21  their impact on their defense; that, because they are so

22  voluminous, I am not going to require the defense to point out

23  what of all of this they do or do not have.  I am going to

24  place that burden squarely on the government.  It is their

25  burden to show good cause for a protective order.  At this

```
 1   point, I am not prepared to find that there is good cause

 2   relating to these materials given the explanation, given the

 3   description, given how these materials were obtained, and

 4   ultimately, they are just too voluminous for this Court to go

 5   through them all.

 6        And at this point, I am prepared to expand the individuals

 7   or parties that can review these.  As far as that is concerned,

 8   I am prepared to limit that.

 9        And so, at this point, I will turn to the government to

10   request, who are you requesting that these materials be limited

11   to?  I know at this point there's a request for Sheppard

12   Mullin, I think for outside counsel, for any number of

13   individuals with Company A.  In your view, what would be the

14   appropriate pool of those that would have access?

15             MS. PIERSON:  I guess, in our view, if we are talking

16   about who would we give access to, I think the appropriate

17   people would be IT personnel at Company A because they are the

18   ones who would be able to identify the various IP addresses

19   that were used, the various domain names; the people engaged in

20   that, as opposed to upper management and Sheppard Mullin, who

21   are engaged in the ongoing investigation that was the subject

22   of the declaration filed under seal.

23             THE COURT:  So, let me ask, why would upper

24   management need to review these materials?

25             MS. RIM:  Your Honor, the defense would be satisfied
```

1    if the protective order was limited to the compliance

2    department of Company A as well as Sheppard Mullin, not to

3    ignore your question.

4           MS. PIERSON:  We do have an issue with the compliance

5    department because -- and, again, it was discussed with the

6    Court in the filing under seal -- because there are people in

7    the compliance department who are -- that we discussed in that

8    particular declaration.

9        But if I could just step back for a moment, because the

10   Court suggested there was evidence that Company A was in

11   possession of this stuff, and I think that that's really not

12   necessarily the case.  Because the way Company A did its

13   mailings was they sent -- some of the mailings were sent from

14   their internal email teams, but many other mailings were sent

15   by what they call affiliates.  And affiliates are someone where

16   you go and you farm it out.  And you send them an email

17   campaign, and then they send it out to the email addresses that

18   they have.

19       So Company A -- sorry -- sends the email campaign that

20   they have to the affiliates, and then the affiliates send it

21   out to so-and-so@Yahoo.com.  And it is the affiliates who have

22   these email addresses and lists.

23       And in that way, Company A can increase a hundred-fold its

24   footprint because they can send hundreds or thousands of

25   affiliates out, sending these emails, as opposed to just being

1    sent by their own internal email group.

2        So, you know, the idea that all of these were in the

3    possession or are in the possession of Company A, to the extent

4    that the Court had that impression, is possibly erroneous

5    because of their extensive use of affiliate marketers and

6    affiliate marketers especially to send to sort of the lower

7    tier clients, if you will.

8        They had -- the company has higher tier clients that are

9    large, national firms whose names you would recognize, and

10   those were carried more by the internal emails.  But then the

11   lower tier clients, who might be "tirecoupons.com" or

12   "Asiansingles" or something like that, would be farmed out to

13   the affiliates, and the affiliates then would send it out to

14   JaneDoe@Yahoo.com.  So the "Jane Doe" address might belong to

15   the affiliate.

16       THE COURT:  All right.  I have a commitment that I

17   have to make, but here is what I am going to do.

18       I am going to let the government know that the Court views

19   the government as holding the burden in establishing good

20   cause.  In their response, at page 6, line 11, the government

21   asserts that if the defendants are correct that Company A

22   should already have the mailing address, email addresses, and

23   any other PII contained in the discovery materials, then

24   there's no prejudice.

25       My view of that sentence is that if the defendants are

53

1   correct, that Company A already has the mailing addresses, and

2   email addresses and other PII, then that's for the government

3   to show to the satisfaction of the Court that that is the case.

4        And, I guess, let me turn it around; that it is the

5   government's burden to show that these addresses are not in the

6   possession of Company A.  Given what has been requested, given

7   how it's been requested, given the position of the defense, I

8   want further clarification and further information that leads

9   the Court to conclude that Company A does not already have the

10  mailing address, email addresses, and other PII.

11       So I am going to place the onus on you.  I will direct the

12  government to file something by next Wednesday.  And then I

13  will allow the defense to file a response by the following

14  Wednesday.  And then I will take the matter under submission,

15  and I will issue an order.

16       And then, with respect to who this information would be

17  accessible to, to the extent that you wish to address that

18  further, I will permit that as well.  But at this point, as a

19  threshold matter, I want to be pointed to the proof, the

20  reasons, why the Court should conclude that this information is

21  not already in possession of Company A.

22            MS. FEVE:  Your Honor, one reason why we asked is

23  because the defendants are -- one of the arguments they make in

24  their brief is that the government made a willful

25  misrepresentation to the Court.

