<pre>
 1                     UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,      .
                                    .
 5                  Plaintiff,      . No. 18-cr-4683-GPC
                                    .
 6                  v.              . August 1, 2019
                                    . 9:34 a.m.
 7   JACOB BYCHAK,                  .
     MARK MANOOGIAN,                .
 8   MOHAMMED ABDUL QAYYUM,         .
     PETR PACAS,                    .
 9                                  .
                    Defendants.     . San Diego, California
10   . . . . . . . . . . . . . . . .

11                   TRANSCRIPT OF MOTION HEARING

12           BEFORE THE HONORABLE GONZALO P. CURIEL
                  UNITED STATES DISTRICT JUDGE
13

14

15   APPEARANCES:

16   For the Plaintiff:      United States Attorney's Office
                             By: ROBERT CIAFFA, ESQ.
17                               SABRINA FEVE, ESQ.
                             880 Front Street, Room 6293
18                           San Diego, California 92101

19   For the Defendant       Law Office of David W. Wiechert
     JACOB BYCHAK:           By: JESSICA C. MUNK, ESQ.
20                               DAVID W. WIECHERT, ESQ.
                             115 Avenida Miramar
21                           San Clemente, California 92672

22   For the Defendant       Mintz Levin
     MARK MANOOGIAN:         By:  RANDY K. JONES, ESQ.
23                           3580 Carmel Mountain Road, Suite 300
                             San Diego, California 92130
24

25   ///
</pre>

```
 1   APPEARANCES (CONTINUED):

 2


 3   For the Defendant          Bienert, Miller & Katzman, P.L.C.
     MOHAMMED ABDUL             By:  WHITNEY Z. BERNSTEIN, ESQ.
 4   QAYYUM:                          JAMES RIDDET, ESQ.
                                      THOMAS BIENERT, ESQ.
 5                              903 Calle Amanecer, Suite 350
                               San Clemente, California 92673
 6


 7   For the Defendant          Bird Marella Boxer Wolpert
     PETR PACAS:                  Nessim Drooks & Lincenberg
 8                              By:  NAEUN RIM, ESQ.
                                     GARY S. LINCENBERG, ESQ.
 9                              1875 Century Park East
                               Suite 2300
10                             Los Angeles, California 90067

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:            Chari L. Bowery, RPR, CRR
                               USDC Clerk's Office
23                             333 West Broadway, Suite 420
                               San Diego, California 92101
24                             chari_bowery@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

3

