1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,      .
                                   .
5              Plaintiff,          . No. 18-cr-4683-GPC
                                   .
6              v.                  . October 24, 2019
                                   . 2:30 p.m.
7   JACOB BYCHAK,                  .
    MARK MANOOGIAN,                .
8   MOHAMMED ABDUL QAYYUM,         .
    PETR PACAS,                    .
9                                  .
               Defendants.         . San Diego, California
10  . . . . . . . . . . . . . . . .

11          REDACTED TRANSCRIPT OF MOTION HEARING

12       BEFORE THE HONORABLE GONZALO P. CURIEL
                UNITED STATES DISTRICT JUDGE

13

14

15  APPEARANCES:

16  For the Plaintiff:      United States Attorney's Office
                            By: ROBERT CIAFFA, ESQ.
17                              MELANIE K. PIERSON, ESQ.
                            880 Front Street, Room 6293
18                          San Diego, California 92101

19  For the Defendant       Law Office of David W. Wiechert
    JACOB BYCHAK:           By: JESSICA C. MUNK, ESQ.
20                              DAVID W. WIECHERT, ESQ.
                            115 Avenida Miramar
21                          San Clemente, California 92672

22  For the Defendant       Mintz Levin
    MARK MANOOGIAN:         By:  RANDY K. JONES, ESQ.
23                          3580 Carmel Mountain Road, Suite 300
                            San Diego, California 92130

24

25  ///

```
1    APPEARANCES (CONTINUED):

2


3    For the Defendant        Bienert, Miller & Katzman, P.L.C.
     MOHAMMED ABDUL           By:  WHITNEY Z. BERNSTEIN, ESQ.
4    QAYYUM:                       JAMES RIDDET, ESQ.
                              903 Calle Amanecer, Suite 350
5                             San Clemente, California 92673

6
     For the Defendant        Bird Marella Boxer Wolpert
7    PETR PACAS:                Nessim Drooks & Lincenberg
                              By:  NAEUN RIM, ESQ.
8                             1875 Century Park East
                              Suite 2300
9                             Los Angeles, California 90067

10

11

12

13

14

15

16

17

18

19

20

21   Court Reporter:          Chari L. Bowery, RPR, CRR
                              USDC Clerk's Office
22                            333 West Broadway, Suite 420
                              San Diego, California 92101
23                            chari_bowery@casd.uscourts.gov

24   Reported by Stenotype, Transcribed by Computer

25
```

```
 1              SAN DIEGO, CALIFORNIA; OCTOBER 24, 2019; 2:30 P.M.

 2                                  -o0o-

 3              THE CLERK:  Calling Item Number 2 on the calendar,

 4   Case Number 18-cr-4683, U.S.A. v. Defendant 1, Jacob Bychak.

 5   If I could have the attorney's appearance, please.

 6              MS. MUNK:  Good afternoon, Your Honor.  Jessica Munk

 7   and David Wiechert on behalf of Jacob Bychak, who is present in

 8   court.

 9              MS. RIM:  Good afternoon, Your Honor.  Naeun Rim for

10   Petr Pacas, who is present in court.

11              MR. JONES:  Good afternoon, Your Honor.  Randy Jones,

12   on behalf of Mark Manoogian, who is present in court.

13              MS. BERNSTEIN:  Good afternoon, Your Honor.

14              MR. RIDDET:  Good afternoon, Your Honor.  James

15   Riddet and Whitney Bernstein, both attorneys representing

16   Mohammed Qayyum, who is present in court.

17              THE COURT:  Good afternoon.

18              MR. CIAFFA:  Robert Ciaffa and Melanie Pierson on

19   behalf of the United States.

20              THE COURT:  Good afternoon, Counsel.

21        We are here on a number of motions, and this is kind of an

22   unusual case in that we have kind of gone forward in fits and

23   starts.  And I know we had tackled some of these issues way

24   back in August, and afterwards, a number of things have

25   occurred.  A number of submissions have been made, including
```

1    declarations from Mr. Curran, Mr. Lindsey.  Initial briefing

2    has been provided.  The government submitted an *in camera*

3    submission relating to matters before the grand jury.  That was

4    at my request following the August 1 hearing.

5         And so, at this point, let me identify how I would like to

6    proceed.

7         Let me begin by having the parties address the motions --

8    motion to dismiss Counts Six through Ten, and Count One,

9    conspiracy, for -- based upon related arguments.

10        I have read the papers, moving papers, responding papers,

11   and replies, additional papers, and the declarations that I

12   referenced.  And it seems like, at the end of the day, what we

13   have is the government asserting that the statute, when it

14   makes reference to "registrant," makes reference to "ARIN," the

15   registry that has been in existence now since that

16   responsibility was passed on to it, and that the "R" in ARIN is

17   "registry."  So, if you are in that registry -- and we know

18   that even pre-ARIN IP addresses are included -- that that makes

19   you a registrant.

20        The defense points to what they view as the lack of the

21   word "registration" prior to 1997.  They point to the fact that

22   there are any number of IP address holders that do not have --

23   if not a current registration, who have not taken advantage of

24   the opportunity to get into the post-ARIN system and obtain all

25   the benefits and privileges that are attendant thereto.  And so

1   that, to the extent that that is the case, as a result, only

2   those pre-ARIN IP address holders who affirmatively opt into

3   the ARIN system should be considered to be registrants.  It is

4   a pretty narrow view.  And it seems to me that it's too narrow,

5   and that it relies on things that, at the end of the day, don't

6   matter as it relates to a registry and providing notice of who

7   registrants are for purposes of this statute.

8        So those are my initial take-aways from what I have

9   reviewed as to the registrant issue, and I do understand that

10  there are additional questions about the statute and relating

11  to who false statements need to be made to and such.

12       But at this point, let me turn to the moving parties,

13  here, the defendants, and I will ask that you address this one

14  issue that I proposed or I offer, but otherwise feel free to

15  make any other arguments that you believe are appropriate.

16            MS. MUNK:  Thank you, Your Honor.

17       We actually don't believe it is narrow, Your Honor, and I

18  will explain why.  I do think it is important to go through a

19  chronology of IP addresses and kind of the history of how it

20  first developed, where we got to with ARIN and then Congress

21  passing the statute because I think that really puts in line

22  what Congress was thinking about when they passed the CAN-SPAM

23  Act.

24       So, with regards to the chronology, Your Honor, in the

25  early 1990s, before the creation of ARIN, the IP address system

1   was very different than it is today with ARIN.  And initially,

2   Jon Postel -- this is in Mr. Lindsey's declaration -- but he

3   kind of helped create the internet.  And it was this very

4   informal process, where he would assign IP numbers, and he did

5   so just individually, on his own.  And then he ended up

6   becoming the director of IANA.  IANA stands for Internet

7   Assigned Number Authority.  And they had the contract with the

8   National Science Foundation.

9        So the National Science Foundation then awards a contract

10  to Network Solutions Incorporated -- they also call it NSI --

11  and that creates InterNIC.  InterNIC stands for Internet

12  Network Information Center, and they basically handle IP number

13  and domain name assignments, allocations, and record keeping.

14       So, the process back then -- and again this is in the

15  early '90s -- to get an IP address, an organization would

16  basically just submit a request and ask -- in a very short-form

17  template, ask for an IP address, and they would be given an IP

18  address.  There were no registration agreements.  There were no

19  contracts.  There was no basis to show need.  So it was a very

20  different process back then.

21          THE COURT:  Although, at the end of the day, upon

22  having an IP address assigned, the IP address would be

23  recorded; it would be maintained for identification purposes,

24  for record keeping purposes, correct?

25          MS. MUNK:  I don't know if "recorded" is the right

1    word, Your Honor.  And I just say that because the process, I

2    believe, is literally they would write down, "ABC Corporation

3    received this IP address" or "this netblock address."  There

4    was no official recording.  They just internally kept track of

5    who received what IP address.

6              THE COURT:  You referenced a moment ago there would

7    be this assignment made and then there was record keeping.  So

8    then, when you made reference to the word "record keeping,"

9    what do you understand that to mean?

10             MS. MUNK:  Thank you, Your Honor.  And my

11   understanding -- and again, this is in Mr. Lindsey's

12   declaration -- but I believe the record keeping is just

13   internally, in IANA and InterNIC and presumably Jon Postel

14   before, but I don't completely know, would keep track of who

15   received what number.  That is the record keeping.  And it

16   is -- based on everything I have read and everything all the

17   parties have submitted, I haven't seen anything more beyond

18   that.

19        So, as the internet continued to grow, IP number

20   allocation assignment functions that were initially performed

21   by IANA, then by InterNIC, were distributed into Regional

22   Internet Registries.  This is where, I guess, it seems like

23   globally they decide, "Let's develop Regional Internet

24   Registries to basically control and assign all IP addresses in

25   the whole world."

1          So, the first one gets created in Europe.  It is called

2     RIPE NCC, and that gets created in 1991.  Again, this is

3     separate and apart from the IP addresses that are getting

4     assigned here in the United States.

5          In 1995, APNIC is created, and that covers the Asia

6     Pacific.

7          And then we get to 1997, and that's when ARIN is created,

8     and that is called the American Registry for Internet Numbers.

9          I think this is really important -- again, this is all

10    very technical, but we are looking at a technical statute that

11    uses the term "registrant" and trying to decide what

12    "registrant" means.

13         So, the government and Mr. Curran -- the government cites

14    a specific exhibit; Mr. Curran makes statements; and those

15    statements show that when the plan to establish ARIN was

16    approved, ARIN assumed full responsibility for IP number

17    assignments and related administrative tasks previously handled

18    by NSI.  And when you look at all the articles that we have

19    submitted, Your Honor, on both sides, it doesn't say anything

20    about them handling registration previously and then

21    transferring that to ARIN.  And I think that's important, Your

22    Honor.

23         And, as I mentioned, the article cited by Mr. Curran,

24    which is I believe in paragraph four, that article says nothing

25    about IP registration.  So, again, there was no formal system

1    in place.

2        So, once ARIN gets formed, they actually, now, create a

3    system of registering IP addresses.  And in order to register

4    an IP address -- before an IP address gets assigned to any

5    entity -- because ARIN is now in charge of assigning IP

6    addresses -- a Registration Service Agreement is required.

7    They create this formal process.  The process is you submit a

8    request.  You have to provide proper documentation to show

9    there's a need for the IP space.  And then you also have to

10   enter into a Registration Services Agreement.

11       And, according to Mr. Curran and his declaration, that is

12   actually how an IP address that's newly assigned gets

13   registered.

14           THE COURT:  But, ultimately, when ARIN came in

15   existence, it absorbed or inherited those IP addresses that had

16   been previously assigned, correct?

17           MS. MUNK:  So -- let me respond to that.

18       It didn't inherit them, and I think this is actually

19   important because "inherit" suggests --

20           THE COURT:  Well, whatever you want to call it.  At

21   the end of the day, they are included within the registry.

22           MS. MUNK:  So, Your Honor, it essentially was a data

23   dump.  That's what it was.

