```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,      .
                                    .
 5              Plaintiff,          . No. 18-cr-4683-GPC
                                    .
 6              v.                  . October 1, 2020
                                    . 1:00 p.m.
 7   JACOB BYCHAK,                  .
     MARK MANOOGIAN,                .
 8   MOHAMMED ABDUL QAYYUM,         .
     PETR PACAS,                    .
 9                                  .
              Defendants.           . San Diego, California
10   . . . . . . . . . . . . . . . .

11             TRANSCRIPT OF TELEPHONIC STATUS HEARING
12            BEFORE THE HONORABLE GONZALO P. CURIEL
                   UNITED STATES DISTRICT JUDGE
13

14

15   APPEARANCES:

16   For the Plaintiff:     United States Attorney's Office
                            By: SABRINA L. FEVE, ESQ.
17                               MELANIE K. PIERSON, ESQ.
                            880 Front Street, Room 6293
18                          San Diego, California 92101

19   For the Defendant      Law Office of David W. Wiechert
     JACOB BYCHAK:          By: JESSICA C. MUNK, ESQ.
20                          115 Avenida Miramar
                            San Clemente, California 92672
21
     For the Defendant      Mintz Levin
22   MARK MANOOGIAN:        By:  RANDY K. JONES, ESQ.
                            3580 Carmel Mountain Road, Suite 300
23                          San Diego, California 92130

24   ///

25
```

```
1    APPEARANCES (CONTINUED):

2

3    For the Defendant        Bienert, Miller & Katzman, P.L.C.
     MOHAMMED ABDUL           By:  WHITNEY Z. BERNSTEIN, ESQ.
4    QAYYUM:                  903 Calle Amanecer, Suite 350
                              San Clemente, California 92673
5

6    For the Defendant        Bird Marella Boxer Wolpert
     PETR PACAS:                 Nessim Drooks & Lincenberg
7                             By:  NAEUN RIM, ESQ.
                                   GARY S. LINCENBERG, ESQ.
8                             1875 Century Park East
                              Suite 2300
9                             Los Angeles, California 90067

10

11

12

13

14

15

16

17

18

19

20

21   Court Reporter:          Chari L. Bowery, RPR, CRR
                              USDC Clerk's Office
22                            333 West Broadway, Suite 420
                              San Diego, California 92101
23                            chari_bowery@casd.uscourts.gov

24   Reported by Stenotype, Transcribed by Computer

25
```

1           SAN DIEGO, CALIFORNIA; OCTOBER 1, 2020; 1:00 P.M.

2                              -o0o-

3           THE CLERK:  Calling item number four on the calendar,

4     Case Number 18-cr-4683, U.S.A. v. Defendant Number 1, Jacob

5     Bychak.  If I could have the appearance of the attorneys,

6     please.

7           MS. MUNK:  Thank you.  Jessica Munk on behalf of

8     Jacob Bychak, who is present on court call.

9           THE CLERK:  And Defendant Number 2, Mark Manoogian.

10          MR. JONES:  Good afternoon, Your Honor.  Randy Jones

11    on behalf of Mark Manoogian, who is also present on a court

12    call.

13          THE CLERK:  Defendant Number 3, Mohammed Abdul

14    Qayyum.

15          MS. BERNSTEIN:  Whitney Bernstein on behalf of

16    Mr. Qayyum, and he is also present on the phone.  Good

17    afternoon.

18          THE CLERK:  Defendant Number 4, Petr Pacas.

19          MS. RIM:  Good afternoon.  This is Naeun Rim on

20    behalf of Petr Pacas, who is on the line.  And I believe Gary

21    Lincenberg is also on the line.

22          MR. LINCENBERG:  Yes.  Good afternoon, Your Honor.

23          THE COURT:  Good afternoon to all of you defense

24    counsel and defendants.

25          And on behalf of the United States, who do we have?

1                MS. FEVE:  Good afternoon, Your Honor.  Sabrina Feve

2    and Melanie Pierson on behalf of the United States.

3                THE COURT:  Good afternoon, Ms. Pierson and Ms. Feve.

4          This matter is on calendar for a status hearing.  I was

5    hoping to, at this point, proceed having issued an order ruling

6    on the pending motion.  As you can tell, I have not.

