1                    UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,      .
                                   .
5                 Plaintiff,       . No. 18-cr-4683-GPC
                                   .
6                 v.               . August 20, 2021
                                   . 1:00 p.m.
7   JACOB BYCHAK,                  .
    MARK MANOOGIAN,                .
8   MOHAMMED ABDUL QAYYUM,         .
    PETR PACAS,                    .
9                                  .
                  Defendants.      . San Diego, California
10  . . . . . . . . . . . . . . . .

11              TRANSCRIPT OF TELEPHONIC MOTION HEARING

12            BEFORE THE HONORABLE GONZALO P. CURIEL
                   UNITED STATES DISTRICT JUDGE

13

14

15  APPEARANCES:

16  For the Plaintiff:      United States Attorney's Office
                            By: SABRINA L. FEVE, ESQ.
17                              MELANIE K. PIERSON, ESQ.
                            880 Front Street, Room 6293
18                          San Diego, California 92101

19  For the Defendant       Wiechert, Munk & Goldstein, PC
    JACOB BYCHAK:           By: JESSICA C. MUNK, ESQ.
20                          27136 Paseo Espada, Suite B1123
                            San Juan Capistrano, California 92675
21
    For the Defendant       Mintz Levin
22  MARK MANOOGIAN:         By:  RANDY K. JONES, ESQ.
                                 RYAN T. DOUGHERTY, ESQ.
23                          3580 Carmel Mountain Road, Suite 300
                            San Diego, California 92130
24  ///

25

```
 1    APPEARANCES (CONTINUED):

 2

 3    For the Defendant       Bienert, Miller & Katzman, P.L.C.
      MOHAMMED ABDUL          By:  CARLOS A. NEVAREZ, ESQ.
 4    QAYYUM:                 903 Calle Amanecer, Suite 350
                              San Clemente, California 92673
 5

 6    For the Defendant       Bird Marella
      PETR PACAS:             By:  DARREN L. PATRICK, ESQ.
 7                            1875 Century Park East
                              Suite 2300
 8                            Los Angeles, California 90067

 9

10

11

12

13

14

15

16

17

18

19

20

21    Court Reporter:         Chari L. Bowery, RPR, CRR
                              USDC Clerk's Office
22                            333 West Broadway, Suite 420
                              San Diego, California 92101
23                            chari_bowery@casd.uscourts.gov

24    Reported by Stenotype, Transcribed by Computer

25
```

```
 1              SAN DIEGO, CALIFORNIA; AUGUST 20, 2021; 1:00 P.M.

 2                              -o0o-

 3              THE CLERK:  Calling item ten on the calendar,

 4    18-cr-4683, U.S.A. v. defendant number one, Jacob Bychak.  If I

 5    could have the appearances of the attorney, please.

 6              MS. MUNK:  This is Jessica Munk.  Good afternoon,

 7    Your Honor.  Jessica Munk, on behalf of Jacob Bychak, who is

 8    present on the phone.

 9              THE COURT:  Ms. Munk, good afternoon.

10         And Mr. Bychak, good afternoon.

11              DEFENDANT BYCHAK:  Good afternoon.

12              THE COURT:  And for Mr. Manoogian, may I have an

13    appearance?

14              MR. JONES:  Yes, Your Honor.  Good afternoon.  Randy

15    Jones, Dan Goodrich, and Ryan Dougherty on behalf of

16    Mr. Manoogian, who is not present on the phone; he waives his

17    appearance for today's hearing.

18              THE COURT:  Good afternoon, Mr. Jones, Goodrich and

19    Dougherty.

20         And then, on behalf of Mr. Qayyum, may I please have an

21    appearance?

22              MR. NEVAREZ:  Yes, Your Honor.  Good afternoon.  This

23    is Carlos Nevarez, Bienert Katzman Littrell Williams, on behalf

24    of Mr. Qayyum, who is present for this telephonic conference.

25              THE COURT:  Good afternoon, Mr. Nevarez and
```

1    Mr. Qayyum.

2            DEFENDANT QAYYUM:  Good afternoon, Your Honor.

3            THE COURT:  And then, appearing on behalf of

4    Mr. Pacas, may I have an appearance?

5            MR. PATRICK:  Good afternoon, Your Honor.  Darren

6    Patrick of the Bird Marella firm, for Mr. Pacas, who is also on

7    the line.

8            THE COURT:  All right.  Good afternoon, Mr. Patrick

9    and Mr. Pacas.

10           DEFENDANT PACAS:  Good afternoon, Your Honor.

11           THE COURT:  Do we have anyone else from the defense

12   side in terms of attorneys?  No?

13       All right.  So, let me turn to counsel here in court.  On

14   behalf of the United States, may I have appearances?

15           MS. PIERSON:  On behalf of the United States, Melanie

16   Pierson and Sabrina Feve.

17           THE COURT:  Ms. Pierson and Ms. Feve, good afternoon.

18       We are here on a motion to compel discovery, and as I

19   review the motion and the response, it occurs to me that there

20   is a lot I am not in a position to be able to review because

21   there's so much of what is discussed that is based upon

22   discovery that's been exchanged that I otherwise would not have

23   been provided.  It also occurs to me that some of this, it

24   seems, are things that one would have hoped that

25   meet-and-confers would have been able to arrive at a mutually

1    satisfactory resolution.

