1                  UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    UNITED STATES OF AMERICA,      .
                                    .
5                  Plaintiff,       . No. 18-cr-4683-GPC
                                    .
6                  v.               . November 18, 2021
                                    . 2:00 p.m.
7    JACOB BYCHAK,                  .
     MARK MANOOGIAN,                .
8    MOHAMMED ABDUL QAYYUM,         .
     PETR PACAS,                    .
9                                   .
                   Defendants.      . San Diego, California
10   . . . . . . . . . . . . . . . .

11                   TRANSCRIPT OF MOTION HEARING
12            BEFORE THE HONORABLE GONZALO P. CURIEL
                   UNITED STATES DISTRICT JUDGE
13

14

15   APPEARANCES:

16   For the Plaintiff:     United States Attorney's Office
                            By: SABRINA L. FEVE, ESQ.
17                              MELANIE K. PIERSON, ESQ.
                                CANDINA S. HEATH, ESQ.
18                          880 Front Street, Room 6293
                            San Diego, California 92101
19
     For the Defendant      Wiechert, Munk & Goldstein, PC
20   JACOB BYCHAK:          By: DAVID W. WIECHERT, ESQ.
                                JESSICA C. MUNK, ESQ.
21                          27136 Paseo Espada, Suite B1123
                            San Juan Capistrano, California 92675
22
     For the Defendant      Mintz Levin
23   MARK MANOOGIAN:        By:  RANDY K. JONES, ESQ.
                                 DANIEL J. GOODRICH, ESQ.
24                          3580 Carmel Mountain Road, Suite 300
                            San Diego, California 92130
25   ///

```
1    APPEARANCES (CONTINUED):

2

3    For the Defendant        Bienert Katzman Litrell Williams LLP
     MOHAMMED ABDUL           By:  WHITNEY Z. BERNSTEIN, ESQ.
4    QAYYUM:                       JAMES D. RIDDET, ESQ.
                              903 Calle Amanecer, Suite 350
5                             San Clemente, California 92673

6

     For the Defendant        Bird Marella
7    PETR PACAS:              By:  GARY S. LINCENBERG, ESQ.
                                   ALEXIS A. WISELEY, ESQ.
8                             1875 Century Park East
                              Suite 2300
9                             Los Angeles, California 90067

10

11

12

13

14

15

16

17

18

19

20

21   Court Reporter:          Chari L. Bowery, RPR, CRR
                              USDC Clerk's Office
22                            333 West Broadway, Suite 420
                              San Diego, California 92101
23                            chari_bowery@casd.uscourts.gov

24   Reported by Stenotype, Transcribed by Computer

25
```

```
 1              SAN DIEGO, CALIFORNIA; NOVEMBER 18, 2021; 2:00 P.M.

 2                                 -o0o-

 3              THE CLERK:  Calling matter three on calendar,

 4    18-cr-4683, United States of America v. Jacob Bychak, Mark

 5    Manoogian, Mohammed Abdul Qayyum, Petr Pacas, on for motion

 6    hearing.

 7              THE COURT:  Appearances, please, from the defense.

 8              MS. MUNK:  Good afternoon, Your Honor.  Jessica Munk

 9    and David Wiechert on behalf of Jacob Bychak, who is present in

10    court.

11              THE COURT:  Good afternoon.

12              MR. JONES:  Good afternoon, Your Honor.  Randy Jones,

13    on behalf of Mark Manoogian, who is present in court.  And I

14    believe my colleague, Dan Goodrich, is appearing via telephone.

15              THE COURT:  Good afternoon, Mr. Jones.

16              MS. BERNSTEIN:  Good afternoon, Your Honor.  Whitney

17    Bernstein on behalf of Mr. Qayyum, who is present before the

18    Court.  And also, on the telephone, is my colleague, James

19    Riddet.

20              MR. LINCENBERG:  Good afternoon, Your Honor.  Gary

21    Lincenberg and Alexis Wiseley for Mr. Pacas, who is present.

22    And I am not sure if my colleague Nicole Van Dyk Rodriguez is

23    present by phone, but if she is, she can announce her

24    appearance.

25              THE COURT:  All right.  Mr. Pacas is here?
```

1          MR. LINCENBERG:  Yes.

2          THE COURT:  Good afternoon.

3      And on behalf of the United States?

4          MS. FEVE:  Good afternoon, Your Honor.  Sabrina Feve

5   and Melanie Pierson for the United States in person.  Our

6   colleague, Candy Heath, is on the phone.

7          THE COURT:  Good afternoon.

8      We are here on three motions, specifically two as it

9   relates to the 281 motion, joint motion to compel discovery

10  that was filed September 20th, and then joint motion for

11  reconsideration, also filed on September 20.  That is document

12  282.

13     Meanwhile, the original motion to compel discovery that

14  raised a number of these issues was the one filed on July 30th,

15  2021.  That's in ECF Number 257.  There have been numerous

16  documents filed besides the motions.  There have been responses

17  and, in some instances, replies and supplemental points and

18  authorities; but, when it comes down to it, essentially, there

19  are two requests.  One is to reconsider the Court's earlier

20  ruling denying the motion to compel the discovery or disclosure

21  of the identity of the Spamhaus informant, and then, second of

22  all, a motion asking the Court to direct the government to

23  produce all information, all evidence, all documents, relating

24  to the cooperation between the United States and Spamhaus

25  outside of this case.

1          First, with respect to the informant, at this point, I am

2     not prepared to reconsider.  There is new information in the

3     sense that the defense is aware, through inadvertence from the

4     government, who the Spamhaus informant is; and then, second of

5     all, there has been this evolving motion regarding suppression

6     of evidence based upon a state actor theory.  That has now

7     expanded so as to focus on Spamhaus as the means to have

8     suppression of evidence.

9          I note "evolving" because initially, in the joint motion

10    to compel discovery filed on July 30th, at that time, the

11    defense had requested production or identification of all

12    documents that came from Company A informant, either directly

13    or through Spamhaus, and the date when the government received

14    Company A documentation identified in number one above.

15         In response to that motion, the Court granted it in part.

16    As noted by the defense, I directed the government to identify

17    what documents that the Spamhaus informant had obtained from

18    the Company A source.  Documents were provided and have been

19    produced in discovery.

20         And so, now, the defense is asking for all documents and

21    information relating to Spamhaus interacting with and assisting

22    the government in investigations and prosecutions related to

23    violation of the CAN-SPAM Act or other federal statutes apart

24    from the instant case.  So now the focus is on Spamhaus, and

25    then, by extension, the Spamhaus informant.

1          The Court would previously have denied the motion to

2     compel discovery regarding the identity of the Spamhaus

3     informant, given the likelihood that his safety could be at

4     risk, given that his continued use could be jeopardized, given

5     the fact that he was not going to be called as a witness, and

6     that ultimately his -- and given the manner in which the

7     government had obtained its evidence in the case, the Court

8     found that the identity of the informant was not required under

9     Rule 16 or *Brady*.

10         I understand at this point there is this motion to

11     suppress that is being developed by the defense.  Given what

12     the Court has before it, relating to the timing of the limited

13     information that was provided by the Spamhaus informant, given

14     the timing of the obtaining of the grand jury subpoenas,

15     subpoenas that were otherwise issued to outside sources, the

16     Court is at this point not convinced that reconsideration is

17     warranted.

18         And as to the second issue pending -- that is, to have the

19     government identify any and all documents relating to Spamhaus

20     interacting with and assisting the government investigations

21     and prosecutions related to violations of the CAN-SPAM Act or

22     other federal statutes, at this point I am not inclined to

23     grant that.  At this point, the defense has pointed out -- or

24     pointed to other cases where Spamhaus has assisted the

25     government.  The Court has directed the government to produce

1    documents relating to Spamhaus' cooperation in this case.

2        Ultimately, the only thing that I would be prepared to do

3    is to determine whether or not any payments were made to

4    Spamhaus and whether a CI file has been maintained.  And as I

5    understand it, the Spamhaus source was not opened up as an

6    informant until -- I am not sure if it was 2017 or 2018, but

7    sometime after the information that's being relied on by the

8    government for its case-in-chief was already obtained.

9        And I have a question to the government as to whether or

10   not they would even be in a position of identifying how many

11   occasions that Spamhaus has provided any type of information to

12   the FBI or to the government.

13       So that would be my tentative, and I am prepared to hear

14   from defense counsel.

15           MR. LINCENBERG:  Thank you, Your Honor.

16       I think in light of the Court's reasoning and tentative, I

17   would suggest that the Court consider a more limited ruling

18   that would at least allow us to develop a basis that would

19   satisfy some of the criteria the Court is looking at.  And in

20   that regard, I thought what would be helpful, in light of the

21   government -- part of the last filing, if I may, to overview a

22   few of the points that I think have been developed in the

23   record, both as a result of the more recent discovery documents

24   that we have received from the informant's communications with

25   Agent Chabalko as well as from some of the arguments and what I

1    would contend even amount to certain concessions of some of the

2    issues.

3        And the first thing I wanted to mention, Your Honor, is

4    that one thing that jumps out here is -- and this is really

5    developed more over time from the more recent emails we have

6    received, is that --

7            THE COURT:  When you say the "recent emails," are you

8    referring to the 11 emails obtained from C.Y.?

9            MR. LINCENBERG:  Not C.Y., no.

10       I am referring, Your Honor, to, for example, what was

11   Exhibit 12 to our supplement memorandum, which is an

12   August 2021 email exchange between the informant and Agent

13   Chabalko.  Let me summarize for the Court what is involved

14   there.

15       So, this supports the broader point that the evidence that

16   is now developed is that there's been a clear -- there's clear

17   evidence supporting that there's been an invasion of the

18   attorney-client privilege.

19           THE COURT:  The government disputes that, as I

20   understand it.

21           MR. LINCENBERG:  Yes, the government disputes that.

22       And the government may have more information than we do in

23   terms of whether there have been certain waivers by corporate

24   counsel or the like, but let me explain what I am referring to,

25   Your Honor.

1        For example, if the Court looks at Exhibit 13 to our

2    pleading, this was a September 2017 email from the informant to

3    the FBI agent in which he is talking about communications that

4    he has clearly reviewed involving attorney Linda Goodman.

5    Linda Goodman was an attorney for the company that was advising

6    them on all sorts of compliance-related issues.  And in the

7    course of this discussion, he says, "Did you see these emails?

8    What about the Linda Goodman emails?  Does attorney-client

9    privilege prevent you from viewing them?"

10       Now, from what I see in the email exchange, Agent Chabalko

11   is generally careful enough not to put in writing, "Hey, tell

12   me what they say," or "I would like to see them," or anything

13   like that.  But we see what looks like a record of

14   acquiescence, if not outright encouragement.

15       And Exhibit 12 is, I would suggest, shocking, what we see

16   here.  This is August 25th of 2021, and it is an email from the

17   informant -- back and forth, but the lengthy ones are from the

18   informant to Agent Chabalko in which he's describing what he is

19   saying may very well be privileged communications.

20       Again, he is assuming that he has his normal repartee

21   going with Agent Chabalko, which is pretty colorful language,

22   pretty strident.  He does not believe that any of these are

23   going to be turned over to defense lawyers.

24       And he essentially says, at the beginning, with regard --

25   he says, "I found the Chris Young email documents, and, to

1  avoid any potential attorney-client-privilege issues, I will

2  only provide the headers of the emails as well as a summary of

3  the contents, to provide some context."

4      And then this email chain is some 20-plus pages long.  And

5  it's replete with summaries of apparent attorney-client

6  communications generally involving communications involving --

7  with Linda Goodman, who is an attorney for the company.  And

8  some of them are involving an in-house counsel, Jonathan Harrow

9  (phonetic), at the company.

