**BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS LINCENBERG & RHOW P.C.**
Gary S. Lincenberg, SBN 123058
Nicole R. Van Dyk, SBN 261646
Darren L. Patrick, SBN 310727
Alexis A. Wiseley, SBN 330100
1875 Century Park East, Floor 23
Los Angeles, CA 90067
Telephone: (310) 201-2100
Email: glincenberg@birdmarella.com
        nvandyk@birdmarella.com
        dpatrick@birdmarella.com
        awiseley@birdmarella.com

*Attorneys for Petr Pacas*

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
Thomas H. Bienert, Jr., SBN 135311
James D. Riddet, SBN 39826
Whitney Z. Bernstein, SBN 304917
Carlos A. Nevarez, SBN 324407
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Email: tbienert@bklwlaw.com
        jriddet@bklwlaw.com
        wbernstein@bklwlaw.com
        cnevarez@bklwlaw.com

*Attorneys for Mohammed Abdul Qayyum*

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.**
Randy K. Jones, SBN 141711
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Telephone: (858) 314-1510
Email: rkjones@mintz.com

Daniel J. Goodrich, BBO 692624 (Pro Hac)
Ryan Dougherty, BBO 703380 (Pro Hac)
1 Financial Center
Boston, MA 02111
djgoodrich@mintz.com
rtdougherty@mintz.com

*Attorneys for Mark Manoogian*

**WIECHERT, MUNK & GOLDSTEIN, PC**
David W. Wiechert, SBN 94607
Jessica C. Munk, SBN 238832
27136 Paseo Espada, Suite B1123
San Juan Capistrano, CA 92675
Telephone: (949) 361-2822
Email: dwiechert@aol.com
        jessica@wmgattorneys.com

*Attorneys for Jacob Bychak*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

UNITED STATES OF AMERICA,

14

 Plaintiff,

15

16  v.

17

JACOB BYCHAK, *et al.*,

18

19  Defendants.

20

21

22

23
24
25
26
27
28

Case No. 18-CR-4683-GPC

Honorable Gonzalo P. Curiel

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENTAL MISCONDUCT**

Date:  April 1, 2022
Time: 2:30 p.m.
Dept.: 2D

*[Declaration of Gary S. Lincenberg submitted herewith under seal]*

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................. 1

II.  BACKGROUND ................................................................. 2

    A.  Procedural Background ................................................ 2

    B.  The Government Has Known About the Relevant Attorney-Client Relationships For Years. ................................. 4

    C.  Invasions of the Defense Camp. .................................... 6

        1.  Counsel Investigated Spamhaus's ROKSO Database ................................................ 6

        2.  The Informant Shared ROKSO Search Terms with the Government for Years. ................................. 6

    D.  Invasions of the Attorney-Client Privilege. ............................. 9

III.  ARGUMENT ................................................................. 12

    A.  Defense Counsel's Case-Related Research Constitutes Attorney Work Product. ................................................ 12

    B.  Correspondence With Legal Counsel is Facially Privileged. ................................................ 13

    C.  The Government's Outrageous Conduct Violates Defendants' Fifth and Sixth Amendment Rights ................................. 14

        1.  The Government Deliberately Intruded into the Defense Camp. ................................................ 15

        2.  The Government Deliberately Intruded into Defendants' Attorney-Client Relationships. ................................. 16

    D.  The Government Has the Heavy Burden of Proving No Prejudice ................................................ 18

        1.  Defendants Have Made a *Prima Facie* Showing Under *Danielson*. ................................................ 18

        2.  The Government Cannot Meet its Heavy Burden of Showing No Prejudice On the Papers. ................................. 19

    E.  Dismissal is the Appropriate Remedy for the Government's Misconduct. ................................................ 21

    F.  Alternatively, the Court Should Preclude Witnesses and Evidence. ................................................ 22

IV.  CONCLUSION ................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                    **Page(s)**

*United States v. Aguilar*,
   831 F. Supp. 2d 1180 (C.D. Cal. 2011) ............................................... 21, 22

*United States v. Bundy*,
   968 F.3d 1019 (9th Cir. 2020) ................................................................... 21

*United States v. Chapman*,
   524 F.3d 1073 (9th Cir. 2008) ........................................................... 21, 22

*United States v. Chen*,
   99 F.3d 1495 (9th Cir. 1996) ..................................................................... 13

*United States v. Danielson*,
   325 F.3d 1054 (9th Cir. 2003) ........................................................... *passim.*

*In re Grand Jury Subpoenas*,
   454 F.3d 511 (6th Cir. 2006) ..................................................................... 20

*United States v. Harrison*,
   213 F.3d 1206 (9th Cir. 2000) ............................................................. 3, 22

*United States v. Haynes*,
   216 F.3d 789 (9th Cir. 2000) ..................................................................... 14

*Hickman v. Taylor*,
   329 U.S. 495 (1947) ................................................................................... 12

*In re Lidoderm Antitrust Litig.*,
   No. 14-MD-02521-WHO, 2015 WL 7566741
   (N.D. Cal. Nov. 25, 2015) ......................................................................... 13

*People v. Joly*,
   No. 354379, 2021 WL 935704 (Mich. Ct. App. Mar. 11, 2021) ............. 23

*United States v. Horn*,
   29 F.3d 754 (1st Cir. 1994) ....................................................................... 23

*United States v. Irwin*,
   612 F.2d 1182 (9th Cir. 1980) ........................................................... 14, 16

*United States v. Kastigar*,
   406 U.S. 441 (1972) ..................................................................................... 2

*United States v. Marshank,*
    777 F. Supp. 1507 (N.D. Cal. 1991)........................................ 18, 20, 21, 23

*United States v. Nobles*,
    422 U.S. 225 (1975) ............................................................... 12

*United States v. Obagi,*
    965 F.3d 993 (9th Cir. 2020) ................................................ 22

*United States v. Samango,*
    607 F.2d 877 (9th Cir. 1979) ............................................ 21, 22

*United States v. Segal,*
    No. 02-CR-112, 2004 WL 830428 (N.D. Ill. Apr. 16, 2004).................. 12

*Skyline Wesleyan Church v. California*
    *Dep't of Managed Health Care*,
    322 F.R.D. 571 (S.D. Cal. 2017) ............................................ 13

*United States v. Stringer,*
    535 F.3d 929 (9th Cir. 2008) ................................................ 14

*United States v. Sullivan,*
    No. CR 17-00401 JMS-KJM, 2020 WL 1815220,
    (D. Haw. Apr.9. 2020) ....................................................... 23

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ............................................................ 13

*United States v. Walther,*
    652 F.2d 788 (9th Cir. 1981) ................................................ 18

*United States v. Wirth,*
    No. CRIM. 11-256 ADM/JJK, 2012 WL 1110540,
     (D. Minn. Apr. 3, 2012).................................................... 13

**Other Authorities**

Fed. R. Civ. P. 26(b)(3) ........................................................... 12

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3        Defendants Jacob Bychak, Mark Manoogian, Mohammed Abdul Qayyum,

4    and Petr Pacas (collectively, "Defendants") bring this Motion to Dismiss Based on

5    Outrageous Governmental Misconduct (the "Motion"), in light of the

6    government's invasions of the attorney client privilege and of the defense camp.

