**WIECHERT, MUNK & GOLDSTEIN, PC**
David W. Wiechert, SBN 94607
Jessica C. Munk, SBN 238832
Jahnavi Goldstein, SBN 245084
27136 Paseo Espada, Suite B1123
San Juan Capistrano, CA 92675
Telephone: (949) 361-2822
Email: dwiechert@wmgattorneys.com
        jessica@wmgattorneys.com
        jahnavi@wmgattorneys.com

*Attorneys for Jacob Bychak*

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKYAND POPEO, P.C.**
Randy K. Jones, SBN 141711
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Telephone: (858) 314-1510
Email: rkjones@mintz.com

Daniel J. Goodrich, BBO 692624 (Pro Hac)
Ryan Dougherty, BBO 703380 (Pro Hac)
1 Financial Center
Boston, MA 02111
djgoodrich@mintz.com
rtdougherty@mintz.com

*Attorney for Mark Manoogian*

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
Thomas H. Bienert, Jr., SBN 135311
James D. Riddet, SBN 39826
Whitney Z. Bernstein, SBN 304917
Carlos A. Nevarez, SBN 324407
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Email: tbienert@bklwlaw.com
        jriddet@bklwlaw.com
        wbernstein@bklwlaw.com
        cnevarez@bklwlaw.com

*Attorneys for Mohammed Abdul Qayyum*

**BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG RHOW P.C.**
Gary S. Lincenberg, SBN 123058
Alexis A. Wiseley, SBN 330100
Darren L. Patrick, SBN 310727
1875 Century Park East, Floor 23
Los Angeles, CA 90067
Telephone: (310) 201-2100
Email: glincenberg@birdmarella.com
        awiseley@birdmarella.com
        dpatrick@birdmarella.com

*Attorneys for Petr Pacas*

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JACOB BYCHAK, et al.,

      Defendants.

Case No. 18-CR-4683-GPC
Honorable Gonzalo P. Curiel

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO
SUPPRESS AND DISMISS UNDER THE
FOURTH AMENDMENT AND
REQUEST FOR EVIDENTIARY
HEARING**

[Declarations of Jacob Bychak; Mark
Manoogian; Mohammed Abdul Qayyum;
Petr Pacas; and <u>Under Seal</u> Declaration of
Jessica C. Munk and attached <u>Under Seal</u>
Exhibits filed concurrently herewith]

Hearing Date: April 1, 2022
Hearing Time: 2:30 p.m.
Department:    Courtroom 2D

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................. 1

II.   FACTUAL BACKGROUND .............................................. 1

    A.    Defendants' Employment at Company A and B, and Their
        Reasonable Expectation of Privacy ................................ 1

    B.    CY's Employment at Company A and B and Theft of Documents
        and Information ............................................................. 3

    C.    Background of Spamhaus and Its Agent the SI ................. 5

        1.    Spamhaus' History of Cooperating with the Government ........ 5

        2.    SI's History of Working with the Government ................. 6

        3.    SI's Direction and Assistance to the Government In This
            Case ..................................................................... 6

            a.    SI's Communications with the Government and
                Sharing of Information and Documents From CY .................... 7

            b.    The SI Worked Closely and Continuously with the
                Government from the Outset of this Investigation ................... 9

            c.    The SI Shares with the FBI Purloined Documents,
                 Including Privileged Material .................................. 11

III.  PROCEDURAL HISTORY ............................................. 13

IV.   LEGAL ARGUMENT ................................................... 14

    A.    Due to Spamhaus and the SI's Collaboration with the Government,
        the Provision of Documents and Information Purloined By CY
        Involved State Action ................................................... 14

        1.    Whether The Government Knew of or Acquiesced In the Intrusive
            Conduct ............................................................... 15

        2.    Whether the Party Performing the Search Intended to Assist Law
            Enforcement Efforts or Further His Own Ends ................... 17

B.     CY's Theft of Information and Documents Implicates the Fourth Amendment and the Defendants Have Standing to Challenge the Search.................................................................................................... 19

      1.     Defendants Had a Subjective Expectation of Privacy In Their Company Email ........................................................................... 20

      2.     Defendants' Expectation of Privacy In Their Company Email was Objectively Reasonable .......................................... 22

C.     The Court Should Suppress and Dismiss Under the Fourth Amendment, or Alternatively Hold an Evidentiary Hearing to Determine the Relationship Between CY and Spamhaus and the SI, As Well As the Relationship Between the Government and the SI, and a *Kastigar* Hearing to Determine the Appropriate Remedy .................. 23

V.     CONCLUSION ........................................................................ 24

**Cases**

*Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912 (9th Cir. 2001) .......................................................................................................... 17

*Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ........................................ 20

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ........................................ 14

*Frazer v. United States,* 18 F.3d 778 (9th Cir.1994) ..................................... 23

*Guest v. Leis*, 255 F.3d 325 (6th Cir. 2001) ................................................. 20

*Kastigar v. United States*, 406 U.S. 441 (1972) ............................................ 24

*Katz v. United States*, 309 U.S. 347 (1967) .................................................. 20

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ....................................... 16

*Lustig v. United States*, 338 U.S. 74 (1949) ................................................. 15

*O'Connor v. Ortega*, 480 U.S. 709 (1987) .................................................... 22

*Quon v. Arch Wireless Operating Co., Inc.*, 309 F. Supp. 2d 1204 (C.D. Cal. 2004) .......................................................................................................... 20

*Riley v. California*, 573 U.S. 373 (2014) ...................................................... 20

*Smith v. Maryland*, 442 U.S. 735 (1979) ....................................... 19, 20, 21

*United States v. Ageyev*, 2019 WL 8989871 (E.D. Wash. September 20, 2019) .......................................................................................................... 19

*United States v. Babichenko*, No. 1:18-cr-00258, 2020 WL 4043143 (D. Idaho July 16, 2020) ................................................................................. 20

*United States v. Burrows*, 872 F.2d 915 (9th Cir.1989) ................................ 23

*United States v. Caputo*, No. 3:18-cr-00428-IM, 2019 WL 5788305 (D. Or. Nov. 6, 2019) ....................................................................................... 21, 22

*United States v. Chavez-Miranda*, 306 F.3d 973 (9th Cir. 2002) ................... 23

*United States v. Chukwubike*, 956 F.2d 209 (9th Cir. 1992) ........................ 17

*United States v. Cleaveland*, 38 F.3d 1092 (9th Cir. 1994) ............................... 15

*United States v. Greiner*, 235 F. App'x 541 (9th Cir. 2007).......................... 22

*United States v. Heckenkamp*, 482 F.3d 1142 (9th Cir. 2007) ........................ 22

*United States v. Jacobsen*, 466 U.S. 109 (1984) ............................................. 20

*United States v. Keith*, 908 F. Supp. 2d 33 (D.Mass. 2013)........................... 19

*United States v. Meregildo*, 920 F. Supp. 2d 434 (S.D.N.Y. 2013) ................ 18

*United States v. Reed*, 15 F.3d 928 (9th Cir. 1994)............................. 15, 16, 17

*United States v. Slayer*, No. S-10-061 LKK, 2012 WL 458472 (E.D. Cal. Feb. 10, 2012) ............................................................................................. 20

