RANDY S. GROSSMAN
Acting United States Attorney
MELANIE K. PIERSON
SABRINA L. FEVE
Assistant U.S. Attorneys
California Bar No. 112520/226590
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7976
Fax: (619) 546-0631
Email:Melanie.Pierson@usdoj.gov/Sabrina.Feve@usdoj.gov

CANDINA S. HEATH
Senior Counsel
Texas Bar No. 09347450
Computer Crime and Intellectual Property Section
U.S. Department of Justice
Washington, D.C. 20005
Tel: (202) 307-1049
Email: Candina.Heath2@usdoj.gov

Attorneys for Plaintiff
United States of America

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18cr4683-GPC |
| Plaintiff, | **UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO SUPPRESS AND DISMISS UNDER THE FOURTH AMENDMENT AND REQUEST FOR EVIDENTIARY HEARING** |
| v. | |
| JACOB BYCHAK et. al., | |
| Defendants. | |

**I.**

**Introduction**

At the heart of defendants' motion is the argument that the government conducted a warrantless search when CY obtained Company A and Company B emails (hereinafter "the

1   Eleven Emails"[1]) from his then-employer. All defendants lack standing to raise this Fourth

2   Amendment challenge.

3   Even if they had standing, to prevail, defendants must show that, *at the time of the*

4   *search*, the private searcher (CY) acted at the direction or encouragement of the

5   government. *United States v. Sherwin*, 529 F.2d 1, 6 (9th Cir. 1976) (*en banc*). It is

6   undisputed, however, that CY left the employment of either Company A or Company B by

7   July 2013 and that the Eleven Emails were sent between June 27, 2011, and May 29, 2013.[2]

8   To prove a Fourth Amendment violation involving the Eleven Emails (which the

9   government is not using in its case-in-chief), defendants must show that CY took the

10  documents from Company A and Company B without authority, acting at the government's

11  direction or encouragement, at the time of the alleged search. To connect these dots,

12  defendants posit that the Spamhaus Source (SS) directed or encouraged CY's search *and*

13  acted as a government informant at the time of the "search" in or before July 2013.

14  The defense theory simply fails, chronologically, because CY acquired the Eleven

15  Emails prior to July 2013, when his employment ended, at a time when his existence as a

16  source of information and the existence of the Eleven Emails was unknown to either the

17  FBI or Spamhaus. The uncontroverted documentary evidence demonstrates that CY

18  contacted Spamhaus in September 2013, two months after he left his employment with

19  Company B.[3] The first notice to the FBI that CY existed and had been providing

20  information to Spamhaus occurred in May 2014. It is impossible for the FBI to have

21  directed someone to obtain documents for them when they didn't even know of the

22  person's existence until nearly a year after the documents were obtained. The government's

23  _____

24  [1] The Eleven Emails were provided to the court by the Government, under seal, as Exhibits
    2-13, to ECF No. 283 (Gov. Resp. & Opp'n to the Defs' Third Mot. for Disc'y of the

25  Spamhaus Source, filed September 27, 2021).

26  [2] ECF No. 283, Ex. 3; Adconion-Disc02-Reports-00928. The government's discovery
    citations reference the first page of the document and not the entire page range.

27  [3] ECF No. 295, Ex. 2 (SS May 2014 email to the FBI stating, "we've got an anonymous
    informant sending us a ton of info since September 2013" who "doesn't know anything

28  about THIS investigation").

1    evidence demonstrates that although the FBI first attempted (unsuccessfully) to contact CY

2    to obtain information on June 3, 2014, the FBI did not obtain the Eleven Emails that

3    Spamhaus obtained from CY until October 12, 2017, and CY did not meet with the FBI

4    until December 2017.[4] Moreover, CY had an independent motive for contacting Spamhaus

5    to provide his former employer's records in September 2013 – namely, that his former boss

6    had advised Spamhaus in September of 2013 that CY was to blame for spamming activities

7    that Spamhaus had attributed to Company B. [ECF No. 295, Ex. 27.]

8         Contrary to the defense theory, it is undisputed that although CY began providing

9    information to Spamhaus in September of 2013, SS was first interviewed by the San Diego

10    office of the FBI in June of 2104 and did not become a Confidential Human Source (CHS)

11    for the FBI until October of 2018. Therefore, SS could not have been encouraged by the

12    FBI to obtain internal Company A documents, much less the specific emails involved in

13    this matter, prior to July of 2013, when CY obtained the Eleven Emails. SS has further

14    consistently maintained that SS neither tasked CY to obtain documents, nor acted at the

15    government's request.[5] Spamhaus itself also had an independent motive to collect and

16    disclose such evidence, because the mission of Spamhaus is to eliminate all unsolicited

17    commercial email, which essentially targets the very business of the defendants.

