1                    UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    UNITED STATES OF AMERICA,       .
                                     .
5                  Plaintiff,        . No. 18-cr-4683-GPC
                                     .
6              v.                    . April 11, 2022
                                     . 2:52 p.m.
7    JACOB BYCHAK,                   .
     MARK MANOOGIAN,                 .
8    MOHAMMED ABDUL QAYYUM,          .
     PETR PACAS,                     .
9                                    .
               Defendants.           . San Diego, California
10   . . . . . . . . . . . . . . . .

11
               TRANSCRIPT OF MOTIONS IN LIMINE HEARING
12           BEFORE THE HONORABLE GONZALO P. CURIEL
                    UNITED STATES DISTRICT JUDGE
13
     APPEARANCES:
14
     For the Plaintiff:      United States Attorney's Office
15                           By: SABRINA L. FEVE, ESQ.
                                 MELANIE K. PIERSON, ESQ.
16                               CANDINA S. HEATH, ESQ.
                             880 Front Street, Room 6293
17                           San Diego, California 92101

18   For the Defendant       Wiechert, Munk & Goldstein, PC
     JACOB BYCHAK:           By: JESSICA C. MUNK, ESQ.
19                           27136 Paseo Espada, Suite B1123
                             San Juan Capistrano, California 92675
20
     For the Defendant       Mintz Levin
21   MARK MANOOGIAN:         By:  RANDY K. JONES, ESQ.
                                  DANIEL J. GOODRICH, ESQ.
22                           3580 Carmel Mountain Road, Suite 300
                             San Diego, California 92130
23

24

25   ///

```
 1   APPEARANCES (CONTINUED):

 2


 3   For the Defendant        Bienert Katzman Litrell Williams LLP
     MOHAMMED ABDUL           By:  WHITNEY Z. BERNSTEIN, ESQ.
 4   QAYYUM:                       JAMES D. RIDDET, ESQ.
                                   CARLOS A. NEVAREZ, ESQ.
 5                            903 Calle Amanecer, Suite 350
                              San Clemente, California 92673
 6


 7   For the Defendant        Bird Marella
     PETR PACAS:              By:  GARY S. LINCENBERG, ESQ.
 8                                 DARREN L. PATRICK, ESQ.
                                   ALEXIS A. WISELEY, ESQ.
 9                            1875 Century Park East
                              Suite 2300
10                            Los Angeles, California 90067

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:          Chari L. Bowery, RPR, CRR
                              USDC Clerk's Office
23                            333 West Broadway, Suite 420
                              San Diego, California 92101
24                            chari_bowery@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
 1              SAN DIEGO, CALIFORNIA; APRIL 11, 2022; 2:52 P.M.

 2                              -o0o-

 3         THE CLERK:  Calling matter 20 from the calendar,

 4   18-cr-4683, United States of America v. Jacob Bychak, Mark

 5   Manoogian, Mohammed Abdul Qayyum, and Petr Pacas, on calendar

 6   for motion in limine hearing.

 7      Can I get appearances, Counsel, for Jacob Bychak.

 8         MS. MUNK:  Good afternoon, Your Honor.  Jessica Munk

 9   on behalf of Jacob Bychak, present in the courtroom.

10         THE COURT:  Ms. Munk, good afternoon.

11         THE CLERK:  And appearances, please, for Mark

12   Manoogian.

13         MS. MUNK:  He just stepped out.  He will be right in.

14         THE COURT:  I see Mr. Jones now.

15      Mr. Jones, would you like to make your appearance on

16   behalf of your client?

17         MR. JONES:  Yes, Your Honor.  Randy Jones and Dan

18   Goodrich on behalf of Mr. Manoogian, who is present in the

19   court.

20         THE COURT:  All right.  Good afternoon.

21         THE CLERK:  Can I get appearances for Mohammed Abdul

22   Qayyum.

23         MS. BERNSTEIN:  Good afternoon, Your Honor.  Whitney

24   Bernstein and Carlos Nevarez, in court, on behalf of

25   Mr. Qayyum, also present in the court.
```

1        Listening telephonically is Jim Riddet and perhaps Leah

2   Thompson of our office.  I am not sure if Ms. Thompson is on

3   the line.

4        THE COURT:  Good afternoon, Ms. Bernstein and

5   company.

6        And then, as to Mr. Pacas?

7        MR. LINCENBERG:  Good afternoon, Your Honor.  Gary

8   Lincenberg, Alexis Wiseley, and Darren Patrick, on behalf of

9   Mr. Pacas, present before the Court.

10       THE COURT:  Mr. Lincenberg and Mr. Pacas and company,

11  good afternoon.

12       And on behalf of the United States?

13       MS. PIERSON:  Melanie Pierson and Candi Heath on

14  behalf of the United States.

15       Ms. Feve is appearing right now before Judge Benitez, and

16  I am sure she will be here momentarily.

17       THE COURT:  Okay.  We are here on motions *in limine*

18  that have been presented by both sides.  As a starting point,

19  the Court will note that, as I am sure you all know, the

20  purpose of a motion *in limine* is to obtain a ruling excluding

21  evidence which is so potentially unduly prejudicial that it

22  would be impossible to unring the bell if the evidence makes

23  its way before the trier of fact.  There are a number of

24  motions *in limine* that have been presented which, in the

25  Court's view, are -- require a nuanced view as to what is the

1    parties are seeking to exclude.  And so, for the most part,

2    most of the motions *in limine* will be deferred.

3         It is apparent to me from my review of the various motions

4    *in limine* that we do need to set time limits, and I haven't

5    done so as of this moment because --

6         (Sabrina Feve, AUSA, entered the courtroom.)

7              THE COURT:  -- it hasn't been clear to me how it is

8    that the government intends to present their case.  I have a

9    better idea now, given the identification of the number of

10   witnesses and also observing that there's certain challenges of

11   certain types of evidence -- that is, evidence that goes beyond

12   the 11 netblocks in the government's most recent papers.  As I

13   understand it, there were five netblocks that were listed in

14   the indictment, and then nine, and then to 11.  There's

15   question of whether or not more than the 11 should be admitted.

16        And questions that I will have there are how much

17   additional time will be required to present this additional

18   evidence.  And I know that there are these AFRINIC -- I am not

19   sure if I pronounced that correctly -- A-F-R-I-N-I-C netblocks

20   and GetAds netblocks that are the subject of dispute in this

21   matter as to whether or not that should be admitted.

22        So, the one thing that I think the Court needs to do is

23   get a handle on what this case is going to encompass at trial

24   and come up with a time frame that is fair in terms of limiting

25   the government in its case-in-chief, and then we will be in a

1  position to pretty much provide a similar amount of time for

2  the defense.  So that's how I see things.

3      Let me provide you with a tentative on a number of the

4  motions *in limine* that at this point I am either prepared to

5  deny outright or to defer.  And so let me begin with the motion

6  *in limine* that's contained in ECF 349, to preclude the

7  government from improperly relying on the Nortel transaction at

8  trial.  Based upon my review of that, my tentative would be to

9  deny that motion to the extent that the government intends to

10 offer it for purposes of demonstrating that these netblocks

11 have monetary value, that they are not just worthless articles

12 or things.  As to the challenges as to whether or not the

13 Nortel netblock value is one that the government is able to

14 show is fair, reasonable, and what the market will bear or what

15 was properly valued, that goes more as to the weight, and

16 defense will be allowed to inquire about that.

17     As to 350-1, the motion to admit co-conspirator

18 statements, I am going to defer until trial.  I know there's a

19 dispute as to what the government has to demonstrate before

20 co-conspirator statements are offered.  At this point, the

21 Court is not prepared to make a determination, given that we

22 don't have any evidence before the Court.

23     With respect to the GetAds and AFRINIC netblocks, let's

24 talk about that in the context of time limits and then the

25 request to limit the government to 11 netblocks.

1          Next, 351-1, the government's motion relating to

2     depositions.  I plan to go through these objections and then

3     provide a ruling as to each.  Given the number of motions *in*

4     *limine*, given the number of issues raised in the depositions, I

5     am not prepared to do that here in court at this time.

6          Next is 352-1, the government's motion to exclude

7     undisclosed experts.  As I understand it, that is likely moot.

8     The defense has identified two experts that they intend to call

9     at trial.

10         As to undisclosed reciprocal discovery, the Court at this

11    point will defer to trial to determine whether or not there is,

12    in fact, undisclosed reciprocal discovery.  At this point, it

13    hasn't been identified.

14         And at this point, the defense is also concerned about the

15    government's lack of a complete exhibit list identifying what

16    they intend to offer, and the defense is asking the Court to

17    permit the defense to withhold their exhibit list or some part

18    of their reciprocal discovery obligation until they receive the

19    government's exhibit list.  I am somewhat receptive to that

20    view.

21         As to the law, I will defer until trial.  To the extent

22    that there will be an offer of the law, which would invade the

23    Court's role as the judge of the law, we will take that up at

24    the appropriate time.  We don't need to do that at this

25    juncture.

1    As to the advice of counsel, that's an issue that I think
2    I am going to want to look at closer and that's, I think, a
3    matter that relates to available defenses in these types of
4    cases.  Frankly, I think it requires a bit more research by
5    myself in this area, so I am not prepared at this moment to
6    rule one way or another on that.
7        As to courtroom witnesses -- and to the extent that that
8    is a request to exclude witnesses, the Court will permit each
9    side to have their case agent or investigator, lead
10   investigator; and then, otherwise, I will exclude other
11   witnesses unless permission is obtained, sought and obtained
12   from the Court.
13       As to unadopted FBI reports and notes, I will defer to
14   trial.
15       As to immigration status and punishment, I will grant it
16   as to punishment and I will direct the defense not to make any
17   reference to punishment.
18       As to immigration status, it is not clear to me that
19   referring to someone's immigration status is to potentially
20   prejudicial that it should be excluded at this time, but I am
21   prepared to hear more from the parties if they wish.
22       As to 353.1, the motion to preclude references to "spam"
23   and "spammers," I am going to deny it as to spam.  At the same
24   time, I think we will need to have a working definition of what
25   spam is.  There's reference to it as just any commercial email,

1    and then I think it's often used as to unwelcome commercial

2    email.  So I think once we have some ground rules or once we

3    have a working definition in place, it can be used.  Certainly,

4    there's things like spam filters that are referred to

5    throughout.  There's things like the name of the organization,

6    Spamhaus.

7         And so, I am not going to allow it to be thrown around

8    freely; but at the same time, I don't see that it's so

9    potentially prejudicial that it needs to be excluded in every

10   iteration or every matter that it is otherwise used in the

11   industry.

12        I will grant the motion to preclude the government from

13   referring to the defendants as "spammers."  I think that tends

14   to be more derogatory and has little relevance to describe

15   somebody as "a Spammer."  But certainly, the term "spam" is

16   something we have used throughout these proceedings, and the

17   only issue I have is the definition is less than crystal clear.

18        As to Mr. Manoogian's status as an attorney, I am not

19   inclined to exclude that.  I don't see where that is unduly

20   prejudicial.  Depending upon how the government utilizes that

21   information could be the subject of an objection; but,

22   otherwise, the mere mention of Mr. Manoogian's status as an

23   attorney, in the Court's view, is not unduly prejudicial and is

24   not properly the subject of a motion *in limine*.

25        Next, as to 354, motion *in limine* to exclude evidence that

1  goes beyond the 11 identified netblocks, that, again, is the

2  one that I kind of reserve to deal with with respect to time

3  limits and some of these other challenges.

4       Next, 355-1, motion *in limine* to exclude references to

5  identity theft.  The Court doesn't view evidence regarding

6  identity theft as pointing to the prosecution of the defendants

7  for identity theft versus that, in terms of how the defendants

8  allegedly conducted their operation and how they went about

9  their business, that there were aspects where other people,

10 other company representatives' identity, was assumed for

11 purposes of having these letters of announcement for purposes

12 of utilizing these netblocks.  So I am prepared at this time to

13 deny that motion *in limine* to exclude reference to identity

14 theft.

15      Similarly, I am also prepared to deny motion *in limine*

16 found at ECF 356 which seeks to exclude any evidence regarding

17 the use of dba's, P.O. boxes, email addresses under different

18 names, because it appears to be part and parcel of what the

19 government alleges was the scheme, was the means in which this

20 operation was operated.

21      Next, as to 357-1, I am prepared to grant the motion *in*

22 *limine* for attorney *voir dire*, and the only question will be

23 what time or amount of time will be provided.

24      Next, as to the motion *in limine* to preclude reference to

25 certain individuals as victims, at this point, I am not

1    prepared to grant that motion.  It is possible that, if the
2    government goes back to the victim well repeatedly, that it may
3    be properly subject to an individual objection.  But as far as
4    excluding any reference to victims, Court is not prepared to do
5    that at this juncture.
6         As to 359-1, motion *in limine* to preclude irrelevant and
7    unfairly prejudicial expert testimony; alternatively, request a
8    *Daubert* hearing; it appears that the government is attempting
9    to cover their behinds by making sure they don't run afoul of a
10   requirement that places an obligation on them identifying
11   witnesses as being expert witnesses.  And certainly, we know
12   now the Ninth Circuit has devised a dual purpose kind of
13   witness instruction, where witnesses testify to some extent
14   about percipient matters and then maybe provide some
15   information that can be viewed as expert.
16        I am prepared to defer any rulings to trial.  For the most
17   part, it appears these witnesses will be testifying about
18   standards and practices regarding the sale or transfer of
19   netblocks, letters of announcements, ARIN; and so, it's more,
20   kind of, background information to set the stage as to what
21   happened here versus opining as to whether or not something
22   exists or doesn't exist, something that calls for an expert
23   opinion.
24        So, at this point, I am not prepared to preclude expert
25   testimony.  And to the extent it is irrelevant, the defense can

1    object based upon relevancy and/or unfairly prejudicial under

2    Rule 403.

3        And then, if needed, to the extent answer we have

4    testimony that would implicate the need for a *Daubert* hearing,

5    the Court will do that at trial.  But I am not going to hold

6    any number of *Daubert* hearings today or in advance of trial.

7        And then, as to motions *in limine* to exclude government's

8    evidence under Rule 404(b), again, this is one of those

9    situations where it looks like the government is alternatively

10   arguing that evidence is inextricably intertwined with the

11   facts relating to the allegations; and then, in the

12   alternative, pointing that, if they are not inextricably

13   intertwined, that they are admissible under 404(b).

14       The Court at this time is not going to analyze every

15   portion of the testimony relating to potential possible 404(b)

16   evidence.  I will take it up during the course of trial.

17       So, those are my tentative rulings as to the motions *in*

18   *limine*.

