```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,      .
                                    .
 5                 Plaintiff,       . No. 18-cr-4683-GPC
                                    .
 6            v.                    . May 6, 2022
                                    . 3:00 p.m.
 7   JACOB BYCHAK,                  .
     MARK MANOOGIAN,                .
 8   MOHAMMED ABDUL QAYYUM,         .
     PETR PACAS,                    .
 9                                  .
                   Defendants.      . San Diego, California
10   . . . . . . . . . . . . . . .

11                  TRANSCRIPT OF MOTION HEARING

12         BEFORE THE HONORABLE GONZALO P. CURIEL
                   UNITED STATES DISTRICT JUDGE

13

14

15   APPEARANCES:

16   For the Plaintiff:    United States Attorney's Office
                           By: SABRINA L. FEVE, ESQ.
17                             MELANIE K. PIERSON, ESQ.
                               CANDINA S. HEATH, ESQ.
18                         880 Front Street, Room 6293
                           San Diego, California 92101
19
     For the Defendant     Wiechert, Munk & Goldstein, PC
20   JACOB BYCHAK:         By: DAVID W. WIECHERT, ESQ.
                               JESSICA C. MUNK, ESQ.
21                         27136 Paseo Espada, Suite B1123
                           San Juan Capistrano, California 92675
22
     For the Defendant     Mintz Levin
23   MARK MANOOGIAN:       By:  RANDY K. JONES, ESQ.
                               RYAN T. DOUGHERTY, ESQ.
24                             DANIEL J. GOODRICH, ESQ.
                           3580 Carmel Mountain Road, Suite 300
25                         San Diego, California 92130
```

```
 1   APPEARANCES (CONTINUED):

 2

 3   For the Defendant       Bienert Katzman Litrell Williams LLP
     MOHAMMED ABDUL          By:  WHITNEY Z. BERNSTEIN, ESQ.
 4   QAYYUM:                      JAMES D. RIDDET, ESQ.
                                  CARLOS A. NEVAREZ, ESQ.
 5                           903 Calle Amanecer, Suite 350
                             San Clemente, California 92673
 6

 7   For the Defendant       Bird Marella
     PETR PACAS:             By:  GARY S. LINCENBERG, ESQ.
 8                                DARREN L. PATRICK, ESQ.
                                  ALEXIS A. WISELEY, ESQ.
 9                           1875 Century Park East
                             Suite 2300
10                           Los Angeles, California 90067

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:         Chari L. Bowery, RPR, CRR
                             USDC Clerk's Office
23                           333 West Broadway, Suite 420
                             San Diego, California 92101
24                           chari_bowery@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
 1              SAN DIEGO, CALIFORNIA; MAY 6, 2022; 3:00 P.M.

 2                              -o0o-

 3              THE CLERK:  Calling matter five on calendar,

 4    18-cr-4683, United States of America v. Jacob Bychak, Mark

 5    Manoogian, Mohammed Abdul Qayyum, and Petr Pacas, for a motion

 6    hearing.

 7              THE COURT:  Appearances, please.

 8              MR. NEVAREZ:  Good afternoon, Your Honor.  Carlos

 9    Nevarez, Whitney Bernstein, and my colleague, James Riddet, on

10    the phone, appearing on behalf of Mohammed Abdul Qayyum, who is

11    present here.

12              THE COURT:  Good afternoon.

13              MR. JONES:  Good afternoon, Your Honor.  Randy Jones,

14    on behalf of Mr. Manoogian.  I have my colleagues, Dan Goodrich

15    and Ryan Dougherty on the telephone, and Mr. Manoogian is

16    present.

17              THE COURT:  Mr. Jones, good afternoon.

18              MR. PATRICK:  Good afternoon.  Darren Patrick, Alexis

19    Wiseley, and Gary Lincenberg, on the telephone, for Petr Pacas,

20    who is present.

21              THE COURT:  Good afternoon.

22              MS. MUNK:  And good afternoon, Your Honor.  Jessica

23    Munk and Dave Wiechert appearing via telephone on behalf of

24    Jacob Bychak, who is present in the courtroom.

25              THE COURT:  All right.  I knew we were missing one
```

1    and I do recall now I gave you permission to appear

2    telephonically, and I know you are feeling a little under the

3    weather.

