UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                            Plaintiff,<br><br>v.<br><br>JACOB BYCHAK, et al.,<br><br>                            Defendants. | Case No.:  18-CR-4683-GPC<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENTAL MISCONDUCT**<br><br>**[ECF No. 330.]** |

Before the Court is Defendants' Motion to Suppress and Dismiss Under the Fourth Amendment. ECF No. 330-1. The United States opposed the motion. ECF No. 337. Defendants filed a reply in support of the motion. ECF No. 343. The Court heard oral argument on the motion on April 1, 2022. ECF No. 381. For the reasons set forth below, the Court **DENIES** Defendants' motion to dismiss, and **DENIES** their request to hold an evidentiary hearing.

## FACTUAL BACKGROUND

The Spamhaus Project ("Spamhaus") was founded in 1998 in London and currently operates from Andorra La Villa, Andorra. Spamhaus is an international nonprofit organization that "tracks spam and related cyber threats such as phishing,

1

malware, and botnets, and provides real time threat intelligence to the Internet's major networks, corporations and security vendors." Spamhaus, About Spamhaus, https://www.spamhaus.org/organization/ (last visited May 12, 2022). The Register of Known Spam Operations database (ROKSO) "is a depository of information and evidence on known persistent spam operations, assembled to assist service providers with customer vetting and the Infosec industry with Actor Attribution." *Id.* For law-enforcement agencies (LEA), Spamhaus provides a secure ROKSO LEA portal which gives law-enforcement access to classified records. *Id*. Spamhaus' services are used by the Internet's ISPs, email service providers, corporations, universities, governments and military networks. *Id.* It also works with law-enforcement agencies to identify and pursue spam and malware sources worldwide and works closely with law-enforcement cybercrime teams and "assist investigations into spam senders, phishing, botnets, and malware operations" and compiles profiles, backgrounds and evidence on spam gangs and spam operations. *Id*. Spamhaus's main LEA working partners are the National Cyber Forensics and Training Alliance and the Federal Bureau of Investigation (FBI). *Id*.

The government began investigating this case in 2013 when an employee of Spamhaus, the Spamhaus Informant ("SI"), approached the Baltimore branch of the FBI with information about Company A. *See* ECF No. 385 at 189[1] (Munk Decl., Ex. 15). In early 2014, the Baltimore FBI referred the investigation to the San Diego FBI after the SI indicated the targets of the investigation were located in San Diego. ECF No. 316-1, Chabalko Decl. ¶ 12.

The SI and FBI Special Agent Chabalko ("SA Chabalko") first exchanged emails on May 16, 2014. ECF No. 385 at 215-16 (Munk Decl., Ex. 18). Soon thereafter, the SI shared with SA Chabalko the law enforcement login information to access the LEA

---

[1] Page numbers are based on the CM/ECF pagination.

portal of the ROKSO database that is not publicly available, "for things related to this or any other case. . . ." *Id.* at 215, 260. On May 16, 2014, the SI sent an email to SA Chabalko describing an IP netblock hijacking scheme which was allegedly being arranged by Mark Manoogian. *Id*. SA Chabalko asked the SI to send him information as they had discussed during a telephone conversation. *Id.* On May 22, 2014, the SI notified SA Chabalko that Spamhaus had an anonymous informant that had been sending a "ton of info" about Company A since September 2013, and that the SI suspected the person was CY. ECF No. 385 at 219 (Munk Decl., Ex. 19). CY was reportedly a former employee of Blackstar/Adconian who got cheated by them. *Id*.

CY worked at Company A during 2011 as an independent contractor, ECF No. 385 at 2 (Munk Decl.), until he began working at Company B in January 2012 as the Chief Technology Officer. ECF No. 385 at 10 (Munk Decl., Ex. 1). In July 2013, CY's employment with Company B ended. In September 2013, CY first contacted Spamhaus. *See* ECF No. 385 at 219 (Munk Decl., Ex. 19).

