1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    UNITED STATES OF AMERICA,      .
                                    .
5                 Plaintiff,        . No. 18-cr-4683-GPC
                                    .
6                 v.                . May 25, 2022
                                    . 8:30 a.m.
7    JACOB BYCHAK,                  .
     MARK MANOOGIAN,                .
8    MOHAMMED ABDUL QAYYUM,         .
     PETR PACAS,                    .
9                                   .
                  Defendants.       . San Diego, California
10   . . . . . . . . . . . . . . . .

11               TRANSCRIPT OF JURY TRIAL, VOLUME 3
12          BEFORE THE HONORABLE GONZALO P. CURIEL,
             UNITED STATES DISTRICT JUDGE, AND A JURY
13

14   APPEARANCES:

15   For the Plaintiff:     United States Attorney's Office
                            By: SABRINA L. FEVE, ESQ.
16                              MELANIE K. PIERSON, ESQ.
                                CANDINA S. HEATH, ESQ.
17                          880 Front Street, Room 6293
                            San Diego, California 92101
18
     For the Defendant      Wiechert, Munk & Goldstein, PC
19   JACOB BYCHAK:          By: DAVID W. WIECHERT, ESQ.
                                JESSICA C. MUNK, ESQ.
20                          27136 Paseo Espada, Suite B1123
                            San Juan Capistrano, California 92675
21
     For the Defendant      Mintz Levin
22   MARK MANOOGIAN:        By:  RANDY K. JONES, ESQ.
                                 RYAN T. DOUGHERTY, ESQ.
23                               DANIEL J. GOODRICH, ESQ.
                            3580 Carmel Mountain Road, Suite 300
24                          San Diego, California 92130

25   ///

```
 1   APPEARANCES (CONTINUED):

 2

 3   For the Defendant        Bienert Katzman Litrell Williams LLP
     MOHAMMED ABDUL           By:  WHITNEY Z. BERNSTEIN, ESQ.
 4   QAYYUM:                       THOMAS H. BIENERT, Jr. ESQ.
                                   CARLOS A. NEVAREZ, ESQ.
 5                            903 Calle Amanecer, Suite 350
                             San Clemente, California 92673
 6

 7   For the Defendant        Bird Marella
     PETR PACAS:              By:  GARY S. LINCENBERG, ESQ.
 8                                 DARREN L. PATRICK, ESQ.
                                   ALEXIS A. WISELEY, ESQ.
 9                            1875 Century Park East
                             Suite 2300
10                            Los Angeles, California 90067

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:          Chari L. Bowery, RPR, CRR
                             USDC Clerk's Office
23                            333 West Broadway, Suite 420
                             San Diego, California 92101
24                            chari_bowery@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
 1            SAN DIEGO, CALIFORNIA; MAY 25, 2022; 8:30 A.M.
 2                              -o0o-
 3       (The following proceedings were held in open court out of
 4   the presence of the jury:)
 5            THE COURT:  Let the record reflect that we are
 6   outside the presence of the jury.
 7       We received the news regarding Mr. Lincenberg and his test
 8   results, and I understand that Ms. Munk didn't feel that well,
 9   but she had negative test results.  And it raises the concern
10   that I have expressed now for weeks.  Given as many people as
11   we are placing in this relatively small space, it is a real
12   possibility that, if one of us contracts COVID, that -- if not
13   all of us, a number of us will.
14       And, certainly, it's one thing for all of us, who accept
15   the risk by being lawyers or judges in these matters, but when
16   we bring in jurors, who are already sacrificing, it's incumbent
17   upon me to find a way forward which honors, recognizes the
18   rights of the defendants, but then, at the same time, provides
19   enough care and security and instruction as to how we move
20   forward so that we can protect our jury.
21       At this point, I think it makes sense to have all of the
22   attorneys, as soon as reasonably practicable, to take a rapid
23   test and then, in that way, find out if there's anyone else --
24   because you are all right next to each other.  There's no
25   social distancing.  And we are not in a position that we can do
```

1   that.

2       To the extent Mr. Lincenberg is positive, has contracted

3   it and it was an accurate test, then the individuals that he

4   was seated next to are also potentially individuals who have

5   now contracted the virus.  So I think that is something that we

6   have to do.