54

```
 1          THE COURT:  I don't believe that you made that.

 2          MS. FEVE:  And so we are asking just for

 3   clarification, because obviously, if so, we have a reporting

 4   obligation.

 5          THE COURT:  No, no, I don't.  I did see that in the

 6   moving papers, and I saw that addressed in the response.  I

 7   don't believe that the government ended up misrepresenting

 8   anything.

 9      I believe the points and authorities asserts, at page 2,

10   the Court issued the protective order based on the government's

11   representation that the discovery material contained personal

12   identifying information that was not already known to

13   Company A.

14      And the government's response was it had obtained records

15   from third parties that included PII for third-party witnesses

16   whom the government alleges received, and in some cases

17   complained about, email spam.

18      So I am not prepared to find that the government made any

19   misrepresentations; but, at the same time, the Court does find

20   that the government has the burden to establish good cause and

21   that, at this point, I am not satisfied that that showing has

22   been made, but I will give the government this further

23   opportunity.  All right.

24          MS. RIM:  Your Honor, just one brief request.  Could

25   we at least include Sheppard Mullin in the protective order,
```

55

1   and we can accept Your Honor's request for further briefing

2   with regard to Company A, but at least outside counsel of

3   Sheppard Mullin?

4           THE COURT:  You mean ultimately?  Because at this

5   point, I am going to stay or I am not going to direct the

6   government to produce these materials today.  I am going to

7   wait for the government to provide this additional briefing,

8   and then afterwards, I will issue an order one way or another.

9   And to the extent that I issue an order modifying, I will

10  identify who is entitled to review, access this information.

11  All right?

12          MS. RIM:  Thank you.

13          MS. FEVE:  Thank you, Your Honor.

14          THE COURT:  Thank you.

15          MS. PIERSON:  There was one motion that the Court

16  didn't address at all, which was the government's motion for

17  reciprocal discovery.

18          THE COURT:  I expect at this time the defense is

19  going to assert that they are not sure that all the

20  government's discovery obligations have been addressed or met;

21  but, Ms. Bernstein?

22          MS. BERNSTEIN:  Your Honor, it sounds like even the

23  government noticed today that they intend to continue producing

24  discovery.  They also have represented that they intend to

25  continue to produce discovery that they intend to request

1  protective orders for, so it certainly doesn't sound like their

2  discovery is complete.

3      We are aware of our obligations and we will, of course,

4  meet those.

5          THE COURT:  At this point, I will refrain from making

6  any reciprocal discovery order until we conclude these issues.

7  All right.  That will be all.

8          MR. RIDDET:  Your Honor, we haven't set a date to

9  come back.

10          THE COURT:  I think you said you were going to set a

11  date with my clerk.

12          MS. PIERSON:  Can we have one more, because we filed

13  a joint motion relative to --

14          THE COURT:  Speedy trial?

15          MS. PIERSON:  -- to exclude time, yes.

16      And the way that read was that we were excluding time from

17  today's date to the date set today for trial.  Rather than

18  excluding from the last hearing to this hearing, what we

19  intended to do was exclude from this hearing to the date of

20  trial.

21          MR. RIDDET:  We would agree that the time can go from

22  the next motion date until the trial date.

23          THE COURT:  Well, at this point, I will find

24  excludable time from today to the next hearing date, given the

25  pending motions, motions to dismiss.  And then, at that time,

1    we will determine whether or not we need to continue for some

2    other reason.

3          But the Court continues to find that this case is complex,

4    and that's an additional basis to find excludable time.

5          Does that address your concern?

6                MS. PIERSON:  I guess so, yeah.

7                THE COURT:  Go ahead.  Ms. Pierson, did you want to

8    say something?

9                MS. PIERSON:  We just want to be sure that the

10   defense is also okay with the Court's ruling here on excludable

11   time, that they all are in --

12               MR. WIECHERT:  There are motions pending.

13               THE COURT:  Right.  Even if they weren't okay --

14               MR. RIDDET:  Well, we are.

15               THE COURT:  -- you would have a hard time showing the

16   Ninth Circuit that I erred in finding excludable time.

17         The motion to dismiss was just -- the reply was filed

18   within a couple of weeks ago and so this was the first hearing

19   that we had on that.  And to the extent that it is a matter of

20   first impression, certainly there's justification to kick it to

21   the next hearing date.  And after that, it may be that I take

22   it under submission to write up the order, so that would also

23   be justified.

24         But at this point, I think we have the record covered.

25               ALL:  Thank you, Your Honor.

58

```
1        (End of proceedings at 2:30 p.m.)

2                        -o0o-

3            C-E-R-T-I-F-I-C-A-T-I-O-N

4

5            I hereby certify that I am a duly appointed,

6    qualified and acting official Court Reporter for the United

7    States District Court; that the foregoing is a true and correct

8    transcript of the proceedings had in the aforementioned cause;

9    that said transcript is a true and correct transcription of my

10   stenographic notes; and that the format used herein complies

11   with rules and requirements of the United States Judicial

12   Conference.

13           DATED:  May 3, 2019, at San Diego, California.

14

15                        /s/  Chari L. Bowery
                          _____
16                        Chari L. Bowery
                          CSR No. 9944, RPR, CRR
17

18

19

20

21

22

23

24

25
```