```
 1              SAN DIEGO, CALIFORNIA; AUGUST 1, 2019; 9:34 A.M.
 2                               -o0o-
 3         THE CLERK:  Calling item one on the calendar, Case
 4    Number 18-cr-4683, U.S.A. versus Defendant Number 1, Jacob
 5    Bychak, if I could have the appearance of the attorney, please.
 6         MS. MUNK:  Thank you, Your Honor.  Jessica Munk and
 7    Dave Wiechert on behalf of Jacob Bychak, present in court.
 8         THE CLERK:  Defendant Number 2, Mark Manoogian.
 9         MR. JONES:  Good morning, Your Honor.  Randy Jones on
10    behalf of Mark Manoogian, who is also present in court.
11         THE CLERK:  Defendant Number 3, Mohammed Abdul
12    Qayyum.
13         MR. BIENERT:  Good morning, Your Honor.  Thomas
14    Bienert, Whitney Bernstein, and James Riddet for Defendant
15    Qayyum.
16         THE CLERK:  And Defendant Number 4, Petr Pacas.
17         MS. RIM:  Good morning, Your Honor.  Naeun Rim and
18    Gary Lincenberg for Petr Pacas, who is present.
19         THE COURT:  Good morning.
20         MR. CIAFFA:  Robert Ciaffa and Sabrina Feve on behalf
21    of the United States.  Thank you.
22         THE COURT:  Good morning.
23       There's currently pending two motions to dismiss.  One is
24    directed at Counts Six through Ten, as void for vagueness.
25    That motion has been continued in order to permit the defense
```

1    to obtain and file a declaration in response to that filed by

2    the government, the declaration of John Curran.  So we have

3    continued that matter to August 20.

4         And then there is a motion to dismiss based upon

5    misadvising, misinstructing the grand jury.  I had indicated

6    that I would entertain arguments on that.

7         I have reviewed the motion, the basis for the motion.  I

8    don't see at this point that it is supported.  The defense

9    observes that, "Although the government has fashioned this case

10   as one about the alleged misappropriation of inactive IP

11   addresses, substantial evidence in the record shows the case is

12   really an attack on unsolicited commercial advertising itself."

13   There's the proposition offered that, "If the government

14   erroneously stated that unsolicited commercial emailing and the

15   use of 'doing business as' and multiple dominion names was

16   illegal, then the indictment should be dismissed since the

17   grand jury decision to indict most likely was based on this

18   very prejudicial misstatement of the law."

19        I would tend to agree that, if the government told the

20   grand jury that unsolicited commercial emailing was illegal,

21   that there would be a problem, and that if the government

22   advised the jury that the use of dba's was illegal, that would

23   be problematic.  I don't see any evidence of that.  I have

24   reviewed the indictment, the manner and means, the further

25   parts of the scheme and artifice that are identified, and it

1    appears to me that they just paint a picture of what steps were

2    taken, what means were utilized to perpetrate the alleged

3    artifice and scheme.

4       I have reviewed the remarks by the prosecutors during the

5    course of any number of proceedings that we have had, and we

6    have had a number as to protective orders and discovery.  I

7    don't see in those comments or remarks by the government

8    evidence that, in fact, the government's theory before the

9    grand jury was that all SPAM is illegal, that using dba's is

10   illegal.  I don't see that.

11      So, at this point, certainly, there is no evidence to

12   support the motion to dismiss, and the only question would be

13   whether or not what is before the Court is sufficient for the

14   Court to conduct an *in camera* inspection of the grand jury

15   proceedings as they relate to instructing the grand jury on the

16   law.

17      So that's my tentative at this time with respect to that,

18   and I am happy to hear from the defense.

19          MR. BIENERT:  Thank you, Your Honor.  Once again,

20   Your Honor, I am Thomas Bienert, counsel for Mohammed Qayyum.

21      Your Honor, we would say there are four different topics

22   that we believe the evidence suggests were conveyed and

23   certainly enough where, at a minimum, grounds may exist to

24   dismiss because of a matter that occurred before the grand jury

25   and that, at a minimum, there should be a review of the grand

1   jury transcripts.

2       And the four are -- of the four -- I am realizing I almost

3   need a little checklist.  Of the four, two of them are before

4   you in this motion, one of them is before you in the void for

5   vagueness, and one of them is one we really just learned about

6   as a result of the government filing of the declaration of its

7   expert, Mr. Curran.

8       And the four issues are the idea that unsolicited email --

9   or, as they call it, SPAM -- in a broad context, is improper or

10  illegal; number two, the idea that using dba's is somehow

11  sinister and illegal -- those are actually -- as Your Honor, I

12  think, noted in your comments, they are before you as part of

13  this motion -- number three, the fact that the cause of action

14  that is actually charged, the 1037(a)(5) cause of action

15  specifically deals with being a registrant, so that's the

16  void-for-vagueness issue as to what is a registrant because we

17  don't have any guidance on that, and that is needed.  And then

18  number four, the new issue is -- and this would affect the wire

19  fraud -- is, in the declaration of John Curran, at paragraph 14

20  of his declaration, he says, and I quote, "When a registry

21  allocates a number to an entity, it is giving that entity the

22  ability to use that number.  No property right is conferred to

23  the recipient."  And that's in bold and italicized.

24      What that introduces, Your Honor -- what he is talking

25  about there is the actual IP address, the Netblocks at the

1    issue of our case, when it's being introduced to a registry

2    like ARIN, A-R-I-N.  What the government is now introducing

3    into the case is whether or not you even have a property

4    right -- their expert says no -- and if there is no property

5    right, you can't have a wire fraud because, of course, a wire

6    fraud is about obtaining something of value, a recognized

7    property right, through false means, et cetera.

8         So, obviously, that is not briefed.  It is something we

9    can and would brief when appropriate.  But I would submit to

10   Your Honor that these four points -- two of which I am going to

11   talk about now because they are directly before you -- each of

12   them is a reason to have concern that the grand jury was

13   misadvised, and that could taint the indictment.

14        So, looking, first of all --

15            THE COURT:  Let me stop you one second.

16        It looks like two of these issues, these matters, relate

17   either in some way to the companion motion to dismiss or void

18   for vagueness, which we will take up on August 20, and then one

19   relates to Mr. Curran's declaration.  And so it seems that at

20   this point, we may be ahead of ourselves with respect to what

21   the law is and as to the significance of paragraph 14 of

22   Mr. Curran's declaration.

23        So, rather than engage and pursue this motion in a

24   piecemeal fashion, does it make sense to table this at this

25   point so that we can have -- I will allow further briefing with

1    respect to this development relating to paragraph 14; the

2    government can respond, and that will then be taken care of?

3    With respect to 1037 and the registrant question, we will be

4    able to decide the void-for-vagueness issue in advance of that,

5    so we don't have the tail wagging the dog, and we can make

6    better use of our time.

7             MR. BIENERT:  Well, I think that's a very prudent and

8    practical observation.  It may make perfect sense.  Because I

9    definitely believe that, cumulatively, the need for looking at

10   the transcripts is stronger than just the two topics that are

11   raised here.

12        I guess the question is, since we are here, does Your

13   Honor want me to -- really, the only thing I was going to

14   address in a little more detail are the dba's and the SPAM

15   aspect.

16            THE COURT:  You can address it if you wish because I

17   don't see it.  I reviewed the indictment, paragraphs 2C, 5, and

18   8, and I don't believe that the government is asserting in its

19   indictment or in its statements here in court that SPAM is

20   illegal.  There's statutes that they are pursuing prosecution

21   on, and they are offering method and means.  They are offering

22   different overt acts.  And overt acts don't necessarily,

23   themselves, have to be illegal.  So I think there's a certain

24   amount of -- if not cherry-picking, selection of certain

25   phrases in order to support this argument.

1      But if you wish to address those first two points further

2  at this point, juncture, since we are all here, that's fine

3  with me.

4           MR. BIENERT:  I will at least throw out our thoughts,

5  Your Honor.

6           THE COURT:  Sure.

7           MR. BIENERT:  Obviously, this is good you are letting

8  us know your concerns.  That is making it easier to focus now

9  or down the line.

10      Well, first of all, look; it is just a simple equation, in

11  my view.  If I am sitting in my house with my kids and I am

12  going to play Monopoly, we have to understand the rules.

13      In something a lot more serious, in a grand jury

14  proceeding, it goes without saying that the grand jury needs to

15  understand the law and the rules in order to be able to assess

16  whether to bring an indictment.

17      This is a different-than-usual situation because we are

18  dealing, number one, with a new statute that is, for all

19  intents and purposes, not tested or certainly minimally tested

20  in very few cases and not on these topics directly.

21      And number two, it is an esoteric area of the law.  This

22  isn't something simple like "Thou shalt not kill," or "rob a

23  bank."  This is complex stuff.

24      And so, I would submit to Your Honor that in the setting,

25  in the atmospherics here, and knowing that the standards just

1  for reviewing of the grand jury, for example, is that grounds

2  could exist to dismiss the indictment based on what happened in

3  front of the grand jury, that the fact that it is a new statute

4  and it is a complex area of law is a factor.

5      Now, let's apply that to what we know.  First and

6  foremost, I just want to point out the practical issue.  I

7  agree with Your Honor.  They didn't say in the indictment, "We

8  misinstructed the jury."  And they certainly don't say that in

9  their pleadings.  But that's not the issue.  The issue is what

10 happened in front of the grand jury?

11             THE COURT:  Which you don't know.

12             MR. BIENERT:  Exactly.  We can only speculate.  And I

13 think -- I have been doing this 33 years.  I have had a handful

14 of cases involving grand jury issues of getting transcripts.

15 Some I have won; some I have lost.  But here is what I can tell

16 you:  I have never had one where we knew what happened in the

17 grand jury until we got the transcripts.

18             THE COURT:  Sometimes you do, I think, because

19 sometimes you have it play out this way.  There's a grand jury

20 that convenes.  The government presents evidence.  Witnesses

21 are called.  Those witnesses testify at trial.  And as a result

22 of testifying at trial, the material that they provided or

23 their testimony at the grand jury becomes Jencks and it is

24 turned over.  And so then defense counsel is able to review the

25 grand jury transcript and see what happened there.  Right?

1          MR. BIENERT:  Agreed.

2          THE COURT:  And then we can then find out what they

3    said at trial, if there's inconsistencies -- even if there's

4    not inconsistencies, to the extent something improper occurred,

5    in terms of relying on triple hearsay -- and I am not sure if

6    that by itself would be grounds for a motion to dismiss.  But

7    some of the New York cases that you reference, from the Second

8    Circuit, have this view about double and triple hearsay and how

9    that affects the proceedings.

10        But you do, on occasion.  And I have looked to see how do

11   these matters even come up, given that, in general, grand jury

12   proceedings are secret?  And that's what I observed.

13        So -- because I was trying to think, is it unfair for me

14   to ask you to point to something more concrete than what you

15   are?  I think the law requires me to have you provide something

16   more concrete.  And at this point, what you have pointed to, I

17   think -- if not -- well, at this point, I am not satisfied.

18          MR. BIENERT:  Well, first of all, I agree with you,

19   that we are required to point to something.  I am not going to

20   say -- use the word "unfair."  I think that's an overly harsh

21   standard that you were using in your explanation.  But

22   certainly, I would submit that we don't have to provide you

23   something that is 100 percent concrete.  I think it is a

24   circumstantial scenario.

25          THE COURT:  Yeah.  And I looked at the circumstances.

1    And at this point, those circumstances, to me, I think, are

2    based on speculation.

3           MR. BIENERT:  Well, I guess, because, obviously, the

4    circumstances are the ones laid out.  I don't have any, you

5    know, death pill that I am going to tell you about now that you

6    are going to go, "Oh, my God."  But I will just comment on

7    this, and I probably do want to caucus with co-counsel so we

8    can talk about whether we should be continuing here or doing it

9    all in one fell swoop later.

10         But I would submit to, Your Honor, this is not a situation

11    where it is a rank fishing expedition.  There are specific

12    things we are pointing to.

13           THE COURT:  And I get that.  And something you said a

14    moment ago, about how this isn't a simple case, and this is

15    perhaps -- if not esoteric, it is a statute that hasn't been

16    addressed much in previous cases.  So, I am not sure if that

17    helps you or hurts you because in one of the cases that you

18    cite, where there was an action by the Court to dismiss an

19    indictment based upon misinstructing the jury, that was

20    actually on something as pedestrian or everyday as constructive

21    possession.  Right?  Which is one of the principles that I

22    think all of us are quite familiar with.  And because the AUSA

23    misinstructed the jury on that, the Court was concerned and,

24    ultimately, for that and other reasons, dismissed.

25         Here, we do have this -- if not untested, we have this

1    statute that we don't have a lot of law on.  And so that's why

2    you filed the motion to dismiss for void for vagueness.  And so

3    the question becomes, given the paucity of prior law, at this

4    point, isn't your remedy best obtained through the motion to

5    dismiss for void for vagueness?

6          MR. BIENERT:  Well, I am not going to say that I

7    think it is my best remedy.  Obviously, based on your

8    tentative, it may be.  But we still believe, Your Honor, that

9    we are articulating specific facts that do show that the

10    butcher's scale has a finger or two on it.

11    And I will say this, you know.  We are not talking about

12    an act that talks about helping the homeless or going out and

13    being Mother Teresa.  We are talking about an act that

14    addresses something that many citizens don't like to begin

15    with, unsolicited emails.

16    Now, it's constitutionally protected.  No doubt about it.

17    The First Amendment applies.  It is a legal business.  But if I

18    just walk into a room and there are 23 grand jurors sitting

19    there, and I just say, "Hey, how many of you guys like

20    unsolicited email, SPAM?"  You know what you are going to get.

21    You are going to get, I don't know, at least 20 hands go, "I

22    hate it."

23    So we are against a backdrop where maybe the legality and

24    what is legal is going against the grain, is not something that

25    people drop out of the womb understanding.  It needs to be

1   explained to them.

2       And, to me, when I go into what I will call a friendly

3   environment -- you know, where they have the pitchforks and the

4   rope ready, potentially, to go after people who send them these

5   emails, and then I potentially talk about SPAM or unsolicited

6   emails in a way that suggests anybody who receives it is a

7   victim -- which at least is the characterization in that one,

8   sort of, contested hearing with Your Honor -- and then I add to

9   it, for good measure, "By the way, they are hiding who they

10  are; they are using dba's; we don't even know who they are" --

11  when, in fact, it's common; it's legal; there's nothing wrong

12  with it -- I would submit that, looking at those particular

13  facts and practical realities, it sure isn't going to take a

14  lot for these jurors to go, "Stamp my name on that.  They are

15  guilty."

16      On the other hand, what should happen is, "But, by the

17  way, ladies and gentlemen of the grand jury, not all of this

18  mail is illegal."

19      And you get some people going, "Hmm, really?"

20      "And by the way, it is not illegal to use a dba when you

21  are doing this type of business.  In fact, it's very common."

22      You would get other grand jurors going, "Hmm, I didn't

23  know that."

24      So, in this background, I do think we need to apply a

25  level of common sense.  I believe that this is a case -- while

1    I agree with the government that there's case law that says
2    they don't necessarily have to give instructions to the grand
3    jury, if they do, they can't be wrong.  And I would submit to
4    Your Honor there are cases where you do have to give
5    instructions, and especially one like this that is maybe
6    counterintuitive at some level, maybe technical.  People don't
7    know.

8        So I do think we have met the standard at least for a
9    review of what instruction did they give?  Did these grand
10   jurors just decide for themselves what was right or wrong?  Did
11   they give them any descriptor of the legality or non-legality
12   of using dba's?  Did they give them any explanation of what
13   carve-outs, if any, there are when SPAM can be legal?  And
14   based on what we have seen and heard, I would submit that there
15   is concern that those things weren't handled properly.

16       And then that gets us into why wouldn't there be a review
17   of the grand jury transcript, I would submit by us, defense
18   counsel, but certainly by Your Honor, and here is why.  Let's
19   go to that part of the equation.  What is the harm that's being
20   protected here?  Most of us here were AUSAs for years.  I
21   understand the so-called secrecy issue, but this case has been
22   indicted for almost a year.  We are well into discovery.  We
23   know who the defendants are.  We know who some of the key
24   witnesses are.  We know kind of/sort of what the issues are.
25       I would submit to Your Honor that the reason to keep the,

1    quote, "secrecy" here is de minimis or nonexistent as to our

2    clients.

3        Now, my understanding -- they may say, "Well, we are still

4    looking at things."  If that is the case -- and I don't know it

5    to be -- I would submit they could redact out -- we would rely

6    on them in good faith to redact things that have names of

7    people who aren't in play here.  Okay.

8        But I would submit to Your Honor that this is not a

9    situation where there's a need for the secrecy.  We shouldn't

10   be sitting around this table wondering what they told the grand

11   jury.  And this is a scenario where we have identified

12   particular facts that suggest that maybe the grand jury thought

13   that the law and the criminality side was broader than it is.

14       And let me make one final point, and then I will sit down,

15   unless Your Honor has questions.

16       I also think we need to look at what is the purpose of the

17   law, as I understand it.  A primary purpose of the CAN-SPAM Act

18   is to make sure that when people are getting legal SPAM,

19   unsolicited emails, they have an ability to say, "No, I don't

20   want this anymore."  And they can actually send something back

21   that goes to a registry that can contact the right people to

22   say, "Hey, take Bienert off your list."

23       Well, there aren't any allegations in this case that that

24   happened.  In fact, our view of the world is all of that was in

25   play.  The dba's were listed.  They had phone numbers of people

1  they could have contacted.  In other words, even if I accept

2  what the government alleges, the whole system of SPAM,

3  unsolicited email advertisement, in this case was met properly.

4  People were receiving proper legal types of advertisements,

5  advertisements for banks, insurance companies, match.com and

6  the like, not illegal types of ads.  If they did not want to

7  receive such ads, they had the information where they could

8  send something back and say, "Take me off that list."  The

9  dba's named were the real ones, so that our client's company

10  could be contacted through its dba's and stop sending SPAM to

11  those people.

12      So, when we mix all this together, I would submit, we have

13  what looks like -- I have a hard time seeing who a victim is

14  here as far as atmospherics.  But the one thing I know is the

15  purpose that is trying to be avoided in the Act that makes a

16  carve-out for when unsolicited emails and advertisements go

17  over the line, that purpose is met, and we have colorable

18  reasons why we have legitimate questions about whether the

19  grand jury was sort of nudged, unintentionally, to bring an

20  indictment when they didn't know the rules.

21      So, for that basis, based on the two points we are

22  covering, I would submit at a minimum, Your Honor, there should

23  be a review of the grand jury transcripts, and, of course,

24  there's more because of the declaration and the vagueness

25  issue.