24       So, the government's position is that the WhoIs

25   database -- the WhoIs database essentially has all IP addresses

10

```
 1    in this area, in this region, every IP address, whether or
 2    not --
 3              THE COURT:  Pre and post ARIN, right?
 4              MS. MUNK:  Yes.
 5         And our position is, whether or not they are registered or
 6    not, it was a data dump.  So, basically, they just were given
 7    all this information -- whether or not it was accurate or not
 8    doesn't matter -- and they put it into their system.  But --
 9              THE COURT:  Into the registry?
10              MS. MUNK:  Into their WhoIs database.
11         They call that the registry, but then why is ARIN creating
12    a process that registration is completely different than their
13    WhoIs database?
14              THE COURT:  Well, because ARIN came into existence
15    and was made up of stakeholders who made a part of ARIN's
16    membership, I guess, and so they came up with a system to
17    further refine the registration process.
18         But, I guess, at the end of the day, my question is, to
19    the extent that you have something called ARIN, and the "R" in
20    ARIN is "registry," and that that came into existence -- that
21    was in existence at the time that the legislature, the
22    Congress, enacted this law, that they would have been aware of
23    the existence of ARIN; they would have been aware of the fact
24    that pre- and post-ARIN IP addresses were identified and were
25    included in this registry; and in that way, they would have
```

1    been in a position to point to this word "registrant" as being

2    associated with ARIN, as being identified with the WhoIs

3    database.

4            MS. MUNK:  Well, Your Honor, "registrant" -- that's

5    actually an interesting point because ARIN doesn't consider --

6    if you are in the WhoIs database, while they are calling it a

7    "registry," they don't consider those people registrants.  You

8    actually only get the right to be the registrant if you enter

9    into one of their Registration Service Agreements or their

10   Legacy Registration Services Agreements.

11       And Your Honor, we actually submitted with Mr. Lindsey's

12   declaration Exhibit 1, which is a copy of -- they call it an

13   RSA/LRSA.  And paragraph 2B1 grants the person who signs, the

14   Legacy address holder who signs that, if they sign that, they

15   then are granted the right to be the exclusive registrant.

16       So I think this is actually a really important fact, Your

17   Honor, because without signing that, you are not a registrant,

18   and ARIN agrees.

19            THE COURT:  ARIN agrees?

20            MS. MUNK:  They put it in the contract, Your Honor.

21   If you are a registrant, why do I have to sign something to

22   receive that right?

23            THE COURT:  Let me ask you, does ARIN consider

24   pre-ARIN IP addresses to be registered?

25            MS. MUNK:  I think ARIN -- ARIN has incentive to

1    basically control every IP address that exists.  And they want

2    to, just like they want to have a completely accurate database.

3            THE COURT:  Incentive or mandate?  Isn't the whole

4    purpose of ARIN and these other regional RIRs in order to be

5    able to ensure that just one entity is using, utilizing a

6    particular IP address, so you don't have two or three or four

7    different entities doing that?

8            MS. MUNK:  Your Honor, so -- the mandate is actually

9    a really good question because what could have happened is --

10   if, I believe, they were actually transferring registration,

11   when they made this transfer to ARIN, they could have said,

12   "Look, ARIN owns and controls all of these IP addresses,

13   regardless of who received them before.  And basically, if a

14   company goes out of business or anything happens, then ARIN can

15   take those back."

16       That's not the state of how this works, Your Honor.

17       Basically -- and I think this is laid out pretty clear in

18   Mr. Lindsey's declaration -- is that ARIN actually doesn't have

19   rights or control over Legacy IP addresses until someone enters

20   into a Legacy RSA, or there are situations where maybe it gets

21   sold and it is negotiated where the company buying it then

22   enters into an RSA with ARIN.

23       So ARIN created this Legacy RSA program as incentive

24   because they are trying to get control of that Legacy space

25   that they actually don't have any control over, and I think

13

```
 1    that's a really important point, Your Honor, because the
 2    CAN-SPAM Act doesn't come around until six years later.  And
 3    there's -- there's a significant time where ARIN's RSA program
 4    is already formed.  They have this formal registration.  The
 5    contract is granting a person who enters into it the exclusive
 6    right to be the registrant.  And it just makes sense that
 7    Congress isn't trying to regulate kind of this wild, wild west
 8    system that happened in the early '90s.  And let me explain why
 9    I think they were not trying to do that, Your Honor.
10        And we did request judicial notice of the legislative
11    history, and I believe the government also made some citations
12    to the legislative history.
13             THE COURT:  There's no objection to the request?
14             MR. CIAFFA:  No objection.
15             MS. MUNK:  So, in 2003, when the Act gets passed out
16    of the Senate, it reads, "Falsely represent the right to use
17    five or more IP addresses."
18        We know Congress ends up changing that language.  They
19    change it from "Falsely represent the right to use" to "Falsely
20    represent oneself to be the registrant."  And, clearly, they
21    were concerned about this registrant status.  They wanted to
22    criminalize theft of registered IP addresses.
23        And it just seems that, given, kind of, the history --
24    they knew that there was a registration services process
25    through ARIN -- that it was difficult to regulate back in the
```

14

1   early '90s when IP addresses were handed out left and right.

2   There were tons of dot-com companies, that presumably needed IP

3   addresses, that went out of business.  Often these IP addresses

4   are left dormant or inactive, or maybe they sell and the person

5   never updates the information because that was never required.

6   So the WhoIs database isn't accurate.  It just was unclear.

7        So they recognize, "We want to criminalize falsely

8   representing yourself to be the registrant."  It is not enough

9   that you are just using an IP address, which, if every IP

10  address is registered, there would really be no need to change

11  that language to "registrant."  And they made it specific.  And

12  I think that's really important in the Court's consideration

13  because we are trying to guess at the legislative intent here,

14  but clearly they wanted to make it more narrow and more

15  specific.  And it just makes sense that they recognize that it

16  would be ARIN, and any new IP address that gets allocated or

17  assigned by ARIN is going to be a Registration Services

18  Agreement.

19           THE COURT:  Is there any reference to "ARIN" during

20  the debate on this statute?

21           MS. MUNK:  I haven't seen any reference, Your Honor.

22  But, given that it was six years later -- and, again, in the

23  early '90s, this is very -- ARIN is the late '90s, and there's

24  now, you know, this formal registry in place.  But I just have

25  a hard time thinking that Congress is thinking about

1    registering early IP addresses when there was no formal system

2    and it is just really unclear who owns or controls or what

3    happened to some of that space.

4            THE COURT:  If that's the case, then why did this, as

5    you call it, data dump occur so that ARIN could end up

6    including all of these IP addresses?

7            MS. MUNK:  Well, I think they are still keeping track

8    of who initially received the IP address.

9            THE COURT:  What is the point?

10           MS. MUNK:  I think just for keeping track of it, Your

11   Honor.  I mean, it makes sense that "This was initially

12   assigned to ABC Corp."

13       But the problem is -- and this is what I believe

14   Mr. Lindsey does a good job disputing Mr. Curran's declaration.

15   He talks about the accuracy of the database, but there's lots

16   of instances where the WhoIs database isn't accurate.

17       Now, I will say, 1997 on -- any IP address assigned from

18   1997 on seems to be pretty accurate because they are required

19   to update all that information per the Registration Services

20   Agreement.

21       So, most of the IP addresses actually are registered.  We

22   are talking about a narrow group.  And I don't know numbers,

23   Your Honor.  I haven't seen any of this in the reading.  But we

24   are talking about a very select group of numbers that have not

25   been entered into Legacy Registration Services Agreements.

```
 1         I don't know if the Court has more questions on this
 2   point.
 3             THE COURT:  Well, it seems like, to the extent that
 4   Congress was worried about hijacked IP addresses, that that
 5   concern would be most present or it would be best addressed by
 6   these pre-ARIN IP addresses, because that's where you would
 7   find IP addresses that perhaps had not been used in a while and
 8   that could be used for mischief, versus ones where people were
 9   actually -- or entities were paying to maintain their
10   registration dues or whatever they pay for these fees, and so
11   that there's less of a likelihood that those would be used for
12   mischief, versus the pre-ARIN.
13             MS. MUNK:  So, Your Honor, I think, you know, we are
14   basically trying to go back in time, right, and try to figure
15   out what Congress intended in 2003, which is quite a while ago,
16   and just the development of the internet and all of that.
17         So I think we have a benefit today, 16 years later,
18   recognizing, "Oh, gosh, it seems like it is the Legacy IP
19   addresses that they should have been concerned about."
20         But, again, they did narrow the statute, and I am not sure
21   this was on their radar then.  They narrowed the statute for it
22   to be "registrant."  Why not keep it "right to use" if they are
23   just concerned about any theft of any IP address?
24             THE COURT:  I guess the government's assertion is
25   that being a "registrant" means "right to use," so it is a
```

1    shorthand way of making reference to that concept.

2         MS. MUNK:  But, Your Honor, we have to look at the

3    plain meaning of the words of the statute.  It is not

4    synonymous.  And they changed it.  "Right to use" is completely

5    different than "registrant."  If it isn't, they could have kept

6    it.

7         And, again, "registrant" means something.  I do want to

8    talk a little bit about the definition, but if you have more

9    questions on this point, I am happy to address those.

10         THE COURT:  So, in your view, a pre-ARIN assignee of

11    an IP address would be, under this phrase "right to use,"

12    included; but once you use the word "registrant," then the

13    pre-ARIN IP assignee would not be, unless they affirmatively

14    ended up registering post ARIN?

15         MS. MUNK:  Your Honor, just looking at the plain

16    words of the statute, I believe it reads:  "Falsely represent

17    their right to use five or more IP addresses."  I take that to

18    mean, if I -- any IP address.  If I am falsely taking them or

19    stealing or what have you and representing I have the right to

20    use it, whether it's registered or not is irrelevant.  I am

21    basically using it and saying I have the right to use it.

22         They changed the language.  The language is "Falsely

23    represent oneself to be the registrant."

24         So it actually adds two additional facts here.  You have

25    to, one, have a registered IP address.  Otherwise, if it is not

1    registered, I don't believe there is a registrant.  My guess is

2    we could probably agree on that with the government, but I am

3    not sure.  And then you also have to represent that you are the

4    registrant.

5         So it's two additional things.  It needs to be registered,

6    so there's a registrant.  And you actually have to represent --

7    to falsely represent that you are the registrant.  And that is

8    much more specific than "falsely represent the right to use."

9              THE COURT:  You may proceed.

10             MS. MUNK:  Your Honor, with regards to "registrant,"

11   again, statutory interpretation, we look at the plain and

12   ordinary meaning of the words.  You can use dictionary

13   definitions as guidance.

14        "Registrant," defined by the Merriam Webster dictionary,

15   is "One that registers or is registered."

16        "Register," the verb, is defined as "To make or secure

17   official entry of in a registry or to enroll formally,

18   especially as a voter or student."

19        "Registration," by the Merriam Webster dictionary is

20   defined as "The act of registering and entering a registry, or

21   a document certifying an act of registering."

22        So, looking at this word and the different definitions and

23   what we -- I think just the average person thinks of when

24   talking about registration, it is really an affirmative step,

25   to register something.  So I was trying to think of examples,

1    Your Honor, that would be helpful for the Court.  And I think

2    registering to vote, registering your car with the DMV,

3    registering your child for school -- these are all affirmative

4    acts that somebody is making a step and saying, "I want to

5    register to vote.  I want to register my car.  I want to

6    register my child for school."

7         That is what happens with ARIN's program, '97 on.  You

8    have to, basically, affirmatively register.  And their

9    registration -- and it says it in their contract -- is that you

10   have to enter into a Registration Services Agreement.

11        The system, early '90s, pre-ARIN -- I have seen nothing

12   that says you register your IP address, the recipient of the IP

13   address is registering that IP address.  There's no affirmative

14   step in that.  And all the examples I can think of, I can't

15   think of anything where you are not actually affirmatively

16   taking that step to register.  And, again, this is important

17   because we are looking at Congress' intent when we have very

18   little guidance.

19             THE COURT:  Although, even under the Webster

20   dictionary definition of "registrant," it provides for a

21   situation where someone is registered.  And so, to the extent

22   that you have a registry, and you have these IP addresses that

23   are listed, that would seem -- that would qualify that that is

24   registered.