7          There are a number of issues that remain for the Court.

8    Ultimately, the salient issue in this motion, as well as the

9    earlier motion to dismiss, is whether legacy IP netblocks are

10   property under the wire fraud statutes in the hands of the

11   registrant, and it is clear to the Court that, to determine

12   whether a particular interest is property for purposes of the

13   fraud statutes, the Court is directed to look to whether the

14   law traditionally has recognized and enforced the interest as a

15   property right.

16         And so, with respect to the term "traditionally,"

17   obviously, that references traditional principles or opinion.

18   And "tradition," then, also is defined as "adhering to past

19   practices or established conventions."

20         In this case, there are some questions as to whether or

21   not we have that present.  And I have reviewed the papers; I

22   have reviewed a number of cases that have been referenced in

23   the papers, as well as *Law Review* articles, research materials

24   that have been referenced in those decisions.  It seems to me,

25   as a starting point, there would be a question as to whether or

1   not, in 2010, there would have been a tradition to view IP

2   netblocks as property.

3       And, at this point, let me ask the government, does the

4   government take the position that, as of 2010, there was such a

5   tradition?

6           MS. FEVE:  Your Honor, this is Sabrina Feve.

7       I am trying to track the Court's question.  Could you

8   contextualize for me, when you point to "tradition," which case

9   is that coming from?  I am just trying to understand what the

10  legal context is in which to opine on whether or not, in 2010,

11  the tradition was there.

12          THE COURT:  Well, there's actually a number of cases,

13  but one that uses that precise language would come out of the

14  Third Circuit.  There was actually two.  *United States v.*

15  *Hedaithy*, 395 F.3d. 580, at 590, a 2004 case; and then *United*

16  *States v. Henry*.

17      But beyond that, it is just the principle that's been

18  utilized by, even, the Supreme Court.  One of the cases that

19  the government relies upon -- if not exclusively, primarily,

20  for its definition of property, is *Pasquantino v. United*

21  *States*, 544 U.S. 349, 355.  And, so, the government offers that

22  for the proposition that property, for purposes of the wire

23  fraud statute, is something of value or a valuable entitlement,

24  and it doesn't make any reference at all to tradition or how

25  the law has reviewed it.  But the decision itself does make

1    reference to how common law or how tradition has viewed it.

2         The Supreme Court, in *Pasquantino*, begins by observing

3    that, "When interpreting a statute, we must give words their

4    ordinary or natural meaning."  But then it goes on and

5    recognizes that "The common-law fraud confirms the

6    characterization of Canada's right to excise taxes.  The right

7    to be paid money has long been thought to be a species of

8    property."

9         So, there is, essentially, this recognition that, in

10   defining "property" under the wire fraud statute, you need more

11   than just showing that something has value, but there has to be

12   something beyond that; that it's been viewed as having value

13   for some period of time.  And to the extent that there's

14   reference to "tradition," one would expect that it would be

15   more than a day or even a year.

16        So, that is underlying my question, Ms. Feve.

17             MS. FEVE:  Thank you.  Thank you for the context.  I

18   think I am tracking it much better now.

19        So, yes, we do take the position that, as of 2010, IP

20   netblocks represented something of value, and our analysis for

21   that holding lies with the fact that, as we interpreted

22   *Pasquantino*, but also *Kelly* and the other cases surrounding

23   this, is that they do not say that there was a finite list of

24   what was or was not property; that they look to the common law

25   to understand what the word "property" means.  And then they

1    look at the thing that is at issue to determine whether or not

2    that thing that is at issue falls within the definition of

3    property that was operative.

4         And here we do believe that "something of value or

5    valuable entitlement" -- which is used not just in *Pasquantino*

6    but also in *Kelly* and also in *McNally* and even, I believe -- I

7    have to check because I didn't know we were going to be having

8    a substantive hearing, so I apologize if I am a little bit

9    flatfooted -- but I believe that *Cleveland* and *Carpenter* also

10   make reference to this notion that "property" has to be

11   something of value.  And that, particularly in the area of

12   intangible rights, it can be intangible; that is to say, it is

13   not a horse or a house or a car.  But it has to have -- it has

14   to have value.  It can't just be something like honest

15   services, which was, historically, the stalking horse against

16   which many of these cases were being defined.  And for purposes

17   of, kind of, resorting to the notion of traditional common law,

18   again, it was what was property.

19        I believe that there are many times throughout the canon

20   of Supreme Court cases, where, to illustrate why, to the

21   Supreme Court, the answer is obvious, they have referred to

22   historical precedent, saying, "How could you dispute that this

23   was something of value if it was previously recognized as

24   something of value in a prior court case?"