2         So I find myself, yet again, in a position where I am

3    trying to understand the positions of both parties and then

4    take a close look at what we have and arrive at a decision that

5    is fair under all the circumstances.

6         And so, at this point, let me just begin by asking defense

7    counsel, given Ms. Pierson's response, given the additional

8    information that she reports having provided, I believe, on

9    August 6 with respect to the email exchange between Anon-1 and

10   the FBI, and the rest of her declaration, is there still a

11   dispute that the Court needs to address?

12        And to the extent that there is, what is it specifically

13   that you believe the government has that you have been denied?

14        And who will address this from the defense side?

15             MS. MUNK:  Your Honor, this is Ms. Munk, and I will

16   be addressing that.

17             THE COURT:  Okay.  Would you, please.

18             MS. MUNK:  Yes.  Thank you, Your Honor.

19        And we recognize the difficult position that the Court is

20   in, and I would like to give a little overview of why we had to

21   bring this motion and kind of what has changed since the

22   government responded.

23        So, in regards to this Spamhaus informant, he had been

24   working at the government's behest since 2013.  He had numerous

25   meetings with the government throughout 2013, 2014, providing

1    the government with documents and mapping out this entire case

2    for the government.

3         Now, the government's initial search warrant of

4    Mr. Manoogian's email address, which occurred in late 2014 --

5    and this predates any grand jury subpoenas -- relies on

6    information from this Spamhaus informant.  And in fact, the

7    Spamhaus informant --

8              THE COURT:  Let me ask you something.

9         You said that the initial search warrant obtained in 2014

10   was based upon a substantial amount of information provided by

11   the Spamhaus informant.  So you had an opportunity to review

12   the affidavit in support of the search warrant from 2014; is

13   that correct?

14             MS. MUNK:  That is correct.  We do have that in the

15   discovery, Your Honor.

16             THE COURT:  And as to the affidavit, it recounts

17   specifically what information they received from the Spamhaus

18   informant, correct?

19             MS. MUNK:  The agent, I believe Agent Chabalko, he is

20   referencing information he got from the Spamhaus informant in

21   his affidavit.  That's correct.

22             THE COURT:  And is there a number of instances where

23   the affidavit makes reference to the Spamhaus informant

24   referencing Anon-1?

25             MS. MUNK:  It does not, Your Honor.

1          THE COURT:  So, as to whether or not Anon-1's

2    information became part of this affidavit, are you in a

3    position to argue one way or another whether or not Anon-1's

4    information was utilized?

5          MS. MUNK:  No, Your Honor.

6      So, what I would like to do is kind of go over some of the

7    facts and how we learned them, why we had to bring the motion,

8    and then what we have learned since the government's responded.

9      But I just want to flag for the Court that the government

10   did rely on this informant in their initial affidavit.  And

11   that's important because the government repeatedly keeps

12   telling us, "Oh, don't worry about what documents we got from

13   this Spamhaus informant and the Adconion informant, because our

14   case-in-chief is going to be derived from grand jury

15   subpoenas."

16     Well, the grand jury subpoenas don't come until 2016.  So

17   we can't be rested assured that that is completely clean.  And

18   we are trying to get answers to a lot of these questions that

19   we do believe are simple, simple questions that should get, you

20   know, reasonably simple answers and, unfortunately, we haven't.

21     Just so the Court will understand what is happening --

22          THE COURT:  Let me stop you one second.

23     So, your concerns don't necessarily relate to information

24   that has been provided as to the Spamhaus informant because, as

25   I understand it, Ms. Pierson reports she's provided reports and

1   emails and basically all the communications that would have

2   been exchanged between the FBI and the Spamhaus informant.

3       You are more concerned and/or exclusively concerned about

4   this Anon-1; is that right?

5           MS. MUNK:  Not exclusively, Your Honor.

6       When I did at first have Ms. Pierson's declaration -- you

7   kind of infer that -- I think it's paragraph -- is it paragraph

8   nine or ten?  I think it's paragraph ten.  It sounds like they

9   provided all the documents, but they don't -- from the Spamhaus

10  informant, but they don't use the word "all."

11      And so we actually asked the government to clarify, have

12  they provided us with all of the documents from the Spamhaus

13  informant?  And they specifically said, "No" -- or I don't know

14  if she used the exact words "no," but the government said, "We

15  provided you the relevant documents."

16          THE COURT:  Let me do this.  Since we have

17  Ms. Pierson here, let me ask her, in response to that question,

18  have you provided all of the reports and otherwise, email

19  contacts, between the Spamhaus informant and the -- first, the

20  reports?  Have you provided all the reports?

21          MS. PIERSON:  We have provided them with all of the

22  reports that are relevant to this case.