10         THE COURT:  Let me ask you two questions.

11     With respect to this potential invasion of the

12  attorney-client relationship, would that figure in a Fourth

13  Amendment analysis?

14         MR. LINCENBERG:  No, I don't think so.  I think it

15  would figure into a Fifth and Sixth Amendment analysis and the

16  constitutional rights of interference with counsel, effective

17  assistance of counsel and due process and the like.

18     And by the way, there's other emails.  There's one,

19  Exhibit 16, which was from November 2018, from the informant.

20  He says, "Read Linda underscore libel email in particular," he

21  is referring to this attorney, Linda Goodman.

22         THE COURT:  And are these emails being provided to

23  the FBI agent?

24         MR. LINCENBERG:  Pardon?

25         THE COURT:  Are they provided to the FBI agent that

1    he references --

2           MR. LINCENBERG:  I think that an evidentiary hearing

3    would allow us to see whether they were provided.  I have no

4    knowledge that they were provided.  I do have knowledge --

5           THE COURT:  We can ask the government.

6           MS. BERNSTEIN:  The FBI agent, Chabalko, is on the

7    emails.

8           MR. LINCENBERG:  Right.  But the Court's question is

9    were the emails themselves provided.

10          MS. MUNK:  Yes, they were, Your Honor.  They are

11   attached as a zip file.

12          THE COURT:  To the extent they are provided, doesn't

13   that give you the extent of the information that the FBI would

14   have obtained?  Doesn't that fill in the gaps and provide you

15   what you are looking for as it relates to the government?

16          MR. LINCENBERG:  It fills in some of the gaps.

17       The reason I am going over some of these interesting

18   statements in the emails themselves is it also shows a pattern

19   which may amount to government misconduct.  Not -- not talking

20   about AUSA misconduct; I am talking about FBI agent misconduct.

21   And if -- you know, in the broader context of the question of

22   the relationship between the Spamhaus informant and Agent

23   Chabalko and this lengthy investigation where, you know, the

24   government sets forth a record -- and my sense from the Court's

25   tentative is that the Court accepts that that is the record of

1    the communications -- that the record shows, for example, that

2    this guy -- they didn't officially call him a CHS until 2017 or

3    2018; that they may have called him a CHS in 2013, but, Judge,

4    believe me, it was inadvertent.  And anyways, this purloining

5    of the documents from the company --

6            THE COURT:  But aside from what we call him, don't

7    you have the information that would have been developed between

8    2013 and 2017 by the Spamhaus CHS that then was turned over to

9    the government?

10           MR. LINCENBERG:  I don't think the question is

11   whether we have the information that was turned over.  That's

12   not our objection, Your Honor.

13       If one of the issues, in terms of, first of all, whether

14   this informant was a state actor, is was there encouragement,

15   acquiescence, and the like.  And the government takes the

16   position no, there was not; this person is not a state actor.

17       Look, the guy says, "I didn't take direction from the

18   FBI," and so forth.

19       I think there's enough of a record for the Court to allow

20   us to do further inquiry rather than just accept the word.  And

21   I would also suggest if we accepted the word of what we knew a

22   year or two ago, it would also be a slightly different word

23   from what we have gotten only because of these hearings where

24   the Court has, I think, prodded the government to turn over

25   further discovery and dig deeper.  I don't believe that these

1  AUSAs have been knowingly withholding things.  I just think

2  that these hearings and the Court's inquiries have prodded them

3  to dig deeper.

4      But I am also suggesting that the issue is not simply

5  getting into, for example, and looking at FBI files -- not just

6  302s but files discussing the interplay between the agent and

7  the informant in this case -- are important not only for a full

8  record of a determination of whether the person's a state

9  actor, but also in terms of governmental misconduct, because

10  there does appear to be a record of this informant getting and

11  looking at privileged communications.

12      Now, I don't know the full answer as to whether there's a

13  waiver and I am not suggesting that every document that has an

14  attorney's name on it is privileged.  That's a more detailed

15  inquiry that I think needs to be explored.  It seems pretty

16  clear that the joint strategizing that was going on between the

17  informant and the FBI agent back in 2013, 2014, involved a

18  review of documents that he was obtaining, and it appears that

19  some were involving Linda Goodman.  This may or may not have

20  led company counsel to waive certain privileges and not other

21  privileges.  It is my understanding, but I don't have a full

22  answer, that company counsel has not fully waived the

23  privilege.  And it is certainly evidence of governmental

24  misconduct.

25      And just the language of these emails and the looseness

1    with how the informant describes these documents, "Hey, maybe

2    you don't want to look at this.  I will just summarize what

3    they say," or things like that.

4        And, by the way, remember, there's so much communication,

5    anyway, between the FBI agent and the informant, and the

6    informant has this privileged stuff in his mind.  He knows what

7    is there.  I would be shocked if there wasn't more discussion

8    between the agent and the informant that involved a disclosure

9    of privileged information.

10       And we see in Exhibit 2 to our pleading, the May 2014

11   email in which the agent is talking about, you know, recruiting

12   witnesses, this is the joint-strategy-type talk.  And then

13   there's this, "Better to have these discussions in person."

14   You know, now, that may just be because it's too much to talk

15   about in an email, but it's also suggestive that "There's

16   certain things we may not want to create a record of," which we

17   now see in part why.  One of the reasons is because it appears

18   that there's privileged information passing to the informant,

19   who passes it on to the FBI agent.

20       And whether or not the informant is officially a state

21   actor at the time or not, if the FBI agent knows what is going

22   on -- and I would suggest that the record supports that the

23   agent does know what is going on -- that's important for us to

24   be able to inquire into.

25       Now, in addition to invasion of the privilege, we now see,

for the first time, broader evidence of invasion of the defense
camp and defense work product.  For example, Exhibit 24 to our
pleading is a September 26, 2021 email.  So this is in the
middle of hearings on the issues we are discussing, and the
informant and the agent are going back and forth.  And the
informant writes to the FBI agent, "Even defense attorney Gary
Lincenberg knows that Spamhaus are the experts on spammers and
comes to our site for information on them."

    And then he lays out all of these search strings that are
going on down below.

    And then he writes, "Previously, defense attorney Randy
Jones was also relying on Spamhaus for information on his
guilty spamming client."

    And then, Exhibit 23, there's discussion about, "Well, at
this time, we know who the lying lawyer is.  It's Jessica
Munk."  And, "She and Linda Goodman would make a great pair.
Despite all the derogatory things she has to say about
Spamhaus, her law firm continues to utilize an email filtering
system that subscribes to Spamhaus data."

    Now, the government can give an answer to that and say,
"Well, that doesn't -- this is a private organization, and they
can monitor what they are doing," and so forth.

    And the Court can say, "All right.  I will accept that.
We won't go further."

    What I am suggesting to the Court is this is enough

1   evidence, and it's emblematic of, you know, looking at what are

2   these defense lawyers' opinions?  How are they developing their

3   defense?  Why are they looking up certain IP protocol numbers,

4   and the like, if not to get into our minds?

5       Now, we don't see any discouragement from the FBI agent to

6   Spamhaus doing this.  An evidentiary hearing will allow us to

7   explore whether, in fact, he did discourage or whether he

8   encouraged it or passed it along and the like, and what else

9   was going on because clearly these emails are not the end of

10  the story.

11      We also see another email, as soon as we win this mistrial

12  in our Phoenix trial, the FBI agent is immediately saying, "Oh,

13  these defense lawyers can't use this excuse to continue the

14  trial date anymore.  They just got a mistrial."

15      In and of itself, fine, he can monitor what I am doing in

16  Phoenix.  But there is a chilling effect when you are a defense

17  lawyer and you are trying to do investigation and somebody who

18  even the government admits now is an informant -- a CHS is part

19  of the government's team -- is monitoring the activity of

20  defense lawyers as they are preparing for trial.

21      And I am not here today to ask the Court to give a remedy.

22  This is not a motion to dismiss.  I am here to try to persuade

23  the Court that there's enough "there" there, particularly in

24  what we have recently received, to warrant an evidentiary

25  hearing.

1        THE COURT:  The evidentiary hearing would be relating

2   to motions for additional discovery or eventually as to the

3   Fourth Amendment motion to suppress?

4        MR. LINCENBERG:  The Fourth, Fifth, and Sixth

5   Amendment issues.  So, with regard to the Fourth Amendment

6   issue, for example, the government comes in and they present

7   some evidence that says, "You know what?  The argument that

8   Mr. Wiechert has been making, that the May 2013 theft of

9   documents from the company is an unlawful search, doesn't fly

10  because this guy didn't become an informant until July 2013."

11       Well, I, as a defense lawyer, don't accept that

12  representation on its face.  When the government says, "You

13  know what?  This calling him a CHS in 2013, it was inadvertent.

14  It was a mistake," I don't accept that.  I don't think it's

15  reasonable.

16       It's part of Spamhaus' mission to go out in the world and

17  go after spammers and people like my clients and others.  And

18  there is -- part of the way this informant validates and

19  justifies and touts his own value to Spamhaus, that he is

20  working with the FBI, and he has the ear of the FBI, and

21  there's joint investigations.

22       And what have we now received from the government?  A copy

23  of a 2016 PowerPoint for a presentation to the public.  The

24  government has taken off -- I see counsel nodding her head no;

25  I thought it was to the public -- a PowerPoint where it's

1    jointly being presented by I think the FBI and this informant.

2    It appears that way.  We also see an email where the informant

3    is saying, "You can use my name.  Don't worry, you can use my

4    name."

5         Well, in a situation where, A, we already know the name

6    because they inadvertently disclosed it; B, there's such a

7    close relationship here; C, there's clearly evidence of joint

8    investigation and acquiescence and encouragement, whether or

9    not it amounts to him being a state actor in May of 2013, we

10   don't yet have a full record to make our best argument for the

11   Court on that because we don't have full information.  We

12   haven't been able to talk to these folks.  But I would be

13   surprised if Spamhaus, in some way or another, was not involved

14   in looking at our clients and trying to jive up the FBI even at

15   an earlier date.  All we are asking right now is to be allowed

16   to go into it further.

17        Now, the government, in their papers, states that if the

18   Court does have a hearing, that hearing should be *in camera*.

19   And my answer to that is "Fine."

20        They cite to the *Henderson* case –– and the *Henderson* case

21   is a case where the Court noted that, if there is such a

22   hearing, if the Court hasn't yet made a decision to disclose

23   the informant's name, do it *in camera*.  Of course*, Henderson*

24   says defense counsel should be present so they can examine the

25   witnesses and review the documents and make their arguments to

1    the Court. But that hearing, I would submit, should certainly

2    take place.

3         Your Honor, I am going to move away from some of the

4    privilege and invasion of the defense points which I think have

5    really mushroomed from some of the recent discovery --

6              THE COURT: Let me ask, with respect to the identify

7    of the Spamhaus informant, to the extent that you do file a

8    motion based upon the Fourth and Fifth and Sixth Amendment, is

9    there any way to avoid having the Spamhaus informant called as

10   a witness in the matter?

11             MR. LINCENBERG: Well, there may be a way of avoiding

12   it, but I would respectfully suggest that the informant should

13   be called.

14             THE COURT: What would be the way of avoiding it?

15             MR. LINCENBERG: The Court could just, of course,

16   order, "We are going to first take testimony from FBI Agent

17   Chabalko. We are going to first review his files," not just

18   the emails with this person, but the files which are case

19   reports or logs of communications with the informant or

20   summaries of strategy and evidence in terms of working with the

21   informant to develop other witnesses and the like. The Court

22   could do it in stages.

23             THE COURT: And then, what if the informant, the

24   Spamhaus informant, didn't want to submit to an interview and

25   said, "You know what? I don't want to talk to you"?

1          MR. LINCENBERG:  Well, I -- I would suggest that

2    probably would be violating his informant agreements with the

3    government to not make himself available.  I can't cite you

4    with verse from an FBI manual on that, but I would certainly

5    suggest that.

6       And we should get to the point of asking him.  If he is

7    going to refuse to testify, then we could take it one step at a

8    time, and we can make our argument why he should be compelled

9    to do so.  I would be shocked if he refused to testify.