7        For years, FBI Special Agent Chabalko—the case agent at the helm of the

8    government's prosecution—has been using an informant (hereafter, "Informant")[1]

9    to gather privileged information and to willfully invade the defense camp.

10   Defendants previously brought to the Court's attention clear evidence showing that

11   the Informant then knowingly transmitted this privileged information to the

12   government in two ways: (1) *first*, by deliberately monitoring defense counsel's

13   online research and handing over defense counsel's search terms on the Spamhaus

14   website to the government; and (2) *second*, by sending the government facially

15   privileged emails—which *were not produced* to the government in response to its

16   grand jury subpoenas—and summarizing their contents.

17       Attempting to evade accountability for this misconduct—and only *after* the

18   Court ordered the government to investigate these incidents—Agent Chabalko now

19   makes the untested assertion that the Informant was acting without his direction or

20   acquiescence.  Agent Chabalko first responded by submitting a declaration,

21   misleadingly painting the Informant's emails conveying privileged information as

22   isolated incidents, and stating that the Informant's conduct was "unsolicited."  But

23   Agent Chabalko's declaration was silent as to whether he had *acquiesced* in the

24   Informant's improper conduct.  At the Court's direction, he submitted a second

25   declaration, this time self-servingly stating that he did not "passively approve" the

26   Informant's conduct.

27
---
28   [1]    The government refers to the Informant as the "Spamhaus Source" or "SS."

1      Agent Chabalko's untested statements are flagrantly misleading.  Agent

2  Chabalko completely ignores evidence that the Informant had been sending him

3  information about online research conducted by or on behalf of attorneys for *four*

4  *years* prior to conveying defense counsel's trial strategy information.  Agent

5  Chabalko likewise omits any reference at all to the summary of one of the

6  privileged emails that the Informant sent to him, and glosses over the fact that he

7  bypassed the taint team and sent privileged emails directly to the prosecution.

8      Although the Court initially granted Defendants' request to cross-examine

9  Agent Chabalko to more fully establish the government's misconduct, the Court

10  later changed its position and canceled the evidentiary hearing.  Still, the Court

11  indicated that Defendants had sufficient evidence to bring this Motion.

12      The government blatantly used the Informant to invade the attorney-client

13  privilege and defense camp. The Court should therefore hold a hearing, pursuant to

14  *United States v. Kastigar*, 406 U.S. 441 (1972) and *United States v. Danielson*, 325

15  F.3d 1054 (9th Cir. 2003), to put the government to its burden of proof, and then

16  determine the appropriate remedy. Given the government's repeated misconduct

17  and interference with Defendants' right to counsel, Agent Chabalko's failure to be

18  entirely forthcoming in his sworn declarations, and Defendants' inability thus far

19  to fully develop the record of misconduct, the remedy should be dismissal.  In the

20  alternative, the Court should permit the Defendants to fully develop the record of

21  misconduct that the government has sought to conceal for purposes of this motion

22  and any appellate review.

## II.     BACKGROUND

### A.     Procedural Background.

25      In late September 2021, the government produced emails from the Informant

26  showing that the Informant had passed defense counsel's search terms to the

27  government.  On October 18, 2021, Defendants filed a Supplemental

28  Memorandum of Points and Authorities In Support of Defendants' Motions for

1  Reconsideration and to Compel.  *See* ECF No. 295 (the "Supplemental MPA,"

2  cited as "Supp. MPA").  In the Supplemental MPA, Defendants revealed evidence

3  showing that the Informant had transmitted privileged information to the

4  government.[2]  When Defendants filed the Supplemental MPA, there was nothing

5  in the record suggesting that the government had ever instructed the Informant to

6  stop accessing defense counsel's work product or providing privileged

7  information.

8       At the November 18, 2021 hearing, after much argument and only when

9  directly questioned by the Court, the government stated ***for the first time*** that, after

10  receiving the Informant's September 2021 emails, the government asked their

11  internal ethics advisor for advice and instructed the Informant not to provide

12  information about counsel's online research.  *See* Nov. 18, 2021 Hr'g Tr. 56:17-21.

13  In light of this new information and the Court's concerns about the Informant's

14  conduct, the Court scheduled an evidentiary hearing, during which Defendants

15  would be permitted to question Agent Chabalko, and asked the parties to file

16  additional papers regarding the scope of the hearing.  *Id.* at 68:1-8, 72:13-16.  On

17  December 3 and 10, 2021, Defendants and the government respectively submitted

18  their proposals.  ECF Nos. 315 & 316.  The government also submitted a

19  declaration from Agent Chabalko.  *See* ECF No. 316-1 (Dec. 10, 2021 Declaration

20  of Special Agent Charles Chabalko, cited herein as "Chabalko Decl.").

21       On January 18, 2022, the Court changed its position and canceled the

22  evidentiary hearing.  The Court nevertheless expressed skepticism about Agent

23  Chabalko's declaration not having addressed whether he "acquiesced in any

24

25  [2]   "Because the Supreme Court has determined that ***the knowledge of one***
26  ***government actor must be imputed to another***," unless otherwise noted herein,
   references to the "government" include both the investigative and prosecutorial
27  agencies. *United States v. Harrison*, 213 F.3d 1206, 1215 (9th Cir. 2000), *as*
   *amended* (June 29, 2000) (emphasis added).
28

improper conduct by his CHS." Jan. 18, 2022 Hr'g Tr. at 5:21-24; *see also id.* at 6:12-14. Thus, on January 21, 2022, Agent Chabalko filed a supplemental declaration, presumably to address this concern. *See* ECF No. 321 (Jan. 21, 2022 Supplemental Declaration of Special Agent Charles Chabalko, cited herein as "Supp. Chabalko Decl."). Defendants have not had the opportunity to question Agent Chabalko regarding either declaration.