*United States v. Walther*, 652 F.2d 788 (9th Cir. 1981)................................. 16

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) .............................. 20

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) .............................. 20

*United States v. Ziegler*, 474 F.3d 1184 (9th Cir. 2007) .......................... 16, 21

*USA v. Bohannon*, 506 F. Supp. 3d 907 (N.D. Cal. 2020) ............................ 19

## **Other Authorities**

Department of Justice, Bugat Botnet Administrator Arrested and Malware Disabled (October 13, 2015), https://www.justice.gov/opa/pr/bugat-botnet-administrator-arrested-and-malware-disabled (specifically identifying Spamhaus as a partner in the FBI's investigation) ...................... 5

Elinor Mills, Q&A: FBI agent looks back on time posing as a cybercriminal, CNET Tech (June 29, 2009), https://www.cnet.com/tech/services-and-software/q-a-fbi-agent-looks-back-on-time-posing-as-a-cybercriminal/ ...................... 5

FBI, Operation Ghost Click, November 9, 2011, https://www.fbi.gov/news/stories/international-cyber-ring-that-infected-millions-of-computers dismantled ........................................................................................................ 5

FBI, Testimony to House Committee on Small Business Regulatory Reform and Oversight Subcommittee, https://archives.fbi.gov/archives/news/testimony/small-business-cyber-security ........................................................................................................ 5

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

https://www.spamhaus.org/organization/ (last visited February 10, 2022)..........................5

https://en.wikipedia.org/wiki/Steve_Linford. On February 23, 2015 .................................9

https://www.ncfta.net/ (last visited Feb. 15, 2022) ..........................................................10

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Spamhaus Project ("Spamhaus") is an international organization that touts itself as a member of the "Law Enforcement task force" that "works closely" with the FBI and other law enforcement agencies to combat cyber-crime. For more than a decade, Spamhaus has partnered with the FBI in criminal investigations, and the FBI credits Spamhaus as one of its "private sector partners" in prosecuting criminal cases. The Spamhaus Informant ("SI") has advised and directed the government's investigation and prosecution of the Defendants from the outset. Given their extensive relationship with the FBI, Spamhaus and the SI function far more like state actors than private individuals. Indeed, this case is rooted in information provided by the SI to the FBI. At its inception, the SI notified Special Agent Chabalko that he was receiving "tons of information" from a Company A insider, believed to be CY, putting the government on notice that the information the SI relayed may be tainted. In fact, it was tainted because the SI was receiving stolen information and documents from CY, which included the Defendants' confidential emails. The Fourth Amendment is violated when a state actor conducts an unreasonable search or seizure, or when a private actor engages in such conduct with the government's knowledge and acquiescence. Spamhaus and the SI are state actors because the government encouraged their illicit relationship with CY. The fruits of that union should be suppressed under the Fourth Amendment, warranting dismissal of this case. In the alternative, the Court should hold an evidentiary hearing to confirm the Fourth Amendment violation, and then a *Kastigar* hearing to determine the tainted leads and evidence that flowed from the Fourth Amendment violation.

## II. FACTUAL BACKGROUND

### A. Defendants' Employment at Company A and B, and Their Reasonable Expectation of Privacy

Defendants Jacob Bychak, Mark Manoogian, Mohammed Abdul Qayyum and Petr

Pacas (collectively, "Defendants") are former and current employees of Company A.[1] The allegations in the Indictment are for conduct that allegedly occurred between December 2010 through September 2014. Dkt. No. 1. The following addresses each defendant seriatim.

On April 5, 2010, Jacob Bychak was hired by Company A as a marketing analyst. Declaration of Jacob Bychak ("Bychak Decl.") at ¶ 1. Mr. Bychak later moved to the Operations team. *Id.* at ¶ 2. In June through September of 2011, the date of some of the purloined emails by CY, Jacob Bychak was Company A's Business Operations Manager. *Id.* Between 2011 to 2014, during Mr. Bychak's employment at Company A he was issued a laptop and a company email address. *Id.* at ¶ 3. He had a password to login to his laptop and a password to login to his email address. *Id.* He took his laptop home almost every evening and if he left it at his office, it was locked in his desk drawer. *Id.* at ¶ 4. Mr. Bychak used his laptop for work and personal use and occasionally used his company email address for non-company related emails. *Id.* at ¶ 5. During this time, Mr. Bychak was not aware of any policy in place that they monitored company email. *Id.* at ¶ 6. Based on these facts, Mr. Bychak had an expectation of privacy in his email address with Company A. *Id.* at ¶ 7.

Mark Manoogian was hired by Company A in October 2011 as a Business Development Manager. Declaration of Mark Manoogian ("Manoogian Decl.") at ¶ 1. He held this position through late 2014. *Id.* at ¶ 2. Mr. Manoogian was issued a company laptop and email address and he set separate passwords for his laptop and email that to his knowledge the company did not have access to. *Id.* at ¶ 3. Mr. Manoogian took his laptop home almost every night or kept it locked in his desk if it was left at the office. *Id.* at ¶ 4. He occasionally used his laptop for personal uses and his company email address for non-company related emails. *Id.* at ¶ 5. To his knowledge, he was not aware of any company policy to monitor his company email. *Id.* at ¶ 6. Based on these facts, Mr. Manoogian had

---

[1] Company A had two prior predecessor companies for which Defendants worked. For ease, this motion will refer to these predecessor companies as Company A.

an expectation of privacy in his email address with Company A. *Id.* at ¶ 7.

Between 2011 to 2013, Mohammed Abdul Qayyum was an employee of Company A. Declaration of Mohammed Abdul Qayyum ("Qayyum Decl.") at ¶ 2. He was issued a laptop and company email address from Company A. Mr. Qayyum had a password to log into his laptop and a separate password to log into his email. *Id.* at ¶¶ 2-3. Mr. Qayyum was not aware of any company policy that permitted Company A to monitor his email and Company A did not have his passwords. *Id.* at ¶ 5. Mr. Qayyum almost always had his laptop in his possession. *Id.* at ¶ 4. Based on these facts, Mr. Qayyum had an expectation of privacy in his email address with Company A. *Id.* at ¶ 6.

Lastly, in October 2006, Petr Pacas was hired by Company A as an employee. Declaration of Petr Pacas ("Pacas Decl.") at ¶ 2. In January 2009, Mr. Pacas rejoined Company A as a Director of Business Management. *Id.* at ¶ 3. In early 2011, Mr. Pacas was promoted to Director of Operations. *Id.* at ¶ 4. In May of 2011, Mr. Pacas left Company A and went to work for Company B[2] as VP of Operations until the company was purchased by Company A in September 2013, when he returned to Company A as VP of Operations. *Id.* at ¶¶ 5-6. While employed by Company A and B, Mr. Pacas was given a laptop and company email address, which he protected by passwords that were not shared with anyone. *Id.* at ¶¶ 7-10. Mr. Pacas was unaware of any policy at either Company A or Company B indicating that it monitored his email account or laptop computer, nor did he believe that Company A or Company B had the technical ability to do so. *Id.* at ¶¶ 8, 10. Further, Mr. Pacas always took his Company A and Company B laptop home at night, and when he traveled. *Id.* Based on these facts, Mr. Pacas believed his Company A and B email accounts and laptop computers were private and that no one could access their contents. *Id.* at ¶ 11.