## II.

### Points And Authorities

18    A. Each Defendant Lacks Standing to Challenge the Acquisition of the Eleven Emails

19         The defendants' motion fails as a preliminary matter based on a lack of standing.

20    Each defendant can only challenge the admission of illegally-obtained evidence if *that*

21    defendant can prove a *personal* violation of a legitimate expectation of privacy.[6] *United*

---

[4] Adconion-Disc39-01779, Adconion-Disc02-Reports-00928, ECF No. 295, Exs. 13 & 14.

[5] *See, e.g.,* ECF 295, Ex. 21 (SS August 2021 email stating that the "FBI never requested that [CY] or Spamhaus needed to do anything. . . Spamhaus does not act under the direction of the FBI or any other government agency").

[6] The government notes here that the Fourth Amendment does not protect against unreasonable intrusions by private parties, which further cripples the defense's arguments.

*Government's Response to Defendants' Motion to Suppress*
*And Dismiss Indictment Under the Fourth Amendment*

2

*18cr4683-GPC*

1    *States v. SDI Future Health Inc*, 568 F.3d 684, 695 (9th Cir. 2009).   To the extent that the

2    Eleven Emails involved any defendant, it was in that defendant's business, rather than

3    personal, capacity. "Property used for commercial purposes is treated differently for Fourth

4    Amendment purposes from residential property." *Id.* (citation omitted). In this vein, "an

5    employee of a corporation, whether worker or manager, does not, simply by virtue of his

6    status as such, acquire Fourth Amendment standing with respect to company" property.

7    *Id.* at 696.  In *SDI,* the Ninth Circuit distinguished the reasonable expectation of privacy in

8    company property possessed by owners of a small family-run business that, at its peak,

9    employed only 25 employees, versus that of employees of a large company. In this case,

10   Company A, which was at varying times either a multinational UK corporation or, later, a

11   multinational Singapore corporation, would be considered a large company under *SDI,* so

12   defendants, as its non-executive employees, would have a diminished expectation of

13   privacy in their business emails.

14         The crux of the defense's complaint is that a prior co-worker, CY, shared[7] his own

15   Company A and Company B emails[8] with Spamhaus, and that Spamhaus, through SS,

16   provided those eleven emails to the FBI in violation of the Fourth Amendment. The defense

17   fails to provide any relevant facts or caselaw supporting each individual defendant's

18   standing to challenge CY's alleged "search" of work emails sent to or received by CY.

19         The cases cited by the defense regarding standing are not persuasive, as none address

20   the acquisition and possession of workplace emails by a private party who was a sender or

21   _____

22   *Walter v. United States,* 447 U.S. 649 (1980), *United States v. Reed*, 15 F.3d 928, 931 (9th
23   Cir. 1994).

24   [7] The defense uses multiple terms to include "stolen" and "purloined."  Either definition
     relies on a wrongfully appropriation of the property in question. In this case, it is undisputed
25   that as an employee, CY was assigned a company email account, and during his
26   employment with the company, was allowed to access and use his company email account
27   to send and receive emails.

     [8] The defense also complains that CY shared or stole "information." This issue will be
28   discussed later in the response.

*Government's Response to Defendants' Motion to Suppress*          *18cr4683-GPC*
*And Dismiss Indictment Under the Fourth Amendment*

1    recipient of the emails. Caselaw distinguishes the privacy expectations differently in a

2    commercial workplace compared to a residence. *New York v. Burger*, 482 U.S. 691, 700,

3    (1987) ("An expectation of privacy in commercial premises ... is different from, and indeed

4    less than, a similar expectation in an individual's home."). The physical items challenged

5    by the defense consist of nine Company A emails and two Company B emails. To establish

6    standing, the defense must prove that physical evidentiary items (these eleven emails) were

7    illegally obtained, that the violation was personal to the defendant-at-issue, and that the

8    defendant-at-issue held an actual subjective expectation of privacy that also was

9    objectively reasonable.

10        The Ninth Circuit in *SDI* discussed at length the test necessary to prove that physical

11   evidence was illegally taken from a place of business in violation of an employee's

12   legitimate expectation of privacy.[9] To establish a personal connection to assert standing,

13   each defendant needs to show:

14   > (1) whether the item seized is personal property or otherwise kept in a private place
15   > separate from other work-related material; (2) whether the defendant had custody or
     > immediate control of the item when [it was seized]; and (3) whether the defendant
16   > took precautions on his own behalf to secure the place searched or things seized from
     > any interference without his authorization. Absent such a personal connection or
17   > exclusive use, a defendant cannot establish standing for Fourth Amendment
18   > purposes to challenge the search of a workplace beyond his internal office.