19       There's a motion to preclude speaking objections, and,

20   certainly, as pointed out by the defense, we don't need a

21   motion *in limine* to preclude speaking objections -- the law

22   already does that -- and it is just a matter of ensuring, in my

23   capacity as judge of the facts and deciding what evidence comes

24   in, to ensure that the parties comply with the requirements

25   that you state your objections succinctly and without allowing

 1   them to become speaking objections.

 2       So, that's a lot that I have offered you, and at this

 3   point, let me hear from the defense with respect to their

 4   positions on any of the tentative rulings that I have provided.

 5           MS. MUNK:  Your Honor, just briefly, I wanted to make

 6   sure the Court also had the *ex parte, in camera*, under-seal

 7   motion to exclude the government's forensic accounting experts.

 8   We filed it *in camera* under seal based on privileged

 9   information.

10           THE COURT:  What ECF was that?

11           MS. MUNK:  I am sorry, Your Honor?

12           THE COURT:  The ECF number for that?

13           MS. MUNK:  There isn't an ECF number because it's

14   filed *in camera* under seal.

15           THE COURT:  *In camera*?

16           MS. MUNK:  So, we did not serve the government

17   because, again, it contains privileged information we are

18   unable to serve them.

19           MS. BERNSTEIN:  I have a copy.

20           THE COURT:  Can I see it?

21           MS. MUNK:  It was filed March 24.  We did file a

22   notice publicly of it.

23           MS. FEVE:  There are -- if you look on the docket,

24   you will see there's a gap of numbers, so it may actually have

25   ECF numbers.  But if your CRD pulls it up -- obviously, we

 1    don't have it, but because I have dealt with this issue on the

 2    docket --

 3              THE COURT:  There are ECF numbers that correspond to

 4    this?

 5              MS. FEVE:  I suspect there are because, on the public

 6    docket, there are blanks.  If you look around March 24, when

 7    defense counsel says she filed it, I am sure your CRD can pull

 8    it up.  I don't remember offhand what the blanks are, but I

 9    know there's roughly between a six- and eight-number sequence

10    that is not on the public docket.

11              THE COURT:  I had not reviewed this.

12        What we can probably do is set a further hearing to

13    address this, and then have some follow-up on things like time

14    limits, and then give me a little bit more time to provide my

15    rulings on the depositions, the deposition objections that have

16    been lodged by the parties.

17        Ms. Bernstein, I will return this to you, and then with

18    the understanding that we will take up that at a further

19    hearing.

20              MS. MUNK:  Okay.  Thank you, Your Honor.

21        And just for the record, the notice I filed publicly of

22    the *in camera* under-seal motion, that is Docket Number 348.

23              THE COURT:  348?  All right.  Thank you.

24        Mr. Lincenberg?

25              MR. LINCENBERG:  Your Honor, I thought the Court's

```
 1    overview was helpful, and it might be helpful for the defense
 2    to take five minutes and talk about what we really need to
 3    argue or not in light of the Court's tentatives today, would be
 4    my suggestion.
 5              THE COURT:  That's great.
 6              MR. LINCENBERG:  Can we take a couple-of-minute
 7    break?
 8              THE COURT:  Sure.  Do you want to actually take a
 9    break, a five-, ten-minute break?
10              MR. LINCENBERG:  Five minutes, I think.
11              MR. JONES:  Your Honor, five minutes means ten
12    minutes.  Give us ten minutes, Your Honor.
13              THE COURT:  I know that, Mr. Jones.
14         (Recess taken from 3:16 p.m. to 3:26 p.m.)
15              THE CLERK:  Re-calling matter Number 20, 18-cr-4683
16    as to Jacob Bychak, Mark Manoogian, Mohammed Abdul Qayyum, and
17    Petr Pacas.
18              THE COURT:  Ms. Bernstein?
19              MS. BERNSTEIN:  Your Honor, I guess, to overview
20    everything we wanted to cover, I will take up 404(b), the 11
21    netblocks, and the time limits, because that seemed to be an
22    area the Court had interest in.
23         And then I think there were a number of discrete other
24    matters people wanted to touch on after that.
25              THE COURT:  Okay.
```

1          MS. BERNSTEIN:  So I want to -- and I am sorry I have

2     lost my voice this weekend.  I will try to articulate and go

3     slowly.

4        But I wanted to start by just explaining to the Court what

5     we have understood the government's case to be and what the

6     government is now suggesting its case is.  And I do think this

7     is something we need to resolve today because it dramatically

8     affects how we prepare for trial and whether we think we can

9     even be prepared in a month from now.

10       So, there's -- I don't have the page number, but perhaps

11    the government does.  But there's a grand jury exhibit, 251,

12    and I think it was in the government's 404(b) notice.  It lists

13    11 separate netblocks.

14          THE COURT:  Was that 251?

15          MS. BERNSTEIN:  It's grand jury Exhibit 251.  I think

16    it is in ECF 347.  And it lists 11 separate netblocks that the

17    government contends Daniel Dye, one of their cooperators, and

18    his company, GetAds, sold to our clients, to the defendants'

19    company, and through -- and then imputes to the defendants.

20       Five of those -- I can pass this up to the Court if this

21    is helpful.

22       So, there's a number of IP addresses that correlate to

23    each netblock.  It is just the 11 separate netblocks.  Five of

24    those netblocks are in the indictment.

25          THE COURT:  I am sorry.  I am looking at this, and

1   there are -- one, two, three, four, five, six, seven -- so, as

2   to this one, 198.68.64.0, there's a whole slew of numbers on

3   this one, whereas a lot of the other IP ranges, it's very

4   limited.  Why do we have so many that relate to Internext.net?

5          MS. BERNSTEIN:  I am not entirely sure.  But our

6   focus is on -- those are the IP blocks that correlate to the

7   domain.  We, sort of, refer to it as the Internex netblock, and

8   we --

9          THE COURT:  You refer to them --

10         MS. BERNSTEIN:  As the "Internex netblock," for that

11  example that you just provided, and it contains all of those IP

12  addresses.  There's the Medavis netblocks.  There's ECT.

13  There's Sierra Semi.  There's Sura.net.

14     So, those are 11 separate netblocks that we have spent

15  years preparing for, with an understanding that the

16  government's case-in-chief was going to pertain to the five

17  charged netblocks.  And as the government has pointed out in

18  their papers, we have also been on notice that they did intend

19  to reference all netblocks in that exhibit.

20         THE COURT:  So, what does your trial preparation

21  entail for these 11 netblocks?

22         MS. BERNSTEIN:  So, the six netblocks that are in

23  there that are uncharged but are still in that chart, there's

24  over 48,000 pages of discovery that relate to those extra six

25  netblocks that are not in the indictment but that are in the

1    chart.

2        We -- I am not standing before you saying that we are not

3    prepared on those six.  We have known for a long time that the

4    government is going to focus its case on these 11 netblocks,

5    which are the world of netblocks that were transacted amongst

6    and between their cooperator and our clients' companies.

7            THE COURT:  Just walk me through, what does

8    preparation entail?

9        If I get this -- keeping in mind, you are just telling me

10   "11 netblocks," and 11 doesn't sound like a huge number.

11   40,000 pages sounds a lot bigger.

12       But as to those 40,000 pages, what are you doing with

13   them?  What do they consist of?  What is involved in terms of

14   preparation of a defense?

15           MS. BERNSTEIN:  We have over 2 million pages of

16   discovery from the government.  We search based on the name of

17   the netblock and the numbers, the IP block, to get the world of

18   documents that relate to each of these IP blocks and netblocks

19   so that we can understand the entire history of the netblock.

20   Where did it start from?  Who was its initial owner?  Was it or

21   was it not registered with ARIN?  The Rule 15 the depositions

22   that the parties have done, each of those individuals --

23   there's one whose name starts with an L and one whose name

24   starts with an S.  Those each correlate to a different

25   netblock.

1    It's my understanding that the government will at least

2    one witness per netblock to say, "I was the rightful owner of

3    this netblock."  So it is about having all documents that

4    correspond to the netblock.  It is then about identifying every

5    single witness that corresponds to that netblock, from the

6    netblock's origination -- I believe all of these are pre-1997.

7    That's an important date because ARIN, this kind of

8    pseudo-governmental governing body, starts in 1997, regulating

9    this.  So we have to create a lifeline -- an entire chronology

10   that spans over 30 years for each of these.

11   That includes identifying everyone who has ever touched

12   the netblock; the domain names that have been associated with

13   the netblock; what brokers used these netblocks; what brokers

14   sold these netblocks; what ISP companies have announced these

15   netblocks.  And so, it's voluminous.

16   I mean, even just filtering the government's

17   2-million-plus pages of discovery, to get the world that each

18   netblock contains, is a ton of documents.  Then we have to go

19   through all of that.  And that is spawning other witnesses that

20   we have to talk to, people at different companies.

21   So, I hope that gives some color.  I can give a bit more,

22   perhaps, not on the record, not in open court.

23       THE COURT:  So, then, that tells me, kind of, the

24   task at hand that you engage in when you are provided and you

25   have been provided with these netblocks, and you have indicated

1    that, given the fact that you have had these netblocks for a

2    significant period of time, that you are comfortable that you

3    have done this due diligence that relates to them.

4         So, to the extent that the government is proposing

5    something beyond these -- and I am not sure if something like

6    the GetAds and AFRINIC qualifies as these additional netblocks

7    that create these unduly burdensome responsibilities at this

8    point.  Is that your position?

9              MS. BERNSTEIN:  Yeah, so to clarify, these are the

10   GetAds netblocks.  What you have before you are the GetAds

11   netblocks.

12             THE COURT:  What I have before me?

13             MS. BERNSTEIN:  Yes.  Those are the 11 GetAds

14   netblocks.  Five of them are in the indictment.  The other six

15   are not charged but the government contends are inextricably

16   intertwined.

17        What the government has supplemented now is now they are

18   adding AFRINIC netblocks.  It's A-F-R-I-N-I-C.  They are

19   governed by the African Region that governs the Internet, as

20   opposed to ARIN, which is the American Registry for Internet

21   Numbers.

22             THE COURT:  So, as to these GetAds, you are not

23   asking the Court to exclude those, at least, to the extent that

24   they are part of this 11 set of netblocks that you already had

25   discovery for; but it is these AFRINIC netblocks that you first

1   learned of —— was it in March, or when?

2          MS. BERNSTEIN:  Six days before the motion *in limine*

3   hearing —— I think it was March 18th —— when the government

4   filed Docket 347.

5       To put a finer point on the GetAds netblocks before moving

6   on to the AFRINIC netblocks, I am feebly asking you to not

7   include those six netblocks, because they are not charged

8   conduct.  And I think you indicated we could take it up on a

9   case-by-case basis.  But I just want to illustrate for the

10  Court how dramatically it expands the scope of this trial.

11  There will be —— I don't even know how many unique witnesses to

12  those six netblocks that are not part of the charged five

13  netblocks.  And those six netblocks that are part of the GetAds

14  netblocks but are not in the indictment, represent nearly

15  50,000 pages of discovery.  So, it is a feeble ask to not

16  include it, because we have not been on notice; I am not going

17  to tell the Court we haven't been.

18          THE COURT:  So, with respect to the six —— and these

19  are the non-Daniel Dye ones; they are the ones that go beyond

20  Daniel Dye, correct?

21          MS. BERNSTEIN:  They are all Daniel Dye and GetAds.

22          THE COURT:  All 11?

23          MS. BERNSTEIN:  All 11.  It's just that five are in

24  the indictment and six are not.

25          THE COURT:  Okay.  So, then, you wouldn't necessarily

1    be calling a host of additional witnesses?  You would be

2    calling Daniel Dye on all 11.  And then, as to each netblock,

3    does each of the netblocks, then, require, I guess, the owner

4    to testify and then the custodian and all that?

5            MS. BERNSTEIN:  Yes.  I believe there will be at

6    least one unique witness per additional netblock.

7            THE COURT:  And I guess I will ask the government to

8    let me know -- how long do you anticipate these witnesses will

9    testify?  In terms of their direct examination, how long do you

10   anticipate that that will take?

11       Let me stop for a second.  Do you have an idea of what the

12   answer is to that?

13           MS. PIERSON:  I am not sure exactly what witnesses

14   you are asking about.

15           THE COURT:  We have 11 netblocks, and Daniel Dye will

16   testify on all of them in terms of some role that he had in

17   terms of utilizing them.  Then, as to each 11 of the netblocks,

18   you will have to call one or more witnesses who will kind of

19   describe where these netblocks came from, how they were

20   obtained, how they were -- whatever -- utilized, and whether or

21   not they were I guess passed on to one or more of the

22   defendants.  Is that right?

23           MS. BERNSTEIN:  Essentially.

24           THE COURT:  So, the witnesses that you will need to

25   establish to the trier of fact that these netblocks were part

1    of this fraudulent scheme, or part of this scheme that was in

2    violation of the CAN-SPAM Act, how long do you anticipate it

3    will take?

4            MS. PIERSON:  I don't think you can quite do the math

5    like that, and here's why.

6            THE COURT:  How would you do the math?

7            MS. PIERSON:  Okay.  Well, it's going to be

8    additional questions to the same witnesses we are already

9    having.  So, in other words, Daniel Dye sold them all of them,

10   so he is going to talk about all of them.  There were two

11   individuals who were the hosting companies, so they are going

12   to testify about all of the netblocks, including the AFRINIC

13   netblocks.  So it will be a few more questions to those

14   witnesses, but not additional witnesses.

15       There will be some additional witnesses who are going to

16   come in as to some of the netblocks and say, "That signature

17   there on that is not mine," or, "My company didn't authorize

18   this," because many of the names were actually made up by the

19   defense and Daniel Dye on these letters of authorization.  So

20   someone may have to come in from a company to say, "No one by

21   the name of Robert Littlebear ever worked for my company," and

22   that would be that.

23           THE COURT:  For example, we have two deponents that

24   you deposed which were in that category, I guess, that they

25   were -- if not keepers of these netblocks, they have knowledge

1   that you will -- they will be testifying about.  Are there

2   other witnesses besides these two that are also going to be --

3          MS. PIERSON:  There are, but I would suggest those

4   two that we did the depositions with are sort of outliers

5   because both of them had significant additional information

6   that weren't with -- that we are not going to have with all

7   these other witnesses.

8      Leona Williams, the one woman, had actually sold her

9   netblock, and so we went through all of the information about

10  the sale of that, which was -- is not going to be present for

11  everyone.

12         THE COURT:  So, those are the ones that were obtained

13  as a donation; is that right?  She worked for the educational

14  concern?

15         MS. PIERSON:  Well, nobody paid for their netblocks

16  before you know -- in the early days.  So yes, she was -- if

17  you read about the donation, that was her.