4         Good afternoon to you all.

5         And on behalf of the United States?

6              MS. FEVE:  Good afternoon, Your Honor.  Sabrina Feve,

7    Melanie Pierson, and Candy Heath.  Ms. Heath is appearing by

8    telephone.

9              THE COURT:  Good afternoon to you all.

10        We are here on a motion to admit evidence regarding

11   AFRINIC IP netblocks and then, on the flip side, a motion to

12   exclude evidence beyond evidence relating to 11 netblocks that

13   are either named or implicated by the indictment.  I have

14   previously heard argument regarding this.  At the last hearing,

15   following some additional argument, I directed the government

16   to provide supplemental notice of 404(b) evidence and gave the

17   defense an opportunity to respond.

18        I have reviewed the government's supplemental notice of

19   evidence along with the attached exhibits, and I have also

20   reviewed the defense response.

21        So, as a starting point, it is clear that the AFRINIC acts

22   are not alleged in the indictment, so then the acts are not

23   charged.  And the threshold question for the Court then

24   becomes, as to these uncharged acts, whether or not they are in

25   fact Rule 404(b) prior acts or whether or not they should be

1  construed as inextricably intertwined with the charged conduct.

2  This question is fact-specific, is fact-based.  And so, a

3  number of cases have decided this threshold question through

4  different lenses.  Some courts have determined whether or not

5  the uncharged conduct constitutes a necessary preliminary step

6  towards completing the crime charged.  It doesn't appear that

7  that's what we have here.

8      Second, uncharged conduct may be directly probative of the

9  crime charged.  It doesn't appear that the offered evidence is

10  directly probative.  It may have some probative value, but it

11  doesn't appear to be significant.

12     Third, some cases have looked at it to determine whether

13  or not the misconduct or the other acts arise from the same

14  transaction or transactions as the crime charged.  I think

15  that's probably the strongest argument that the government has

16  that that is what we have here.

17     Other cases have looked to see whether or not the

18  uncharged misconduct is an integral part of a particular

19  witness's testimony concerning the crime charged.  It doesn't

20  appear that that is what we have here or that that has been

21  asserted by the government.

22     And then fifth, that the uncharged misconduct evidence

23  completes the story by a charge.  There are a number of cases

24  that have presented their view on how this threshold issue

25  should be decided.  For example, *United States v. Swiatek*,

819 F.2d 721, looked to determine whether or not the exclusion of the evidence would leave a conceptual void in the story of the charged crime.  It doesn't appear that this AFRINIC evidence would leave such a void.

Other cases, such as *United States v. Palamon* (phonetic), raise the question of whether or not the other act testimony is necessary because otherwise the evidence would be incomplete and confusing without this testimony.  It doesn't look like that's what we have here either.

And so, with respect to this threshold question of inextricably intertwined with the charges that are presented, I am prepared to find that there's not a sufficient showing that the AFRINIC facts are inextricably intertwined.  They are certainly not necessary to provide a complete, comprehensive accounting.  They are not necessary, and they do not leave a conceptual void without these facts being provided.  The exclusion will not leave us with an incomplete and confusing accounting of what happened.

So, then, looking at this evidence through the lens of Rule 404(b), the Court begins its review and analysis by considering the specific facts that are identified as ones that would prove up this proposed 404(b) conduct.  It looks like there are seven dates that are referenced, from April 8 through May 7 of 2013.  There is the initial email or communication where Mr. Manoogian advises Mr. Bychak and Mr. Qayyum that the

1    AFRINIC IPs will cost a $1.37 each for two months.  And then

2    Mr. Manoogian asks Mr. Qayyum, "Abdul, is this something we

3    would want to announce with Hostwinds if we want to pursue it?"

4         There's nothing particularly sinister on its face relating

5    to this communication.