On June 2, 2014, at the U.S. Attorney's Office in San Diego, the SI was first interviewed by SA Chabalko and SA Jason Zohn. ECF No. 385 at 222 (Munk Decl. Ex. 20). Also present during the interview was Assistant U.S. Attorney Sabrina La Feve. *Id.* On the next day, June 3, 2014, SA Chabalko sent an email to the SI's anonymous source, and the anonymous source responded that he would be willing to work with SA Chabalko if he could remain anonymous. ECF No. 385 at 257 (Munk Decl. Ex. 22). On June 4, 2014, SA Chabalko informed the SI that he had contacted the anonymous source. ECF No. 385 at 260 (Munk Decl., Ex. 23). On June 7, 2014, the SI told SA Chabalko "[CY] is willing to talk. Does not know anything except one of our partners is looking into [Company A] spamming and maybe he can help with some info." ECF No. 385 at 262 (Munk Decl. Ex. 24). And on June 11, 2014, the anonymous source (believed to be CY by this time) emailed to SA Chabalko, "I'm happy to help" but because he was concerned

about anonymity, also said "[i]f you want to send me questions like Spamhaus does, they can probably vouch that I help out with the things they need specifically." ECF No. 385 at 258 (Munk Decl. Ex. 22). The record reflects that the FBI first met with CY in December 2017. ECF No. 337 at 3.

In July 2014, SA Chablako obtained records from a hosting company that had unwittingly assisted in the hijacking of IP netblocks by announcing the nebblocks on the internet. Th records obtained included emails between Mark Manoogian and the hosting company, and Letter of Authorization's (LOA) that were used to hijack dormant IP netblocks. ECF No. 385 at 268-69 (Munk Decl., Ex. 25).

On December 23, 2014, the Government sought and obtained a search warrant for the Company A work email for Mark Manoogian which was supported by a probable cause affidavit from SA Chabalko. ECF No. 385 at 265-75 (Munk Decl. Ex. 25). The affidavit relied on information provided by the SI relative to Company A's alleged scheme to hijack abandoned or unused IP netblocks and which was corroborated by the records independently obtained by the FBI in July 2014 from one of the hosting companies. *Id.*

On December 28, 2015, CY sent a zip file to Spamhaus containing several Company A emails. The body of CY's email included the subject lines and summaries of the emails he had included in the zip file. ECF No. 287 at 184.

On September 27, 2017, the SI told SA Chabalko that Spamhaus had received "internal emails implicating various people of doing various things" and asking whether SA Chabalko wanted the emails, particularly because Company A's lawyer, Linda Goodman was on some of the emails. ECF No. 385 at 404 (Munk Decl., Ex. 42). SA Chabalko responded "I will find out for you and let you know." *Id.* On October 12, 2017, the SI sent SA Chabalko a message with "interesting emails" that he received from CY. ECF No. 385 at 406 (Munk Decl., Ex. 43). SA Chabalko contacted the U.S. Attorney's

Office and advised that SI had sent him an email with an attached zip file which the SI represented might contain emails with an attorney. ECF No. 334, U.S. Opp., at 5.

The SI was not officially designated as a confidential human source until October 2018. ECF No. 337 at 3. The Indictment in this case was filed on October 31, 2018. ECF No. 1. However, the SI and SA Chabalko were in consistent contact between 2014 and the time of the Indictment. *See, e.g.*, ECF No. 385 at 402 (Munk Decl., Ex. 41).

Pertinent to the instant motion, the SI sent SA Chabalko an email in November 2018 with the same eleven internal Company A emails provided by CY that were sent in October 2017, because the earlier email did not work. ECF No. 385 at 411 (Munk Decl., Ex 45). The attached zip file is titled "Interesting Emails Fixed.zip." *Id.*

After discovering the SI had shared these eleven internal emails with SA Chabalko, Defendants filed a motion to compel further discovery on July 30, 2021 (ECF No. 257-1) seeking identification of those documents which were provided to the SI and the government by CY. ECF No. 257-1. The Court granted the motion in part and directed the Government to have the SI identify all documents that the Company A informant had provided to the SI. ECF No. 275. In response, the SI again sent the eleven emails in August 2021. ECF No. 287 at 165-91.

## LEGAL STANDARD

"The Fourth Amendment guarantees 'the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Smith v. Maryland*, 442 U.S. 735, 739 (1979). "[T]he capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1990). Thus, a "search" within the meaning of the Fourth Amendment "occurs when the government infringes upon 'an expectation of privacy that society is prepared to consider reasonable." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

The reasonable expectation of privacy inquiry is two parts: an individual bears the burden of demonstrating (1) a subjective expectation of privacy and (2) that the subjective expectation is one that society is prepared to recognize as reasonable (the objective test). *See Rakas,* 439 U.S. at 143-44. Indeed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). The reasonableness touchstone generally means that law enforcement must obtain a judicial warrant in order to conduct a search, unless the search falls within an exception to the warrant requirement, such as exigent circumstances when there is a "compelling need for official action and no time to secure a warrant." *Missouri v. McNeely*, 569 U.S. 141, 149 (2013); *Riley v. California*, 573 U.S. 373, 402 (2014).