7       I am also at this point inclined to ask the jury to also,

8   with the tests that we have provided them, to test a minimum of

9   once a week.  I am looking into getting more tests.  I don't

10  think it would be over the top to have us test every morning.

11  I am sure you have all gone to a wedding or some event where

12  there was a requirement that, before you arrive, that you would

13  have tested negative.  I don't think that's unreasonable.  I

14  think we should, here, be able to have the wherewithal, the

15  resources, to obtain those rapid tests.

16      So I will direct counsel to take a rapid test every day

17  while we are in trial, and then I am going to look into that

18  for our jury.  I don't know if we will be able to do it every

19  day.  I will push for, at a minimum, every week.

20      But otherwise, it's crazy that we would spend as much time

21  and money and effort to get ready for a trial and for it to be

22  for naught.  And we still have any number of questions to

23  answer, including, if in fact Mr. Lincenberg has contracted

24  COVID, will we suspend these proceedings while we await for him

25  to get well?  At what point do we inform the jury that we are

1    in a room where one of us has contracted COVID?  What point do

2    I call for a time-out so that we can assess where we are

3    health-wise?

4        So there are a number of matters of concern that I have to

5    address, and I don't pretend to have all of the answers.  So I

6    welcome any suggestions, any offerings that you all may have in

7    terms of a path forward.

8        Ms. Feve?

9         MS. FEVE:  Your Honor, the government has conferred

10   with defense counsel, and defense has not emailed us.  But, in

11   GDMA, Judge Sammartino has kept that jury safe, but she's

12   required them to wear a mask, and everyone in that courtroom

13   has been wearing a mask.  So, the fact that they have made it

14   this far without a COVID positive is a testament to the power

15   of the mask.

16       And we can do the tests, but, really, the most effective

17   precaution against spreading it is just having people wear

18   masks.  So we would just --

19        THE COURT:  At the same time -- and I get that in

20   terms of here, in terms of a possible superspreader ongoing

21   event.  But to the extent that folks are going to go back home,

22   they are going back to the community, where people aren't

23   wearing masks.  And I doubt that many of us are going to wear a

24   mask.  So that's one of the primary places where the virus is

25   being spread.

```
1          But I agree with you, that we have to look for ways to
2     increase our protection, to limit the exposure to others who
3     may contract it while we are here.  I think that's right.  Will
4     it keep us all safe?  I hope so.
5          MS. FEVE:  I have two members of my household who are
6     immunosuppressed, who have to get vaccinated and boosted every
7     four months.  You never see me in this courtroom without a mask
8     on.  I have managed to keep my family safe for the past two
9     years, and no one has gotten COVID because we wear masks.  It
10    is not that hard.
11         THE COURT:  Well, certainly, it is not that hard, but
12    for some people, they have elected -- and, frankly, myself, I
13    mask up when I meet at sidebar.  At the same time, when I go
14    out in public, I don't.  I don't.  Am I wrong?  Some people may
15    have a view that I am.  But -- and you have already heard from
16    the jury.  There's a number of them who expressed some
17    discomfort or some unwillingness to mask up.  And it's -- at
18    some point in time, I may have to go that route.
19         Mr. Bienert?
20         MR. BIENERT:  The point I was going to make is
21    there's two layers to this.  And I don't have the answers, by
22    the way, but I am just thinking it through.
23         Layer one is just how do we try to go forward.  What is
24    the protocol, if any?  I am fine, obviously, with whatever the
25    Court comes up with because I have no problem with a mask, but
```

1    I like not having a mask on when I am not next to someone.

2        I think the bigger issue, in my mind, is we are no longer

3    in the "How do we address this going forward," in the general

4    sense.  But, like Ms. Bernstein the first half of the day, I

5    was elbow to knee with Mr. Lincenberg the second half of the

6    day.  You know, I am vaccinated; I am double boosted; I am not

7    too concerned.  But I am certainly pretty likely to have gotten

8    some viral load.

9        I think the question I have in my head is once we know

10   that someone we have all been next to for long periods of time

11   likely has it -- because Mr. Lincenberg said he tested twice;

12   and as I understand it, the home test, if you test twice, it's

13   pretty likely.  He also -- I think one of the things, as I

14   understand it anecdotally, that prompted him to test was he got

15   an email late yesterday that some people he had been around

16   prior to coming here all had COVID -- not all, but several.  So

17   I think we have to assume it is highly likely that he does have

18   it.