```
 1              THE COURT:  All right.  Thank you.

 2              MR. BIENERT:  Thank you, Your Honor.

 3              THE COURT:  Let me hear from the government.  Why

 4    shouldn't the Court conduct an in camera review of the grand

 5    jury proceedings?

 6              MS. FEVE:  We are not talking about the motion to

 7    dismiss; we are just talking about a Douglas Oil analysis of

 8    whether or not the Court should conduct an in camera review?

 9         Okay.  So, turning to the Douglas Oil standard, first, it

10    just helps to actually start the argument with what the

11    standard is.  They need to be able to show a potential

12    injustice.  The need for disclosure has to be greater than the

13    need for continued secrecy and only the relevant parts of the

14    transcripts should be disclosed.  That's the three-part test.

15         But Douglas Oil and Ninth Circuit have also made it clear

16    that the party seeking the disclosure bears the evidentiary

17    burden, and also -- and this is the term you see pervasive

18    throughout the case law, is that the defendants have to show a

19    particularized need.  For that, you can look at Walczak, which

20    is from the Ninth Circuit -- it is the 1986 case -- but there

21    is also Dennis v. U.S., 384 U.S. 855, which is a Supreme Court

22    case.  Whenever you read the Ninth Circuit analysis, the

23    touchstone they keep coming back to is that the defendants have

24    to show this particularized need.