25             MS. MUNK:  So, Your Honor, if -- so, a "registrant"

1    is registered.  But, again, what is the registry?  And that's

2    the debate here.  Right?  They believe if you are listed in

3    this database -- which, again, would include every IP address

4    in this whole area.  So, again, it just seems doubtful that

5    Congress would need to narrow a statute that already includes

6    every IP address by changing the language.  I just don't

7    believe that's -- that was their intent, Your Honor.

8         THE COURT:  Let me do this.  Let me bounce to the

9    government and get a response with respect to that particular

10   argument about how Congress' -- if not evolution, Congress'

11   modification of the phrase that they -- phraseology that they

12   use, "right to use" to "registrant," how that's salient,

13   material, or informative.

14        MR. CIAFFA:  Yes, it is, Your Honor.  In fact, the

15   legislative history, the change from "right to use" to

16   "registrant" goes from more vague to more specific.  It

17   undercuts the defense argument.

18        Remember, what we are here for today is to decide whether

19   this statute is unconstitutionally vague.  We are not here to

20   decide whether the defendants are guilty or not.  The defense

21   argument here -- although it is couched as a vagueness

22   argument, the defense is not arguing that the term "registrant"

23   is vague.  They are arguing that the term is quite clear, and

24   that it excludes the victims in this case.  And they go to

25   great lengths to try to prove that point, that "registrant" is

1  very clear; it does not include these people, and therefore,

2  the defendants did not violate the statute.

3        And, again, this Court should not, at this juncture,

4  engage in what would ordinarily be a Rule 29 motion, about

5  whether the defendants really impersonated a registrant or they

6  impersonated somebody else who wasn't the registrant.  That is

7  not what is at stake here at this point in this motion.

8        This Court needs to decide whether the term "registrant,"

9  as used in the statute, is unconstitutionally vague.  And

10  applying the correct legal standards here that the Ninth

11  Circuit laid out, quoting the Supreme Court, the Court can

12  easily find that the defendants have not met their burden of

13  overcoming the presumption of constitutionality of a statute.

14  As you know, the Ninth Circuit, in *Kilbride*, quoting the

15  Supreme Court, held that a statute is unconstitutional on its

16  face if it fails to provide a person of ordinary intelligence

17  fair notice of what is prohibited, and it's unconstitutional as

18  applied if it failed to put the defendant on notice that his

19  conduct was criminal.

20        I agree with the defense counsel that we look to the

21  common, ordinary meaning of words.  We look to the dictionary.

22  And "registrant," I agree, as what it says in the dictionary,

23  is "one who registers or is registered."  And a "register" is

24  something that is a record that contains regular entries of

25  items or details.

22

 1        When Congress decided to make the statute impersonating
 2   the registrant, it eliminated the vagueness argument because
 3   then a defendant doesn't have to worry about, "Gee, I don't
 4   know whether this person really has the right to use that IP
 5   address.  Or maybe he does; maybe he doesn't have that right.
 6   I don't know."
 7        Congress made it much more specific.  If you impersonate
 8   the registrant, you are guilty.  Whether the registry is
 9   correct, whether it is incorrect, if you impersonate the
10   registrant, you are guilty.  And that, I believe, undercuts --
11   the legislative history here undercuts the defense argument
12   that the statute is vague because it takes away that element
13   where the defendant would have to wonder whether a person had
14   that right, maybe they don't have that right.  If they are
15   listed in the registry and you impersonate them, that's what
16   Congress said is the crime, and that makes it much more
17   specific and much more easy for a person to guide his behavior.
18   If he impersonates the registrant, you are guilty.
19        In this case, there's nothing vague about the term
20   "registrant."  It is the person or entity that was allocated
21   the IP address, as listed in the internet registry.
22        In order to support the defense argument, you have to buy
23   into this false construct that there are some IPs that are not
24   registered to anybody at all and that they are simply up for
25   grabs to whoever wants to hijack them.  You have to buy into

1    that in order to accept their argument that these people are

2    not registrants.  And I urge the Court not to buy into those

3    assumptions.

4        As Mr. Curran, the chief executive officer the American

5    Registry of Internet Numbers, said, "There's no such thing as

6    an unregistered IP address."  And he makes it quite clear that

7    even IP addresses which were allocated and assigned before ARIN

8    came into existence, they are still registered within ARIN.

9            THE COURT:  You don't disagree, though, that there

10   doesn't appear to be any reference to the word "registration"

11   prior to ARIN?  That there's more -- that there's, instead,

12   reference to the word "assignment"?

13       Are you aware of the word "registration" being used?

14           MR. CIAFFA:  I can't say definitively, Your Honor, in

15   all honesty.  I have done some research myself, but it is not

16   part of this record before this Court at this time.

17       As Mr. Curran stated in his declaration, there was also a

18   registry in the sense that there was always a list of the

19   people to whom IP addresses were assigned and allocated.  And

20   the reason for that, as the Court indicated, is to ensure the

21   uniqueness of all IP addresses and to avoid the possibility

22   that someone would try to use the IP address belonging to

23   someone else.

24           THE COURT:  Let me ask you.  We were told about the

25   evolution of this system of keeping tabs of IP addresses.  At

```
 1   the outset, you had this individual -- I am not sure of his
 2   name; Postel or somebody -- but he was actually responsible for
 3   assigning IP addresses; is that correct?
 4            MR. CIAFFA:  It was the National Science Foundation.
 5            THE COURT:  An individual that was at the National
 6   Science Foundation?
 7            MR. CIAFFA:  It was a government department.
 8            THE COURT:  Okay.  So, someone -- there was some
 9   reference to how this person was so instrumental in the
10   development of this process.
11       But in any event, let me ask the question as to at what
12   point in time this system, where people could contact the
13   pre-ARIN entity and inquire whether or not an IP address was
14   assigned to someone in particular, when did that come into
15   play?  Does did that come into play before ARIN?
16            MR. CIAFFA:  And the registry before ARIN was
17   InterNIC, I-N-T-E-R-N-I-C.
18            THE COURT:  We have now, in ARIN, was in existence
19   with InterNIC?
20            MR. CIAFFA:  InterNIC was the registry that existed
21   before ARIN's registry, which is called "WhoIs."
22            THE COURT:  So, as a registry, then, anyone could
23   access it on the internet?
24            MR. CIAFFA:  Public.
25            THE COURT:  So InterNIC was -- served the same
```

1    function as ARIN?

2            MR. CIAFFA:   The same thing.   The same thing.

3        Interestingly, the counter declaration, written by the

4    lawyer that the defendants hired to write it, really doesn't

5    dispute any material point here.   Although he avoids the term

6    "registry," he does confirm the following three points:   He

7    confirms that each IP address is uniquely assigned and

8    allocated.   He confirms that InterNIC and the other predecessor

9    registries "kept track," quote/unquote, of such assignment and

10   allocation.   And he does confirm that all of this information

11   was passed along to ARIN, who took over the responsibility to

12   maintain the listings.

13       So, with those three concessions -- I don't mean it in an

14   adversarial way -- but acknowledgments, there's really nothing

15   in material dispute as to whether or not the statute is vague

16   as to the point in "registrant."   But let's look at some

17   concrete examples.   I think it will make things a little

18   easier.   I, frankly, have not had a case involving this statute

19   before, so until I looked at what we are talking about -- and I

20   would like to show the Court, if I might.

21       I am handing the Court a few documents that correspond to

22   Count Ten in the indictment, just as an example here.

23       Directing the Court's attention to the first page, which

24   is Grand Jury Exhibit 248, which has been -- all of this has

25   been supplied to the defense.

1    We are talking about here exhibit -- Count Ten.  Count Ten

2    in the indictment concerns an IP block 165.192.0.0.  It is an

3    IP block that contains approximately 64,000 IP addresses.  The

4    first page here, which is marked as Grand Jury Exhibit 248, is

5    a screenshot of ARIN's WhoIs registry for Count Ten, this IP

6    block.  And as the Court can see, ARIN's registry shows that

7    this IP block alleged in Count Ten was registered on August 6,

8    1993.  It doesn't say it was allocated on August 6, 1993.  It

9    doesn't say that maybe it was given to somebody on August 6 of

10   1993.  It says it was registered on August 6 of 1993.

11       And it says that it was registered to Educational

12   Corporate Technologies, as the Court can see under

13   "organization."

14       And on the second page, continuing the screenshot, it

15   shows that the point of contact for this IP address is

16   Mr. Darrell Lynn.  And Mr. Darrell Lynn has an email address of

17   dlynn@ect.net.

18       So, according to the ARIN registry, the IP block alleged

19   in Count Ten has -- I can't think of another way of saying "the

20   registrant" to be Educational Corporate Technologies,

21   registered on August 6, 1993, with a point of contact of

22   Darrell Lynn.

23       Moving on to the next stapled sheet that I handed to the

24   Court, this is Grand Jury Exhibit 171, also provided to the

25   defense.  This is an email, for example, from Mark Manoogian to

1   Abdul Mohammed, cc Jake Bychak.  "Subject:  Get ads LOA,"

2   letter of authorization.  Attachment:  The ECT-LOA.  "Abdul,

3   Hostwinds is saying their DC," data center, "said that the LOA

4   is invalid saying the WhoIs information didn't match.  I looked

5   it up before I sent and it appears to match.  Am I missing

6   something?"  Signed, Mark Manoogian.

7       If you look at the last page, this is what was attached.

8   This is the letter of authorization in question.  On top, it

9   appears to come from Educational Corporate Technologies.

10      Authorization to announce or reannounce an IP address.

11   And it says, "To Whom It May Concern, Educational Corporate

12   Technologies, ECT, hereby authorizes Core Xchange to announce

13   or reannounce the following root block."  It lists the block

14   alleged in Count Ten, and it is purportedly signed by Darrell

15   Lynn, vice president of ECT.

16      This is the impersonation that forms the basis of

17   Count Ten.  And I could go through all the different counts

18   here, but the point that the government makes is that the

19   defendants, by their own conduct, not only consulted but relied

20   on the registry because if they didn't impersonate the

21   registrant, the whole scheme would not work.  They needed to

22   impersonate the correct person that was listed in the registry.

23      It was not a coincidence or a twist of fate that the

24   defendants happened to have a letter with Darrell Lynn, vice

25   president of ECT.  They specifically chose him because, as we

28

1  saw in the WhoIs registry, under Educational Corporate

2  Technologies, Mr. Darrell Lynn is the point of contact.  So, in

3  order for this scheme to succeed, you have to impersonate the

4  registrant.

5      Now, again, I could go through this with several other of

6  the counts, but I don't want to bore the Court.  But I just

7  wanted to put something visual for the Court to understand that

8  screenshot.

9          THE COURT:  All right.  And I think at this time, you

10  have responded to the question that I posed regarding the

11  legislation and the change that was made from "right to use" to

12  "registrant."

13          MR. CIAFFA:  I am sorry, yes.

14          THE COURT:  Do you want to switch up?

15          MS. RIM:  Your Honor --

16          THE COURT:  You weren't done?

17          MS. RIM:  I just wanted to address the Court's

18  question just now about the legislative intent.

19      So, you know, I think -- first, I think that the

20  government and the defense agree that "registrant" apparently

21  means different things to different people.  We are arguing

22  that the narrowest definition should apply, but that's not to

23  say that it is not confusing.  So, you know, we have in here I

24  think, like, eight lawyers, a judge, very intelligent people,

25  and I bet that nobody here is quite sure what "registrant"

29

1   means.  And that means it's vague.