25        And, obviously, if we had a previous court case, we would

1   be doing the exact same thing.

2       But nothing in these court cases, as I read them, held the

3   proposition that there is a chicken/egg conundrum, which is to

4   say that you must previously have been defined as "property" to

5   be held as "property."

6       And here, if we do what we typically do in cases where

7   there is a novel set of facts before the Court, we reason by

8   analogy.  And what we know is, in the cases that we presented

9   in our brief, there are many types of things, whether it was a

10  an oil and gas loophole, which is a Ninth Circuit case from

11  earlier in the 20th Century.  We have also seen the

12  cryptocurrency cases, where all of these items were analyzed to

13  determine whether or not that item and whatever possessory

14  interest was held in it by the potential victim, whether or not

15  it constituted something of value.

16      So that is why, even if you don't own the land under which

17  you might have oil and gas or mineral rights, the fact that you

18  have an interest in those oil and gas rights and that you can

19  make money off those gas rights was construed as something of

20  value, just as the notion that you had cryptocurrency, even if,

21  hypothetically, it is really just a bunch of zeros and ones

22  because it never exists in the physical world, it can be

23  converted into money, which is why the courts have repeatedly

24  held it was something of value.

25      And in this case, in 2010, there was a very active market

1   for IP netblocks, and I believe that the defendants' own expert

2   would testify to this if we were to engage in a fact-finding

3   function with regard to how we would flesh that out.

4        But, yes, unequivocally, we believe that, in 2010,

5   everyone who was dealing with netblocks understood that they

6   were something of value.  And one of the facts we would point

7   to, to the extent that we will ultimately bear the burden of

8   proof, is that in this case, the defendants' own company was

9   willing to spend hundreds of thousands of dollars for these

10  netblocks and that, if they didn't represent something of

11  value, they would have never paid such a large and significant

12  sum of money.

13       THE COURT:  And ultimately, though, the Court is

14  required to determine whether or not the netblock interest not

15  only has been recognized but it's been enforced as a property

16  right.  And I am trying to determine, then, what to make of the

17  *Global NAPS* case, from March of 2015, which begins its analysis

18  observing "the sparse authority on property rights in legacy IP

19  address cases."

20       And, given the sparse authority, doesn't that impact the

21  Court's review in determining whether or not these rights have

22  been enforced as property rights?

23       MS. FEVE:  Your Honor, respectfully, I don't think

24  they do, because, again, we understand *Pasquantino* to be a

25  definition of what constitutes property, and that the guidance

1    in that definition is that any Court contemplating a new set of

2    facts or a new set of developments, whether it's cryptocurrency

3    or IP addresses, is capable of applying that definition to the

4    item before it to decide whether or not it represents something

5    of value; and that, in the cases where these things have

6    existed for a long time, is it more straightforward?  Yes.  But

7    I believe that *Global NAPS* actually shows you why the fact that

8    there was no predecessor or there were fewer predecessors --

9    because I believe *Global NAPS* actually referred, in part, to

10   the District Court proceedings in *Kremen*, as well as the

11   decision out of -- and I apologize if I am confusing the Boston

12   decision with the Delaware decision -- but if I am correct that

13   *Global NAPS* is the Boston decision, that one is relying, in

14   part, on the previous decision by the Delaware Bankruptcy

15   Court, as well as litigation in the Northern District of

16   California in the civil context, for *Kremen*.

17        But even so, even with that sparse authority, they still

18   have the tools because they were referring back to the

19   definitions of whether or not there was a property interest

20   that could be transferred, so that they could understand how to

21   address the cause of action before it, which was, basically,

22   you know, "Can we or can we not transfer this asset?"

23             THE COURT:  Here is my concern.  I am concerned that

24   the definition of "property" that's relied upon by the

25   government, by *Pasquantino*, is incomplete because it doesn't

1    recognize the need for some previous recognition of the

2    interest constituting "property," as the language in

3    *Pasquantino* that I quoted references and as the Third Circuit

4    makes more clear in their guidance on how one is to define

5    "property" and what one is to consider; that is, that one looks

6    to the law, whether or not it's traditionally recognized and

7    enforced something as a property right.