23      And why I limit it like that -- and they can tell this

24  from the discovery -- the Spamhaus informant is not just

25  corresponding with the FBI agent here, but also with FBI agents

1    in other offices.

2         THE COURT:  As to other charges?

3         MS. PIERSON:  Yes.

4         THE COURT:  So that's why you would not be able to

5    say unequivocally that, "We have provided you with every report

6    that relates to the Spamhaus informant"?

7         MS. PIERSON:  Yes.  But we have given them everything

8    that relates to this indictment.

9         THE COURT:  All right.  And so, given that clear

10   response, Ms. Munk, do you have reason to contest that?

11        MS. MUNK:  Yes, Your Honor.

12   And this is -- I don't want to go through a timeline, but

13   just so you know, since the government filed their opposition,

14   they produced a bunch of stuff that I would actually like to

15   inform the Court about this stuff.  But they also, last week,

16   produced, in production 40 -- it came last week -- a 302 that

17   was written the day before by one of the FBI agents that

18   appears they are trying to rewrite history on the Spamhaus

19   informant.

20   So, all the evidence we have shows that the Spamhaus

21   informant was clearly an informant since 2013.  He had a DHS

22   number.  He was mapping out this case for the government.  He

23   gave them a dossier on everybody related to this case, that we

24   actually did not receive until this August 5th production.  And

25   I consider it *Brady* because Mr. Bychak, my client, is nowhere

1    on this dossier, and Mr. Qayyum isn't on the dossier, and we

2    didn't even get this document that the government has had since

3    2014 until bringing this motion and providing it on the 6th.

4        But then, a week later, there's this new 302 that

5    basically says that this Spamhaus informant did not officially

6    become an informant until October 2018.  And we are extremely

7    concerned by this because this is completely contrary to all

8    the facts and evidence we have seen.

9        And we, at this point, actually, are going to ask the

10   Court to order they produce the entire informant file on this

11   guy, because we believe he has been working with the

12   government, hand in hand, for a long time, it sounds like

13   working on other cases.  And Spamhaus has a long history of

14   working with the government and the FBI in numerous

15   investigations.

16       And they are basically balking at this idea that he is a

17   state actor and trying to roll back the notion that he could be

18   a state actor, and he is basically running this whole case.

19   Their discovery that basically says -- he was even advising in

20   2017 how the government should charge this case; and, "Oh, here

21   is the CAN-SPAM Act.  You should try this.  And you should also

22   charge the wire fraud statute."

23       So we feel that we have a lot of evidence that all points

24   to him being a state actor and the fact that the government is

25   giving us big pushback on what we find are pretty simple

1    answers.  Initially, we just asked them, "Please identify the

2    documents that you got from the Spamhaus informant that

3    originated with the Adconion informant, and why do you feel you

4    got those."

5        And they wouldn't tell us.  They said, "It's in the

6    discovery tranches."

7        When we go back to the discovery tranches, which we got

8    all this year, there are thousands of pages, and it is not

9    clear often, in this, who is providing this information.

10       And one example I wanted to raise for the Court, is on

11   August 6, after the government filed their opposition, they

12   produced an additional 1800 pages of discovery.  And in

13   Ms. Pierson's declaration -- I believe it's paragraph five --

14   she indicates, "Here are four documents we got from Chris

15   Young," who is believed to be this Adconion informant, "And we

16   previously received those in June."

17       What they omitted in June was the enclosure email from

18   Chris Young's lawyer.  So, the enclosure email from his lawyer

19   made it very clear these four documents came from Chris Young,

20   but that wasn't produced to us, so we couldn't really tell that

21   these four documents were from Chris Young, and they didn't

22   produce it until this August 6th production.

23       And I highlight that for the Court because they keep

24   saying, "Oh, it's in the discovery tranches.  You can figure it

25   out."  But, yet, we can't, because they are withholding certain

 1   pieces of evidence.  And one is a disclosure letter, which made

 2   it very simple that these four documents came from Chris Young.

 3       I also mention they included this dossier, which was from

 4   June 2, 2014.  It is literally a road map of every player in

 5   this case.  And my client is not on it.  And if your client

 6   isn't on it, the government has this document since 2014 and

 7   never produced it --

 8           THE COURT:  Let me ask you something.  Stop.  Stop.

 9   Let me ask you something, please.

10       In the motion for discovery, at page 2, it requests

11   production or identification by Bates number of all documents

12   in the government's possession which came from Company A

13   informants, either directly or through Spamhaus.

14       And so, when you say Company A informants, that includes,

15   then, this Spamhaus source; is that right?

16           MS. MUNK:  So, the Company A -- Company A is

17   Adconion.  The Spamhaus informant is the guy from Spamhaus who

18   has been working with the government since 2013.

19           THE COURT:  So, then, this request would not include

20   the Spamhaus informant?

21           MS. MUNK:  Yeah.  So, this request --

22           THE COURT:  I guess it would indirectly.  To the

23   extent that the Spamhaus informant has documents that

24   originated from the Company A informant, then you are

25   requesting those documents; is that right?

1          MS. MUNK:  Yes.  Right.  Or if the government has

2     produced them, to at least identify by Bates number.