10       Your Honor, this whole notion of the person being afraid,

11    and the Court mentioned the term "safety," with all due

12    respect, I think that is weakest argument the government has

13    made.  This person is out there, doing joint presentations.

14    His name is obviously known.  This idea of vexatious

15    lawsuits -- he wouldn't be the defendant; Spamhaus would be the

16    defendant.  Spamhaus gets sued at times.  There's no basis.

17          THE COURT:  Let me ask, as to these joint

18    presentations involving the Spamhaus informant, he appears at

19    different events and states his name, his position, and what

20    role he's had in certain operations?

21          MR. LINCENBERG:  I am going to let Ms. Munk answer

22    that.

23          MS. MUNK:  Your Honor, I think this is really

24    important.  We just found out, on October 29, from the

25    government, that the Spamhaus informant gave a joint PowerPoint

1    presentation with Agent Chabalko and this occurred, according

2    to the government, in May of 2016.  It was related to IP

3    hijacking.  And the government represented it was sponsored by

4    a nonprofit corporation dedicated to facilitating collaboration

5    and information-sharing between private industry, academia, and

6    law enforcement intelligence community.

7        And so, part of the reason why we requested leave to file

8    supplemental exhibits is we had already filed our opening

9    brief, but I believe it is Exhibit 32.

10              MR. LINCENBERG:  Exhibit 2 to document 307.

11              MS. MUNK:  It's Exhibit 32, Your Honor, and it is a

12   58-page PowerPoint presentation.  And, Your Honor, do you have

13   Exhibit 32?

14              THE COURT:  Let me tell you, there have just been so

15   many sealed documents filed, and the problem is they end up

16   sealed before they end up having an ECF number attached.  And

17   so, the way I look at it, if there's something in the sealed

18   document that's of consequence, you better put it in your

19   papers.  And then, to the extent that you refer to it in your

20   papers, and the government disagrees that it exists or that you

21   are misstating it, then we will take a look precisely at these

22   papers.  But I am not going to be looking at every page of

23   every ECF document.  It would be crazy.  It would be a waste of

24   my time.

25              MR. LINCENBERG:  I completely understand that.

1        It was provided late, so we did a supplemental filing.

2            MS. MUNK:  Your Honor, this is really significant

3    because what we found out -- and, again, this is after we filed

4    our supplemental opening brief.

5        I just passed up the first page of the PowerPoint and the

6    last page.  The first page has the Spamhaus informant's name

7    and email.  He's redacted it to give us.  But he had this

8    PowerPoint presentation with this large community in May of

9    2016, puts his email up there with the FBI, and they

10   specifically address our case, Your Honor.

11       So, there's three cases that are --

12           THE COURT:  When you say it is a large community,

13   it's expected that it's an open, public community?  Or it's a

14   closed community, where you have law enforcement and

15   individuals who have kind of a need to know and would be

16   expected to be careful with identifying these people?

17           MS. MUNK:  Well, Your Honor, this is what we know

18   because the government literally just sent us this one email

19   the day before the disclosure and the government produced the

20   PowerPoint the next day.  So all we know is, from this email,

21   is that it's being sponsored by a nonprofit corporation.  It

22   was never represented this was an internal FBI presentation;

23   rather, this is some May 2016 presentation sponsored by a

24   nonprofit corporation and, apparently, in attendance is private

25   industry, so a number of members in private industry, academia,

1    and then law enforcement and intelligence.

2        So, I mean, obviously, I am assuming now the government

3    can discuss how many people were there.  But I think what is

4    important, Your Honor, is that government counsel had no idea

5    that this happened, that Agent Chabalko was the copresenter.

6        And if you look at the first page of this 58-page

7    PowerPoint that I passed you, Agent Chabalko's name is there

8    and then the Spamhaus informant's name is there, with I believe

9    his email that's been redacted.  And they do this joint

10   presentation, and it goes through three case examples, and one

11   of them is our case.

12       And what is also interesting about them discussing our

13   case in 2016 -- so this is preindictment -- is that the

14   government's number one cooperating witness, Daniel Dye, who

15   pled in this case, and then, who he allegedly received these

16   hijacked netblocks, Scott Richter, they are both identified in

17   the PowerPoint, but our clients are never identified.  And,

18   again, I see this as more *Brady* evidence; like why we are we

19   not getting this stuff?  And we have no idea what Agent

20   Chabalko is doing with this informant.

21       So I think this is -- this example is twofold.  One, I

22   think it shows his identity is not a secret.  He is clearly out

23   there.  He is giving presentations.  This idea that he is

24   fearful of his safety -- I agree with Mr. Lincenberg -- is the

25   weakest argument the government has provided.

1          And we also have other exhibits in the record where he

2     asks Agent Chabalko or Agent Chabalko asked to drop his name

3     when talking to witnesses and when talking to ARIN people.  And

4     the Spamhaus informant says, "Of course you can drop my name."

5     And that's Exhibit 18.

6          So, really, kind of everybody knows who this guy is, and

7     we now know his name, but we should be able to pursue that,

8     Your Honor.  So I just don't think there's a safety issue at

9     all or this is even a typical confidential informant at this

10    point.

11         But secondly, Your Honor, the other big point is that we

12    really have no idea what Agent Chabalko's interactions with

13    this Spamhaus informant were.  And the government has

14    repeatedly, in this court, in their declarations have said, "We

15    didn't direct -- we didn't direct the Spamhaus informant to

16    take documents from Chris Young."

17         Well, government counsel may have not directed him, but we

18    have no idea what Agent Chabalko did.  The record is completely

19    silent on his communications.  We have all these emails that

20    show they are talking on the phone.  They are meeting in

21    person.  We don't know what he possibly could have told the

22    Spamhaus informant, and, frankly, government counsel has no

23    idea.  And this PowerPoint shows they don't know because in

24    2016, May of 2016, they are giving a public presentation that

25    the government counsel wasn't even aware about.

1        So, again, this just further shows the need to do an

2   evidentiary hearing so we can inquire about some of these

3   questions to see if we really can tee up the Fourth Amendment

4   issue.  At this point, we don't have all of the discovery.

5              MR. LINCENBERG:  And I would just add one small

6   point.  I believe that the only reason we got this was because

7   these prosecutors are acting in good faith.  And as the Court

8   raises questions and inquires, they go back and take the next

9   step.

10       Now, I doubt that they have seen all of the FBI's internal

11   files -- which I think are going to show a lot -- but in dribs

12   and drabs we are learning more.

13       And this guy doesn't talk like he feels a safety concern,

14   either.  The front page of this exhibit is the October 28, 2021

15   email from the informant to Agent Chabalko about this

16   presentation, and what appears to be the case is maybe Agent

17   Chabalko talked to the government, and the government -- "Hey,

18   we need to get a copy of this, turn it over to the defense."

19       He says, "Okay.  So the idiot lawyers" -- obviously

20   referring to us -- "Okay.  The idiot lawyers want to see even

21   more illegal stuff that their guilty spammer clients were

22   involved with.  Great."

23       This guy has reached out, spoken to all sorts of

24   witnesses.  He's given public presentations.  This is not an

25   instance -- and the government is even -- sort of has an

1   inconsistent position where they say, "Well, he wasn't an

2   informant a long time ago; he isn't an informant now."  He is

3   an informant when it helps them, to get the *Roviero* test in

4   place.  He is not an informant when they are worried about him

5   being a state actor even though the course of conduct in the

6   investigation and throughout the entire time period is the

7   same.

8           THE COURT:  So, let me hear from government counsel

9   and allow them an opportunity to respond to these points.

10          MS. FEVE:  Your Honor, I will go backwards.

11      The conference where this PowerPoint was given was the

12  2016 Slam Spam —— S-L-A-M, S-P-A-M —— conference sponsored by

13  the NCFTA, which I believe stands for National Cyber Forensics

14  and Training Alliance.

15      I don't have the records on my phone for the 2016 one, but

16  the 2021 Slam Spam conference was invite only.

17      As the name suggests, Slam Spam was a group of like-minded

18  people who are dedicated to limiting and disrupting and

19  detecting spam.

20          THE COURT:  So, there were three Slam Spam

21  conferences that were attended ——

22          MS. FEVE:  No.  There was one in 2016.  I was trying

23  to say I am literally trying to find things on my phone right

24  now.  It was simply to say I do know —— and I believe this may

25  be on the PowerPoint front page; I don't have it before me ——

1    but that is the conference.  And NCFTA is the group of

2    academics, law enforcement, industry, and intelligence folks.

3    It's invite only.  It is not given to the public.  NCFTA has a

4    website.  I am sure the defense will explore it.

5         As you can see from the first page that I believe

6    Mr. Jones gave you, the source is there in his official

7    capacity as a Spamhaus employee.  And when you sign up to be an

8    informant for the government, it does not mean that you are

9    never supposed to speak to anyone or do anything.  We obviously

10   have industry informants.

11        And, for instance, when we are prosecuting environmental

12   crimes, it would be virtually impossible to do so if we didn't

13   have members of industry who cooperated with the government and

14   we don't expect those members of industry or members of a

15   nonprofit dedicated to eradicating environmental crimes to,

16   after they sign up, cease to have any public role whatsoever.

17        Yes, we did not know about it.  As soon as we found out

18   about it, we asked the FBI for the PowerPoint.  The FBI did not

19   do the PowerPoint and they didn't have it, which is why we

20   hadn't seen it when we had been through their entire file.  And

21   they requested the PowerPoint from the Spamhaus source, who

22   provided it.

23            THE COURT:  So, given the fact that you have done

24   your due diligence and learned that this PowerPoint existed and

25   that, in fact, this Spamhaus informant has spoken -- if not in

1    the complete open and public, to enough individuals where it

2    wasn't like there was a vow of silence or confidentiality or

3    anything between the invite-only group, I expect?

4              MS. FEVE:  I believe, Your Honor, that that does not

5    change our calculus at all.  Obviously, as soon as we found out

6    about it, we turned it over to the defense.

7         But we have industry sources who are willing to disclose

8    that they partner with us in limited environments.  And that's

9    what I am emphasizing.  The environment where that was -- it

10   wasn't a Ted talk.  It wasn't on the internet.  It wasn't open

11   to everybody.  It was very narrow.  It was only people who

12   shared a commonality of interest, which is the disruption of

13   spam.

14        Now, it is no secret that the source works for Spamhaus.

15   And so, yes --

16             THE COURT:  Let me ask you.  If one were to go on the

17   internet and Google or look up this person, would one find

18   evidence regarding what we are talking about here, these Slam

19   Spam, and talking about what role he's played in the

20   investigation of certain individuals?

21             MS. FEVE:  I don't think it would say anything about

22   him playing a role in an investigation of individuals.

23        I don't know that you can find this PowerPoint on line.  I

24   haven't been able to find it when I have done the searches.

25             There are advanced ways to frame your search -- and I am

1    sure we are going to hear more about how this could have been

2    Googled.

3         But when we found out about it, we disclosed it.  Because

4    we were waiting to get the PowerPoint, we wanted to make sure

5    we told defense right away.  That's why we sent the email

6    notification.  And as soon as we got the PowerPoint, we

7    produced that as well.

8         But the answer, Your Honor, is no, it does not change our

9    calculus, because it is not reasonable for us to ask an

10   employee of Spamhaus to never speak at a conference that is

11   about spam.  That's a normal thing for a Spamhaus employee to

12   do.

13        THE COURT:  And I am not suggesting that the

14   government should do something like that.  But the question

15   would become whether or not, at this point, given his level of

16   visibility and his role with Spamhaus, whether in fact the cat

17   is, essentially, out of the bag as it relates to him, his role

18   in going after spammers, such that there would not be as great,

19   or any, concern about his safety or continued --

20        MS. FEVE:  None of our concerns have changed because

21   the people who would seek to harass him -- and we seriously

22   dispute the defense's very cavalier dismissal that we don't

23   know what we are talking about and neither does he; that they

24   know better than anyone whether or not his safety has any

25   concerns.