In this Motion, Defendants request that the Court hold a *Kastigar/Danielson* hearing and then determine the appropriate remedy. In light of the government's repeated misconduct, and Defendants' inability thus far to fully develop the record of misconduct, the remedy should be dismissal.

## B. The Government Has Known About the Relevant Attorney-Client Relationships For Years.

The government has been investigating this case since 2013. From the investigation, the government knew that Company A had retained The Goodman Law Firm and its founder, Linda Goodman (together, "Goodman"), to provide legal advice regarding its email advertising business. The government also knew that Goodman had retained the Mandatus Corporation and its CEO, Adam Brower (together, "Brower") to provide consulting services with respect to anti-spam organizations, such as the Spamhaus Project ("Spamhaus"), in order to help her provide legal advice.

For example, on June 2, 2014, the Informant provided the government with a dossier containing "profiles of individuals" relating to this case including, among others, Goodman, Brower, and Company A's CEO. *See* Ex. 1 (ADCONION-DISC02-REPORTS-01011 at 017).[3] The profile of Goodman contained the name of her law firm, and stated that she "[w]orks with" Brower to advise her clients

---

[3]   Exhibits are submitted under seal as attachments to the Under Seal Declaration of Gary S. Lincenberg (the "Lincenberg Declaration").

regarding their email marketing business.  Ex. 2 (ADCONION-DISC39-01752 at 766).  The profile of Brower stated that he is an "e-mail delivery consultant" whose "[k]nown clients" include Goodman and Company A.  *Id.* at 765.  The profile of Company A's CEO stated that she had hired Goodman as legal counsel for Company A.  *Id.* at 768.  Thus, at least as of June 2, 2014, the government was well aware of the attorney-client relationship between Goodman and Company A, and of the presumptively privileged consulting relationship between Goodman and Brower.

On January 16, 2018, Brower made a small document production to the government in response to a grand jury subpoena.  The production contained a letter in which Goodman advised Brower that she was "assert[ing] the attorney work product and attorney client privileges."  Ex. 3 (ADCONION-MANDATUS-062-00005).  Goodman explained that because Brower's "[s]ervices … were undertaken under a contract with [Goodman] … ***the work, communications and documents fall within the scope of the privileges***."  *Id.* (emphasis added).  Thus, on January 16, 2018, the government was reminded of the ongoing attorney-client relationship involving Goodman, and of the presumptively privileged consulting relationship between Goodman and Brower.[4]

On October 31, 2018, the government filed the Indictment.  *See* ECF No. 1.  Shortly thereafter, counsel of record for Defendants entered their appearances in this case.  *See* ECF Nos. 8, 22, 31-34.  Further, during the year prior to the Indictment, the government and many counsel of record had met, and the

---

[4]     Despite Goodman's clear invocations of privilege, Brower produced his emails, and the government decided to review them – a decision that defense counsel understands became the basis for under seal briefing concerning a protective order.  Defendants understand that the protected nature of Brower's work with Goodman was not resolved by the Court until late 2018.  In any event, as discussed more fully below, the government's invasion of the attorney-client privilege extends beyond Goodman's emails with Brower.

government was aware of counsel's representation.  Thus, by early November 2018, the government had not only known of the attorney-client relationship involving Goodman, and of the presumptively privileged consulting relationship between Goodman and Brower, but the government also knew of the attorney-client relationships between Defendants and their counsel in this case.

### C.    Invasions of the Defense Camp.

#### 1.    Counsel Investigated Spamhaus's ROKSO Database.

Spamhaus maintains a series of registries and "blocklists," which claim to identify entities and individuals that Spamhaus has decided are involved in spam operations.  Spamhaus's blocklists play a prominent role in this case.  Between December 2010 and September 2014, the period of the alleged conspiracy, the names of key witnesses and the netblocks at issue appeared on Spamhaus's blocklists.  One such list is called the Register of Known Spam Operations ("ROKSO").[5]  As explained in the Supplemental MPA, the Informant used the blocklists as a tactic to induce key witnesses to provide information during the government's investigation.  *See* Supp. MPA at 16-17.  Thus, defense counsel visited Spamhaus's website, and the ROKSO database in particular, to investigate the basis for the claims against Defendants and develop their defense.

#### 2.    The Informant Shared ROKSO Search Terms with the Government for Years.

In September 2021, the Informant sent the government two emails containing search terms used in Spamhaus's ROKSO database.  On September 21, the Informant sent the government a list of Brower's search terms.  Ex. 4 (ADCONION-DISC45-00001).  In his email, the Informant again reminded the government that Brower "teams up with" Goodman, and "*is regularly searching*

---

[5]    *See* https://www.spamhaus.org/rokso/.

*our public ROKSO database for information related to this case*." *Id.*[6] (emphasis added).  On September 26, the Informant again emailed the government *a list of search terms used by defense attorneys* in Spamhaus's ROKSO database.  Ex. 5 (ADCONION-DISC46-00001).  The email included the attorney's name, search string and the date, time and location of the search.  *Id.*

In his declaration, Agent Chabalko, stated:

> I did not ask SS to provide any information regarding searches conducted by defense counsel by accessing the publicly available Spamhaus website and ROKSO database. I received two such emails from SS, and immediately forwarded them to the U.S. Attorney's office. After receiving advice from the U.S. Attorney's office, I sent an email to SS on October 18, 2021, requesting that SS cease providing such information to us.

Chabalko Decl. ¶ 11.  But Agent Chabalko's declaration was silent as to whether he had acquiesced in the Informant's pattern of tracking ROKSO searches conducted by or on behalf of attorneys (the very issue that Defendants raised with the Court at the November 18, 2021 hearing).  At the Court's direction, Agent Chabalko submitted a supplemental declaration, claiming that:

> On Tuesday, September 21, 2021, SS sent me an email indicating that one defense attorney's law firm subscribed to Spamhaus' email filtering system. The email also indicated that a former Spamhaus employee, *possibly employed by outside counsel for Company A, had conducted queries of the Spamhaus' public database known as ROKSO* (Register of Known Spam Operations).

> I forwarded the email to the U.S. Attorney's Office and sought advice. Before I received any advice, SS sent me another email on Sunday, September 26, 2021, that indicated *two defense attorneys' law firms also had conducted queries of Spamhaus' public*

---

[6]   While the database is publicly accessible, the history of users, their specific search terms, and the dates and times of searches are not public information, and is information the government would not have but for the Informant or a duly-authorized subpoena.