**B.  CY's Employment at Company A and B and Theft of Documents and Information**

---

[2] Company B was a separate company from Company A, but was partially owned by Company A's former CEO Kim Perell.

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

For a period of time in 2011, CY worked at Company A. <u>Under Seal</u> Declaration of Jessica C. Munk ("Munk Decl.") at ¶ 2. On January 1, 2012, CY began employment at Company B. Munk Decl. at ¶ 3, Ex. 1.[3] CY was Company B's Chief Technology Officer. *Id.* at ¶ 1. CY's employment agreement with Company B, prohibited the taking of documents and other information from Company B[4] and specifically provided:

> You shall, during and after the Term hereof, keep in confidence and shall not use for you or others, other than in connection with the business or affairs of the Company, or divulge to others, any secret or confidential information, knowledge or data of the Company or of any clients of the Company obtained by you as a result of your engagement hereunder unless authorized by Company or required by law. The covenants set forth in this Paragraph shall survive the termination of this Agreement and termination of your employment.

*Id.* at ¶ 16. CY's employment agreement also included a Confidentiality Agreement that prohibited the disclosure of confidential information to any third party. *Id.* at Ex. A, ¶ 2, pp. 3294-95.

As early as September of 2013, according to the SI, CY began sharing "tons of information" about Company A and Defendants with Spamhaus and the SI. Ex. 19. It has been determined that CY purloined at least eleven emails from Company A and B and gave them to the SI, who in turn, gave them to the FBI. *See* Exs. 2-12. The defense determined that CY provided these internal emails to SI who provided them to the FBI. *See* Dkt. No. 283-1, Declaration of AUSA Melanie Pierson ("Pierson Decl.") at ¶¶ 3-4. Rather, the government appears to dispute the significance these emails had on its investigation and Indictment of this case. However, based on the SI's early communications with the government, the SI made it clear to the FBI that he was receiving "tons of information" from a Company A insider believed to be CY, and as established *infra*, this was the same time the SI laid out this case for the government,

---

[3] All Exhibits are submitted <u>under seal</u> as attachments to the <u>under seal</u> Munk Decl.

[4] It is believed that Company A had a similar agreement with CY, but counsel for Company A has notified the defense they cannot locate this agreement. Munk Decl. at ¶ 3.

which appears to be based on information CY took from his employment at Company A and B.

## C. Background of Spamhaus and Its Agent the SI

### 1. *Spamhaus' History of Cooperating with the Government*

Spamhaus was founded in 1998. Spamhaus touts itself as a member of the "Law Enforcement task force" that "works closely" with law enforcement agencies such as the FBI to "assist[] investigations into spam senders, phishing, botnets and malware operations, and compil[e] . . . evidence on spam gangs and spam operations."[5] In 2006, the FBI's then Assistant Deputy of the Cyber Division testified before Congress that the FBI planned "to combat the growing threat of cyber-crime" alongside the "Spamhaus Project" and other organizations.[6]

Spamhaus has historically undertaken significant investigative duties and key roles in FBI investigations. For example, in 2008, Spamhaus "made a listing for [an undercover FBI agent] as being a top spammer" in order to bolster the FBI agent's credibility in a sting operation that led to the arrest of individuals associated with the "DarkMarket."[7] In 2011, in connection with the arrest of individuals allegedly associated with a "cyber ring," the FBI credited Spamhaus as one of its "private sector partners."[8] And, in 2015, Spamhaus again "partner[ed]" with the FBI to bring various charges, including wire fraud, against a defendant.[9] Consistent with this pattern, the FBI in this case has acknowledged

---

[5] Spamhaus, About Spamhaus, https://www.spamhaus.org/organization/ (last visited February 10, 2022).

[6] *See* FBI, Testimony to House Committee on Small Business Regulatory Reform and Oversight Subcommittee, https://archives.fbi.gov/archives/news/testimony /small-business-cyber-security.

[7] *See* Elinor Mills, Q&A: FBI agent looks back on time posing as a cybercriminal, CNET Tech (June 29, 2009), https://www.cnet.com/tech/services-and-software/q-a-fbi-agent-looks-back-on-time-posing-as-a-cybercriminal/.

[8] *See* FBI, Operation Ghost Click, November 9, 2011, https://www.fbi.gov/news/ stories/international-cyber-ring-that-infected-millions-of-computers-dismantled.

[9] Department of Justice, Bugat Botnet Administrator Arrested and Malware Disabled (October 13, 2015), https://www.justice.gov/opa/pr/bugat-botnet-administrator-arrested-and-malware-disabled (specifically identifying Spamhaus as a partner in the FBI's investigation).

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

that Spamhaus "*works with law enforcement to identify and pursue spammers worldwide*." Ex. 20 at p. 1011 (emphasis added).

### 2. SI's History of Working with the Government

The SI in this case has been employed by Spamhaus since 1995. *Id.* SI on numerous occasions has acted as a government informant to the FBI, and along with this case, is currently a Confidential Human Source (CHS) "for another field office of the FBI." Dkt. No. 316-1, Declaration of Special Agent Charles Chabalko ("Chabalko Decl.") at ¶ 13. The government has also made numerous representations to the Court that the SI is cooperating and acting as an informant in other matters. Ex. 13 at 8:24-9:3; Ex. 14 at 7:22-8:1, 31:15-17.

### 3. SI's Direction and Assistance to the Government In This Case

In 2013, the SI approached the Baltimore FBI with information about allegedly "hijacked" IP addresses, identifying Company A as a target for the FBI's investigation and recommending the FBI bring charges under the CAN-SPAM Act. Ex. 15. The FBI's 302 Report referred to the SI as "S-00091118." *Id.* at p. 980.

On July 15, 2013, the SI sent the FBI a report identifying alleged hijacked netblocks by Company A, many of which are charged in the Indictment. Ex. 16 at pp. 982, 984.

In September 2013, the SI began receiving "a ton of information" from an anonymous informant believed by the SI to be CY. Ex. 19 at p. 3284.

On October 18, 2013, the SI emailed the FBI a spreadsheet containing a list of alleged "hijacked IP blocks." Ex. 17.

In February 2014, the Baltimore FBI Field Office referred this investigation to the San Diego FBI Field Office after the SI indicated the targets of the investigation were located in San Diego. *See* Dkt. No. 316-1, Chabalko Decl. at ¶ 2.

Over the following years, the SI continued to help the government build its case, supplying the FBI with information about Company A and Defendants, and helping to facilitate the government's access to witnesses and evidence.

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

a. <u>SI's Communications with the Government and Sharing of Information and Documents From CY</u>

Shortly after this investigation was transferred to San Diego, and before the FBI collected any "objective" evidence, the SI disclosed to the FBI that he was receiving a "***ton of information***" from an insider from Company A since September 2013, whom he believed to be CY. *See* Ex. 19 (emphasis added).