19   *SDI*, 568 F.3d at 1257 (citing *United States v. Anderson*, 154 F.3d 1225, 1230-32 (10th Cir.

20   1998)). "[A]n individual challenging a search of workplace areas beyond his own internal

21   office must generally show some personal connection to the places searched and the

22   materials seized." *SDI*, 568 F.3d at 1257.

23        As to the first prong of the test, no defendant can say that even one of the Eleven

24   Emails was his "personal property" or kept in a "private place" under his exclusive control.

25   _____

26   [9] Although the defense's motions and the defendants' declarations discuss the defendants'
     work-issued laptops and their access to their company emails from that laptop, the defense
27   never contends that their co-worker CY acquired the eleven emails from any of the
     defendants' laptops.
28

1    It is undisputed that a third-party email provider, Intermedia, hosted Company A's email

2    system, as documented in the warrants to search defendant Manoogian and other

3    employees' Company A email accounts. [ECF No. 330-1, pp.16-17, 22, Ex. 26 & 34.]

4    Company A and Company B issued defendants their corporate email accounts and thus had

5    custody, control, and ownership of the emails the defendants sent and received from these

6    accounts, as evidenced by the thousands of emails to and from the defendants that

7    Company A and Company B produced in response to grand jury subpoenas (which

8    defendants have received in discovery). Perhaps to avoid acknowledging their individual

9    lack of control over the computers that hosted and operated their employee email systems,

10   the defense does not identify where they claim the supposed "illegal search" occurred.

11   Defendants also do not address the fact that, during his employment, CY, as defendants'

12   coworker at Company A and B, would have had the same access to Company A and

13   Company B emails stored on his work-issued computer or laptop  Thus, the Eleven Emails

14   were not kept in a private place controlled by any of the four defendants and CY could

15   readily access emails in which he was a party during his employment with each company.

16        As to the second prong, defendants cannot claim exclusive control of the eleven

17   emails. While the defendants imply they had copies of the Eleven Emails on their work-

18   issued laptops at the time of CY's alleged "seizure," any work emails would have also had

19   to exist in locations controlled by Company A and Company B, such as on any sender or

20   receiver's company-issued laptop or computer, and definitely on the third-party provider's

21   system. Absent this storage on a centralized mail server, the FBI would not have been able

22   to search and seize evidence from the Company A email accounts assigned to defendant

23   Manoogian and other Company A employees, nor would either Company A or Company

24   B have been able to search its employees' email records for materials responsive to the

25   grand jury's subpoenas. Finally, CY's receipt and possession of the Eleven Emails belies

26   any defendant's claim to exclusivity.

27        As to the final prong, defendants cannot claim they "secured" CY's computer or the

28   third-party provider's system. Logically, since the defendants did not have exclusive

1   possession of these Eleven Emails, they could never "secure" them. Rather, once again,

2   Company A's and Company B's production of thousands of employee emails shows that

3   Company A and Company B maintained custody, control, and ownership of their

4   employees' emails at all relevant times. Ultimately, these facts show that the emails

5   belonged to Company A and Company B, and the defendants cannot vicariously assert

6   their employers' Fourth Amendment rights. *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).

7        A deeper dive into the Eleven Emails further reveals that each defendant was not a

8   party to all Eleven Emails. In fact, as admitted in the defense brief, Manoogian was not an

9   identified party to any of the Eleven Emails. [ECF No. 330-1, FN 16].[10]  A review of the

10  headers of the Eleven Emails reveals that Bychak specifically was identified in seven

11  Company A emails, Qayyam specifically was identified in two Company A emails (which

12  also included Bychak), and Pacas was the only defendant identified in the two Company B

13  emails.  Thus, the defense's broad sweeping claim of "standing" is fatally flawed.

14       At the same time, CY was specifically named in seven of the Eleven Emails and was

15  likely a party to email groups that were copied on two others.  The remaining two emails

16  begin not with a traditional header but instead with the phrase "[part of a message reply],"

17  indicating that there is more to the email than was transmitted. Based on other emails

18  provided by Company A, it appears that CY was a part of the ensuing email thread.[11]

19  Moreover, an email dated June 28, 2011, sent to all employees in the San Diego area, had

20  an attachment listing dozens of email addresses (for example, kevin@CompanyA.com)

21  and providing the password for these accounts.  The practice of sharing passwords with

22

23

24  [10]  Defendants may have also received Company A emails addressed to rdd@CompanyA.com, sdoperation@CompanyA.com, and adsdall@CompanyA.com.