18     And then Mr. Dorn, they spent two-thirds of the time with

19  Mr. Dorn talking about his emails and how he didn't want to

20  travel to San Diego.  But he also had two documents that no one

21  else has, and those were the two documents where he actually

22  had the application back in 1993, to the predecessor to ARIN,

23  to get them the netblock, and the document that they received

24  in response to that.  So we had discussion about that that we

25  are not going to have with other witnesses.

So I would suggest that those two depositions are going to be much longer than all of these other witnesses that we are going to present just to say, "I didn't authorize these people to use my name," or, "My company didn't authorize these people to trade the netblock."

THE COURT:  So, do you have an estimate as to how much longer the trial will take if the AFRINIC evidence comes in?

MS. PIERSON:  About 20 minutes.

MS. BERNSTEIN:  I disagree strongly, Your Honor.

THE COURT:  And what is the basis of your disagreement, Ms. Bernstein?

MS. BERNSTEIN:  First of all, the AFRINIC netblocks -- the first we began looking into them was -- I think it was around March 18th, or whenever the governed filed document 347.  There are thousands of documents that relate to the AFRINIC netblocks.  Each one of those documents are multiple pages long.  The platform we are using doesn't give an easy page count so I can't provide that at this moment to the Court, but it is a substantial body of discovery to review.

It's more discovery to the AFRINIC netblocks than there is in the typical border bust case.  So this is just on the government's 404(b), there is the same amount of discovery that a standard trial in this district has.

The AFRINIC netblocks were brokered by someone in India.

1    That is someone we are going to be talking to.  That is someone

2    we would move for Rule 15 depositions for.  That's someone we

3    never looked into before prior to March 18th.

4         We did a meet-and-confer call with the government where

5    the government said, "Yeah, there's a lot of documents that

6    might be related to that company, but the ones you have to

7    focus on aren't that extensive."

8         You know, respectfully, we do our own investigation and

9    don't, sort of, take our blinders from the government's

10   case-in-chief.  We are going beyond that.

11        So, there's at least this individual in India.  There are

12   people in that individual's company.  There are people who have

13   previously interacted with that individual, who have interacted

14   with that individual since we have.  Those are all people who

15   we would want to be interviewed, we would need to be

16   interviewing and speaking to, taking depositions of, and

17   perhaps calling as witnesses.

18             THE COURT:  So, Ms. Pierson, it may only take 20

19   minutes of time at trial to present this AFRINIC testimony; but

20   Ms. Bernstein is asserting that, as far as defending and

21   preparing and doing due diligence with respect to this

22   evidence, that in fact it is much more time consuming, it is

23   much more involved.  And that, given where we are now, at mid

24   April or thereabouts, and trial is scheduled to begin in

25   another five weeks or so, that it really doesn't provide them

1    with adequate time to make necessary inquiries, searches, and

2    schedule depositions and have them; where, at the same time

3    they are being called upon to do that, they are trying to

4    prepare for trial, get their exhibits done and meet with their

5    clients, and that's where problem lies.  How do you respond to

6    that?

7            MS. PIERSON:  My response to that is we need to look

8    at the true timeline of all this evidence.  The evidence about

9    the AFRINIC netblocks was given to the defendants in 2018 and

10   2019.

11      (Counsel confer.)

12           THE COURT:  The AFRINIC?

13           MS. PIERSON:  Yes.

14   But then, because we wanted to make it clear that this was

15   a special group that they should focus on, there was discovery

16   production 17, which was given to them on January 13 of 2020.

17   And we gathered together all of the documents, the relevant

18   documents related to the AFRINIC netblocks.  There were 19

19   documents, 31 pages.  And they have had them since January 13,

20   2020.

21           THE COURT:  Say that again.  It was how many pages?

22   How many documents?

23           MS. PIERSON:  33 pages, and 19 documents.

24   And one of the documents is a summary, an overview, by the

25   FBI, where they -- because what we first did was we turned over

1   an article on January 15 of 2019, which explains the problem

2   with the theft of a bunch of different AFRINIC netblocks, and

3   this article specifically mentioned the ones that were

4   purchased by the defendants.

5        So, reviewing that document, then, the FBI went through

6   the documents that we had from Company A and pulled out all

7   these relevant documents.  So we have emails from the

8   defendants talking about it.  We have got the purchase

9   documents.

10             THE COURT:  Talking about "it," being the AFRINIC?

11             MS. PIERSON:  Yes.  Yes.

12        And so -- and also, records with one of the hosting

13   companies, where they got notified that the netblock was

14   hijacked.  And then, after that notice, the defendants'

15   continuing to use those netblocks.

16             THE COURT:  So, the defense says -- has offered

17   argument based upon attempts to have the government stipulate

18   as to, I guess, a universe of netblocks and trying to limit it

19   to 11.  Ultimately, they report that those talks broke down and

20   that the government indicated that they would offer testimony

21   that I guess is relevant to their case.

22        During the course of this back-and-forth and the

23   meet-and-confers, were there discussions about the AFRINIC --

24             MS. PIERSON:  Absolutely.  And we referred them,

25   again, to this particular discrete discovery production, and we

1    said we imagine that the hosting company person was going to

2    testify about that.

3             THE COURT:  When you said that, Ms. Bernstein shook

4    her head "no."

5        Is that found in any email exchanges?

6             MS. BERNSTEIN:  No, I just want -- we had a call a

7    week prior to motions *in limine*.  That is the only time we have

8    ever discussed it.  There has never been another call.

9        So we have, throughout the years of this case, both pre

10   indictment and post indictment, been trying to get the

11   government to narrow its case.  And there's never been a talk

12   of AFRINIC prior to the government filing its notice.

13            THE COURT:  I read about these meet-and-confers and

14   communications back in a fall of 2021.

15       And so, at that point in time, Ms. Pierson, in the fall of

16   2021, there were no precise mention -- there was no precise

17   mention of AFRINIC; is that right?

18            MS. PIERSON:  I think that's accurate.

19            THE COURT:  And then, as far as the production

20   Number 17, that's from January 13, 2020, and that includes all

21   of your, I guess, AFRINIC evidence that you otherwise would be

22   prepared to present at trial; is that right?

23            MS. PIERSON:  That's right.

24            THE COURT:  So contemporaneous with that production,

25   was there some indication given to the defense that this

```
 1   evidence, part of the production Number 17 was evidence that

 2   the government would rely upon at trial?

 3            MS. PIERSON:  I have to say I can't recall.

 4            MS. BERNSTEIN:  I am sorry.  Could you repeat that,

 5   Your Honor?

 6            THE COURT:  My question was about production 17.

 7            MS. BERNSTEIN:  Yes.

 8            THE COURT:  We know it includes, as I understand it,

 9   some AFRINIC documents?

10            MS. BERNSTEIN:  Yes.

11            THE COURT:  So the question was whether or not at

12   that time, when production 17 was made, whether or not the

13   government made any representations about that AFRINIC

14   documents and discovery being discovery that they anticipated

15   would bear on or relate to matters that would be offered at

16   trial?

17            MS. BERNSTEIN:  Your Honor, the answer is no.  And I

18   think what is particularly frustrating from my perspective is

19   that we made a 404(b) request and demand in November of 2018.

20   And the government has known since -- even without

21   404(b)-specific demand, the government knows that is something

22   that matters to us.  We have had numerous -- we have had bill

23   of particular litigation.  We have had innumerable hearings

24   before Your Honor.  There's millions of pages of discovery.

25   And so we have constantly wondered "What is the case?  What is
```

1   the case?  What is the case?"  So that we can prepare for it.

2       So, to not provide any 404(b) notice before a week before

3   in lims, six weeks before trial, when it is an expensive

4   additional investigation on a case that's already been expanded

5   well beyond the indictment.

6       And we are not really here battling about the four corners

7   of the indictment, because we have sort of accepted that these

8   other six netblocks are probably coming in and we have prepared

9   accordingly, but there's never been a focus on the AFRINIC

10  netblocks until now.

11      The government wants to say it gave us documents that it

12  views as relevant in production 17.  We just received

13  production 60.  So, there certainly isn't -- I would like to

14  tell you I know what every single document they have produced

15  is, but I don't, and I haven't focused on them all the same

16  way.  None of us have.  So, we are in trial about five

17  netblocks that is already being expanded to double the size

18  because of all these other netblocks.

19      For Ms. Pierson to say the depositions were a broader

20  scope, I don't think that's true.  I think once we start

21  cross-examining someone, it has a large scope.  And so, we are

22  going to have that.

23      They are having unique witnesses for each of these six

24  netblocks that are coming in beyond what is in the indictment.

25  To layer on and say, now, "Here is three more netblocks that

1    involve an international broker, transactions overseas,

2    thousands of pages of discovery," we are not in a place at this

3    point before trial to adequately investigate that, to

4    adequately prepare a defense to that.

5        Beyond the lack of notice and the issues that causes,

6    there is not a proper 404(b) basis for which they are offering

7    this.  It's pure propensity, Your Honor.

8        They are saying -- they have no evidence to connect --

9            THE COURT:  I am not sure if I agree with that --

10           MS. BERNSTEIN:  Okay.

11           THE COURT:  -- but I am concerned that this is

12   discovery the government originally produced for one reason or

13   another back in January of 2020.  And we know at some point

14   between then and now, a decision was made to offer evidence

15   regarding this AFRINIC evidence or documents.

16       At the same time, we also know that during this time

17   frame, the defense has been working hard to trying to pin the

18   government down as to, "What is your theory?  What are you

19   going to be offering?  What can we reasonably rely upon as the

20   universe of netblocks?  Can we say it is the 11?"

21       So, given the fact that the government had this

22   information as of early 2020; there were these asks that were

23   made in 2021 and at that point there wasn't a response that,

24   "Oh, yeah.  Well, you got that AFRINIC stuff, right?  We intend

25   to offer that."  And so, then, as of 2021, you would be in a

1   position to -- "All right.  Well, I don't think that that's

2   right.  I think it's maybe untimely, but I get it.  I

3   understand that that is your position."

4       And so -- but for us to now have that announcement on the

5   eve of trial, two months before trial begins, that does concern

6   me because it seems to me that, while it may only take 20

7   minutes of additional time at trial, it takes a lot more than

8   20 minutes -- perhaps 20 hours; more than that -- to be able to

9   get a handle on what is underlying this -- these documents and

10  this evidence.

11      So, that's my concern, Ms. Pierson.  Can you address it?

12          MS. PIERSON:  Well, I guess, again, I go back to the

13  fact that we gave them this stuff as a discrete -- we didn't

14  bury this among 2 million documents.  This was one discrete

15  discovery production of 33 pages.

16          THE COURT:  Out of 60, or -- as I understand it,

17  there's been 60, now, of these productions?

18          MS. PIERSON:  And there will probably be many more

19  because we keep continuing to get documents, and so we are

20  doing our very best to live up to our discovery obligations.

21          THE COURT:  But why didn't you kind of let the

22  defense know in 2021, when they were asking you to identify the

23  universe of netblocks?  What was so hard about letting them

24  know at that point, "Well, there's the 11 netblocks, but

25  there's the AFRINIC netblocks that we provided you back in

```
 1    early 2020, January 13th, 2020.  Those are netblocks that we

 2    believe we are entitled to introduce"?  Why didn't the

 3    government do that?

 4              MS. PIERSON:  Well, the discussions were a little

 5    different.  They are like, "Okay.  What are you using in your

 6    case-in-chief?  Are you going to focus on the 11 netblocks from

 7    Daniel Dye?"

 8         And, "Absolutely.  That's what we are doing.  We are

 9    focusing on the GetAds netblocks.  That is what this case is

10    about."

11         But these AFRINIC netblocks, then, as it appeared more and

12    more like the defense was going to be, "The evil Daniel Dye and

13    the evil Vincent Tarney" --

14              THE COURT:  Well, you have always known that, from

15    day one.  You wouldn't even need to have as distinguished and

16    experienced a panel of defense lawyers to know that.

17              MS. PIERSON:  Right.  But, you know, when we had the

18    conversations with them, they weren't asking us, "What else are

19    you going to do out there?"

20         And what they wanted us to do was to agree to not make any

21    mention of any other netblocks, and we need to make mention of

22    other netblocks along the way.

23              THE COURT:  But there's a difference between

24    mentioning and then relying upon something that then triggers

25    or generates a due diligence obligation on the part of defense
```

1    counsel, and so that's where I have a little bit of a concern.

2            MS. PIERSON:  What I was trying to get at is we

3    weren't saying that we were refusing to limit our case to the

4    11 netblocks.  We still believe that's the core of our case.

5    That's what it is all about.

6        But what they asked us to stipulate to was we would not

7    produce any evidence whatsoever relating to any of these other

8    netblocks.  And, for instance, Daniel Dye offered them many

9    other netblocks for sale besides the ones they brought.  I

10   assume that we are going to discuss that.

11       The government should be able to respond and deal with

12   these other netblocks if they come up on cross-examination.

13       The auditors --

14           THE COURT:  Are you saying that this would be only

15   used for rebuttal?

16           MS. PIERSON:  Or cross-examine or redirect.

17       We are trying to anticipate possible things, but we can't

18   say, "Look, we can't talk about any other netblocks," because

19   that would unduly hamper our ability to produce the case.

20       For instance, we are also going to call an auditor to talk

21   about how much money they made.  Well, the auditor looked at

22   all netblocks, all different netblocks; and so, in order for

23   the auditors to talk clearly about how much was made from these

24   netblocks, they had to exclude other netblocks, and so he is

25   going to have to discuss other netblocks, too.  And I can see

1   that coming up with the hosting companies, who hosted other

2   netblocks as well as these netblocks.

3        So we didn't want to be forced to limit our proof to only

4   those 11 netblocks, although that's what we are going to be

5   arguing to the jury, is --

6            THE COURT:  Let me ask you.  What does your expert

7   have to say in terms of how much money would have been

8   generated by the use, misuse, of these 11 netblocks?

9            MS. PIERSON:  $5 million.  $5 million.

10           THE COURT:  So, then, as to these additional

11  incidents of misuse of netblocks, your expert --

12           MS. PIERSON:  We haven't calculated the AFRINIC.

13       The only thing that we want to produce the AFRINIC ones

14  for is to show that they engaged in the same type of conduct --

15  i.e. buying these things for super cheap, putting in false

16  LOAs -- and did so without Dye and Tarney involved.  That's all

17  we care about.  So the jury can then decide that, you know,

18  perhaps --

19           THE COURT:  I could see why you would care about

20  that, and I could see why you would want to offer that.  I

21  guess the problem or the part that I am having a problem with

22  is, given your understanding of how the defense is going to aim

23  at the cooperator Dye, and recognizing that these AFRINIC

24  netblock transactions would be able to bolster your client's,

25  perhaps, credibility to the extent it ends up being taken on,

1    that you would have let the defense know about that before

2    March of 2022.

3              MS. PIERSON:  I guess I have to say that the case

4    law -- there isn't a case out there that I could find that

5    suggested that 66 days in advance of trial -- and it actually

6    was referenced in our expert notice that was given on

7    March 10th -- you know, is not enough.

8              THE COURT:  Keeping in mind that I think there might

9    be one or two other CAN-SPAM cases in history.  And this is a

10   very unique case for any number of reasons.  We know it.  We

11   have seen it attacked on multiple motions to dismiss for any

12   number of reasons.