6         The next communication is on April 10th, Mr. Manoogian

7    emails Mr. Qayyum and Mr. Bychak and indicates that they should

8    have the LOAs for the AFRINIC IPs 8:00 a.m. the following

9    morning.  Again, there's nothing particularly sinister or

10   criminal about that particular email.

11        Next, we have Mr. Manoogian emailing himself a template

12   LOA for the AFRINIC IPs, which makes reference to the IP block

13   that is in question; that is, the AFRINIC IP block

14   196.193.0.0/16.

15        This provides some measure of evidence that Mr. Manoogian

16   is connected in some way with a template for the AFRINIC IPs.

17   Earlier, it was suggested that Mr. Manoogian himself had sent

18   these to himself and would have been responsible for these

19   false LOAs that the government asserts were used to hijack

20   these AFRINIC IP addresses.

21        At the same time, the next day, we have Mr. Manoogian

22   emailing dave@techbensis (phonetic), asking where the AFRINIC

23   LOA is, and reminding them they were supposed to have it two

24   hours ago.  That seems to contradict this idea that

25   Mr. Manoogian was, himself, the one that was preparing the

AFRINIC LOA.

The next email, that same day, is one from Mr. Manoogian to Mr. Bychak and Qayyum, stating that, "The TBS LOA is attached, looks official.  In the hands of Hostwinds."

And this observation, looks official, is one that corresponds with the government's theory that Mr. Manoogian was involved in either preparing for forwarding fraudulent LOAs, and so this reference to "looks official" would support the government's theory.

And to the extent that Mr. Manoogian shared it with Mr. Bychak and Mr. Qayyum, then the argument of the government would appear to extend any inappropriate actions of Mr. Manoogian to Mr. Bychak and Mr. Qayyum, so that they would be aware that something is amiss, something is wrong.

Next, we have, on that same day, Dave responding to the earlier email, where there was a question as to where the AFRINIC LOA was at.  And the response is something along the lines, "Is everything okay with announcement?"  And Mr. Manoogian replies that he will know more in the morning. There's not much that one can glean from that on its face.

Next, there's this reference to the April 18, 2013 placement of the AFRINIC IPs on the Spamhaus Block List for spamming through hijacked networks.  And the question there is how much credence, how much traction that provides for the government.  Certainly, along with the email on April 26th,

1    from Manoogian to Qayyum and other employees, that, "The

2    AFRINIC IPs are on the SBL" -- which is the Spamhaus Block

3    List -- "and are nonetheless okay for you to start using right

4    away, I think."

5        Once again, we have Mr. Manoogian emailing others and

6    sharing information.

7        On May 2, Mr. Holden received an email from his internet

8    provider indicating that the AFRINIC IPs are hijacked.  And

9    then the question is to what extent that was shared with

10   Manoogian, Bychak or Qayyum.  It doesn't say so here.

11       Then, May 7th, 2013, Mr. Manoogian emails Holden and asked

12   him to keep the SBL AFRINIC IPs on line until the end of the

13   billing cycle.

14       From this evidence, the government has offered the proof,

15   or these acts, to demonstrate Mr. Manoogian's custody and

16   control of an LOA template; that that is evidence that he had

17   the knowledge and tools needed to prepare LOAs himself and was

18   not exclusively relying on his coconspirators to draft or

19   prepare these documents.

20       With respect to this theory, again, it is confined to

21   Mr. Manoogian.  To the extent there's a suggestion that

22   Mr. Manoogian, then, had the knowledge and tools to prepare the

23   LOAs for himself, the Court is not prepared to find this is

24   compelling or strong evidence of knowledge to engage in the

25   criminal conduct that is charged.  And that is the focus.