The exclusionary rule generally renders inadmissible any fruits of an unreasonable search conducted by the government. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). However, the Supreme Court has consistently held that an individual must have standing in order to properly seek exclusion of any illegally-obtained evidence. The standing inquiry, that is, "whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it" is "more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing." *Rakas*, 439 U.S. at 140. Further the Court has held that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Id.* at 133-34 (rejecting defendants' "target" theory which would have extended Fourth Amendment standing to all targets of an investigation). For example, if police officers pull over a vehicle, and events lead them to conduct a search of the vehicle, generally only the owner or driver of the car can move to suppress

evidence on Fourth Amendment grounds.[2] *See Rakas,* 439 U.S. at 148 (finding defendants "made no showing that they had a legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers").[3] Similarly, an overnight guest might have a legitimate expectation of privacy in the host's home, *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) but a visitor who is "merely present with the consent of the householder may not," *Minnesota v. Carter*, 525 U.S. 83, 90 (1998).

In *United States v. Warshak*, the Sixth Circuit held that individuals possess a reasonable expectation of privacy in their email communications, even though emails must pass through an internet service provider ("ISP") to be sent from one address to another, 631 F.3d 266, 286 (6th Cir. 2010). In so doing, the Court analogized ISPs to the post office—where officers may not open people's mail without a warrant unless some exception applies. *Id.* Thus, "agents of the government cannot compel a commercial ISP to turn over the contents of an email without triggering the Fourth Amendment." *Id.* A defendant therefore has standing to challenge a search of his or her email accounts. Standing to challenge a search of one's emails mirrors standing in the traditional Fourth Amendment context: a defendant may only move to suppress the fruits of a search on his own email address, not a search of another person's email address.

///

///

---

[2] *Cf. Brendlin v. California*, 551 U.S. 249, 254, 263 (2017) (holding that vehicle passengers, as well as drivers, are seized during a traffic stop).

[3] The Court acknowledges that the Supreme Court has generally held that people have a reduced expectation of privacy in their vehicles, known as the automobile exception to the warrant requirement. *See Carroll v. United States*, 267 U.S. 132 (1925). However, in *Rakas*, the Supreme Court made clear that "petitioners' claim is one which would fail even in an analogous situation in a dwelling place" because they did not have a reasonable expectation of privacy. 439 U.S. at 148.

**DISCUSSION**

Defendants move to suppress eleven emails that originated inside Company A and Company B. ECF No. 330-1, Defs.' Mot. As described above, the Government has access to these emails because CY sent them to the SI who in turn sent them to SA Chabalko. *See* No. 385 at 406 (Munk Decl. Ex. 43). Defendants also seek dismissal of the Indictment, or in the alternative, an evidentiary hearing "to confirm the Fourth Amendment violation." ECF No. 330-1, Defs.' Mot., at 8.

In order to suppress the eleven emails, Defendants must demonstrate that the eleven emails are the fruit of an illegal search conducted by a government actor. Defendants must show (1) that they each have a reasonable expectation of privacy in the eleven emails—that is, a subjective expectation of privacy in the emails, and that society is prepared to find reasonable such that there was a legitimate expectation of privacy, and therefore standing, *Rakas*, 439 U.S. at 143, such that (2) a government intrusion upon or seizure of the emails was a warrantless Fourth Amendment search and the evidence obtained should be suppressed. *Jacobsen*, 466 U.S. at 113. The Court addresses each issue in turn.

For the reasons set forth below, the Court finds that Defendants Manoogian, Qayum and Pacas lack standing to challenge the introduction of the emails. The Court further finds that Defendants have not demonstrated there was a "search" under the meaning of the Fourth Amendment. Accordingly, the Court DENIES Defendants' motion to suppress and dismiss.

**I.   Standing: Individual Defendants' Legitimate Expectations of Privacy**

In order to mount a Fourth Amendment challenge against the search or seizure of the eleven emails at issue, Defendants must demonstrate they have standing to contest the alleged government action. As such, Defendants must demonstrate they had a subjective

expectation of privacy in the emails, and that this expectation of privacy is objectively reasonable. *Rakas*, 439 U.S. at 143.