19       My next-door neighbor is a pulmonologist, and I have spent

20   a lot of time talking to him, with five kids, and dealing with

21   our kids getting it.

22       The question becomes what do we do now?  I am ready to go

23   today.  It pains me to not make use of a day.  But as

24   coincidence would have it, we aren't back in session until

25   Tuesday.

```
1          My understanding, at least generally, is that even if we
2    are exposed -- let's assume we got exposed Monday to
3    Mr. Lincenberg for the first time, what I have been told
4    repeatedly is it takes at least three to five days for your
5    test to come back positive even if you were exposed and get
6    COVID.  So I am not sure that anything we test now is going to
7    tell us anything about whether we got something here in court.
8          It seems to me that because this is such a hot button and
9    because I worry that there are going to be jurors who don't
10   believe in masks or vaccines, and there are going to be jurors
11   who have the same view as Ms. Feve, that this is outrageous
12   everyone is not masked up -- and everybody's view is reasonable
13   because we all have a right to our own view.
14         I am just wondering if, we can test on Sunday and
15   Monday --
16              THE COURT:  I see where you going, and at this point,
17   I don't believe we should go forward.  And this allows us to be
18   transparent with the jury.  I believe that they are entitled to
19   have an understanding of what is going on.  I think that allows
20   us to regroup so everybody can test between now and next
21   Monday.  The jury themselves can test with their rapid test
22   today, and hopefully get their hands on another one and then
23   test on Monday.  And then we can go forward with eyes open,
24   with an understanding, did anyone else contract it?  And at
25   least have some reasonable basis to conclude can we go forward.
```

```
 1        So, that's what I intend to do.  Does anyone have any
 2   vigorous objections?
 3             MS. PIERSON:  I don't have an objection.
 4        I wanted to have us think ahead.  What if somebody does
 5   test positive?  What if they come back Monday and we have
 6   jurors or other counsel who test positive?  Where do we go from
 7   there?
 8             THE COURT:  You know, I have, for months now, been
 9   dreading, number one, the jury selection process because I just
10   figured it was going to be long, hard.  And then, two, being
11   able to make forward -- and God bless Judge Sammartino and the
12   people involved in that case and the fact that they have been
13   able to make it this far.
14        There may be a couple of differences.  One is we are in a
15   much smaller courtroom.  Two is that we are now at the spike;
16   when that trial started, there wasn't a spike.  And the spike
17   has begun as of May 5th or so.  It's growing.  So that's
18   another big difference.
19        And so, ultimately, I believe that the only responsible
20   way to go forward is for us to be able to all take our rapid
21   tests -- number one, for defense counsel's sake, be able to
22   have that time frame where we will know whether or not you have
23   contracted it, the next three, four, five days.  And then
24   taking a test will be more meaningful versus just like, right
25   now, running over to CVS and taking a test.  And then we will
```

1    be more assured either you do have it or don't have it.

2       If someone does end up developing it, I am prepared to

3    take breaks, five days or seven days or nine days, and get this

4    somehow or another tried between now and August or September

5    unless somebody tells me that I can't.  I don't want to.  I

6    don't really have the time and calendar space to do it, but I

7    will.

8       And, ultimately, I recognize that I am going to have to

9    react to unfolding developments.  We have had some developments

10   since last night.  My reaction, response, is today we are going

11   to take a break.  We are going to then have the attorneys and

12   the jurors take a rapid test, probably more like Sunday or

13   Monday, and then see where things stand.  We will get telephone

14   calls from jurors if they have gotten a positive, and then we

15   will regroup.  We will have a hearing here in court,

16   telephonically.  But we will find a path forward.  So that's

17   what I am prepared to do.

18          MR. JONES:  Your Honor, that includes the defendants

19   as well?

20          THE COURT:  Yeah.  Yeah.  Yeah.  And I would expect

21   that, then, they would also have their spouses and their

22   families test.  This is an important matter for all of us.