25         They also have to show the injustice, though, here, Your
```

1    Honor, and I return to that first prong of the *Douglas Oil*

2    analysis, which is that the defendants have bootstrapped the

3    alleged error that they articulate in support of their motion

4    to dismiss under the *Bank of Nova Scotia* analysis, where they

5    say there was an error.  The error was misadvising the grand

6    jury.

7         To say that because there was an error, they misadvised

8    the grand jury, that is what results in the possible injustice.

9    So we still have to kind of look back and scrutinize what is

10   this error and has the evidentiary burden been met before we

11   even go on to the next prongs about does it outweigh the need

12   for secrecy and how would we handle the transcripts?  And we

13   have to go back to the Court's original point, which is what,

14   other than speculations, is concrete evidence before the Court

15   that there was an error?

16        Here, they have pointed to, now, four factors that they

17   say imply the government misadvised the grand jury.  We can

18   look at those four factors and we can also look at the

19   defendants' actual statements where he says, "We can only

20   speculate" in his argument to Your Honor.

21        It is clear from the Ninth Circuit and the Supreme Court,

22   but *DeTar* is one of the widely cited cases that speculation is

23   insufficient.  In *DeTar*, you may recall the defendant said that

24   an unidentified grand juror had told him that a prior grand

25   jury had voted not to indict him, and that, based on this

1   report, he made a motion to get the grand jury transcripts.

2       The Ninth Circuit said, "We need more than that

3   speculation.  The fact that you are telling us an unnamed grand

4   juror said this is insufficient," and they denied the motion.

5       When you see the progeny of *DeTar*, where they cite it,

6   that is the take-away; that you can't just get up and say, "I

7   think something might have happened," or, "I hope something

8   might have happened," or, "I am even telling you something

9   happened, but I don't have particulars."  You need to show

10  particular facts that an error occurred, and so we have to go

11  back to the original point, which is what is the error.

12      The defendant says that the error is that the government

13  misadvised the grand jury, and the evidence of this is the fact

14  that the wire fraud charges in the indictment alleged overt

15  acts involving dba's.

16      Your Honor, if you want to know how we advised the grand

17  jury on the 1037(a)(5) charge, the place to look is not for the

18  1343 charge; it is the 1037(a)(5) charge.  So I would submit

19  that looking at portion of the indictment that bears on a

20  completely different charge is insufficient evidence and is,

21  frankly, irrelevant as to what the government understood the

22  proper instruction to be for the (a)(5) charge.

23      They also point to the statements made in the discussion

24  of the third-party privacy interests of individuals whose

25  emails, names, and mailing addresses were going to be

1    disclosed -- not just to the defendants, but to people who were

2    uncharged.  And, as the Court knows, under the Crime Victims

3    Rights Act, the government and the courts have an obligation to

4    consider the privacy rights of individuals, individuals who are

5    victims.

6         Now, the CVRA, unlike 1037 and completely independent of

7    it, defines "victims" very broadly.  It is those who are

8    directly or proximately impacted by a crime.  In discussing the

9    privacy rights of those third parties vis-a-vis a protective

10   order, the government referred to them as "victims."  The

11   defendants are now saying that statement is evidence that the

12   government does not understand and misadvised the grand jury.

13        Your Honor, the place to look for how we understand 1037

14   is not in the discussion of the CVRA and how to best comply

15   with our discovery obligations with the defendant and the

16   privacy interests of these third parties.  It is to look at the

17   document; it is also to look at our pleadings; and, finally,

18   there's another place that they can very readily look that they

19   have not brought to the Court's attention, and that's a plea

20   agreement.

21        We entered into a plea agreement with two cooperating

22   defendants.  The Court has seen plenty of plea agreements from

23   the government, so you know one of the things that we do in

24   there is we recite the elements.  In the plea agreement with

25   Daniel Dye, there is a recitation of the elements.  And I will

 1    direct the defendants to the Bates stamp number, because it is

 2    not before the Court.  But I will tell you that in early

 3    December, we produced this plea agreement, which is signed by

 4    the defendant, and it is ADCONION-DISC02-REPORTS-00902.  And

 5    there, we specifically --

 6              THE COURT:  Does the Court have a copy of that?

 7              MS. FEVE:  It does not, but I will gladly submit it

 8    to the Court.

 9         But my point is the defendants had access to these

10    documents.  They could go readily look at this.  So, in terms

11    of what evidence they put before the Court, I think it is

12    important to note they have what they understood, in December

13    of 2018 -- and in fact, the plea agreement was entered in

14    January of 2018, which is before the defendants were indicted.

15              THE COURT:  So, what does that document tell us?

16              MS. FEVE:  What it says is that the government

17    alleged the elements for a violation of 18 U.S.C. 1037(a)(5)

18    and (b)(2)(E), which are the charges now pending before the

19    Court, are, one, the defendant knowingly falsely represented

20    himself to be the registrant or the legitimate

21    successor-in-interest to the registrant of five or more

22    internet protocol addresses.

23         Two, the defendant knew these internet protocol addresses

24    would be used to intentionally initiate transmission of

25    multiple commercial electronic mail messages.

1     Three, as a result of this conduct, defendant obtained

2   anything of value aggregating $5,000 or more during any

3   one-year period.

4     And, fourth, the offense was in or affecting interstate or

5   foreign commerce.

6         THE COURT:  What was the fourth the element, again?

7         MS. FEVE:  The fourth was the offense was in or

8   affecting --

9         THE COURT:  No, the third element regarding $5,000?

10        MS. FEVE:  "As a result of this conduct, defendant

11  obtained anything of value aggregating $5,000 or more during

12  any one-year period."

13    (Counsel confer.)

14        MS. FEVE:  So, that plea agreement, actually, my

15  co-counsel is pointing out, should be before the Court because

16  it is a notice of a related case, and that would be in the case

17  of United States v. Daniel Dye.  But we can get a copy for the

18  Court.

19     And I use this as an example for Your Honor, which is to

20  say that, in this case, the defendants not only have the plea

21  agreement, they not only have the indictment, and they not only

22  have the pleadings that were submitted to the Court, where we

23  emphasize the primacy and centrality of the netblocks in the

24  1037(a)(5) fraud scheme, but they also have all of the grand

25  jury exhibits that were put before the grand jury.

1       So, rather than getting up before you and speculating

2  about some buffoonish grand jury proceeding where there were

3  pitchforks and people hated SPAM and no one bothered to look at

4  the facts and think about the law, what they can actually do is

5  see that there are over 800 pages of grand jury exhibits; there

6  are over 250 exhibits.  And when you look at these exhibits, it

7  is clear that the use and control and misappropriation of

8  netblocks was a central element of the grand jury's

9  investigation, and that is consistent with the indictment,

10  which properly pleads the crime.

11       And so, for them to come before the Court and say, "Your

12  Honor, there was an error, and that error will result in an

13  injustice," they have to show the error.  And I will submit to

14  the Court that, both under the *Bank of Nova Scotia* analysis,

15  but also under the *Douglas Oil* analysis, they have not met that

16  first predicate step of demonstrating an error.

17       And if they cannot show the error, then there is no

18  potential injustice, and we don't even have to go through the

19  following steps.

20            THE COURT:  Thank you.

21       Response?

22            MR. BIENERT:  Couple things.  Number one, on the last

23  point made about the elements that they say is in a plea

24  agreement, that I think was subsequent to the grand jury --

25  number one, the elements of a separate plea agreement don't

1  tell us what they said to the grand jury.  Number two, even if

2  at some point in the grand jury they said the same exact

3  elements, the four that were just mentioned by the government,

4  those statements, in and of themselves, don't explain anything

5  and use a lot of terms that grand jurors weren't going to know

6  what the heck they mean.

7      What is a registry?  When do you have to register?  Where

8  do you have to register?  Who has to register?  Who is an

9  authorized person?

10     There's so many questions there.  Much of that, Your

11 Honor, is part of the vagueness motion.

12     Number three, the fact that someone goes into the grand

13 jury and says what the right thing to say is does not change

14 the fact that if, in addition to that, they say the wrong

15 thing -- like suggesting that merely doing SPAM, or unsolicited

16 emails, is improper; like suggesting that someone is hiding

17 their identity and that's improper -- that's what makes the

18 presentation one that cannot be -- we can't be confident in.

19         THE COURT:  But what supports those two propositions,

20 that the government went before the grand jury and told them

21 that SPAM is illegal, that with respect to the second

22 proposition --

23         MR. BIENERT:  The second one was the dba or hiding.

24         THE COURT:  -- the dba, that just the use of dba's is

25 criminal?  Where is that?

1    MR. BIENERT:  First of all, the dba comment or the

2    "hiding their identity," that's in the indictment.  And I agree

3    with counsel --

4    THE COURT:  But they don't say, per se, it is

5    illegal.

6    MR. BIENERT:  No.  But what they do do -- the

7    government is pointing out paragraph 8 in the wire fraud, where

8    they mention it there.  I agree they mention it there.  But

9    they also mention it in paragraph 2, which are the manner and

10   means of the conspiracy alleged.  And they expressly say that

11   one of the manners and means of the conspiracy is, in essence,

12   hiding their identity through dba's.

13   So, what the indictment on its face indicates, is that

14   they are telling the grand jurors that the hiding of the

15   identity through dba's -- I will just use the term is "done in

16   a nefarious way."  We don't know what they told them, but it

17   certainly tells us that it was expressed in some way, shape, or

18   form that makes it likely that the grand jurors had it

19   suggested to them that this use of dba's in order to accomplish

20   this charged conspiracy is a negative, when, in fact, it is

21   not.

22   THE COURT:  So, in your view, does every manner and

23   means identified in an indictment necessarily have to be

24   criminal?

25   MR. BIENERT:  No.

27

1          THE COURT:  And every overt act, does that have to be

2    criminal?

3          MR. BIENERT:  No.

4          THE COURT:  So, the fact that they make reference to

5    these things that, on their own, may not be criminal, that

6    doesn't, then, support the notion that the government is

7    telling the grand jury that SPAM is illegal and the use of

8    dba's is illegal?

9          MR. BIENERT:  We would say -- first of all, I

10   definitely agree with Your Honor that you can have a manner and

11   means or an overt act that is not criminal.  It is all

12   contextual.  It is all fact specific.  But I don't necessarily

13   agree that because it doesn't have to be illegal that it

14   doesn't support our position.  I would submit that what we see

15   in the words used, in a pretty minimal, de minimis indictment,

16   as well as the comments made when the government is talking to

17   you and us, like the comments made about unsolicited emails and

18   the recipients being, quote, "victims," I would submit that it

19   demonstrates the attitude that the government has towards those

20   concepts.  And I would submit to you that it does demonstrate

21   that, as a matter of practical reality and common sense, I

22   would submit, that when the government is talking about these

23   issues, it talks about them as though they are improper, and

24   therein lies the issue.

25         And that is where I have to think that the atmospherics --

28

 1   new statute, complicated statute, something that many people

 2   aren't enamored of -- it makes the likelihood that the

 3   indictment is brought largely because of those factors much

 4   greater.

 5        And then, what we really have, if we boil it down to the

 6   narrow issue -- if all they did was walk in and say, "You are

 7   here to decide whether or not," and they just mention those

 8   four points -- the single biggest one being about representing

 9   to the registry that you are the person who is authorized --

10   that, right there, is fraught with all kinds of questions.

11   There had to be more said than that.  I think common sense

12   tells us that.  And we know from looking at the indictment

13   there was talk about using dba's.  And we know from the

14   attitude the government has there's talk about people who

15   receive unsolicited emails being "victims."

16        THE COURT:  Isn't the gist or isn't the essence of

17   this statute that the government is proceeding under, these

18   false representations to obtain these IP addresses, these

19   netblocks, that that is where Congress said, "Okay.  People may

20   engage in sending out SPAM, and we are not going to outlaw it";

21   but to the extent that individuals engage in false

22   representations to obtain these registrations or undertake this

23   scheme, that -- just like with wire fraud and mail fraud, that

24   it is these false representations which are then used to

25   advance a scheme which is the nub, the heart of the problem

1    that Congress is trying to remedy?

2         MR. BIENERT:  Certainly, we don't know what the

3    government said to the grand jury about that.  But in terms of

4    the indictment, I would certainly agree with Your Honor that it

5    is obviously a big portion of their case to say, "The gravamen

6    of the impropriety that violates the statute, we, the

7    government, say is falsely claiming to these host companies

8    that you have -- that you are the registered person or have a

9    right to say you are."  That's certainly a significant part of

10   their case.

11        But the fact -- they are not saying it, by the way, the

12   way you phrased it, where they are saying false things to say

13   they got them.  I would submit that's not what it appears to

14   be.  It is what they said to the host to say, "We are allowed

15   to use this."

16        But I will be honest.  Even the colloquy we are having,

17   Your Honor, I would submit, demonstrates this is pretty

18   esoteric stuff.  It is not a straightforward statute.  And the

19   grand jurors, I would submit, would not know what any of these

20   terms mean.

21        I will give you another phrase, for instance, this

22   registry we are talking about.  My understanding is the

23   registry came about in late 1990s, and I don't think there is

24   any dispute that the IP addresses or the netblocks at issue in

25   this case predate the registry.  There's some real interesting