2        So, I think the issue here -- and that was something, by

3   the way, that Ms. Bernstein pointed out to me last night, so I

4   didn't mean to steal her comment.

5        But the reason I am addressing it now is because there's a

6   listing component of ARIN, and that's what the InterNIC log

7   was.  That was a listing of who owned -- not "owned"; sorry --

8   who was allocated an IP address.  And when that log was

9   created, there was less of a concern at the time that you would

10  run out of IP addresses.  Nobody foresaw pre 1997 that IP

11  addresses and data would be so prolific that you would run out

12  of IPs.  That's why IP addresses are now valuable because

13  you've actually run out.  Because you have -- in order for the

14  internet to connect, every single device has to have an IP

15  address -- a printer, a modem, everything -- for all the

16  machines to talk to each ear.

17       At the time, it was simply a listing.

18       What is different between InterNIC and ARIN is that their

19  Registration Services Agreement that ARIN requires people to

20  sign now, before they get allocated an IP address, is that it

21  is not just that you get the exclusive right -- and just since

22  the Elmo is up, I just want to -- if you could ignore the work

23  product.

24       So this is the contract that you have to sign.

25       How do you zoom out?

```
 1              THE CLERK:  At the very top, there's a little scroll
 2    button.
 3              MS. RIM:  Your machines are much more advanced than
 4    in the Central District.
 5         So, what it says here -- this is the contract that we
 6    attached in Docket 116.  It is attached as Exhibit 1 for Marc
 7    Lindsey's declaration.  And what it says is -- this is what
 8    Ms. Munk was referring to earlier.  I just wanted the Court to
 9    see it.  It says once you sign this contract, that's when you
10    get the exclusive right to be the registrant.  So if you don't
11    have this contract, you are not a registrant.
12         And what that means is once you become a registrant of
13    ARIN, sure, you get the benefit of getting the exclusive right
14    to be the registrant, but you also have responsibilities.
15    That's why it's now a requirement to sign that contract before
16    you get an IP address.  And those responsibilities include
17    paying fees.  They also include that you have to use the IP
18    address.  This is all on ARIN's policies that they have
19    incorporated as part of the RSA agreements that they make
20    people sign.  So, if you are not using that IP address -- I
21    think it is like 50 percent of the time in the first year -- it
22    is all on their policies -- you lose it.
23         And that's because Congress -- when Congress started
24    regulating IP allocations and registrations, they were
25    concerned with two things.  One -- as the Court pointed out,
```

```
 1   one was the idea that, you know, you don't want people to
 2   deceive who you are.  So, you don't want people using an IP of,
 3   let's say, a legitimate organization, hijacking it and
 4   pretending that the emails are coming from a legitimate
 5   organization.  That was one concern.  But the other is waste,
 6   and this was part of the legislative history we have filed.
 7   You don't want to waste IP addresses, and that was what was
 8   happening.  Because, before, it was just a listing.  There was
 9   no registration agreement that required people to use the IP
10   addresses.  There also was no mechanism to abandon an IP
11   address.  Now, all you have to do is stop using it, and ARIN
12   can terminate it, and they can assign it to someone else.
13        So, when the Court asked, "Wouldn't Congress be more
14   concerned with the pre-ARIN addresses?"  I would say no,
15   because the pre-ARIN addresses -- those people are not paying
16   for a registration fee to be registered with ARIN, and they are
17   not paying to be the exclusive right to be a registrant.
18             THE COURT:  But, to the extent that they are
19   concerned about SPAM, they would have less reason to be
20   concerned about someone who is paying, who is using their IP
21   addresses versus these unused IP addresses that are pre-ARIN
22   that are kind of in the wild, wild west and are vulnerable to
23   being misused.
24             MS. RIM:  That's actually not true, Your Honor.  The
25   reason why --
```

```
 1              THE COURT:  Which part is not true?

 2              MS. RIM:  A pre-ARIN IP address that is not

 3    registered, with an RSA -- there are many ISPs that block

 4    emails from those addresses already.  So the benefit you get

 5    from the registering with ARIN, paying the fee, entering into a

 6    contract is that you get -- those emails pass through.

 7         But if you don't register, you don't have to pay the fee,

 8    but the downside is those emails have more of a tendency to get

 9    blocked.

10              THE COURT:  For example, like the Educational

11    Corporate Technologies block, you are saying that those would

12    have been more likely to be blocked?

13              MS. RIM:  Yes.  Because if it didn't show up, this

14    is -- this is how -- I mean, the hackers in this case, they

15    immediately can see it wasn't registered, had not been

16    registered in ARIN, right, because it is obvious.  So that's

17    why pre-ARIN addresses are less valuable, because there's a

18    risk that, even if you buy it, none of your emails will go

19    through.

20              THE COURT:  I don't know if I agree with that.  It

21    seems to me that, as in Count Ten, to the extent that is there

22    unused IP netblock and there is the recognition that this is

23    valuable, if they are able to score these, I guess, 64,000 or

24    so IP addresses, that it's worth the time of identifying

25    this -- if not owner, registrant or assignee and seeking to
```

1    hijack these 64,000 IP addresses, with the view that, "Nothing

2    ventured, nothing gained"; "For every five of these that we

3    submit, only one or two will go through, but it's still worth

4    our effort."

5            MS. RIM:  Your Honor, first, I do want to stop using

6    the word "hijack" here because I think that if you don't have

7    an RSA and you haven't been given an exclusive right to use an

8    IP address, I don't know that someone can hijack something that

9    is not exclusively -- I mean, when people were listed on

10   InterNIC, there's no document that the government has provided,

11   there's no statute or definition that has said those people had

12   the exclusive right to use.

13           THE COURT:  But, in practice, it was exclusive,

14   wasn't it?  That's the whole point of having IP addresses

15   assigned to a person, is so that they have exclusive use.  And

16   then, ultimately, to the extent there's a problem, the

17   exclusive user can be identified --

18           MS. RIM:  But this is why what Ms. Munk was saying

19   with respect to the change from "right to use" to "registrant"

20   is so important.  And the reason that it is important is that

21   it is not clear that the government can regulate IP assignments

22   that happened before ARIN's RSAs.  ARIN can now regulate them

23   because they are contractural agreements.  But without a

24   contract, if you were assigned an IP before, if ARIN really

25   thought that didn't mean anything, they would just try to

1    subject them to the same requirements.  And if you were

2    assigned an IP address and you weren't using it, they would

3    just assign it to somebody else.  But they are not quite sure

4    what to do with these IP addresses because it is not like the

5    government can just do whatever they want with it.

6         So the issue is that it is not so much the right to use,

7    that the registrant was to be more specific, but only ARIN

8    registrants -- this is, in our view, the narrowest

9    interpretation -- can really be regulated and be held to their

10   contractual agreement that they will comply with ARIN's rules

11   and regulations, and, in exchange, they get the exclusive right

12   to be the registrant.

13        Now, there is another interpretation, that, you know, if

14   you were allocated an IP address before ARIN existed, even

15   though InterNIC doesn't have the word "registrant" in it,

16   there's another interpretation, that if you show up in the ARIN

17   database -- and it does say, as in the exhibit that --

18        (Counsel confer.)

19            MS. RIM:  -- Mr. Ciaffa just showed us, that the ARIN

20   database says "Registered in 1993," even though, in 1993, there

21   was no registry.  And that is the very definition of vague.

22   Which definition is it, and how is a person of ordinary common

23   sense supposed to know that "registrant" didn't mean the ARIN

24   RSA contracted registered IP holders?

25        That's all I wanted to say.

35

```
1              THE COURT:  Thank you.
2              MS. MUNK:  Your Honor, I just had a few brief points.
3          With regards to the document that was presented by the
4    government, while this wasn't part of the briefing, I think
5    it's important to note.  This is an ARIN document, Your Honor.
6    This isn't a document that came from InterNIC.  This isn't a
7    document that came from IANA.  It is a document from ARIN, and
8    they believe --
9              THE COURT:  Isn't that what matters, though?  In
10   terms of trying to figure out what and who a registrant is, you
11   would look to see what is in existence as of 2003 or
12   thereabouts when this statute was enacted.  You don't look back
13   to what was it like in the old west, in 1990 or 1995.
14       "Okay.  In 2003, when Congress used the word 'registrant,'
15   what does it mean?"  And to the extent that the government's
16   position is that "registrant" means that you are registered in
17   ARIN, the clearly defined registry.  And in its simplicity, it
18   has an attractiveness to it versus, kind of, this, "Oh, well,
19   they didn't sign this contract; they weren't entitled to all
20   the benefits and privileges that come therefrom."  It is like,
21   "Okay.  That's a means of trying to overcomplicate what,
22   otherwise, 'registrant' would suggest."
23             MS. MUNK:  Your Honor, I agree you look at what -- in
24   2003, what did Congress intend.  That's what we are trying to
25   do here.
```

1       And I agree that I believe they would have looked at ARIN

2    and it is just what -- what is the means and how is something

3    registered in ARIN.  And I do think it's very plausible --

4    because this is correct -- that ARIN had this formal

5    Registration Services Agreement process.  That an IP address,

6    1997 on -- it does not get allocated to anybody without a

7    Registration Services Agreement.  And that is a big change from

8    the early '90s, where none of that was required.  So I think it

9    is very plausible that Congress would have required that.

10   Because again, if every IP address is registered, why -- they

11   wouldn't have needed to change that language and make it more

12   specific, Your Honor.

13       And I think it goes, again, to this early system.  This

14   was assigned in the early '90s, 1993.  There is nothing to

15   suggest that ECT, Educational Corporate Technologies, knew they

16   were a registrant, that they had this registered IP address.

17   There's nothing to suggest that.

18            THE COURT:  Why does it matter?

19            MS. MUNK:  I think it matters because we are looking

20   at -- we are looking at a statute that has used specific words

21   and to put the defendants on notice.

22            THE COURT:  In terms of whether or not Educational

23   Corporate Technologies, in 1993, knew that someone viewed them

24   as a registrant, why would that matter with respect to what

25   Congress was trying to do in writing this law in 2003?

37

```
 1              MS. MUNK:  Well, because, again, I think it's
 2    reasonable that Congress didn't want to get into regulating a
 3    system that occurred very early on in the internet.  It was
 4    really kind of unclear how stuff was issued and allocated and
 5    what have you --
 6              THE COURT:  What evidence is there of that?
 7              MS. MUNK:  I think the difference is they changed the
 8    language, Your Honor.
 9              THE COURT:  But, as Mr. Ciaffa points out, in doing
10    so, they made it more specific and less subject to an attack of
11    void for vagueness.
12              MS. MUNK:  Your Honor, we disagree with that.
13        They made it more narrow, yes.  It took out
14    misrepresenting the right to use any IP address and it had to
15    be an IP address that was registered, with a registrant.
16        "Registrant" in this context, in this IP -- where we are
17    all trying to figure out what did Congress mean and how were IP
18    addresses allocated or registered, it is vague, Your Honor.
19    And I believe that both sides -- I mean, I think, at the end of
20    the day, probably none of us in this courtroom actually know
21    because we weren't in the minds of Congress and they have given
22    us very little to look at.
23        But what we have done is presented a very plausible,
24    reasonable definition.  The government, arguably, has presented
25    a plausible, reasonable definition.  The term is ambiguous in
```

1   this statute.  And under the rule of lenity, Your Honor, the

2   Court should rule in favor of the defendants based on the rule

3   of lenity and we should win, essentially.  I mean, the Court

4   should find it's vague under the rule of lenity because it's

5   absolutely plausible it would require something specific, like

6   a Registration Services Agreement.