8        And you cite these cases that don't address the netblock

9    interest.  And even these cases that do take up the issue of

10   whether or not netblocks can constitute property, they end up

11   looking at and analyzing these interests under two guises or in

12   two ways.  They look at the legacy and the non-legacy

13   netblocks, because it makes a difference.  And I have

14   understood the government's position throughout this to

15   acknowledge that there is a difference, and that the difference

16   is one that would favor the government's view with respect to

17   the issue of this entitlement or value.

18       Is that correct, Ms. Feve?

19           MS. FEVE:  Yes.

20       And just to make sure I understand, we would argue that

21   both pre- and post-legacy netblocks have possessory interest

22   for the registrants.  But we understand that under the case in

23   controversy doctrine and, you know, the fact that we should be

24   arguing to the facts before us, we believe that these

25   particular sets of netblocks particularly because they are pre

1    ARIN --

2             THE COURT:  Because they are legacy?

3             MS. FEVE:  -- have a possessory interest --

4        Yes.  We argue that the legacy interest makes them even

5    more strongly considered property under the notion that there's

6    a possessory interest, just because we see the ways in which

7    the market and ARIN and the administrative and legal framework

8    that evolved around them treats them differently.  And so we

9    are speaking to the netblocks that are before the Court because

10   we understand that's the case for controversy here, and that

11   this distinction emphasizes the point that we believe, you

12   know, is correct, which is that there is a possessory interest

13   that constitutes "property" for purposes of the wire fraud

14   statute; namely, a valuable entitlement, and one that has been

15   recognized by the fact that there are all of these market

16   transactions where, you know, good and serious money is being

17   exchanged.

18        Even if you look at the value of the transaction in the

19   Delaware bankruptcy proceedings, for those netblocks, millions

20   of dollars were paid for those netblocks.  And so, anyone who

21   was aware of that transaction would have been on notice that it

22   was widely perceived not only that IP addresses had something

23   valuable, but that it was very valuable, that is was valuable

24   on the order of millions of dollars.

25             THE COURT:  There's no question that these netblocks

1   have value.  I am prepared to find that, and I don't think the

2   defendants themselves would question that.

3        But the issue becomes whether the law has traditionally

4   recognized and enforced something as a property right, not

5   whether the market has been created and is now open and selling

6   these things on the market.  That's not the question.  But it

7   is whether the law has now developed to the point to recognize

8   and enforce something as a property right.  And that's the

9   concern that I have, whether or not we have that here.

10        And it seems to me that the Court can address that

11   question without taking judicial notice of all the things,

12   Exhibits A through I, that the defense has asked me to

13   consider.  I can make this determination without considering

14   extrinsic evidence, without holding a hearing, but I can look

15   at the state of the law as of 2010 through 2014.

16        And when I do that, I am having problems in terms of

17   finding a way to conclude that, as of 2010 to 2014, the law had

18   traditionally recognized and enforced legacy netblocks as

19   constituting a property right for purposes of the wire fraud

20   statutes.

21        Would you like to address that?

22            MS. FEVE:  Again -- yeah.  I think there are two --

23   there are two ways I want to address it.  The first is I

24   believe that the law -- the reason why Congress doesn't have to

25   constantly rewrite the wire fraud statute -- which I believe

1    was last enacted in, roughly, 1952 -- is that because the

2    understanding is not that the item itself has to be on some

3    sort of judicially noticed list of property or not property;

4    it's that the intrinsic qualities of the item at issue have to

5    either match or not match the legal definition of what is

6    "property," which is, here, a valuable entitlement or something

7    of value.

8            THE COURT:  And I get that, Ms. Feve.  For example,

9    you cited the example of cryptocurrency.  Cryptocurrency didn't

10   exist at the time that the wire fraud statute was enacted.  But

11   looking at the nature of cryptocurrency, how it functions -- it

12   is essentially a digital form of currency, of money.  It

13   operates as money.  And to the extent that there are so few

14   distinguishing characteristics between money, cash, and

15   cryptocurrency, that it would behoove a Court to conclude that,

16   "Well, there's no cases that have decided that cryptocurrency

17   are property, so we are not going to arrive at that

18   conclusion."

19       But, here, we have something that is far different.  And

20   especially given the history of how these netblocks came to

21   exist, given ARIN's position as to whether or not these things

22   are property or not, given the decisions that have come to

23   conclude -- and I think, as of this moment, in my mind, there's

24   no question that these netblocks have been recognized as

25   property interest, but the fact is that those cases have been

1    slow in coming.  They began to take shape in around 2011; then

2    we have the 2015 case of *Global NAPS* —— which is after the

3    conspiracy and after the substantive offense charges here were

4    committed —— that come in to provide further support for the

5    notion that these netblocks constitute property —— and

6    recognizing that *Global NAPS* and *in re Nortel* I don't think

7    would stand for the proposition that any netblock is property,

8    but that legacy netblocks, because they are not ones subject to

9    any contractual obligations to ARIN, would be and are property.