3          And we say that because, again, they keep acting like it's

4     so obvious and clear, but there's these examples where stuff is

5     omitted; or, for instance, this dossier that they just gave us,

6     in production 39, on August 6th, they re-produced the Spamhaus

7     informant's 302.  This is from 2014.

8          And in Ms. Pierson's declaration, she lets us know about

9     it -- I don't know if it was a mistake or what, but this

10    document they never previously produced.  And so I assumed, as

11    one would, that the document would be right after the 302.

12    Right?  Because that way -- "Here is the 302 again; here's the

13    document."  When you look at the discovery, right after the

14    302, it is about 150 pages of advertisement emails.

15         So I asked the government, "Is this the document?"

16    Because that just logically would be the obvious document right

17    after the 302.  No, it wasn't.  It was like 1,000 pages later,

18    and it is the dossier laying out the players.

19         But my point is that the discovery isn't given to us in a

20    very clear, easily discernible manner.  In some cases, it does

21    seem more clear, but other cases it is not.  And so we were

22    just asking, "What page" -- "If you can just identify by Bates

23    number the documents that the Spamhaus informant sent you that

24    originated with Chris Young, the Adconion informant."  And we

25    still request they do that since they filed their opposition.

1     And they basically said, "You have everything.  You can

2   figure it out," essentially.

3          THE COURT:  Let me ask Ms. Pierson.

4      Ms. Pierson, with respect to this request, production or

5   identification by Bates number of all documents in the

6   government's possession which came from Company A informant or

7   informants, either directly or through Spamhaus, have you

8   already produced that discovery, or is there outstanding

9   discovery that is in your possession which falls within this

10  category?

11         MS. PIERSON:  This is a difficult question to answer.

12  And it seems like a simple one, but it is not, because we got

13  documents from the individual at Spamhaus.  And to the extent

14  that we got them, whatever documents there are, it is

15  documented, the date that we got them and what they are.

16     Now, where the Spamhaus person got them is not known to

17  us, unless it says, for instance, in the report, "He provided

18  this from" -- some of it, he said, "I got this from the hosting

19  company," so then you would know in the report that he got it

20  from the hosting company.

21     But there are documents there that I don't know where they

22  came from, so I don't want to be coming to the Court or coming

23  to anyone and saying, "This is the universe of stuff," when I

24  don't really know that.

25         THE COURT:  All right.  So, at this point --

1          MS. PIERSON:  But we have given them everything that

2     we got from the individual at Spamhaus here.

3          Now, the individual at Spamhaus speculated that a non --

4          THE COURT:  Let me back up.

5          So, you have provided everything that you received from

6     the Spamhaus source that related to Company A that was turned

7     over to you?

8          MS. PIERSON:  Related to this case, yes.

9          THE COURT:  And that was turned over to the defense?

10         MS. PIERSON:  Yes.

11         THE COURT:  But there may be other materials that may

12    have been accessed or be the source of information that was

13    provided by the Spamhaus informant that originated from a

14    Company A informant, and at this point, you are not certain

15    whether or not that's the case, and so you are trying to avoid

16    painting yourself in a corner?

17         MS. PIERSON:  Exactly.  Exactly.

18         But what I can tell the Court is if you look at the

19    chronology -- this is a document that they attach, actually, to

20    their pleading, Exhibit C, that actually sort of disproves

21    their assumptions.  Because, if you look at it, it is an email

22    from the Spamhaus informant to the FBI, and it's dated

23    September 27 of 2017.

24         And he says, in that email, "So far, I have not included

25    anything our informants have given us."  That's September 27,

1   2017, a year after we issued all the subpoenas.  He says, "They

2   have sent internal emails."  Okay.  Not given you any of that.

3   "Do you want to see these emails?"  He asked the FBI.

4        Now, if this person were working for the FBI, and the FBI

5   had directed them to obtain these internal emails, the

6   informant would not be saying, "Do you want to see these?"  He

7   would be saying, "Here is what I got that you asked me for."

8   It is not there.

9        This is -- we have given them what we have got.  Their own

10  emails that they provided the Court show that it didn't happen

11  before we issued the subpoenas.

12            THE COURT:  So, at this point, just during the course

13  of these proceedings, what otherwise began as a very sculpted

14  and limited discovery request has now opened up and expanded to

15  include a request for entire CI files.  And, again, I am being

16  asked to rule on all these exceedingly complicated matters off

17  the cuff, essentially, because I don't have the availability of

18  all this discovery.  And granted, I don't want it.  I have

19  already had to review *in camera* any number of documents, and

20  it's time-consuming.  And I will, to the extent that I have to,

21  but I don't want to.

22       And certainly, to the extent that now we are being asked

23  on the fly to expand the request, expand the ask that was

24  originally made, then, at this point, it's like I am not

25  prepared to do that, not based upon just representations that

1    are just entered into the record without an opportunity to have

2    the government respond, and I guess, more importantly, for the

3    parties to try to resolve this, because I don't want this to be

4    a reoccurring theme, where I have to become involved over and

5    over again on these matters where I don't have the level of

6    institutional knowledge that you all have.  You all have been

7    reviewing these document and papers for years.  And,

8    ultimately, for me to come in on August 20th of 2021, in the

9    midst of all this, and then point out that, "Yes, Ms. Pierson.