1    But no, we have no concerns because the people he was
2    speaking to were a friendly audience.  Again, he is a Spamhaus
3    employee.  He is going to interact with people outside
4    Spamhaus.  There are going to be people outside Spamhaus who
5    are aware of his name, who are aware that he speaks to
6    Spamhaus, and there will have been people at this conference
7    who knew that he knew an FBI agent.
8        But, again, this was 2016.  He was not a CHS at that
9    point.  This was him speaking in his capacity as a Spamhaus
10   employee.  And our understanding from the FBI agent is he
11   basically sat there to answer questions about what law
12   enforcement can and can't do.  But that it was not, as the
13   defense suggests, this buddy-buddy thing, of "Hey, here is a
14   investigation we are working on together," because, again,
15   taking a step back, this was a 2016.
16       In 2016, we issued grand jury subpoenas.  There was a very
17   large, very independent investigation in which the Spamhaus
18   source was completely uninvolved.  But even, as the Court
19   knows, when an investigation switches from the covert side to
20   the overt side and relies heavily on the grand jury practice,
21   the prosecutors take on a more active role even than they did
22   before in terms of guiding the prosecution.
23       So to say that in 2016 none of the prosecutors were
24   involved and all of us were somehow being puppetted by the
25   Spamhaus source is not a reasonable argument to make given the

1   people who were involved.

2        We had Bob Ciaffa, Melanie Pierson, and myself.  Following

3   Mr. Ciaffa's retirement, we were lucky enough to get Candy

4   Heath.  Mr. Ciaffa was the longtime chief of our fraud section.

5   Ms. Pierson has been in the fraud section for a very long time.

6   To suggest that, between the two of them, Ms. Pierson and

7   Mr. Ciaffa would not have independently known to subpoena

8   records once the case went overt is just not a reasonable

9   argument to be made.

10            THE COURT:  But it seems like the defense argument is

11   focused more on your FBI agent and his relationship going back

12   some period of time, his relationship with the Spamhaus

13   informant, and the fact that, I guess, even as of October of

14   this year, there's these exchanges -- are there exchanges

15   between --

16            MS. FEVE:  No.

17        Mr. Lincenberg spent a great deal of time speaking about

18   an August 25, 2021 email.  And I want to address that because

19   he may be misunderstanding or he may be inadvertently

20   misleading the Court.  But the August 25, 2021 email is the

21   email that the Spamhaus source drafts in response to the Court

22   order directing him to disclose what documents he got from

23   Christopher Young.

24        There was nothing spontaneous about this.  There was

25   nothing subject to the direction of the FBI.  This was the FBI

1    relaying the Court's order that he was to identify exactly what

2    documents he had from Christopher Young that he had provided to

3    the FBI, so that we, the government, could comply with the

4    Court's order.

5         That he extemporizes and shares his thoughts, yes.  But he

6    has been doing that throughout all of these emails.  And it is

7    very clear to anyone reading these emails that he is very, very

8    aware that the defense gets them.  This is how he has an

9    indirect conversation with the defense.  They talk about him in

10   their pleadings; he talks about them in his emails.  And he

11   wisely says, if the government could tell him what to do, they

12   would tell him to stop.

13        But this is where we are at.  We do not direct him.  We do

14   not control him, and we do not try and control or manipulate

15   witness testimony.  We take it, we produce it, and we keep

16   going.

17        But as far as that email, the only thing he is talking

18   about in that email are the Christopher Young emails that had

19   already been litigated and discussed.  There was nothing new.

20   There was nothing novel.

21        I don't understand, frankly, the theory the defense is

22   espousing for why this is a huge smoking gun in August of 2021,

23   that something terrible happened at some point because, first,

24   the bad thing was the purloined emails.  Now the bad thing is

25   that the defense left the defense camp, went to a third-party

1   website that is run by an organization that they have

2   repeatedly and publicly attacked in their pleadings; chose,

3   once they had left the defense camp, to disclose information to

4   this third-party website; and now they are mad that this

5   third-party website told the government what they voluntarily

6   and knowingly disclosed to this third-party website.

7       They are indignant, and if that's how they want to feel,

8   that's how they can be, but they are very experienced, very

9   capable attorneys.  And they know, when they go into elevators,

10  they are not supposed to have phone calls that are sensitive or

11  privileged.  They know when they take their work with them,

12  they keep it close to them; they don't leave it behind

13  somewhere in a third-party place.  If they issue a subpoena to

14  a third party, they understand that that third party will

15  disclose their receipt of the subpoena to them, just like they

16  know if they interview third-party witnesses, those

17  witnesses -- they are not going to give us their notes, but

18  they are going to tell us, potentially, what they were asked.

19      There's nothing different here about them going to a

20  third-party website, especially because it is a website that is

21  controlled and operated by a party to which they have taken a

22  very adversarial stance repeatedly and over the course of

23  several years.

24      So I understand that they are indignant.  I don't

25  understand why because under the ABA's model rules, they are

1    presumed to be familiar with the policies of those third-party

2    websites.  And, again, when you leave the defense camp and you

3    go to a third party, you no longer get to expect that your

4    disclosures to that third party are privileged.  There can be

5    no be invasion when you are talking about material that you

6    knowingly and deliberately disclosed to a third party.

7         With regard to Linda Goodman, there is nothing new about

8    the Linda Goodman emails.  The defense has over 500 pages, at a

9    minimum, of emails involving Linda Goodman, and they have had

10   them for a year.  And you have never heard the suggestion that

11   anything improper has occurred.

12        Why that has suddenly occured now, especially after the

13   Court has had at least three rounds of briefing, and now, for

14   the first time, we are being told it is not a Fourth Amendment

15   motion that we need discovery on; it is a Fifth and Sixth

16   Amendment motion, that we have never briefed in all of these

17   motions for reconsideration.

18        And they are arguing that something deeply, deeply wrong

19   occurred because C.Y. gave an email that has Linda Goodman on

20   it to the Spamhaus source.  Never mind that we have produced,

21   as I said, hundreds of pages of emails with Linda Goodman,

22   because she wore many hats.  And the fact that there were

23   privileged reviews done is extremely abundant if you look at

24   the footers because what you will see is they literally have

25   her name in it.

1    Company B -- which is not even the employer for the

2    defendants at the end -- during most of the period that we have

3    charged -- did a separate taint review where they produced over

4    200 pages of documents involving Linda Goodman that they

5    agreed -- and it was not a waiver.  They said they couldn't

6    claim privilege on those emails.

7        Similarly, they have no documents with Linda Goodman that

8    are privileged.  The only emails that we have produced are the

9    ones that we have, which have either been subject to a filter

10   team which reviewed them with outside counsel for Company A and

11   Company B, or that were produced to us by the legal teams for

12   parties from whom we subpoenaed these records.

13       So, in this case, Latham & Watkins represents Company B.

14   Sheppard Mullin represents Company A.  Michael Crowley, Knut

15   Johnson, and Marc Geller have all represented Linda Goodman.

16   They are obviously very capable of going to those attorneys and

17   saying, "Hey, were you aware that this email came to us?  Do

18   you claim that this is privileged?"

19       At no point have they come to you and said, "Yes; in fact,

20   we know in good faith that this is a privileged document the

21   government should not have had."  They have given you no

22   evidence to suggest that what I am saying is false, especially

23   because you can see it in the footers of the discovery

24   documents that we are getting from Latham & Watkins in response

25   to the subpoena we served on Company B.

1        We also have like -- and I haven't even gotten into the

2   Linda Goodman emails that we have from Company A.  For many

3   years, the defense was in a joint defense agreement with these

4   law firms.  This is no secret that these documents are out

5   there or that these parties are represented.  They have very

6   capable lawyers who these lawyers are all in touch with or have

7   been in touch with.

8        So, to now say for the first time that the mere existence

9   of Linda Goodman on an email is grounds for a Fifth and Sixth

10  Amendment motion is news to all of us because they have had

11  hundreds of pages of emails with Linda Goodman's name on them

12  for years.  So suggesting that, somehow, the existence of this

13  email to third parties -- that would be C.Y. and the Spamhaus

14  source -- is mission critical that we have to have a parade of

15  hearings when, again, they have a thousand pages of emails

16  between the FBI and the Spamhaus source, and all they are

17  relying on is innuendo.

18       And at the end of the day, *Gonzalo-Beltran* is very clear

19  that there's a three-part test.  And the three-part test is not

20  Mr. Lincenberg's estimation of whether or not there's a "there"

21  there.

22       It's, one, the degree of the informant's involvement in

23  the criminal activity.  In this case, there was none.  Two, the

24  relationship between the defendant's asserted defense and the

25  likely testimony of the informant.  Again, the informant will

1    not testify.  And three, the government's interest in

2    nondisclosure, which is not only the witness's safety, but also

3    the ability to use him as an informant on an ongoing basis and

4    the ability to recruit and retain informants in other cases who

5    will not be scared off by what happens in this case.

6         So, Your Honor, I hope that I have addressed your

7    concerns, and if I haven't, I am happy to speak to any

8    particular factual situation.  But I think the bottom line here

9    is that there is nothing untoward involving this Linda Goodman

10   email.  The defense has the email.  If they want to point to

11   the particular text in there that they argue could in no shape

12   or form be conceived as unprivileged, we are happy to discuss

13   it with them, but they have not done so to date.

14        And as far as the August 25, 2021 email, again, that was

15   just drafted in response to the Court.  There was nothing

16   untoward about it.

17        (Counsel confer.)

18            MS. FEVE:  And as far as -- I want to address your

19   last point, which is the payments to Spamhaus.

20        This request is very similar to the request in the

21   Northern District of California case that defense rely on.  I

22   believe it's called *Wolfenbarger*.  And if I have that slightly

23   off, I apologize.  But that was a case where Yahoo and another

24   company had detected a web cam in the Philippines that was

25   being used to commercially distribute child exploitation

1    videos.  And Yahoo and this other company, Xoom -- or

2    X-O-O-M -- relate a series of a tips over years to the FBI.

3    And the FBI, in a centralized place, took those tips and pushed

4    them out into the field, and one of those tips resulted in the

5    Northern District of California prosecution.

6         And Judge Koh went through a similar analysis to what the

7    Court is going through here, with regard to the Rule 16 issue,

8    which is Spamhaus, as opposed to the informant privilege, which

9    is the Spamhaus source's identity.  And ultimately what she

10   found was that this was a fishing expedition, where the defense

11   was requesting not just records relating to their individual

12   defendant but relating to all of the referrals from Yahoo

13   throughout the FBI.

14        And in this case, this is even broader because, there, at

15   least it was all within the umbrella of FBI activity.  Here, I

16   am not quite sure how I would find out how components outside

17   of the DOJ have done so.  And so the feasibility of how to

18   execute this request is very opaque to me, especially given

19   that we have produced to the Court and to the defense in our

20   briefing links to the various pages on Spamhaus' website where

21   they expressly say, "We do not get government funding.  And to

22   the extent we have ever sought it, it was from the UK

23   government, because that is where we are based and located."

24        And so, given that there is existing evidence saying they

25   have not received it from the U.S., to be ordered to do a

 1   search that, frankly, I don't know even know how to execute, to

 2   go look for a negative, when the source with the most

 3   expertise, which is Spamhaus itself, has said that they have

 4   not received this, I believe that that evidence and that record

 5   shows that, once again, this is a fishing expedition.

 6        They are not coming to you with more than a speculation or

 7   a hope that Spamhaus receives money.  They are coming to you

 8   relying on a series of innuendos and assumptions to say we

 9   think Spamhaus does something, and it could involve funding

10   from the government, but we have zero evidence to suggest that.

11   And our evidence is Spamhaus' website, which says, "We don't

12   get money from the government.  We don't even get money from

13   our own government, which is the UK."