***ROKSO database***. Both of SS's September 2021 emails listed the terms queried of Spamhaus' public ROKSO database, but did not identify the query results. Neither I nor the FBI directed SS to obtain this or any information regarding queries by members of the defense team of Spamhaus' public ROKSO database, nor did I passively approve such conduct.

After receiving advice from the U.S. Attorney's office, ***I sent an email to SS on October 18, 2021, requesting that SS stop providing such information*** to the government.

Supp. Chabalko Decl. ¶¶ 6-8 (emphasis added).

Both of Agent Chabalko's declarations fail to disclose that the Informant had been gathering and sharing information about ROKSO searches conducted by or on behalf of attorneys ***for at least four years*** before Agent Chabalko claims to have asked the Informant stop.  For example:

- On September 15, 2017, the Informant sent Agent Chabalko an email attaching information about Brower's searches in Spamhaus's ROKSO database.  The Informant explained that he was providing the information ***because it*** "***gives you an idea of what they were up to***, and that they were well aware that they were using hijacked IP blocks."  Ex. 6 (ADCONION-DISC26-03813) (emphasis added).

- On March 27, 2018, the Informant sent Agent Chabalko an "updated … spreadsheet of SBL and ROKSO records" accessed by Brower, noting, "***[i]t looks like he is still working with Linda Goodman and still very interested in many listings related to [Company A]***."  Ex. 7 (ADCONION-DISC26-03550) (emphasis added).

- On April 27, 2018, the Informant sent Agent Chabalko "updated logs of the things [Brower] is accessing," noting that "[i]t seems like he's still very interested in" companies "suspected to be working with [Company A]."  Ex. 8 (ADCONION-DISC26-04227).

- On June 26, 2018, the Informant sent Agent Chabalko another "[u]pdate on [Brower's] website access," explaining that "he's accessing a lot of records on spam operations," including with respect to the Company A.  Ex. 9 (ADCONION-DISC25-00966).

- On July 10, 2018, the Informant sent Agent Chabalko the "[l]atest [Brower] ROKSO searches," indicating that "*[h]e seems worried about any connections between Linda Goodman" and Company A*. Ex. 10 (ADCONION-DISC26-02780) (emphasis added).

As explained above, when the government received each one of these emails, the government was well aware of the attorney-client relationship involving Goodman, and of the presumptively privileged consulting relationship between Goodman and Brower.

Thus, it should have come as no surprise when, on September 21, 2021, the Informant emailed Agent Chabalko a list of **search terms** "**related to this case**" that Brower had used in the ROKSO database.  Ex. 4.  And it should have come as even less of a surprise when, on September 26, 2021, the Informant emailed Agent Chabalko a list of search terms used by **counsel for Defendants** to conduct case-related research in the ROKSO database.  Ex. 5.  Yet, even after these incidents, by Agent Chabalko's own recounting, he inexplicably waited another month, until October 18, 2021, to request that Informant cease providing information about the defense camp's privileged activities.  Chabalko Decl. ¶ 11.

### D.    Invasions of the Attorney-Client Privilege.

On September 27, 2017, the Informant told the government that he had internal Company emails, some of which involved Goodman.[7]  Ex. 11 (ADCONION-DISC25-00864).  On October 12, 2017, the Informant sent the government a zip file called "interesting emails," which contained the documents previewed in his September 27th email.  Ex. 12 (ADCONION-DISC27-00001).  On November 8, 2018, the Informant emailed the government twice—*first*,

---

[7]   The privilege holder for the facially privileged documents is Company B.  In May 2013, when the privileged communications at issue occurred, Goodman served as outside counsel for both Company A and Company B.  In 2014, Company A acquired Company B's email advertising business.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

attaching another zip file called "Interesting Emails Fixed," which contained the same documents he provided on October 12, 2017 (Ex. 13 (ADCONION-DISC27-00131)), and *second*, telling the government to "***Read the linda_libel.txt email in particular***," referring to ***one of the facially privileged emails*** in the zip file, and ***summarizing the contents of that email***.  Ex. 14 (ADCONION-DISC26-03542).

In response, the government submitted a declaration from Agent Chabalko, stating, in relevant part:

> In an unsolicited email on September 27, 2017, SS advised that SS had received internal emails from a source, some of which involved an attorney. SS asked, "does attorney/client privilege prevent you from viewing them?" On October 12, 2017, I received an unsolicited email from SS with the attached zip file "Interesting Emails.zip" containing documents and the message from SS, "Here are some interesting emails." I did not review this zip file attachment, instead I emailed the U.S. Attorney's Office for advice. Later that day, after receiving their advice via email, I sealed the attachment, pending a filter team review, and did not review the documents in the zip file, nor did I discuss the documents or the content of the documents with SS.
>
> … On November 8, 2018, I received an email from SS, this time with the attached zip file "Interesting Emails Fixed.zip," containing what I believed to be the same document from the previously received zip file "Interesting Emails.zip." Although I do not recall why SS sent this email with the "fixed" zip file, I believe that in preparing to provide documents to the U.S. Attorney's Office for discovery, I noticed that the sealed zip file "Interesting Emails.zip" was corrupted, and I may have requested another copy from SS. ***I provided SS's November email with the zip file "Interesting Emails Fixed.zip" to the U.S. Attorney's Office.*** I do not recall reading the contents of either zip file until the time when the contents thereof were produced to the defense as discovery.

Chabalko Decl. ¶¶ 9-10.  In his supplemental declaration, Agent Chabalko added:

> I contacted the U.S. Attorney's Office for advice prior to receiving the [September 2017] zip file. I asked SS to place the data in a zip file if SS did send it, and told SS that I could not review emails containing potential confidential attorney communications until the documents were found to be not privileged. Based on advice from the U.S.

1
2
3
4
5

Attorney's Office, I did not review the zip file. I do not recall reading the contents of this zip file, or the replacement zip file sent to me by SS in November 2018, until the contents were produced to the defense as discovery, after a review by a filter team. I did not discuss those documents or their contents with SS. Neither I nor the FBI passively approved SS revealing to me any confidential communications with an attorney.

6
7

Supp. Chabalko Decl. ¶ 5.  Far from providing clarity, the events described in Agent Chabalko's declaration raise new questions and credibility issues.