On May 16, 2014,[10] Special Agent Charles Chabalko ("Chabalko") emailed the SI with his contact information and wrote: "[p]er our telephone conversation, … please send me any new information you have and I will contact you early next week … to discuss the case." Ex. 18 at p. 3280. That same day the SI replied to Chabalko and gave him access to Spamhaus' Law Enforcement Portal to search through their classified information. The SI also informed Chabalko that "[t]he guy at [Company A] that is arranging all the hijacks is ***Mark Manoogian … [i]f you can subpoena [him] you will find a goldmine of info***." *Id.* at pp. 3279-80 (emphasis added).

On May, 22, 2014, the SI emailed Chabalko that he has "***an anonymous informant sending us a ton of info since September 2013*** … ***[h]e knows*** all the people we'll be talking about and ***everything about [Company A's] operations*** … ***[h]e would be a goldmine of information***[,]" and stated he believed the informant was CY. Ex. 19 at p. 3284 (emphasis added). Chabalko encouraged the SI to facilitate the government's access to CY, explaining that "[t]his would be ***vital to our investigation***" and asking, "***would he be willing to meet with us?***" *Id.* at p. 3283 (emphasis added). The SI inquired how to tell this "'anonymous' guy that there is an FBI investigation … [w]ithout tipping everyone off" and Chabalko recommended, "[t]here are things we can do … "***[b]etter to have those discussions in person***." *Id.* (emphasis added).

On June 2, 2014, Chabalko interviewed the SI, who laid out this case for the

---

[10] This is the first email between the SI and Agent Chabalko that the government has disclosed to the defense. Munk Decl., at ¶ 20.

government. Ex. 20. According to the 302 Report, ***Spamhaus "works with law enforcement to identify and pursue spammers worldwide***." Ex. 20 at p. 1011 (emphasis added). The SI explained Company A's need for IP addresses and advised on the American Registry for Internet Numbers ("ARIN") and pre-ARIN netblocks. *Id.* The SI provided a list of IPs alleged to be hijacked by Company A, including many that have been indicted in this case. *Id.* at pp. 1014-1015. The SI again discussed his anonymous informant he believed was CY and indicated "[t]his individual has ***intimate knowledge of [Company A's] operations and of the hijacking of IPs*** … [and] ***[t]his [informant] has provided information that only a former employee would know***." *Id.* at p. 1016 (emphasis added). During this interview, the SI provided the FBI with "numerous documents," including a dossier of the individuals allegedly involved in this hijacking scheme. *Id.* at 1017; Ex. 21.[11] It is clear the SI began sharing with the government information from CY ***before*** the FBI had collected any "objective" evidence to build its case.

On June 3, 2014, Chabalko emailed the anonymous informant, using an alias "Jon Doe" with the email address, "therealspmrsofoc@gmail.com," to see if he was interested in working with the FBI. Ex. 22. The informant inquired how the FBI would maintain his confidentiality and Chabalko asked to speak with him over the phone or meet in person. Ex. 22.[12] On June 4, 2014, the SI emailed Chabalko that "this anonymous guy REALLY wants to see [Company A] and the others exposed." Ex. 23.

On June 7, 2014, the SI emailed Chabalko ***"[CY] is willing to talk"*** and assuring him that he "[d]oes not know anything except ***one of our partners*** is looking into [Company A]." Ex. 24 (emphasis added).

On June 11, 2014, the anonymous informant responded to Chabalko's June 4 email,

---

[11] The dossier that the SI provided to the government in June 2014 was not produced to the defense until August 6, 2021 in response to Defendants' Motion to Compel Discovery. The dossier did not mention Defendants Bychak or Qayyum. Munk Decl., at ¶ 23.

[12] Although this email correspondence was in June of 2014, Chabalko did not draft the 302 Report until August 3, 2021.

and again inquired into how the FBI would protect his identity, providing "[i]f you want to *send me questions via email like Spamhaus does, they can probably vouch that I help out with the things they need specifically*." Ex. 22 at p. 1780 (emphasis added).

On November 30, 2014, the SI sent Chabalko additional information about Company A and Defendants. Ex. 25.

Based on information from the SI, on December 23, 2014, the FBI issued its first search warrant for Mark Manoogian's Company A email account, as initially advised by the SI. This initial warrant was *after the FBI had received information from CY through the SI*. Ex. 26. In the search warrant, Chabalko explained the case background and technical aspects of netblocks "[a]ccording to information provided by [the SI]." *Id.* at p. 108.

      b.   <u>The SI Worked Closely and Continuously with the Government from the Outset of this Investigation</u>

From the outset of this investigation, the SI has worked closely with the FBI and Agent Chabalko to pursue and direct the government's investigation, and has continuously provided the FBI with needed resources. Since the SI's first written communication with Chabalko, the SI gave the FBI access to their Law Enforcement ("LE") Portal to search through "classified information." Ex. 18 at p. 3279. On June 4, 2014, the SI sent Chabalko passwords to their LE Portal so he can search Spamhaus' "SBL and ROKSO database (including classified records) for things related to this or any other case…" Ex. 23.

In January of 2015, the government met with the SI, other members of Spamhaus, along with Steve Linford, the founder and CEO of Spamhaus to discuss this investigation. Ex. 27; *see also https://en.wikipedia.org/wiki/Steve_Linford*. On February 23, 2015, Chabalko notified the SI he was locked out of the Spamhaus LE Portal and asked the SI to verify his username and password. Ex. 28. The next day, Chabalko received a list of contacts at ARIN from the SI and Chabalko asked the SI if he can "drop [the SI's] name" and the SI agreed. Ex. 29. Throughout this investigation and before the Indictment, the SI

regularly sent Chabalko information for the FBI to look up on Spamhaus' LE Portal. *See* Exs. 30-32. Chabalko's sworn affidavit provides that he met with the SI in person a second time between January and March of 2015 for the SI to assist him in "identifying DBA's and domain names associated with the IP addresses at issue." Dkt. No. 316-1, Chabalko Decl. at ¶ 3. The defense has not received a 302 Report from this meeting. Munk Decl. at ¶ 35.

On March 24, 2015, Chabalko emailed the SI with assistance in locating the owners of the Sierra and Trinity MicroSystems netblocks, which have both been charged in the Indictment. Ex. 33.

On May 1, 2015, the FBI issued a second search warrant for the email address of Daniel Dye from GetAds who allegedly sold Defendants the hijacked netblocks, along with several email accounts of employees of Company A. This search warrant affidavit was based in part on information from the SI and primarily based on Mark Manoogian's emails that were produced to the government in response to the December 23, 2014 search warrant. Ex. 34.