25  Additionally, Manoogian's name does not even appear in a Company B Employee List

26  provided in discovery. [Company B Employee List dated September 24, 2016, which listed the start and end dates of each employee (ADCONION-DISC03, TEL00001780.]

27  [11]  AMOBEE 1356819 relates to the email of Aug. 18, 2011 and AMOBEE 11278519-

28  1278530 relates to the email dated July 21, 2011.

1  everyone in the office is inconsistent with a subjective belief in an expectation of privacy
2  in one's work emails.[12]

3      Although each defendant submitted a declaration claiming a subjective expectation
4  of privacy in the Eleven Emails, their contention really focused on a claim of privacy in
5  their laptops. Since the record is devoid of any allegation that (1) CY accessed each
6  defendant's laptop without authorization, or (2) the emails acquired by CY were "personal"
7  to the defendants, or (3) the defendants have standing to challenge a search of the
8  company's email system or of CY's laptop, the defendants' declarations fail to meet the
9  legal threshold of a subjective expectation of privacy. While a password on a computer and
10  a lock on a door may give rise to a subjective expectation of privacy in a computer or an
11  office or room, that is not the situation here. The company emails belong to the company.

12      A review of the employment agreements for Pacas and Bychak, (AMOBEE1263348,
13  AMOBEE1263375), demonstrates that Company B considers all "company materials" to
14  be the sole property of the company. Business communications such as emails are
15  conventionally included in Company B's definition of "company materials." Also, in a
16  2011 Company A employment agreement,[13] Company A declared that "All E-Mail-
17  Accounts provided by the company should only be used for business purposes," and that
18  the company "conducts continuous ongoing computer tracking surveillance of its staff and
19  reserves the right to examine the Employee's use of the Internet, including email, at any
20  time." The agreement continues, "[t]he Employee consents to this surveillance."

21  B. The Defendants Have Not Articulated a Basis to Challenge the "Information" and
22     Other "Documents" Referenced

23      The defense spends an inordinate amount of time complaining about the
24  "information" that SS provided to the FBI, speculating that some of the "information" may
25  have come from CY. The defense fails to describe with specificity this "information;"

_____

[12] The list did not include the email addresses of the individual defendants in this case.

[13] Company A employment agreement dated May 2011, AMOBEE1257031, paras. 24.4
and 24.6, which involves an employee at a non-U.S. office.

7

where, how, or from whom the "information" originated; or, for that matter, how such "information" could have been unlawfully obtained. It appears these references to "information" are separate and distinct from the physical items referenced (the Eleven Emails) and instead relate to verbal or articulated "information" speculated to have passed from CY to SS to the FBI, without explaining how such verbal "information" is afforded protection under the Fourth Amendment. The Fourth Amendment protects "the right of the people to be secure in their person, house, paper or effects, against unreasonable search and seizure." The defendants have failed to identify any items allegedly seized besides the Eleven Emails.

Information, such as facts provided by an informant based on the informant's personal observations, experiences, or knowledge, do not implicate the Fourth Amendment and are not subject to suppression for a violation thereof. Informants, more often than not, provide inside information to law enforcement about a person or an organization based on the informant's relationship with or knowledge of that person or organization. A private individual's observations or knowledge about the activities of those engaged in criminal activities neither constitutes a search nor a seizure, when not acting at the direction of the government. Thus, during his employment with both companies and dealings with the defendants, CY acquired knowledge. His acquisition of this knowledge in no way constitutes a "theft" of, or a search or a seizure of "information."

C. The Defendants Lack Any Expectation of Privacy Under the Invited Informant Doctrine.

Even if Spamhaus, SS, or CY were government agents, their acquisition of "information" about Company A, Company B, and the defendants, still would not constitute a search under the invited informer or misplaced confidence doctrines. The Ninth Circuit recently summarized the lack of Fourth Amendment protections under the invited informer doctrine:

Under the appropriate Fourth Amendment precepts, "[u]ndercover operations, in which the agent is a so-called 'invited informer,' are not 'searches' under the Fourth Amendment." "[A] defendant generally has no privacy interest"—not merely an

unreasonable privacy interest—"in that which he voluntarily reveals to a government agent." In other words, use of a government informant under the invited informer doctrine—even if not in good faith in the First Amendment sense—does not implicate the privacy interests protected by the Fourth Amendment.

*Fazaga v. Federal Bureau of Investigation*, 965 F.3d 1015, 1033-34 (9th Cir. 2020) (cert granted on other grounds 141 S.Ct. 2720, U.S., June 7, 2021) (a defendant does not have any privacy expectations in communications recorded by a government informant) (internal citations omitted). In *United States v. Aguilar*, 883 F.2d 662, 703 (9th Cir. 1989) (superseded on other grounds by statute), the Supreme Court opined that a person does not have an expectation of privacy or confidentiality in his or her conversations or dealings with an invited informer, regardless of the location of those conversations or dealings.