13       But certainly, one has to appreciate that netblocks is

14   something that, if you are a defense lawyer, once you learn

15   about that -- "Okay, this is what the government is claiming;

16   that there's these 11 netblocks and that they were

17   misappropriated, they were obtained through false pretenses" --

18   that that allegation is one that triggers a considerable amount

19   of work and due diligence in order to figure out whether or not

20   the government's conclusion about this alleged misappropriation

21   or misuse is in fact supported.

22       And so, the unique nature of how these netblocks operate,

23   how they are being relied upon by the government, what is

24   needed to be done in terms of defense due diligence, is one

25   where I wouldn't expect to find a case that would tell me that,

1    "Oh, yeah, if it involves netblocks, 60 days is more than

2    sufficient."

3         This isn't a border bust.  If this was a border bust and

4    we were talking about certain information that was developed 30

5    days, 45 days before trial, yeah, it is not that complicated,

6    not that big a deal.

7         Maybe to the extent that Ms. Bernstein is wrong, what she

8    is talking about that one would need to do, that that is

9    unwarranted, unjustified, unsupported, then we have a different

10   conversation.  But at this point, I haven't heard you direct

11   yourself to what Ms. Bernstein has explained to the Court is

12   necessary, is needed to adequately prepare given the timing of

13   these pieces of evidence.

14        MS. PIERSON:  Well, I would suggest that there is

15   some case law out there that is helpful to the Court in that

16   there are cases -- for instance, in complex fraud case, which I

17   would call this a complex fraud case.  And in a complex fraud

18   case we cited in our papers, there was one where the court said

19   53 days notice is more than sufficient.

20        THE COURT:  For what?  What was at play?

21        MS. PIERSON:  That is *Giacomini*.

22        THE COURT:  So, what was involved in that case?  53

23   days to do what?

24        MS. PIERSON:  You know, as I stand here, I can't

25   remember --

```
 1              THE COURT:  Because it all matters, right?  All
 2    evidence is not created equal, and all due diligence required
 3    to follow up is not the same.
 4         What case was that again?
 5              MS. PIERSON:  Giacomini.
 6              THE COURT:  What is the cite?
 7              MS. PIERSON:  It is 2002 Westlaw 393194, from the
 8    Northern District of California.
 9              THE COURT:  Say that again.  2002 Westlaw --
10              MS. PIERSON:  393194.
11              THE COURT:  393194.
12              MS. PIERSON:  And also De Anda, from the Northern
13    District of California, 2019 Westlaw 2863602, where notice was
14    given four weeks before trial, was considered timely,
15    especially -- and one from the Mariana Islands, where the Court
16    noted that Commonwealth -- the Court noted ten days before
17    trial was timely, especially where the defendant had the
18    evidence eight months earlier.
19              THE COURT:  Again, all of this is so fact dependent.
20    The fact that there was a ten-day that was found to be great,
21    40 days, 60 days -- it is all going depend upon, all right.
22    What was it?  What did it require in terms of a response?  As
23    to preparation?  And at this point, I don't know what any of
24    these cases relate to.
25         I know what this case, according to Ms. Bernstein,
```

1   involves.  And it seems to me that, given those facts -- let me

2   ask you this, Ms. Bernstein.

3       You stated it turns out there was a broker in India who

4   was responsible for setting up one or more of these AFRINIC

5   netblocks.  And at this point, you have, I take it, located the

6   broker?

7               MS. BERNSTEIN:  No, we have not even located the

8   broker.

9               THE COURT:  Okay.  So you mentioned something about

10  depositions.  So, in fact, is there going to be a need for a

11  deposition for anyone relating to these AFRINIC netblocks?

12              MS. BERNSTEIN:  There would be, Your Honor, and

13  that's part of the deep, grave concern over the short time

14  frame as well.

15              THE COURT:  Who would be deposed?

16              MS. BERNSTEIN:  The AFRINIC broker.

17              THE COURT:  The one you have not found yet?

18              MS. BERNSTEIN:  Correct.  And that broker occupies

19  the same space in narrative as Daniel Dye, as Vincent Tarney.

20  That broker is that link in this completely unrelated trial

21  within a trial that we are going to have if the AFRINIC

22  netblocks come in.  It is the central, critical character for

23  the story that the government wants to tell and that we want to

24  disprove.  So that broker would be a foundational person we

25  need to locate and we need to depose.

```
 1          I think -- my co-counsel can speak to this a bit more, but
 2     we have spent years on the government's representations this
 3     case is all about Dye and Tarney; it's all about GetAds; it's
 4     all about these netblocks.  We have never once been told that
 5     the AFRINIC netblocks were going to be referenced for any
 6     purpose.  There are thousands of netblocks in the discovery.
 7     For the government to say they won't stipulate to not mention
 8     them is very different than trying to make an entire 404(b)
 9     argument about a different set of netblocks that deals not even
10     with ARIN but with AFRINIC.
11          One of the government's witnesses is John Curran.  He is a
12     person associated with ARIN.  There is a "John Curran"
13     associated with AFRINIC.  It is an entire parallel allegation
14     with an entire parallel cast of characters.  There's a broker.
15     There's owners of the netblocks.  There's peoples whose names
16     did or didn't appear on letters of authorization.  There's
17     people who did or didn't give permission to that broker to have
18     their netblock conveyed to someone else.  There's people who
19     accepted the netblocks.  There's people who tried to announce
20     the netblocks.  There's AFRINIC and its governing body.  It is
21     an entire trial within a trial.
22          And I think what the Court had said earlier is, yes, if we
23     had been told in 2021 that the government was going to focus on
24     AFRINIC, we could have said, "We disagree, but we can start
25     prepping."  And that's what we have said to the GetAds
```

1    netblocks.  We disagree that those six GetAds netblocks, that

2    are not in the indictment, should be a part of this case.  But

3    we have been on notice for a long time and we have prepped.

4    And so we are here saying to you, "It shouldn't come in," but

5    we understand it might, and we have been prepared for it.  We

6    have prepared for years for that.

7        It's sort of the same thing, and I feel almost as though

8    we didn't -- that was our response years ago, "Well, we

9    disagree, but we will prep."  And so we sort of already

10   conceded that, and we have already let this case get expanded

11   well beyond where it should, to the point when I can't really

12   stand before you and, with a straight face, say why those six

13   netblocks shouldn't come in because we have prepared for them.

14       But we have not prepared for the AFRINIC netblocks in any

15   capacity whatsoever.  We have only begun to review the

16   thousands of pages of discovery, while doing everything else

17   that happens a month before trial.

18       And so we are just -- the bottom line -- and other counsel

19   can speak more to this, too -- but we are just not in a place

20   to provide a constitutionally adequate defense if the AFRINIC

21   netblocks come in and we are in trial before Your Honor in five

22   weeks.

23              THE COURT:  Anything else?

24              MS. BERNSTEIN:  Not as to that.

25              THE COURT:  On anything else?

1          MS. BERNSTEIN:  I was going to also address the time

2    limits, but I am not sure how Your Honor wanted to include

3    that.  I think you said you wanted to take that up with what

4    the scope of the trial is going to be.

5          THE COURT:  I guess we could talk about that now.

6       My vague recollection is that when the parties first

7    talked about trial and the length of trial, that we weren't

8    talking about six weeks.  I don't think we were even talking

9    about five weeks.  I think we are more like three or four

10   weeks.  And so, given that I didn't have a clear idea of what

11   the government's case was going to look like, who the witnesses

12   were going to be, I didn't want to get ahead of myself to start

13   creating arbitrary time limits.  At the same time -- and I made

14   reference to this at the last hearing, that I question whether

15   or not this case requires six weeks to be tried, defended, and

16   rebuttal.

17      And so, the only question for me at this point is arriving

18   at a time frame that the Court believes is reasonable given the

19   number of witnesses, the need of avoiding evidence that's

20   cumulative.  I know that that is one of the grounds that the

21   defense has identified as a basis to exclude certain

22   dual-purpose witnesses, and I will be prepared to entertain

23   objections regarding cumulative at trial.

24      And at the same time, I also am of the view that we should

25   have government witnesses cross-examined primarily by one

```
 1   defense lawyer who will go in and cross-examine on -- if not
 2   the big-ticket issues, on matters of common interest, and that
 3   then follow-up questions by defense lawyers would be available
 4   to develop or to go into matters that relate to a specific
 5   defendant.  That would be my view, that that makes sense as far
 6   as efficiently moving forward, and I want to move forward
 7   efficiently.  I don't want to waste the jury's time.
 8        So, at this point, let me ask the government, what is your
 9   estimate as to how many hours you believe it will take to call
10   and present your witnesses on direct examination?  How many
11   witnesses do you have?
12             MS. PIERSON:  I don't think that we have made an
13   estimate yet of how many --
14             THE COURT:  We need to.  We need to get there.
15             MS. PIERSON:  Okay.  All right.  What we had thought
16   about was I actually did the math and said, "Okay.  X number of
17   days of trial.  We are going to have six and a half hours of
18   trial each day, given the hour for lunch and the two 15-minute
19   breaks."  So I multiplied that out.  I got 149.5 hours.  And I
20   thought it would be fair if each side was given 70 hours.
21        Within those 70 hours, it would be opening statements,
22   direct examination of your own witnesses, cross-examination of
23   adverse witnesses, and any sidebars requested by that party.
24             THE COURT:  My question is how many witnesses do you
25   have?
```

1          MS. PIERSON:  I want to say 33, I think, roughly.

2          THE COURT:  I expect you have some big-ticket

3    witnesses, like Mr. Dye?

4          MS. PIERSON:  Right.

5          THE COURT:  Do you have another cooperator similar to

6    Mr. Dye?

7          MS. PIERSON:  There's Mr. Tarney, who did one of the

8    hosting companies.  I anticipate the expert witnesses will take

9    quite a bit of time, both on direct and cross.

10         THE COURT:  As to Mr. Dye, how long do you anticipate

11   it will take to put him on and have him testify as to what he

12   has to say?

13         MS. PIERSON:  You are talking just direct?

14         THE COURT:  Yes.

15      Let me do this, because I said we are going to have

16   another hearing because there's a motion that was filed under

17   seal that I had not reviewed and then there's the deposition

18   objections that I need to rule on.  But between now and that

19   next hearing, I would like for you -- have you notified the

20   defense who those 33 witnesses are?

21         MS. PIERSON:  No.  I am sure they can guess who most

22   of them are because they are the percipient witnesses on all

23   these events.

24         MS. BERNSTEIN:  We would greatly appreciate a witness

25   list.

 1          THE COURT:  When would you have been prepared to do

 2    that?

 3          MS. PIERSON:  As soon as we have actually figured it

 4    out for ourselves.  We don't have a final witness list.  We can

 5    certainly give them a draft witness list.

 6       They have had a draft exhibit list for quite some time.

 7          MS. BERNSTEIN:  Your Honor, I can speak to that.  It

 8    was inadvertently disclosed.  We have not accessed that until

 9    maybe two weeks ago.

10          THE COURT:  Accessed what?

11          MS. BERNSTEIN:  They sent us a draft witness list

12    inadvertently in September.  We did not touch it, did not make

13    use of it, did not touch it, understanding our ethical

14    obligations to not make use of inadvertently disclosed work

15    product.

16       Two weeks ago, when they filed something that said, "You

17    have had our witness list" -- "our exhibit list" -- excuse

18    me -- we said, "Oh, we can use it?"

19          THE COURT:  You have a draft witness and draft

20    exhibit --

21          MS. BERNSTEIN:  We have never received a draft

22    witness list.

23          THE COURT:  You have a draft exhibit list?

24          MS. BERNSTEIN:  We have a draft exhibit list that

25    they prepared as of September that we began accessing as of

1   about two weeks ago.

2           THE COURT:  And how many exhibits are listed there?

3           MS. BERNSTEIN:  I don't know off the top of my head.

4           MS. MUNK:  It's over 200, Your Honor.

5           MS. PIERSON:  Fortunately, this is not like GDMA.

6   There's not over 1,000 exhibits.  Keep it small, tight.

7           THE COURT:  Yes.

8       So, what I need the government to do is arrive at an

9   exhibit list.  And keeping in mind that this may be some set of

10  circumstances that would justify adding another witness or two.

11  I am not going to prejudge that.

12      But I think it will be helpful for the Court, for defense

13  counsel, to have that -- because, here we are.  We are, like,

14  five, six weeks from trial.  And unless there's yet another

15  variant that creates a wave, I need to try this case.  This

16  case is too old.  It keeps dragging down my entire docket.  I

17  can't do anything because I have Bychak right ahead.  And you

18  all had an opportunity to see some of the challenges that I am

19  experiencing in terms of trying to come up with trial dates.

20  So that's what it does, that is what this case does, and I want

21  to get it through, and I want to have it tried efficiently.

22      So, to the extent that I need to know what time frame is

23  reasonable, then I need for the government to come up with a

24  witness list, an exhibit list, and then give me some estimates

25  as to how long it is going to take to put on witnesses that we

1  have on that list.  And then I am going to make a call.  And it

2  very likely may be less than what is proposed here, 70 hours

3  per side.

4          MR. JONES:  Your Honor, could I say something to

5  that?  And I think that was the purpose on this motion *in*

6  *limine* hearing.

7      We believe that most of the evidence that the government

8  intends to present is highly prejudicial and irrelevant.  I

9  mean, we have just spent --

10          THE COURT:  I will decide that.

11          MR. JONES:  I understand that.

12      I know there's going to be people talking about some of

13  the items you said you would deny with respect to our motions.

14  I hope you reconsider that for that reason.  Because just like

15  you are reconsidering the AFRINIC stuff, there are a lot of

16  things that I think could be streamlined and give the defense a

17  fair trial and would also address the Court's concern about

18  timing.

19          MS. BERNSTEIN:  Your Honor, I can also represent that

20  we will -- I think Your Honor mentioned earlier, it is your

21  preference to have one defense counsel take primary cross.  It

22  is our preference, too, to try this case as efficiently as

23  possible, and that's something we will be doing.

24      This is the first I have heard of 70 hours per side, and I

25  do want to highlight to the Court that, though we are trying to

1    work as a team and efficiently and there are some common

2    defenses, there are also many unique defenses, and there's four

3    very uniquely situated defendants all or none of whom may

4    testify.