1    Here, the offering is that he had the knowledge to prepare LOAs
2    himself.
3         At the same time, this sequence of communications doesn't
4    particularly support the idea that Mr. Manoogian himself
5    prepared the LOA.  He is contacting other people asking where
6    the LOA is.  And then, afterwards, the person he is asking
7    where the LOA is at responds and says, "Is everything okay with
8    the announcement?"
9         So, it is certainly circumstantial.  We don't have
10   something that is concrete.  And to the extent that it is
11   circumstantial, it would tend to invite a mini trial or would
12   not particularly assist the trier of fact in sorting through
13   the issue of Mr. Manoogian's knowledge of the preparation of
14   fraudulent LOAs or himself being involved in the preparation of
15   fraudulent LOAs.
16        The next theory of admissibility is offered as to -- as
17   relates to Mr. Manoogian's question to Qayyum.  "Abdul, is this
18   something we would want to announce with Hostwinds?"  And the
19   assertion is that "It is consistent with the conspirators'
20   practice of using (inaudible) to announce the IP addresses that
21   involved dubious LOAs."
22        There's a lot of -- if not moving parts, there's a long
23   distance between this question and getting this to something
24   that moves the ball forward as to proving the charges here.  It
25   is consistent with a practice of using (inaudible) to announce

1    dubious LOAs.

2        Again, dubious LOAs, given how circumstantial the evidence

3    is, given the end result in terms of what we obtained from

4    offering it, it would appear to the Court, under 403, Rule 403,

5    that the probative value of the evidence is outweighed by the

6    likelihood to prejudice, for example, Mr. Bychak, who is not

7    included in this email.

8        The third theory is that "The conspirators' blasé response

9    to the AFRINIC IPs being placed in the SBL after being deemed

10   hijacked and their continued use is consistent with their

11   willingness to engage in unauthorized use of GetAds IPs and

12   shows an absence of mistake."

13       I think this is probably the strongest of the theories;

14   but even there, we are relying upon circumstances, and the

15   circumstances is -- if not a blasé response, it's a lack of

16   response from at least Mr. Qayyum and Mr. Bychak; that when

17   they receive these emails about "looks official" or that when

18   they receive -- when Mr. Qayyum receives this email, "I think

19   it's okay for you to start using right away, I think," that

20   from those emails that are one-way, one can then assert, "Well,

21   the failure to respond to those emails, the blasé response, is

22   consistent" -- again, we come back to that term "consistent" --

23   that doesn't give the Court great comfort in analyzing the

24   admissibility of this evidence.

25       And then lastly, the proposed 404(b) conduct is

1    intertwined and overlaps with the charged conduct.  We have

2    talked about that already.  It does have some overlap, but with

3    respect to the manner the Court is prepared to review this

4    evidence, I am not convinced that the evidence should be

5    admitted.

6         There are a number of arguments raised by the defense

7    regarding late notice that I am not prepared to embrace and I

8    don't think I need to.  But there were a number of things that

9    were raised by the defense, and to the extent that I didn't

10   raise them in my tentative ruling, they weren't persuasive to

11   me.  But what is persuasive is what I have reported to you.

12   And given all of that, I am prepared to exclude the evidence in

13   the government's case-in-chief.

14        I would leave the door open to permitting some of this

15   evidence to be used in cross-examination of Mr. Manoogian.

16   There are certain things that he had to say regarding these

17   LOAs and actions he would have taken regarding these LOAs that

18   could become relevant if Mr. Manoogian testifies.

19        And then, to the extent that Mr. Manoogian asked

20   Mr. Holden to keep the SBL AFRINIC IPs online, to the extent

21   that there was something that made that email relevant, I would

22   consider permitting the government to use that in

23   cross-examination of Mr. Manoogian.

24        So I am not closing the door entirely as to the use of

25   some of this evidence at trial as to Mr. Manoogian.  So that

1  would be my tentative.

2      Does the government wish to be heard further?

3          MS. FEVE:  Your Honor, we appreciate your thorough

4  analysis and we will submit.

5          THE COURT:  So, that is my ruling.

6      And is there anything else to address at this moment?

7          MS. BERNSTEIN:  Thank you, Your Honor.  I just have a

8  couple -- I think some of my colleagues might have minor

9  points, and I just have a couple of housekeeping matters to ask

10  the Court about.

11      One is whether the Court would like to set a deadline or

12  instruct us to work with the parties to provide proposed

13  preliminary jury instructions.