### a. Subjective Test

In support of the motion to suppress and dismiss, Defendants filed four Declarations in which each individual Defendant attests that he "had a password to login to my laptop and a separate password to login to my email address," that he "took [his] laptop home almost every evening and if I left the laptop in my office, it was locked in my desk drawer," that there was no company policy of which they were aware that suggested Company A or Company B monitored employees' email addresses, and other similar statements. ECF Nos. 330-2, 330-3, 330-4, and 330-5. As such, Defendants argue they each had a subjective expectation of privacy in their work email address with Company A and the messages sent and received from those work email accounts. *See* ECF No. 330-1 at 9-10.

### b. Personal Violation

The Government relies primarily on *United States v. SDI Future Health, Inc.*, 568 F.3d 684 (9th Cir. 2009), to support its argument that Defendants lack standing because each individual Defendant cannot demonstrate a violation of a personal legitimate expectation of privacy, and because people have a diminished expectation of privacy in their workplace property.

As an initial matter, under substantive Fourth Amendment law, "[a] person has standing to sue for a violation of this particular 'right of the people' only if there has been a violation as to him, personally." *Id.* at 695 (citing *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968)). Here, the alleged seizures involve, for the most part, CY turning over his *own emails* from his *own accounts* while working at Companies A and B. Further, no Defendant has demonstrated a personal connection to all eleven emails. *See* ECF No. 337 at 7. Instead, the record shows:

- Among the eleven emails, there are two in which none of the four Defendants are identified as a recipient. *See* ECF No. 385 at 44 (Munk Decl., Ex. 3); ECF No. 385 at 102 (Munk Decl. Ex. 4).
- Defendant Manoogian was not an identified sender or recipient of any of the eleven emails. ECF No. 330-1 n. 16.
- Defendant Bychak was an identified party in seven of nine Company A emails. In two of the seven emails, he is the only Defendant identified as a sender or recipient. *See* ECF No. 385 at 34-42 (Munk Decl., Ex. 2); ECF No. 385 at 128-35 (Munk Decl. Ex. 7). CY did not receive those two emails, but he did receive the other five.
- Defendant Qayyum was an identified sender or recipient in three of nine Company A emails. *See* ECF No. 385 at 136-162 (Munk Decl., Exs. 8, 9, 10). CY also received these three emails. *Id.*
- Defendant Pacas was the *only* Defendant who received the two Company B emails. ECF No. 385 at 163-175 (Munk Decl., Exs. 11, 12). CY also received both of these emails. *Id.*
- Overall, CY was a party to seven of the eleven emails. Among the four emails which CY did not personally receive, Defendant Bychak was the only Defendant who was an identified recipient on two of the emails, while the other Defendants are not identified as recipients.
- CY's dates of employment at Company A and Company B correspond to the dates of the eleven emails.

The above establishes that all of the emails received by Defendants Pacas, Manoogian, and Qayum were also sent to CY who shared joint control of those emails with the sender and other recipients. *Cf., United States v. Arreguin*, 735 F.3d 1168, 1174 (9th Cir. 2013) (consent for search can be demonstrated by showing that: (1) a third party

10

had shared use and joint access to or control over a searched area; or (2) "the owner of the property to be searched has expressly authorized a third party to give consent to the search.") Given CY's shared use and control of nine of the eleven emails, the Defendants could not reasonably expect that CY would not read the emails directed to him or forward them as he saw fit. Any such expectation is not one that society is prepared to recognize.[4] Accordingly, these three Defendants lack standing to challenge searches or seizures of any of the eleven emails. At most, only Bychak would have standing to challenge CY's seizure of two emails that were not also directed to CY.

### c. Objective Test

Rather than take issue with whether Defendants each possessed a subjective expectation of privacy in their work email addresses which they accessed from their work-issued laptops, the Government contends Defendants lack standing to challenge the Government's acquisition of the emails because their expectation of privacy in the emails fails the objective test of the *Katz* inquiry. ECF No. 337, U.S. Opp., at 3.

The Government relies on the *SDI* test for search of a workplace, which asks: (1) whether the item seized is personal property or otherwise kept in a private place separate from other work-related material; (2) whether the defendant had custody or immediate control of the item; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization. 568 F.3d at 1257.