23          MR. WIECHERT:  Yes, Your Honor, a couple of thoughts.

24   I just finished a trial in April in the Central District of

25   California, in a courtroom in Santa Ana.  It had a number of

```
 1   plexiglass panels between the lawyers, and the witness box had

 2   plexiglass panels.  The witnesses also were given a mask that

 3   you could see through the mask, so you could see what their

 4   facial features were like during the course of the examination,

 5   so the jurors could actually --

 6           THE COURT:  Basically, you are describing the

 7   protocols that were in place kind of in between the COVID --

 8   the spikes, and we had, at one time, plexiglass in front of our

 9   staff, which we pulled down.  We never had the plexiglass, in

10   this courthouse, between jurors or between counsel.  At the

11   same time, we weren't holding matters with 12 attorneys and

12   four defendants.

13       So I guess the question is do we adopt those sorts of

14   safeguards?  And being that I work with the government that is

15   not known for being the most nimble as far as coming up with

16   plexiglass separators for counsel, I don't really see that that

17   would be forthcoming.

18       But, I understand that there are still protocols in place,

19   leftovers from when we were -- before the vaccination, for

20   example, when we were all so concerned and deathly afraid of

21   contracting COVID.

22       So, do you suggest we look into that?

23           MR. WIECHERT:  Yes, Your Honor.

24       And I am somewhat bristling from being admonished from a

25   schoolmarm prosecutor about masking or not masking.
```

1       I think it's really important when you are interacting

2   with a jury for the jury to see your face and for you to see

3   the jury.

4           THE COURT:  We get that.  We all get that.  We lived

5   through that.

6           MR. WIECHERT:  So -- but we also want this to go on

7   and finish.  So, from the standpoint, though, of due process,

8   there's certain things that masks affect our due process

9   rights, our clients' due process rights, such as being able to

10  see the witness's face.

11          THE COURT:  And as far as that's concerned,

12  throughout the pandemic, every witness who has testified has

13  testified either with a mask down or with a clear mask.  So the

14  trier of fact has always had an opportunity, and the attorneys,

15  and the defendant, to observe the demeanor of the witness.  So

16  that will continue.

17          MR. WIECHERT:  I also believe that the jurors have a

18  right to view the defendants at counsel table.  That's one of

19  the reasons why courtrooms are set up so jurors see the

20  defendants.

21          THE COURT:  I don't know if they have a

22  constitutional right for that, particularly when there are

23  health considerations.  Perhaps that will be litigated one day;

24  but at this point, I am not prepared to recognize that right.

25          MR. JONES:  Your Honor, one last thing.  And I know

1    the government is not nimble, and I don't know how helpful they

2    would be, but air purifiers in the courtroom or something like

3    that?

4         THE COURT:  I know the clerk, John Morrill, has

5    worked to have as state-of-the-art as we can have air

6    purification systems in the courthouse, in the courtrooms,

7    recognizing the importance of that.

8         MR. JONES:  Okay.

9         THE COURT:  So let's bring in our jury.

10    (The following proceedings were held in open court in the

11   presence of the jury:)

12        THE COURT:  Please be seated.  Let the record reflect

13   that all counsel, the accused, and all of our jurors are

14   present in the courtroom.

15    24 hours is not a very long period of time.  We see that

16   within the last 24 hours, we had awful, horrible, atrocious

17   events take place in Texas, and I know all of our hearts are

18   thinking about the parents of the children who were sadly

19   killed yesterday, and the teachers who also lost their lives.

20   So I know we have all had an opportunity to reflect on that and

21   will pray for the affected families.

22    Another development closer to home is, as you all will

23   recall from the beginning, I have been mindful and concerned

24   about you all as far as keeping you safe.  And you have also

25   heard me repeatedly reference how I will do what I can to avoid

wasting your time.  And that is just in recognition of the
unbelievable sacrifice that you give to us and how you are, in
many ways, the heroes of our justice system by being willing to
serve as jurors, especially in a case that is as long as this
one is projected to take.

        We learned that one of our attorneys has tested positive
for the virus, and so at this point, then, for me, I want to
make sure that you all are safe, moving forward.  I don't
believe we can continue today by continuing with trial.  We
otherwise were only going to be going forward today and
starting up next Tuesday.

        What I am prepared to do is, from this point forward, have
us all mask up during the trial.  But, in addition, to the
extent that the attorney who tested positive was in close
proximity to his fellow attorneys, I don't want to set up some
kind of superspreader situation, where they are going to
contract it and give it to others.  I think we need to take a
pause.  We need to, at this point, suspend the proceedings for
today, and then with the aim of starting back up next Tuesday.