```
 1    issues.  I have a feeling the grand jury wasn't told, "By the
 2    way, the IP addresses we are talking about predate the
 3    registry."  There's some real interesting issues about what do
 4    you do when a statute comes about later and there was some
 5    things that you have from years before and the statute talks
 6    about using a registry, when we don't even know who or what or
 7    why or when you use it; but, certainly, the registry wasn't in
 8    place when the IP netblocks came about.  There's a whole host
 9    of questions.  That's the point.
10            THE COURT:  And you have raised a host of questions
11    in the context of the void for vagueness and now in your
12    attempts to respond to Mr. Curran's declaration.
13        At this point, the mere fact that this is an esoteric
14    statute does not, in my view, provide evidence to warrant
15    turning over the grand jury transcripts.  That fact, by itself,
16    doesn't do it for me.
17            MR. BIENERT:  Well -- and, obviously, I would cite
18    the other facts, but I am not going to beat a dead horse.
19        I am going to take a seat, if that's all right.  I think
20    some of the counsel for other parties have a few comments.
21    Thank you, Your Honor.
22            THE COURT:  Thank you.
23            MR. LINCENBERG:  Thank you, Your Honor.  Gary
24    Lincenberg on behalf of Mr. Pacas.
25        Government counsel indicated that there are places that
```

31

 1   defense can look to try to find evidence to support this
 2   motion, and the Court, in the inquiry, was recognizing there's
 3   a bit of a chicken-and-egg problem here.  How can the defense
 4   make a showing when they don't have the transcript itself?
 5        One of the areas that government counsel pointed to was
 6   they can look at the statements that government counsel has
 7   made in prior hearings.  Well, that was one of the things that
 8   we did, and I think it supports our motion.
 9        If the Court looks to the declaration filed by my partner,
10   Naeun Rim, in support of this motion, and Exhibit A to that
11   declaration is a copy of the transcript of proceedings before
12   this Court on February 14th of 2019.  At what is page 20 of 33,
13   or page 15 of the transcript, at line 13, Ms. Feve states,
14   "Just to provide a record for the Court, in this case, the
15   allegations are that these individuals as well, in the course
16   of their employment for Company A, sent unsolicited commercial
17   email to people who had not consented, registered to, or agreed
18   to be the recipient of this email, which is commonly called
19   SPAM.  So, under these allegations, the people who receive the
20   unsolicited emails were victims."
21        Now, this is what counsel is saying even in the courtroom.
22   You can imagine -- it doesn't take a big leap to suggest,
23   "Well, what might they have said to a grand jury," that is
24   going to be an unsophisticated audience, not focusing on the
25   particulars?  And you can imagine, if they made the same

1    statements to the grand jury, how powerful that could be.

2        Government counsel went on, and I am going to skip two

3    sentences down, to line 25, where they start describing the

4    victims.  Now, again, this is talking to the Court.  They are

5    saying, "These are people who actually took multiple steps to

6    try and get themselves off the email distribution lists that

7    were being distributed and used by Company A to send the SPAM.

8    These were the people who were saying, 'I don't want to

9    communicate with you.'"

10       And then, a couple of lines lower, on page 16 of the

11   transcript, government counsel says, "So, to draw an analogy,

12   if we had a boiler-room scheme, where people were being called

13   by phone and receiving phone calls that they did not want and

14   potentially luring them into doing things that they did not

15   want to do, this would be analogous to us saying" -- and it

16   goes on.  And down below, government counsel again talks about

17   "I am going through this with the Court to help illustrate to

18   the Court how we perceive the victims in this case."

19       So this is -- this is in a courtroom proceeding.

20           THE COURT:  But, as explained by Ms. Feve, that

21   relates to the rights of individuals who are proximally

22   impacted by crimes, and it related to the question of

23   protective orders.

24           MR. LINCENBERG:  Right.  Right.  That was the context

25   of counsel making that argument.

1      But I am pointing out that you can imagine, from a

2   defendant's point of view, when they see that this is how they

3   are describing the victims and --

4            THE COURT:  Do you agree that, under the CVRA, that

5   her description of these individuals as "victims" would be

6   consistent with the CVRA?

7            MR. LINCENBERG:  I don't agree.  I don't believe that

8   these people are victims.  These people would have been

9   receiving unsolicited commercial email whether -- wherever they

10  got the netblocks from.  I think that it -- really, under their

11  theory, the way it's been explained to me, it is more, "Well,

12  they took somebody's netblocks without the authorization," the

13  argument being that the victim is perhaps the person who failed

14  to authorize it.

15     But I am not here to get into a debate right now about who

16  the victims are.  And I am not here to get into a debate about

17  privacy because we are not here today objecting to government

18  counsel's concern about protecting the privacy.  The Court, as

19  I understand it at the moment, is really not weighing, for now,

20  whether to show this to the defense but whether the Court

21  should review this material itself.  So we don't have a privacy

22  concern implicated but our limited remedy that we are seeking

23  at the moment.

24     And, in looking at this, this is clearly an area where the

25  Court has some discretion, and so the question isn't simply

34

1    "Why should I" -- "Why should I give the defense any relief

2    here?"  But it's also, "Why not give relief, when the relief is

3    simply at the moment asking Your Honor to test whether there is

4    any credibility in what the defendant is perceiving may have

5    been going on in the grand jury?"

6         When you couple that with these types of statements, with

7    the commonsense reality that what is going to get the average

8    person jibed up is the idea that somebody is sending them SPAM

9    that they shouldn't be doing.  I don't think the grand jurors

10   are getting too jibed up about whether there's letters of

11   authorization or not.

12        Then you couple this with the point that this is a really

13   new statute, because we don't have a body of instructions and

14   tested case law to help guide the prosecution.  The prosecution

15   could be acting in perfectly good faith in trying to present

16   instructions to the grand jury, which they believe are

17   appropriate, and they may in fact, in part, be guided by some

18   of the folks that they are relying on, in part which are

19   nongovernmental folks -- the Spamhaus and people looking to

20   battle against SPAM -- and get it wrong.  This is an easy area

21   to get it wrong.

22        And if there's confusion about who the victims are, if

23   there's confusion about whether or not these were post-ARIN or

24   pre-ARIN registration and whether that makes a difference, if

25   there's confusion about whether there is a profit interest --

1   and by "confusion," I mean untested; different courts might

2   come to different conclusions on this.

3        And if -- and then, this is against an overlay that this

4   is an area of speech, which courts always give greater

5   deference, whether it is in a forfeiture context and there's a

6   need for additional hearings, or vagueness statutes, which I

7   don't want to veer into right now, but that's always an area

8   where courts allow extra protection.

9        That -- it seems to me that in asking the question, "Why

10  turn it over," it is just as fair to say "Why not?"

11       We are going to be having another hearing on August 20 in

12  connection with vagueness, for example.  Won't it help the

13  Court exercise the Court's reasoning to know whether, for

14  example, the positions that the prosecution is taking in court

15  are potentially inconsistent with what they told the grand

16  jury?

17       And it seems that, given that the Court both has that

18  discretion, and I think this even touches on supervisory

19  authority to allow the Court to decide these issues and control

20  the docket and the courtroom and deal with legal issues now

21  which are going to come up throughout the rest of this trial as

22  late as debates over jury instructions, it seems to me it is in

23  the interest of the Court to, at least in the first instance,

24  review those transcripts now, prior to the August 20th hearing.

25            THE COURT:  All right.  Thank you.

1              MR. LINCENBERG:  Thank you, Your Honor.

2              MS. MUNK:  Good morning, Your Honor.  Jessica Munk on

3    behalf of Jacob Bychak.

4         I can be brief, but I do want to bring to the Court's

5    attention a case that we cite in our opening brief, *united

6    States v. Ho*, a District of Hawaii case, and I believe it is

7    instructive for whether the Court should conduct *in camera*

8    review here.  That specific case, the defendant was charged

9    with witness tampering under 1512, which the law requires a

10   nexus between the obstructive act in that case and the official

11   proceeding.  And while the indictment specifically used that

12   language, in open court, the government suggested to the Court

13   that it need to only prove that the defendant was obstructing

14   an investigation that ultimately resulted in a federal grand

15   jury investigation.  And the Court noted that if the statements

16   by the government intended to convey that a defendant need not

17   contemplate a particular official proceeding, that that runs

18   counter to the law.

19        And the government, at that hearing, when pressed by the

20   Court, started to back away a little bit -- which appears to be

21   the case here, that the government is now saying, "Oh, no.  We

22   are not just saying unsolicited commercial email is illegal" --

23   but what the Court said -- and I think this is really

24   important, Your Honor -- the Court said, "Based on the

25   government's statements," even though they backed off of them

1    in open court, the Court said it "cannot rule out that the

2    government did not improperly instruct the grand jury regarding

3    the nexus requirements."  And the Court said, "Because of that,

4    I have to do an *in camera* review."

5        And I submit, Your Honor, that this is similar.  We have

6    statements by the government in open court saying that

7    unsolicited commercial email essentially is illegal and the

8    recipients of that email are victims.  I mean, we can't rule

9    out --

10          THE COURT:  When did the government say that SPAM is

11   illegal?

12          MS. MUNK:  Your Honor, I am happy to restate this,

13   but this is what I believe this says, is that in this case the

14   allegations are that the individuals, in the course of their

15   employment for Company A, sent unsolicited commercial email to

16   people who had not consented, registered, or agreed to be the

17   recipients of this email, commonly called SPAM, and under these

18   allegations, the people who receive this email, these

19   unsolicited emails, are victims.

20          THE COURT:  All right.  So that's one element that

21   would be established or that the government would attempt to

22   establish at trial.  But, for purposes of that hearing, the

23   government was referencing the CVRA.

24          MS. MUNK:  So, Your Honor, I understand that the

25   government is trying to back away from this and try to explain

1   it --

2          THE COURT:  I don't see it as backing away.  We were

3   talking about a protective order.  That's what we were talking

4   about.  We weren't talking about the elements of the crime.  We

5   were talking about whether or not the Court should exercise its

6   discretion to protect these individuals.  And the government's

7   position was that they should be viewed as victims under the

8   CVRA and the Court should protect their personal information,

9   personal identification information.

10      And so I don't see this notion that the government's been

11  making these assertions that SPAM, on its own, is criminal,

12  case closed.  I don't see that.

13          MS. MUNK:  So, Your Honor, the government didn't say,

14  though, that they are victims because they received

15  "unsolicited commercial email from hijacked netblocks."  They

16  just said "unsolicited commercial email."  We were all quite

17  taken aback by it and very surprised.

18      So, Your Honor, I do think it suggests that the grand jury

19  may have been misinstructed and it warrants *in camera* review.

20      I don't believe, just on the face of that, we can rule out

21  that that occurred.  And the Court, even this morning,

22  recognized if the government had advised the grand jury that

23  SPAM is illegal or unsolicited commercial email is illegal,

24  that would be a problem.  I don't believe those statements --

25  that we can rule that out, Your Honor, and we do submit, at a

1    minimum, the Court should do *in camera* review.

2              THE COURT:  All right.

3              MS. RIM:  Your Honor, I just have a little bit more

4    to add.

5        I think the Court's question as to whether these are

6    victims under the CVRA is exactly the problem we are trying to

7    illustrate.  The way Ms. Feve described the recipients of these

8    emails was as if they were victims of a crime, as if receiving

9    an unsolicited commercial email is, in itself, a crime.  And

10   that's the problem.  It is not a crime to receive an

11   unsolicited commercial email.

12       And if that was what was implied to the Court, and the

13   Court is, at this hearing, questioning whether she was

14   suggesting that these were victims under the CVRA, that's the

15   issue; if those were similar implications made in the grand

16   jury, then of course the grand jury, like the Court, might also

17   think, "Oh, you might be a victim just because you got an

18   unsolicited commercial email."  And there was no reference to a

19   commercial email from a hijacked netblock.  It was people who

20   did not sign up to receive these emails.  That was the

21   characterization of why these recipients were potential

22   victims.

23       I also want to point out that, with the protective

24   order -- the protective order was not limited to IP addresses

25   that are alleged in the indictment, so these are emails that

1    were sent from IP addresses that are not even implicated to be

2    hijacked or taken.

3        So the idea -- I guess the larger point is that I believe

4    what the government was describing, the audience that they were

5    describing are people who did not sign up for emails and they

6    are getting unwanted emails.  And if the position is that that

7    is a crime victim, then I just want to be clear that we

8    unequivocally disagree with that, and we think that would be a

9    reversible error.

10         THE COURT:  Thank you.  Anyone else?

11         MR. JONES:  Your Honor, I also want to say a couple

12    of things, if I might.  I don't want to belabor the point.  I

13    think the Court is about ready to shut it down anyway.

14        Randy Jones on behalf of Mr. Manoogian.

15        I was just looking at the indictment, Your Honor, and we

16    are talking about unsolicited emails.  But even in the manner

17    and means, it talks about commercial email and puts in quotes

18    "SPAM."  So I think that kind of puts up some of the problem

19    that we are having here, is what exactly did the prosecutor say

20    to the grand jurors when they instructed them about what this

21    case was all about?  And if they -- as has already been pointed

22    out by my colleagues, if they in any way implied or stated

23    explicitly that the fact that these people received unsolicited

24    commercial email and therefore that was illegal, then I think

25    there's a problem, as the Court has already pointed out.

1       So, in my point, I just wanted to say I think that this

2   is -- what we are here for is for the pursuit of justice,

3   trying to find out what the right answer is, what happened, and

4   I think this is the proper time now for the Court to take a

5   look at the transcripts to see, *in camera*, what instructions

6   were given, what type of questions were asked by the grand

7   jury, to see if they were having the same sort of problems with

8   this indictment and the language and the terms that were used

9   that we are fighting about now here in this court.

10      We ask that you do an *in camera* review, Your Honor.

11      Thank you.

12          THE COURT:  I think it would be wise, to avoid any

13  issues down the line, for the Court to engage in an *in camera*

14  review.

15      As the parties have noted, this is a case that involves an

16  esoteric statute.  There are a number of issues that would be

17  ones of first impression.  Certainly, in the event that the

18  defendants are convicted, this case will go to the

19  Ninth Circuit; there will be a whole series of appellate issues

20  relating to a whole array and universe of matters.

21      So, given that, it seems that the wisest course is for the

22  Court to engage in an *in camera* review so as to assure itself

23  that this notion that the government would have told the jury

24  that SPAM is illegal, that using a dba is illegal, is not

25  present in the grand jury.  And if it is present, as I said

1    before, that would be a problem.

2        So, I don't see that an *in camera* review would compromise

3    the government's investigation, would otherwise not give way to

4    the presumption that grand jury proceedings are secret.  And I

5    think it would fill out the record on appeal, if that occurs,

6    or if there is an appeal, so that the Ninth Circuit can see the

7    Court took its obligation seriously, that it conducted all

8    necessary inquiries that are appropriate.

9        MS. FEVE:  Can I ask, for clarification, is the Court

10    seeking to review the transcript of the proceeding where the

11    grand jury returned an indictment?  Or are you seeking to

12    review every witness who ever appeared before the grand jury?

13        THE COURT:  I think it would be what was requested,

14    which is grand jury instructions and government argument and

15    colloquy with the grand jury regarding SPAM, commercial emails,

16    and the use of dba's and multiple domain names.

17        MS. FEVE:  Because the legal standard is, in addition

18    to having to show an error, that there is a particularized

19    need.  This is, as you know, an ongoing investigation.  So we

20    would be looking at instructions up to the point at which an

21    indictment was returned in this case?

22        THE COURT:  Yes.

23        MS. FEVE:  And with regard to an indictment being

24    returned, it would be, presumably, where the grand jury

25    returned the indictment, but also if there was any other

1  proceeding at which any legal instruction was given to any

2  other panel?

3      There were also multiple panels for this case, Your Honor.

4  This is part of why we tried to emphasize the particularized

5  need.

6          THE COURT:  I would think, at the end of the day, it

7  would need to be the grand jury that returned the indictment.

8          MS. FEVE:  So, my understanding of the Court's

9  marching orders are we should request transcripts of the

10 proceeding before the grand jury where the indictment was

11 returned, and then we should review to see if there are any

12 other proceedings before the panel that returned the indictment

13 where a legal instruction was given?

14         THE COURT:  Instructions, government's argument and

15 colloquy with the grand jury regarding SPAM.

16         MS. FEVE:  What do you mean by "arguments" or

17 "colloquy"?  Because, typically, we will give instruction and

18 call witnesses, but there is no colloquy.

19         THE COURT:  To the extent a grand juror would have

20 asked, "What is this registry?"  Or "What do you mean by

21 fraudulent" --

22         MS. FEVE:  Requests for legal guidance from the grand

23 jury?  Questions and answers from the grand jurors with regard

24 to the AUSA's function as a source of legal information?

25         THE COURT:  Yes.  Yes.