7       And one final point is ARIN doesn't have any right to

8   control or do anything about this early Legacy space where one

9   hasn't entered into a contract.  They want to, but they don't.

10  And there could be all these transfers that have occurred that,

11  maybe, four corporations down now use this IP space.  And what

12  is in the WhoIs database is completely irrelevant, and they

13  don't update it because they don't want to be bound by ARIN

14  policies.  I think Mr. Lindsey laid this out very well, that

15  they have so many -- just a very rigid structural system.  You

16  have to pay fees.  You have to do all these things.  If you

17  stop using it, don't use so much, they will take it back.  You

18  can't transfer it without their consent.  You can't sell it.

19  All these different requirements.  And they don't have the

20  regulation over it.

21      So I think it is plausible and very reasonable that

22  Congress would recognize, "Look, we want to regulate registered

23  IP addresses, that it's very clear they registered."  Under our

24  definition, there's no question they are registered, and that's

25  very likely what Congress could have intended, Your Honor.

1    I do think maybe some of my colleagues, some of the other

2    lawyers for some of the other defendants want to weigh in on a

3    few points.  I will let them do that, unless you have

4    questions, Your Honor.

5              THE COURT:  Mr. Jones?

6              MR. JONES:  I don't have anything, Your Honor.

7              THE COURT:  Mr. Riddet?

8              MR. RIDDET:  Yes.  Thank you, Your Honor.

9    Your Honor, as you know, we are talking about Section A5

10   of the statute, which makes it a crime for one to represent

11   themselves to be a registrant or successor in interest to a

12   registrant.

13   I would submit, Your Honor, that one can only falsely

14   represent that he or she a registrant if he isn't a registrant.

15   In other words, if someone is a registrant, and they say, "I am

16   a registrant," there would be no false representation, and,

17   therefore, no violation of section A5.  So, in order, Your

18   Honor, for a defendant to know or be guilty of this section, he

19   must or she must know what a registrant is and that he or she

20   is not a registrant.

21   Now, we have two experts, Your Honor, who have submitted

22   conflicting declarations to this Court on what a registrant is,

23   and they disagree.  And I would submit, Your Honor, that if

24   those experts don't know what a registrant is, or at least have

25   a different view on what a registrant is, how could our clients

1    know what one is?

2        The test, Your Honor, for statutes that do not involve

3    First Amendment protection is if the statute fails to put a

4    defendant on notice that his conduct is criminal, it is

5    unconstitutionally vague.  I think that's the situation here,

6    Your Honor.  And I would submit it on that basis, unless Your

7    Honor has any question.

8            THE COURT:  Well, and I wonder, to what extent can I

9    consider the government's response?  Which is, in their

10   actions, in hiding their true identity, that this is

11   essentially consciousness of guilt; that this conduct points to

12   the knowledge, points to scienter, the awareness; that they do

13   what a registrant is, and they know they are not the

14   registrant, and as a result, that's why they were avoiding

15   using their true identity and they are impersonating the actual

16   true registrant.

17           MR. RIDDET:  That seems to be an argument that would

18   be made at trial as to whether or not the government was able

19   to prove that the defendants knew they were not registrants.

20   Our question is whether the statute itself is

21   unconstitutionally vague.

22           THE COURT:  What you are saying is that even though

23   your client may have known and figured it out, that that still

24   doesn't take us away from the point you are trying to make,

25   which is that the statute itself would not have informed a

1   reasonable person of what all it covers?

2          MR. RIDDET:  I think that is correct.  I think when

3   Congress decides to put the word "registrant" into a statute,

4   Congress has some obligation to define the term.  And I think

5   we all agree that that was not done.

6          THE COURT:  All right.  Thank you.

7      Response?

8          MR. CIAFFA:  Again, rolling back to what this motion

9   is, the defendants have moved the Court to declare the statute

10  unconstitutional on its face and unconstitutional as applied to

11  their conduct.

12     With respect to their motion to declare the statute

13  unconstitutional on its face --

14         THE COURT:  The Court would have to find that this

15  was First Amendment protected activity; is that right?

16         MR. CIAFFA:  Yes.  Otherwise, the Court should not

17  decide that and the Court should decide only whether it was a

18  vague as applied.  That's the first thing.

19     But even if the Court were to go ahead and make the

20  decision, like the Ninth Circuit did in *Kilbride*, although the

21  Ninth Circuit didn't decide one way or the other; they said,

22  "Well, we are just going to decide it anyway," they did.  So if

23  the Court wishes to go that way, that's fine.

24     With respect to the statute's constitutionality and

25  whether it is vague or not, as applied to the defendants'

1    conduct, the best approach is wait and see that a record is

2    made about what the defendants actually did.  But if the Court

3    wishes to decide this, if the defense is urging the Court to

4    decide this now -- that's why the government brought in the

5    exhibits to show the Court the defendants knew exactly what was

6    prohibited here because they consulted the WhoIs registry.

7              THE COURT:  Let me ask you.  To the extent that the

8    Court does decide the question of vagueness as applied, does

9    that, then, assist us with determining what evidence is

10   relevant at trial?  For example, with respect to these

11   competing experts, Mr. Lindsey and Mr. Curran, to the extent

12   that the Court finds that the statute is not vague as applied,

13   then does that set aside the need to hear from Mr. Curran and

14   Mr. Lindsey at trial?  Whereas, if the Court defers until

15   trial, then we would have that precise issue to consider?

16             MR. CIAFFA:  I believe so, Your Honor.  If the Court

17   decides that the statute is not vague, then the issue about the

18   meaning of the word "registrant" should not be a bone of

19   contention at trial.

20             THE COURT:  Because, otherwise, it will be, right?

21             MR. CIAFFA:  Otherwise, it would be.

22      And I believe it might be overly confusing to the jury as

23   to whether the defendants impersonated the registrants or they

24   just impersonated some other person that happened to be the

25   person registered in ARIN.

1    And what I want to leave the Court with is a concrete

2    example of the results that would occur if the defendants' view

3    were adopted.  About a week ago, I plugged in my DOJ IP address

4    in the ARIN, WhoIs, to see who it was registered --

5            THE COURT:  What do you mean, your IP?

6            MR. CIAFFA:  My computer, sitting on my desk.

7            MS. MUNK:  Your Honor, not to the cut counsel off,

8    but we are going to object.  I don't see how presenting

9    documents to us that were internet -- we have all done internet

10   searches, but presenting them to the Court where we haven't had

11   a chance to look at it is irrelevant, Your Honor.

12           MR. CIAFFA:  If counsel wishes to challenge whether

13   it is really my IP address or not, she may.

14           THE COURT:  Your point being you are trying to give

15   an example of how this would operate --

16           MR. CIAFFA:  This is my IP address.

17           MR. JONES:  Your Honor, there's an objection.  And we

18   would ask that counsel remove the exhibit from the screen.

19           THE COURT:  There is an objection.

20     So, at this point, with respect to the objection, what is

21   the purpose of offering this and how is it otherwise --

22           MR. CIAFFA:  The purpose is illustrative.  It is

23   demonstrative.  The rules of evidence do not apply at this

24   pretrial hearing, and it shows that my --

25           MR. JONES:  Your Honor --

44

1          THE COURT:  Wait.

2          MR. CIAFFA:  -- that my Department of Justice IP

3    address, which is one part of a 64,000-IP-address block, was

4    registered in 1994 before ARIN.

5          THE COURT:  Wait.

6      So your response is that the rules of evidence would not

7    apply at this proceeding?

8          MR. CIAFFA:  Correct.

9          THE COURT:  So, response to that?

10         MS. MUNK:  Your Honor, I guess the response would be

11   that counsel had lots of opportunity to put in what he believes

12   should be part of evidence with the briefs, so we are now being

13   presented with something new that is beyond the scope of the

14   briefs, Your Honor.

15         MR. CIAFFA:  I will take this back.

16     The point here is --

17         THE COURT:  The objection is overruled.

18     But I won't rely upon this.  Just go ahead and present

19   your argument.

20         MR. CIAFFA:  Thank you.

21     The point is that if the defense argument were accepted,

22   again, this false construct that there is such a thing as an

23   unregistered IP address, then 64,000 IP addresses belonging to

24   the Department of Justice, including mine, are open game and

25   free to be hijacked, and that's not what Congress intended.

45

 1       This is a fraud statute.  Congress placed the civil

 2  penalties in another title of the U.S. Code.  In Title 18,

 3  Congress was concerned about preventing fraud.  They were

 4  intending to protecting people who were allocated IP addresses,

 5  whose names appeared in the registry and were -- continued to

 6  be maintained in the registry.

 7       No one disputes that there's only one registry.  And no

 8  one disputes that there's only one person who is allocated to

 9  each IP address.  And under the plain meaning of the statute,

10  the statute is not vague the defendants have not met their

11  burden of challenging and overcoming the presumption of

12  constitutionality.

13            THE COURT:  Thank you.

14       Any further argument from defense?

15            MS. MUNK:  Just briefly, Your Honor.

16       Since we have now brought up this document from the DOJ's

17  IP address, the defense feels pretty confident that the DOJ has

18  most likely entered into some type of RSA or Legacy RSA.

19       So, again, our definition of "registered" would actually

20  only apply in very limited circumstances, where essentially IP

21  addresses, Legacy IP addresses, were either held by defunct

22  companies that just let them sit there forever, or they have

23  been transferring them and they don't want to be bound by the

24  rigid rules of ARIN, which there's lots of -- there's lots of

25  circumstances where people do not want to enter into a

 1    Registration Services Agreement with ARIN, and we submit that

 2    they are not registered, Your Honor.

 3        One quick point is the government talked about if we start

 4    talking about "registrant" with the jury, it would be

 5    confusing.  Your Honor, this is our point, is that "registrant"

 6    in this context is vague.  It's ambiguous.  Our definition is

 7    reasonable.  Their definition is reasonable.  We don't really

 8    know.  And at the end of the day, when a statute is ambiguous

 9    and open to two reasonable interpretations -- which I submit we

10    have two reasonable interpretations -- under the rule of

11    lenity, Your Honor, the Court should construe the term against

12    the government and in favor of the defense.

13        I believe that the Court should find, at a minimum, under

14    the rule of lenity, that the statute is vague and should

15    dismiss the counts, Your Honor.

16        THE COURT:  With respect to the question that I posed

17    to Mr. Ciaffa, to the extent that the Court were to find that

18    the statute is not void for vagueness as applied, in your view,

19    is there any point, any relevancy, or any basis for these two

20    witnesses, Curran and Lindsey, to testify at trial?

21        MS. MUNK:  I think one of the issues at trial will

22    be, I mean, could the defendants have violated the statute if

23    there's no registrant?  I think this would be an issue at

24    trial, Your Honor, and I guess likely we would call

25    Mr. Lindsey.

47

```
1          THE COURT:  I am sorry?  Say that again.

2          MS. MUNK:  Well, Your Honor, one of the elements is

3   that there's going to be -- there's a registrant.  So this will

4   be an issue at trial.  And I think --

5          THE COURT:  Wouldn't the Court instruct as a matter

6   of law what that means?

7          MS. MUNK:  I thought you said if you found it wasn't

8   vague.

9          THE COURT:  Right.  If the Court found this term is

10  not vague, that the motion to dismiss is denied, would, then,

11  for purposes of the instructions -- because the Court would

12  have to instruct the jury as to what these terms mean -- then,

13  to the extent that that is a matter of law that the Court would

14  instruct the jury on, why would there be need for these

15  competing experts?

16         MS. MUNK:  Off the top of my head, without consulting

17  with anyone else on my team, Your Honor, I think just for

18  intent purposes, there might be a reason to have experts for

19  intent.

20      Mr. Lindsey is talking about this space.  He knows this

21  space.  And we appreciate John Curran's declaration, but it is

22  very biased in favor of pro ARIN.  Mr. Lindsey -- he deals with

23  IP addresses all the time and Legacy IP addresses, so I think

24  it is important for a jury to hear what would somebody actually

25  be considering on whether or not a Legacy IP address is
```

48

1    registered.