10        And so, I think I disagree with one of the positions that

11   you had made earlier, that either legacy or non-legacy

12   netblocks would both function as property or at least they had

13   been recognized as such.

14        So, at this point, looking at the indictment, it doesn't

15   make reference to whether or not these netblocks are legacy or

16   non-legacy; but, during the course of this litigation, it has

17   become apparent to me that the government's position is that

18   these are legacy netblocks.

19        Would you agree with that, Ms. Feve, and can I operate

20   under that assumption?

21        MS. FEVE:  I think you can, Your Honor.

22        But I think that —— you asked me a few questions ago if I

23   believed you could issue the findings based on there being no

24   findings of fact.  And my concern is that, in your

25   distinguishing cryptocurrency from netblocks, you did two

1  things.  The first is that -- your first response was,

2  "Cryptocurrency, I look at the thing, and it is just inherently

3  so similar to currency that how could I say it doesn't follow?"

4  And that's a different standard and a different test than what

5  you are applying to the netblocks.

6      And then the second thing is that when you were

7  distinguishing why you find cryptocurrency to be compelling as

8  a property interest but not netblocks, you referred to facts

9  outside of the indictment.  You cited, in particular, ARIN's

10  position, and I believe that is not something that's in the

11  indictment, and that, as soon as we start looking to facts

12  outside of, I believe, existing case law, as far as legal

13  principles or what is on the indictment, we get into that gray

14  space, which is what makes this, as a motion to dismiss, so

15  challenging.

16      So, if we peel back to the kind of thing of the concrete

17  test of there is a traditional component to all property

18  interest, that you read as being inherent in *Pasquantino*, that

19  we can address that as a pure -- a purely legal question.  But

20  I think that part of the challenge here is, just, it seems as

21  though the Court's analysis of netblocks -- there is this

22  gravitational pull towards some facts that are currently in the

23  record, and that this is a disservice to the government

24  because, unlike the defendants, we have not tried to put forth

25  the facts in our case.

1        So, to the extent that this is purely a question of law,

2   and the Court's position is that, if it hasn't been declared

3   property by a prior legal decision before the crime took place,

4   it can't be property when the crime took place, well, then,

5   that is a legal decision that we can -- the Court can reach and

6   we can assess what the next steps are.

7        But I would just -- looking at the same cases as the

8   Court, I believe that the definition is supposed to be more

9   flexible so that the statute can evolve with the world.

10       And as far as the fair notice issue -- which is what I

11  read as the Court's concern, which is, "If there wasn't a case,

12  how would you know?" -- most people don't read case law, and

13  most people look to the circumstances around them to

14  understand, "Is this or is this not property?"  And that's part

15  of why we have these canons of construction that would say we

16  give words their plain and ordinary meaning, so that people

17  don't have to be lawyers; they can just understand the words

18  themselves.

19       And that's why I keep referring back to the fact that

20  everyone around the defendants, including the defendants

21  themselves, understood you paid money for netblocks, you didn't

22  just take them and use them, and that was because everyone

23  recognized, as a layperson, that there was a property interest.

24            THE COURT:  All right.  Well, certainly, the Court is

25  required to review the indictment and what is contained within

1    the four corners of the indictment; but it is also clear to me

2    that the Court is instructed, in determining whether a

3    particular interest is property, to look whether the law has

4    traditionally recognized and enforced it as a property right,

5    and so that the Court is instructed to look at the law, and

6    that that doesn't constitute either extrinsic evidence or going

7    beyond what the Court is entitled to do in these sorts of

8    cases.

9         Do you agree with that proposition, Ms. Feve?

10         MS. FEVE:  I do.

11         And this is where we come back to the law has defined

12    property repeatedly as "a valuable entitlement or something of

13    value," and at no point in *Kelly* or *Pasquantino* did the

14    justices who wrote those decisions -- I believe Thomas and

15    Kagan -- say, "And it has to have a traditional component as

16    well."  And that's part of why we referred back repeatedly to

17    the Ninth Circuit's decision in *Ali*, which pushed back on the

18    notion that "property" has to be a traditional concept of

19    property; that the point of analysis begins and ends with the

20    legal definition, which is "something of value"; and then you

21    look to the facts, which is "Are there facts to show that this

22    something at issue here constitutes something of value?"