10   Where did these 1800 pages come from?  Why weren't they

11   provided earlier?"  And then going back, expanding discovery

12   requirements in that manner, given what we have here, I am not

13   prepared to operate in that way.

14        Again, returning to the original ask, given what

15   Ms. Pierson has represented, what does the defense believe that

16   Ms. Pierson or the government has which is responsive that has

17   not been provided?

18             MS. MUNK:  Your Honor, we don't want the Court to

19   have to weigh in on these matters either.  We were hoping to

20   resolve it.  But the government, unfortunately, repeatedly

21   says, "It is in the discovery; bring a motion; we are not going

22   to tell you."

23        And I was surprised by this because while they write this

24   whole brief about how the Spamhaus informant is not a state

25   actor, Ms. Pierson's declaration actually answers some of these

1    questions somewhat.  We do know now the government represented

2    they got four documents from Chris Young directly, from his

3    lawyer, and those are the only four they got directly from him,

4    so we know the answer to that.  But, unfortunately, we have

5    learned all these other things.

6         So, I would request that -- this is their Spamhaus

7    informant.  This is their informant they have been working with

8    for eight years on this case.  This guy has basically given

9    them this entire case, sourced them a ton of information.  Why

10   can't the government just ask him, "Let us know which documents

11   that you gave us originated from the Adconion informant, and we

12   can let defense counsel know"?  That would be a very simple

13   thing that the government can do.

14        And if the Court isn't willing to at least address the FBI

15   file at this point -- maybe we will end up briefing that.  But

16   the only reason I raise that now, Your Honor, and it wasn't

17   previously briefed is because the government, just last week,

18   filed a 302 -- or gave us a 302 indicating he wasn't an

19   informant officially until 2018, which we believe is completely

20   false and contrary to all the evidence we have seen.

21        So, if the Court is not willing to address that at this

22   point, I guess we can meet and confer with the government, see

23   if they are willing to give it to us.  We did make the request

24   of them yesterday, but I have not heard back.

25        But I think, at a minimum, at least what we briefed, we

1    would ask that the government confer with their Spamhaus

2    informant, that we know they are regularly in contact with,

3    Agent Chabalko is in regular communication with, and have him

4    clarify the documents he gave the government that originated

5    from the Adconion informant.

6             THE COURT:  All right.

7             MS. MUNK:  And I believe the government can easily do

8    it.

9             THE COURT:  Let me ask Ms. Pierson, do you have any

10   issue, any problem, with doing that?  Asking your Spamhaus

11   informant to, as well as he can, identify any documents that

12   were obtained from the Company A informant?

13            MS. PIERSON:  You know, I think we are here on a

14   discovery motion, which is what is covered by Rule 16 and what

15   have you, and what they are asking us to do is do additional

16   investigation and create documents that don't exist.

17            THE COURT:  I don't know if that's what we have

18   because, first of all, you represented as an officer of the

19   court -- and I accept that representation -- that you have

20   produced all documents that you are aware of which came from

21   the Company A informant; at the same time recognizing that some

22   of the information from the Spamhaus informant may have been

23   obtained from the Company A informant, but you weren't made

24   known or that wasn't made known to you.

25            So, at this point, the question would be, "Okay.  I

1    understand your response, your position.  That's reasonable.

2    Is there any reason why we shouldn't have you ask that

3    informant as to any other information that may have been

4    sourced from Company A informants," keeping in mind that it may

5    be difficult to reconstruct, going back two, three, four, five

6    years, as to, "Okay.  Back in 2018, remember I mentioned that

7    piece of information?  I actually obtained that from the

8    Company A informant."

9        So, I understand and appreciate that there may not be a

10   way to really do that without having the Spamhaus informant go

11   over -- I don't know how many pages it is, if it's dozens,

12   hundreds or thousands.  Can you give me an idea?

13              MS. PIERSON:   Thousands.

14       But I think that what we could do -- because I think that

15   what is at issue is did he give us documents surreptitiously,

16   because that is the only thing that could be a basis of a

17   Fourth Amendment.  Somebody says something to him and he

18   repeats something orally, information that he got, that's not

19   the basis for a Fourth Amendment motion.  Obtaining --

20   surreptitiously obtaining internal company documents could be

21   the basis.