14            THE COURT:  As far as the Spamhaus informant, are you

15   prepared to state that he does not receive?

16            MS. FEVE:  Not only am I prepared to state that, but

17   he has in his emails, which the defense has received;

18   specifically said he receives no payment.

19        So, again, I hear this repeated request to interview the

20   source, but every time the interview request is made, it

21   ignores the fact that, in many cases, that the Spamhaus source

22   has answered those questions and that the defense does simply

23   not like that answer.

24        And while I don't doubt that they are -- with their

25   rhetorical prowess and years of experience that they can't ask

1   pointed questions, the Spamhaus sorts of questions have at the

2   same time been extremely unambiguous.  And they were, namely,

3   "The FBI did not task me to do this.  I did not go and get

4   these documents from C.Y.  And I do not receive any money."

5       So in each of these cases, he has soundly and

6   unequivocally refuted the arguments and the innuendo that

7   defense routinely and repeatedly raised but for which they

8   provide no concrete evidence, notwithstanding the fact that

9   they have 1,000 pages of emails between the Spamhaus source and

10  the FBI agent.

11          THE COURT:  All right.  Thank you.

12          MS. FEVE:  Your Honor, one last thing.

13      We don't have the CI file.  That's in a different city,

14  with a different office.

15          THE COURT:  The CI file for the Spamhaus informant?

16          MS. FEVE:  Right.

17      Because he was not opened out of San Diego.  He was opened

18  out of a different FBI office.

19          THE COURT:  But you would have access to it, I would

20  think.

21          MS. FEVE:  The FBI can -- when we have needed --

22  because of the way they handle CHS files, we go to them with

23  our request.  But it is just to say that in San Diego, the

24  prosecutors don't have open access to the CHS file out of this

25  other city.

```
 1              THE COURT:  Well, I would expect that you would want
 2    to review that file just to confirm that he hasn't received
 3    payment and then to --
 4              MS. FEVE:  The FBI has confirmed for us he hasn't
 5    received payment.
 6              THE COURT:  And then, as far as any other information
 7    that may relate to this investigation, would that be contained
 8    in his CI file?
 9              MS. FEVE:  Well -- no.
10      What we have been repeatedly told is that the Las Vegas
11    file pertains to a Las Vegas investigation, and that any time
12    he's dealing with our case file, we are given that information
13    so that we can include it in our file.
14              THE COURT:  Say that last part again.  Whenever he
15    provides --
16              MS. FEVE:  So, when he communicates with Agent
17    Chabalko, he cc's his handler, which they have seen on their
18    emails --
19              THE COURT:  His Las Vegas handler?
20              MS. FEVE:  Yes.
21      He cc's them, and they have seen that on the emails they
22    have seen in discovery.
23      So the handler is aware of the contact.  But he doesn't
24    speak to the Las Vegas handler; he speaks directly to Agent
25    Chabalko.
```

1          And we have reviewed every single one of his emails with

2    Agent Chabalko that the FBI has given us.

3               THE COURT:  Ms. Bernstein?

4               MS. BERNSTEIN:  Thank you, Your Honor.

5          Ms. Feve went over a lot of information.  I am not going

6    to address every single one of them.  In particular,

7    Mr. Lincenberg has some things to follow up with, but I did

8    want to speak to a couple of the points.

9          This motion -- the issues in these motions, Your Honor,

10   is, first of all, whether or not the informant has been acting

11   as a state actor.  And the analysis of whether the informant is

12   a state actor is not one that is determined by payments, though

13   we don't have an answer to that beyond what Ms. Feve just put

14   into the record --

15              THE COURT:  Although, that is a relevant

16   consideration.

17              MS. BERNSTEIN:  It is a relevant consideration, but

18   that is not determinative.  It is their involvement.  It is the

19   coaching.  It is the conversations.  It is the direction.  It

20   is their contacts.

21         What is abundantly clear is the government does not know

22   the extent of Agent Chabalko's interactions with the informant.

23   They are oral.  They are oral communications.  A lot of them we

24   have seen, where Agent Chabalko takes pains to say, "No, let's

25   not write about that.  Give me a call."  We don't know if the

1    government knows anything about that.

2        There was a 2016 presentation that -- not "Government,"

3    with a capital G; not FBI, as an entity, but this case agent

4    gave with -- not Spamhaus, as an entity, and not a cooperator

5    in general, but this informant.  They gave a presentation

6    together.  And we just received it on October 29th of 2021.

7    It's five years old.

8           THE COURT:  At the same time, recognizing that this

9    isn't someone that was going to be called as a witness.  And

10   the only way it even has any impact on this case now is as it

11   relates to this state actor question, which is of recent

12   vintage.  And keeping in mind that initially the focus of the

13   defense motion, back in July, was as to the source at

14   Company A, not Spamhaus.

15       And it was only after I partially granted -- and I will

16   read from your papers.  You said, "The key Fourth Amendment

17   question, then, is whether the Company A informants and/or the

18   individuals who actually seized Company A's internal

19   documentation were operating as government instruments or

20   agents."  That's what you said in the original papers that were

21   seeking discovery.

22       And then, it was only afterwards, then, in September, that

23   we saw, "As the Court recognized in its previous

24   discovery-related order, the Spamhaus informant's interactions

25   with the government and the Company A insider are relevant to a

1   potential Fourth Amendment challenge.  A corollary" -- and so

2   this is kind of the camel getting his nose under the tent -- "A

3   corollary, then, is that Spamhaus' overall history of

4   interacting with and assisting the government in other

5   investigations, into commercial email companies, et cetera,

6   tend to show the government acquiescing in Spamhaus' intrusive

7   conduct."

8        So that's when that pops up, September.

9        So the notion that this PowerPoint from a 2016

10  presentation was not made available until recently, that's why,

11  because these weren't salient or these weren't matters that

12  were presented in a clear fashion or were even in existence

13  before September.

14            MS. BERNSTEIN:  And, respectfully, Your Honor, I

15  would disagree with that because I think, as Ms. Munk touched

16  upon, the Spamhaus informant and this case agent gave a

17  presentation about this case where they are saying all the bad

18  actors in this case and what the people in this case are doing

19  wrong, and they do not name any of the defendants sitting here.

20  They name the government's cooperator and an unindicted person.

21  So I actually do think that there's *Brady* material there.

22        But leaving that aside because that wasn't the Court's

23  question --

24            THE COURT:  It would be exculpatory, because there's

25  not an actual allegation or identification of your client as

```
 1    being involved in some criminal enterprise?

 2            MS. BERNSTEIN:  In a presentation that the informant

 3    and this case agent are giving talking about who is

 4    responsible, and it doesn't name any of our clients.

 5            THE COURT:  And, again, I don't have the full

 6    PowerPoint presentation.  I expect the government may have a

 7    response as to that.

 8        Was there somehow something in the PowerPoint that would

 9    limit the culpable parties to either Mr. Dye or to one or two

10    people?

11            MS. BERNSTEIN:  I don't want to speak to that as I

12    haven't actually reviewed it prior to this hearing, and that

13    was a bit of an aside.  It is that I do actually think there's

14    Brady in there.

15        But leaving that aside, your question was about when it

16    became salient, and the suggestion was it wasn't until

17    recently.  Our motion --

18            THE COURT:  I don't think we have clearly determined

19    that it was Brady.  At this point, I haven't had some part of

20    the presentation presented to me to show that the presentation

21    included certain information that necessarily would have

22    exonerated your client or any other defendant in this case.

23        Continue, please.

24            MS. BERNSTEIN:  When we are trying to get at the

25    state direction and the state actor relationship between the
```

1    government and C.Y., who gives documents to the informant, who

2    gives documents to Chabalko that form the basis of this case,

3    though the government, quote/unquote, "cures" that by getting

4    independent warrants, the direction that the government is

5    giving to their informant is relevant.  It can't all be

6    structured like, "Oh, we don't know what's in the FBI file

7    because that's in a different city and we don't have access to

8    it."

9              THE COURT:  I agree with that.

10             MS. BERNSTEIN:  Or "We don't know what is going on

11   right now" -- because the declaration is from Ms. Pierson.  It

12   is not from their agent, who is the person who has the contact.

13   There's never been an allegation that it is these prosecutors

14   who are directing their informant.  It is the agent.  And

15   that's what we have always been saying.

16        And noticeably absent is anything from the agent saying

17   that's not true.

18        Ms. Feve suggests that the informant has, in emails, given

19   answers to our questions and that should be sufficient.  I

20   don't know if the Court even needs me to address why that's

21   such a ridiculous argument.

22             THE COURT:  Say that one more time.

23             MS. BERNSTEIN:  Ms. Feve had said the questions that

24   matter here -- "Did the FBI task him to do things?  Did he

25   direct Chris Young?  Did he receive payment" -- that the

1  informant has answered all that.  He's provided those answers

2  in his emails and he's answered all of that.

3       We are not allowed to use his identity.  We have had no

4  opportunity for cross-examination.  We have no reason to

5  believe that what he says is true.  We have a lot of evidence

6  to suggest that what he says is not true and that there was a

7  lot of direction amongst him and Chabalko.

8       What is abundantly clear right now is, you know, we talked

9  about the invasions of the defense camp, and Ms. Feve gave a

10  strong defense of the ABA rules and us knowing what we are

11  doing when we do investigations and when we go on our website

12  and not being on our phones in the elevator.  That makes very

13  clear the government is by no means telling their informant,

14  "Stop doing that.  Stop reporting to us the search terms that

15  Mr. Jones is using on behalf of his client preindictment.  And

16  stop telling us what those searches terms are because there's

17  an inference that we can take from that what his investigation

18  is, what his client's telling him."  The government is not

19  saying don't do that.  She cited ABA rules that we are supposed

20  to know that our internet searches get back to the government

21  through their cooperator about a case.

22       We have not taken issue with the prosecutors' actions in

23  this case.  We have suggested that their agent has been

24  directing the informant, who directed Chris Young and recruited

25  other people.  We have not heard from the informant.  We have

1    not heard from their agent.  We hear representations that they

2    have made.  And the -- this 2016 presentation is relevant

3    because the fact that the government didn't know it existed

4    until recently really underscores how little the government

5    knows about their agent's relationship with this informant.

6         And so, for the government to proffer, "No, there was no

7    direction; no, there were no payments; no, there was nothing;

8    that's what he said," this just isn't -- it's information that

9    needs to be subject to cross-examination.

10        We were here, Your Honor, on the three issues, on whether

11   it is a state actor, whether they have invaded the defense camp

12   and whether privilege has been invaded.

13        And I have two other points that counsel passed out, so I

14   do want to put those into the record, and then I will get back

15   to these two points, Your Honor.

16        One, this all goes to whether the informant has any true

17   concerns about his identity being revealed.  The last page of

18   Exhibit 12 of our motion, Your Honor, is a veiled threat to

19   defense counsel.  It is an email from November 8 of 2018 --

20             MS. MUNK:  No --

21             MS. BERNSTEIN:  I am sorry.  I will let Ms. Munk

22   explain what the veiled threat is.

23             MS. MUNK:  It's part of the Spamhaus informant's

24   email to the government in August of this year, Your Honor, but

25   it's when he is summarizing these emails.  He essentially --

1    and this appears to be a veiled threat, Your Honor, and it's

2    very concerning to defense counsel.

3        It says, "So, as usual, the defense lawyers are lying

4    again.  Their lips are moving.  I would sure like to know

5    exactly which one of the lawyers is writing this stuff.  They

6    would surely get a special mention in our upcoming Spam Queen

7    series of blog articles, 'The Rise and Fall of the World's

8    Largest Spam Operation.'"

9            MS. BERNSTEIN:  Exhibit 18, Your Honor, is an email

10   from Chabalko, the case agent, to the informant.  Chabalko had

11   asked the informant, "Can I drop your name as to how I got

12   their contact information?"