8
9
10
11
12
13
14
15
16
17
18

For example, Agent Chabalko states that he sealed the "Interesting emails.zip" file "pending a filter team review" and then he read them "after a review by a filter team."  Chabalko Decl. ¶ 9; Supp. Chabalko Decl. ¶ 5.  But he does not state whether and when he actually sent either of the zip files to the filter team for review.  That is because he never did.  Instead, in September 2020, "[a]s the prosecutors were reviewing the email information provided to the FBI by SS … a zip file was found which contained an email from outside counsel for Company A."  ECF No. 299-1 ¶ 8 (Nov. 1, 2021 Declaration of M. Pierson).  Only then, on September 23, 2020, did "a filter team [take] over the review."  *Id.*  In other words, what Agent Chabalko's declaration fails to disclose is that he knowingly sent privileged documents directly to the prosecution team.

19
20
21
22
23
24
25
26

Further, Agent Chabalko claims that he "told SS that [he] could not review emails containing potential confidential attorney communications until the documents were found not to be privileged."  Supp. Chabalko Decl. ¶ 5.  Even if true, it is clear that the Informant did not heed that warning.  Indeed, on the very same day that Informant sent the government a "fixed" zip file, the Informant also suggested (in an email with the same "Interesting emails" subject line) that the government "*[r]ead the linda_libel.txt email in particular*," referring to one of the

27
28

1   two facially privileged emails in the zip file.  Ex. 14.[8]

2   Defendants now respectfully submit this Motion, requesting that the Court

3   hold a *Kastigar/Danielson* hearing, and then determine the appropriate remedy

4   which, given the foregoing conduct, should be dismissal.

5   **III.   ARGUMENT**

6   **A.   Defense Counsel's Case-Related Research Constitutes**

7   **Attorney Work Product.**

8   The work product doctrine "protect[s] against disclosure of the mental

9   impressions, conclusions, opinions, or legal theories of a party's attorney or other

10   representative concerning the litigation."  Fed. R. Civ. P. 26(b)(3).  "The work-

11   product doctrine ... reflects the strong 'public policy underlying the orderly

12   prosecution and defense of legal claims.'"  *United States v. Nobles*, 422 U.S. 225,

13   236–237 (1975) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)).  "[I]t is

14   essential that a lawyer work with a certain degree of privacy, free from

15   unnecessary intrusion by opposing parties and their counsel."  *Hickman*, 329 U.S.

16   at 510.  To that end, the doctrine "shelters the mental processes of the attorney,

17   providing a privileged area within which he can analyze and prepare his client's

18   case."  *Nobles*, 422 U.S. at 238.  The role of the work product doctrine "in assuring

19   the proper functioning of the criminal justice system is even more vital" than its

20   role as a bar to discovery in civil litigation.  *Id.* at 238.

21   Here, Defense counsel's search terms are protected by the work product

22   doctrine. When the Informant shared defense counsel's search terms with the

---

23

24   [8]   Defendants understand that the privileged documents ***were not otherwise***

     ***produced*** to the government by the privilege holder in response to the

25   government's grand jury subpoenas.  Rather, the government is only in possession

26   of these emails because CY took them from Company A and passed them to the

     Informant, who, in turn, passed them to the government.  For the Court's reference,

27   and without waiving any applicable privileges, the two privileged emails are

28   submitted under seal as Exhibits 13A & 13B.

government, those **"search terms … provide[d] a window into the attorney's thinking"** and "indicate[d] that [counsel] was researching the claims at the heart of the present litigation."  *United States v. Segal*, No. 02-CR-112, 2004 WL 830428, at *8 (N.D. Ill. Apr. 16, 2004) (emphasis added).  The Informant knew that the ROKSO search information would give the government "**an idea of what they were up to**" and **what they "seem[] worried about**."  Exs. 6 & 10 (emphasis added).  Indeed, the ROKSO search information revealed **who** conducted the search, **when** they did it, and **what** they looked for—in other words, the metadata for the search.  *See United States v. Wirth*, No. CRIM. 11-256 ADM/JJK, 2012 WL 1110540, at *4 (D. Minn. Apr. 3, 2012) (explaining that metadata "shows the [attorneys'] mental processes … by revealing the [attorneys'] … decisions and steps" and, therefore, constitutes "'opinion work product' entitled to stronger protection than other types of work product").

### B.    Correspondence With Legal Counsel is Facially Privileged.

Similarly, the attorney-client privilege "applies to communications between lawyers and their clients when the lawyers act in a counseling and planning role, as well as when lawyers represent their clients in litigation."  *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996).  It extends to "advice regarding the client's business affairs."  *Id.*  The privilege protects "not only the giving of professional advice … but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981); *see also Skyline Wesleyan Church v. California Dep't of Managed Health Care,* 322 F.R.D. 571, 583 (S.D. Cal. 2017) (same); *Chen*, 99 F.3d at 1499–1500 ("People … have to be able to talk to their lawyers candidly without fear that what they say to their own lawyers will be transmitted to the government.").

Here, there is no question that Company B's internal emails, in which Goodman responds directly to a question from a Company executive, are facially privileged.  *See Chen*, 99 F.3d at 1501 ("The communications between lawyer and

1  client which enable a lawyer to perform this function are privileged."); *In re*

2  *Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2015 WL 7566741, at *4

3  (N.D. Cal. Nov. 25, 2015) ("The attorney-client privilege protects communications

4  between attorneys and their clients even when the facts being conveyed may

5  themselves be unprivileged.").  In fact, Defendants understand that these

6  documents were not produced to the government in response to its grand jury

7  subpoenas *because* they are privileged.  *See* Exs. 13A & 13B.  Despite the facially

8  privileged nature of this information, the government obtained and reviewed it,

9  blatantly disregarding Defendants' confidential relationships with legal counsel.

10      **C.      The Government's Outrageous Conduct Violates**

11             **Defendants' Fifth and Sixth Amendment Rights.**

12      Government interference with a defendant's attorney-client relationships

13  may violate Defendants' "Fifth Amendment right to due process of law." *United*

14  *States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980).  "A claim of outrageous

15  government conduct premised upon deliberate intrusion into the attorney-client

16  relationship will be cognizable where the defendant can point to actual and

17  substantial prejudice."  *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir. 2000),

18  *amended on denial of reh'g* (Aug. 15, 2000) (citation and internal punctuation

19  omitted).

20      Similarly, "government interference with a defendant's relationship with his

21  attorney may render counsel's assistance so ineffective as to violate his Sixth

22  Amendment right to counsel" if it "substantially prejudices" the defendant.  *Irwin*,

23  612 F.2d at 1185, 1187.  Substantial prejudice may result "from the prosecution's

24  use of confidential information pertaining to *defense plans and strategy*," and

25  "from other actions *designed to give the prosecution an unfair advantage at*

26  *trial*."  *Id.* at 1187 (emphasis added).