After the government's second search warrant, the SI continued to work closely with the FBI and assisted and directed the government's investigation. In fact, in May of 2016, Chabalko and the SI presented at a national conference together and openly spoke about this investigation to members of the public. This presentation was not disclosed to the defense until October 29, 2021, and according to government counsel was not discovered by them until preparing to respond to Defendants' supplemental motions for reconsideration and motion to compel discovery related to Spamhaus and the SI. Munk Decl. at ¶ 38, Ex. 35. The conference was held by the National Cyber Forensics and Training Alliance ("NCFTA"), and according to their website, "was established in 2002 as a nonprofit ***partnership between private industry, government, and academia*** … to identify, mitigate and disrupt cyber crime." *See* https://www.ncfta.net/ (last visited Feb. 15, 2022) (emphasis added). In the months leading up to this presentation, the SI emailed Chabalko, "[n]ow we have to figure out ***if we want to talk about the ongoing case***, or just

hijacking in general." Ex. 36. (emphasis added). It was the SI who informed Chabalko "we can't name the company in the presentation." Ex. 37. The joint PowerPoint presentation included the SI's name and email address, along with Chabalko's name on the first slide. The last slide listed the SI's name and email to answer any questions. *Id.* Ex. 35 at pp. 2, 59. The joint presentation discussed this investigation, along with two other investigations. Chabalko's sworn affidavit downplays those in attendance at the conference stating it was "not open to the public" (Dkt. 361-1 at ¶ 3), when in fact private industry and academia were in attendance, which include members of the public. Pursuant to the Court's November 18, 2021 order, on December 3, 2021 the government produced an internal FBI report by Chabalko memorializing his presentation with the SI at the conference. Ex. 38. The Chabalko report indicated there were 100 attendees present and the audience included analysts, executives and employees and staff. *Id.*

After this joint presentation, the SI continued to work hand-in-glove with the government. In December 2016, the SI assisted the government with the IPs, which Chabalko indicated was "a huge help for us", but again there is no 302 Report memorializing this meeting. Ex. 39. In July 2017, the SI told Chabalko he was creating spreadsheets for the hijacked IPs from their spam blocking system. Ex. 40. The SI then advised Chabalko on the scope of the CAN-SPAM Act, the text of that statute, and the penalties, and advised the government to also charge wire fraud. *Id.* at p. 855. In August 2017, the SI emailed Chabalko about Company A's systems and provided, "***I'll be sending a LOT more information soon***." Ex. 41 (emphasis added).

> c. The SI Shares with the FBI Purloined Documents, Including Privileged Material

In addition to the SI sharing information from CY with the government from the outset of this investigation, on September 27, 2017, the SI emailed Chabalko along with two additional FBI agents and stated, "***our informants* … *have sent internal emails*** implicating various people of doing various things. Some of this is ***involved their lawyer***, ***[LG]***." Ex. 42 (emphasis added). The SI asked Chabalko if he "want[ed] ***to see these***

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

*emails*" and for the LG emails, "***does attorney/client privilege prevent you from viewing them?***" *Id.* Chabalko responded he would find out and let him know. Chabalko's sworn affidavit omits any reference to advising the SI that he could send these internal emails. However, it appears Chabalko told the SI he could send them because on October 12, 2017, SI emailed Chabalko a zip file titled "Interesting emails.zip." Ex. 43. Attached to this zip file are the eleven purloined emails from CY. Also on that day, the SI provided Chabalko with updated contact information for CY. Ex. 44. Throughout 2017 and 2018, the SI provided numerous documents and information to Chabalko.

On November 8, 2018, at 10:53 a.m. the SI emailed Chabalko with a zip filed titled "Interesting Emails Fixed.zip" and stated he "converted these files for easier viewing in Windows … [o]ther than that, the actual contents of the files were not edited." Ex. 45. The SI requested a call with Chabalko "to discuss a couple things." *Id.* That same day at 7:16 p.m., the SI again emailed Chabalko with the subject "Re: Interesting emails" and recommended Chabalko "***Read the linda_libel.txt email*** in particular" and then the ***SI told Chabalko the contents of the email, with Company A's counsel, LG***. Ex. 46 (emphasis added).

The government's explanation of receiving the CY purloined documents from the SI and the receipt of privileged emails is inconsistent. AUSA Pierson declared on September 27, 2021 that she was reviewing a zip file containing the eleven emails in September of 2020 and noticed "emails involving an attorney … and asked for a taint review before the items were produced in discovery, to protect any potential attorney client privilege." *See* Dkt. No. 283-1 at ¶ 6. However, Chabalko's declaration indicated that after receiving the "Interesting Emails.zip" file from the SI, with potentially privileged documents, he "emailed the U.S. Attorney's Office for advice … [and] after receiving their advice via email, [he] sealed the attachment, pending a filter team review, and did not review the documents in the zip file[.]" Dkt. No. 316-1, Chabalko Decl. at ¶ 9. Chabalko further stated he received the November 8, 2018 email from the SI with an attached zip file "Interesting Emails Fixed.zip" and believed he may have "noticed that

the sealed zip file 'Interesting Emails.zip' was corrupted, and … requested another copy" from the SI. *Id.* at ¶ 10. Chabalko stated he provided the U.S. Attorney's Office with this zip file. *Id.* What is clear from these inconsistent declarations is that the purloined emails were <u>not sealed for taint review</u> and instead provided to the prosecuting AUSAs for review.

## III.   PROCEDURAL HISTORY

Since the October 31, 2018 Indictment, the defense has filed numerous discovery motions. On March 15, 2019, Defendants moved to compel discovery relating to the SI, suspecting that "the [SI] has essentially acted as an investigative agent for the FBI since 2013." Dkt. 71-1 at 16.

On July 30, 2021, Defendants filed another motion to compel based on newly produced documents showing the SI provided the FBI with purloined internal Company A documents from its informant. Dkt. 257-1. Defendants sought identification of all documents in the government's possession that came from this informant to determine whether the government obtained those documents in violation of the Fourth Amendment. This motion was granted in part. Dkt. 275.

On September 20, 2021, Defendants again moved to compel discovery relating to Spamhaus' history of cooperating with governmental investigations in order to establish that Spamhaus is a state actor. Dkt. 281-1. Defendants also filed a motion for reconsideration of the Court's April 30, 2019 order denying disclosure of the SI's identity based on "newly discovered evidence," including the close and continuous cooperation between the SI and the government and the inadvertent disclosure of the SI's identity by the government. Dkt. 282-1. Prior to the October 4, 2021 hearing, the government produced new documents revealing that the SI had intentionally invaded the defense camp in an attempt to help the government respond to Defendants' motions. At the October 4, 2021 hearing, given this newly produced evidence, the Court ordered supplemental briefing.

After Defendants filed their supplemental briefing, in response the government

disclosed to the defense that the SI presented at a conference with Chabalko a PowerPoint Presentation that involved this case. Munk Decl. at ¶ 38. On November 18, 2021, the Court held a hearing on the supplemental briefing. At that hearing, the Court denied the Defendants' motion for reconsideration to disclose the identity of the SI and to compel discovery regarding the government's cooperation with Spamhaus in other investigations, but ordered an *in camera* hearing with Chabalko "to learn … more about the relationship between the agent and the [SI] so the Court can be more fully informed." Ex. 48 at pp. 67:1-5, 72:8-13. The Court ordered the government to review SI's informant file, and any internal FBI reports referencing Chabalko and Spamhaus, and ordered briefing on the scope of the hearing. *Id.* at pp. 72:12-73:2, 75:8-11, 16. After the parties filed their proposal for the scope of the *in camera* hearing and the government's objection to the hearing, the Court held a telephonic hearing on January 18, 2022, and vacated the *in camera* hearing. The Court ordered Defendants to file their substantive motions and then the Court would consider revisiting whether to have an evidentiary hearing. *Id.*

## IV. LEGAL ARGUMENT

### A. Due to Spamhaus and the SI's Collaboration with the Government, the Provision of Documents and Information Purloined By CY Involved State Action

Spamhaus' and SI's collaboration with the government began long before their introduction of CY to the FBI and has continued long after. In short, both Spamhaus and the SI were state actors at the time that they participated with CY to provide the Department of Justice with stolen documents and information relevant to the Defendants that preceded the filing of the Indictment against them. Under the Fourth Amendment, the conduct of Spamhaus, the SI and CY are attributable to the government when evaluating whether the Defendants have been the subjects of illegal searches and seizures.