In *United States v. Wahchumwah*, 710 F. 3d 862 (9th Cir. 2013), the Ninth Circuit found that the defendant's Fourth Amendment rights were not violated by the use of a buttonhole camera by an undercover agent in the defendant's home, under the invited informant doctrine.  The court noted that the camera, which recorded the events in the home, observed nothing more than the undercover agent himself, who had been invited into the home by the defendant to make an undercover purchase of Golden eagle feathers. Similar to *Wahchumwah*, CY was invited into the workplace by his employers, and the Eleven Emails were nothing more than he could observe with his own eyes, while on the premises. The defendants therefore cannot claim a legitimate expectation of privacy in the Eleven Emails, nor identify additional "information" they claim CY provided or obtained in violation of the Fourth Amendment. *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979).

D. <u>Spamhaus, SS, and CY Are Not Agents of the Government</u>

The defense bears the burden to establish government involvement in a seizure made by a private party. *See United States v. Snowadzki*, 723 F.2d 1427, 1429 (9th Cir. 1984). The defense asks the court to find Spamhaus to be a "state actor,"[14] and then to find SS to

---

[14] In United States constitutional law, a "state actor" is a person acting on behalf of the government, and subject to certain Constitutional limitations. *Quirarte v United Domestic Workers*, 438 F.Supp.3d 1108, 1117 (S.D.Cal. 2020) provides a detailed discussion of the

*Government's Response to Defendants' Motion to Suppress*
*And Dismiss Indictment Under the Fourth Amendment*                    *18cr4683-GPC*

be a "state actor," and then to infer that CY must also be a "state actor." [ECF 330-1, pp. 8, 21-22, 25-26]. Only by achieving a trifecta of "state actors" can the defense confuse CY's legitimate acquisition and possession of CY's own company emails with some sort of illegal search or seizure. Chronologically, the defense's attempted trifecta fails. CY's legitimate acquisition and possession of the eleven emails occurred well before any "state actor" activity could have occurred:

- Nine of the Eleven Emails are Company A emails, and they were dated between June and September 2011.
- In or around September 2011,[15] CY left the employ of Company A.
- The two Company B emails within the Eleven Emails were dated in May of 2013.
- In July 2013, CY left the employ of Company B.[16]
- In September 2013, Company B told Spamhaus that CY was responsible for alleged Company B spamming and CY, in turn, contacted Spamhaus to provide information about Companies A and B. [ECF No. 295, Exs. 2 & 27.]
- In February 2014, San Diego FBI opened its investigation into Company A.
- In May and June 2014,[17] SS advised San Diego FBI (by email and in person, respectively) that Spamhaus had an anonymous informant providing "information." SS also provided Spamhaus business records, open-source data, and technical explanations of that data to assist the FBI.
- In June of 2014, the FBI tried to contact the anonymous informant providing information to Spamhaus and was unsuccessful in obtaining information.

---

tests used to determine what conduct constitutes a state action. However, in this case, the government believes the defense really means "an agent of the government."

[15] Date is from the FBI 302 of interview of CY on December 13, 2017, ADCONION-DISC02-REPORTS-00928-32.

[16] Date is from the Company B Employee List, identifying start and end dates. ADCONION-DISC03, TEL0000178.

[17] FBI SA Chalbalko first met and interviewed SS in June 2014. [FBI Supplemental Affidavit, ECF No. 231, p.1].

*Government's Response to Defendants' Motion to Suppress*
*And Dismiss Indictment Under the Fourth Amendment*                    18cr4683-GPC

1

2

- On December 28, 2014, SS received the Eleven Emails from CY. [AMOBEE-DISC 42-00010.]

3

4

- On September 27, 2017, SS first advised the FBI that SS possessed some emails SS received from an anonymous informant, believed by SS to be CY.[18]

5

- In October of 2018, SS became a CHS for the FBI.

6   The record indicates that CY acquired the eleven Company A and B emails during

7   CY's employment at each company (2011 and 2013), well before CY contacted SS, and

8   years before SS advised the FBI that the emails existed. The timing of CY's acquisition of

9   the eleven emails eliminates any possibility that CY was an agent of the government or

10   "deputized" by the case agent to act when CY acquired the eleven emails. Assuming that

11   CY's legitimate acquisition of the eleven emails constituted a search by a private party,

12   "once a private search is completed, the subsequent involvement of government agents

13   does not retroactively transform the original intrusion into a government search." *United*

14   *States v. Veatch*, 674 F.2d 1217, 1222 (9th Cir. 1982) (quoting *United States v. Sherwin*,

15   539 F.2d 1, 6 (9th Cir. 1976) (*en banc*)).