5        So, to suggest that there's 70, and we are sort of this

6    indistinguishable mass that gets 70 doesn't actually capture

7    the differences amongst all of us and the differences that

8    might need to be drawn out either through client testimony or

9    through supplemental cross, but we will have one person doing

10   primary cross to be efficient.

11       MR. LINCENBERG:  Your Honor, the only thing I was

12   going to add, this comes back to this AFRINIC/404(b) issue.  It

13   is really -- the government's proposed method of introducing

14   this evidence is the most dangerous for defendants and the

15   Court.  The government says, "We are just going to have some

16   people take 20 minutes and talk about how you did the same

17   thing to somebody else," in a complete vacuum.

18       We don't know whether AFRINIC, for example, like ARIN,

19   says that these are not property.  We don't know what these

20   brokers told -- if they spoke to any of the defendants and what

21   they said to them.  There's so many things that make this

22   dangerous when it is just reduced to the government with that

23   quick punch, when -- this could be a whole trial of 70 hours of

24   the government's case.  The government is suggesting it is no

25   different than the GetAds.

1    It's very dangerous to just, last minute, say, "All right.

2    Well, the government's suggesting a purpose, and therefore we

3    are going to let it in, and I will try to manage that," when

4    the defense has not had the opportunity to really explore this.

5    And I know it took me three years just to understand what

6    internet protocols and netblocks were and the like.  We have

7    spoken to different experts in trying to understand the

8    registry, the registration.  And now you are talking about a

9    whole different organization, called AFRINIC, which may have it

10   own rules.  It is not easy to get ahold of these witnesses

11   because who knows where they are.

12        MS. MUNK:  I just want to add a couple of things,

13   Your Honor, also with regard to the AFRINIC netblocks.  There's

14   actually different brokers for each of the three netblocks.

15   So, again, the government -- there's three netblocks that they

16   identified in their 404(b) notice, and while the government is

17   suggesting this is a quick -- "Oh, these three AFRINIC

18   netblocks, 20 minutes."  It is a huge undertaking, Your Honor.

19        And I just want to be sure the record is really clear,

20   here.  We had a bill of particulars hearing before Your Honor

21   in January of 2019, and the Court ordered that the parties meet

22   and confer on what is in play.  And the government represented

23   to the Court at the hearing this case is about these 11

24   netblocks in grand jury Exhibit 251.  And we had

25   meet-and-confers with the government.  I submitted as exhibits

1   the letters that went back and forth.  It was very clear that

2   this is what the case was about.

3        And even when we were asking the government to stipulate

4   back in -- I think it was late August 2021 about this, they

5   never said -- they still -- while they refused to stipulate,

6   they didn't flag the AFRINIC netblocks.  They continued to say

7   this case is about the 11.

8        And in more recent meet-and-confers, Your Honor, we asked,

9   "Oh, for your case-in-chief, you know, stipulate about your

10  case-in-chief" -- because they kept referencing, "Our

11  case-in-chief is limited to these 11."

12       I will suggest, and I know we have essentially almost

13  conceded this, but the Court does have legitimate concerns on

14  time here.  A lot of this evidence is going to be extremely

15  cumulative.  Each netblock, the domain, there is a person that

16  they are going to put on that was originally assigned this

17  netblock.  Many of these companies have gone out of business or

18  went bankrupt and sold to a new company.

19       So the evidence is actually pretty substantial for each

20  additional of the six, within the 11, and so I just think the

21  Court should be aware of that.  It seems the government is

22  downplaying that a little bit.

23       But regard to AFRINIC, it is massive, Your Honor.  And we

24  are very concerned because they were actually leases, so it was

25  set up quite a bit different than what the government is

1    alleging.  They are alleging that the company and our clients

2    purchased them.  They weren't purchases.  And apparently the

3    company did a number of leases with these brokers.  So this is

4    stuff we would want to look into and absolutely would want to

5    depose these brokers.  And we believe very likely would come

6    out this is completely legitimate, Your Honor.

7        So, just with regard to a prejudice, it's been over three

8    years we have relied on the 11, Your Honor, and we believe

9    that, at the last minute, now, regardless of these other

10   cases -- you are right, this is very unique, and you can't rely

11   on some other case that said 50 days is sufficient because we

12   would need substantial time to adequately prepare, Your Honor.

13            THE COURT:  Anything else?

14            MS. BERNSTEIN:  No, Your Honor.

15            THE COURT:  Any further response?

16            MS. PIERSON:  Yes.  I want to respond and say, as to

17   the AFRINIC netblocks, there are three listed in the purchase

18   documents.  We are only going to present evidence on one of

19   those three, and that's been set up in terms of the emails and

20   what have you.  There was one that was -- got noticed as a

21   project, and that is the one of those three; however, in an

22   abundance of caution, of course, we noticed all three because

23   all three will be in the documents with respect to the

24   purchase.

25        With respect to our witnesses, the defense has known for

1   quite some time who they are.  We filed expert notices on ten

2   witnesses.  They know that the two co-conspirators are

3   testifying.  They know that people -- all the people with

4   respect to the authorized users of the netblocks -- we will

5   have a representative for those ten netblocks.  I don't think

6   that there will be anyone for Internex.

7       We will have custodians of record from GetAds about domain

8   names, and we will have custodians of record from Earth Class

9   Mail regarding the post office boxes.  And we have tried to get

10  stipulations on these, but so far no -- no luck.

11      And there will be FBI agents who will testify about the

12  results of the search of the documents.

13      And there will be four witnesses from Company A:  Brittney

14  Kondrat, Mario Samonte, Sasha Treviso, and Kevin Wolf.  They

15  know all these people.  They have got their grand jury

16  testimony.  They have got all the documents that have been

17  produced by these various companies.

18          THE COURT:  So, there's these ten witnesses that

19  qualify in some way as possible expert witnesses, and that

20  includes people like Curran?

21          MS. PIERSON:  Right.  We filed -- it is part of the

22  documents.

23          THE COURT:  So, there's ten of those; there's two

24  cooperators; there's the authorized users of the netblocks.

25  And to the extent there's 11 netblocks, does that mean there

1    will be 11 witnesses?

2          MS. PIERSON:  Well, two of them are done because we

3    took their depositions.  And one of them, I don't think we are

4    going to have --

5          THE COURT:  Say that again?

6          MS. PIERSON:  We have taken the deposition of two, so

7    we will have two -- and one of them, we are not going to have

8    someone, so that would be eight, eight other individuals,

9    probably, to establish the lack of authorization.  And we will

10   probably have to have a ninth person, from Siemens, to come to

11   establish that Siemens had no other "Steven Dorn," unless they

12   want to stipulate to that.

13         THE COURT:  And then we have custodians of record for

14   a couple of these outfits?

15         MS. PIERSON:  Custodians of record for GoDaddy, for

16   the domains.  Custodians of record of Earth Class Mail, about

17   the post office boxes.  And people -- have somebody from

18   Cogent, the ISP, the upstream providers.

19         THE COURT:  So these are custodian of records, so we

20   are talking about in and out, right?

21         MS. PIERSON:  Right.  They will be in and out, but to

22   the extent that they will have to explain their records so the

23   jury can understand their record.  "This is what we do.  Here

24   is what the record looks like.  Here is how you understand it."

25         THE COURT:  And then, how many FBI agents?

1            MS. PIERSON:  Just one.

2            THE COURT:  So, right now, we have about 23

3    witnesses, so the other 10 witnesses or so --

4            MS. PIERSON:  I named four individuals from Company A

5    who are going to testify.

6            THE COURT:  Four from Company A, and what will their

7    testimony relate to?

8            MS. PIERSON:  Company A practices.

9            THE COURT:  Do you have an estimate of how long their

10   direct examination would be?

11           MS. PIERSON:  I do not.  We need to sit down and talk

12   about what we need each of these people to cover.  Ms. Heath is

13   here this week to meet with us all week.  This is what we

14   intend to, hopefully, complete this week.

15           THE COURT:  Okay.

16           MS. PIERSON:  I wanted to just address one other

17   matter with the Court, with respect to the immigration status,

18   because we filed an additional points and authorities.  I am

19   not sure if you saw it.

20           THE COURT:  Under seal?

21           MS. PIERSON:  No, not under seal.

22      Because this was after we filed our motion, the Ninth

23   Circuit came out with a case, which I think is dispositive on

24   this issue.  *U.S. v. Kvashuk*.  It was a Ninth Circuit case, on

25   March 24, 2022, where the Ninth Circuit upheld the grant of a

1   motion *in limine* to exclude immigration status under 403,

2   finding that the nature of unfair prejudice from the jury's

3   knowledge that a defendant could face immigration consequences

4   outweighed the probative value.

5        In that case, there was actually more probative value

6   than -- they haven't postulated any probative value here.  And

7   in that case, the defendant was arguing that, as part of his

8   defense, he was -- he was charged with multiple fraud things,

9   but part of it was moving stuff via bitcoin.  And he was

10  claiming that he sent it via bitcoin because he was here

11  seeking asylum and he didn't want his country of origin to know

12  about the bitcoin and possibly locate him, or whatever.

13       So, what the Court said in *Kvashuk* was the Defendant could

14  testify what has country of origin was.  We have no problem

15  with that.  If either of the defendants want to testify -- if

16  somebody wants to testify that they are from a country other

17  than the United States, we don't have any issue with that.  It

18  is the immigration status that is prejudicial, when the jury

19  could hear that they might have possible immigration

20  consequences.

21       So, anyhow, we filed a supplemental --

22            THE COURT:  I saw that.

23            MS. PIERSON:  I just wanted to bring the Court's

24  attention to that because I wasn't sure you had a chance to

25  review that.

```
 1           THE COURT:  I did.  And I agree that I would have no
 2   problem with -- I don't know if it's Mr. Pacas or Mr. Qayyum,
 3   to testify where they were born.
 4      As to immigration status, it doesn't seem to the Court
 5   that that is salient, at least at this point.  And that would
 6   be a matter that the defense would need to take up outside the
 7   presence of the jury as to giving his immigration status.
 8      Ms. Bernstein?
 9           MS. BERNSTEIN:  That's fine, Your Honor, if it's
10   something you want to defer to trial.
11      That case -- I would like to put a finer point on what
12   Ms. Pierson said if the Court would like.  That was a very
13   discrete part of the Ninth Circuit's ruling.
14      And I apologize, because I missed a flight last night and
15   I flew in this morning --
16           THE COURT:  I'm sorry.  You missed a flight?
17           MS. BERNSTEIN:  I missed a flight last night and I
18   flew in this morning, so I am a little discombobulated with my
19   materials.  As opposed to filing a supplemental response, I had
20   something typed up that I was going to share with Your Honor
21   today.
22           THE COURT:  On that point?
23           MS. BERNSTEIN:  On that point.  But I have had a lack
24   of sleep.
25      I have the case in front of me.  It just was a narrow
```

1    point.  It wasn't the holding of the Ninth Circuit case.  And I

2    think it is a real stretch to suggest that that applies to

3    immigration status in every criminal matter that ever occurs

4    thereafter.

5            THE COURT:  And I have to expect that the Ninth

6    Circuit was looking at this through the lens of whether or not

7    the Court abused its discretion.

8            MS. BERNSTEIN:  I think it was an abuse of discretion

9    standard, and I think the Court had also identified that there

10   were other ways counsel could have made the point other than

11   through -- there were other ways counsel could have made the

12   point that there were legitimate uses to the bitcoin other than

13   asylum seeking.

14           THE COURT:  When I hear a ruling like what is

15   reported from this decision, it generally turns out that the

16   Ninth Circuit upholds the trial court, finding that they didn't

17   abuse their discretion.

18       Just so you know, as far as my discretion, I would be

19   inclined to exclude immigration status as well because I think

20   potentially it would be problematic.  I have no problem with a

21   defendant testifying as to where he was born.  That's certainly

22   fair game.  But going beyond that, in immigration status, I

23   think that that does, perhaps, set up the prospect of one or

24   more jurors could start to speculate as to how these

25   proceedings might affect that person's immigration status.

1          MS. BERNSTEIN:  I think you would be surprised how

2     few people actually care about that.

3          But to the Ninth Circuit's case, it actually -- it was

4     evaluating whether the defendant's due process rights were

5     violated and whether the district court abused its discretion

6     with its *in limine* ruling.  And I can file something, a

7     paragraph, but I just wanted to put parameters on that

8     description.

9          I think if it suffices for the Court that, if and when we

10    cross that bridge, we can raise it outside the presence of the

11    jury, we understand that ruling.

12          THE COURT:  Yes.  All right.

13          MR. JONES:  Your Honor, before I let my colleague

14    speak on some of the other items -- I am not sure if

15    Ms. Bernstein is finished -- but with respect to the witness

16    and exhibit list, I think Ms. Pierson stated a few minutes ago

17    there were 33 witnesses, and I tried to keep count of how many

18    she just listed.  I am not sure if there's 33.

19          THE COURT:  It was around 37 or so.

20          MR. JONES:  And in light of the fact that she has the

21    four Company A witnesses coming in to talk about business

22    practices this week, which might limit the number of Company A

23    individuals needed to talk about the business practices, we

24    would ask if you could set a deadline for the exhibit list for

25    the government for next Monday.

```
 1            THE COURT:  I don't know about next Monday, but I am

 2   looking at, in two weeks, for the government to come up with an

 3   exhibit list and a witness list.  And that unless there's --

 4            MR. LINCENBERG:  Ms. Pierson was kind enough to

 5   suggest she would send over her draft list now, as long as she

 6   can change it.  I don't want to backtrack from that.

 7            THE COURT:  That's fine.  To the extent you already

 8   have a draft, you can provide that at any time.  And then, to

 9   the extent that, then, we are talking about something a little

10   bit more -- if not set in stone, a little bit more durable --

11            MS. PIERSON:  I am happy to provide my draft list.

12      I can tell you, for instance, one of our witnesses died in

13   the pendency of this case, so we are scrambling to find another

14   witness for that person.  That's part of why it is a draft.

15   But I will provide my draft tonight.

16            MR. LINCENBERG:  We move to exclude testimony from

17   that witness.

18            MS. BERNSTEIN:  It might relate to the six additional

19   netblocks.  I don't know who passed away, and I am sorry to

20   hear that.  But I also think perhaps some of the older

21   witnesses that that might have pertained to might have been

22   related to the six uncharged GetAds netblocks.  And I think it

23   underscores the point Ms. Munk made a little bit ago, that

24   there really is substantial testimony that's going to come in

25   on those uncharged netblocks.
```

```
 1              THE COURT:  So, I will direct the government to
 2      produce pretty much a final exhibit list and witness list by
 3      close of business, April 22.  That's about a week and a half
 4      from now.
 5           And then, as to adding a witness or an exhibit, to the
 6      extent that it is clear that the government is operating in
 7      good faith and isn't engaging in gamesmanship, I will consider
 8      an addition.  But at this point, let's aim for a final.
 9           And after you have that, then I expect the defense will be
10      in a position to, to the extent they can, offer up exhibits
11      that they intend to offer at trial so that the government can
12      have a review and consideration of that.
13           So it seems to me that April 29th would be a reasonable
14      time frame for reciprocal exhibit lists, witness lists, with
15      the understanding it's always a little different with defense
16      disclosing certain things, and there are things there may not
17      be a final decision on.  But I would like for the defense to
18      make a good-faith effort to identify matters that really aren't
19      in question, that isn't giving up the store, that isn't
20      something that we need to quarrel about or worry about.
21           And then, we will have a follow-up hearing on April 26th,
22      and at that point, we will see where we are as to witnesses and
23      exhibits.  I will have an opportunity to review the depositions
24      that are the subject of the government's motion *in limine*.  And
25      then I will also have adequate time to review the *in limine*
```

1    that was filed under seal.  And then we will be -- and at that

2    point, I will be prepared to make a final ruling on the AFRINIC

3    netblocks.