14          THE COURT:  That's interesting that you mention that.

15  I have been thinking about this case and about certain

16  technical aspects about it relating to ARIN, relating to IP

17  netblocks, and it seems to me that there would be a large swath

18  of information regarding all this that the parties don't

19  dispute and that the parties could arrive at a stipulation as

20  to how some of these organizations operate; and in that way, we

21  can both educate the jury, and we could maybe even provide some

22  of this information -- if not during jury selection, at least

23  during the time that we have the preliminary instructions.  We

24  can remind them of that in the jury instructions, just so they

25  will have a means to better understand all of this.  Because we

1    have been working on this case for four years now, and you will

2    recall, when we first started -- not that I am conversant now,

3    but I was far less conversant, and it is a steep learning curve

4    for laypeople.

5        So I think it would be advantageous for everyone if the

6    parties could come to an agreement on stipulations on some of

7    these -- if not technical issues, on who ARIN is, what they do,

8    and what netblocks are, and how they fit into all of this.

9        So, to the extent that you are proposing to offer

10   preliminary instructions, I will allow you to do that.

11       I will ask you to provide them -- could you get them by

12   the 12th, in the morning?

13             MS. BERNSTEIN:  I mean, I certainly think we can

14   endeavor to put something together and communicate with the

15   government.

16             THE COURT:  I think we have a hearing on the 12th.

17             MS. BERNSTEIN:  We do.  If that's okay with the

18   government.

19             THE COURT:  If you can have them filed during the

20   morning time, then I will look at them during the lunch hour

21   and we will see where we are; otherwise, I will encourage you

22   to meet and confer and find ways to streamline the presentation

23   of the evidence at trial.

24       And by the way, there was also the matter about the jury

25   questionnaires that was raised at the last hearing, and since

1    then, we have received the questionnaires.  We have 100-some

2    prospective jurors that have indicated that they are able to

3    serve.  Keeping in mind -- and I was just informed of this

4    yesterday or the day before -- that even as to those 100-some

5    jurors, they can change their mind.  They could end up making

6    it as easy as rescheduling their jury service, and then they

7    would be gone to us.

8        And so, given that, as to those jurors who have indicated

9    that they cannot serve, I may have said to Mr. Lincenberg at

10   the last hearing that we would be prepared to provide you with

11   all of those questionnaires.

12       At this point, it doesn't make sense to me.  It is a huge

13   box, and to have it digitized and to have it then produced,

14   given that, at the end of the day, any one of those jurors can

15   just say, "You know what?  I am rescheduling."  So it doesn't,

16   to me, make sense to produce that for you, so I do not intend

17   to do that.

18       I will review as many as I can, but it seems to me that if

19   you have already someone who is indicating that they are not

20   inclined to serve on a six-week trial and that they can just

21   take the luxury of calling and saying, "I just want to

22   reschedule," that there's no real point.

23            MS. BERNSTEIN:  If I understand correctly, about

24   1,000 were mailed out.  So it sounds like about 100 people --

25            THE COURT:  More than 100.

1          (Discussion between clerk and Court.)

2              THE COURT:  158.

3              MS. BERNSTEIN:  I guess, if the Court is going to

4    accept the folks who claim to be unavailable, if that's

5    accepted on its face, I don't think there is any need for us to

6    see those juror questionnaires, but would ask to be able to

7    review the questionnaires of the potential jurors.

8              THE COURT:  Yes, and I would be prepared to do that.

9              MS. BERNSTEIN:  And I wanted to ask about timing on

10   that because we are getting down to the wire, here.

11             THE COURT:  So, those were waiting for me when I got

12   back on Tuesday.  So I will ask my staff to begin the process

13   of digitizing and making copies of these documents and provide

14   them as soon as we can.

15             MS. BERNSTEIN:  Okay.  Thank you.  I also wanted to

16   just inquire of the Court, like, a very technical issue about

17   how we are going to sit for trial.

18         There's four defendants.  Each defendant has three

19   attorneys who intend to participate in trial.  We don't need

20   all three sitting at counsel table all the time, but we would

21   like if the defendant and two attorneys can be present.  I

22   think that is 12 of us.  And I think we would get close, but we

23   could probably fit 12 around this table.