Analogizing a search of an employee's corporate email accounts to the facts involving personal offices in *SDI* is somewhat strained, because Fourth Amendment

---

[4] While CY may have been contractually precluded from taking confidential information from Company B after he ended his work at those companies, the contract is between CY and Company B and the contract does not extend any rights or benefits to the Defendants. ECF No. 385 at 10-20 (Munk Decl., Ex. 1).

challenges involving internet technology present unique challenges. Defendants argue the *SDI* test does not apply to the instant motion because analogizing the eleven emails to a search or seizure of a physical evidence in a physical workplace is distinguishable. They instead point to *Warshak* and similar cases for the proposition that individuals can have a legitimate expectation of privacy in the contents of their personal email accounts (thus making a warrantless search generally unreasonable). And the Ninth Circuit has held that while privacy expectations may be reduced when people are warned that information and communications on a network may be monitored, limited monitoring does not alone defeat a privacy expectation in some materials. *United States v. Heckencamp*, 482 F.3d 1142, 1146 (9th Cir. 2007).

In principle, the Court agrees with the Defendants that individuals possess a reasonable expectation of privacy in their email communications. However, this reasonable expectation of privacy does not extend to prohibit recipients of the emails from reading or sharing the email. Keeping in mind, CY could readily access the emails in which he was a party during his employment at the Companies, Defendants could not have a reasonable expectation that the emails contained information that was private and that society is prepared to protect under the Fourth Amendment

For the foregoing reasons, the Court finds that the Defendants Pacas, Manoogian, and Qayum lack standing to challenge any alleged search or seizure of the eleven emails. These Defendants have failed to demonstrate they each suffered a personal violation, and failed to establish an objectively reasonable expectation of privacy in the emails at issue here. The Court finds that Defendant Bychak had an objectively reasonable expectation of privacy in two of the emails that were received by him and were not received by CY.

**II.    "Search": Government Intrusion Upon a Legitimate Expectation of Privacy**

Next, even assuming the Defendants have standing to seek suppression of the eleven emails, they have also failed to demonstrate there was a "search" by a government

actor that triggers Fourth Amendment protection. An intrusion upon someone's legitimate expectation of privacy (the threshold question for standing) only implicates the Fourth Amendment if the search is by a government actor. The burden is on the Defendant to show the government was involved in a private search. *United States v. Cleaveland*, 38 F. 3d at 1093. Thus, Defendants must demonstrate (1) there was an intrusion, and (2) that such an intrusion was conducted by a government actor. They have not met this burden.

To apply the reasonable expectation of privacy analysis in this case, "it is important to begin by specifying precisely the nature of the state activity that is challenged." *Smith v. Maryland*, 442 U.S. 735, 741 (1979). Here, Defendants are challenging the transfer of the eleven emails from CY to the SI to SA Chabalko. However, Defendants clarify that they "do not contend that CY was an agent of the government. Rather, the evidence shows that Spamhaus and the SI were acting as agents of the government, and an evidentiary hearing is needed to determine if CY stole the documents with the SI's direction and/or acquiescence." ECF No. 343, Defs.' Reply, at 5.

Defendants' entire motion depends on a theory that Defendants' emails were "stolen" or "purloined" from Defendants, thus resulting in an illegal seizure. Defendants speculate that CY "could easily take documents and information at any point, regardless of whether he continued working at the Companies," ECF No. 343 at 5. Besides conjecture, Defendants fails to point to any facts that support this fanciful assertion.

The Government contends "[t]he defense theory simply fails, chronologically, because CY acquired the Eleven Emails prior to July 2013, when his employment ended, at a time when his existence as a source of information and the existence of the Eleven Emails was unknown to either the FBI or Spamhaus." ECF No. 337, U.S. Opp. at 2. The timeline in this case shows that the SI contacted the Baltimore FBI in 2013, that they began their investigation into Company A sometime thereafter, and that CY's

employment at Company B ended in July 2013. While it is, in a theoretical sense, *possible* that the SI directed CY to steal the eleven emails from Company A, following the end of his employment, there is absolutely no evidence to suggest that this is what happened.