        Between now and Tuesday, what I would ask is that you take
the rapid test that we have provided you.  I would ask you to
take it maybe around Sunday or Monday.  If you can get access
to additional tests, if you already have some at home, I would
say go home and take one today.  But then take one on Sunday or
Monday.  That way, it will be closer to when we would be all

 1   coming back.

 2        And then, if you do test positive, to call us, let us know

 3   of that fact.

 4        And then, my hope is, by Sunday or Monday, we will know if

 5   we are all clear to go forward.  I don't want to go forward

 6   unless we are all clear.  My obligation, one of my obligations

 7   is to protect you, so I take that very serious.  And so, in my

 8   view, that's the most responsible and safe way to proceed in

 9   this case.

10        So, I will be excusing you at this time.  You can go about

11   your business, but please follow the directives in terms of the

12   rapid test.

13        Also, it makes sense for all of us to be mindful, to the

14   extent that we are able to go forward, of the fact that we are

15   part of a process where there's so many people involved, where

16   we can't proceed without all of us.  And so that if we end up

17   having a delay of five days or a week or two weeks, it will

18   probably create additional hardships and problems and issues.

19        And Mr. Grabiel, did you have a question, sir?

20             JUROR:  Thank you, Your Honor.  Yes.  That was my

21   question, is that if someone tested positive, whether one of us

22   jurors or the prosecutors or defendants and their team, that

23   means the case would not -- we would not be convening that day

24   and eventually implies the extension?  I am thinking through

25   how this relates to my work obligations.

```
1              THE COURT:  Yeah, and that's a great question.  As
2    you can see, every party has more than one attorney.  And so,
3    as far as the additional attorneys, they all have separated
4    their tasks in certain ways.
5         To the extent that we end up having attorneys test
6    positive, for example, if we are able to start back up Tuesday,
7    and then we are able to go a week or two or three, and then we
8    have one of our attorneys contract COVID, then the Court will
9    have a heart-to-heart; we will have a hearing to determine
10   whether or not we are in a position to go forward, recognizing
11   a defendant's right to be represented by an attorney of his
12   choosing.
13        So it is possible that we would proceed in fits and
14   starts.  And as I mentioned, I know that some of you have let
15   me know that you have travel plans or events that are taking
16   place in mid July.  To the extent that we get there, then I
17   realize that it may be that we can't conclude.  Or it may be
18   that we will then just have to suspend proceedings that much
19   longer.
20        There's a lot of things that can happen.  And as you can
21   imagine, I have been thinking about them for some time now.
22   That's why I requested a supply of rapid tests; that's why I
23   requested the N95 masks because all of those things have been
24   circulating in my mind, how we will be able to make it forward
25   safely.
```

 1          So, just realize that I will continue trying to find a way

 2    forward so that we can safely manage to have this case tried.

 3    All right?

 4          Yes.

 5              JUROR:  Is there a number to call?  Is it that little

 6    card you gave us?  Is it the card you gave us?

 7              THE COURT:  My clerk, Andy.  Yes.  He is fielding

 8    everyone's calls, be it attorneys or jurors, and he will

 9    instantly reach out to me.

10          Any other questions?

11              JUROR:  Unless we hear otherwise, Tuesday morning at

12    8:30?

13              THE COURT:  Yes.

14          And then I will remind you of the admonition.  We are

15    suspending things for four or five days or so, but it is

16    imperative that you not be exposed to any of the legal or

17    factual issues that relate to this case, the parties, or the

18    attorneys.  So it's very important to be observant and avoid

19    exposure to anything involved in this case.

20          Any other questions?

21          Thank you so much for your patience and understanding, and

22    we hope to see you Tuesday morning.