```
 1          MS. FEVE:  Okay.
 2          MR. BIENERT:  I have couple of comments on that, Your
 3    Honor.
 4      Number one -- and, again, I don't know what they did, but
 5    when I was running grand juries, when you have one grand jury
 6    and then it expires and you go to another grand jury, there is
 7    usually some reading to the new grand jury of either a summary
 8    or some of the transcripts that were presented to the old grand
 9    jury, so I would ask if they did anything like that -- I agree
10    with Your Honor; where I think you are going is what matters is
11    the grand jury that returned the indictment.  I agree with
12    that.
13      But then, working backwards from that, number one, if
14    there were things from an old grand jury that were presented to
15    the new grand jury that fall into any of the categories you are
16    prescribing, I would submit that should be included; and number
17    two -- and this is extremely important -- any law enforcement
18    or expert or legal witnesses.  Because, again, I am only going
19    on my own experience, but when I was instructing and running
20    grand juries, typically, in an esoteric area of the law, I
21    would call an FBI agent, an IRS agent, a computer specialist,
22    someone like that, who would walk the grand jurors through what
23    all these terms are, what is the CAN-SPAM Act, et cetera.
24      Maybe, to state it in the negative, I would submit that we
25    should get -- not "we" -- Your Honor should be given anything
```

1   and everything that was presented to the indicting grand jury,

2   except if they have a pure fact witness, just a citizen witness

3   who just comes in and says, "I saw; I heard" -- I don't know

4   that that needs to be seen.  But typically, in my experience,

5   the expertise submissions to the grand jurors don't come from

6   the AUSAs; they come from an FBI agent or computer specialist,

7   someone who explains to them how all this works.

8           MS. FEVE:  Your Honor, this is not what *Douglas Oil's*

9   legal standard sets before the Court for *in camera* review.

10  This is not a particularized need.  This is not a showing of

11  manifest injustice.  I appreciate the Court's very practical

12  judicial economy perspective, which is "Let's make this

13  easier."  And I understand it was an appealing argument when

14  counsel got up and said, "Why not?"  But that isn't the

15  standard.  And I think one of the issues we need to be mindful

16  of, as we go down this practical resolution, is that the reason

17  the legal standard is what it is and it has this predicate

18  showing that they actually did have an affirmative obligation

19  to show evidence, to make an argument beyond "Why not look at

20  the transcripts?"

21      We understand the Court's position, and we will submit to

22  it.  But I think that what you are seeing right now is the

23  evidence of the danger with this approach, which is now they

24  want -- "By the way, now we think other witnesses said things,"

25  absent any evidence to the contrary.

1          THE COURT:  I understand.  And at this point, what

2    started as a concern of what the government's position was in

3    their presentation to the grand jury now is expanding to what

4    did each of the witnesses say and how could that somehow or

5    another be tied in with some misinstruction of the law.

6        I am not going to go that far.  I am not going to go that

7    far.  At this point, out of an abundance of caution, I have

8    made a ruling with respect to the *in camera* inspection, and

9    beyond that, the Court finds that there's nothing but rank

10   speculation to support a further inspection.  So that will be

11   the order.  All right?

12       Yes.

13          MS. BERNSTEIN:  Your Honor, not to be left out of the

14   hearing, I did want to touch on one other issue, if that's okay

15   at this time.

16          THE COURT:  Okay.

17          MS. BERNSTEIN:  Just one other matter that I wanted

18   to flag and raise for the Court is the area of attorney

19   proffers.  So, the government -- this was raised in our

20   discovery motion, which I think has been continued in some

21   capacity to today.  That was at Document 36.

22       The government has two cooperating witnesses in this case,

23   and I believe it is okay to put their names on the record.

24   Daniel Dye is one -- he did not testify before the grand jury;

25   that's whose plea agreement they were referencing earlier --

1   and Vincent Tarney, who did testify before the grand jury for

2   134 pages, which we understand from a letter from Ms. Pierson.

3   And Mr. Tarney's testimony is presumably one of the bases for

4   the charges against our clients.

5       We have no 302s.  We have no notes.  We have no interviews

6   with Vincent Tarney.  We asked the government for this

7   information and they explicitly told us that there have been no

8   government interviews of Mr. Tarney; not that there are no

9   notes of interviews with Mr. Tarney, but that there are no

10  interviews of Mr. Tarney.

11      We don't think that the government signed Mr. Tarney up as

12  a cooperator and put him into the grand jury for 134 pages

13  without knowing what he would say.  And we believe that

14  attorney proffers were done.  We don't know how many were done.

15  We don't know how long those were for.

16      We did request these attorney proffers in our discovery

17  motion, and the government's response was that it indicated it

18  would disclose the constitutionally required information.  We

19  have not received anything.  We have not received attorney

20  proffers despite following up.

21      And we want to just be clear and have on the record that

22  if the government's position is that these are not

23  discoverable, we do want that on the record so that we can

24  preserve that for appeal.

25      We do believe that we are entitled to Tarney's agent's

1    adoptive admissions and statements under Rule 16, because his

2    statements are about our clients' actions and knowledge, and

3    that's material to preparing our defense.  Under *Brady* and

4    *Giglio*, his statements go directly to his credibility as a

5    witness and to possible areas of impeachment.  And under

6    Jencks, there are explicit cases –– I can reference the Court

7    to one –– that the government doesn't get to shield attorney

8    proffer statements on behalf of a cooperating witness from

9    Jencks just by structuring it the way they seem to have as an

10   end-run around the rules.

11        One case to look at for that proposition, Your Honor, is

12   *U.S. v. Sudikoff*.  It is 36 F.Supp.2d 1196.  It is a Central

13   District case, a decision by Judge Pregerson from 1999.  It

14   never went up to the Ninth, and it stands.

15        Finally, there's some serious constitutional issues and

16   due process and fairness concerns that are implicated here.

17   The government can't just loophole the Constitution.  Tarney is

18   one of their main witnesses, and we are left here, almost a

19   year into the case, without a clue as to what he plans to say.

20   We have no interviews and no statements.

21            THE COURT:  You have his grand jury testimony?

22            MS. BERNSTEIN:  We do not have his grand jury

23   testimony.

24        So it severely handicaps our ability to prepare this

25   defense and to develop impeachment, and that implicates our due

1    process rights.  So it further underscores the need -- this is

2    not what our grand jury motion was about, but it does further

3    underscore the need for the grand jury testimony of Vincent

4    Tarney well in advance of trial so that we are able to prepare

5    a defense.

6            THE COURT:  All right.  Thank you.

7            MS. BERNSTEIN:  Thank you, Your Honor.

8            THE COURT:  Response?

9            MS. FEVE:  Your Honor, Mr. Tarney was represented by

10   now Judge Berg when he came before the grand jury.  Counsel is

11   free to follow up with Mr. Berg.  Mr. Berg did not make an

12   attorney proffer for Mr. Tarney before appearing before the

13   grand jury.

14           THE COURT:  Does that address your concern --

15           MS. FEVE:  And we understand our Jencks obligations.

16           THE COURT:  I am sorry?

17           MS. FEVE:  We do understand our Jencks obligations.

18           THE COURT:  So you are saying -- is it Mr. Turney?

19           MS. FEVE:  Tarney, T-A-R-N-E-Y.

20           THE COURT:  As to Mr. Tarney, he did not, through now

21   Magistrate Judge Berg, make an attorney proffer?

22           MS. FEVE:  Correct.

23           THE COURT:  So that was one question that you wanted

24   me to pose directly?

25           MS. BERNSTEIN:  Yes.  Thank you, Your Honor.