2            THE COURT:  To the extent that I find both witnesses

3    are biased, at the end of the day, isn't it still up to the

4    Court to determine what that term means?

5            MS. MUNK:  Well, Your Honor, we are asking you to

6    interpret a statute from Congress; that's correct, Your Honor.

7    Again, if it's ambiguous, which I believe, at a minimum, it is,

8    it should be interpreted in our favor.

9            THE COURT:  Thank you.

10           MS. MUNK:  Thank you, Your Honor.

11           MR. CIAFFA:  Looking down the road -- and of course,

12   we don't know what the defense is going to be.  If the defense

13   is, "Yes, we impersonated people, but they weren't really the

14   registrants, and therefore we are not guilty," that's a

15   different type of defense.  I don't know if that's going to be

16   the defense at this time.

17       But, at a minimum, the government would need to introduce

18   evidence as to who was the registrant as of the time this crime

19   was committed.  So, for example, the ARIN representative

20   witness would testify that, with respect to block number blah,

21   blah, blah, the registrant on that day was Mr. Darrell Lynn,

22   then the government would introduce the letter of authorization

23   that shows Darrell Lynn, and that would be the person that was

24   impersonated.  That's the way it would come out.

25           THE COURT:  Necessarily, one would have to identify

49

1    ARIN as this entity and what it does or what it maintains in

2    its records.  And then, with respect to what was contained

3    within this registry, provide proof as to these various IP

4    addresses.  And then you would have your other proof relating

5    to these letters and these communications.  And I wouldn't

6    think that you would need to go through the history --

7            MR. CIAFFA:  No, we would not.  We would ask, "Who

8    was the registrant of this IP address as of this date?"

9        He would say, "Darrell Lynn."

10       This is what -- this email address, and we would introduce

11   it.  Something along those lines.  We would not get into the

12   meaning of the word "registrant."  And, again, depending upon

13   if the defense wishes to make their defense that they are not

14   really the registrant and they just happened to impersonate

15   them, and it was a coincidence.

16           THE COURT:  Mr. Riddet.

17           MR. RIDDET:  Thank you.

18           MR. CIAFFA:  Oh, one thing my colleague reminded me,

19   Your Honor, no, the IP block that the government was speaking

20   about with the Department of Justice was not subject to a

21   Legacy agreement with ARIN.  It is in exactly the same boat as

22   the others.

23           THE COURT:  We don't need to talk about that block.

24   It is not relevant.

25           MR. CIAFFA:  Okay.

1          MR. RIDDET:  Your Honor, most of the discussion today

2    has been those cases which involve a statute that has not had

3    First Amendment protection, the as-applied test, if you will.

4    However, I just wanted to remind the Court that we have fairly

5    thoroughly briefed the question of whether or not this is a

6    statute that has First Amendment protection.  And the

7    government's response says that it's unclear whether this is a

8    case of First Amendment protection.

9        We believe there is strong evidence that A5 is one of

10   those that has First Amendment protection, and if Your Honor

11   finds that that is correct, then, of course, the test is on its

12   face.  I just wanted Your Honor to understand we are not giving

13   up that argument.  It is in the briefs and we stay by it.

14          THE COURT:  When the government says it is unclear,

15   it is only because the Ninth Circuit didn't definitively come

16   forward --

17          MR. CIAFFA:  Yes.

18          MR. RIDDET:  New statute, not much authority.

19   Correct.

20          MS. MUNK:  Your Honor, just to add to that point, I

21   believe, Your Honor, the government cited the *Simpson* case, and

22   I think it was out of the Fifth Circuit, but my recollection is

23   it did involve subsection A2 of the CAN-SPAM Act, and there the

24   Court specifically said -- and we actually address this in our

25   reply brief, Your Honor -- the Court said that commercial email

51

 1    receives First Amendment protection, but it didn't in that case

 2    because it doesn't receive First Amendment protection if it's

 3    misleading, false, or deceptive.  Under Section A2, it is

 4    actually regulating false and deceptive commercial email, and

 5    here, we don't have that.  It is not talking about the content

 6    of the email, but it is affecting email, so we believe that the

 7    *Simpson* case actually shows we would receive First Amendment

 8    protection.

 9          THE COURT:  But it does involve fraudulent conduct as

10    far as false pretenses, pretending to be someone else, correct?

11          MS. MUNK:  It does involve misrepresenting the

12    source, but the content of the email could be completely

13    legitimate.  So, I mean, I won't get into specifics, but this

14    isn't an allegation where the government has charged, "You were

15    sending false and deceptive emails."  That's not at issue here,

16    Your Honor.  So our position is that the First Amendment would

17    apply, and we could do a facial vagueness challenge, which

18    looks at the ordinary person.  It is an ordinary person

19    standard.  And again, I am not going to rehash it all, but I do

20    believe an ordinary person, honestly, Your Honor, would have no

21    idea, and that this would be vague and, at a minimum,

22    ambiguous.

23        Thank you.

24          THE COURT:  Thank you.

25        All right.  As I started at the beginning of these

proceedings, the Court referenced an *in camera* review that was

conducted by the Court, and that is based upon a submission

that the government made on August 21st.  And what was provided

were transcripts from proceedings on October 17 and

October 31st of 2018.

         With respect to the October 17th proceedings, there's

nothing which bears on the issues that were identified by the

defense relating to using or -- let me back up.

         There's no indication that the government suggested at any

time that SPAM was illegal, that using dba's was illegal.

Further, that's also true with respect to the proceedings on

October 31st of 2018.

         However, there is one page or actually a couple of pages

that I have reviewed which relates to essentially the precise

discussion that we have been having with respect to

"registrant."

         Let me do this.  I am going to conduct an *in camera*

proceeding with my reporter in chambers and then inquire as to

what their position is on turning over four pages from these

materials, so we will take a short break, and then I will see

counsel, government counsel, and my court reporter in my

chambers.

                  MR. RIDDET:  Are you come back on the bench?

                  THE COURT:  Yes.

                  MR. RIDDET:  There's one other matter I want to bring

1    up.

2           THE COURT:  I am going to go in chambers, and we will

3    be back and put on the record the Court's conclusions.

4           MR. RIDDET:  Thank you, Your Honor.

5       (The following proceedings were heard in chambers:)











(The following proceedings were held in open court:)

THE COURT:  We are back on the record.  All counsel and parties are present.

The *in camera* proceeding that was held will be sealed.

The Court, as indicated before, had gone through the transcripts from the proceedings on October 17th and 31st of

1    2018 and found that there was no suggestion by the government

2    that the use of SPAM or "doing business as" designations was

3    unlawful.  But there was also an issue that was raised by the

4    defense regarding instructions to the jury on the law.

5        I have reviewed those sections, and specifically they are

6    identified in the *in camera* proceeding.  And the Court has

7    identified the sections that it wished to hear the government's

8    position on.  It has heard from the government.  And at this

9    point, the Court is prepared to find there are no portions of

10   the October 17 or October 31 transcripts that need to be

11   disclosed.

12       And the Court will direct that the court reporter make

13   this transcript part of the record to the extent that it is

14   something that ends up being reviewed by the Ninth Circuit.

15       So that I believe responds to the remaining issues that

16   were before the Court on the grand jury proceedings.  We had

17   previously entertained argument on the grand jury on

18   August 1st.  The Court had found that there was nothing but

19   speculation to support the request but that the Court would

20   review *in camera* the proceedings that I specified.  I have done

21   that now, and that is my ruling.

22           MS. MUNK:  Your Honor, thank you.

23       With regard to -- I know you previously alluded to the

24   fact that you intended to issue a written ruling on the

25   vagueness motion.  I don't know if that is still your intent.

59

```
 1              THE COURT:  It is.
 2              MS. MUNK:  As the Court is aware, we have a Rule 17
 3   subpoena out to ARIN.  We have them personally served, and we
 4   expect by, at least mid November, we should receive those
 5   documents.
 6              THE COURT:  At least by --
 7              MS. MUNK:  By mid November.  So, Your Honor, our
 8   request would be -- we don't know if there's something we want
 9   to supplement, or maybe the government would, so we would ask
10   the Court would be open to deferring ruling?
11              THE COURT:  Yes.
12         And so, to the extent that you have made reference to the
13   subpoena, and it involves ARIN, does the government -- is the
14   government aware of what is requested?
15              MR. CIAFFA:  No.  We did not have any notice of a
16   subpoena to ARIN.
17              THE COURT:  I didn't require the defense to provide
18   that notice.  But, at the same time, there's nothing that says
19   that ARIN can't tell the government they have been asked to
20   provide certain information.
21              MS. MUNK:  And, Your Honor, I believe the request was
22   that the documents actually be produced to the Court, and we
23   had no objection to make them available to the government, and
24   that's what I believe the Court granted.
25              THE COURT:  Yes.  So if there is anything responsive
```

60

1   to your request, then they would be provided to the Court, and

2   then both sides would have the opportunity to review them.

3          MS. MUNK:  Thank you, Your Honor.

4      And just from a procedural standpoint, is that something

5   that the Court then notifies the parties when they have

6   received the documents?

7          THE COURT:  Yes.

8          MS. MUNK:  Should we follow up?

9          THE COURT:  Let's do this.  It's hard to get all of

10  you in court at one time.  I was going to say we would set the

11  matter for a status hearing.  We would determine what, if

12  anything, has been provided, and then, based upon that, then

13  the Court would be willing to give each side opportunity to

14  review and provide further supplemental authorities or

15  pleadings.

16         MS. PIERSON:  Typically Rule 17 subpoenas are issued

17  with a return date that has to match the date of a court

18  hearing.  Was that subpoena returnable for today?

19         MS. MUNK:  No, Your Honor.  We set it for -- we were

20  setting it for 30 days.  The subpoena date is -- the timing --

21         THE COURT:  Sometimes, they will send them early.

22         MS. PIERSON:  Okay.  I think the rule requires them

23  to produce them at the hearing on the date and then make it

24  available at that point to both parties.

25         THE COURT:  So, refresh my memory.  Which date?

61

```
 1          MS. MUNK:  So, there's a couple of tricky things,
 2   Your Honor.  Our goal initially was that we would get them in
 3   time, but -- you know.
 4       We put, on the subpoena November 4.  I was estimating 30
 5   days.  But by the time they actually were served with the
 6   subpoena, I believe that was the middle of October, and on our
 7   document request, we did say 30 days.
 8       I actually haven't heard from a representative of ARIN
 9   yet.  They were personally served.
10       The other little snag in this is that the clerk -- after
11   you approved the order, when they made us the subpoena, they
12   didn't actually sign or stamp it, and I was a little concerned
13   about delaying this even further with getting it back down here
14   and then it then getting sent back to our office, so I went
15   ahead and served them with the Court's order.
16       Again, I haven't heard from ARIN, so no one has told me
17   they are objecting or they are going to quash it or anything,
18   but they have been personally served.
19       So, I believe if they are following the 30 days -- the
20   subpoena says November 4.  If they are following the 30 days
21   from service, I believe it would be November 16 or 17.  I would
22   need to double-check my notes, Your Honor.
23          THE COURT:  Ms. Pierson, any suggestions?
24          MS. PIERSON:  Since this is the first we have heard
25   about it, it's hard to say.  But I would have thought that the
```

1    subpoena would have had to have been issued for a date where

2    there was a court proceeding.