23         THE COURT:  All right.  Well, I take it that the

24    defense would disagree with that.

25         But, more importantly, in my view, what you just said

1  doesn't take note of, again, the underpinnings and the language

2  in *Pasquantino* that looked not only at what was involved --

3  that was that money that was owed to Canada in the form of

4  taxes -- but then the recognition that the law had confirmed

5  Canada's right to these excise taxes; that the right to be paid

6  money has long been thought to be a species of property.  And

7  citing, of all things, *Blackstone*, commentaries in the laws of

8  England in 1768.

9       And, so, I think what I need at this point is further

10 briefing on this precise issue in terms of, to the extent that

11 the Court is allowed to look at and, in fact, is required to

12 look at the law relating to the subject interest that is being

13 described as "property," whether or not the Court just does

14 what the government is doing, which is determining whether it's

15 something of value; or whether or not we follow this

16 Third Circuit requirement that, in determining whether a

17 particular interest is property for purposes of the fraud

18 statutes, one looks to whether the law traditionally has

19 recognized and enforced it as a property right.  And then, to

20 the extent that the answer is that that is a correct statement

21 of the law, then, in our case, whether or not it would have

22 been traditionally recognized, in 2010 through 2014, that

23 netblocks, either legacy or non-legacy, were recognized by the

24 law and enforced by the law as property rights.

25      So, let me ask the defense if they have anything they

1    would like to offer at this moment.

2            MS. RIM:  Your Honor, if the Court is going to order

3    additional briefing, I can address most of the points there.

4        I did want to clarify just a couple of points briefly.

5        First, *Pasquantino* does not say property is anything of

6    value.  The specific quote is, "This right" -- meaning the

7    right to collect uncollected excise taxes -- it says, "This

8    right is an entitlement to collect money from petitioners, the

9    possession of which is something of value," and then goes on to

10   describe valuable entitlement.

11       We discussed this in our reply to the last motion, but an

12   entitlement is not anything of value.  An entitlement is

13   something that's been traditionally recognized as property.  It

14   is something that is legally due, either because of a statute

15   or because there's a contractual right.  It is not enough that

16   it is just something of value because, if that were the

17   definition of property, you would have vagueness issues all

18   over the place with the fraud statute.

19       And that is why this whole analysis -- again, I just want

20   to bring it back to the fact that this is not about whether

21   something substantively could be considered a property right

22   now, it is about notice.  It is about whether a criminal

23   statute that uses the word "property" is ambiguous.  And the

24   Supreme Court has dealt with that by saying it has to be

25   something that has been either traditionally recognized or, to

1    use the language the Court just quoted from *Pasquantino*, has

2    long been held to have been property.

3        So, the only other point I want to clarify at this point

4    is that we do not read *Global NAPS* -- although it was a

5    decision that came after the facts alleged in the indictment,

6    but we did not read that case as holding that IP netblocks,

7    legacy netblocks, are property.

8        The exact language that the Court used there was, "I

9    conclude that CentNet had some former property interest in the

10   disputed blocks and that its interest was transferable.

11   Because this conclusion is all that is necessary to resolve

12   this motion, I make no further decisions about the nature of

13   the property interest that CentNet had in the disputed blocks."

14       So, the Bankruptcy Court concluded that the, you know,

15   either the -- basically, that CentNet had the right to sell or

16   transfer their interest in the IP netblocks, whatever that

17   interest may be, for something of value, but the Court

18   expressly did not make a finding that it was a property

19   interest.  And that is because ARIN continues to take the

20   position that IP netblocks, especially legacy netblocks, are

21   not property.

22       And they take that position because they believe that

23   finding that they are property will open up the internet to a

24   black market of legacy IP netblocks being sold in a way that is

25   untraceable and that will allow the world, and potentially

1    people who have the intent to use these IP addresses, to sell

2    drugs or do any other kind of illegal activity in a way that

3    will make it impossible for ARIN to keep track of.