22       So, if we were to look at just the documents that he gave

23   us --

24              THE COURT:  Which consists of what?  Dozens,

25   hundreds, or thousands?

```
 1            MS. PIERSON:  That's probably dozens, right?  I mean,
 2   just in terms of the actual documents that he gave us as
 3   opposed to information, which is what you get from an
 4   informant.  Informants give information.
 5       The actual documents, I think, are a much more manageable
 6   number.  And we could ask him, you know, with respect to all
 7   the documents.
 8       Now, must we ask about every document, or must we simply
 9   ask about the documents that were obtained prior to the
10   issuance of subpoenas?
11            THE COURT:  Because --
12            MS. MUNK:  Your Honor, just to clarify --
13            THE COURT:  Because of the fruit of poisonous tree or
14   because of Fourth Amendment issues, that anything after that
15   would be pretty much moot?
16            MS. PIERSON:  Right.  Yes.  Because that's the only
17   materiality that they have alleged for these documents.
18            THE COURT:  Ms. Munk?
19            MS. MUNK:  Your Honor, so I -- actually, having
20   reviewed a lot of this stuff, this Spamhaus informant knows the
21   documents.  He knows what he gave the government.  He's all
22   over this.  He's been running -- he ran this investigation, at
23   least what we are seeing.
24       So I think he could probably very easily say, "These are
25   the documents I got from Chris Young."  And he sends these
```

1    email files.

2         So, we would be asking for all the documents he got from

3    Chris Young, and I don't think it should be anything that

4    predates 2016.  Again, we don't know what the Spamhaus

5    informant was directing him to tell them.  We don't know what

6    those communications are.  And maybe that will tee up a

7    different motion.  We don't know at this point.

8         But I think the government can very easily ask the

9    Spamhaus informant, "Identify the documents that you gave us

10   that originated from Chris Young," and he can probably pretty

11   easily do that.  And that's what we would be requesting.

12             THE COURT:  Do you have an issue with that?

13             MS. PIERSON:  I think if it's limited to the ones

14   that we got before the subpoena, we have no issue.

15             THE COURT:  And Ms. Munk, do you believe that you are

16   entitled to post subpoena -- identification of post-subpoena

17   documents?

18             MS. MUNK:  I mean, yes -- yes, Your Honor.  I think

19   we are entitled to all --

20             THE COURT:  And what is the theory?

21             MS. MUNK:  I think we are entitled -- I am sorry,

22   Your Honor.  The telephone is hard.

23        What is that?

24             THE COURT:  What is the theory of your entitlement to

25   those -- or to that information?

1          MS. MUNK:  The theory of entitlement is, again, we

2     know that the Spamhaus informant was working with this Chris

3     Young, Adconion informant, since September 2013.  And he was --

4     according to Exhibit A that we submitted with our motion to

5     compel, he was giving the Spamhaus informant tons of

6     information.  That's what he put in his email.

7          And we want to know -- the government has produced these

8     documents, right?  They said they produced everything their

9     Spamhaus informant has given to them, to us, in this

10    investigation.  We just want to know, pre or post -- I don't

11    think there would be a time limit on it -- what are those

12    documents and when did they get them?

13         If they happened to get them way later, okay.  Maybe that

14    helps the government's argument.  But we should be able to know

15    which documents derived from --

16         THE COURT:  So, at this point, since we are just

17    talking about dozens, we are not talking about thousands, I

18    will direct the government to --

19         MS. PIERSON:  Can I make one more point?

20         Chris Young, who they seem to be very concerned about now,

21    left the employ of Adconion in 2013.  So, to the extent that he

22    left with documents from Adconion, you know, he left with

23    documents that were 2013 or earlier, which is going to have

24    very limited relevance to this case.

25         THE COURT:  But it also goes to this notion of

1   whether or not you would have received them before or after the

2   issuance of the subpoena?

3          MS. PIERSON:  Right.  There's that.  But what they

4   are leaving out, too, is the fact that the Spamhaus informant

5   is getting all sorts of documents from Anon-1.

6          THE COURT:  From what?

7          MS. PIERSON:  Anon-1, this person with this email

8   address of --

9          THE COURT:  Chris Young is not Anon-1?

10          MS. PIERSON:  Spamhaus guesses that Chris Young is

11   Anon-1, but no one knows, as we stand here today, if Chris

12   Young is Anon-1.

13      We can get the documents that they know that they got --

14   that they are certain they got from Chris Young, but Anon-1 is

15   an unknown as we stand here today.

16          THE COURT:  Well, I am going to direct --

17          MS. MUNK:  Your Honor --

18          THE COURT:  Yes.

19          MS. MUNK:  Your Honor, so, yes, we would want the

20   documents they got from Anon-1.  Again, you go back to -- they

21   are probably internal company documents.  This idea that 2013

22   is irrelevant, this entire case is based on 2011 to 2014.

23   These emails that derive from Chris Young --

24          THE COURT:  Ms. Munk, Ms. Munk, I have a 1:30 matter.

25   I had indicated to the government that they should have the

1    Spamhaus informant review all of these documents, all of them,

2    and then identify which originated with Chris Young.  And so,

3    anything that Ms. Pierson may have said to pooh-pooh the notion

4    that anything is irrelevant before 2013 or anything else really

5    doesn't matter at this point, does it?