13       Sorry.  Chabalko -- Chabalko says, "Can I drop your name

14   as to how I got their contact information," referencing various

15   potential witnesses in this case and people the government

16   intended to interview.  And the informant writes back, "Yes, of

17   course."

18       And so it really does suggest that there's not only not a

19   safety concern but that the informant is a vital part of the

20   prosecution's investigation and prosecution of this case.

21       But I wanted to just reorient us for a second as to the

22   issues that have come up, which is whether Spamhaus and the

23   informant were acting as state actors and were directing C.Y.,

24   who provided purloined documents; whether the government,

25   through their informant and through their agent have been

1    invading the defense camp; and whether there's also been a
2    concerning invasion of privilege.
3        I am going to leave the final one for Mr. Lincenberg to
4    address.
5        But there's certainly ample evidence, Your Honor, to
6    suggest that there's a much cozier relationship between this
7    case agent and the FBI and the Government, with a capital G,
8    and this informant and his entity, whether he's giving
9    presentations as a CI, whether he's giving presentations in his
10   individual capacity, as just a friend of the agent's.  There's
11   a lot of evidence to suggest that they are close and that there
12   was some direction.  And that there's a lot of information we
13   don't know because Agent Chabalko made an effort to take it off
14   line, to take it out of emails and to put it into
15   communications.
16       So we think that an evidentiary hearing really is
17   necessary to explore that further and to question the people
18   who have information about it, as opposed to the prosecutors
19   who are making representations based on the best information
20   they have available to them at the time, which appears to not
21   be all the information that there is.
22       In lieu of an evidentiary hearing, if the Court would
23   prefer to first address this, as the government suggested in
24   their brief, in an *in camera* hearing akin to what occurred in
25   *Henderson*, that would be fine.  If the Court wants to review

1    all of this voluminous information and have the ability, so

2    that we have some ahead-of-time discovery, to see the extent of

3    these communications, including the informant log and any time

4    there's ever been communications, phone calls, emails.  You

5    know, we want to know whether or not the FBI agent has utilized

6    the Spamhaus log-in for the law enforcement portal to look at

7    defense searches, to know what defendants have been doing,

8    because we know that the informant provided that information to

9    Agent Chabalko.

10        And we just -- there's sort of a *prima facie* case of

11   evidence of direction and encouragement and communications and

12   acquiescence into what the informant does.  And at the heart of

13   the issue is whether the informant directed Chris Young and

14   whether the government, through Agent Chabalko, has been

15   directing the informant.

16        So we would be requesting an evidentiary hearing on that

17   or, alternatively, *in camera* review.  But because we are

18   cognizant of the Court's ability to review all this with the

19   extensive background of the case, we think the most practical

20   way of going about this is to have a hearing with people on the

21   stand, with Agent Chabalko, with the informant, so that we can

22   get to these issues from the people who know it.

23        The lack of affidavits from either of them is noticeable.

24   And that's the issue that we think needs to be resolved.

25        I am going to let Mr. Lincenberg talk about the privilege.

```
 1              THE COURT:  Actually, let me turn to Ms. Feve, and
 2     you can address the request to follow the Henderson in camera
 3     review.  What is your position in response?
 4              MS. FEVE:  They haven't met their showing, Your
 5     Honor.  Gonzalo-Beltran is a three-part test, and we get to
 6     Henderson once they have made a prima facie showing.
 7          And again, you keep hearing innuendo about how we don't
 8     know enough, and there's sneaky somethings in the emails
 9     suggesting that there's this vast conspiracy of the FBI tasking
10     Spamhaus to do unspecified illegal things.
11          Because we heard about the purloined emails, and now we
12     are being told the recently disclosed and discovered, as of
13     late summer, early fall, 2021, when the Spamhaus source sent an
14     email disclosing that the Spamhaus source, completely on his
15     own volition, had gone back into Spamhaus' own records,
16     third-party records and disclosed records of third-party
17     records.  And they are saying that because the Spamhaus source
18     looked at Spamhaus' own records in 2021, that something very
19     bad happened prior to the indictment in this case, or somehow
20     makes pervasive misconduct so far throughout the case that it
21     must be dismissed in a Fifth and Sixth Amendment motion that
22     they have never argued to the Court or to the government prior
23     to today was the source of a need for their discovery.
24          I just -- they keep moving the gateposts and so it is
25     extremely hard to, kind of, go back and say, "Here is the test,
```

1    and here is why they haven't met it."  Because every time we

2    say, "Here is why we haven't met it," they say, "Yes, but that

3    is not the materiality theory.  We have a new materiality

4    theory.  Now it is the Fifth and Sixth Amendment."

5         We have amply documented to the Court why, based on their

6    original theory of a Fourth Amendment motion, they have not

7    satisfied *Gonzalo-Beltran*.  There is no universe of facts in

8    which they can show that the records we obtained pursuant to a

9    subpoena were somehow part of some *Kastigar*-like chain of

10   malfeasance such that the entire case is going to be dismissed.

11             THE COURT:  Let me ask you.  As to the notion that

12   the government has unleashed this source who is attempting to

13   invade the defense camp by identifying what steps they may be

14   taking in defending their client, and that then that person is

15   reporting to the government regarding as to what the Spamhaus

16   informant is learning, and thereafter, the government isn't

17   saying, "You know what?  Stop.  We do not want you to say

18   another word about what steps you are taking to determine what

19   a defense attorney is doing in this case."

20             MS. FEVE:  Your Honor, again, the time frame in which

21   we are looking at is the pendency of this motion.  The email

22   that they are very upset about was filed, I believe, in October

23   of 2021 in response to briefing in which they were -- it could

24   be construed they feel attacked by the source; the source feels

25   attacked by their briefs.

```
 1          In response to their briefing, throughout the summer and
 2    early fall, the Spamhaus source, in what, to someone who is
 3    neither a defense attorney, who feels aggrieved, or a Spamhaus
 4    source, who feels aggrieved, appears to be him poking back.
 5    "Hey, you are saying all these bad things about me.  But I
 6    looked at Spamhaus' records, and you can't think Spamhaus is
 7    this terrible vigilante organization because you guys use it to
 8    filter out spam.  And by the way, you even came to our
 9    website."
10          The first time that the government learned that he had
11    gone to his own records -- again, this motion he invaded the
12    defense camp by consulting his own records -- that is not a
13    logical argument.  You don't get to disclose something to a
14    third party and then say, "You should not have taken notice of
15    me disclosing things to you."  It is just not --
16               THE COURT:  Certainly, you wouldn't do that.
17               MS. FEVE:  No, I wouldn't.
18          But my point is they went to a third party.  And to come
19    in here and be so aggrieved that they went -- if they go and
20    knock on a witness's door and the witness comes and tells us
21    what they said, they don't get to say that we invaded the
22    defense camp.
23               MS. BERNSTEIN:  Your Honor, that is not what is going
24    on here and I am quite offended by the suggestion --
25               MS. FEVE:  Please don't interrupt me.
```

1    They went to a third-party website.  There's no

2  disputing --

3         THE COURT:  Let me just say something.

4    It concerns me that you would have someone reporting to

5  the government that, "I have learned the searches that have

6  been made by defense lawyers as they may relate to this case,

7  and I want you to know what they are," and for the government

8  to go, like, "Oh, okay.  Give me more."

9         MS. FEVE:  But we did not say that.  We actually

10  instructed him not to do that.

11         THE COURT:  And that's the question --

12         MS. FEVE:  And we also -- and we also --

13         THE COURT:  Stop.  I told them not to interrupt you.

14  Don't interrupt me.

15         MS. FEVE:  I am sorry.

16         THE COURT:  So, the matter is whether or not you did

17  advise the Spamhaus informant to stop.  According to

18  Ms. Bernstein, you haven't, and you didn't, and that

19  demonstrates this complicity or acquiescence.

20    At this point, you are stating for the record the

21  government has told him to zip it, back off, to not relay this

22  information.  Correct?

23         MS. FEVE:  We both did that and we reported it to

24  PRAO, P-R-A-O.

25         MR. JONES:  I'm sorry.  I didn't hear that part.

 1            MS. FEVE:  P-R-A-O.

 2       When they filed the reply brief that was eventually

 3  withdrawn, as soon as we saw the reply brief, we reported

 4  ourselves to PRAO.

 5            MR. JONES:  That is not the important point, Your

 6  Honor --

 7            MS. FEVE:  My point, Your Honor -- I am making two

 8  points, is that as far as --

 9            MR. JONES:  No, Your Honor --

10            THE COURT:  Let me let you finish, and then I will

11  let you speak, Mr. Jones.

12            MS. FEVE:  As far as how seriously we took this, to

13  respond to Ms. Bernstein's allegations that we were cavalier or

14  the Court's concern that we invited it -- again, this is not

15  discoverable information.  I am relaying this to -- I am

16  relaying this to allay the Court's concerns.

17       But, A, we sent a message, in writing, instructing the

18  source not to do this.  And we also went to our internal ethics

19  advisor and said, "Look, this thing happened.  Here is our

20  documentation that we did not solicit it.  We are seeking input

21  on what exactly we should tell him."

22       So it is to say that this was the opposite of treating

23  this as something that was okay.

24       However, my point is that, while we have taken it very

25  seriously, I still believe that, legally, to say -- to say that

1    you don't like it, that's fine.  But to say that we

2    deliberately or knowingly invaded the defense camp when they

3    went to a third-party website I don't believe is supported

4    either by rules of ethics or by the law because of what the law

5    is about the privilege.

6         So we are standing up here to say, "Hey, we don't think

7    that their pursuit of tarnishing the source and accusing him of

8    all sorts of ethical lapses is founded or fair."  But to say

9    that this is something we would either encourage or approve of

10   is different.

11             MR. JONES:  Your Honor?

12             THE COURT:  Mr. Jones.

13             MR. JONES:  First of all, we never, you know, talked

14   about this whole notion of arguments counsel is making.  I am

15   not sure -- she is all over the place here.

16        And, quite frankly, I usually don't get offended, but I am

17   offended by this notion she is trying to make it sound like we

18   are emotional or irrational or indignant or all of that.  This

19   case is about our clients and our clients' rights to due

20   process under the law, under the Fourth, under the Fifth, and

21   under the Sixth Amendment.

22        We have raised this issue of, you know, invasion of

23   defense camp many times.  And just like counsel has done

24   today --

25             THE COURT:  You said many times?

1          MR. JONES:  Well, we raised it at the last hearing,

2     of course, right?

3          THE COURT:  Before the last hearing, was there a

4     previous --

5          MR. JONES:  We filed papers on that.  I, in fact,

6     filed the response to that.

7          THE COURT:  But that's recently.

8          MR. JONES:  The reason the ball keeps moving is they

9     keep giving us discovery.

10         THE COURT:  At my direction.

11         MR. JONES:  No, no, not at your direction.

12    When we bring up points, like we do in every argument we

13    have had so far, they go back.

14    The notion that they have their case agent in bed with the

15    Spamhaus informant and they didn't know that the agent and the

16    Spamhaus informant did a presentation together about our case

17    in 2016?  That's absurd, Your Honor.  That's absurd.

18    No prosecutor -- I mean, that would have been the first

19    question.  "How do you know this guy?  Who is this CI that you

20    are bringing in to help us with this case?  Have you met him

21    before?  Have you done any work with him before?  Do you know

22    him?"

23    The fact that either the agent didn't tell them about him,

24    or the fact that he told them and they ignored it -- both are

25    problematic, Your Honor.

1    And the reason we need a hearing is we need to delve into

2    these facts.

3    I appreciate Ms. Feve, you know, her enthusiastic and

4    passionate arguments, but that's just Ms. Feve.  She is not on

5    the witness stand.  She didn't even know they did a

6    presentation together in 2016.  She doesn't know what they are

7    saying.  She doesn't know what they are doing.  She doesn't

8    know what they are talking about.