27      Under either analysis, "[a] claim of government interference with the

28  attorney-client relationship has three elements: (1) the government was objectively

1  aware of an ongoing, personal attorney-client relationship; (2) the government

2  deliberately intruded into that relationship; and (3), as a result, the defendant

3  suffered actual and substantial prejudice." *United States v. Stringer*, 535 F.3d 929,

4  941 (9th Cir. 2008).  Here, all three criteria are met.[9]

5          **1.      The Government Deliberately Intruded into the**

6                  **Defense Camp.**

7          The invasion of the defense camp was "neither accidental nor unavoidable,"

8  but was rather the result of the SS's "deliberate and affirmative acts." *United*

9  *States v. Danielson*, 325 F.3d 1054, 1059 (9th Cir. 2003), *as amended* (May 19,

10  2003).

11          After the Informant sent the first email containing Brower's search terms on

12  September 15, 2017, the government was on notice that the Informant may

13  continue to send more ROKSO search information, potentially in violation of

14  Defendants' Constitutional rights.  *See Danielson*, 325 F.3d at 1068 (explaining

15  "once the [government] learned … that [informant] had obtained trial strategy

16  information (and therefore knew that he might learn more such information in

17  future conversations), the prosecution team was on notice of a potential Sixth

18  Amendment violation if [the informant], now acting on behalf of the government,

19  continued to [provide information]").

20          That is exactly what happened.  Between September 15, 2017 and

21  September 21, 2021, the Informant deliberately sought out search terms used by or

22  on behalf of attorneys in the ROKSO database, and emailed them to Agent

23  Chabalko at least five times.  *See, e.g.*, Exs. 6-10.  Each time, the Informant

24  indicated that the search terms related to Company A or various facts at issue in

25  _____

26  [9]   As explained above (*see supra* at 4-6), the government has been objectively
   aware of the ongoing attorney-client relationship involving Goodman since at least

27  2014, and the attorney-client relationships between Defendants and their counsel
   since before 2018.

28

1   this case.  *See id.*  The Informant even reminded the government that Brower

2   worked for Goodman, and that the ROKSO search terms revealed what Goodman,

3   in her capacity as legal counsel, was "very interested in" and "seem[ed] worried

4   about."  *See* Exs. 4, 7 & 10.  Yet, the government made ***no attempt*** over that four-

5   year period to tell the Informant to stop sending ROKSO search terms.

6          Thus, by September 2021, when the Informant emailed the government

7   Brower's ROKSO ***search terms*** "***related to this case***," the government had

8   acquiesced in the Informant's conduct to such a degree that its own conduct was

9   akin to deliberate intrusion.  Ex. 4.  And, even after September 26, 2021, when the

10  Informant sent Agent Chabalko search terms that ***defense counsel had used to***

11  ***investigate the government's claims in preparation for trial***—thereby revealing

12  which evidence defense counsel may view as problematic or may intend to focus

13  on at trial[10]—the government *still* waited another month, until October 18, 2021,

14  before asking the Informant to stop.  *See* Ex. 5; Chabalko Decl. ¶ 11.  Incredibly,

15  even after the Court requested an explanation, Agent Chabalko's declaration failed

16  to candidly disclose that the Informant continually sent him information about

17  ROKSO searches conducted by or on behalf of attorneys for *four years* prior.

18         This is precisely the sort of deliberately invasive conduct that is "designed to

19  give the prosecution an unfair advantage at trial."  *Irwin*, 612 F.2d at 1187.

20                  **2.      The Government Deliberately Intruded into**

21                          **Defendants' Attorney-Client Relationships.**

22         Likewise, the government became aware on September 27, 2017 that the

23  Informant had obtained the Companies' facially privileged documents.  Ex. 11.  At

24  that point, the government knew that the Informant might convey privileged

25  _____

26  [10]   The fact that the Informant's emails "did not identify the query results" is
     irrelevant.  Supp.  Chabalko Decl. ¶ 7.  Defense counsel's decision to use certain
27  search terms over others is, by itself, informative to the government and reveals
     defense strategy that was otherwise unknown.
28

information in the future.  *See Danielson*, 325 F.3d at 1073 (explaining that the government " was on notice that [the informant] might learn more" privileged information).

Again, that is precisely what happened.  The Informant sent the government zip files containing facially privileged emails.  *See* Ex. 12 (ADCONION-DISC27-00001); Ex. 13 (ADCONION-DISC27-00131).  While Agent Chabalko purports to "not recall" reviewing or discussing the contents of the zip files (despite recalling other specifics that serve the government's position), his correspondence with the Informant shows that, on November 8, 2018 (the very same day that the Informant sent him the "fixed" zip file), the Informant also told Agent Chabalko to "***Read the linda_libel.txt email in particular***"—referring to one of the facially privileged emails from the zip file—and summarized the contents of that email.  Ex. 14 (ADCONION-DISC26-03542).  Even after the Court asked Agent Chabalko to provide an explanation, his declaration omitted any reference at all to the Informant's summary of this privileged email.[11]

To make matters worse, although Agent Chabalko ***knew*** that the zip file contained facially privileged emails, he passed the November 2018 zip file directly to the prosecution team, without first sending them to the taint team to review.  *See* ECF No. 299-1 ¶ 8 (Nov. 1, 2021 Declaration of M. Pierson) ("As the prosecutors were reviewing the email information provided to the FBI by SS … a zip file was found which contained an email from outside counsel for Company A.").  Indeed, no attempt appears to have been made to send the privileged emails to a filter team until 2020—years after they had been received by the government.  *See Id.*  The government's blatant disregard for the attorney-client relationship runs afoul of

---

[11]     It is highly unlikely that Agent Chabalko's omission of this email is an oversight.  This email, like all of the Informant's other emails about the zip files containing privileged information, had the same exact subject line: "Interesting emails."  *Compare* Ex. 14, *with* Exs. 12 & 13.