The Fourth Amendment protection against unreasonable searches and seizures applies when "a private party acts as an 'instrument or agent' of the state in effecting a search or seizure." *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971). The burden is on the defendant to show the government was involved in a private search. *United States*

*v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir. 1994).

State action is implicated when an individual is acting as a government instrument or agent. *Lustig v. United States*, 338 U.S. 74, 78 (1949) ("[A] search is a search by a federal official if he had a hand in it"). "The general principles for determining whether a private individual is acting as a government instrument or agent for Fourth Amendment purposes have been synthesized into a two-part test." *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994) (internal citation omitted). The test inquires: (1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends. *Id.* (finding that a motel manager's search of the defendant's room was conducted solely to assist narcotics officers, and not to protect motel property, therefore he was a state actor and the search was unlawful).

### 1. Whether The Government Knew of or Acquiesced In the Intrusive Conduct

On May 22, 2014 the FBI learned that the SI had obtained internal Company A information involving Defendants from CY. Ex. 19 at pp. 3283-84. At that point, the government was placed on notice that information provided by the SI might be tainted by information from the illegally obtained documents, resulting in a potential Fourth Amendment violation if the SI (then acting as a state actor on behalf of another state actor, Spamhaus, or the government), continued to convey information it received from CY to the government. Chabalko relied on information he learned from the SI in his affidavit for a search warrant of Defendant Manoogian's emails on December 23, 2014. *See* Ex. 26. Despite the government being on notice that the SI was providing likely tainted information, the government continued to use the SI to liaise with CY, and the SI received additional documents from CY on December 28, 2015, which the SI ultimately passed onto the government. Ex. 47 at pp. 28, 32.

This evidence alone is sufficient to establish a basis to believe the government acquiesced in the SI's unlawful conduct making him a state actor. It also supports at a bare minimum the need for an evidentiary hearing to assess the extent to which the

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

investigation and subsequent indictment was tainted as fruits of an unlawful search.

Here, the facts indicate that the Company A informant, whom the SI believed was CY, and who clearly had employment ties to Company A, was in contact with the SI and agreed to provide information prior to the issuance of the early subpoenas and warrants. The FBI was looped into the SI's plan to gather information from this informant. This situation is not unlike the situation in *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007). In *Ziegler*, the Ninth Circuit upheld the district court's finding that the company's IT employees were "de facto government agents" when they made copies of another employee's hard drive pursuant to an FBI investigation stemming from a tip that the employee had accessed child pornography. *Id.* at 1190.

A search by a civilian that occurs during what amounts to a "joint operation" with officers will be regarded as a police search. *See Lugar v. Edmondson Oil Co*., 457 U.S. 922, 941 (1982) ("[W]e have consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment."). Many of the facts suggest that the government and Spamhaus, and more specifically, Chabalko and the SI were effectively mounting a joint operation, which included the use of CY, although unilateral action by Spamhaus or the SI if a state actor, independent of Chabalko, would be sufficient. Even if Chabalko's conduct doesn't amount to a "joint operation" – there is ample evidence of his knowledge of and acquiescence to effectively "deputize" the SI's actions to circumvent Defendants' Fourth Amendment rights through the use of CY.

Acquiescence alone is enough. *See Reed*, 15 F.3d at 931 (finding Fourth Amendment violation where "[the government] definitely 'knew of and acquiesced' in [informant's] search … and *made no attempt to discourage him*"); *United States v. Walther*, 652 F.2d 788, 793 (9th Cir. 1981) (affirming suppression of evidence obtained in violation of the Fourth Amendment, explaining that "[w]hile the [government] had no prior knowledge that this particular search would be conducted," the informant had conducted such a search in the past and did so "*with no discouragement from the*

*[government]*"). Chabalko's Supplemental Affidavit contains self-serving statements in conflict with plain facts. Chabalko states "neither I nor the FBI have tacitly approved any actions taken by S[I] at S[I]'s own initiative." Dkt. No. 321 at ¶ 3. First, Chabalko cannot speak for the entirety of the FBI. Second, emails between the SI and the government demonstrate that the government made no attempt to discourage the collection of Company A's internal documents and information. In fact, after the SI asked Chabalko whether the attorney/client privilege prevented him from disclosing emails with Company A's lawyer – the SI ended up disclosing those documents to Chabalko, which shows not only did the government <u>not discourage</u> this conduct but approved of and acquiesced in it as Chabalko himself intentionally received potentially privileged emails. Further, Chabalko's claims in his initial declaration that he sealed the privileged emails for a filter team review (Dkt No. 316-1 at ¶ 9), is inconsistent with AUSA Pierson's declaration that in September 2020 she came across this zip file containing emails involving an attorney and *she* referred them for a taint team to review. Dkt. No. 283-1 at ¶ 6. The facts show that Chabalko repeatedly accepted information and/or emails from the SI that Chabalko was fully aware were being obtained by the SI via means to intentionally circumvent the Fourth Amendment (as well as the Fifth and Sixth Amendments). Accordingly, the first factor is clearly established – the government knew of and acquiesced to the SI's unlawful searches conducted via CY.

### 2. Whether the Party Performing the Search Intended to Assist Law Enforcement Efforts or Further His Own Ends

The second factor focuses on the motivation of the private citizen to determine if he was a state actor. The Ninth Circuit has "emphasized that a private searcher must have a legitimate motive other than crime prevention" to keep the conduct out of the gambit of state action. *Reed*, 15 F.3d 928, 932 (9th Cir. 1994) (citing *United States v. Chukwubike*, 956 F.2d 209 (9th Cir. 1992), *cert. denied*, 504 U.S. 945 (1992); *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 924 (9th Cir. 2001). Spamhaus, and specifically the SI was clearly working with the intent to assist law enforcement efforts

and therefore the SI was a state actor when he coordinated with CY to obtain documents in violation of Defendants' Fourth Amendment rights.

The government has argued, without any sworn declaration by the SI, that the SI's self-interested purposes are: (1) a mission to identify spammers and disrupt spamming activities; and (2) to gather information on an affiliate of Company A to defend a defamation lawsuit.

As to the first argument – throughout various briefings and hearings the government has argued that the SI assisted law enforcement to further Spamhaus' own ends because it has a mission to identify spammers and disrupt spamming-related activities. However, this is a joint mission in clear partnership with law enforcement. As previously briefed in Defendants' Supplemental MPA (*see* Dkt. No. 295) and as shown above, the FBI and Spamhaus have worked as partners and collaborators on numerous cases, in addition to this one. Spamhaus touts itself on its website and in publications as a member of the "Law Enforcement Taskforce working closely" with the FBI, which the FBI has also acknowledged; and that Spamhaus shared its resources, expertise, and training with the FBI in this matter and other matters. These actions have made Spamhaus and its employees, including the SI, "core" members of the FBI's investigative team. *United States v. Meregildo*, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013) (individuals who "perform investigative duties" or "make strategic decisions about the prosecution of the case" are "core" members of the prosecution). Therefore, the SI's furtherance of Spamhaus' "mission" does not create a motive independent of assisting law enforcement, as the goals of Spamhaus are the same goals of the government.