16   To support its flawed contention that Spamhaus is a "state actor," the defense

17   compares Spamhaus to the National Center for Missing and Exploited Children (NCMEC).

18   NCMEC, a U.S. entity that was created by Congress in 1984, was reauthorized in 2013

19   with $40 million in U.S. government funding. NCMEC is mandated by federal statutes,

20   specifically 18 U.S.C. § 2258A and 34 U.S.C. § 11293, to collaborate with U.S. law

21   enforcement. NCMEC is required to forward its information to law enforcement and

22   thereby relies on law enforcement to locate and stop offenders.

23   Spamhaus, on the other hand, was founded in 1998 in London, England as a private

24   non-profit organization dedicated to fighting email spam and "related cyber threats such as

25

26

---

27   [18] On October 12, 2017, SS sent the FBI a zip file titled "Interesting emails.zip." On

28   November 8, 2018, SS again sent the zip file "Interesting Emails Fixed.zip," as a repaired version of the previously sent zip file. [FBI Supplemental Affidavit, ECF No. 321, p.1-2].

*Government's Response to Defendants' Motion to Suppress*          *18cr4683-GPC*
*And Dismiss Indictment Under the Fourth Amendment*

1   phishing, malware, and botnets."[19] Currently located and registered as a Not-For-Profit

2   Limited Liability company in Andorra, Spamhaus does not receive income or generate

3   profits, does not receive money from the U.S. government, does not have customers, and

4   is not involved in commerce.[20] Spamhaus' mission is simple, that is to track and report

5   accurate information regarding spam and related cyber threats.[21] Spamhaus then offers this

6   data free to the public, including to ISPs, government and military organizations, security

7   vendors, private corporations, academia, and private industry worldwide.[22]

8       To fulfill its mission, Spamhaus staff and the Spamhaus systems compile data to

9   include the IP addresses associated with the sending of spam, and the entities controlling,

10  using, or owning those IP addresses. Spamhaus' publicly available databases serve to

11  protect over 3 billion[23] user mailboxes in over 18 countries.[24] Spamhaus' DNSBL

12  databases (Domain Naming System-based Block Lists) provide real-time listings of

13  domains or IP addresses which have been used for purposes to send spam in disregard to

14  Spamhaus policy. Spamhaus Advisories consist of more focused databases, which identify

15  domains or IP addresses involved in sending spam, injecting exploits, phishing, or violating

16  Spamhaus policy. The SBL (Spamhaus Block List) Advisory is a database of known or

17  verified spam sources, i.e. IP addresses that violate Spamhaus' policy for acceptance of

18

19

20

21

22   [19] https://www.spamhaus.org/organization/.

23   [20] https://www.spamhaus.org/organization/statement/013/popular-myths-about-spamhaus.

     [21] https://www.spamhaus.org/organization/. Spamhaus was created seven years before the
24   CAN-SPAM Act was passed (in 2003), and thus, Spamhaus' mission and operations are
25   neither reliant on nor directed by any U.S. law.

26   [22] https://en.wikipedia.org/wiki/The_Spamhaus_Project;
     https://www.spamhaus.org/organization/.

27   [23] This figure is as of October 2021.

28   [24] https://www.spamhaus.org/organization/.

*Government's Response to Defendants' Motion to Suppress*                    *18cr4683-GPC*
*And Dismiss Indictment Under the Fourth Amendment*

1  inbound email.[25]   Entities that are repeat offenders are listed in the Spamhaus database

2  ROKSO (Register of Known Spam Operations.

3

4  Spamhaus is legally distinguishable from NCMEC (the National Center for Missing

5  and Exploited Children), which was held to be an agent of the government in *United States*

6  *v. Ackerman*, 831 F.3d 1292 (10th Cir. 2011).  In *Ackerman*, the Tenth Circuit determined

7  that NCMEC was a government entity because it was endowed with law enforcement

8  powers beyond those of private citizens. *Id*. at 1296. NCMEC was authorized by statute,

9  which required private parties to provide it with information, and was funded primarily by

10  the federal government.  None of these factors apply to Spamhaus, which is a non-profit

11  foreign entity that possesses no statutory powers, rights, or responsibilities, and is not

12  funded by the U.S. government.

13  The *Ackerman* court determined that NCMEC, in addition to being a government

14  entity, was also a government agent because the statutory reporting requirements

15  established that: (1) the government knew and acquiesced to the private search, (2) the

16  government exercised substantial control over the search, and (3) the searching party

17  intended to benefit the government. The facts relied upon by the *Ackerman* court are not

18  present in this case, as there are no statutes providing public authority for the activities of

19  Spamhaus. Spamhaus is strictly a private actor, operating to promote its mission of fighting

20  spam.