4        And just to let you know, I will look at these cases

5    beyond these to get a sense of whether or not I believe that

6    the holdings, that the analysis in those cases applies here.

7    And to the extent that I find that it doesn't, I will rule

8    accordingly.

9        Ms. Feve?

10           MS. FEVE:  Your Honor, with regard to your agenda

11   list for April 26, I would like to potentially add one item.

12           THE COURT:  Yes.

13           MS. FEVE:  On the advice of counsel motion, I heard

14   you deferring, and I just wanted to share the Court a piece of

15   information that recently came --

16           THE COURT:  I will add that to that as well because

17   that is --

18           MS. FEVE:  And I want to, kind of, put a pin in it to

19   make sure that everyone is clear and on the same page, which is

20   that we recently learned that the defense has served a trial

21   subpoena on Linda Goodman.  You are familiar with Linda Goodman

22   at this point because she is the outside counsel.  Linda

23   Goodman's attorney actually suggested that the government

24   should file a motion to quash, and I told him we were not going

25   to do that.

1      But I believe that subpoenaing Linda Goodman for testimony

2    goes well beyond using the Goodman emails that have already

3    been produced in discovery, which are vetted by Company A and

4    deemed not privileged.

5      And with regard to Linda Goodman, there are two very

6    particular issues, which is that if the testimony is not going

7    to be excluded, I think we are going to need a Rule 104

8    hearing.

9           THE COURT:  We will need a what?

10          MS. FEVE:  A Rule 104 hearing.

11     Because, with regard to Linda Goodman, there are going to

12   be two very particular legal issues that will need to be

13   addressed outside the presence of the jury.  The first is

14   attorney-client.  Her attorney, Marc Geller, indicated that she

15   plans to claim privilege.  Now, obviously, that's premature

16   until we hear the questions.  We understand the law as well,

17   that it depends on the nature of the questions.

18     But, given that the defendants do not hold the

19   privilege -- Company A does -- I believe any hearing on this

20   issue is going to need a legal representative of Company A

21   there to speak to whether or not they are willing to do a

22   waiver.  I also believe Linda Goodman's attorney would probably

23   need to be there.

24     But I want to flag the second issue, which is that we have

25   a good-faith belief, a goof basis for believing that if she did

1   not do so on direct, she would likely do so on cross, and that

2   is to invoke the Fifth Amendment.

3        And our good-faith basis is based on the fact that her

4   paralegal has previously invoked; that her prior legal counsel

5   has previously contacted the government regarding Fifth

6   Amendment concerns; and that when Michael Crowley, who now

7   represents the paralegal, for a short time represented both

8   Linda Goodman and the paralegal in the grand jury proceedings

9   before Judge Moskowitz, he also raised the Fourth Amendment

10  issue with regard to Ms. Goodman.

11       So, again, we understand that the Fifth Amendment also

12  depends on the nature of the question being asked.

13       But, given all of the concerns about keeping this trial

14  efficient and orderly, trying to address those issues on the

15  fly in the middle of trial is potentially a disaster.  So

16  that's why we are asking that the Court hold the Rule 104

17  hearing, plan to do so, given the different equities and

18  stakeholders, so it doesn't potentially disrupt trial, or so

19  that we are not in a situation where a witnesses is invoking

20  the Fifth or claiming privilege.  Because, again, to the extent

21  there is a waiver, there are thousands of documents the

22  government was never given access to by Company A because they

23  invoked the privilege.

24            THE COURT:  Do you have any response?

25            MS. BERNSTEIN:  As I stand before you, I don't.  I am

1    not prepared to respond to all of that except that it is my

2    understanding that at least one of the people the government

3    mentioned, the paralegal, as the basis for believing that

4    Ms. Goodman would invoke on cross-examination, I believe the

5    government gave immunity to that paralegal.  And so, when

6    immunity is within the province of the government to provide,

7    they don't get to dole it out to affect what the defense can

8    and cannot put on.  And it would raise issues of trying to

9    compel judicial immunity if the government wanted to immunize

10   some and not others.

11            MS. FEVE:  And we would be prepared to address why a

12   much lower-level individual -- what she was given, to what

13   extent and why.  But to the extent that you are going to seek

14   to compel the government, I can represent right now that, given

15   the scope of Linda Goodman's conduct, her authority, her reach,

16   her seniority, we are not going to immunize her.

17            MS. BERNSTEIN:  Your Honor, all of this feels a bit

18   premature, again, because a witness can't wholesale invoke

19   before they take the stand.  I think, as the government itself

20   conceded, we have a number of documents from Ms. Goodman in

21   discovery.

22            THE COURT:  And I do appreciate that this is being

23   identified.  And to be frank, I expect that there will be any

24   number of challenging issues that are presented to me during

25   trial.  And I will do what I can to have those matters

 1    addressed at night or on my motion calendar day so as not to

 2    waste the jury's time.  So I appreciate that heads up, and I

 3    know that you all are going to challenge me.

 4         So, all right.  Our next hearing --

 5              MR. LINCENBERG:  Your Honor, we have a few other

 6    issues.

 7              THE COURT:  Well, go right ahead.  You wanted to

 8    address some of my other tentatives?

 9              MR. JONES:  Mr. Goodrich has a couple of issues.

10              MR. GOODRICH:  Thank you, Your Honor.  Good

11    afternoon.  I just wanted to talk briefly about the references

12    to spam.  I know you made a preliminary ruling that "spammers"

13    is out, and we appreciate that.  I want to address the

14    intertwined language.

15         The defendants don't have an issue with Spamhaus, spam

16    cop, CAN-SPAM.  It's very much intertwined in this matter.  I

17    think we just really take issue with any kind of attempt to

18    misuse the term "spam" to dirty up our clients.

19         And you may think of spam, the first thing that comes to

20    your mind is, unfortunately, porn, pills --

21              THE COURT:  Actually, that isn't the first thing.

22              MR. GOODRICH:  Maybe that is just me, Your Honor.

23    Sick thoughts.

24         But porn, pills, Nigerian prince scams.  These are the

25    things the jury thinks of when they think of spam.  It's

1    incredibly prejudicial to our clients to refer to their, in our

2    view, legitimate email practices as sending spam, when it

3    evokes such an emotional response.

4          THE COURT:  And I think that's why we need to have

5    some ground rules as to what we are talking about with respect

6    to spam.  And I don't know the answer to that, but it seems

7    like I have seen the term "spam" used to describe any

8    commercial email, whether or not it was welcome or not.  I have

9    always thought of spam as being unwelcome commercial email,

10   that somebody is trying to sell me a car warranty extension,

11   that somebody is trying to let me know about this free iPhone

12   that I just earned or something.

13         That's, frankly, what I think, is people actually trying

14   to get my information.  And they will do it by claiming that I

15   have won something, right?  Rather than some of these other

16   things.

17         And I mean, certainly, probably at the -- not the genesis,

18   but when you first started to see spam, it was related to a lot

19   of these pills and other things.

20         But, now, I think we see that most of the spam, at least

21   that I receive -- and it might be because of spam filters or

22   whatever else -- are ones where it's asking me to participate

23   in a commercial transaction.

24         So I think, ultimately, we are going to have a number of

25   witnesses who can describe what is spam and what are we talking

1    about as to spam, so that we can be meticulously clear as to

2    how that term is being used by the witnesses called to testify.

3         MR. GOODRICH:  Your Honor, we would be happy to work

4    with the government to propose a preliminary jury instruction

5    defining what spam is, if we could get on the same page as the

6    government.

7         THE COURT:  I don't know if we need to have --

8         MS. FEVE:  Your Honor, I am going to double-check,

9    but I think that the CAN-SPAM Act actually defines it.  So, as

10   a matter of law, we are going to look at the statute.

11        But if there's any concern about there being a 403 risk of

12   confusion, if the witness uses the word "spam," we can always

13   ask them, "What do you mean by that?"

14        We don't want to mislead the jury and don't want to throw

15   this around cavalierly; but our point is this word is so baked

16   into the argument that we are happy to address these

17   concerns -- again, no one wants the jury confused.  To the

18   extent that it arises and it is not the clear from the context,

19   we can follow up with the witnesses, so if there is a

20   difference between the witnesses, we can fix it, and we can

21   certainly work on that instruction as well.

22        But as far as the law, I think the CAN-SPAM statute

23   actually defines it.

24        MR. JONES:  Your Honor, I didn't mean to cut off my

25   colleague, but the only concern is it is not a great leap to

1  say "spammers," versus "senders of spam."  There's that sort of

2  connotation that we are trying to get rid of by not using the

3  word "spammer," but if you say, "They were senders of spam,"

4  what is the difference?

5          THE COURT:  Context matters, repetition matters,

6  and -- I will leave it at that.  Context and the way it's used,

7  the number of times it's used, matters.

8      And I just don't see the government having to rely upon

9  the misuse of the term "spam" in order to build its case.

10  They, at this point, are relying upon certain alleged

11  misrepresentations that were used to appropriate the netblocks

12  of others; and to the extent that that evidence or those

13  allegations are borne out, that's far more serious than someone

14  receiving an invitation to click on -- to obtain their free

15  iPhone.

16          MR. GOODRICH:  I think it goes back to, really,

17  having a definition we can agree on on what spam is.  It is our

18  position that our clients were not sending unwanted emails.

19  The government defines it.

20          THE COURT:  I don't think that's their theory.  They

21  were just basically saying that these netblocks were obtained

22  for purposes of the spam.  Not that they were the ones that

23  were sending them versus that they were the ones that were

24  obtaining or misappropriating these netblocks.

25          MR. GOODRICH:  They cite several dictionary

1    definitions of what spam is that say unwanted emails.  I think

2    the point I am trying to make is Company A was using opt-in

3    mail lists and Company A was using suppression lists to ensure

4    that they weren't sending unwanted email.

5        And our clients were in charge of acquiring IP addresses.

6    They were not mailers.  They were not senders.

7        So, to say to send spam, when that wasn't in our clients'

8    jobs or, you know, it was their understanding the emails were

9    not spam, they were actually -- most of the ad campaigns were

10   to legitimate, oftentimes Fortune 500 companies.

11            THE COURT:  All right.  Well, we shall see.

12            MR. GOODRICH:  Your Honor, I had one more thing to

13   address, and that was mention of Mr. Manoogian as an attorney.

14   I know you have a preliminary ruling.  I just wanted to bring

15   your attention -- the government cites this case, *Fletcher*.

16   And in *Fletcher*, the defendant was a lawyer.  He had practiced

17   law and he had a background in tax work, and the case was about

18   tax evasion.  So, clearly, in *Fletcher*, it was relevant because

19   he is a lawyer and he is a tax lawyer, essentially, so it goes

20   to intent, of his intent to commit tax fraud.

21       But in this case, Mr. Manoogian passed the bar 2008.  He's

22   never practiced as a lawyer.  Not barred in California, never

23   sat for the bar exam in California.  He has never practiced law

24   at Company A during the relevant time frame of the indictment.

25   He never provided any legal opinions regarding anything to do

1    with this case.

2        So to the extent that his background, educational

3    background, comes in in testimony -- we would ask that the

4    government should be precluded from arguing that because he is

5    a lawyer, he should have known better, essentially; he should

6    be able to form requisite intent that what he was doing was

7    committing illegal conduct.

8            THE COURT:  I am not prepared to do that.  It seems

9    to me that somebody only having a fifth grade education,

10   somebody who only had a high school education, that somebody

11   had a doctorate, that's helpful for the trier of fact to get a

12   sense of how sophisticated, how educated of an accused do we

13   have, so that some of these events would have seemed unusual,

14   would have seemed suspect.

15       And so, I am not prepared to exclude that evidence.  As to

16   whether or not the government makes proper use of that evidence

17   in crafting their arguments, we will wait and see.  If they

18   don't, then the remedy is an objection and I will rule on it.

19           MR. GOODRICH:  I appreciate that.

20       One more thing on that is I know lawyers are held to a

21   higher standard, and I know jury members think that you pass

22   the bar exam, you know everything about the law --

23           THE COURT:  Well, your client hasn't passed the

24   bar -- or has he?

25           MR. GOODRICH:  He has passed the bar exam.

 1          You know, I get probably a dozen calls a month from my dad

 2     about stuff to do with his business that he thinks -- I know

 3     nothing about corporate business or anything.  I am a

 4     litigator -- barely, I guess.

 5          But, you know, I don't think it's appropriate for -- the

 6     jury's going to be able to consider that he passed the bar

 7     exam.  He knows everything about the law.  And because he knows

 8     everything about the law --

 9               THE COURT:  Well, if that was the argument they made,

10     and if there was an objection, I would sustain it.

11               MR. GOODRICH:  Thank you.

12               THE COURT:  I don't expect that that's going to be

13     the argument, but we will see.

14               MR. GOODRICH:  I appreciate it.  Thank you.

15               MR. PATRICK:  Thank you, Your Honor.  Darren Patrick.

16          If you would allow, I would like to say a few words about

17     the first MIL that you talked about in your tentative ruling,

18     which was number three, ECF 349.

19               THE COURT:  Nortel?

20               MR. PATRICK:  Yes.

21          I understood from the Court's tentative that you wanted to

22     deny that in the following respect:  That the government should

23     be able to talk about the Nortel transaction as evidence that

24     IP addresses have value.  And I understood that to be the

25     Court's rationale.

1        I just wanted to make a point of clarification that what

2    we are actually trying to exclude in MIL number three is

3    something a little bit different, which is what the market

4    value was, and using the Nortel transaction as evidence of the

5    defendant's state of mind, specifically.