24             MR. JONES:  That would be real tight.

25             MS. BERNSTEIN:  I don't know if the Court is able to

 1    bring in an additional table, or we can provide an additional

 2    table.

 3         And the other request I wanted to make is for the

 4    attorneys who are not actively participating in whatever is

 5    going on at the moment, if they are sitting either against the

 6    wall or the first row here, if we could bring in narrow folding

 7    tables that we could leave in the court, just because it's very

 8    difficult to sit without a surface, if that was something -- we

 9    recently had this massive case in Arizona and had to

10    reconfigure the courtroom, and we found folding tables to be a

11    really good solution.

12              THE COURT:  I am not sure if I understand that every

13    defendant needs to have two attorneys at counsel table, but

14    maybe you can talk to me more about that.

15         To the extent that we can obviously fit them in the areas

16    in relation to the wall, ahead of the bar, there, do we have to

17    have two defense lawyers per defendant?

18              MR. JONES:  Your Honor, that's the preference for

19    counsel.  We discussed this this morning and think that that

20    would work best.

21              MS. BERNSTEIN:  I don't think it's going to be that

22    tight.  This side will very comfortably fit six or seven folks,

23    and I think we can comfortably fit four to five right here, so

24    I don't think we are talking about such an addition.

25         And we are all working to use one trial tech, so there

1    won't be four, one for each defendant; we are using the same

2    trial tech.

3              THE COURT:  So, let's do this.  We will look into

4    that request.  And then we will inquire how many more chairs,

5    how many people we can, as a practical matter, fit at this

6    configuration of counsel table; how much room we have for

7    another table behind this one here.

8         As to these -- I guess you called them foldable tables,

9    that an attorney would have, and he would bring and place in

10   front of him?

11             MS. BERNSTEIN:  Your Honor, I am thinking of a very

12   narrow, just the width of a binder, so they are very narrow.

13   You can just set them up, kind of like a narrow TV table.  Set

14   it up so whoever is sitting there has a surface.

15             THE COURT:  I don't have a problem with that.

16             MS. BERNSTEIN:  And the final housekeeping I wanted

17   to ask the Court about is if the Court has any issue or problem

18   with one or more of the defense counsel deferring their opening

19   to the beginning of the defense case.

20             THE COURT:  No.  That's something that defendants can

21   hold off on.

22        Anything else?

23             MS. BERNSTEIN:  Your Honor, there is a motion that I

24   filed.  We just haven't taken it up --

25             THE COURT:  And we are not going to.

```
 1          MS. BERNSTEIN:  We don't need to in this moment, but
 2   I wanted to be sure it was on your radar.  It's Docket 360 --
 3   nope.  Sorry.
 4      Docket 387.
 5          THE COURT:  387?
 6          MS. BERNSTEIN:  Correct.
 7          THE COURT:  What is the motion called?
 8          MS. BERNSTEIN:  It is a motion in limine to preclude
 9   the references to the words "hijacking" and "hijacked."
10          THE COURT:  Oh, I saw that earlier.  And as I was
11   reviewing what we have here, it looks like that's a term of art
12   that's used by any number of participants in all this,
13   including the Spamhaus, so I would not be prepared to grant
14   that motion.
15          MR. JONES:  Your Honor, Ms. Wiseley has a point to
16   raise.
17          MS. WISELEY:  Briefly, Your Honor, we wanted to give
18   you a quick update regarding the government's exhibit list.  At
19   our last hearing, you ordered the government to provide us with
20   the documents on that list, which they did last night, so we
21   are in the process of reviewing those documents.  And, in
22   addition to those documents, they have given us an updated list
23   with a number of changes.
24      So, before we are able to respond in kind, we will need to
25   do our own analysis of those changes in the documents
```

1    themselves.  So we wanted to make the Court aware.

2            THE COURT:  Thank you.

3            MR. JONES:  And, Your Honor, one last thing on a

4    personal point.  We have a hearing on the 12th.  I am going to

5    be out of the district.  Is it okay if I can appear

6    telephonically?