In the Fourth Amendment context, the Ninth Circuit has adopted a two-part test to determine whether a third party was acting on behalf of the government: (1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the action intended to assist law enforcement efforts or further his own ends. *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994). When such a third party has mixed motives for pursuing a particular course, "the mere existence of a legitimate, independent motive apart from crime detection or prevention does not immunize a search from scrutiny regardless of the level of government involvement," but the court must assess whether "the government's participation was [] so extensive" as to raise constitutional concerns. *United States v. Cleaveland*, 38 F.3d 1092, 1094 (9th Cir. 1994). Further, the court may find the government acquiesced in an informant's conduct when there is a "particular pattern" of activity. *United States v. Walther*, 652 F.2d 788 793 (9th Cir. 1981).

Defendants' theory of the Government's acquiescence is that as of "May 22, 2014 the FBI learned that the SI had obtained internal Company A information involving Defendants from CY." ECF 330-1 at 22. Defendants continue that "at this point, the government was placed on notice that information provided by the SI might be tainted by information from the illegally obtained documents, resulting in a potential Fourth Amendment violation. . . ." *Id.* This wholly conclusory claim is purportedly based upon a May 22, 2014 email from the SI to SA Chabalko reporting that "an anonymous informant sending us a ton of information since September 2013 . . . [h]e knows all the people we'll be talking about and everything about [Company A's] operations."  A later email

observes that the informant "has provided information that only a former employee would know." ECF No. 385 at 227 (Munk Decl., Ex. 20). Contrary to Defendants' position, there is nothing to support the conclusion that the Government was on notice as of May 22, 2014 that information obtained from the SI was tainted or that the Government acquiesced in any Fourth Amendment violation.

Recognizing that CY was no longer employed at the time that the 11 emails were obtained, Defendants again speculate that the CY took the documents after the end of his employment because "[s]omeone with [CY's] credentials could easily take documents and information at any point, regardless of whether he continued working at the Companies." ECF No. 343 at 5. Defendants have wholly failed to demonstrate that CY took actions as a government actor.

In view of the above, the Court concludes that Defendants have failed to meet their burden to show the government was involved in a private search. Having found that CY acted as a private actor when he sent the emails to Spamhaus, the Court need not determine whether the SI was a government actor.[5]

For the foregoing reasons, the Court DENIES Defendants' motion to suppress the eleven emails.[6]

### III. Remedy Would be Suppression Not Dismissal

As the Court has noted, Defendants moved to suppress the eleven emails as evidence, and to also dismiss the indictment based on the Fourth Amendment violations

---

[5] The Defendants rely on *United States v. Ackerman*, 831 F. 3d 1292, 1296 (10th Cir. 2016), to support their argument that Spamhaus is a government actor. Congress has not enacted any statutes which create duties or confer powers on Spamhaus. Spamhaus's role as a law enforcement partner in pursuing spammers does not create the type of relationship that transforms Spamhaus into a government actor.

[6] The Government has represented they do not intend to introduce the eleven emails in their case-in-chief, which further calls into question the Fourth Amendment challenge, which protects against the admission of illegally-obtained evidence.

alleged in the instant motion. Defendants have not provided a legal basis for seeking dismissal in addition to suppression based on the alleged seizure of the emails. As the Government explains, suppression is the only proper remedy available to Defendants on the grounds presented in this motion. *See* ECF No. 337 at 17. Having already declined to suppress the eleven emails, the Court also DENIES Defendants' motion to dismiss for the alleged Fourth Amendment violation.

## IV.   The Court Declines to Hold an Evidentiary Hearing

Defendants request an evidentiary hearing to determine "when and why CY took the information and documents" which would further elucidate the early interactions between the SI and CY. As already discussed, Defendants have not provided any evidence beyond mere conjecture that CY was encouraged or instructed by the SI to "acquire" the eleven emails and send them to the SI in 2013. Instead, the relevant evidence suggests that CY already had the emails in his possession, from his time at Company A and Company B, and decided independently to send them to Spamhaus in order to clear his own name. The Court has not found any factual questions in dispute that could be meaningfully clarified by holding an evidentiary hearing. Defendants have not presented a plausible foundation for the theory they hope to shore up through such a hearing. And further, the Court finds no reason to believe an evidentiary hearing would alter the Court's legal conclusions on threshold legal questions like Defendants' lack of standing, because their personal Fourth Amendment rights were not violated.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

## CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** Defendants' motion to suppress and dismiss under the Fourth Amendment, and **DENIES** Defendants' request to hold an evidentiary hearing on this matter.

**IT IS SO ORDERED.**

Dated:  May 12, 2022

Hon. Gonzalo P. Curiel
United States District Judge