23          (The following proceedings were held in open court out of

24    the presence of the jury:)

25              THE COURT:  We are outside the presence of the jury.

```
 1          You may be seated.

 2          And just so you know, I had debated whether to address the

 3   tragedy in Texas this morning on the way into the office, and I

 4   wasn't going to.  But I did receive this note from Bridgette

 5   LaBar, and it says, "Dear Judge Curiel, will you lead the

 6   courtroom in a moment of silence for the lives lost in Texas

 7   yesterday, if you think it is appropriate."

 8          I didn't lead a moment of silence, but I did acknowledge

 9   the lost lives, and I know we are all very sad.

10          Is there anything else to address at this moment?

11          MR. JONES:  Your Honor, I don't know if you wanted to

12   address the 803 matter, or you want to wait until Tuesday?

13          THE COURT:  I think we did address it with respect to

14   the Amobee.  I think there were a couple of outstanding

15   matters.

16          MS. BERNSTEIN:  Your Honor, I think Mr. Jones is

17   referring to my late filing.

18          THE COURT:  Yeah, and I had not reviewed that.  The

19   pocket memo?

20          MR. JONES:  Yes.

21          THE COURT:  I haven't reviewed it.

22          MR. JONES:  So you are not prepared to deal with that

23   today?  Okay.

24          MR. BIENERT:  And can I just say, on that issue --

25   because what occurred to me, we all want to satisfy Your Honor
```

1   with what you want, and we make sure we are flagging things, so

2   we wanted to get that law to you.

3        On the other hand, just as an observation, what that issue

4   is is really going to come up in the here and now; in other

5   words, we have no idea how the government intends to go about

6   using exhibits with witnesses, et cetera.

7        And so, I think we inadvertently had Your Honor's clerk on

8   it and we took that off.  But there's a lot of dialogue back

9   and forth with the government and us on what we agree on and

10  don't.

11       It just strikes me that when it comes to these

12  then-and-there evidentiary issues, I am assuming that it is not

13  the government's, in essence, directive that we are somehow

14  supposed to talk about each and every exhibit before they start

15  putting the witnesses in and speculate to them on the

16  objections we may or may not use.

17       But what you want us to do is flag for you things we know

18  are going to be meaty issues that you should have lead time to

19  know about and decide when and how to address.  So we thought,

20  in an abundance of caution, we want to let you know what we

21  think is hornbook law for how they can't get exhibits in

22  because it just looked to us like that's what they were going

23  to try to do.  We don't know that.

24       But, setting that aside, I just want to be clear, it is

25  not my practice -- and I don't think it would be practical or

1     appropriate -- for us to have to, for each and every exhibit

2     the government says, "We are going to use all these exhibits

3     tomorrow with witness X," so somehow before trial send them

4     something that says, "We may object to the exhibits on the

5     following grounds," because it is their job to properly admit

6     evidence and foundation and exceptions, and we do it in the

7     then and there.

8             THE COURT:  Certainly.  And I think we have to

9     distinguish matters that develop organically, at trial, where

10    the good, old-fashioned objection is raised, and those things

11    for which the law says pretrial notice has to be provided, be

12    it in the Rule 404(b) context, be it in the 902(11) context.

13    There are certain provisions that require notice in advance

14    and, in that process, an objection in advance, so this can play

15    out before trial.

16        At the same time, as I mentioned yesterday, oftentimes

17    when the government files a motion *in limine* to admit

18    something, I deny it because I am not in trial right now.  We

19    don't know whether or not an objection will be lodged at trial

20    and it will be well taken.  And you will say, "Oh, but, motion

21    *in limine*."

22        No.  Motions *in limine* are threshold rulings to keep out

23    things that would otherwise be impossible to unring the bell if

24    they make it into the record.

25        What you are referring to is basically matters that

1    require an objection at the appointed time.  Has the government

2    established the proper foundation for an exhibit?  Well, we

3    will hear what you think.  You may think it's irrelevant.

4    Overruled.  You may think that it's hearsay.

5        I will say, "what hearsay?"

6        Business record, check?  Does that follow the business

7    record checklist?  That's how we will go about it.  There's

8    nothing mysterious or nothing super complicated about that

9    aspect of this case.

10        MR. JONES:  The only thing that I was concerned

11    about, Your Honor, we weren't clear that your ruling yesterday

12    tended to appear to just deal with the authentication piece.

13        THE COURT:  Just with the authentication piece.

14        MR. JONES:  Yeah, and we want to be clear that you

15    didn't preadmit all the exhibits, because we got some exhibits

16    last night, about 6:30, seven o'clock.

17        THE COURT:  No.  No.  And I think the government

18    themselves conceded.  They repeated over and over again they

19    are just asking for an authentication of these documents as

20    being what they purport to be but without any further

21    determination they are admissible as non-hearsay or they are

22    even relevant.

23        Those matters, those objections are maintained by the

24    defense, and they can raise them in due course.