```
 1        I believe that he has now -- since Mr. Berg took the
 2   bench, I believe he is now represented by Jason Conforti.
 3        Our request for attorney proffers extends beyond simply
 4   whatever preparation apparently was not done before a witness
 5   was put into the grand jury for 134 pages and signed up as a
 6   cooperator, given an executed cooperation addendum and offered
 7   a misdemeanor plea bargain.
 8        So we are just concerned with the technicalities and the
 9   way the government might be trying to parse this.
10        It's somewhat unfathomable that the government is going to
11   sign someone up and put them in for 134 pages totally blind.
12            THE COURT:  It is somewhat surprising that a witness
13   such as Mr. Tarney would not have been interviewed before a
14   grand jury appearance.
15        But that's what you are representing?
16            MS. FEVE:  I understand, Your Honor.  I understand
17   that.  That is what happened.  I have not received any
18   communication with substantive -- I don't remember hearing from
19   Mr. Conforti.  I didn't realize he was representing Mr. Tarney,
20   but it could be that he's communicated with other members of my
21   office, but I haven't seen any sort of substantive proffer from
22   Mr. Conforti.  We will be mindful and look and check to see.
23        I understand it is an unconventional situation.  Those are
24   what the facts in this case are.
25            THE COURT:  So, when he testified, was it after or
```

1  before his plea?

2          MS. FEVE:  It was before.

3      We can tell the Court what happens at sidebar and

4  *in camera*, but we can't do that here because it would violate

5  Rule 16 and, frankly, they are not entitled to that information

6  right now, and there's no written materials.  They will get

7  their Jencks transcript.

8          THE COURT:  So, the government is prepared to confirm

9  here on the record that there were no interviews that produced

10  a 302.  There were no interviews that produced notes --

11          MS. FEVE:  There were, I believe -- and I think that

12  this is in a 302, so I will go check.  I believe that Agent

13  Chabalko served a subpoena on Vincent Tarney directly prior to

14  him appearing before the grand jury.  And it may be that

15  Vincent Tarney asked or communicated directly back to the agent

16  by email regarding the subpoena.  It was not a long

17  conversation, but we will definitely check.

18      I am not saying there was never any communication.  The

19  first communication was when the grand jury subpoena was served

20  on Mr. Tarney.  He was requested to both testify and produce

21  documents.  We will check to see what, if any, response he

22  provided to Agent Chabalko.

23          THE COURT:  Please do so.  And then, if there is

24  anything in the way of discoverable information, you will be

25  directed to turn that over at the appropriate time, and at

1    least, at a minimum, inform defense counsel of the existence of

2    it, in the event that you would not be prepared to immediately

3    produce it.

4        Is there anything else that you believe is necessary at

5    this time to inquire into?

6            MS. BERNSTEIN:  Just on that point, Your Honor, the

7    government's investigation into this case preceding the

8    indictment spanned many years.  I think it was at least five

9    years that the government had been interviewing some of the

10   periphery witnesses, speaking with our clients.  So I don't

11   want to narrowly look at the time frame of once the subpoena

12   was served and immediately responded to.  Our broad request --

13   we have no statements whatsoever from this witness.  None.  We

14   have no notes, no interviews.  We have no statements.

15   Obviously, the grand jury exhibit -- the grand jury transcripts

16   haven't been provided to us.

17       So our request, which I believe we are owed under Jencks,

18   *Brady, Giglio* and Rule 16, is for any communications and not to

19   try and circumvent this with some loophole of, you know, using

20   an agent of the witness to avoid having to, you know, in the

21   government's view, create witness statements.

22       While we appreciate the Court's mandate and the

23   government's position that they will follow up, I just want to

24   clarify that this does span a broader period of time than

25   simply looking at what happened when he was served with a

```
 1    subpoena and likely communicating directly with the FBI agent.
 2         THE COURT:  All right.  And so, I will ask the
 3    government to inquire fully with respect to how it was that
 4    Mr. Tarney came to testify, cooperate, so we don't have a
 5    situation arise at a later point in time that, in preparing for
 6    trial, then it turns out that there was some communication that
 7    perhaps wasn't memorialized but which gave rise to an agent to
 8    suggest to the government that the witness be called, without
 9    any preparation.
10         I think, at this point, given that this is, as pointed
11    out, unconventional, there is a need to just nail down and find
12    out exactly what transpired so we can avoid this as a potential
13    issue down the line.
14         All right?
15         Ms. Bernstein?
16         MS. BERNSTEIN:  Thank you, Your Honor.
17         The only final thing I wanted to raise with the Court is
18    the continuance of the void-for-vagueness motion.  The
19    August 20 date that we have been referencing was the deadline
20    by which we intend to submit a counter declaration to
21    Mr. Curran's declaration, not the date that was set for
22    hearing, so we did want to just clarify that and figure out a
23    date to set for hearing.  I think, maybe with this many
24    schedules, it might be best if we -- we wanted to ask for that
25    to be an evidentiary hearing, so maybe it is best to figure out
```

54

 1    a different date to get that set once this hearing closes so we

 2    are not bothering the Court with our calendars.  That's it.

 3          And then, I know Mr. Lincenberg has one final point.

 4          Thank you, Your Honor.

 5               MR. LINCENBERG:  Before we moved off to talking about

 6    dates, Your Honor, on this last point about Mr. Tarney, our

 7    concern is not simply getting attorney proffers, which was the

 8    main point we were arguing and counsel responded, but it's also

 9    the grand jury transcripts.

10          And I am cognizant -- I hear the government stating, "We

11    recognize our Jencks Act obligations," with the idea that a

12    Court is going to feel restricted to force them to turn it over

13    earlier.  But this particular grand jury transcript is central

14    to our planning.  We don't want to go down the road of starting

15    to look for experts and engaging experts if we don't know what

16    the central witness in this case is going to say.  There's a

17    big time and expense, and there's a bit of a chicken-and-egg

18    situation here.

19          So, I know we are not talking about trial dates yet, but

20    it is severely hampering the defense's ability to prepare for

21    trial.  And in those circumstances, I believe that the Court

22    can exercise supervisory authority in this regard to press the

23    government to provide a date and, frankly, press the

24    government, if they are going to call this individual as a

25    witness, to provide that grand jury transcript to us now.