3              MS. MUNK:  Your Honor, we did review the local rules,

4    and I don't recall that being a requirement.

5              THE COURT:  I mean, generally, or -- necessarily,

6    there is a date noted.  So, at this point --

7              MS. MUNK:  We would be agreeable to a status

8    conference, Your Honor.  That probably makes the most sense.

9              THE COURT:  You haven't reached out to ARIN?

10             MS. MUNK:  I haven't reached out to them.  I can.

11             THE COURT:  And given that at this time the

12   government is aware that this subpoena exists, is there any

13   problem with the government reaching out to ARIN and

14   determining whether or not they reviewed it, whether or not

15   they have any objections, and a date certain that they would be

16   able to respond?

17        (Counsel confer.)

18             MR. CIAFFA:  That would place the government in an

19   unusual position, and ARIN is not a government entity.  We

20   don't represent them.

21             THE COURT:  No.  No.  That's fair.  That's fair.

22   That's fair.

23             MS. MUNK:  Your Honor, just to clarify, when we did

24   apply for this under seal, ex parte, we did request that it not

25   be shared with anyone.

63

```
 1            THE COURT:  Well, the substance of this?

 2            MS. MUNK:  The substance, correct.

 3            THE COURT:  And I think the Court has the discretion

 4   to permit the government to have knowledge of the existence of

 5   the subpoena.  As to why you wanted it and what specifically

 6   was that you were requesting, at this point, I haven't notified

 7   the government of that.  And at this point, I am satisfied that

 8   they don't need to know as of right now.

 9       And I also am satisfied that, once the materials are

10   provided, that both sides would have the opportunity to review

11   the documents.  So, I guess the thing is trying to come up with

12   a time frame for a status hearing.

13       Do you want to contact ARIN and inquire whether or not

14   they received the subpoena and are prepared to respond to it

15   and, if so, when they would be able to do so; and then, based

16   upon that information, schedule a follow-up hearing here?

17            MS. MUNK:  Your Honor, yeah.  We could do one of two

18   things.  I am happy to contact ARIN and see what time frame

19   they will give me.  Or I am also fine with setting a status

20   conference.  I don't know, maybe early December.  I am just

21   trying to think.

22       I think the 30 days -- at a minimum, they would have until

23   the middle of November, and I know there's Thanksgiving.

24            THE COURT:  I guess the number of defects that you

25   have identified here are such that perhaps what we should do is
```

64

1   issue a new subpoena that has -- that is stamped, that has a

2   date.  And then, to the extent they already know there's going

3   to be -- that there already is this request, we will be able to

4   have a date certain which we can rely upon these materials

5   being provided, and then we don't have to guess.

6           MS. MUNK:  If that's the Court's preference, that's

7   fine, Your Honor.

8           MR. CIAFFA:  I would make a suggestion, Your Honor.

9   Obviously, I don't know what things have been requested from

10  ARIN and whether or not it's anticipated that it's going to be

11  something that will change the Court's mind.  The government

12  would request that the Court, having now had several hearings

13  on this motion, issue an order without prejudice.  And if the

14  defense wishes to reopen based upon what ARIN produces, that

15  will be up to them, and they can always bring it up again.

16      But at this point -- again, I don't know whether this is

17  some blockbuster piece of evidence that's going to change the

18  course of this motion on vagueness.  So we would just ask that

19  a ruling be made, without prejudice, and if it turns out it's

20  something so important that the defense wishes to ask the Court

21  to reopen, we could do it at that time.

22          MS. MUNK:  Your Honor, I guess our position -- just

23  to clarify, this is the actual substantive hearing we have had

24  on the vagueness motion.  But we are at the end of October at

25  this point, and I actually think the return date here is in a

1    couple of weeks.  So I anticipate -- again, I am happy to reach

2    out to them tomorrow and see if I can get ahold of anybody.

3    But assuming they are not going to request a continuance or

4    they are not going to move to quash, I believe we would have

5    the stuff mid November, Your Honor, which is not that far away.

6              THE COURT:  All right.  Let's set this for a status

7    hearing on November 14th at 4:00 p.m., and that is three weeks

8    from now.  And I expect that you should have more information

9    about when ARIN will be supplying this information to the

10   Court.  And then on the 14th, I can share it with the parties.

11   And then we can determine whether or not additional briefing is

12   appropriate.

13             MS. MUNK:  Your Honor, my only request would be -- I

14   am just looking at the dates.  I believe they were served -- it

15   was either the 15th or 16th, so the 30 days -- I think it would

16   be that week.  So I don't know if we -- if we are hoping that

17   the documents would be here, could we maybe do this at a

18   conference the following week, on the 21st?  Because, ideally,

19   the documents will be here.

20             THE COURT:  We can't do it on the 21st.

21             MS. MUNK:  Or that week?

22      (Discussion between clerk and Court.)

23             THE COURT:  I can do it on the 20th at lunchtime, at

24   12:00 p.m.

25             MR. RIDDET:  What day of the week is that?

```
 1              THE COURT:  A Wednesday.
 2              MR. RIDDET:  That works.
 3              MS. MUNK:  I believe that works for all of us, Your
 4    Honor.
 5              MR. RIDDET:  Noon?
 6              THE COURT:  Yes.
 7         And if you receive word they are going to supply it a week
 8    or two before that, let me know, and we will advance that.
 9              MS. MUNK:  Your Honor, I will try to get ahold of
10    somebody tomorrow, and if I do, do you want me to call Kimmi --
11    not call -- email.  I will email her and the government and let
12    them know, let Your Honor know what they said.
13              THE COURT:  All right.  And then, in the meantime, I
14    will be drafting the order without any further briefing.
15              MR. JONES:  Just a quick question, Your Honor.  Are
16    the clients required to be here for the hearing on the 20th?
17              THE COURT:  You can waive.
18         Although, let's start thinking in terms of trial dates.
19    After this motion is decided, to the extent that I don't grant
20    the motion to dismiss, are the parties close to being prepared
21    for trial?
22              MS. RIM:  I wanted to raise to the Court that we do
23    intend to bring one more motion to dismiss based on the
24    declaration of John Curran that the government filed, where he
25    stated that an IP netblock is not property, and that goes
```

67

```
 1   directly to the issue of --

 2            THE COURT:  Mail fraud?  Or wire fraud, mail fraud?

 3            MS. RIM:  Yeah, exactly, Your Honor.

 4        So we were going to ask the Court if the Court would like

 5   us to set a hearing date for that, or if the Court wants us to

 6   confer with the government to get a schedule together.

 7            THE COURT:  I know this came up in August, and I was

 8   actually thinking that there may be something -- that it would

 9   have been presented, given that this has been known now.  I

10   would be looking to have this heard sooner rather than later.

11        Can you have this motion filed within the next couple of

12   weeks?

13            MS. MUNK:  Your Honor, really quick, that is

14   another -- just to remind the Court, there's also a request in

15   our subpoena to ARIN about documents related to this issue.  So

16   I don't believe we would be prepared in case there's anything

17   in there that we would need to include in our motion.

18            MR. RIDDET:  Your Honor --

19            THE COURT:  Yes.  I understand that.

20        So, I do see a relationship between what has been

21   requested and then this motion.  So I won't require you to file

22   a motion before this information is provided.

23            MS. RIM:  I have one more point, and then I can sit

24   down, which is to the extent the Court is going to begin

25   drafting and considering the vagueness motion, I did want to
```

68

1  put on the record our strenuous objection to the Court

2  considering the grand jury exhibits that the government showed.

3          THE COURT:  You mean the ones related to Count Ten?

4          MS. RIM:  Yes, the email and the ECT WhoIs document.

5          THE COURT:  I don't recall an objection being made to

6  those.  There was an objection made to Mr. Ciaffa's IP address,

7  which I ultimately sustained.

8          MS. RIM:  Then I am objecting now.  I am sorry if I

9  didn't do it while the argument was being made.

10     But there is a lot of context here -- I am not going to

11  bore the Court at this point -- that I was just concerned when

12  the Court says "consciousness of guilt."  There are a lot of

13  facts that are going to be in dispute as to what the defendants

14  knew about this letter, who provided the letter -- not just

15  this letter but other letters.  And I just -- to the extent

16  that this is about a legal question, about whether a statute is

17  vague, these exhibits are completely irrelevant to that

18  question.  And we are not -- this is not a fact hearing.

19     If the Court is going to consider this, we would ask that

20  the Court allow us to explain and put in our own factual

21  evidence.  But I don't think that would be appropriate for this

22  legal inquiry.

23          THE COURT:  Mr. Ciaffa, do you wish to be heard?

24          MR. CIAFFA:  As the Court knows, the rules of

25  evidence don't apply at this hearing, number one.

69

```
 1        Number two, it was a demonstrative aid to show the Court

 2   what we are talking about when we talk about the registry, the

 3   American Registry for Internet Numbers, and what information is

 4   contained therein.  And I believe it's illustrative to assist

 5   the Court and the parties so we all understand what we are

 6   talking about.

 7            MS. RIM:  Your Honor, Mr. Ciaffa characterized these

 8   communications as a defendant impersonating somebody.  That's

 9   not an illustrative, demonstrative argument.  And, on their

10   face, the documents don't show that.  There has to be a lot

11   more evidence for the Court to decide one way or another.

12        All the email says is that the LOA does not seem to match

13   the WhoIs info.  It doesn't say who provided the LOA.  It

14   doesn't say who signed it.  It doesn't say, "Oh, I wrote this

15   LOA and I signed it."  And, regardless, those facts are not

16   before the Court right now, and there will be an opportunity to

17   talk about those facts.  And if the Court would like, we can

18   introduce our own evidence, but it is totally irrelevant to

19   this legal question.

20            THE COURT:  All right.  Well, I will accept it as

21   demonstrative evidence just as far as pointing the Court's

22   attention to the term "registered," so as to support their view

23   that this is a registry; it does provide for registration

24   information; notwithstanding the fact that, back in 1993,

25   Educational Corporate Technologies may not have filed a
```

1    registration document; that, for purposes of -- as of November

2    of 2015, this was contained within the registry as a registered

3    document.

4        And with respect to the letter on the BGP letter of

5    agency, dated October 18, 2013, that this is an example of how

6    an IP block is transferred, authorized --

7            MS. RIM:  Your Honor, this is why this is an issue.

8    This email gives no context.  There's nothing in here that

9    indicates who -- who the -- who sold the netblock, what that

10   person represented to the defendants, whether that person could

11   have provided the LOA, and --

12           THE COURT:  Without even considering the defendants'

13   role in this, basically, it just shows that if you are

14   identified as an organization that is connected to an IP

15   netblock, and you have the recipient of this IP block being

16   identified, that the letter that is attached is what happens,

17   evidently, when one is conducting transactions or seeking

18   authorization to announce IP addresses, do you dispute that's

19   when this letter purports to be?

20           MS. RIM:  Yes, Your Honor, we do.  And that is a

21   factual dispute that will be heavily contested if there is a

22   trial on this issue.

23           THE COURT:  That this is not an authorization to

24   announce?

25           MS. RIM:  Your Honor, I am trying to -- if the Court

1   is -- first, our position is that the LOA has nothing to do

2   with the meaning of the word "registrant."

3       But secondly, Your Honor, the question here is not about

4   whether a hosting company needs an LOA.  It is about what

5   people understood this particular LOA to be, and that's not

6   pertinent to the question of what "registrant" means, and that

7   is what is going to be presented to the jury at trial.  And

8   there's a lot of evidence, Your Honor, that is helpful to us

9   that we did not bring into court because it was not relevant to

10  this argument.