4            THE COURT:  Well, certainly, ARIN has been -- if not

5    protective, has tried to stake an interest not only in

6    non-legacy but legacy netblocks, but they haven't fared very

7    well, from what I can see.  So they keep putting up a good

8    fight, but the Courts continue to, essentially, take the view

9    that, "You know what?  To the extent that you don't have a

10   contract, that there's not some sort of license between ARIN

11   and these recipients of these legacy netblocks, that, you know,

12   it's understandable why you would take that position, but this

13   is something that you cannot enforce in a court."  And,

14   ultimately, these bankruptcy courts have found that these

15   holders of these interests can transfer, can sell their stake,

16   you know, producing money for these bankruptcy estates.

17       But I think I understand where things stand.  But, again,

18   I mean, to the extent that we are talking about a 2015 case and

19   the indictment itself proceeds from December of 2010 through

20   the fall of 2014, the question would be whether or not it even

21   matters what a Court had to say the following year.

22       So, with that, let me ask, who would like to take the

23   first -- if not stab, the first efforts to address the Court's

24   questions that were posed?  The defense or the government?

25           MS. RIM:  It would seem appropriate for the

1    government to file the first brief here since the majority of

2    the questions appear to be regarding the government's position.

3            MS. FEVE:  Your Honor, we would respectfully ask the

4    defendants, as the moving party and who also appeared to more

5    closely track and appreciate the Court's position, tee it up,

6    just because when we are trying to address these issues orally,

7    we are at a slight disadvantage.

8            THE COURT:  And keeping in mind that, ultimately, the

9    defense will have two opportunities because you can file the

10   opening papers, the government can respond, and you can file a

11   short reply.

12       We don't need 25 pages on this.  We will limit this to ten

13   pages for the defense, ten pages for the government's response,

14   and then five pages for a reply.

15       And let me inquire of the defense, how much time are you

16   requesting?

17           MS. RIM:  Hold on.  Let me look.

18       Could we have until --

19           THE COURT:  How about the 15th?

20           MS. RIM:  That would be fine.

21           THE COURT:  All right.  So, we will have those papers

22   filed on October 15th.

23       And then the government -- do you need a couple of weeks?

24           MS. FEVE:  Yes, please, Your Honor.

25           THE COURT:  October 29.  And then a reply November 5.

1    And then a hearing on November 12 at 1:00 p.m.

2         My clerk is getting ready to tell me something.

3         (Discussion between clerk and Court.)

4            THE COURT:  We can do it 11/19 at 1:00 p.m.

5         And we will hold that hearing here in court, so the

6    defendants are directed to be present here.

7         Do you understand, Mr. Bychak?

8            DEFENDANT BYCHAK:  Yes, I do.  I was on "mute."  Yes,

9    I understand.

10            THE COURT:  Mr. Manoogian?

11            DEFENDANT MANOOGIAN:  Yes, Your Honor.

12            THE COURT:  Mr. Qayyum?

13            DEFENDANT QAYYUM:  Yes, Your Honor.

14            THE COURT:  Mr. Pacas?

15            DEFENDANT PACAS:  Yes, Your Honor.

16            THE COURT:  And then, the Court will find excludable

17   time between now and then, given the reopening of the motion,

18   and then also based upon the judicial emergency identified,

19   declared by Chief Judge Burns.

20         And then, is there anything else to address at this

21   moment?  From the defense?

22            MS. FEVE:  Not from the United States, Your Honor.

23            MS. RIM:  Nothing for Mr. Pacas.

24            MR. JONES:  Nothing from Mr. Manoogian, Your Honor.

25            MS. BERNSTEIN:  Nothing for Mr. Qayyum.

1          MS. MUNK:  And nothing for Mr. Bychak, Your Honor.

2     Thank you.

3          THE COURT:  All right.  Then, that will conclude this

4     proceeding.  Have a good weekend.  Stay safe.

5          ALL:  Thank you, Your Honor.

6        (End of proceedings at 1:41 p.m.)

7                          -o0o-

8               C-E-R-T-I-F-I-C-A-T-I-O-N

9

10          I hereby certify that I am a duly appointed,

11     qualified and acting official Court Reporter for the United

12     States District Court; that the foregoing is a true and correct

13     transcript of the proceedings had in the aforementioned cause;

14     that said transcript is a true and correct transcription of my

15     stenographic notes; and that the format used herein complies

16     with rules and requirements of the United States Judicial

17     Conference.

18          DATED:  October 1, 2020, at San Diego, California.

19

20                    /s/  Chari L. Bowery
                      _____
21                    Chari L. Bowery
                      CSR No. 9944, RPR, CRR
22

23

24

25