6            MS. MUNK:  Well, Your Honor, if you are going to

7    direct them to have them get the answer, no, then it isn't

8    relevant.  I just wasn't sure --

9            THE COURT:  That's what I just said.

10           MS. MUNK:  All right.  Thank you, Your Honor.

11           MS. PIERSON:  Just so it is clear, you are ordering

12   us to ask the informant, as to the actual documents that he

13   transmitted to the government, which ones came from Chris

14   Young?

15           THE COURT:  Yes.  And before or after the subpoena.

16           MS. PIERSON:  Okay.  Anything he is certain that came

17   from Chris Young, we will identify.

18           THE COURT:  Yes, Ms. Munk?

19           MS. MUNK:  Yes.  And we are in agreement with that.

20   And now that the government has represented they have got tons

21   of documents from Anon-1, who the informant believes is Chris

22   Young --

23           THE COURT:  I am not sure that they made that

24   representation, but go ahead.

25           MS. MUNK:  Well, no, I think they did, Your Honor.

1   The email -- the Spamhaus informant repeatedly emailed Agent

2   Chabalko, "We think this is Chris Young.  We have this Adconion

3   informant.  He hates everybody at Adconion.  We think he is

4   Chris Young."

5       We would ask that the government identify those documents

6   as well, which I am assuming the government has given us, since

7   the Spamhaus informant gave them to the government.

8            THE COURT:  And does that come within the ask that is

9   made in your motion for discovery?

10           MS. MUNK:  Yes, Your Honor, it does.  (Inaudible.)

11           THE COURT:  And would otherwise have not been

12  addressed by Ms. Pierson's earlier response?

13           MS. MUNK:  No, it would have been addressed, Your

14  Honor, because this would have been part of the request from

15  our initial motion to compel.

16           THE COURT:  So, what specifically do you believe that

17  Ms. Pierson has that has not been provided and which is not

18  going to be further followed up by Ms. Pierson by the Court's

19  directive today?

20           MS. MUNK:  Yes.  So, Your Honor, we didn't know until

21  Ms. Pierson filed her opposition and the declaration this

22  reference to Anon-1.  We weren't aware of that.  So, Anon-1,

23  the Spamhaus informant believed was Chris Young.  I understand

24  they don't know 100 percent if that's the case.  I am not sure

25  the FBI agent interviewing Chris Young ever asked him because

1    it is not in the 302.

2        But we referenced in our request "Company A informant."

3    And the Anon-1 informant was supposedly giving them the

4    Spamhaus informant internal Adconion emails, so that would fall

5    under "Company A informant."

6        So I think our initial motion addressed this, and we would

7    request that they also identify which documents the Spamhaus

8    informant gave them originated from Anon-1, because that would

9    be this other Company A informant that would be addressed in

10   our initial motion.  We just didn't know he was called "Anon-1"

11   until her opposition.

12             THE COURT:  Ms. Pierson?

13             MS. PIERSON:  We don't know who Anon-1 is, so how

14   would it be helpful to know what documents came from that

15   person?

16             THE COURT:  Ms. Munk?

17             MS. MUNK:  Because the -- because the Spamhaus

18   informant got all those documents and was saying how helpful it

19   would be to the investigation and were feeding them to the FBI.

20   And the FBI was very excited to know that there was an Adconion

21   information and he could tie this investigation together.  So,

22   we want to see that.  This is completely relevant.  And we are

23   supposed to have it.

24             THE COURT:  You are not asking to receive something

25   so much as for the government to identify certain features or

1    aspects about those documents, specifically whether or not they

2    originate with Anon-1, Chris Young, or something like that?

3            MS. MUNK:  Right.  They could identify the Bates

4    number.  Because, according to the government, we at this point

5    should have every document related to this investigation that

6    they received from their Spamhaus informant.  So the Spamhaus

7    informant can say, "Oh, these documents I provided, they came

8    from Anon-1."  And then the government can tell us the Bates

9    for it.  And then the Spamhaus informant can say, "These

10   documents I provided you came from Chris Young."  And they can

11   let us know the Bates numbers and the dates of when they

12   received them.  And that's what we would be requesting.

13           THE COURT:  All right.  The request is denied.

14       Is there anything else to address at that moment?

15           MS. PIERSON:  Yes, Your Honor.

16       I would like to just bring up the fact that we did file

17   the motion to reconsider taking the deposition of Mr. Dorn, and

18   we did file under seal two letters -- letters from two doctors

19   and his letter.  We would have nothing more to give, but we

20   would submit on that and ask for a decision.