9    We get glimpses of this from the emails.  We know they are

10   talking about us like a dog, you know.  Talking about our

11   clients like a dog, you know, for no basis.  Viewing my

12   searches as a defense attorney?  I am appalled by that.  I am

13   offended by that.  And the Court should be, too.  And the Court

14   should order that we have an evidentiary hearing so we have

15   Mr. Chabalko get on the stand and/or this Spamhaus person.  I

16   mean, that's the bottom line.

17   The fact that they have a CI that they say, "Well, the CI

18   file is in Las Vegas, so we don't know what is in there.  We

19   haven't looked at it.  But we have been told."

20   You were a prosecutor for a long time, Your Honor.  You

21   would never have let that go on like that.  That's not how you

22   roll -- excuse my French; did I just say "roll"? -- that's not

23   how you operate.

24   So, what Ms. Feve is trying to do is to throw a lot of

25   stuff up on the wall to get the Court kind of overwhelmed by

1    all of the moving parts --

2          THE COURT:  Actually, if I was going to say that

3    somebody is trying to do that, I would actually think it is the

4    defense.  It is the defense that has just bombarded me with so

5    many papers, so many sealed documents and has moved the ball.

6        At the same time, I recognize that sometimes it's

7    necessary to move the ball when new information is developed

8    and then new theories can be identified.  So I get that.

9          MR. JONES:  Right.

10          THE COURT:  But, ultimately, this notion it is the

11   government that's all over the place, I wouldn't agree with

12   that.

13          MR. JONES:  Well, with all due respect, Your Honor, I

14   would disagree, because here is the thing.  I would bet, you

15   know, dollars to donuts that we get some discovery tomorrow

16   after this hearing.  That's how it's been coming out, you know.

17          THE COURT:  Although -- but, if you think about it,

18   Mr. Jones, talking about careers as prosecutors, you, as a

19   prosecutor, I am sure, would have been involved in cases where

20   based upon developments during the course of pretrial

21   proceedings, new lines of discovery were identified.  And you,

22   yourself, being that you have had the professional

23   responsibility, a duty to guarantee the rights of all of the

24   defendants that were involved in the cases, you went out and

25   made further inquiries.

1    And so, you weren't in a position from day one to be able

2    to make every possible inquiry.  You weren't.  So you have

3    developed information along the way.  And sometimes, you even

4    developed things on the eve of trial.

5    And so, this notion that we have the government, perhaps

6    willfully, ending up withholding information and then suddenly,

7    after a hearing, providing new information that you were

8    entitled to weeks or months or years ago, I don't think it

9    really captures the reality of what happens in a prosecution

10   such as this.

11          MR. JONES:  I understand in most cases, but not in

12   this case.  This case has been around -- the government been

13   investigating this case since 2013.  This Spamhaus informant

14   has been working with the government since 2013.  Since 2013.

15   It is now 2021, Your Honor.  We just got the PowerPoint

16   information a week or two ago.  Right?

17   Before that, it wasn't until we asked for other

18   information we got a dossier, an informant dossier.

19   This has been years in the making.  They have been working

20   with this guy for years, Your Honor.  And the fact that they

21   tell you today that they have not looked at the CI files?  I

22   mean, Your Honor, it's about due process.  And we need an

23   evidentiary hearing.

24          THE COURT:  Mr. Lincenberg, you wanted to wrap up?

25          MR. LINCENBERG:  Please.  And thank you for Your

1    Honor's indulgence for our arguments.

2         Again, to go back, we are really just trying to develop

3    the evidence here, and we have shown enough to have an

4    evidentiary hearing.  When Ms. Feve talks about not meeting the

5    standards, the *Henderson* court says that the requirement for

6    this *in camera* hearing with an informant is, quote, "A minimal

7    threshold showing of relevance."  When we have the person who

8    in many ways was the case agent on this case, this informant,

9    who is a person who himself is really interviewing -- I use the

10   term, quote/unquote, "interviewing" witnesses on his own, often

11   before presenting them and working them and helping them come

12   forward to the FBI, it's not a question of whether the

13   government is going to call the informant as a witness or not.

14   This person has statements from witnesses.

15        And they haven't given us their witness list.  Maybe they

16   are not going to call Chris Young, for example.  But Chris

17   Young -- there's a lot of these emails that go into developing

18   him as an informant and information that he's providing.

19        And if the Court looks at even one email of the documents

20   provided, it really should be Exhibit 2, which is this

21   May 22nd, 2014 email chain, where there's this back-and-forth

22   between Chabalko and the informant about developing strategy

23   for this investigation.  And on the question of, you know,

24   direction, we have Chabalko writing, you know, in response to

25   this email about this informant providing all this information

1    and how should we bring it forward and what is the strategy

2    with him, he said, "This would be vital to our investigation if

3    we can bring him aboard."  That's really a statement of

4    direction; "Yeah, go out, and try to recruit him further."

5        It says, "Having an inside person to tie everything

6    together would be extremely helpful.  Would he be willing to

7    meet with us?  We, of course, would make sure to protect his

8    identity, information, and the information provided to us."

9        This is really two case agents -- one guy who is at

10   Spamhaus, one at the FBI -- talking about recruiting informants

11   and developing information.  And then they go into further

12   strategy.

13       The informant writes back to Chabalko, "So, this is going

14   to be tricky.  How do we tell this, quote, 'anonymous' guy that

15   there's an FBI investigation and you want to meet with him?"

16       And Chabalko writes back, "That's the tricky part.  Let's

17   talk about it more in detail when we meet on June 2nd, when we

18   talk on June 2nd."

19       "There are things we can do to recruit this guy.  Better

20   to have those discussions in person."

21       And you know, you can imagine -- they can call this a

22   fishing expedition, but you can imagine the informant, when he

23   is trying to recruit the other informant -- if it's Chris Young

24   that they are talking about -- him saying, "Hey, you know,

25   there's things that can be done to protect you.  The FBI can

1    help you, and I, on behalf of Spamhaus, cannot attack you," or

2    whatever it may be, different incentives, for these witnesses.

3    And so, what statements the informant obtained and the like are

4    pretty important.

5         And again, *Henderson* says it is a minimal showing of

6    relevance.  I think we have made a maximal showing of

7    relevance.

8         Now, there's always this chicken and egg.  I have been

9    doing this for a long time and run into these cases, and the

10   government cites them, saying, "Well, the defense has to show

11   something.  They can't go on this fishing expedition."  And the

12   defense lawyer is scratching our head, because you can only

13   make arguments based on what you know and logic and reason and

14   go to the next step.

15        And I think the Court has done a fair job of asking

16   questions that have helped get us to various next steps because

17   these good-faith prosecutors have gone back and probably said,

18   "Hey, this is what came up in court.  Chabalko, we have some

19   more questions for you," and they learn more.  And that's, in

20   part, why our theory and our arguments develop and expand from

21   Fourth into Fourth, Fifth, and Sixth Amendment arguments, which

22   leads me to the privilege issue.

23        I don't think the Court wants to get into a battle of who

24   is right and who is wrong right now in terms of what was

25   privileged and what was not.  But what we have in front of us

1    are emails where this informant is saying, "We have privilege

2    issues, so, you know, I am not going to reveal these

3    documents."

4         Now, some of these were early on.  Maybe it was before

5    there were disclosures or waivers or whatever the case may be.

6    But we clearly have an informant who, at various points in

7    time, sees these as potentially privileged documents and yet he

8    is still conveying this information to the government.

9         Third, there was a reference to the *Wolfenbarger* case, and

10   the *Wolfenbarger* case was the Yahoo and Xoom case that

11   government counsel was referring to.  I would just note that,

12   in that case, essentially, what the Court says, which favors

13   the defense, is that discovery of activities and communications

14   with the FBI is warranted to show that the FBI acquiesced,

15   quote, "in order to deem such entities agents of the state."

16        In every case, the Court is going to come to a different

17   decision as to whether this is a mere fishing expedition or

18   whether there's enough there to go to that evidentiary hearing.

19   But that's why they talk about having -- needing to get into

20   FBI files in order to learn the truth and flesh out this issue.

21             THE COURT:  So, I am a little bit confused as to how

22   *Henderson* would come into play at this point.  Looking at the

23   papers of the government, at page 15, ECF 283, they make

24   reference to *Henderson* as it relates to, "Defendants seeking to

25   unmask an informant must show more than mere suspicion that the

1    informant has information that will prove relevant and that *in*

2    *camera* review of informant is prerequisite condition before

3    disclosing the informant's identity."

4         So there's been this talk about evidentiary hearings

5    predisclosure of the Spamhaus informant's identity.  There's

6    been discussions about evidentiary hearings at the Fourth,

7    Fifth, and Sixth Amendment hearings.  There's discussions about

8    the FBI agent and an *in camera* hearing relating to the FBI

9    agent as well.  And would that be in the context of both the

10   predisclosure of the informant's identity and at the Fourth,

11   Fifth, Sixth Amendment hearing?

12            MR. LINCENBERG:  Well, first of all, that would be

13   how cautiously the Court wants to proceed.  I would suggest the

14   Court doesn't need to proceed cautiously because we know who

15   the informant is and there's no safety concerns.

16        But I think the confusion comes from -- and it's the

17   balance of that footnote that the Court was reading, as to

18   whether the minimal threshold applies to having a hearing

19   versus disclosure itself.  And I would suggest that the

20   confusion is when government counsel is saying -- is talking

21   about whether they have met a burden.  The burden is lower to

22   have the hearing.  And so that's why I am arguing to have the

23   hearing rather than asking the Court, in light of the Court's

24   tentative, to order disclosure at this time.

25            THE COURT:  And just to let you know what I am

1    thinking at this point, I would be leaning to some type of

2    *in camera* hearing relating to the FBI agent, to learn a little

3    bit more about the relationship between the agent and the

4    Spamhaus informant so that the Court would be more fully

5    informed.  And it appears to me that being more fully informed

6    makes sense given that there have been facts that have been

7    developed recently -- or not facts, but disclosures; for

8    example, the 2016 PowerPoint presentation, the joint

9    presentation between the Spamhaus informant and the FBI, that

10   the attorneys were not aware of.  And then, by virtue of their

11   due diligence, they did learn about that.

12        The fact that this is an unusual case because it is not

13   the traditional informant that we are talking about, where the

14   government goes out on the streets and finds somebody who can

15   buy drugs, or we have an agent who is hanging something over a

16   defendant's head and says, "Okay, you could work it off," and

17   so a relationship suddenly develops.