1 Defendants' Fifth and Sixth Amendment rights.

2      **D.**    **The Government Has the Heavy Burden of Proving No**

3           **Prejudice.**

4      To determine whether the government's review of privileged material results

5 in a violation of Defendants' Constitutional rights, courts apply a burden-shifting

6 analysis. *First*, a defendant must make a *prima facie* showing that the government

7 intentionally reviewed privileged material. *Danielson*, 325 F.3d at 1071. *Second*,

8 "[o]nce the prima facie case has been established, 'the burden shifts to the

9 government to show that there has been . . . no prejudice to the defendant[] as a

10 result.'" *Id.*

11         **1.**    **Defendants Have Made a *Prima Facie* Showing Under**

12            ***Danielson*.**

13      To make a *prima facie* showing that the government intentionally reviewed

14 privileged material, "the government informant must have acted affirmatively to

15 intrude into the attorney-client relationship and thereby to obtain the privileged

16 information." *Danielson*, 325 F.3d at 1071. As explained above (*see supra* 15-

17 17), there is no question that the Informant acted affirmatively to intrude into

18 attorney-client relationships. There is also no question that the Informant did so

19 with the government's knowledge of his pattern of conduct, even if not at its

20 explicit request. *See United States v. Marshank*, 777 F. Supp. 1507, 1530 n.17

21 (N.D. Cal. 1991) ("In determining if government actions are sufficiently egregious

22 to warrant dismissal … *courts have looked to whether there is a pattern of similar*

23 *government misconduct*.") (Emphasis added). *See also United States v. Walther*,

24 652 F.2d 788, 793 (9th Cir. 1981) (explaining that the government "knew or

25 should have known that [the informant] had made it a practice to inspect [luggage],

26 and had acquiesced in that practice"). As a result, the government's privilege

27 invasions were "neither accidental nor unavoidable." *Danielson*, 325 F.3d at 1059.

28      Indeed, this is not a case where the government passively received

Case No. 18-CR-4683-GPC

privileged information that it could not have anticipated.  Nor is this a case where the Informant obtained trial strategy information that it never passed on to the government.  *See Danielson*, 325 F.3d at 1068 (distinguishing a case where the Court found that, "[a]t no time did [the informant] discuss with or pass on to [the government] any details or information regarding … trial plans, strategy, or anything having to do with the criminal action") (citation omitted).  Rather, the Informant reported regularly and extensively to Agent Chabalko over a four-year period, sharing what an attorney "***seem[ed] worried about***" with no reprimand whatsoever.  Ex. 10 (emphasis added).  And, even after sending the September 2021 emails containing Brower's and defense counsel's search terms, the government ***still*** waited another month, until October 18, 2021, to tell him to stop. *See* Exs. 4 & 5; Chabalko Decl. ¶ 11.  Thus, the facts plainly show that the "informant … acted affirmatively to intrude into the attorney-client relationship" and obtained privileged information. *Danielson*, 325 F.3d at 1071.

### 2. The Government Cannot Meet its Heavy Burden of Showing No Prejudice On the Papers.

In light of these deliberate invasions of the defense camp, the burden shifts to the government to show that Defendants were not prejudiced.  *Danielson*, 325 F.3d at 1071.  Where, as here, the government has obtained trial strategy information, "the question of prejudice is more subtle." *Id.* at 1070.  Because "it will often be unclear whether, and how … improperly obtained information … may have been used," the *Kastigar* analysis applies to both "direct and indirect use" of wrongly obtained information, and the government must show that "all of its pre-trial and trial strategy was based on independent sources." *Id.* at 1070-1074 (explaining that the burden "is not limited to a negation of taint") (quoting *Kastigar v. United States*, 406 U.S. 441, 460 (1972)).  This is a "heavy burden," and "the mere assertion by the government of the integrity and good faith of the prosecuting authorities is not enough." *Danielson*, 325 F.3d at 1072 (internal

quotation marks omitted).  Instead, "the government must introduce evidence and show by a preponderance of evidence that it did not use … privileged information." *Id.* at 1074.

Here, the prosecutors who will try this case, and the agents who investigated it, have for several years had insight into how various attorneys have been thinking about the charges, both before and after the Indictment was filed.  This raises questions about whether, in the pre-indictment period, the government may have considered any of that information in "interpreting evidence," deciding to "focus[] the investigation" on certain witnesses, or even "deciding to initiate the prosecution" in the first place.  *Danielson*, 325 F.3d at 1072.  It likewise raises questions about how the government may make certain decisions about its trial strategy after seeing which terms defense counsel decided to search in the ROKSO database—for example, "about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case in chief, and what to save for possible rebuttal."  *Id.* at 1074.

In sum, the SS's affirmative misconduct, and the government's years-long acquiescence in it, pervades this case to such an extent that no evidentiary hearing is needed.  But if the government can somehow show on the papers that "all of its pre-trial and trial strategy" is not tainted by its violations of Defendants' constitutional rights, then at a minimum, the Court should order an evidentiary hearing where the government is put to its "heavy burden" of proof.  *Danielson*, 325 F.3d at 1074 (remanding to "hold an evidentiary hearing at which this standard can be applied").  The government's untested statements in declarations from Agent Chabalko and the prosecution team are insufficient to meet this burden.  *See*, *e.g.*, *Marshank*, 777 F. Supp. at 1511–12 (ordering dismissal for privilege violation, after making findings of fact based, in part, on "testimony presented at [an evidentiary] hearing"); *see also In re Grand Jury Subpoenas*, 454 F.3d 511, 517 (6th Cir. 2006) ("[T]he leaking of privileged materials to investigators would

1   raise the spectre of *Kastigar*-like evidentiary hearings.").

2       **E.    Dismissal is the Appropriate Remedy for the Government's**

3       **Misconduct.**

4         A district court may dismiss an indictment under its inherent supervisory

5   powers "(1) to implement a remedy for the violation of a recognized statutory or

6   constitutional right; (2) to preserve judicial integrity by ensuring that a conviction

7   rests on appropriate considerations validly before a jury; and (3) to deter future

8   illegal conduct." *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020); *see*

9   *also United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) (same);

10  *United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979) (same).

11        Case law in this Circuit supports dismissal for a constitutional violation

12  based on privilege invasions. *See, e.g.*, *Marshank*, 777 F. Supp. at 1521–22

13  (dismissing indictment under court's supervisory powers, explaining that the

14  "prejudice from the constitutional violation cannot be remedied by suppression of

15  the evidence" because "the taint of the [privilege violations] infected every part" of

16  the case); *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1206-1210 (C.D. Cal.

17  2011) (dismissing indictment under the court's supervisory powers based on

18  government misconduct, including "improperly obtaining attorney-client

19  privileged communications," in the hope that "this ruling will have a valuable

20  prophylactic effect").