In fact, Spamhaus uses law enforcement to succeed in its mission, much like the National Center for Missing and Exploited Children ("NCMEC") uses law enforcement to identify those distributing child pornography and disrupting those activities. Spamhaus, like NCMEC, acts as a government agent or instrument, even though both are not-for-profit organizations rather than government agencies. Courts in the Ninth Circuit have followed the Tenth Circuit's reasoning regarding NCMEC's status as a government agent

or instrument. *See, e.g. United States v. Ageyev*, 2019 WL 8989871 at *1 (E.D. Wash. September 20, 2019); *USA v. Bohannon*, 506 F. Supp. 3d 907, 915-16 (N.D. Cal. 2020). Normally, NCMEC receives a "CyberTip" of suspected child pornography from an internet service provider (ISP). The ISP usually has its own business purposes independent of a criminal investigation such that its search does not implicate the Fourth Amendment.[13] *Ageyev*, 2019 WL 8989871 at *1 (citing *United States v. Keith*, 908 F. Supp. 2d 33, 36 (D.Mass. 2013)). However, if NCMEC goes beyond the ISP's search by viewing data that was not originally viewed by the ISP, NCMEC violates the Fourth Amendment, because it acts as a government agent or instrument searching further than a private party. *See Ageyev*, 2019 WL 8989871 at *1. NCMEC's viewing of information outside of the ISP's original search requires the involvement of the government and a warrant.

As to the second argument – even ignoring the surreptitious nature of the SI's circumvention of discovery rules and court processes to gather information to defend a civil lawsuit – the government has provided no evidence that the SI's search in conjunction with CY would have produced such information. In fact, the emails from the SI to the FBI did not make any mention of a lawsuit with Company A's affiliate.

Spamhaus and the SI's clear goal was and is to assist and/or act as law enforcement with the government, therefore the second factor clearly resolves that the SI was a state actor and improperly utilized CY to circumvent the Fourth Amendment (all of which the government acquiesced to), resulting in an unlawful search justifying suppression.

### B. CY's Theft of Information and Documents Implicates the Fourth Amendment and the Defendants Have Standing to Challenge the Search

Individuals are protected from unreasonable searches by the government under the Fourth Amendment. *See Smith v. Maryland*, 442 U.S. 735, 739 (1979). A "search" is an infringement on an individual's reasonable expectation of privacy. *See United States v.*

---

[13] Further, the user agrees to terms of service when utilizing the ISP, and consent negates a Fourth Amendment violation. Company A and Defendants did not consent to any search in this case.

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

*Jacobsen*, 466 U.S. 109, 113 (1984). An individual bears the burden of showing: (1) a subjective expectation of privacy; and (2) that this expectation was objectively reasonable. *See Smith*, 442 U.S. at 740 (citing *Katz v. United States*, 309 U.S. 347, 361 (1967) (Harlan, J. concurring). This is also the test for standing to challenge a warrantless search of e-mails and other electronic communications. *See id.*; *see also United States v. Slayer*, No. S-10-061 LKK, 2012 WL 458472 at *n.8 (E.D. Cal. Feb. 10, 2012) (an individual has a reasonable expectation of privacy in emails stored remotely on a third-party server, and has standing to challenge a search and seizure under the Fourth Amendment) (citing *United States v. Warshak*, 631 F.3d 266, 283-88 (6th Cir. 2010)).

As Fourth Amendment rights are personal, an individual can only challenge the search of their e-mail accounts, and not the search of others' email accounts. *See United States v. Babichenko*, No. 1:18-cr-00258, 2020 WL 4043143 at *5 (D. Idaho July 16, 2020). Although courts have also recognized that an individual loses a reasonable expectation of privacy "in an e-mail that had already reached its recipient," they may have a reasonable expectation of privacy in one they received.[14] *See Quon v. Arch Wireless Operating Co., Inc.*, 309 F. Supp. 2d 1204, 1211 (C.D. Cal. 2004) (citing *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001)). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Reasonableness generally requires law enforcement to obtain a judicial warrant prior to a search, unless the search falls within an exception to the warrant requirement. *See id.* at 382 (internal citations omitted); *see also United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) (holding "a subscriber enjoys a reasonable expectation of privacy in the contents of emails").

    **1.** ***Defendants Had a Subjective Expectation of Privacy In Their Company Email***

For an individual to demonstrate a subjective expectation of privacy, the

---

[14] Additionally, the California Constitution may afford an individual a reasonable expectation of privacy in confidential communications, including conversations, letters, and text messages. *See id.* at 1210-11.

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

individual's actions must show he sought to "preserve [something] as private." *See United States v. Caputo*, No. 3:18-cr-00428-IM, 2019 WL 5788305 at *3 (D. Or. Nov. 6, 2019) (citing *Smith*, 442 U.S. at 740). In the context of data generated by work computers, the Ninth Circuit has found that a computer password and lock on an office door satisfies a subjective expectation of privacy. *See United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007).[15] *Ziegler* involved images an employee stored on his work computer and presumably did not share with anyone voluntarily. In the context of emails, courts require evidence demonstrating an individual believed his work emails were private. *Caputo*, 2019 WL 5788305 at *3.

Here, of the eleven emails that CY purloined from Company A and B, and provided to the SI who provided them to the government, three of these emails CY does not appear to have received, and without an evidentiary hearing, it is unclear how he stole them. *See* Exs. 2-12. The rest of the emails Defendants received,[16] and Mr. Bychak sent three of the emails that Mr. Qayyum received. The emails range from June 27, 2011 through May 29, 2013, and the two emails taken by CY in 2013 are Company B emails, which Mr. Pacas received. *See id.* Because Defendants were recipients of these emails, they can have an expectation of privacy in them, which they did.

In fact, between 2011 and 2014, the Defendants all set passwords on their Company A and B issued laptops and email addresses, and the company did not have those passwords. Bychak Decl. at ¶ 3; Manoogian Decl. at ¶ 3; Qayyum Decl. at ¶¶ 2-3; Pacas

---

[15] In *Ziegler*, the owner of a company's internet service provider contacted the FBI with a tip that a company employee had accessed child pornography from a work computer. *Id.* at 1185-86. After meeting with the FBI, the company's internet technology (IT) administrator and another IT employee obtained a key to the office containing the computer and made two copies of the computer's hard drive. *Id.* at 1187. The company's corporate counsel then told the FBI that it would voluntarily turn over the computer. *Id.*

[16] While Mr. Manoogian was not a recipient of *these* emails, the defense believes there are other documents and information stolen by CY and given to the SI and ultimately the government, which gives Mr. Manoogian standing to challenge CY's theft of this information.

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

Decl. at ¶¶ 8, 10. Defendants typically kept their laptops with them or had them locked up if they were left at the office. Bychak Decl. at ¶ 4; Manoogian Decl. at ¶ 4; Qayyum Decl. at ¶ 4; Pacas Decl. at ¶¶ 8, 10. Mr. Bychak and Mr. Manoogian used their laptops for work and personal use, and occasionally used their company email for non-company related purposes. Bychak Decl. at ¶ 5; Manoogian Decl. at ¶ 5. Further, Defendants were not aware of any policy at Company A or B pursuant to which the company monitored its employees' email communications. Bychak Decl. at ¶ 6; Manoogian Decl. at ¶ 6; Qayyum Decl. at ¶ 5; Pacas Decl. at ¶¶ 8, 10. Based on these facts, Defendants each had a subjective expectation of privacy in their company emails. Bychak Decl. at ¶ 7; Manoogian Decl. at ¶ 7; Qayyum Decl. at ¶ 6; Pacas Decl. at ¶ 11.

### 2. *Defendants' Expectation of Privacy In Their Company Email was Objectively Reasonable*

Once a subjective belief of privacy in one's emails is demonstrated, the individual must also show that the privacy expectation was objectively reasonable. *United States v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007). To that end, courts generally look to workplace policies such as "actual office practices and procedures" and "legitimate regulation." *Caputo*, 2019 WL 5788305 at *3 (citing *O'Connor v. Ortega*, 480 U.S. 709, 717-18 (1987)). Merely accessing a network or sharing a computer does not render an individual's expectation of privacy unreasonable. *Id.* (citing *United States v. Heckenkamp*, 482 F.3d 1142, 1146-47 (9th Cir. 2007)). However, privacy expectations can be reduced if the individual is notified that information transmitted through the network is not confidential and that systems administrators may monitor communications transmitted by the user. *Id.* (citing *Heckenkamp*, 482 F.3d at 1147). But, limited monitoring alone does not diminish a reasonable expectation of privacy in the files on a hard drive. *Heckenkamp*, 482 F.3d at 1147; *but see United States v. Greiner*, 235 F. App'x 541, 542 (9th Cir. 2007) (no reasonable expectation of privacy where defendant received banner notices of monitoring and disclosure to law enforcement each time he logged onto his work computer).

Here, Defendants were not aware of any Company A and B policy during 2011 to 2014 where the company monitored their email communications. Bychak Decl. at ¶ 6; Manoogian Decl. at ¶ 6; Qayyum Decl. at ¶ 5; Pacas Decl. at ¶¶ 8, 10. Further, Defendants all had passwords on their company issued laptops and emails addresses, they used their laptops for personal and company use, and accordingly, their expectation of privacy in their company emails was objectively reasonable. *See* Bychak Decl. at ¶¶ 3, 5, 7; Manoogian Decl. at ¶¶ 3, 5, 7; Qayyum Decl. at ¶¶ 3, 6; Pacas Decl. at ¶¶ 8, 10, 11. Therefore, the Defendants have standing to challenge the illegal search of their emails.

### C. The Court Should Suppress and Dismiss Under the Fourth Amendment, or Alternatively Hold an Evidentiary Hearing to Determine the Relationship Between CY and Spamhaus and the SI, As Well As the Relationship Between the Government and the SI, and a *Kastigar* Hearing to Determine the Appropriate Remedy

Given the inception of the government's investigation began on information from the SI, a state actor, and the passing of stolen information and documents from CY to the government, the Court should suppress that stolen information and documents, and dismiss the Indictment as fruits of the poisonous tree. At a minimum, the Court should grant an evidentiary hearing as the Defendants have shown by a preponderance of the evidence that a hearing is necessary. *See United States v. Chavez-Miranda*, 306 F.3d 973 (9th Cir. 2002); *see also United States v. Burrows*, 872 F.2d 915, 917 (9th Cir.1989); *accord Frazer v. United States,* 18 F.3d 778, 781 (9th Cir.1994) ("Evidentiary hearings are particularly appropriate when "claims raise facts which occurred out of the courtroom and off the record").

As the evidence shows, the SI has been directing and advising on this investigation from the outset and has been a state actor from the inception. Further, even before the SI began providing information to Chabalko, the SI was receiving "tons of information" from CY, who was taking information and documents from Company A and B, and has tainted the government's investigation from the beginning. Accordingly, Defendants have shown by a preponderance of the evidence that they are entitled to an evidentiary hearing

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

to determine the extent of SI's relationship not only with Chabalko and the government, but also with CY and whether CY was taking "tons of information" and documents at the SI's direction or acquiescence in violation of Defendants' Fourth Amendment rights. Finally, the Court should hold a *Kastigar*[17] hearing to determine the extent of the poison generated by the Fourth Amendment violation.

## V.    CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court suppress the illegally obtained documents and information by a state actor as well as their fruits and concomitantly dismiss this action, after an evidentiary hearing if necessary, and then hold a *Kastigar* hearing to determine the taint created by the illicit activities of CY encouraged or acquiesced by state actors.

Respectfully submitted:

Dated:  February 18, 2022          **WIECHERT, MUNK & GOLDSTEIN, PC**

By: *Jessica C. Munk*
   David W. Wiechert
   Jessica C. Munk
   Jahnavi Goldstein
   *Attorneys for Jacob Bychak*

Dated:  February 18, 2022          **MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.**

By: *Randy K. Jones*
   Randy K. Jones
   *Attorneys for Mark Manoogian*

---

[17] *Kastigar v. United States*, 406 U.S. 441 (1972).

Dated: February 18, 2022

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**

By: *Whitney Z. Bernstein*
    Thomas H. Bienert, Jr.
    James D. Riddet
    Whitney Z. Bernstein
    Carlos A. Nevarez
    *Attorneys for Mohammed Abdul Qayyum*

Dated: February 18, 2022

**BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.**

By: *Alexis A. Wiseley*
    Gary S. Lincenberg
    Alexis A. Wiseley
    Darren L. Patrick
    *Attorneys for Petr Pacas*

DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT

**CERTIFICATE OF AUTHORIZATION TO SIGN ELECTRONIC SIGNATURE**

Pursuant to section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures of the United States District Court for the Southern District of California, I certify that the content of this document is acceptable to counsel for the Defendants and that I have obtained authorization from Randy K. Jones, Whitney Z. Bernstein, and Alexis A. Wiseley.

Dated: February 18, 2022                    By: s/*Jessica C. Munk*
                                                 Jessica C. Munk

## CERTIFICATE OF SERVICE

Counsel for Defendant certifies that the foregoing pleading and attached declarations have been electronically served on the following parties by virtue of their registration with the CM/ECF system:

AUSA Melanie K. Pierson
AUSA Sabrina L. Feve
AUSA Ashley E. Goff
U.S. Attorney's Office
880 Front Street, Rm 6293
San Diego, CA 92101
melanie.pierson@usdoj.gov
sabrina.feve@usdoj.gov
ashley.goff@usdoj.gov

Candina S. Heath
Department of Justice
1301 New York Avenue NW, Suite 600
Washington, DC 20530
candina.heath2@usdoj.gov

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 18, 2022, at San Juan Capistrano, California.

s/*Jessica C. Munk*
Jessica C. Munk