21

22

23

24  [25] Per https://www.spamhaus.org/sbl/policy/, "Spamhaus does not evaluate the content or

25  legality of the contents of an email message, merely whether that message constitutes spam by this definition [unsolicited bulk email]. The responsibility for complying with

26  Spamhaus SBL policy begins and ends with the senders of bulk email, owners of websites

27  advertised by bulk email, and providers of services that are used to support bulk email operations. SBL listings are based on evidence which has satisfied the SBL team that the

28  IP address or IP address range meets its listing criteria."

1    E.  A Private Party Search Does Not Implicate the Fourth Amendment

2         Since CY neither illegally nor unlawfully acquired these Eleven Emails, his

3    continued possession of the same does not rise to the level of a search, much less an illegal

4    one. The Fourth Amendment does not protect against unreasonable intrusions by private

5    parties. *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994). In their motion, the defense

6    correctly sets out the two-part inquiry in *Reed*, established to evaluate a violation of the

7    Fourth Amendment related to private party searches. To establish that the private party (or

8    in this case the trifecta of parties) acted as a government agent, the defense must establish

9    both (1) the government knew of and acquiesced in the intrusive conduct; and (2) the party

10   performing the search intended to assist law enforcement efforts or further his own ends.

11   *Id.* at 931. In looking at step two, if a private party has dual motives, that is a "legitimate,

12   independent motivation to further its own ends" and a desire to assist law enforcement, the

13   Ninth Circuit requires the Court to determine whether "the government's participation"

14   was "so extensive" as to rise to the level of a Constitutional violation. *United States v.*

15   *Cleaveland*, 38 F.3d 1092, 1094 (9th Cir. 1994).

16        First, the defense fails to set forth facts establishing that *any* intrusive conduct by

17   CY even occurred. Second, the defense cannot claim that the intrusive conduct, if such

18   occurred, was encouraged or condoned by the government *at the time it occurred*. There is

19   no evidence whatsoever to suggest that in 2011 and 2013, when CY legally acquired the

20   eleven emails – his own work communications – that he did so intending to assist law

21   enforcement in 2017. Instead, the evidence indicates that CY disclosed the emails to

22   Spamhaus for his own private purposes, which was to clear his name of the accusations

23   being made that he was the source of spam attributed by Spamhaus to Company B. Even

24   if CY somehow had a dual motive, his providing information to Spamhaus was unknown

25   to the FBI until May of 2014 and the fact that he possessed the Eleven Emails was unknown

26   to the FBI until September of 2017, so it simply cannot be that the "government's

27   participation" *at the time of the alleged search* "was so extensive" as to rise to the level of

28   a violation of the Fourth Amendment.  If the government had any indication that CY (or

*Government's Response to Defendants' Motion to Suppress*
*And Dismiss Indictment Under the Fourth Amendment*                    *18cr4683-GPC*

SS) possessed internal Company A emails in 2013 that might be helpful to its case, the FBI would have endeavored to obtain them lawfully and quickly, rather than waiting until September of 2017. Ultimately, defendants bear the burden to establish a Fourth Amendment violation and prove that CY, as a private party, acted as an agent or instrument of the government. *United States v. McGill*, 718 F.Supp. 2d 1240, 1243-44 (S.D. Cal. 2010) (citing *United States v. Gumerlock*, 590 F.2d 794, 799 (9th Cir. 1979)), a burden that the defense has failed to meet.

Applying the *Reed* factors to Spamhaus, there is no evidence that Spamhaus engaged in any intrusive conduct, encouraged CY to provide the Eleven Emails, or did so at the direction of the or acquiescence of the government, which did not become aware of the Eleven Emails until years later 2017.  Spamhaus defines "spam" as unsolicited bulk email messages," and further defines "bulk" as messages sent as part of a larger collection of messages with identical content.[26] The Spamhaus mission to eliminate unsolicited commercial email necessarily causes Spamhaus to monitor conduct that goes far beyond actions prohibited by the CAN-SPAM Act, which is limited to cases involving fraud and false statements relating to multiple commercial email messages. The Spamhaus staff has legitimate independent motivations for collecting all sorts of data about individuals and companies worldwide, like the defendants, who are engaged in internet marketing, which have nothing to do with violations of the CAN-SPAM Act. Indeed, the initial contact between CY and Spamhaus occurred because Spamhaus was trying to determine the source of spam that Company B had blamed on CY. That was a private Spamhaus motive, not a motive to assist the government.  Even if Spamhaus somehow had a dual motive to also help law enforcement, under the *Cleaveland* test, it can't be said that "the government's participation" was "so extensive" as to rise to the level of a Constitutional violation, where the government didn't learn of the existence of the Eleven Emails until three years after they were removed from Company A and Company B.

---

[26] www.spamhaus.org/faq/Section/Glossary

*Government's Response to Defendants' Motion to Suppress And Dismiss Indictment Under the Fourth Amendment*                    *18cr4683-GPC*

F.  Dismissal is Not an Appropriate Remedy for a 4th Amendment Violation.

Defendants seek dismissal for the alleged Fourth Amendment violation based on a passing reference to *Kastigar v. United States,* 406 U.S. 441 (1972). [ECF No. 330-1 at 23-24.] They fail, however, to discuss *Kastigar*, let alone explain how this case justifies the extreme remedy of dismissal.  This failure obscures the fact that *Kastigar* did not involve either a motion to dismiss or a Fourth Amendment violation.  Rather, *Kastigar* involved the Fifth Amendment and addressed the extent to which the government could compel, and later use, testimony elicited from a witness invoking the Fifth Amendment.  406 U.S. at 442.  Defendants' failure to cite a legal basis for dismissing the indictment for their alleged Fourth Amendment violation likely stems from the fact that, "the remedies available to a criminal defendant alleging a Fourth Amendment violation are limited to 1) suppression of evidence pursuant to the exclusionary rule and/or 2) a collateral civil rights lawsuit pursuant to 42 U.S.C. § 1983." *United States v. Colburn*, 546 F. Supp. 3d 22, 27 (D. Mass. 2021) (citing *Hudson v. Michigan*, 547 U.S. 586, 591, 596–97 (2006), which held that civil remedies are available for Fourth Amendment violations and the exclusionary rule (not dismissal) should be the court's "last resort"); *see also United States v. Morrison*, 449 U.S. 361, 366 (1981) ("[The Supreme Court of the United States] ha[s] not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment.").  Given the unambiguous precedent recognizing that dismissal is not a remedy for Fourth Amendment violations, defendants' motion to dismiss should be denied.

G.  There is no Basis for an Evidentiary Hearing.

An evidentiary hearing on a motion to suppress need only be held if the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the court to conclude that contested issues of material fact exist. *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (citing *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986); *United States v. Irwin*, 613 F.2d 1182, 1187 (9th Cir. 1980); *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972) ("Evidentiary hearings need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial

16

1 | court to conclude that relief must be granted if the facts alleged are proved.")). "A hearing

2 | will not be held on a defendant's pre-trial motion to suppress merely because a defendant

3 | wants one. Rather, the defendant must demonstrate that a 'significant disputed factual

4 | issue' exists such that a hearing is required." *Howell*, 231 F.3d at 621 (citing *Harris*, 914

5 | F.2d at 933). The determination of whether an evidentiary hearing is appropriate rests in

6 | the reasoned discretion of the district court. *United States v. Santora*, 600 F.2d 1317, 1320

7 | (9th Cir.), amended by 609 F.2d 433 (1979).  Here, the defense has failed to allege specific,

8 | definite facts that show CY and SS acted at the direction, or with the acquiescence, of the

9 | government in or before July 2013, when CY conducted the alleged "search." Rather, the

10 | uncontroverted facts demonstrate that: CY did not contact SS until September 2013, the

11 | FBI did not learn of CY's contact with SS until May 2014, the FBI did not attempt to

12 | contact CY until June 2014, the FBI did not learn of the Eleven Emails until 2017, and CY

13 | and SS both had independent motives for acquiring the Eleven Emails.  Moreover, the

14 | government is not using the Eleven Emails in its case-in-chief, so the motion to suppress

15 | these emails is moot.  Defendant's request for an evidentiary hearing should therefore be

16 | denied.

17 | //

18 | //

19

20

21

22

23

24

25

26

27

28

## III.

## Conclusion

The United States respectfully requests that the motion be denied, as the defendants lack standing to challenge the acquisition of the eleven emails and have otherwise failed to establish that the government had any role in directing two separate private parties to obtain and share the eleven emails, particularly in light of the timing of the disclosures and the independent motives of both private parties to obtain and disclose the emails at issue.

DATED: March 4, 2022

Respectfully submitted,

RANDY S. GROSSMAN
Acting United States Attorney

/s/Melanie Pierson
Assistant United States Attorney

/s/Sabrina Fève
Assistant United States Attorney

/s/Candy Heath
Senior Counsel
Computer Crime and Intellectual Property Section
Department of Justice, Criminal Division

*Government's Response to Defendants' Motion to Suppress*
*And Dismiss Indictment Under the Fourth Amendment*

18cr4683-GPC