6        So the argument, as we see it, from the government, would

7    look something like this.  In the Nortel transaction, Microsoft

8    paid $11 per IP address.  In this case, the defendants paid $2

9    for the IP addresses that they acquired from GetAds; therefore,

10   defendants must have known that there was something wrong with

11   these IP addresses; that they were tainted; they had been

12   stolen.

13       And in order to get from the Nortel transaction to

14   defendants' state of mind, there are so many leaps and so many

15   gaps and so many predicate facts that would need to be shown

16   beforehand that we think that it should be admitted under

17   104(b) only with conditional relevance; that is, the government

18   should have to prove all of the predicate facts that would make

19   the Nortel transaction relevant to the defendants' state of

20   mind, and there are many.

21       Defendants would have to have known about the Nortel

22   transaction.  Defendants would have to have believed that the

23   $11 per IP price was an objective established market value.

24   Defendants would have to be shown to have believed that the

25   GetAds IP addresses ought to have been valued similarly.

1    Absent all of these predicate facts, the Nortel

2  transaction, if used to show defendants' state of mind, would

3  miss the point.  It would be prejudicial.  And it would not tie

4  up the loose ends.  It would not fill in the dots that would

5  make the Nortel transaction relevant for that specific purpose,

6  state of mind.

7    And we think it would be premature to deny the motion

8  outright now, not having seen any offer of evidence by the

9  government as to those predicate facts.

10    And if Your Honor has other questions, I would be prepared

11  to address some of the comments made by the government in the

12  government's opposition to our motion.  I will do that now,

13  just very briefly.

14          THE COURT:  I am sorry.  Repeat that last sentence

15  you just said?

16          MR. PATRICK:  I would like to discuss one of the

17  arguments made in the government's opposition to our motion *in*

18  *limine* number three.

19          THE COURT:  Yes.

20          MR. PATRICK:  The government argues, "Well, the

21  courts have a long history of admitting price information as

22  evidence that a defendant knew goods were stolen or

23  misappropriated."  And that's actually not quite accurate.  And

24  the case that they cite for this proposition, *Adelson*,

25  (phonetic), does not really say that.  In fact, it is the

1    reverse.

2        First, you have to show that the defendants knew that the

3    price was not reflective of the value, and only then can you

4    show that delta, that difference between the price paid and the

5    true market value, to show criminal intent.

6            THE COURT:  The government responds that, in the case

7    of Manoogian, Bychak, Mohammed, that they were aware of the

8    Nortel-Microsoft transaction and they were using the same

9    netblock brokerage firm that had represented Nortel to help the

10   defendants find IP addresses to buy or lease.

11       Do you disagree that that evidence would move the ball

12   forward as far as --

13           MR. PATRICK:  No.  I think, at most -- they are

14   referring to an email from November of 2012 from a broker of IP

15   addresses to certain of the defendants basically making a sales

16   pitch and saying, "You should be interested in my services.  By

17   the way, here are a number of links to articles discussing the

18   IP market more generally."  And among those articles listed at

19   the bottom of the email was an article about the Nortel

20   transaction.  That's it.

21       That doesn't really get you very far.  It tends -- it is

22   minimally relevant to the first predicate fact that I

23   mentioned, defendants' knowledge of the Nortel transaction, but

24   it says nothing about and is not probative of the defendants'

25   belief that the price that was obtained in the Nortel

1    transaction was the true objective market price.

2        It obviously says nothing about the value of these IP

3    addresses that Company A had --

4            THE COURT:  As far as a fair, reasonable price, the

5    fact that a bankruptcy judge approved it, that would be some

6    indication that it is in the ballpark?

7            MR. PATRICK:  Well, I would differ with that in the

8    following sense.  In a bankruptcy auction, normally the highest

9    bidder walks away with the parcel that's being sold.

10       A bankruptcy court approving a sale is not an indication

11   that that is market value.

12       The bankruptcy estate would be happy to have a bidding war

13   at which a bidder paid much more than fair market value, and

14   there was no --

15           THE COURT:  Normally, in that kind of auction

16   situation, you have, kind of, a low-ball situation, that people

17   take advantage of the fact that there's this distressed company

18   and there's this asset that is on the block.  But here, even

19   with that being the case, you had Microsoft pay Nortel

20   approximately $11 per address.  So, if anything, you would

21   think that, to the extent that that was a low-ball number, then

22   it would only be more than that.

23       But, here, the defendants were paying $2 per IP address,

24   which would suggest that they were obtaining these hijacked

25   netblocks at 20 percent of what a bankruptcy judge found was a

1    fair price.

2          MR. PATRICK:  I have a couple of responses to that.

3    One, Microsoft is a giant, multinational conglomerate who

4    really wanted 665,000 IP addresses.  They were aware that

5    Nortel had them.  And they made a bid, as a stalking horse

6    bidder, and ultimately the highest bidder.  That is not a

7    direct reflection of their market price.  I don't think there

8    was any overbid in that case.

9          But the analysis that the bankruptcy court would do --

10   and, in fact, there was no analysis that the bankruptcy court

11   could have done at the time.  It is not like looking at the

12   *Wall Street Journal* and finding out what a share of a stock

13   should cost, or what a barrel of oil should cost on an

14   international market.  This was a never-before-seen

15   circumstance in a bankruptcy case.  In fact, it was the first

16   sale of an IP address, a block of IP addresses in a bankruptcy

17   case.  There was no objective standard for pricing.

18         And that's exactly why it is dangerous here for the

19   government to point to that single transaction.  That is not

20   directly tied to any of the defendants here or to Company A and

21   say, "That transaction is a reflection of the objective market

22   price."

23         Incidentally, the IP transaction in the Nortel case

24   happened after Company A started purchasing IP addresses from

25   GetAds.

1          It is a data point.  And we do -- to be clear, we

2    anticipate and we have no quarrel with the government pointing

3    to the Nortel transaction and saying, "Rights to IP addresses

4    can be transferred for money.  It has happened.  For example,

5    it happened in the bankruptcy court in Delaware in 2011."

6    That's not what we are trying to exclude.

7          What we are trying to exclude is using that Nortel

8    transaction and jumping over all of the other evidence that

9    would be necessary to make that relevant to the defendants here

10   and their state of mind, and saying, "That's the market price.

11   You paid $2, which is a fraction of the market price;

12   therefore, you should have known and must have known that there

13   was something wrong."

14         There are just a lot of factual holes that would need to

15   be filled in by the government before they could make that leap

16   to talk about state of mind specifically, so that's really what

17   we are getting at in the motion *in limine*.

18              THE COURT:  So, to the extent that the defendants

19   were paying for hijacked netblocks, you would figure that their

20   job description, their duties and responsibilities, would have

21   included obtaining netblocks, as many as needed, at a price

22   point that was as low as possible.  And so, then, they would

23   need to know, "Well, what is the going rate for netblocks?"

24         And so, to the extent that you had a bankruptcy court

25   judge determine that $11 for IP address was the going rate, at

1    least in that case, that these were the kind of things that the

2    defendants, in seeking and obtaining netblocks, would have been

3    looking into.  Is that -- isn't that a reasonable assumption?

4              MR. PATRICK:  Well, it is actually a bit more complex

5    than that based on the review we have done from the documents

6    and production, including from the government's expert Sandra

7    Brown.  I know that's not really part of this motion, to that

8    extent, but let me first say we do not concede any

9    characterization of "hijacked" netblocks.

10       But I think there are a lot of considerations that go into

11   what a specific IP address is worth at a specific time, and it

12   is not something that so clearcut and applicable to all IP

13   addresses.  It is not a fungible good, like a barrel of oil.

14             THE COURT:  Let me ask, as to Mr. Dye, is there any

15   indication that his statements to the government, which have

16   been shared then with the defense, include statements along the

17   lines of he would have provided these hijacked netblocks; he

18   offered them at $2 per IP address; and when he was selling

19   these at $2 per, he made it clear that the going market for

20   these was $20, was $15; that there was this Nortel Networks

21   fire sale, where they were going for $11 per netblock, and so

22   that they should understand they are getting a great deal.

23       Is there anything like that in the discovery --

24             MR. PATRICK:  I think not, not that I have seen.  I

25   don't think that there is anything that we can see, other

1    than -- the Nortel transaction is not something that is

2    discussed in the emails among the representatives of Company A.

3        The Nortel transaction is just an independent, outside

4    fact.  And it was actually first raised in this case in

5    connection with the motion to dismiss briefing.  And in fact,

6    both sides, defendants and the government, both relied on the

7    Nortel sale order and bankruptcy case for different reasons.

8    And the government said Nortel means that IP addresses have

9    monetary value.  The government made the position that

10   something of value is property; therefore, IP addresses are

11   property.

12       We took the other side of that argument and said there is

13   evidence from the record in the bankruptcy case, in the Nortel

14   bankruptcy case, suggesting that IP addresses are not property,

15   not traditionally recognized property; in fact, there were

16   references in the sale order to the property rights of the

17   debtor, Nortel Networks Corp., and those were stricken out by

18   the bankruptcy judge, by the parties at the behest of ARIN.

19       So it is a very complex issue, and that's one of the

20   reasons why we filed this motion, because it's a little bit

21   facile, a little bit dangerous to say, Nortel happened at $11;

22   therefore, that is the established market price because there's

23   so many other considerations.

24           THE COURT:  Let me hear from the government as to

25   this motion *in limine*.

1          MS. HEATH:  Yes, Your Honor.

2      The knowledge that the defense had of Nortel goes directly

3  to this one email, November 2012, where a brokerage company

4  approached them about finding netblocks for them and, in their

5  eagerness to impress the defendants, attached these links to

6  various articles.  There were seven links.

7      Two of the links directly mentioned, in the title of the

8  link, the Nortel-Microsoft sale.  First one was, "Microsoft

9  Spends 7.5 million on 666,000 Nortel IP4 Addresses."  The

10  second one says, "Court Approves Nortel Sale of IP4 Addresses

11  to Microsoft."

12      Three of the other four, you would have to click on it,

13  but in the body of the article, it also discusses the

14  Microsoft-Nortel sale.  And those titles of those three links,

15  were "Sales of Unused IP4 Addresses Gathering Steam.  Want to

16  Buy an IP4 Address Cheap?  Need IP4 Addresses?  Get Them Here."

17          THE COURT:  Let me ask, to the extent that the

18  defense takes a position that this email was in some way

19  unwanted spam, that it was some solicitation of the poor

20  defendants from this outfit that was involved in obtaining

21  these IP addresses, is there any indication there was a

22  response to the email or there was anything further to suggest

23  that those links were clicked on and that the information was

24  accessed?  Do we have something like that?

25          MS. HEATH:  The totality of the chain of that email,

1    the first one comes from the brokerage.  Then there are several

2    conversations between three of the four defendants talking

3    about, "Hey, should we take them up on this?  It sounds like a

4    good idea."  So they do discuss the offer.

5              THE COURT:  That they accessed the information, or

6    some of it?

7              MS. HEATH:  They don't specifically say in the emails

8    that they accessed or clicked on the links.  But they did talk

9    about potentially following up on this offer.

10             MR. PATRICK:  I would disagree with that

11   characterization.  Unfortunately, we don't have it to look at

12   right now.  But there's no concrete offer in any of these

13   emails.  It was just a sales solicitation.  "We are a broker."

14   But there's -- and there was a conversation in email --

15             THE COURT:  Right.  Because the way you presented it

16   initially was that there was just this standalone email that

17   made its way onto the server.

18             MR. PATRICK:  To be clear, the subsequent

19   conversation had nothing to do with the Nortel transaction

20   whatsoever, and I think the government will agree on the

21   record.

22             THE COURT:  But it would reflect some discussion

23   about, perhaps, hiring this broker, and I guess showing that

24   these individuals had a hand in determining how to go about

25   obtaining netblocks or IP addresses.

1          MR. PATRICK:  One can argue there is a scintilla of

2     evidence that there was some knowledge by one or more

3     defendants of the fact of the Nortel transaction.

4          THE COURT:  Well, but beyond that, that part of their

5     job duties and description included looking into these kinds of

6     matters and determining value for netblocks, right?

7          MR. PATRICK:  One of the -- Company A definitely

8     needed to acquire IP addresses and did so.

9        But not -- there's no evidence that they compared the

10    prices -- obviously, Company A, like any other company, would

11    want to get the lowest price for a netblock.  There's nothing

12    inherently wrong with acquiring something for a lower price

13    than Microsoft paid to Nortel in one specific bankruptcy case.

14         THE COURT:  But then there's this expectation that

15    these individuals who have these duties and responsibilities

16    want to do a good job and try to find a good price; that they

17    are going to do their due diligence, right?

18         MR. PATRICK:  Yes, and they would.  But I don't think

19    there is any evidence that would suggest that an offer for an

20    IP address for two dollars or five dollars or one dollar was in

21    any way suspicious.  In fact, the expert that the government

22    has identified has writings talking about some people pay two

23    to three dollars for an IP address in a Third World country.

24    There is no gloss on that, that that's illegal, or they should

25    believe that it must have been stolen.

1    The point is there are many data points to decide what

2    parties would pay for an IP address under what circumstances.

3    But the Nortel transaction agency was such a specific -- and it

4    was just one transaction.

5         THE COURT:  Let me ask the government, as far as the

6    Nortel transaction, are you expecting that it will be relied

7    upon by one of your experts in determining, kind of, what the

8    going rate was for netblocks in this time frame?  Or as a

9    standalone piece of evidence that, on its own, will be relied

10   upon to make arguments supporting this idea that the defendants

11   had to know that what they were doing was illegal because they

12   would have known that they were paying 20 cents on the dollar

13   for netblocks.

14        MS. HEATH:  The Microsoft transaction is definitely

15   not a standalone.  The Microsoft transaction kick-started the

16   sale of commercial IP blocks in this sphere that we are dealing

17   with.  This is where brokers started appearing and creating

18   their businesses to be able to sell netblocks to other people.

19        THE COURT:  Are you going to have an expert, then,

20   basically rely upon the Nortel to explain the market for it.

21        MS. HEATH:  Yes.  She was part of the Nortel

22   transaction.  That is part of her expertise/background that we

23   will provide the Court, that she was part of that transaction.

24        THE COURT:  It seems to me that this evidence is

25   necessary to tell the story about the monetization of

1    netblocks, and when it started, and how it occurred, and what

2    it involves.

3         MR. PATRICK:  Can I make one point?

4    You have heard counsel say that this the Nortel

5    transaction kick-started the commercial process of transacting

6    in IP addresses that we are talking about in this case.  It is

7    just not true because Company A had already acquired netblocks

8    on the market from GetAds, believing the facts that it believed

9    at that time, prior to the Nortel transaction.

10        THE COURT:  So you can cross-examine the witness and

11   show that they are wrong.

12        MR. PATRICK:  That's fine.  I don't know -- I wasn't

13   clear from government's counsel on how the evidence is proposed

14   to be used, whether the government intends to rely on Nortel to

15   go to a state of mind claim, that these were below market,

16   vis-a-vis the Nortel transaction.  That's not entirely clear,

17   and that's why we filed this motion.

18        Based on the opposition, it looks like they may intend to

19   go there, and having identified Sandra Brown as an expert to

20   talk about the valuation.

21        We would submit that Sandra Brown is perfectly capable of

22   testifying to everything about the Nortel transaction, to the

23   extent it's relevant to a disputed issue as to whether an IP

24   address as value.  But once it crosses the line into opining

25   about defendants' state of mind, and what they knew or didn't

1    know about the Nortel transaction, or what they should have

2    known or must have known --

3              THE COURT:  Let me ask the government, is that how

4    you intend to rely upon this Nortel evidence, that they

5    absolutely had to no know that what they were engaged in was

6    illicit because they were picking up these IP blocks or IP

7    addresses at 20 cents on the dollar, of what they otherwise

8    were available for.

9              MS. HEATH:  The expert's testimony really goes to the

10   industry standards that evolved and are or were in existence

11   during that period of time.  Comparing how an actual

12   transaction occurs, comparing price, comparing documents that

13   are prepared, comparing negotiations, comparing what approvals

14   are needed -- there will be hundreds of transactions that the

15   expert has engaged in during the period of time of our

16   conspiracy, our alleged conspiracy.  So she will have a wealth

17   of knowledge from her own practice that she can provide the

18   jury.

19       The Nortel transaction is, as I said, just what started

20   the major commercial transactions for IP blocks, and this

21   particular expert started as a broker.

22             THE COURT:  I am going to confirm my tentative at

23   this point.

24             MR. PATRICK:  All right.  Thank you, Your Honor.

25             MR. NEVAREZ:  Good afternoon, Your Honor.  Carlos

1    Nevarez.

2        I will be discussing ECF 358; that is, the motion *in*

3    *limine* to preclude use of the term "victims" as to certain

4    individuals.

5        As you stated correctly earlier, Your Honor, context

6    matters, repetition matters.  And in this case, the government

7    has been indiscriminately using the term "victim."  In doing

8    so, the government is presenting defendants as indiscriminate

9    victimizers.

10       So, in various pleadings and representations, the

11   government has called a widespread group of characters and

12   individuals, from ISPs, internet service providers; to upstream

13   providers, like Yahoo; and even at one point, the government

14   stated, "Under these facts, the people who received the

15   unsolicited emails are victims."

16       So, they are referencing --

17           THE COURT:  I am not sure if that's going to be their

18   focus at trial.

19       Is that going to be a part of the government's case, that

20   these are the victims, the people that received the unwelcome

21   commercial emails?

22       As I understand the government's case, you are going to

23   say that the victims are these, otherwise, owners, assignees of

24   these netblocks, who had others take those netblocks and use

25   them for purposes of sending commercial emails.  Is that your

theory, that that is where the victims are, versus people that

might have received emails down the line?

           MS. HEATH:  Yes, Your Honor.

    The people that received the emails down the line, while

they may be impacted by the volume of emails they received, our

indictment focuses on the individual companies, registrants who

lost their ability to use their IP address during that time and

the providers and hosting companies that were convinced or

conned that the defendants actually owned the IP address block

and then approved their use and ability to then send all the

emails.

    The term "victim" -- it was not our intent to use it

indiscriminately during the trial.

    You will hear testimony by some of the individuals who

either felt they were a victim, or they might refer to somebody

else as being a "victim."  But it is not our intent to classify

everybody that was impacted by the defendants' conduct as

"victims."

           THE COURT:  And I think that's how I have understood

the government's case, that you don't need to turn this trial

into, like, a victim-fest, where at every turn we are going to

be using the term "victim."

    At the same time, as I mentioned, context matters,

repetition matters.  If it turns out that the government relies

and leans too much on this victimization or victim tagline, it

1    may be appropriate to object and sustain the objection.

2         Just to have an across-the-board ruling that precludes,

3    prohibits the government from using the term "victim," that

4    doesn't make any sense to me.

5              MR. NEVAREZ:  Agreed, Your Honor.  And the fact that

6    the government is actually limiting the scope of the usage of

7    the world "victim" is well taken.

8         It is still problematic that they are calling characters

9    such as internet service providers victims.  These are entities

10   that -- some of the individuals associated with these entities

11   are going to be testifying either as lay witnesses with

12   specialized knowledge or as experts -- I am not really sure

13   which way the government is going to attempt to present their

14   testimony -- but I am specifically referring to the testimony

15   of Sean Zadig, who is associated with Yahoo.  He is, I believe,

16   the chief -- the chief security officer for Yahoo.  And this

17   individual is going to be talking about the cost of responding

18   to the commercial emails sent to Yahoo from the hijacked

19   netblocks, as well as the impact to Yahoo business dealings,

20   whatever that may mean.

21        This is important, Your Honor, because defendants in this

22   case have been charged with executing a scheme or artifice to

23   defraud.

24        Under U.S. Supreme Court case law and under Ninth Circuit

25   case law -- and I am referring to the case of *U.S. v. Yates*,

1    and the case of *U.S. v. Kelly* -- "In a scheme to defraud,

2    property deprivation must play more than some bit part in the

3    scheme.  The loss to the victim must be an object of the fraud,

4    not merely implementation cost or incidental by-products."

5        Now, the problem here, Your Honor, is if we have Sean

6    Zadig come in to testify as a lay witness with specialized

7    knowledge, or as an expert, and start talking about Yahoo's

8    monetary losses of what I would argue is actually part of their

9    business model -- that is, Yahoo is going to be spending money

10   to filter out commercial emails already -- so if Mr. Zadig is

11   going to take the stand in front of the jury talk about these

12   losses and characterize an entity like Yahoo as a victim in

13   this case, then that is extremely problematic.

14        THE COURT:  That is the thing.  I don't expect that

15   the government is necessarily going to use this tagline of

16   "victim" to describe what happened that Yahoo.  Instead, it

17   goes back to what you just said; that this witness will talk

18   about the impact on Yahoo and what Yahoo had to do in response

19   to criticisms or complaints from Yahoo subscribers who were

20   receiving these unwelcome commercial emails, so then -- what

21   they had to do.  And as far as that impact, I don't see somehow

22   or another that that comes within the umbrella of this motion

23   *in limine*, to preclude reference to certain individuals as

24   "victims."

25        Now you are asking for the Court to, under the guise of a

1  motion *in limine*, to preclude reference to individuals as

2  victims, to prevent them from even testifying as to what impact

3  it had for this spam or this unwanted commercial emails to come

4  across their lines.

5       MR. NEVAREZ:  Correct, Your Honor.  That was actually

6  part of my response to motion *in limine* number nine, but since

7  that topic is going to be deferred to a later point, there is

8  that parallel point that Mr. Zadig is still going to take the

9  stand to speak about Yahoo in a way that characterizes Yahoo as

10  a victim.  And that goes back to motion *in limine* number seven,

11  the victim motion *in limine*.

12      And you did note, Your Honor, that Mr. Zadig is going to

13  be talking about the costs that Yahoo sustained in dealing

14  with, I believe, angry email users.  That, I would argue, is an

15  incidental cost or a by-product of the alleged charge, at best.

16  I would actually say that it is a nonevent that is completely

17  outside and too tenuous to the actual alleged scheme.

18      So, to the extent that Mr. Zadig, or the government, is

19  going to represent Yahoo or Google or these ISPs as victims,

20  then that testimony is irrelevant and unduly prejudicial.

21      THE COURT:  And I disagree.  I mean, it is clear that

22  the government is going to offer evidence which will support

23  the idea that this isn't a victimless crime in that, "Well,

24  there were these commandeered or hijacked netblocks, and they

25  were perhaps misused, but they don't harm anybody, they didn't

1   hurt anybody, affect anybody, impact anybody in any particular

2   way, so what is the big fuss?"  But, in fact, there are

3   real-world implications, and as such, the government should be

4   allowed to have a witness or two describe what those

5   consequences or implications, ramifications are.

6       So I am going to confirm --

7       MR. GOODRICH:  Could I say one thing?  Mr. Zadig's

8   anticipated testimony is that Yahoo suffered some $30,000 in

9   costs associated with cleaning up its networks form spam.  But

10  the problem is that was not the target -- it was clear

11  incidental by-product of scheme itself.

12      So we have, now, the jury considering this $30,000 that

13  Yahoo had to consider, which is monetary value.  And under the

14  wire fraud statute, they have money and property.  So we have

15  this issue with property that's very ambiguous and a lot of

16  discussion will come on that.  And then the government is going

17  to put forth evidence that now we have clear monetary value,

18  $30,000 that Yahoo had to clean up.  That's going to ding our

19  guys in wire fraud.  And that's what we are concerned about.

20      MR. JONES:  And the problem with that, Your Honor, is

21  that, under the wire fraud statute, it has to be the object of

22  the fraud.  So, this $30,000 from Yahoo is not the object of

23  the fraud.  The object of the fraud, according to the

24  government, is sending commercial email.

25      So, you know, given that it is going to confuse the jury

1    on the issue, puts the defense at a very -- a disadvantage, and

2    it's prejudicial and irrelevant.

3            THE COURT:  Certainly, I can gather from what I have

4    heard that the parties will be aiming to re-litigate certain

5    questions about property and determine who should make the

6    determination as to property, whether or not it is to decide it

7    as a matter of law, to what extent the jury should be exposed

8    to any number of cases and such, and the Court will be ready to

9    let you all know what can and cannot be offered along those

10   lines.

11       I am certain that today gives us a bit of a preview of

12   what we have in store, and there is a lot we have in store, and

13   I get that.  I get that.

14           MR. NEVAREZ:  Thank you, Your Honor.

15           MR. JONES:  Thank you, Your Honor.

16           MR. LINCENBERG:  Your Honor, I ask for 90 seconds,

17   and I ask you to hold me to it.

18           THE COURT:  Sure.

19           MR. LINCENBERG:  Real quick, two points.

20       On the references to identity theft, the only point I

21   would make, we are not in disagreement with the government that

22   they should be able to put in evidence that the defendants took

23   somebody else's IP address or whatever it may be.

24       The point is simply they shouldn't be able to call it

25   identity theft, which is a separate felony offense.  I am not

1   sure we are in disagreement over that.

2          THE COURT:  I am not sure.  Is that what the

3   government intends to do, refer to this as identify theft?

4          MR. JONES:  Your Honor, I think in some of the

5   discovery we have seen, they have already done that.  The case

6   agent said, "Do you know you are a victim of identity theft?"

7   And I think that's what has us on high alert.

8          THE COURT:  And I can see where, perhaps, in

9   approaching a potential witness, an FBI agent, at the early

10  parts of the investigation may have introduced himself as, "I

11  am agent so-and-so, and I am here investigating whatever."

12     But that doesn't, then, equate to, then, the government

13  making its case at trial, based upon the notion that we have

14  any number of victims of identity theft who will testify, and

15  those victims will proceed -- Ms. Feve, do you want to address

16  that?

17         MS. FEVE:  Your Honor, I think you understand.

18         MR. LINCENBERG:  Okay.  And then the other one, with

19  regard to precluding the government from, on the sheet, using

20  the dba's and P.O. boxes under different names, we are not

21  moving to preclude them from using that.  But what we are

22  seeking is perhaps a jury instruction on this, that it is

23  lawful to use dba's and the like.

24     Now, the government can argue, "It may be lawful, but you

25  are using them in an unlawful way."  That's fine.  We just want

1    to make clear that it is common conduct to have P.O. boxes and

2    dba's and the like in other names.

3              THE COURT:  And it sounds to me like that's the

4    response.  To the extent that the government makes a big deal

5    out of the use of certain kinds of business transactions that

6    are otherwise commonly accepted, and you are of the view that

7    the government's just relying upon innocuous, kind of, events

8    and things, then, you make that same argument to the jury.  And

9    to the extent that the jury believes you, then, guess what?

10   You have diminished the government's case.

11        But it is not something that at this point I am not --

12   that I am going to involve myself in at a motion *in limine* to

13   exclude and prevent the government from pursuing.

14             MR. LINCENBERG:  And I don't disagree with that

15   ruling --

16             THE COURT:  90 seconds is up.

17             MR. LINCENBERG:  But she used some of my time.

18             THE COURT:  No, but you said to hold you to it.

19             MR. JONES:  Your Honor, can I yield 30 seconds of my

20   time?

21             THE COURT:  No.

22        All right.  We will see you all in a couple of weeks.

23             MS. MUNK:  Your Honor, what time?

24             THE COURT:  I will give you 1:30.

25             MS. FEVE:  Your Honor, do you want us to ask Sheppard

1    Mullin to be available by telephone?

2            THE COURT:  You know, it just seems to me that we

3    aren't in a position to have that question about

4    attorney-clients, about invoking -- it isn't sufficiently cued

5    up for the Court's --

6            MS. FEVE:  We do have different -- just, if you

7    wanted them, I was asking.  That's all.

8            THE COURT:  No.  I think the way I see it, we have

9    some work left to complete, and then we have a new universe of

10   issues that we need to be mindful of and kind of figure out a

11   way to efficiently address them.  So, we will.  We will.

12       That concludes today's proceedings, and I will direct the

13   parties to return on April 26th, at 1:30 p.m.

14       Do you understand, Mr. Manoogian?

15           DEFENDANT MANOOGIAN:  Yes, Your Honor.

16           THE COURT:  And Mr. Qayyum?

17           DEFENDANT QAYYUM:  Yes, Your Honor.

18           THE COURT:  Mr. Pacas?

19           DEFENDANT PACAS:  Yes, Your Honor.

20           THE COURT:  And Mr. Bychak?

21           DEFENDANT BYCHAK:  Yes, Your Honor.

22           THE COURT:  That will be all.

23           ALL:  Thank you, Your Honor.

24       (End of proceedings at 5:34 p.m.)

25                        -o0o-

```
1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3           I hereby certify that I am a duly appointed,

4  qualified and acting official Court Reporter for the United

5  States District Court; that the foregoing is a true and correct

6  transcript of the proceedings had in the aforementioned cause;

7  that said transcript is a true and correct transcription of my

8  stenographic notes; and that the format used herein complies

9  with rules and requirements of the United States Judicial

10  Conference.

11           DATED:  April 18, 2022, at San Diego, California.

12

13                         /s/  Chari L. Bowery
                          _____
14                         Chari L. Bowery
                          CSR No. 9944, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25
```