7            THE COURT:  Yes.

8            MR. JONES:  And Mr. Manoogian will be here in person.

9            THE COURT:  And Mr. Goodrich will be here in your

10   absence?

11           MR. JONES:  He will be in Boston.  I will have

12   someone appear specially for me.

13           THE COURT:  That's fine.

14      Anything from the government, Ms. Pierson?

15           MS. PIERSON:  We want to find out, is the Court going

16   to address the 902.11 at our next hearing?

17           THE COURT:  Yes, I saw that, and I intend to address

18   that at the next hearing.

19           MS. PIERSON:  Okay.  There is also the matter of the

20   outstanding suppression motion.

21           THE COURT:  Yes, there is, so I will give my ruling

22   at the next hearing.

23           MS. PIERSON:  And, finally, we have not received

24   reciprocal discovery.  And I believe the Court gave the date of

25   today's hearing as the date for that.

1          THE COURT:  So, how does the defense wish to respond

2     to that report?  Does the defense intend to provide any

3     reciprocal discovery?  Do you have any?

4          MR. JONES:  Not at this moment, Your Honor.

5          THE COURT:  You don't have any?

6          MR. JONES:  It is our belief that we don't have any

7     at this point to provide.

8          THE COURT:  So, all this time that the defense has

9     been going, "Okay, well, the government wants us to provide

10    reciprocal discovery, but they haven't even produced their

11    discovery," and now that they have, it's like --

12         MR. JONES:  Again, Your Honor, they just presented

13    their exhibit list last night.  700, and that's changed.  So we

14    went from 200 exhibits, at the last hearing, to 700 exhibits

15    that we just got last night and have not had a chance to go

16    through those.

17    I am not saying there won't be any reciprocal discovery,

18    but we are not prepared to give reciprocal discovery at this

19    time.

20         THE COURT:  It seems to me the defense position was

21    not so much we need to see what the government presented by way

22    of exhibits or anything else but we wanted to rely upon our

23    right to withhold our reciprocal discovery until the government

24    had turned over all of this stuff, and they have now

25    represented to the Court that they have.

 1          So, at this point, I expect that the defense will, as

 2    speedily as practicable, identify reciprocal discovery and

 3    provide it to the government.  And that relates to those

 4    matters that are clearly reciprocal discovery that one would

 5    reasonably conclude at this point have been identified as such.

 6          With that, that concludes today's proceedings.

 7               MS. PIERSON:  Will there be a deadline for the

 8    reciprocal discovery?

 9               MR. JONES:  He said "speedily."

10               THE COURT:  Speedily, and before the 12th.

11          And again, I won't be happy if there are exhibits brought

12    to my attention that are ones that should have been brought

13    before, and I will just view it as gamesmanship.

14               MR. JONES:  No, Your Honor.

15               MS. BERNSTEIN:  Your Honor, I think part of the

16    problem is that we did just get these last night, and so we do

17    need to go through them and just figure out what is reactive or

18    not.  We filed a witness list, Your Honor --

19               THE COURT:  It is not my understanding that it is

20    based upon the content of what the government is presenting

21    versus the representation that they have provided what they are

22    required to under the law.

23               MS. BERNSTEIN:  Then I think that that had been a

24    miscommunication, because we do want the ability to see what

25    their case is, to respond to it.

1          Thank you, Your Honor.

2                THE COURT:  All right.

3                MR. JONES:  Thank you, Your Honor.

4          (End of proceedings at 3:40 p.m.)

5                            -o0o-

6                    C-E-R-T-I-F-I-C-A-T-I-O-N

7

8                I hereby certify that I am a duly appointed,

9     qualified and acting official Court Reporter for the United

10    States District Court; that the foregoing is a true and correct

11    transcript of the proceedings had in the aforementioned cause;

12    that said transcript is a true and correct transcription of my

13    stenographic notes; and that the format used herein complies

14    with rules and requirements of the United States Judicial

15    Conference.

16                DATED:  May 12, 2022, at San Diego, California.

17

18                          /s/  Chari L. Bowery

19                          _____
                            Chari L. Bowery
20                          CSR No. 9944, RPR, CRR

21

22

23

24

25