25        MS. MUNK:  Your Honor, there is just one group of

1   exhibits that we do want to raise objections to prior to the

2   witness going on the stand because we don't believe they are

3   relevant, or it seems to be that the government is trying to

4   back-door some stuff that is not related to this case.  So we

5   are fine raising that Tuesday since I understand you haven't

6   reviewed the briefing.

7           THE COURT:  Although, as I am looking at it, it looks

8   like it's all of three pages.

9           MS. MUNK:  The briefing is just related to 803(6),

10  Your Honor, but I know Mr. Wiechert, I guess two days ago -- it

11  feels longer than that -- but raised the issue of the

12  government trying to address specific exhibits or specific

13  email campaigns that went out that just sound bad.  And there's

14  a number of documents in here from SpamCop, which is

15  essentially somebody is complaining that they received an

16  unwanted email.  It's spam, and they want to be unsubscribed.

17      And I don't understand how Ms. Brooks, this witness that

18  the government wants to introduce, is going to be able to talk

19  to anything about that.  There's eight exhibits about that.  I

20  guess we can see maybe they would ask her about one, but it

21  seems like they are trying to get to this theme of, "Oh, the

22  company was sending spam."  And that's just not what this case

23  is about.  It has nothing to do with alleged hijacked

24  netblocks.

25      So I just think it's 403.  It is irrelevant.  And so that

1    is just something we wanted to raise in advance before they

2    tried to put up all these documents before this witness.

3            THE COURT:  All right.  Well, I think those are the

4    classic types of evidence where the moving party tries to

5    establish a foundation for an exhibit.  And at the time they

6    think they have met it, they offer it into evidence.  And then

7    the other side either says, "That's fine with us," or, "No, we

8    object, and we object for these reasons."  And I will be

9    prepared to rule.

10       I expect there will probably be hundreds of objections

11   during this trial, so I will try to do my job as well as I can.

12           MS. MUNK:  Thank you, Your Honor.

13           MR. WIECHERT:  Housekeeping matter, Your Honor.  You

14   may have proceedings in other matters over the next few days.

15   Do you want us to clear up everything?

16           THE COURT:  Yes, please.  We have sentencings

17   tomorrow and Friday and Monday -- no, I take it back.  We are

18   not working Monday.  Monday is a holiday.  But we are having

19   four sentencings tomorrow morning and three or four on Friday.

20           MS. MUNK:  I believe you addressed this, Your Honor,

21   but we can leave the exhibit binders back against the wall; is

22   that correct?

23           THE COURT:  Yes, absolutely.  If you feel secure.

24   And we have had other trials where folks leave their binders.

25           MR. GOODRICH:  Mr. Jones instructed that I am going

1  to stay and watch everything all weekend.  He told me that's my

2  job.

3          THE COURT:  Mr. Jones is very thorough.

4          MS. WISELEY:  Your Honor, Mr. Lincenberg is on the

5  line, and he would like to address the Court.

6          THE COURT:  Mr. Lincenberg, are you there?  How are

7  you feeling, sir?

8          THE CLERK:  He is in listen only.  I can reconnect it

9  if you want to wait.

10          THE COURT:  Mr. Lincenberg, I understand you can hear

11  me.  We will reconnect the line so that you can also be heard

12  on this side.  (Telephonic connection established.)

13      Mr. Lincenberg, are you there?  Mr. Lincenberg, can you

14  hear me?

15          MS. WISELEY:  I believe he is dialing back in.

16          THE COURT:  Okay.  It made reference to two people.

17          THE CLERK:  It would be us and him.  He might have

18  hung up.  That beeping noise, he might have hung up and be

19  trying to recall.

20      Mr. Lincenberg, are you on the phone line?

21          MR. LINCENBERG:  Can anybody hear me?

22          THE CLERK:  Mr. Lincenberg?

23          MR. LINCENBERG:  Can you hear me?

24          THE COURT:  Yes.  We can hear you, sir.

25          THE CLERK:  All right.

1    MR. LINCENBERG:  Good morning, Your Honor.

2    THE COURT:  Good morning, Mr. Lincenberg.

3    MR. LINCENBERG:  Sorry about the mess-up with the

4    trial schedule.

5        I wanted to just ask a few questions and weigh in on a few

6    things.  From what I am reading, you know, there's a difference

7    of opinion whether you should be five or seven days clear of

8    day one.  And although I may have contracted COVID on Monday --

9    or, for all I know, Sunday -- I think they assume day one is

10   the day we test, and I tested yesterday, after court.

11       So the Court should just consider how the Court wants to

12   handle that.  Next Tuesday, from yesterday, I suppose, would be

13   day seven, which might be fine either way.  But, you know, I

14   thought I would get the Court's guidance.

15       THE COURT:  Well, it seems to me that at this point

16   you are positive as of Wednesday or as of Tuesday evening, so

17   to the extent that you were of the view that you didn't have to

18   be here for today's proceedings, and today's proceedings won't

19   take place until Tuesday, perhaps we can have you -- to the

20   extent that you feel well enough, that you can come back on

21   Wednesday morning?

22       MR. LINCENBERG:  That may be fine.

23       And just for the record, part of the decision of not

24   coming in, as I understand it, the witnesses who government

25   counsel is calling are dealing with these netblocks that my

 1  client had nothing to do with.

 2       But if, just for the record, I consulted with my client, I

 3  advised my client that the witnesses we are dealing with deal

 4  with Suranet or something, which had nothing to do with us, and

 5  my client consented.

 6       We are in a slightly different situation from other

 7  counsel in that my junior partner, as the Court may be aware,

 8  came down with breast cancer a number of months ago.  She has

 9  been going through chemotherapy.  She has radiation coming up.

10  The Court may have seen Ms. Van Dyk came down to the courtroom.

11  So I am assisted by two fantastic associates, as good as I have

12  ever worked with.  I have full confidence.  But when they are

13  examining witnesses -- and there will be witnesses -- I will

14  certainly want to be there in court.

15       So, given my COVID-positive situation, it will be very

16  helpful for the government to let me know what their plans are

17  as far in advance as possible.

18       And also, so the Court knows, for the record I guess, my

19  only symptom is a scratchy throat.  I don't know if that will

20  change.  We will see.  But, you know, I am certainly intending

21  to do trial preparation work as much as I can over the upcoming

22  week and will advise anybody if the symptoms change.

23            THE COURT:  All right.  And I will also look further

24  into these, I guess, medical issues regarding the length of

25  time someone who contracts COVID would still have the active

1    virus on them, so it would be able to affect others.

2         And I had originally indicated that we would have our

3    clerk conduct temperature checks for our jurors.  I think at

4    this point it makes sense to have temperature checks for all of

5    us here in the courtroom, attorneys and members of the audience

6    who wish to observe.  And that gives us a means of catching

7    somebody who has potentially developed the virus.

8         So we will expand that protocol that we otherwise had

9    limited for the jury.

10        Mr. Jones?

11             MR. JONES:  I was wondering, would that be the

12   stand-up monitor, you walk in and put your head in the screen,

13   or is it a gun?

14             THE COURT:  My clerk, Andy Sacco, he has a handheld

15   one.

16             MR. JONES:  I am just thinking that with respect to

17   all the people in this trial, and the jurors and stuff, that

18   could take 30 minutes to get us all through.  I know it is the

19   government, but maybe they could invest in one of those

20   monitors, where you just step up and --

21             THE COURT:  Maybe your firm can.

22             MR. JONES:  I will bring ours down.

23             THE COURT:  Anything else, Mr. Lincenberg?

24             MR. LINCENBERG:  No.  Thank you, Your Honor.

25             THE COURT:  Well, stay safe --

1          MS. BERNSTEIN:  I am so sorry, Your Honor.  Your

2     Honor, everyone has tables.  Is it acceptable to the Court if

3     we fold them up and leave them against the wall, or would you

4     prefer we take them with us?

5          THE COURT:  You can keep them here.  The only

6     question is whether or not you leave them there.  You can fold

7     them and put them up against the wall.

8       Anything from the government?

9          MS. HEATH:  Nothing.

10          THE COURT:  Thank you, all.  That will be all.

11       (End of proceedings at 9:24 a.m.)

12                              -o0o-

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C-E-R-T-I-F-I-C-A-T-I-O-N

2

3            I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11            DATED:  May 25, 2022, at San Diego, California.

12

13                          /s/  Chari L. Bowery

14                          _____
                            Chari L. Bowery
                            CSR No. 9944, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25