```
 1         Because, otherwise, it is just going to keep backing
 2   things up down the road, and it is unfair to the defense to be
 3   able to -- to do that.
 4             THE COURT:  Ms. Feve, do you have a timeline or time
 5   frame in mind with respect to turning over Mr. Tarney's grand
 6   jury transcripts?
 7         I guess, first of all, do you anticipate calling him as a
 8   witness at trial?
 9             MS. FEVE:  Your Honor, we do anticipate calling him,
10   but because we don't even have a trial date yet --
11             THE COURT:  Do you anticipate calling him as a
12   witness?
13             MS. FEVE:  We do.
14             THE COURT:  Do you agree that he is a central
15   witness?
16             MS. FEVE:  I haven't thought of him that way, but I
17   am not going to dispute that if they want to.
18         What I would say is we have been waiting for a trial date,
19   and once we had the trial date, we were going to calendar out
20   our Jencks obligations.  And we thought before we had -- that
21   there was so much motion practice before the Court, that we
22   were focusing on that.
23         I would say once we have a trial date, we are happy to
24   discuss with the Court what the Court thinks is a reasonable
25   and fair lead time to produce our Jencks obligations.
```

```
 1          THE COURT:  I think that is fair and appropriate.
 2   Once we get a trial date, we can talk about the disclosure of
 3   the grand jury transcript.
 4          MR. LINCENBERG:  Again, I ask -- I raise the question
 5   of why wait for the trial date?  I don't believe that is fair
 6   because if this is important in our preparation and -- we don't
 7   want to be spinning our wheels.  If Mr. Tarney is saying
 8   something, if he is saying X and our defense is going to have
 9   to prepare for X versus Y, we would like to be making use of
10   our preparation.  We think he is a critical witness here.  And
11   so, putting off -- I mean, counsel's response might mean that
12   for another ten months we don't get his statement; whereas, if
13   we get it now, we can focus on it and prepare for it.  It's
14   probably going to raise motions and the like.  And whatever
15   date is set down the road, it is going to result in another
16   substantial continuance.  We would ask the Court to press the
17   government for an earlier date.
18          THE COURT:  I am not prepared to do that.  Jencks
19   provides that it is turned over after a witness testifies.
20   That is not going to happen here.  It did happen to me in one
21   case when I was a defense lawyer.  I didn't appreciate it, and
22   certainly nothing of that kind is going to happen here.
23      I think the transcript should be provided in advance.  And
24   as far as how far in advance, we can take that up at the time
25   that we select the trial date.
```

1        Given, at this point, we are talking about a hearing in

2   probably September or October, and thereafter who knows whether

3   or not we will be in a position to have a trial date, I don't

4   expect that we are going to have a trial until next year, some

5   point -- hopefully next year -- and I expect that we will

6   probably set a trial date that would be about two or three

7   months out, if not more.

8        But with that lead time, it appears to me that the defense

9   will have sufficient time to obtain, review, respond to the

10  testimony of Mr. Tarney.

11            MR. LINCENBERG:  Your Honor, that's fair enough.  I

12  understand why the Court is coming to that conclusion.

13       I would just ask the Court to keep in mind and be

14  sensitive to some of the concerns that I may now be raising

15  when we venture to get this, to say, "Well, I wish we had known

16  that because we could have been more efficient in our defense

17  preparation; now we need some time to go out and search this."

18  But I get it.

19            THE COURT:  I am trying to balance these various

20  considerations and what the Jencks Act actually says and, at

21  the same time, listening to what you just said, that once you

22  obtain the transcript, you anticipate some sort of additional

23  motion.  I am not sure what that would be, and I am not looking

24  to extend these pretrial proceedings without a good reason.

25  And I have yet to see a motion that was premised upon Jencks

1   information being turned over, at least pretrial.

2        And I do recognize what I said earlier, that, on occasion,

3   where there is Jencks information provided, that ends up being

4   the basis for a motion.  So I guess, given that, there's also a

5   possibility that something that the witness would have said

6   will lead the defense to believe that the jury was misled or

7   something to that effect.

8        But, at this point, I am satisfied that we can order the

9   government to provide the transcript at the time that we select

10  a date for trial.

11            MR. LINCENBERG:  Fair enough.

12       Can we ask at least, from government counsel, once we do

13  set a date, will we be getting this grand jury testimony 90

14  days before trial?  What is the government's thinking?  So

15  that --

16            THE COURT:  I would suggest that you all first meet

17  and confer, and then, to the extent that you can come to some

18  sort of accord, then we can abide by that, we can follow that,

19  and we won't need to take up any time here in court.

20       And then, if you can't and/or if the government's offer is

21  way off of what the defense believes is reasonable, then you

22  can present that to me, and I will be the one who decides.

23            MR. LINCENBERG:  Okay.  Thank you, Your Honor.

24            THE COURT:  Anything else from the government?

25            MR. CIAFFA:  Yes, Your Honor.  Just one thing,

1    please.

2         The government filed a motion for reciprocal discovery,

3    and I don't recall the Court ever specifically granting that,

4    and we would ask that the Court grant that at this time.

5         We have received nothing from the defense.  Maybe they

6    have nothing at this time, but we would like the Court to at

7    least issue the order based on the rule that requires the Court

8    to do so after the government has produced its discovery.

9         And just for the record, in this case, the government is

10   continuing to produce reams of discovery, and I can say

11   literally tens of thousands of documents, the majority of which

12   have come from the defendants' employer, Company A.

13        In addition, the government has produced and will continue

14   to produce almost all of the FBI 302s in this case, which

15   summarize the interviews that the FBI had with its witnesses,

16   even though the government is not required to do so since they

17   have not been specifically adopted by the witnesses;

18   nevertheless, the government is producing those as well.

19        Again -- so the government is taking its discovery

20   obligations quite seriously and providing much more than is

21   technically required under the rules, and given that, we would

22   ask that the Court specifically grant the government's motion.

23             THE COURT:  Response?

24             MS. BERNSTEIN:  Your Honor, the government's motion

25   is at Document 48, and it is only two pages.  And we are well

 1    aware of our obligations and intend to fully comply with them

 2    under both Rule 16 and Rule 26.2.

 3            THE COURT:  All right.  Well, the defense is placed

 4    on notice at this point that it has an obligation to provide

 5    reciprocal discovery as required.

 6        And then, with respect to a hearing date, I will take you

 7    up on your offer, which is for you all to meet and confer with

 8    my clerk and identify a date that works for everyone.  And then

 9    after that date is selected, I will direct that the parties

10    submit an acknowledgment of that hearing date.

11            MR. CIAFFA:  We would be happy to do so.

12        Your Honor, one thing for the Court, does the Court

13    anticipate an evidentiary hearing?

14        And the point is this:  The declarant in the government's

15    response was the CEO of the American Registry of Internet

16    Numbers.  He works in Virginia, on the East Coast, and

17    consequently, the government did not intend to fly this person

18    out for an evidentiary hearing if it is simply going to be

19    based on legal argument and the record.

20        We can possibly have him available by phone, which we

21    intended to do so for today; but we would like the Court to

22    basically rule that an evidentiary hearing, with witness

23    testimony, sworn, live, is not necessary.

24            THE COURT:  Well, ultimately, for purposes of having

25    an evidentiary hearing, we would need to have some matter of

1  consequence that is in dispute and for which cross-examination

2  or examination of that witness would help the Court decide

3  which side to believe.  So I don't know if we have that record

4  yet.

5      And so, at this point, I am not signing up for an

6  evidentiary hearing.  I would need for the parties to

7  demonstrate that there is this issue that is in dispute for

8  which an evidentiary hearing would assist the Court in

9  addressing the issues.

10         MS. BERNSTEIN:  And, Your Honor, I think that what

11  will end up putting Mr. Curran's currently unopposed

12  declaration into immediate and confronting factual disputes is

13  the counter declaration we intend to file with the Court by

14  August 20th.  His declaration was lengthy and raised a number

15  of issues for the very first time, months after the briefing on

16  this matter closed, that we do feel compelled to address.

17      I think to the extent that the Court is going to be taking

18  his declaration into account in assessing whether or not these

19  terms were vague -- and his declaration is trying to explain

20  the background and the history and the use of the terms, so I

21  would imagine that the Court would be analyzing that -- we can

22  represent now his declaration will be contested in the filing

23  we intend to make by August 20, so those facts will be in

24  dispute.

25      So we believe that if that's going to be relevant to the

1   Court's decision, which it seems it will be and we believe

2   that's why the government put it before the Court, because they

3   also believe it's relevant to the motion, to the Court's

4   decision, that there does, in fact, need to be an evidentiary

5   hearing, where Mr. Curran is present for testimony.

6           THE COURT:  And I guess there's two things that we

7   could have here.  One is just competing experts that refuse to

8   agree on hardly anything, and to the extent that there are

9   competing declarations, the Court sizes them up and gives them

10  the weight that it believes is warranted by what they have to

11  say.

12      And then, the second is, to the extent that Mr. Curran

13  makes a point that the defense believes is totally unsupported

14  by any facts, that they would want the opportunity to examine

15  Mr. Curran with respect to that proposition to show that it's

16  due and owed no weight at all because it's so weak and so

17  untethered to any factual basis.

18      Let me do this.  I will direct the parties to identify why

19  we need an evidentiary hearing, and based upon what you allege

20  are the deficiencies in Mr. Curran's declaration and what

21  further examination would do in pointing out those

22  deficiencies, and then the government can respond as to whether

23  or not they believe that we have a good-faith dispute that

24  requires testimony, or whether or not we just have two polar

25  opposite views on things that the Court can decide without a

```
 1   hearing.
 2        So, at this point, then, is it August 20th that the
 3   defense is required to provide the counter declaration?
 4             MS. BERNSTEIN:  Yes, Your Honor.
 5             THE COURT:  So, then, I will direct that on
 6   August 20, at the same time, you submit a request for an
 7   evidentiary hearing and state your reasons why you believe you
 8   are entitled to an evidentiary hearing.
 9        And then, with respect to that request, I will direct the
10   government to file a response by August 27.
11        And then I will issue a ruling at least a week or two
12   before the hearing date that you all end up selecting.
13        And so, when we're coming up with a date and time, we will
14   make sure that it is at a time that will permit us to have an
15   evidentiary hearing, to the extent that's what we end up doing.
16             MS. BERNSTEIN:  Thank you, Your Honor.
17             THE COURT:  Anything else?
18             MS. BERNSTEIN:  No, Your Honor.
19             ALL:  Thank you, Your Honor.
20             THE COURT:  That will be all.  Thank you.
21        (End of proceedings at 11:06 a.m.)
22                            -o0o-
23
24
25
```

1              C—E—R—T—I—F—I—C—A—T—I—O—N

2

3              I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11             DATED:  August 21, 2019, at San Diego, California.

12

13                       /s/  Chari L. Bowery

14                       _____
                         Chari L. Bowery
15                       CSR No. 9944, RPR, CRR

16

17

18

19

20

21

22

23

24

25