11      So we strongly object to these exhibits being considered,

12  and I still fail to see how they are pertinent to the question

13  of the meaning of the word "registrant."

14      To the extent that the Court wants to consider

15  Exhibit 248, I still object to it, but it is less objectionable

16  to me than Exhibit 171, which is entirely irrelevant.  It

17  doesn't even have the word "registrant" on it and it has

18  nothing to do with the legal issue before the Court right now.

19          MR. CIAFFA:  Your Honor, the defense asks the Court

20  to rule on whether the statute is vague as applied to their

21  conduct.  The government introduced or provided the Court with

22  a demonstrative aid to show the connection between the word

23  "registrant" -- that is, on the ARIN registry -- and what the

24  defendants did.  And in that case -- the government is not

25  commenting on whether the defendant was a principal, a

1   coconspirator, guilty to Pinkerton liability at this time at

2   all, and the Court need not decide that. But to the extent

3   that the defendants chose to indicated "I checked the WhoIs

4   registry," which is the registry we are talking about, and

5   attached to that email is the letter of authorization with that

6   person's name.

7            THE COURT: All right. The objection is overruled.

8   It was waived. It was not made in a timely fashion.

9       Anything else?

10           MR. RIDDET: Yes, two quick points.

11      Your Honor, when we were in court on August 1st,

12  Ms. Bernstein brought up an issue with regard to a witness by

13  the name of Tarney. And as Your Honor may remember, Tarney was

14  represented to have testified before the grand jury for over

15  130 pages. We had requested any proffers that were provided to

16  the government prior to the grand jury witness testifying,

17  prior to Mr. Tarney testifying, and we were told that there

18  weren't any. And at the end of that discussion, Your Honor

19  said the following: "So I will ask the government to inquire

20  fully with respect to how it was that Mr. Tarney came to

21  testify, cooperate, so we don't have a situation arise at a

22  later point in time that, in preparing for trial, then it turns

23  out that there was some communication that perhaps wasn't

24  memorialized but which gave rise to an agent to suggest to the

25  government that the witness be called without any preparation."

```
1        Now, that request was made to the government at the time.
2   We haven't heard any response to that.  And I would inquire of
3   the Court whether the government has made that request that
4   Your Honor directed.
5            THE COURT:  All right.  Was there any inquiry made by
6   the government with respect to Mr. Tarney and his cooperation?
7            MS. PIERSON:  There was no proffer whatsoever.
8            MR. RIDDET:  That wasn't what Your Honor ordered.  I
9   can show counsel the wording in the transcript, and perhaps she
10  and I can discuss this and she can -- if you want to give her a
11  little extra time to do it.
12           THE COURT:  And my comments at the end were ones that
13  were seeking to avoid any problems, and I have seen enough of
14  them where, as we get closer to trial, a document surfaced, and
15  it ends up being something that the AUSA didn't know about, and
16  sometimes even the case agent didn't know about, but some other
17  agent learned about it, and it surfaces.  And the next thing
18  you know, we have motions for mistrial.  So that's what I was
19  seeking to avoid.
20       At this point, the government has been very clear that
21  there were no proffers.  To the extent that they are
22  100 percent sure, then I will accept that.  But if there's any
23  problem at all on this, then it will be a problem, a big
24  problem.  We will see what remedies would be appropriate,
25  including a mistrial.
```

```
 1          But at this point, the government has been very clear.
 2     They said that there were no proffers.
 3               MR. RIDDET:  That's true.  That came up on
 4     August 1st.  And Your Honor, having heard that -- and I know
 5     Your Honor's background, has probably put some people before
 6     the grand jury yourself.  It is unusual to call a witness
 7     before the grand jury, in my experience, without there being
 8     some proffer.
 9          So, if there's no proffer, we would like to know if
10     there's anything else.  Was there any kind of a document which
11     advised the government of what this witness would testify to,
12     anything at all?  Your Honor was pretty broad in the language
13     that you made.
14               THE COURT:  Well, Mr. Riddet, you and your team are
15     very experienced, and the government and their team are
16     extremely experienced.  So I have to believe that they know
17     their Brady obligations, their Rule 16 obligations, their
18     Giglio obligations.  And to the extent that what you are asking
19     for is anything that bears on any of those three, that they
20     understand what they are required to produce.  So that's how I
21     will say it at this time.
22               MR. RIDDET:  And the second thing, Your Honor
23     commented a while ago that you wanted to have a trial sooner
24     rather than later.
25               THE COURT:  Actually, I was talking about the motion
```

1    to dismiss based upon this issue of property.

2            MR. RIDDET:  I just wanted to advise the Court, we

3    are still getting discovery from the government.  I don't know

4    how much more is to be produced.

5            THE COURT:  I understood on August 1 that there was

6    still discovery being provided.

7        And at this point, when do you see the endgame or when --

8            MS. PIERSON:  This is very frustrating to the

9    government as well, because what we continue to turn over are

10   documents that are provided by the employer of these

11   defendants, eMoby, in response to subpoenas issued years and

12   years ago, where they said, "Oh, look.  We found additional

13   documents," and, "Oh, look."

14       They just gave us 100,000 pages of documents recently, and

15   we turned them over the same day that we got them.  And we are

16   frustrated ourselves by receiving this.

17       But I would submit that the defense is in a better

18   position than we are to know of the existence of these

19   documents, since they come form their employer.  It is not

20   documents that are resulting from our investigation that are

21   being turned over, but these are -- the continuing documents

22   are documents that are coming from the defendants' employer as

23   they said, you know, that they found additional documents that

24   comply with subpoenas issued years earlier.

25            THE COURT:  Is that true, Mr. Riddet?  Is that what

```
 1    you are receiving?

 2            MR. RIDDET:  I don't know, Your Honor.

 3            THE COURT:  You don't know?  You haven't reviewed it?

 4            MR. RIDDET:  I haven't gotten to the later

 5    disclosures myself, Your Honor.  I don't know.

 6            MS. MUNK:  Your Honor, a couple of things.  We are

 7    receiving productions from eMoby.  These are very voluminous.

 8    Extremely voluminous.

 9            THE COURT:  EMoby?

10            MS. MUNK:  EMoby is the company.

11            THE COURT:  Who employed the defendants?

12            MS. MUNK:  Yes, Your Honor.  But they are mid-level

13    employees.  The suggestion that they know all these documents

14    and they know what eMoby is producing is not the case.

15            THE COURT:  No, I guess the government is saying they

16    issued subpoenas years ago --

17            MS. PIERSON:  Right.

18            THE COURT:  -- and eMoby sat on these documents or

19    withheld them, did not turn them over through no fault of the

20    government.  And now that they have responded in a belated

21    fashion, that the government has taken them as soon as they

22    received them and they copied them and forwarded them to the

23    defense.

24            MS. MUNK:  Your Honor, I don't know if that's

25    correct.  I do know eMoby has give tons of documents to the
```

1    government for years, going back to 2016.  I don't know what it
2    is they are now just producing.  It is an issue that the
3    government would need to take up with counsel for eMoby.  We
4    have no control over that, Your Honor.
5           THE COURT:  Doesn't sound like the government doesn't
6    either.  They issued a subpoena, which comes from the Court,
7    and it is the Court telling eMoby to turn over this
8    information, and in spite of the Court directing them to do
9    this, they are not.
10          MS. MUNK:  Your Honor, again, the government has
11   remedies if they feel like eMoby is withholding documents.
12          THE COURT:  But that would be kind of hard, to the
13   extent they don't know if there's 500,000 documents or a
14   million documents.  There's only so much that they can do to
15   the extent these are not documents in their possession.
16      Ms. Pierson?
17          MS. PIERSON:  We haven't said they are withholding
18   documents, but they continue to find additional documents, and
19   they said recently that they had found an additional server and
20   found all of these other responsive documents on the other
21   server.  These are grand jury subpoenas that were issued years
22   ago, which they are now giving responsive documents.  And,
23   obviously, we feel like we need to give them to the defense,
24   and we have given them without reviewing them to know whether
25   they are relevant.

1          THE COURT:  So, at the end of the day, it sounds as

2     though, through no fault of the defense, no fault of the

3     government, there are still materials being furnished as we

4     speak.

5          And given that, Mr. Riddet, you are entitled to have

6     sufficient time to prepare for trial, to review these

7     materials, and they are voluminous.  So we will not, with that

8     in mind, be taking the position of we need to have this matter

9     tried sooner rather than later.

10          MR. RIDDET:  Correct.

11          THE COURT:  We will try it as soon as practicable, as

12     soon as all counsel can prepare for trial.

13          MR. RIDDET:  Perfect.  Thank you, Your Honor.

14          THE COURT:  Anything else?

15          MS. MUNK:  No, Your Honor.  Thank you.

16          THE COURT:  So, there are so many moving parts in

17     this case.  We are then scheduled for further proceedings on

18     November 20th at 12:00 p.m., and with the understanding that

19     could be advanced.

20          MR. JONES:  And did you confirm whether or not the

21     clients had to be here?

22          THE COURT:  What I was going to say before is, to the

23     extent that your clients are willing to waive their appearance

24     at that time, I will -- is there any problem with the

25     defendants waiving their right to appear, government counsel?

79

```
 1              MR. CIAFFA:  No, Your Honor.

 2              MS. MUNK:  Your Honor, would you just request a

 3   written waiver on file, for us to file?

 4              THE COURT:  We would have a written waiver and have

 5   them acknowledge the next hearing date as soon as we set it.

 6              MS. MUNK:  Thank you, Your Honor.

 7              THE COURT:  Which will be at the next hearing date,

 8   when we will set a hearing on the new motion to dismiss that

 9   will be filed.  All right.

10       As of this moment, then, directing myself to Mr. Bychak,

11   Mr. Manoogian, Mr. Qayyum, and Mr. Pacas, you are ordered to

12   return to this courtroom on November 20th at 12:00 p.m., unless

13   you file a written waiver of that right.  Do you understand?

14              ALL DEFENDANTS:  Understood, Your Honor.

15              THE COURT:  Then that will be all, Your Honor.  Thank

16   you.

17              MR. CIAFFA:  Thank you.

18              MS. PIERSON:  For the record, would the Court exclude

19   time between now and the 20th based on the Court's

20   consideration of the motions?

21              THE COURT:  Yes.  I will find excludable time based

22   on having the matter under submission.

23       And then as to this -- and then with the

24   understanding -- well, in addition, based upon the fact that

25   this is a complex case; the fact that there's still discovery
```

80

1    that's being provided, the Court continues to find that this is

2    a complex case.  This is under 3161(h)(1)(D) and

3    3161(h)(7)(B)(ii).

4              MS. PIERSON:  Thank you.

5              MR. CIAFFA:  Thank you.

6              MS. MUNK:  Thank you, Your Honor.

7              MS. RIM:  Thank you.

8         (End of proceedings at 4:46 p.m.)

9                        -o0o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                C-E-R-T-I-F-I-C-A-T-I-O-N

2

3            I hereby certify that I am a duly appointed,

4   qualified and acting official Court Reporter for the United

5   States District Court; that the foregoing is a true and correct

6   transcript of the proceedings had in the aforementioned cause;

7   that said transcript is a true and correct transcription of my

8   stenographic notes; and that the format used herein complies

9   with rules and requirements of the United States Judicial

10  Conference.

11             DATED:  November 8, 2019, at San Diego,

12  California.

13

14                       /s/  Chari L. Bowery

15                       Chari L. Bowery
                              CSR No. 9944, RPR, CRR

16

17

18

19

20

21

22

23

24

25