21           THE COURT:  And let me hear from the defense.

22       I take it that they have received both of these

23   declarations or documents from --

24           MS. PIERSON:  They were provided to the defense

25   August 5.

```
 1              THE COURT:  What is the position of the defense?

 2              MS. MUNK:  Yes, Your Honor.  Thank you.

 3      We did receive those, and we don't have an objection.

 4              THE COURT:  The Court will direct that the parties

 5      take steps to depose the witness that --

 6              MS. PIERSON:  Very well.

 7      I would also like to just put on the record that the

 8      government has complied and provided the three pages that the

 9      Court directed us to do in the last order.

10      And also, that we do have the examination of the other

11      witness, LWT, now set for September 9, at 11:00 a.m., in

12      Redlands, California.

13              THE COURT:  All right.  Let the record reflect that.

14      And then, is there anything else?

15              MS. MUNK:  Your Honor --

16              THE COURT:  Yes.

17              MS. MUNK:  I am sorry.  This is Ms. Munk.

18      I think part of this just may be the telephone connection.

19      I didn't hear the end part of the Anon-1, if you said that was

20      granted or denied, the request.

21              THE COURT:  Denied.

22              MS. MUNK:  Okay.  So, just to clarify, then, the

23      Court is ordering the government to have the Spamhaus informant

24      identify -- or they identify to us the documents they received

25      from Chris Young?
```

```
 1              THE COURT:  Yes.
 2              MS. MUNK:  But not Anon-1?  Okay.
 3              THE COURT:  Correct.
 4        Well, and for the reasons outlined as to the government's
 5   inability to ascertain that.  So, yes, the Court denies that
 6   part of it.
 7        Is there anything else from the defense?
 8              MS. MUNK:  No, Your Honor.  The only thing I would
 9   ask is that, if they can ascertain it, would the Court be
10   willing to order that?
11              MS. PIERSON:  I didn't hear that.
12              THE COURT:  She said if the government was able to
13   ascertain it, would the Court then direct the government to
14   follow up in that way.
15        Ms. Pierson, do you have anything further?
16              MS. PIERSON:  I guess -- are they asking us to
17   investigate and find out who Anon-1 is?
18        As we stand here now, we are representing we don't know
19   who it is, so how can we identify documents from someone we
20   don't know who it is?
21              MS. MUNK:  And that's not our request, Your Honor.
22        So, Anon-1 used -- I can't remember off the top of my
23   head.  I know this now from the government's -- Ms. Pierson's
24   declaration.  It is something like, "TheRogueSpammerOC@gmail,"
25   or something like that.
```

 1          So, the Spamhaus informant was communicating with this

 2     "RogueSpammerOC" guy and apparently gave them a bunch of

 3     documents.  So the Spamhaus informant can very easily say,

 4     "These are the documents we got" -- which now that we know the

 5     government called Anon-1, which is RogueSpammerOC.  And that's

 6     all we would be requesting is if they can identify those, and

 7     they can let us know.

 8          THE COURT:  The request is rejected or denied.  And

 9     at this point, the Court finds that the grounds provided, the

10     identification of these documents, are insufficiently

11     established so as to warrant the Court to order the government

12     to take further task or take further steps to identify

13     discovery that is in the possession of the defense.

14          So, at this point, our next hearing is scheduled for what,

15     Madam Clerk?

16          THE CLERK:  October 4th, 1:00 p.m.

17          THE COURT:  October 4, 1:00 p.m.

18          And let me inquire with respect to the case that was

19     expected to go well into December, has that trial started?

20          MS. MUNK:  Your Honor, this is Ms. Munk.  And I have

21     been in touch with counsel in that case.

22          The trial was supposed to start Monday.  It got pushed a

23     little bit because one of the lawyers got COVID, but apparently

24     it is scheduled to start September 1st.  It is moving ahead.

25     So, either October 4th or possibly before that, we might have

1   to, you know, move to reconsider the trial date.  But, if

2   anything, we will discuss the trial date in October, at the

3   status conference.

4           THE COURT:  All right.  Ms. Pierson, do you have any

5   further information regarding that case?

6           MS. PIERSON:  I do.

7       I would represent that I spoke to the Assistant U.S.

8   Attorney who is on the case, and what they advised is that

9   there were some requests to move the start date back, and the

10  judge accommodated some of those requests; but they have

11  time-scheduled their jury.  They sent out all these jury

12  questionnaires.  And they told the jury that the case is going

13  to end December 3rd.

14      So, based on that end date, what the judge is did is she

15  subtracted some of the days that they were going to be dark in

16  the center.  So she allowed it to start a little later, but

17  where there were dates that they were going to be dark, she

18  removed those dates.  So these --

19          THE COURT:  Removed them in order to be in trial?

20          MS. PIERSON:  Yes.  Because she wants to be sure that

21  they can keep the jury that they have already time-screened up

22  to December 3rd.

23          THE COURT:  All right.  So, then, that's the latest

24  on that.

25      So, we will confirm the October date, and then that

1   concludes today's proceedings.  Thank you.

2             MS. MUNK:  Thank you, Your Honor.

3        (End of proceedings at 1:49 p.m.)

4                          -oOo-

5                C-E-R-T-I-F-I-C-A-T-I-O-N

6

7             I hereby certify that I am a duly appointed,

8    qualified and acting official Court Reporter for the United

9    States District Court; that the foregoing is a true and correct

10   transcript of the proceedings had in the aforementioned cause;

11   that said transcript is a true and correct transcription of my

12   stenographic notes; and that the format used herein complies

13   with rules and requirements of the United States Judicial

14   Conference.

15             DATED:  September 3, 2021, at San Diego,

16   California.

17

18                       /s/  Chari L. Bowery

19                       _____
                         Chari L. Bowery
20                       CSR No. 9944, RPR, CRR

21

22

23

24

25