18        Here, we have this kind of ongoing relationship as relates

19   to spam between Spamhaus and the FBI.  And certainly, in

20   reviewing the defendants' papers, you point to the government

21   establishing alliances with any number of organizations, whose

22   aim is to enforce the law, be it spam or otherwise.  And just

23   because the government receives tips or obtains some sort of

24   cooperation, that doesn't turn all of these individuals or

25   these organizations into informants.  It just doesn't.

```
 1          But at the same time, as to the Spamhaus informant, given
 2     what we have learned about his zeal for investigations, and
 3     specifically investigations involving these defendants, which
 4     led the government then to go to their professional
 5     responsibility advisor to learn what steps they should take in
 6     response to information that had been brought to their
 7     attention, it seems to me that some type of hearing involving
 8     the FBI agent is appropriate.
 9          What is the government's view?
10          MR. LINCENBERG:  Can I, before the Court turns to the
11     government, make one further suggestion?  Because, frankly, we
12     are thrilled even to take half a loaf right now and go to that
13     step.
14          THE COURT:  I am sure you are.  I am sure you are.
15          MR. LINCENBERG:  And I get it.  The Court will decide
16     maybe we need to go to the next step, maybe not.
17          But I would also suggest that somebody needs to review the
18     FBI files and logs, not just 302s and emails.  And I am not
19     going to put that burden on the Court to do some massive
20     in camera review.  I don't know if the Court wants to assign it
21     to a magistrate.  But I would, in the first instance, trust
22     these prosecutors to review it, the Court order them to
23     review --
24          THE COURT:  Review the file of the Spamhaus
25     informant?
```

```
 1              MR. LINCENBERG:  Well, not just the file of the
 2   Spamhaus informant but all of the FBI's internal files of the
 3   investigation.
 4              THE COURT:  Of this investigation or all
 5   investigations?
 6              MR. LINCENBERG:  Of this investigation, in any way
 7   dealing with Spamhaus and/or this informant.
 8         So would that would include, for example, is if, at the
 9   FBI, they have internal summary reports to supervisors of
10   progress, or how the case develops, or whether to open a
11   file -- things that the government will view as highly
12   sensitive and don't necessarily want to turn over to the
13   defense -- but may contain -- I think are likely to contain a
14   lot of information about dealings and what they have received
15   from Spamhaus, a lot more than are just in emails and the like.
16         And I have dealt with Ms. Pierson for 30 years, and I know
17   her -- I think she would review this with integrity and review
18   it.  And if there was something the government found that might
19   be relevant to this inquiry, that that would be either turned
20   over to the defense, or at least, in the first instance, to the
21   Court, to determine whether it would be relevant.
22         Because I think that, particularly when we go back into
23   the 2013 time frame but even throughout the present, there's
24   going to be more in there than simply shows up in an email
25   between the informant and the agent.
```

```
 1              THE COURT:  Ms. Feve?

 2              MS. FEVE:  Your Honor, the challenge here is that if

 3    you read Henderson, the theory that they always come back to

 4    and the explanation they always come back to is it is not just

 5    relevance; it's relevance to a theory of defense.  So,

 6    throughout the case law on the informant privilege, it's

 7    relevance to a theory of defense.  And here, there's never --

 8              THE COURT:  That would exclude a Fourth Amendment

 9    motion to suppress?

10              MS. FEVE:  Yes.  And we briefed it, and I am not

11    going to revisit the cases.  But it is to say that the due

12    process considerations, when you are seeking to pierce the

13    informant privilege for purposes of either impeachment or

14    Fourth Amendment challenges, are -- there's literally a case

15    from the Supreme Court that says there's no precedent for doing

16    it for anything other than a challenge to the case itself.

17         But, because we understand we are in the Ninth Circuit,

18    and we hear you; we have not --

19              THE COURT:  When you say you understand we are in

20    Ninth Circuit, the Ninth Circuit has a little bit of different

21    view?

22              MS. FEVE:  Sometimes the Supreme Court says something

23    and you know -- and it is a broad and diverse circuit.  We live

24    with the cases that we have.

25         But even the Ninth Circuit has said that relevance -- when
```

1  you get away from -- to the case itself, and when you start

2  looking for impeachment materials or for evidence that could be

3  used in a suppression motion, that there's less and less

4  deference due.

5       So, one of the challenges with regard to defending this

6  motion is that the theory of what is relevant keeps changing.

7  It was initially that it was relevant to a Fourth Amendment

8  challenge.  Today it is relevant to a Fifth and a Sixth

9  Amendment challenge, that has never been briefed.  And that

10  is --

11       THE COURT:  I think, worse, initially, as to the

12  Fourth Amendment, it related to the Company A informant, and

13  then it expanded to Spamhaus.  And then, now, we have gone from

14  Fourth Amendment Spamhaus to Fifth and Sixth Amendments.

15       But I think that's the nature of complex cases, such as

16  this, and with lawyers as experienced and with as much zeal as

17  our attorneys have, that they are -- what is the word -- they

18  are able to identify a possible, viable theory.  And I think

19  that's what happened here.

20       MS. FEVE:  Perhaps, Your Honor.  But the issue is for

21  *Henderson* and the *in camera* review, it is not a fishing

22  expedition.  We have to go in and understand exactly what the

23  inquiry is on.  And that is, again, what is it relevant to?  It

24  was initially relevant to a Fourth Amendment challenge which,

25  as we understood it, was going to be -- there was an

1   impermissible search and that impermissible search obviated any

2   other searches or process that was subsequently issued.

3        Now, we are also hearing that there's potentially going to

4   be a government misconduct challenge; but, again, we can't have

5   a hearing and do a direct, or prepare a witness, or prepare for

6   a hearing if we don't understand what it's relevant to.

7             THE COURT:  I agree.  I agree.

8        So here is what I am prepared to do.  I am not going to

9   direct the government to disclose the identity of the Spamhaus

10  informant, notwithstanding what the defense camp already knows.

11  I am not going to direct the government to turn over all

12  information regarding government cooperation with Spamhaus and

13  other investigations.  But I am prepared to have some type of a

14  hearing that would involve the agent, the case agent, Chabalko,

15  and the only question then becomes what would the scope of the

16  hearing be, because it could easily become a fishing

17  expedition.

18       And so what I am prepared to do is to entertain a

19  five-page pleading from the defense stating what they believe a

20  proper -- properly founded *in camera Henderson* hearing would

21  consist of as it relates to Chabalko, and then the government

22  would respond as to what their position is.  I am sure their

23  starting position would be they haven't met their burden and it

24  shouldn't happen at all.  But beyond that, to the extent that,

25  then, you are prepared to concede some sort of basis for a

1   limited hearing, then for the government to submit something,

2   and then I will issue an order indicating how we will proceed.

3       So, as far as the defense, when would the defense be in a

4   position to offer something?

5       (Counsel confer.)

6           MS. BERNSTEIN:  Your Honor, I think the request is

7   for two weeks.  We were just discussing the Thanksgiving

8   holiday.

9           THE COURT:  That would be December 2nd?

10      And then the government, when would you wish to file your

11  response?

12          MS. BERNSTEIN:  I am sorry, Your Honor.  I want to

13  request December 3rd, if it's possible.  It gives us the week,

14  and Mr. Lincenberg and I will be going to Arizona on the 2nd.

15          THE COURT:  That's fine.

16      Ms. Feve?

17          MS. FEVE:  If they file on December 3rd, Your Honor,

18  we could respond on the 10th.

19          THE COURT:  And just to let you know, I would be

20  prepared to consider time limits.  Even just going over this,

21  it took two hours.  I am sure that, left to your all's devices,

22  we would be here for days.

23          MR. LINCENBERG:  We agree, it should be limited to

24  two days.

25          MR. JONES:  Two and a half days.

1    If I could say something, your Honor, just real quick, so

2  we are clear.  Are we going to get the name of the CI?  Can we

3  have his name since he is no longer in any danger?

4              THE COURT:  No.

5              MR. LINCENBERG:  Your Honor, could I also ask the

6  Court -- the Court has indicated the Court is not going to

7  require the government to turn over those internal files, but

8  could I ask the Court to direct the government review them?

9              THE COURT:  I will ask the government to review the

10  CI file for the Spamhaus informant.

11    And then, as to the existence of these other documents,

12  internal summary reports and such, are you aware of such

13  reports existing?  Have you inquired about whether or not they

14  exist?  And do you have a position as to looking into the

15  matter?

16              MS. FEVE:  Your Honor, we will ask.

17    Neither Ms. Pierson nor I are familiar with them.  And to

18  the extent Mr. Lincenberg has any terms of art he would like us

19  to specifically ask the FBI about, we are happy to use

20  whatever -- if he wants to send us an email, we are happy to

21  ask.  He seems to have something in mind when he brought it up,

22  and so there's no miscommunication.

23              MR. LINCENBERG:  I will make it simple.  It is

24  Chabalko and Spamhaus --

25              MS. FEVE:  No.  No.  When you were saying -- you were

```
1    referring to a specific type of internal report.  We are asking
2    you what it was.
3             MR. LINCENBERG:  I was giving examples of internal
4    reports.  I think it's fair to have a review in connection with
5    this case of internal reports referencing Chabalko and
6    Spamhaus.
7             THE COURT:  Well, I would think to the extent that
8    there is some group of internal summary reports relating to
9    Chabalko and the Spamhaus informant's interrelationship that
10   those would be things that the agent himself would obtain,
11   review, and turn over to you.
12            MS. FEVE:  I thought Mr. Lincenberg referenced
13   something in particular with regards to a type of report filed
14   with a supervisor, which we will -- may I represent to the FBI
15   that we are being ordered to review the CI file?
16            THE COURT:  Yes.  I am ordering it.
17            MS. FEVE:  We will review the CI file.  We will have
18   to go back to FBI headquarters and get permission, so it will
19   take some time, but we are going to represent to the FBI that
20   we have been ordered to review it, and we will do so.  And we
21   will speak with the agent about whether or not there is any
22   written product relating to this case that we have not already
23   reviewed.
24            THE COURT:  Which would cover that.
25            MR. LINCENBERG:  I think it would.  Yes.
```

```
 1            THE COURT:  All right.

 2       So -- and then, as far as further proceedings, I don't

 3   want to hold a hearing, so I will just rule on the papers.

 4            MR. LINCENBERG:  In terms of the scope?

 5            THE COURT:  Yes.  Yes.  And the time limits.  All

 6   right?

 7       And the Court will find excludable time between now and

 8   December 10th -- actually, there's still pending motions, and

 9   so, under 3161(h)(1)(D), this motion for discovery relating to

10   the informant --

11            MR. LINCENBERG:  I think it may be helpful to set a

12   date for a hearing for the inquiry.

13            THE COURT:  That would be in the order.  Given how

14   it's been like herding cats -- and I know, in the past, we have

15   done this off line.  I don't know.  Do you want to, off line,

16   kind of come up with a date?  Looks like it probably wouldn't

17   be until January or something.

18       No?  You don't want to do this off line?  You want me to

19   decide?

20            MS. FEVE:  (Nods head.)

21            MS. BERNSTEIN:  And January is a good date.

22       I just wanted to note that the retrial is set for

23   February 9 in Arizona, so if this could be prior to that, that

24   would be good for us.

25            MR. LINCENBERG:  And January --
```

1    THE COURT:  I guess the other thing we can do is put

2    it on calendar for December 21st, in the afternoon.

3    MS. FEVE:  Mr. Pierson and I are both out the last

4    week of December.

5    MR. LINCENBERG:  January 12?

6    THE COURT:  2022 looks really, really awful.  I am

7    double-booking trials throughout January, February, and March,

8    and so I am just going to have to bite the bullet and put it on

9    a Friday afternoon.  We will start around 2:30.

10    MR. LINCENBERG:  January 14?

11    MR. JONES:  Wouldn't work for me.  I am out of town.

12    Do we have the 7th at 2:30?

13    THE COURT:  You are not available?

14    MR. LINCENBERG:  I am supposed to be out of town the

15    7th.  We can make sure we cover it from my office if that's

16    what everybody else wants.

17    (Discussion between clerk and Court.)

18    THE COURT:  What about January 21?

19    MR. LINCENBERG:  I am teaching Back East that week,

20    but I can have my partner handle the hearing if that's what the

21    Court wants.

22    (Discussion between clerk and Court.)

23    THE COURT:  We will schedule it for 2:30 on

24    January 21st.

25    Anything else?

1          MR. LINCENBERG:  No.  Thank you, Your Honor.

2          MS. BERNSTEIN:  No.  Thank you, Your Honor.

3          MR. JONES:  Thank you, Your Honor.

4          THE COURT:  That will be all.

5       (End of proceedings at 4:09 p.m.)

6                          -o0o-

7                 C-E-R-T-I-F-I-C-A-T-I-O-N

8

9          I hereby certify that I am a duly appointed,

10   qualified and acting official Court Reporter for the United

11   States District Court; that the foregoing is a true and correct

12   transcript of the proceedings had in the aforementioned cause;

13   that said transcript is a true and correct transcription of my

14   stenographic notes; and that the format used herein complies

15   with rules and requirements of the United States Judicial

16   Conference.

17          DATED:  November 22, 2021, at San Diego,

18   California.

19

20                          /s/  Chari L. Bowery
                          _____
21                          Chari L. Bowery
                          CSR No. 9944, RPR, CRR
22

23

24

25