21        Even absent a constitutional violation, the Court may still order dismissal

22  under its supervisory authority to address the government's "flagrant" misbehavior

23  and the substantial prejudice resulting therefrom. *See, e.g.*, *Chapman*, 524 F.3d at

24  1088, 1090 (affirming dismissal of indictment pursuant to court's supervisory

25  power, explaining that the government's conduct "conduct [was] in flagrant

26  disregard of the United States Constitution" and "any lesser sanction would be like

27  endorsing the AUSA's conduct") (alterations omitted); *Samango*, 607 F.2d at 884-

28  885 (finding no constitutional violation, but dismissing indictment, explaining that

1   "the prosecutor's behavior has exceeded the limits of acceptability" and posed "a

2   serious threat to the integrity of the judicial process").

3          The government acts "flagrantly" if its conduct shows "reckless disregard"

4   for its constitutional obligations.  *Chapman*, 524 F.3d at 1085 (explaining that

5   "intentional" conduct is not required).  Here, the government's conduct was neither

6   accidental nor negligent; it was flagrant.  As explained above (*see supra* 6-11, 15-

7   17), the Informant knowingly and repeatedly invaded Defendants' privileges, and

8   he did so with the government's knowledge, even if not at its explicit request.  And

9   even after the Court directed the government to look into these incidents, Agent

10  Chabalko was still not entirely forthcoming about his misconduct and the extent of

11  the Informant's deliberate privilege invasions.  Thus, even if each individual

12  privilege invasion "might [not] have been enough to tip the scales," the

13  "cumulative effect" of the government's "errors and indiscretions" operated to

14  Defendants' prejudice and the indictment should be dismissed.  *Samango*, 607 F.2d

15  at 884; *Aguilar*, 831 F. Supp. 2d at 1205 (considering "the cumulative effect of the

16  [government's] errors and indiscretions") (citation omitted).

17     **F.     Alternatively, the Court Should Preclude Witnesses and**

18             **Evidence.**

19          If the Court somehow finds that the government's conduct is not sufficiently

20  outrageous to warrant dismissal but nonetheless violates Constitutional rights and

21  ethical norms,[12] it should still impose a remedy "tailored to the injury suffered."

22  *United States v. Obagi*, 965 F.3d 993, 1000 (9th Cir. 2020).  Where, as here, the

23  government misconduct involves violations of the attorney-client privilege and

24  work product doctrine, courts have a menu of remedial options.

25

26  _____

27  [12]  *See Harrison*, 213 F.3d at 1215 n.6 ("Because the government's conduct in this
    case greatly disturbs us, we find it worth mentioning that the federal prosecutor

28  may have violated an ethical stricture, as well as a constitutional standard.").

For example, the Court may order the government to "provide the defense with summaries of its witnesses' testimony and lists of its exhibits," "permit the defense to depose the … potential witnesses" exposed to the improperly obtained information, or even "remove the lead prosecutor from the case." *United States v. Horn*, 29 F.3d 754, 759 (1st Cir. 1994).

Likewise, the Court may order suppression of the ill-gotten evidence, as well as any information derived therefrom. *Marshank*, 777 F. Supp. at 1522 (citation omitted); *United States v. Sullivan*, No. CR 17-00401 JMS-KJM, 2020 WL 1815220, at *9-10 (D. Haw. Apr. 9, 2020) (suppressing 473 files obtained by the government, only four of which were privileged, in light of the government's conduct, despite finding that the defendant had not suffered any prejudice); *People v. Joly*, No. 354379, 2021 WL 935704, at *2, *7 (Mich. Ct. App. Mar. 11, 2021), *appeal denied*, 965 N.W.2d 543 (Mich. 2021) (suppressing derivative evidence obtained from a privileged email, explaining that the government "knew that defendant and defendant's attorney were parties to the e-mail," "conducted an investigation based on its contents," and "turned it over to the Prosecutor[.]").

Here, if the Court does not dismiss the indictment entirely, the Court may order the exclusion of all privileged information obtained by the government, and all documentary and testimonial evidence, legal theories, or other governmental work product derived "directly or indirectly" therefrom. *See Danielson*, 325 F.3d at 1072 ("[W]e have interpreted *Kastigar's* prohibition on use to include both direct and indirect use. For example, information derived from compelled testimony may not be used in providing 'assistance in focusing the investigation, deciding to initiate the prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy.'" (citation omitted)).

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court

1   hold a *Kastigar*/*Danielson* hearing to put the government to its burden of proof and

2   then determine the appropriate remedy.  And, given the government's repeated

3   misconduct and wrongful interference with Defendants' right to counsel, Agent

4   Chabalko's failure to be forthcoming in his sworn declarations, and Defendants'

5   inability to fully develop the record of misconduct, Defendants respectfully submit

6   that the remedy should be dismissal.

7

8                           Respectfully submitted,

9   Dated:  February 18, 2022          **BIRD, MARELLA, BOXER, WOLPERT,**
                                       **NESSIM, DROOKS, LINCENBERG &**
10                                      **RHOW, P.C.**

11                                      By:   *s/ Gary S. Lincenberg*
                                             Gary S. Lincenberg
12                                           Nicole Rodriguez Van Dyk
                                             Darren L. Patrick
13                                           Alexis A. Wiseley
                                             *Attorneys for Petr Pacas*
14

15  Dated:  February 18, 2022          **WIECHERT, MUNK & GOLDSTEIN, PC**

16                                      By:   *s/ Jessica C. Munk*
                                             Jessica C. Munk
17                                           David W. Wiechert
                                             *Attorneys for Jacob Bychak*
18

19  Dated:  February 18, 2022          **BIENERT KATZMAN**
                                       **LITTRELL WILLIAMS LLP**
20
                                        By:   *s/ Whitney Z. Bernstein*
21                                           Whitney Z. Bernstein
                                             Thomas H. Bienert, Jr.
22                                           James D. Riddet
                                             Carlos A. Nevarez
23                                           *Attorneys for Mohammed Abdul Qayyum*

24  Dated:  February 18, 2022          **MINTZ, LEVIN, COHN, FERRIS,**
25                                      **GLOVSKY AND POPEO, P.C.**

26                                      By:   *s/ Randy K. Jones*
                                             Randy K. Jones
27                                           Daniel J. Goodrich (Pro Hac)
                                             Ryan Dougherty (Pro Hac)
28                                           *Attorneys for Mark Manoogian*

1

2

3

## **CERTIFICATION OF AUTHORIZATION TO SIGN SIGNATURE**

4        The undersigned counsel of record for Defendant Petr Pacas certifies that the

5 content of this document is acceptable to each of the Defendants' counsel whose

6 electronic signature appears thereon, and that I have obtained their authorization to

7 sign this document on their behalf.

8

9                               *s/    Alexis A. Wiseley*

10                                   Alexis A. Wiseley

3771542.1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 18-CR-4683-GPC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS