```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,      .
                                    .
 5              Plaintiff,          . No. 18-cr-4683-GPC
                                    .
 6              v.                  . May 24, 2022
                                    . 1:27 p.m.
 7   JACOB BYCHAK,                  .
     MARK MANOOGIAN,                .
 8   MOHAMMED ABDUL QAYYUM,         .
     PETR PACAS,                    .
 9                                  .
                Defendants.         . San Diego, California
10   . . . . . . . . . . . . . . . . AFTERNOON SESSION

11
                     TRANSCRIPT OF JURY TRIAL, VOLUME 2
12               BEFORE THE HONORABLE GONZALO P. CURIEL,
                 UNITED STATES DISTRICT JUDGE, AND A JURY
13                      (OPENING STATEMENTS)

14

15   APPEARANCES:
     For the Plaintiff:      United States Attorney's Office
16                           By: SABRINA L. FEVE, ESQ.
                                 MELANIE K. PIERSON, ESQ.
17                               CANDINA S. HEATH, ESQ.
                             880 Front Street, Room 6293
18                           San Diego, California 92101

19   For the Defendant       Wiechert, Munk & Goldstein, PC
     JACOB BYCHAK:           By: DAVID W. WIECHERT, ESQ.
20                               JESSICA C. MUNK, ESQ.
                             27136 Paseo Espada, Suite B1123
21                           San Juan Capistrano, California 92675

22   For the Defendant       Mintz Levin
     MARK MANOOGIAN:         By:  RANDY K. JONES, ESQ.
23                                RYAN T. DOUGHERTY, ESQ.
                                  DANIEL J. GOODRICH, ESQ.
24                           3580 Carmel Mountain Road, Suite 300
                             San Diego, California 92130
25   ///
```

1   APPEARANCES (CONTINUED):

2


3   For the Defendant      Bienert Katzman Litrell Williams LLP
    MOHAMMED ABDUL         By:  WHITNEY Z. BERNSTEIN, ESQ.
4   QAYYUM:                     THOMAS H. BIENERT, Jr. ESQ.
                                CARLOS A. NEVAREZ, ESQ.
5                          903 Calle Amanecer, Suite 350
                           San Clemente, California 92673

6


7   For the Defendant      Bird Marella
    PETR PACAS:            By:  GARY S. LINCENBERG, ESQ.
8                               DARREN L. PATRICK, ESQ.
                                ALEXIS A. WISELEY, ESQ.
9                          1875 Century Park East
                           Suite 2300
10                         Los Angeles, California 90067

11

12

13

14

15

16

17

18

19

20

21

22  Court Reporter:        Chari L. Bowery, RPR, CRR
                           USDC Clerk's Office
23                         333 West Broadway, Suite 420
                           San Diego, California 92101
24                         chari_bowery@casd.uscourts.gov

25  Reported by Stenotype, Transcribed by Computer

```
 1            SAN DIEGO, CALIFORNIA; MAY 24, 2022; 1:27 P.M.

 2                              -o0o-

 3   (The following proceedings were held in open court in the

 4   presence of the jury:)

 5            THE COURT:  Please be seated.  Good afternoon, ladies

 6   and gentlemen of the jury.  I hope you had a good lunch.  At

 7   this time, we are ready to proceed with opening statements.  As

 8   I may have mentioned earlier, the government, because they bear

 9   the burden of proof, will have the opportunity to go first.

10   And then, the defendants can either give their opening

11   statement at this time or they can give it at the conclusion of

12   the government's case-in-chief if it is preceding a defense

13   case.

14       So, at this point, I will remind you that the opening

15   statement is not evidence.  It is designed to give you an idea

16   about what the case is about.  That way, when you start hearing

17   from witnesses, it won't come out of the blue.  You will

18   understand what it is a part of, where it arises from, and you

19   will have a sense of what each party, each side, has to offer

20   on the belief of what the evidence will be and how it will or

21   will not prove their -- well, prove the government's case and,

22   in the view of the defense, how it fails to prove what the

23   government is required to prove.

24       With that, Ms. Pierson, you may proceed.

25            MS. PIERSON:  I am not sure this is necessary, but I
```

 1   will go with it.

 2        This is the time you have all been waiting for, the time

 3   to hear about what the evidence is in this case.  So let me

 4   tell you what the evidence is going to show.

 5        In this case, the evidence is going to show that the

 6   defendants, the four men over there you have been seeing all

 7   this time, those four men stole part of the internet.  They

 8   latched onto internet protocol addresses that belonged to other

 9   people.  They used them to make money by sending unsolicited

10   bulk commercial emails, also known as spam.  They sent -- over

11   the period of the conspiracy, on the stolen netblocks, they

12   sent over 10 billion spam emails, billion, with a B.

13        Now, internet protocol addresses, or IP addresses, you'll

14   hear about all throughout the trial; in fact, you are going to

15   hear from a professor from Princeton, who will explain to you

16   precisely what they are, so I am going to give you the

17   30,000-foot view of what they are.

18        Essentially, IP addresses are the beginning and end point

19   for sending emails or data over the internet.  They are a

20   numerical identifier, or address, if you will, for each device

21   connected to the internet.  Your phone has an IP address.  Your

22   computer has an IP address.  Your iPad has an IP address.

23   Everything has an IP address because that's how things get

24   transmitted to you and from you and how they know where to go.

25        These IP addresses are allocated to various entities,

```
 1    individuals.  Your internet service provider, Cox, assigns you
 2    an IP address that is part of their group so that you can use
 3    that at home to send your internet, your emails from home,
 4    et cetera.  Whoever your provider is, they will assign you an
 5    IP address.
 6        All of the IP addresses that are allocated are kept track
 7    of in what is called a registry.  It is the American Registry
 8    of Internet Numbers.  You are going to hear a lot about them.
 9    ARIN is the acronym for that, and you will have someone from
10    ARIN here to testify and explain, again, in graphic detail,
11    what their registry does.
12        But essentially, ARIN maintains a public registry, so that
13    anyone who wants to find out who the authorized person is to
14    use one of these IP addresses can look it up on the public
15    database called WhoIs.  It will tell you who the registrant is.
16    It will tell you the organization.  It will give you points of
17    contact, email addresses, phone numbers, all of that, so if you
18    have a problem with something that came from their IP address,
19    you have somebody to contact.  It is sort of like a phone book
20    to look up IP addresses, if you will.
21        IP addresses, like any other valuable property, can be
22    sold, can be leased.  The registrant has a number of exclusive
23    rights.  There's a long, long laundry list that you will hear.
24    But they have the exclusive right to sell or lease, among this
25    bundle of rights that you get when you are a registrant.
```

1          Now, IP addresses are very, very valuable to commercial

2     mailers because they simply can't send emails without them.

3     They can't.  They need IP addresses.  The more IP addresses you

4     have, the more emails you can send, the more clicks you get,

5     the more money you can make.  Simple as that.  Simple as that.

6          Now, the defendants had problems with their IP addresses

7     because they were getting burned over and over again, leading

8     to the need to have even more IP addresses.  Now, getting

9     burned essentially is, you will hear -- you will read about

10    this in all the emails because most of the evidence that's

11    presented in this case is going to be through the internal

12    emails between the defendants and between the defendants and

13    the people who they dealt with in commerce relating to these

14    various IP addresses.  The people who were connecting them to

15    the internet, the people who are selling them, the people who

16    are leasing them, and amongst the defendants themselves when

17    things happen to them.  So you will hear them refer to them

18    being "burned" a lot.

19         And what "burned" means is that they were getting blocked

20    from the inbox.  Inbox -- you and I would probably think of an

21    inbox as a noun.  It actually, in this case, will be used as a

22    verb, inboxing, because what they are trying do is to get the

23    email into the inbox using the IP address, so it's inboxing.

24         Now, your internet service providers -- you are going to

25    hear the acronym ISP a lot in this case, which stands for

1    internet service provider, which could be someone like Yahoo,

2    someone like Microsoft, someone like Cox.  There's a whole

3    variety of internet service providers.

4         But the internet service providers try to do you, as a

5    customer or anyone as a customer, a favor and try to limit the

6    amount of unwanted commercial email that ends up in your inbox.

7    They do that with something we would colloquially call a spam

8    filter.  They would call it a proprietary software program.

9    And their proprietary software program -- each internet service

10   provider will have a different proprietary software program.

11   They take different factors into account and do it different

12   ways, so they get different results as well.  Some may be

13   better than others.

14        But a couple of the factors that they look at in deciding

15   whether to limit it is the number of emails that they see

16   coming in a particular period of time from an IP address.  So

17   if they are being flooded by emails from a certain IP address,

18   that is going to end up in the junk mail folder.  That's going

19   to be part of their algorithm.

20        Another thing that might end up into the junk mail instead

21   of the inbox is if they end up on a spam watchdog's block list.

22   There's a bunch of spam watchdogs.  There's one called

23   Spamhaus.  There's one called SpamCop.  There's a whole variety

24   of them.  And many of the internet service providers

25   incorporate their block list into their algorithm as far as

1    what gets into the inbox and what goes into the junk mail.

2         So, what happened was that the defendants, by virtue of

3    the way they conducted their business, had a problem with their

4    IP addresses getting burned.  They couldn't get into the inbox.

5    You will hear evidence that, by March of 2014, 75 percent of

6    the IP addresses that they were using each month got blocked.

7         Adding to the pressure, the number of IP addresses is

8    finite because they are set up in -- they are set up in groups

9    of numbers, and each number can be -- there's like -- there's

10   four groups separated by periods and each number can only be

11   between one and 256.  So once you get between 1 and 256 four

12   times, you have run out of numbers.  And when the internet

13   started, back in the early '90s, no one realized how popular it

14   was going to become, so they never thought they might run out

15   of numbers.  But by the time we get to 2013, suddenly, it looks

16   like we are running out of numbers.  This is a problem.

17        And you may have read about it, heard about how they are

18   changing from IP4 to IP6, to make sure there are more numbers

19   available.  But back at the time that the conspiracy was going

20   on, there was only IP4, and they were running out of them.

21        And what this means is they were becoming scarce, and they

22   were becoming more valuable.

23        So a group of IP addresses, say, about 65,000 of them,

24   would have been allocated for free in 1992.  You need it, you

25   are an educational institution or something like that, and you

1    filled out a form with about six questions, and they gave you

2    65,000 IP addresses.

3        Well, by the time they became scarce in about 2013, that

4    same group of 65,000 IP addresses was worth about $650,000.

5    That same group of IP addresses today?  3.3 million.  There's a

6    lot of money, a lot of value in these IP addresses.

7        And the defendants, because of nature of their business,

8    had a constant need for new, clean -- also called virgin -- IP

9    addresses that hadn't been used for mailing that had not been

10   blocked before, so they could get into the inbox.  It was so

11   important to get into the inbox because that's how you make

12   money.  It's got to get into the inbox.

13       Now, the scheme here in this case was actually fairly

14   simple.  The idea was you would identify netblocks that

15   appeared to be inactive.  And they could go on to the WhoIs

16   website, by ARIN, and they could see that ARIN, for instance,

17   hadn't been able to make contact with the point of contact

18   listed on the website for a couple of years.  And so they would

19   identify that, and then they would identify the domain attached

20   to it.

21       We have IP addresses, which are numbers, and that is sort

22   of how -- that's your address, back and forth.  But if you had

23   to remember every time you with went to a website, "Well,

24   Google is 192.253.0.12," no one is going to remember that.  So

25   what we have are domain names.  Google.com.  You know,

1    "usdoj.gov" for the Department of Justice.  And those are

2    domain names that are attached to the IP addresses that help

3    normal humans remember how to -- who you are reaching out for,

4    so we are not trying to remember all of these long series of

5    numbers.  There's a domain name there.

6         So you needed to get the domain that controlled the IP

7    address.  And a lot of times, if this had been sitting for a

8    while, domain names might come back on the market because if

9    you stopped paying your registration fee, for your domain name,

10   it would lapse, and then that domain would be available for

11   purchase for someone else.  They might look and see that the

12   domain from 1992 was now available to purchase.  Or they might

13   do something else.

14        For instance, you will see that one of the domains in this

15   case involves a company by the name of Open Business Systems.

16   Well, Open Business Systems, when they were registering their

17   IP block and everything, they used the domain name "OBS.net,"

18   and that's what they used.  However, the defendants then

19   purchased -- the coconspirators, purchased a domain name that

20   was "Open Business Systems.net."  So instead of "OBS," it was

21   the whole company name .net, and they used that to get control

22   of the IP addresses, then, that were registered to Open

23   Business Systems.

24        Then what they still had to do was they had to impersonate

25   the true registrants in order to get control of these because

1   when you are using IP addresses and you want to use them, you

2   have to do something -- again, this is one of these terms that

3   you are going to hear about from the professor from Princeton.

4   They do something called announcing them.

5        And this was really -- I struggled with the idea of

6   announcements when I first learned what this case was, but it's

7   really actually simple.

8        Imagine that you got your cell phone and you get a phone

9   number assigned to your cell phone.  But until they activate

10   that number, you can't use that to connect with anybody else in

11   the world on the phone.

12        It is the same thing with an announcement.  In order to

13   use your IP address over the internet, it has to be announced

14   or activated, and that tells the rest of the world that this

15   number is your device, whatever, and you now can connect with

16   the rest of the world.  Without that announcement, you can't.

17        And the people who make the announcements, they call

18   hosting companies.

19        And the hosting company is usually somebody between the

20   basic user and the internet service provider, who makes the

21   announcements and makes the digital connections, if you will.

22        And so, if you are the registrant, you don't need to do

23   anything to announce your IP address because everyone knows it

24   is yours.  But if you are not the registrant, and you want

25   to -- like, let's say you want to lease it to somebody.  Then

1    if somebody went to use it, other people would see, by the

2    WhoIs, by the ARIN registry, that they were not the authorized

3    user.  What they -- the industry standard, essentially, is that

4    you would use something called a letter of authorization, or

5    LOA, and you are going to see 10 or 11 of these in this case.

6         And the letter of authorization basically says, "I,

7    so-and-so," whoever it is, the registrant, "authorize whoever

8    to use my IP address for whatever purpose," and it will be

9    announced through this hosting company.  It is a short letter.

10        Well, in order to activate these IP addresses that they

11   now had control over with the domain names, they had to

12   announce them.  So what they did was they wrote letters using

13   the names of the true registrants and their points of contact

14   that appeared on the ARIN WhoIs, and drafted them up, printed

15   them, signed them, and sent them off to hosting companies,

16   falsely impersonating the individuals and the companies who

17   were the true registrants in order to gain control of these IP

18   blocks.

19        Once they did that, they were golden.  They could then

20   send emails.  They would have to configure it within their own

21   email system, and normally what they would do is they would

22   create a point of contact address.  For instance, there was

23   a -- you will hear testimony, hopefully today, from our first

24   witness, Jennifer Brooks, who worked for a company by the name

25   of Suranet and she had an email address, Jennifer@Suranet.

Well, the defendants gained control of that email address, and
then they configured it so that anybody who wrote an email to
Jennifer@Suranet, it went to them, so that if somebody were
complaining about the IP, complaining about spam on the IP,
anything to do -- if ARIN was sending a notice about it, they
would send it to the point of contact on the thing.  And so all
of those notices then went to them, even though they were not
Jennifer@Suranet.

So, this was not the defendants' brilliant plot.  It
wasn't their idea to begin with, but they grabbed it, they ran
with it.

The idea started with someone by the name of Scott
Richter.  You will hear about Scott Richter a little.  Scott
Richter was somebody who didn't have a very good reputation.
And so, Scott Richter brought in someone by the name of Daniel
Dye to help him market his stolen IP addresses.

Now, at the time, the defendants worked at a small -- at
an email marketing company called Frontline Direct.  You are
going to hear about a number of different iterations of this
company, and they sort of blurred the line.  They started out
as Frontline Direct.  Then they became Adconion Direct.  And
then were bought out by a much larger company and became
Amobee.  The time frames are sort of blurred.  They used the
Frontline email addresses when they were Adconion, and so on,
and so forth.

1          But the defendants here were in a group that were

2     controlling these IP addresses.  They were essentially what

3     they call the OPS team, the operations team.  And Mr. Pacas --

4     first Mr. Pacas, and then Mr. Bychak, were the head of the

5     operations team, and they were the ones in charge of what we

6     would call their -- they were in charge of deliverability, if

7     you will, of the company, the emails.  How do we get them in

8     the inboxes?  I believe their title was director of business

9     operations.

10         Mr. Manoogian worked for them, and he was in charge of IP

11    acquisitions.  He would be the one to go out looking for all

12    the additional IPs they needed to keep sending these emails,

13    and he was also in charge of activation.  So he was the one

14    contacting the hosting company to make sure these IP addresses

15    were turned on so that they could send emails over the

16    internet.

17         Mr. Mohammed Abdul Qayyum was their technical genius.  He

18    was the one behind the scenes who was helping them make the

19    connections, set up the email addresses, tie the domains to the

20    IP addresses, tunnel to the connections with the hosting

21    companies and so on, so forth, so they could make the

22    connections.

23         All these people together worked together to evaluate the

24    IP addresses before they bought them, and you will see their

25    emails back and forth.  "Have you checked this?  How does it

1    look on Cloudmark?  Is it clean?  Do you think that we can send

2    mail on it?"

3         They did their due diligence.  Their due diligence

4    included, of course, looking on the ARIN WhoIs registry to see

5    who owned it.

6         December of 2010, Daniel Dye approached the defendants at

7    Adconion Direct, and others, and he offered to sell them virgin

8    internet protocol address.  Daniel Dye has pled guilty to his

9    role in this conspiracy.  He will be testifying here.  You will

10    hear from him.  You will be able to judge his credibility.  You

11    will be able to see all the avalanche of emails between him and

12    the defendants that corroborate his testimony.

13         Daniel Dye offered netblocks from Scott Richter.  And

14    indeed, he disclosed the fact that they were from Scott

15    Richter.  And what was interesting, of course, about these

16    transactions, and very bizarre, is that he was selling them --

17    what was really valuable was the IP addresses, but the

18    contracts of sale and the invoices were for domain names only.

19    In other words, you were buying the car, but the contract was

20    for the key and the key alone.

21         They didn't buy -- didn't say anything about buying the

22    company, for instance, that owned these IP addresses; didn't

23    say anything about the IP addresses; only the domain name.

24         And what you will hear -- there will be expert testimony

25    on this -- is that they paid well below fair market value for

1   these IP netblocks.

2        You will hear testimony from Sandra Brown, who is an

3   expert involved in the -- she is essentially an IP broker, if

4   you will.  That's now a job.  And she, in her business, helps

5   people buy and sell IPs.  And she will tell you that at or

6   about the time that the defendants were trading in all these

7   IPs, that the fair market price was one dollar per -- ten

8   dollars per single IP address.  Ten dollars.

9        So, the 65,000, let's say, IP addresses in the groups that

10  the defendants were buying would have sold for about $650,000

11  at $10 an IP.  The defendants, however, in buying them from

12  Daniel Dye, paid a dollar an IP address.  For the very first

13  one, they paid $2 an IP address.  Steep, steep discount, well

14  below fair market value.

15       And in fact, you will also see evidence from their emails,

16  that what they paid to own these IP addresses in perpetuity was

17  the same amount that they were spending to lease a comparable

18  size IP address for one to two months.  That's the price

19  comparison between what they paid for with Dye and what they

20  would pay for in the legitimate marketplace.

21       The defendants eventually purchased 11 netblocks from

22  Daniel Dye, and you will hear about all of them.  You will see

23  that they all came with identical contracts of sale, where the

24  contract of sale was for the domain name.  The invoice was for

25  the domain name, but the key to the transaction was the IP

 1   addresses.  Without the IP addresses, there wouldn't be a

 2   $50,000 sale.  And you will see what they actually paid for the

 3   domain names themselves, which was, you know, $25, $11, not

 4   $125,000, not $50,000.  So they paid way above fair market

 5   value for the domain, but way below fair market value for the

 6   netblock.

 7       The very first netblock that they purchased from Daniel

 8   Dye was the one for Open Business Systems, which they purchased

 9   in 2011, and that purchase was consummated by Mr. Pacas.  I

10   believe they purchased that one for about $125,000.  It was

11   purchased by Mr. Pacas after he had a phone call with Daniel

12   Dye and Scott Richter, where they explained to him exactly what

13   he was getting.  He was getting the domain name that controlled

14   the IPs, and as long as they stayed under the radar, it would

15   be okay.

16       Well, Mr. Dye sent to Mr. Pacas the contract to purchase

17   the domain, and the contact information to control the netblock

18   via the domain name, as well as a sample letter of

19   authorization, unsigned.  And he said, "Here is a sample of

20   what you could use to authenticate your use of this domain

21   name."

22       Mr. Dye introduced them to an individual by the name of

23   Vincent Tarney.  Vincent Tarney -- you will hear from him; he

24   is going to testify -- was an individual who had a hosting

25   company in New Jersey, and Mr. Tarney was known by Mr. Dye to

1    host IP addresses of, shall we say, dubious authenticity.  So

2    Mr. Dye introduced the defendants to Mr. Tarney, and Mr. Tarney

3    then hosted some of their netblocks.  Mr. Tarney has also pled

4    guilty to his role in the conspiracy and will testify before

5    you in this case.

6         Now, this very first sale of the Open Business Systems

7    netblock did not go so well for the defendants.  When they

8    purchased it, they realized right away that they didn't have

9    the full bundle of rights that you would have when you

10   purchased -- if you got a legitimate netblock because -- I

11   don't want to get in the weeds here with you, but there were

12   certain things they wanted to do with the netblock that they

13   couldn't because they didn't have authorization.

14        If they wanted to do those things, they would have had to

15   go to ARIN, the registry, and say, "Hey, we are the new owners

16   here.  We want it put in our name."  And once it was put in

17   their name, they would have the full rights.  They chose not to

18   do that.

19        They also -- but the things that it wouldn't do hampered

20   their ability to send mail, which was a big problem for them.

21   So they contacted Mr. Dye, and in fact they threatened to sue

22   Mr. Dye.  Mr. Dye said, "Huh-uh.  I delivered exactly what I

23   promised to you.  I delivered a domain.  I delivered a domain

24   that will send email."  And, in fact, it did send email.

25        Four days after the conversation where Mr. Dye said, you

know, "I gave you what I promised," Mr. Bychak, then, noted
that a goal of his would be coming up with a plan to utilize
the GetAds space.  And GetAds was the company that Mr. Dye
worked for.  So you will hear about GetAds a lot and the GetAds
space because they referred constantly to the netblocks that
they bought from Dye not as "Dye's netblocks" but as "the
GetAds netblocks."

So, instead of washing their hands of Mr. Dye and the
netblocks when they found out they didn't have the rights of an
authorized user, what they did instead was they used it to send
mail.  They used it for three years to send mail, and they
bought ten more.

And, in fact, you'll see BlackMail reports.  And BlackMail
is a -- was a proprietary program they used to track their
emails within the company.  So it has nothing to do with trying
to get money from people and blackmailing, it was just the --
they bought it from a company by the name of Black Star, and it
was BlackMail.

But they have these reports that were generated on a daily
basis, and this was to help the people in the company take care
of both the marketing metrics and the IP metrics.  And you will
hear testimony from people who worked there.  There's marketing
and there's deliverability, essentially.

So, the marketing people would look at the these reports
because what the reports did is it showed, first of all, how

1    many emails per day were being sent, like, let's just say

2    Yahoo.  We are going to send Yahoo mail, and it will tell you

3    how many emails were going to Yahoo bulk mail.  And it breaks

4    it down by IP address.  Which IP addresses were sent?  How many

5    IP addresses per day were sent from each of the different --

6    how many emails were sent from each IP address?  And as well,

7    the marketing campaign that was associated with it.

8        So, the people who were trying to follow the marketing

9    campaign and further target the marketing campaigns would be

10   interested in the marketing campaign part of it and how many

11   emails went to each of the marketing campaigns, while the

12   people on the deliverability side were interested in the number

13   of emails that went out each day that related to the IP

14   addresses, how many were blocked by spam filters, how many were

15   blocked by what reason, so forth, so on.

16       Each of that -- there was a report like that every day and

17   just a machine-generated report by the program owned by the

18   company.  And it would show -- for instance, there are several

19   counts in the indictment based on that.  But in Count Nine, it

20   showed that on the Open Business Systems netblock, in one day,

21   they sent over a million emails.

22       Now, Mr. Dye provided to them the draft letters of

23   authorization.  These are the letters that impersonated the

24   rightful owners of these netblocks that were sent out, and the

25   defendants took them, and they modified them, and they signed

1    them.

2        For instance, in February of 2013, you will see there is

3    an email from Mohammed Abdul Qayyum, and his email address is

4    Abdul Mohammed.  So you when you see him on the emails, he is

5    going to be Abdul Mohammed, even though his full name is Abdul

6    Mohammed Qayyum.  So we are going to refer to him, perhaps, as

7    Abdul Mohammed, because that's the name his coworkers knew him

8    by.

9        He wrote an email sending one of these letters of

10   authorization to defendant Mark Manoogian.  The email said

11   "Print and sign."  One hour later, the signed letter of

12   authorization was sent to the hosting company.

13       Defendants also were fairly sloppy, as it turns out, with

14   these letters of authorization.  Sometimes they sent these

15   things off to the hosting company, and it still said "Enter

16   Name Here" where they were supposed to put in the name of the

17   hosting company on the form that Dye had sent them.

18       You will hear testimony from the true registrants, those

19   people who were the authorized users, according to the American

20   Registry of Internet Numbers, for all of these groups of IP

21   addresses that were stolen by the defendants.  They will all

22   testify that none of them authorized the defendants to use

23   their IP address or their names.

24       Now, it may be suggested these IP addresses were

25   abandoned.  That is not the case.  For example, you will learn,

in the course of this, in 2016, that the ECT netblock was sold for almost $900,000.  This was a netblock that the defendants took over in 2013, I think.  But the netblock was not sold by the defendants.  The netblock was not sold by Daniel Dye.  The netblock was sold by ECT, the company, in fact, that was the registered owner.  It was not abandoned.

The defendants had other problems with these netblocks. And part of it was they were reclaimed on occasion by the rightful owner, who figured out, "Hey, someone is using my netblock."  For instance, in February of 2002, Mr. Pacas purchased a netblock called Cdnair.ca, essentially Canada Air and was an old netblock.  And within two weeks of them purchasing it from Dye for $50,000, it was reclaimed by Canada Air, the successor to Canadian Airlines.

After speaking to Mr. Dye about what happened, Pacas wrote an email to the coconspirators and said, "Now I really understand exactly how this works."  And he said, "I understand now we have got the risk of these things being reclaimed by the owner, but if we can use it for six months and monetize it, I will consider it a success."

And what he said, which is even more interesting, is he said, "Now that I know how to do this, maybe we should think about doing this in-house."

Also, in February of 2013, one of the hosting companies forwarded an email from an internet service provider to

1   Mr. Manoogian.  The internet service provider had rejected one

2   of the letters of authorization.  They listed four reasons, one

3   of the reasons being that the name didn't match the name in the

4   WhoIs for the American Registry of Internet Numbers.  And there

5   were three other problems with it.

6        The company it was sent to said, "Oh, you can contact

7   ARIN, since you own this, and it will be fine."

8        The defendants did not do that.  They did not contact

9   ARIN.  In fact, they did not further pursue hosting this

10  particular IP address group with this hosting company.  They

11  simply chose to move it to a different hosting company that was

12  less diligent about following up on the verifying the facts in

13  the letters of authorization.

14       That was an LOA for the netblock Suranet that was actually

15  owned by a company called Educom.

16       Now, in May of 2013, Mr. Dye offered a group of IP

17  addresses that went with the domain name TrinityMicro.com,

18  offered them to Mr. Bychak.  Because Mr. Bychak is in charge of

19  the OPS team, he was the last word in the buying and selling

20  here.  And Mr. Bychak had Mr. Manoogian and Mr. Abdul Mohammed

21  check it out, investigate.

22       Mr. Abdul Mohammed Qayyum wrote back and said, "I agree

23  that it's risky.  According to WhoIs, it's not fully owned by

24  them, but might as well take a chance."

25       So Mr. Manoogian sent the letter of authorization to the

hosting company with the note "Fingers crossed."  They didn't care.  What they cared about was could they send mail, could they use it to send mail.

Also, in May of 2013, Dye offered other blocks, including one associated with a domain called Paxny.com.  And I am giving you the domain names because you are never going to remember if I tell you it's associated with a string of numbers.

So Bychak then asked Dye, "Hey, we have had some problems in the past.  Do you think we could announce it first to see if it gets marked as hijacked right away?"

And he also asked for the letter of authorization to be sent to him in Word format, rather than PDF, because that will be easier for us, easier that way.

After they had the problems in June of 2013, Dye actually agreed to sell them a larger group of IP addresses at a discount, in acknowledgment for the problems that they had had with the prior things, where they had been reclaimed by people, and they couldn't use them as long as they hoped to to send mail.  So he allowed them -- he offered them a netblock, called Moore Solutions, for $10,000, far less than the $50,000 a netblock he had been charging them in the past.

Now, in July of 2013, Mr. Bychak wrote an email to the CEO of the company.  The CEO of the company was concerned about the problems with the netblocks, particularly because she was -- she knew that Mr. Pacas had been burned in the Canada Air deal.

        Now, Bychak wrote to her and said, "Look, these are some
of the cheapest IPs around.  It is a one-time cost of $50,000
versus monthly rent of a lease up to $85,000," and he convinced
her to keep using the GetAds netblocks.

        In October of 2013, they were discussing whether they
should sell two of the netblocks.  And Mr. Mohammed said they
should avoid discussing how or why they were associated with
these IP blocks.

        They also discuss in the same period buying the ECT
netblock for $50,000.  Mr. Bychak wrote that he was willing to
take the risk and it wasn't any more than any other GetAds
netblock.

        And after purchase, there was an email between Mr. Bychak,
Mr. Manoogian, and Mr. Mohammed Abdul Qayyum, confirming that
the email address impersonating Darrell Lynn, who was the point
of contact on the ARIN registry, had been configured to format
all emails to us.

        And just like that, you will also see evidence of spam
complaints, for instance, that were forwarded to the
Jennifer@Suranet address that was received by the defendants,
and an email from ARIN sent to the Jennifer@Suranet address
saying that Educom was essentially reclaiming the netblock, and
that the -- Educom, the company, had been sold to Educause,
which was then going to control the netblock owned by Educom
and that came to Jennifer@Suranet.

And when they got these emails, like the one from Canada Air, or this one, they stopped mailing on these IP addresses. They didn't go to somebody and say, "This is our netblock." They just stopped mailing, immediately.

In January of 2014, Mark Manoogian sent an email to Mr. Bychak and Mohammed Abdul Qayyum that the -- one of the netblocks, the Educom or the Sura netblock, had been flagged as hijacked, being used by an unauthorized user.  Nonetheless, they decided to continue using it until it was reclaimed by the rightful owner.

They went to some great lengths here to hide their identities as the people who are using these netblocks. Eventually Mr. Manoogian asked the hosting company that he was using to host these things if they could take Adconion's name off the client list and replace Adconion with MyCRM host, and Mr. Manoogian's name was replaced by the name of "Charles Calhoun."  So Mr. Manoogian became Charles Calhoun for that purpose.

You will hear evidence that the IP addresses were associated with the domain name that's associated with a dba for a dba for an LLC, which was owned by Adconion.  And only after peeling all of these layers off would you actually find Adconion as the person who sent these emails associated with these netblocks because besides buying these netblocks for less than fair market value, more than fair market value for the

1   domains, being reclaimed by the rightful owners, the letters of

2   authenticity being rejected, and lacking the normal ability of

3   the registrant to use the IP addresses in certain ways, there

4   was also evidence of other red flags that were ignored by the

5   defendants.  And this would be these listings by the Spamhaus

6   watchdogs, some of them listing it for hijacking.

7       And they -- you will hear evidence that Adconion monitored

8   these various spam watchdogs on a daily basis to see if any of

9   their IPs got listed, and you will see the email chatter, it

10  got SBL'd.  And "SBL" would be for "Spamhaus blacklist" or

11  "Spam blacklist" or might be SpamCop.  It was sort of a generic

12  name, like we call everything "Kleenex" although it's really

13  "facial tissue."  They called everything SBL'd, because it was

14  blacklisted.

15      So, they had those notices as well.  But what the

16  defendants did was they just continued to turn and burn, and

17  that's the phrase they used internally.  When the IPs got

18  burned, they would use another provider, turn and get another

19  IP address, turn and burn.  That was their strategy.

20      What was the motive?  The motive was the almighty dollar.

21  You will hear testimony from two forensic accountants, who went

22  through the books and records of Adconion, and they determined

23  that the amount of revenue earned by Adconion from the

24  fraudulent use of the netblocks involved in this case over the

25  time period of the conspiracy was $5 million.  $5 million.

```
 1          So, after you have heard all this evidence, we will ask

 2     you to return a verdict of guilty on all counts.  Thank you for

 3     your attention.

 4               THE COURT:  All right.  Thank you.

 5          And defense, you may proceed.

 6               MS. MUNK:  Is it possible on take a quick comfort

 7     break, Your Honor?  Is it a little too early?  I apologize.

 8               THE COURT:  We have only been in session 45 minutes.

 9               MS. MUNK:  Okay.  I will power through, Your Honor.

10               THE COURT:  Do you need to use the restroom or

11     something?

12               MS. MUNK:  Yes.

13               THE COURT:  Let's take a five-minute break.

14               MS. MUNK:  Thank you, Your Honor.

15               THE COURT:  You can remain seated or if you want to

16     stand and stretch.

17               JUROR:  I had a question on the time.

18               THE COURT:  We have a question about time.

19          Yes, sir.

20               JUROR:  I just want to repeat what you said.  So we

21     are not meeting Thursday or Friday, and then during the week,

22     you want us here at 8:30; we will leave at 5:00?

23               THE COURT:  By 5:00.

24               JUROR:  And lunch is strictly 12:00 to 1:00?

25               THE COURT:  Yes.
```

```
 1              JUROR:  Or are you going to be --

 2              THE COURT:  For example, if there's a witness and

 3     they are on the stand and they have five minutes left to

 4     conclude and it's 12:00 o'clock, I may go ahead and go five

 5     minutes.  That way, we can accommodate that witness's schedule,

 6     get them through without having to wait around an hour for five

 7     minutes.

 8              JUROR:  And then, same with the breaks.  I know you

 9     listed break time, only 15, 10 minutes, right?

10              THE COURT:  15 minutes generally will be the time

11     that we will provide.  And as I mentioned, what happens is we

12     will be discussing issues out of your presence.  Over the lunch

13     hour, we met.  So, on occasion, we may kind of bleed into the

14     next session, but that will be our goal.

15              JUROR:  Just trying to see if I could squeeze in

16     meetings during lunch, but probably not.

17              THE COURT:  Oh, yeah.  Might not be doable.

18              JUROR:  Okay.

19              THE COURT:  You may recall, those who were here at

20     the beginning, I promised you N95 masks in the event you would

21     like to have one during the trial.  Those are going to be

22     provided to you.  And also, we have a rapid test for each one

23     of you in case you wake up in the morning and have a suspicion

24     that you may have contracted COVID.  Then I will ask you to

25     take the test, and then just make sure that you don't test
```

1    positive at that time.

2            JUROR:  We don't have to wear it?

3            THE COURT:  You don't have to wear it, but if you

4    feel more comfortable with it, then do.

5        (Pause.)

6            MS. MUNK:  Good afternoon, ladies and gentlemen.  I

7    know we have met, but, again, my name is Jessica Munk, and I am

8    here with my co-counsel, David Wiechert, at counsel table here,

9    and we have the privilege of representing Jacob Bychak.

10       Now, the purpose of an opening statement is for each side

11   to give you a preview of what we intend the evidence will show

12   throughout the trial, and the guiding principle around

13   throughout the trial is embedded in our Constitution, and that

14   is that the defendants are presumed innocent unless guilt is

15   proven beyond a reasonable doubt.  And that is the highest

16   burden that there is under our Constitution.

17       Now, I would like to get into a brief overview of some

18   important players in this case.  First, I want to talk about

19   Jacob Bychak.  Jake is 36 years old.  He is right here, at

20   counsel table.  I will ask him to stand up because I know he's

21   blocked, here.  He is 36 years old and he married a college

22   sweetheart, Jean.  He grew up in Santa Maria, California, and

23   he moved to San Diego to attend college, at San Diego State

24   University.  And he went there from 2004 to 2007.  He graduated

25   with a business management degree, and then he went and got an

1    MBA at San Diego State University in 2009.

2        Now, he very briefly worked as a marketing research

3    analyst at a financial services company, and then he was hired

4    by Frontline Direct, on April 5th, 2010.  Jake was 24 years old

5    when he was hired at this company, and this was his first

6    significant job out of college.  Now, today, he still works at

7    the company, a successor of Frontline Direct, called Amobee.

8        Now, Frontline Direct was a commercial marketing company,

9    that was started by Kim Perell in 2003.  She started the

10   company when she was 23 years old, and she started the company

11   from her kitchen table, and she started it with her college

12   friend, Amanda Curry.  Kim Perell was the face of the company,

13   and she was the president, and Amanda Curry was the senior vice

14   president.

15       Kim Perell was a very successful woman and she grew

16   Frontline Direct pretty quickly.  By 2005, Frontline Direct had

17   $3.5 million in revenue.  They had 63 customers, and she had

18   five employees.  And by 2008, Frontline Direct had gained an

19   excellent reputation within the industry, and they were

20   acquired by a larger company, called Adconion Media Group.

21       Now, at the time, Frontline kept their name and later

22   changed it to Adconion Direct in 2011.  But Kim Perell sold

23   Frontline Direct to Adconion for $20 million.  She was very

24   successful.  And she was appointed as the CEO of Adconion

25   Direct.

1          Now, at the time of this acquisition, in 2008, the company

2     grew, at that point, they had 60 to 80 employees.  And this is

3     two years before Jake starts working at the company.

4          Now, Kim Perell was a firebrand.  And she grew Adconion

5     Direct into generating hundreds of millions of dollars in

6     revenue per year.  And if you were a local reader of the

7     San Diego business news, you would have seen lots of stories

8     about Kim Perell being one of the most successful women

9     entrepreneurs in San Diego.  She was voted as most admired CEO

10    by the *San Diego Business Journal*.  Adconion Direct was voted

11    one of the best places to work in 2012.  Adconion was also

12    named one of the most trusted brands by the *San Diego Business*

13    *Journal*.  And in 2013, Kim Perell received the prestigious

14    Ernst & Young Entrepreneur of the Year award.  She was very

15    successful.

16         And Adconion became a well-known, reputable digital

17    advertising company.  They advertised across all channels --

18    video, social, email, mobile -- across all channels.  But this

19    case focuses on commercial marketing -- commercial email

20    marketing, so that's what you are going to hear the most about.

21         Now, Adconion had lots of large, reputable businesses that

22    trusted -- these companies trusted Adconion to do their

23    commercial marketing, and these are large companies that many

24    of us are familiar with:  Liberty Mutual, USAA, Fidelity

25    Investments.  GEICO -- GEICO came up a bunch during

1   deliberations -- subway.  Disney.  These were customers of

2   Adconion Direct.

3        Now, as a bigger company, Adconion Direct had departments.

4   They had an HR department.  They had an accounting department.

5   They had a legal and compliance department.  They also had

6   teams dedicated to the various aspects of commercial email.

7   And those teams, none of the defendants were on.  The

8   defendants actually never sent one commercial email despite,

9   maybe, what it sounded like by the government.  They were not

10  on the email team.

11       They had a Gmail team, a hotmail team, a Yahoo team.  And

12  those various teams were broken up like that because, for the

13  commercial emails that the company sent, if they were sending a

14  particular ad for, say, Disney, and it was going to Gmail

15  users, the Gmail team handled that, and so on.  So it would get

16  divided up by various teams, and there was actually a director

17  of deliverability of email.  And that was not any of the

18  defendants either.  So I just want to make that very clear.

19       And also, the content of the emails are not at issue in

20  this case, but I know there was lots of talk about email

21  annoyance and all of that, but the content is not at issue.

22       Now, the company used opt-in lists, and they were people

23  who signed up to receive these emails, and those were the lists

24  they used to send these commercial emails on behalf of their

25  hundreds of customers.

1      Now, they also had an operations team.  Now, when Jake

2   started, initially the operations team was headed by Pete

3   Pacas.  And Jake moved into the operations role in late 2010,

4   early 2011.  Now, later that year, Pete Pacas left to go to a

5   different company, called Telic, and Jake ended up being the

6   supervisor of operations.

7      Jake supervised Abdul Qayyum, and he was the technical

8   operations manager.  He also later supervised Daniel Weinman

9   and Chelsea Denning, and you will see their names on various

10  emails.  They are on the operations team.

11     Now, there was also an IP acquisition team -- "IP" as in

12  "IP address" -- and Mark Manoogian and Justin Barredo were on

13  that team, and the operations team assisted the IP acquisition

14  team.  Now, the IP acquisition team -- Mark Manoogian and

15  Justin Barredo -- reported to Jonathan Harrill, the in-house

16  lawyer.

17     So I also want to give you a brief background about

18  Jonathan Harrill.  Jonathan Harrill is a lawyer, and he started

19  at Adconion as an employee, and actually worked in an

20  operational role and handled IP acquisition, and he then became

21  the in-house counsel of Adconion, a company of 80-plus people.

22  And in 2012, Jonathan Harrill was the director of legal and

23  compliance.  Jonathan Harrill -- he was actually named by

24  *San Diego Metro Magazine* as a 2014 Men Who Make a Difference.

25  He was well respected within Adconion and well respected within

```
 1   the community.
 2       Now, you are also going to hear testimony from Daniel Dye,
 3   and I just want to give a very brief overview.  Daniel Dye was
 4   an officer of GetAds.  And GetAds marketed itself as a company
 5   that provided electronic marketing solutions and advice.  And
 6   GetAds had a prior business relationship with Adconion.  They
 7   were a marketing affiliate of Adconion.  And GetAds touted
 8   itself as a company that was legally compliant and acted with
 9   integrity.
10       Now, you are going to hear a lot about Spamhaus, The
11   Spamhaus Project, called Spamhaus.  Spamhaus is a foreign
12   organization dedicated to the eradication of mass commercial
13   email, despite the legality of mass commercial email here in
14   the United States.  And Spamhaus officiously interferes with
15   the legitimate activities of companies like Adconion, because
16   they don't like commercial email, and they try to block them
17   from sending commercial email even though they are engaged in
18   totally legal marketing activities.
19       So Spamhaus will blacklist a company or the internet
20   addresses they use.  Now, internet service providers, ISPs --
21   and I apologize for all the acronyms and the technical terms; I
22   know it can be confusing -- but these are like Yahoo and
23   hotmail, and AOL.  ISPs will rely on Spamhaus' blacklist.  So
24   if something is SBL'd, either the company or the IP or the
25   domain is SBL'd, then an email will get blocked.  And if
```

1    Adconion's emails got blocked, they couldn't make money, and
2    that was a huge impact and risk to their business, and I will
3    expand on that later on.
4        In order to send bulk commercial email, Adconion needed IP
5    addresses, and the bigger they became, they needed more IP
6    addresses.  They had hundreds of customers.  And they sent --
7    the company sent millions of emails.  And IP addresses would
8    get blacklisted by Spamhaus.  So Spamhaus was a risk.  And
9    because IP addresses got blacklisted, they had a short shelf
10   life.
11       Now, the company had only leased IPs up to the GetAds
12   deal, which I am about to get into.  But they had numerous
13   sources of where they got IPs.  They got IPs from tons of
14   sources, tons of brokers, and that was just a regular thing
15   that they had to do.  They had a whole team dedicated to it.
16       So now I want to get into what the evidence will show.
17       So, in late 2010 to early 2011, CEO Kim Perell reaches out
18   to Daniel Dye, at GetAds, and inquires about purchasing IPs
19   from him.  Now, Adconion had this prior business relationship
20   with GetAds that was from way prior to the defendants'
21   employment, and that business relationship was cultivated by
22   Kim Perell, the CEO, and another executive, named Kevin Wolf.
23   And Kim Perell and Kevin Wolf both directed the purchase of the
24   GetAds IPs.
25       Now, what Adconion didn't know at the time and what the

1   defendant didn't know at the time is that Daniel Dye was a con

2   artist, and he duped Adconion and the defendants.

3       Now, ladies and gentlemen, you will not see one piece of

4   evidence where Daniel Dye told Adconion or any of the

5   defendants he was selling stolen IPs.  And if you think about

6   it, you wouldn't -- he wouldn't have done that because he

7   wanted to make the sale.  Adconion was a reputable marketing

8   company.  He wanted to make the sale.  You will not see any

9   evidence showing that Daniel Dye told the company or the

10  defendants.  That evidence does not exist.

11      What Daniel Dye represented was that he was selling

12  pre-ARIN, virgin IPs.  Now, pre-ARIN IPs are IP addresses that

13  were allocated in the early to mid 1990s, before the creation

14  of ARIN.  ARIN stands for the American Registry of Internet

15  Numbers, and it was created in 1997, and it created a formal

16  registration process.  And for those addresses that are pre

17  ARIN, they are also called legacy IP addresses.

18      In order to get those formally registered with ARIN, you

19  have to sign a registration services agreement.  So there's

20  something called a registration services agreement, or RSA.

21  And ARIN, if they allocate new addresses today, they require

22  you to sign this registration services agreement.

23      Now, for IPs that were allocated in the early to mid

24  1990s, companies -- you don't have to sign an agreement with

25  them.  But if you want to be formally registered with ARIN,

1    ARIN requires that you sign a legacy registration services

2    agreement, an LRSA, and many companies chose not to do that

3    because when they sign an LRSA with ARIN, they give up lots of

4    rights that they hold.  And ARIN also requires annual fees.  So

5    lots of companies didn't do that, and there was nothing wrong

6    with doing that.

7         Now, IP addresses -- I know IP addresses are this

8    complicated thing.  Essentially, it's, in simple terms, a

9    string of numbers that communicates with a device on a network.

10   And computers use IP address to communicate both over the

11   internet and on other networks.  And IP addresses are similar

12   to telephone numbers in that it's basically kind of like a

13   telephone number for your computer.

14        Now, Adconion ended up purchasing -- they ended up

15   entering into nine contracts with GetAds for the purchase of

16   IPs, and I am not going to go through all of them.  The first

17   contract was handled by Pete Pacas, and he left.  I mentioned

18   he later left the company and went to a different company,

19   called Telic, so I am going to let Mr. Pacas' counsel get into

20   that transaction.

21        But the second transaction -- after Pete leaves, Jake was

22   the manager of transactions.  He handled the second transaction

23   in 2012.  So, in 2012, Kevin Wolf reaches out to Daniel Dye

24   about purchasing IPs, and he connects Jake -- directs the

25   purchase and connects Jake to Daniel Dye.

So, what Jake does, as any good employee would do, he immediately loops in the in-house counsel and includes him on these emails.  He gets the approval from the in-house counsel, Jonathan Harrill.  And Daniel Dye sends Jake the contract, and Jake immediately forwards it to the in-house counsel, Jonathan Harrill, and says, "Let me know if this is okay to sign."

Jonathan Harrill reviews the contract, and -- actually, he reviews the contract and he redline edits it.  So you will see evidence in this case that the in-house lawyer reviewed the contract, made edits to it, made changes he felt was appropriate as the director of legal and compliance at the time, and he sends it back to Jake and says, "Revisions attached."

Jake, knowing the in-house lawyer approved the contract and the deal, he thinks it is completely fine.  He relied in good faith on the lawyer.  And he sends the contract back to Daniel Dye.  "Here is a revised redlined contract.  Let me know if this is okay."

Daniel Dye tells him, "These revisions are probably fine," something to that effect, "but I am running it by legal as well and I will let you know."

Daniel Dye comes back and says, "legal has zero issues with the redlines."  The deal was approved.

So, from Jake's perspective, this deal was completely legal and legitimate.  He never had any reason to question it.

1    The in-house lawyer, who was well respected, the director of

2    legal and compliance, reviewed it and approved it.  And he

3    believed the GetAds lawyer also reviewed and approved it.

4    There was nothing to suggest it wasn't.  He, in good faith, as

5    well as the other defendants, relied on legal.

6         Now, the government made some suggestions in opening about

7    the price, and the going rate of netblocks at the time was $10

8    an IP.  The defense absolutely disputes that, but that wasn't

9    the going rate.  Now, you will hear from an expert from the

10   government who is relying, really, on an outlier transaction

11   related to Microsoft and Nortel in a bankruptcy case.  There

12   wasn't a market value for IPs at this time.  And at the time,

13   Microsoft, in 2011, was the largest computer software company

14   on the Fortune 500 list, and it had $62 billion in revenue.  It

15   is an outlier, and that was not the market value for IPs.

16        But regardless, the price didn't raise any red flags at

17   Adconion, this big company, where lots of people knew the

18   price.  The CEO, Kim Perell, she -- she directed the deal.  She

19   knew the price.  She had no issue with the price.  She said it

20   was fine.  Accounting, they knew the price.  They had a whole

21   accounting department.  They had every -- every lease

22   transaction for IPs, they saw all that paperwork.  They saw the

23   purchases of the GetAds IPs and that didn't raise a red flag

24   for accounting.

25        The in-house lawyer, Jonathan Harrill, he was acquiring

1    IPs, helping with IP acquisition prior to becoming the lawyer.

2    He knew generally what stuff went for and that didn't raise a

3    red flag for him.  It didn't raise a red flag for anybody at

4    the company, it certainly wouldn't have raised a red flag for

5    Jake or the rest of the defendants.

6        Now, for each of the IP netblocks, Dye represented that he

7    legally owned the IP and the associated domain and that he

8    would provide a letter of authorization.  And a letter of

9    authorization was to give to a hosting company to announce the

10   IP to an upstream IP.  Essentially, to make the IP live so you

11   can mail on it.

12       He represented all this.  He said, "These are pre-ARIN

13   IPs."  He told the defendants that they couldn't be registered

14   with ARIN unless you sign a legacy registration agreement.  And

15   he also represented that the point of contact on the ARIN

16   database couldn't be changed.  And again, it couldn't be

17   changed unless you formally register with ARIN.

18       So Daniel Dye gave letters of authority to the defendants

19   and said these are the letters of authority to announce the

20   netblocks, and they were in the names of the original holders

21   of the IPs.  But Dye represented he got these from defunct

22   companies and had the legal authority to do this.

23       You will not see any evidence that Dye told Jake or any of

24   the defendants he forged any signatures.  You won't see any

25   evidence that he told them he did not have authority to provide

1   these LOAs.

2       And in fact, he introduced them to a guy named Vincent

3   Tarney.  He had a company called the Mata Group.  And he

4   also -- it is a hosting company.  He also introduced them to

5   Peter Holden, from Hostwinds, another hosting company, and

6   essentially gave them the stuff they needed and said, "This is

7   what you do."  And at this point, the defendants had never

8   purchased IPs before.  The company had never purchased IPs

9   before.

10      And the government's cooperating witness, Vincent Tarney,

11  he is a cooperator.  He's pled guilty, and he is going to

12  testify.  He is going to testify, he handled the first two

13  GetAds blocks that Adconion purchased, to announce them.  He's

14  going to testify they had no idea what they were doing.  And

15  it's true, they didn't.  They relied on Dye.

16      So, the defendants relied on Daniel Dye.  Adconion relied

17  on Daniel Dye.  And they had no reason to question it.  And

18  Jake and Pete and the other defendants, they had no reason to

19  question it because the company directed and approved this.  So

20  their actions were reasonable, and they certainly were not

21  criminal.

22      Now, the government alluded to, a little bit, about risks,

23  and you are going to hear -- you are going to see some emails

24  that talk about risks.  And that's true, you will.  But the

25  risks for the company were the risks associated with Spamhaus.

1    These were not risks about worry that they are doing something

2    wrong or engaged in criminal activity.  The risk was all

3    related to Spamhaus because Spamhaus is a foreign vigilante

4    organization that will stop at nothing to blacklist commercial

5    marketing companies, and they had a big battle with Adconion.

6    They would blacklist the company name, the domain, people

7    there, the IPs.  There was a huge battle there, despite the

8    legality of the company's activities.

9        And so you will see about risk, but the risk was all about

10   Spamhaus.  They were very concerned about that.  Because if the

11   IP gets blocked, or SBL'd, they couldn't send email.  It

12   would -- the company couldn't send email.  Not the defendants;

13   they never sent email.  But the company couldn't send email.

14       So, as a company, Spamhaus was a huge risk to its business

15   because it directly affected their overall profits.  They can't

16   make money if they can't send email, and it was a huge risk.

17       And it was such a risk that -- the government alluded to

18   this a little bit in its opening, but it was such a risk that

19   they had an outside lawyer, named Linda Goodman, that directed

20   a dba process where the company would create dba's, doing

21   business as, and they did this so if the dba got blacklisted or

22   named, they could stop using it, so it didn't shut their whole

23   company down.  And this came from Linda Goodman, an outside

24   lawyer, an outside lawyer, and actually started fairly early

25   on, when the company was still Frontline Direct.

 1          You will hear testimony from a government witness that
 2     this process started when she started, but as the company grew,
 3     the dba process expanded.  And Jonathan Harrill, the in-house
 4     lawyer, directed the process to use various domains, use
 5     various dba's, and everybody thought that was okay.  And it
 6     was.  There's nothing illegal about using a dba.
 7          And the idea that the government wants you to believe that
 8     it's related to hiding stolen netblocks, that's not the case.
 9     They have this widespread dba practice, and it was all about
10     Spamhaus, to fly under Spamhaus' radar, because that was the
11     real risk to their business.
12          Now, the defendants -- Jake and the other defendants had
13     no motive to knowingly purchase stolen IPs from Daniel Dye.
14     They certainly had no financial incentive to do it.  Jake was
15     not bonused on acquiring these GetAds IPs.  He wasn't bonused
16     on any of that.  He didn't make money by getting these.  He had
17     no financial incentive to do it.  And in fact, in 2013, the
18     year Adconion acquired the most GetAds IPs -- I believe around
19     six or seven that year -- Jake's compensation went down that
20     year.  He made less money that year, the year that they
21     purchased the most IPs.  There was no financial incentive for
22     him or any of the defendants to do this.
23          The government also alluded to the company made millions
24     of dollars, and Adconion made hundreds of millions of dollars a
25     year, between 2011 and 2014.  It did.  It made hundreds of

```
 1   millions of dollars a year.  None of that went in the pocket of
 2   the defendants, by the way.  But they did -- but the GetAds --
 3   the revenue from the GetAds transactions was less than
 4   2 percent of the revenue.
 5        So, Daniel Dye, he -- again, when you see the evidence and
 6   it gets introduced, look at the emails, because Daniel Dye --
 7   again, he is not saying anything about this being stolen or
 8   illegal or nefarious, but he vouches for it.  And in one email
 9   exchange he has with Jake, Jake says, "We don't need IPs right
10   now."  I mean, if he was knowingly purchasing stolen IPs, they
11   would just purchase them and keep them.  He said, "We don't
12   need them right now."
13        Daniel Dye, a few months later, follows up with Jake and
14   says, "Let me know.  I have lots of interest in these IPs.  I
15   don't want to sell them out from under your feet."  He is
16   representing that lots of people are interested, lots of
17   companies are interested in these IPs.
18        So, again, just from what Jake would be thinking, is this
19   isn't an illegal or -- there's nothing illegal about it.  He
20   believed it was completely legitimate.  Just remember that as
21   you see emails.  But also remember that Dye is a con artist and
22   he duped Adconion.  He duped the defendants.  And apparently
23   it's been discovered that he did steal these IPs or had a deal
24   with Scott Richter and had stolen IPs, but that was never
25   represented to the defendants.
```

1    And Dye has signed a plea agreement.  He's a convicted

2    felon.  He's signed a plea agreement and agreed to provide

3    substantial assistance in order to get a misdemeanor.  So his

4    felony conviction will go to a misdemeanor if he provides

5    substantial assistance.  So he has every incentive to lie and

6    say whatever he will to save himself because he wants to get a

7    misdemeanor.  Ladies and gentlemen of the jury, just -- as you

8    hear his testimony, just remember that.

9    Now, there's lots of -- there's other issues with the

10   government's case as well, but since there's three other

11   counsel here and three other defendants, I am going to let

12   counsel for those defendants get into those different areas.

13   But at the end of this trial, after you hear all of the

14   evidence, and whether you find Jake didn't have criminal

15   intent -- which I believe you should -- or that the government

16   failed to prove requisite acts under the federal fraud

17   statutes, or the CAN-SPAM Act, the only reasonable verdict at

18   the end of this is not guilty.  Thank you very much.

19        THE COURT:  Thank you.

20   Mr. Jones?

21        MR. JONES:  Ladies and gentlemen, good afternoon.

22   Normally, I don't have paper when I talk to you, but there's so

23   much I want to cover with you today to let you know what this

24   case is really about and what the evidence is going to show.

25   The evidence will show that the four men that are sitting

1   here at counsel table are not guilty of any crimes, not any of

2   the charges that are on that indictment.  They didn't knowingly

3   conspire with anyone to steal netblocks.  There was no

4   agreement.  There was no plan to commit any crimes, and the

5   evidence will show that to you.

6       They did not knowingly scheme to defraud anyone, and the

7   judge has told you what defrauding means:  Deceive and cheat.

8   And so, in order -- and I will talk about this, more about the

9   wire fraud.  In order to convict somebody of the wire fraud,

10  you have got to deceive them and cheat them out of their money

11  or property.

12      And you have heard what the government said, that these --

13  the defendants, if they did anything, was to avoid Spamhaus.

14      Spamhaus is not a law.  Spamhaus is a nonprofit

15  organization that is intent on making sure that people who sent

16  commercial emails will not do that because they believe -- and

17  it is on their own mission statement, on their website -- that

18  commercial email should be eliminated.  So keep that in mind.

19      There was no scheme.  You heard my colleague say that the

20  defendants' actions, the company's actions -- because,

21  remember, it was the company that purchased these netblocks.

22  It wasn't these four men here that purchased the netblocks.

23      Adconion, a legitimate digital marketing company, one of

24  the top digital marketing companies in the world, located here

25  in San Diego, purchased those netblocks.

1          Adconion, as I said before -- and I am going to call them

2     Adconion because they have gone through a lot of different name

3     changes.  But you heard our colleague.  It is a company that

4     had many departments, including the ones that these gentlemen

5     worked at and still work at.  You had the mail team.  You had

6     the tech department.  You had the sales team.  You had the list

7     team, the emails list team that decides who gets the emails.

8     You had a compliance team.  You had a legal team.  You had an

9     HR team.  And you had an executive leadership team that was

10    running this huge organization.  And they purchased the

11    netblocks.  Kim Perell purchased them, and I will talk about

12    that a little bit more.

13         So, as my colleague said, the company and these

14    individuals were acting in good faith.  And I submit that the

15    four gentlemen that are sitting at counsel table were just

16    doing their jobs.  They were just doing their jobs.

17         You heard that there was legal counsel at this company,

18    the general counsel.  There were processes.  There were

19    procedures.  There were protocols.  There were approvals that

20    had to take place that these individuals, these men sitting at

21    this table had to get approval before they did anything.

22         This is not a case where there are some people sitting in

23    a back room somewhere or in a basement somewhere or in a

24    dungeon somewhere, trying to steal money from somebody, or to

25    steal somebody's property.  These were four young men who were

1    doing their jobs to make sure that the company that purchased

2    these netblocks, that they could use them to send emails.

3    That's all.  The government is trying to make it nefarious, and

4    you won't see any evidence, any evidence of that, ladies and

5    gentlemen.

6         So, there's no crime, there's no fraud.  And as I said

7    before, in *voir dire*, this is not a case about identity theft.

8    The government could have charged these individuals if they had

9    evidence of identity theft.  They didn't charge them.

10        What they are going try to do, ladies and gentlemen, as

11   you listen to the evidence, they are going to try to

12   conflate --

13             MS. PIERSON:  Objection.  Improper argument.

14             THE COURT:  Sustained.

15        Why don't you continue on what the evidence will show.

16             MR. JONES:  The evidence will show this is not a case

17   about robocalls, the evidence will show this is not a case

18   about computer viruses, evidence is going to say it is not a

19   case about phishing or Nigerian Prince scams.

20        In essence, the evidence in this case is not going to show

21   you anything that these four men did to try to obtain money or

22   property from anyone.

23        As my colleague stated, this is a case about Adconion, a

24   legitimate company, a company that was hired by other

25   legitimate businesses in this country to send email ads on

1    behalf of these companies.  She said like Fidelity Investment,

2    USAA, Disney.  These companies hired and paid Adconion millions

3    of dollars -- that's how Kim Perell made so much money for this

4    company -- to send email ads to consumers just like you and me,

5    who signed up to receive the ads, oftentimes not knowing we are

6    opting into receive these ads.

7         It's just like, you know, me buying a pair of jeans for my

8    daughter at Christmastime last year, and the next week, I

9    started receiving ads from American Eagle offering me

10   60 percent off of my next pair of women's skinny jeans.

11        Are the ads annoying?  Did I know that I had signed up to

12   get ads for skinny jeans?  No.  No.  Yes, they are annoying,

13   but they are not illegal.  And the business that Adconion was

14   running was not an illegal business.  And the job that these

15   four men were doing, there was nothing illegal about it.

16        I signed up for it, I guess, when I signed that little

17   thing at the end and checked the box, or didn't check a box,

18   and the next week, I am getting ads for skinny jeans.

19        This company was doing legitimate business, nothing

20   illegal.

21        What the evidence will show, ladies and gentlemen, in a

22   nutshell, is just how overzealous and overreaching the

23   government is in this case.  It is their attempt try to make

24   something out of nothing, to make a crime out of something that

25   is not a crime.  You will hear that the government spent nine

1  years investigating this case on and off, nine years, millions

2  of taxpayer dollars, investigating this crime, where you will

3  hear there are no victims.  There is no motive.  And that these

4  four men were wrongfully charged.

5      As you have already heard these netblocks at the time, or

6  the ones that are part of this trial, they were all handed out

7  free.  As counsel said, if you are an educational institution,

8  and you said "I need some netblocks," and just signed up, and

9  they were given to you because, as she said at that time, no

10  one thought that everyone would have cell phones or Apple

11  watches or anything that needed an IP address.

12      The IP address is the identity to my watch right here.

13  There's a number associated with this watch right now.  There's

14  a number associated with my phone, over there.  There's a

15  number associated with this computer right here.  And they

16  didn't know it was going to explode like this.  So they were

17  free.  They weren't cheap; they were free.  They were giving

18  them out like candy, right?  They were giving them out like

19  candy.

20      And you will find that, when they gave them out in the

21  early '90s, there were people who didn't need them, who forgot

22  that they had them, who didn't use them, who abandoned them.

23  You will hear that these netblocks, for some, were to companies

24  that had gone out of business, not in business anymore, that

25  were bankrupt.

1          You will hear testimony that the FBI contacted some of

2     these people just to remind them that, "Did you know you had

3     the netblock?"

4          "No, I didn't know I had a netblock."

5          You will hear testimony about, "Well, did you lose any

6     money on these netblocks?"

7          "No.  First, I didn't know I had them.  And the only money

8     I lost is you keep calling me and asking me to look up some

9     stuff that I know nothing about."

10              MS. PIERSON:  Objection.  Argument.

11              MR. JONES:  That's what the evidence will show.

12              THE COURT:  Overruled.

13              MR. JONES:  In fact, you will hear from a person

14    named Leona Williams, you will hear from her on video, an

15    elderly lady, who appeared via video, who is saying that,

16    "Yeah, I purchased -- I didn't purchase, but someone who worked

17    for me signed up for these netblocks."  And that company no

18    longer exists.

19         And then some day, about 20 years or so later, somebody

20    came knocking on my door and said, "Ms. Williams, did you know

21    you had some netblocks?"

22         And she says, "No, I didn't know I had them, but I signed

23    up" -- something happened.  I can't recall exactly what she

24    will say.

25              But she definitely didn't take a loss financially because

1   you will hear that she got paid some $800,000 for some

2   netblocks that she didn't even know she had, and she got paid

3   for this stuff way after the time period that this case is

4   about.  So just think about that when you talk about loss and

5   who got hurt and whether there's any money lost.

6        You will hear all -- first of all, these IP address are

7   not property.  You will hear testimony about that from the

8   government's own witnesses, that IP address are not property.

9   And the reason that's important is because of the wire fraud

10  statute.  The object of the scheme, the, quote, "scheme" that

11  the government is going to say that our clients participated

12  in, was either to obtain money or property, to obtain money or

13  property.  And the evidence will show that there was no object

14  to steal money or property.

15       At best, it was an attempt by Adconion, the company that

16  purchased these IP addresses in netblocks, to stay off that

17  Spamhaus list.

18       And let me talk to you a little bit about Spamhaus.  My

19  colleague said Spamhaus is a foreign vigilante organization

20  headquartered in Andora.  If you don't know where Andora is,

21  that's somewhere between France and Spain.  And from all

22  indications, there will be evidence that the founder lives on a

23  yacht somewhere in the Adriatic Sea.  And their mission is to

24  eliminate all commercial email, including legitimate

25  advertisements.  No distinctions among the types of emails.

1   They will block email based solely on the volume of emails.

2        And that's why, as Ms. Pierson said and Ms. Munk has said,

3   is that if you are a commercial email marketer and you are

4   doing volume business, according to Spamhaus, can't do it.

5   Can't do it.  Too many emails.  Too many commercial emails.

6   And we are not having it.  Spamhaus is a guardian of the

7   internet.  We are not going to have that.  We are going to SBL

8   you.  As counsel said, SBLs are terms that are actually made up

9   by Spamhaus.  "SBL" and "hijacked" -- there's no legal

10  definition of hijack.  That's a Spamhaus term that didn't give

11  our clients any sort of indication that they were doing

12  something illegal.  Right?  It is just that you had to be

13  careful of being on Spamhaus.

14       And that's not what they are charged with.  They are

15  charged with conspiracy to commit wire fraud and conspiracy to

16  commit electronic fraud, not conspiracy to not get Spamhaused.

17       And you will hear that the view of Spamhaus is that they

18  are -- there are no laws here in the United States that covers

19  this, and they don't think that, you know, our laws go far

20  enough.  They want us, in the United States, to create laws to

21  cover commercial emails, and that's what the government is

22  trying to do when I say that the evidence will show they are

23  trying to make a crime out of nothing.  And you will see that,

24  and you will hear that from the evidence.

25       And don't be fooled by the number of witnesses that they

 1    are going to call or the number of documents that are going to

 2    be presented in front of you on that screen.

 3         Keep in mind, the judge will instruct you at the end of

 4    the case what the elements of the offense are.  And when you

 5    listen to the elements of the offense and you think about the

 6    evidence that you are going to hear over the next couple of

 7    weeks, it will not add up.  We are going to ask you to find a

 8    verdict of not guilty on these people.

 9         Talk about Adconion being legitimate.  Now let's talk

10    about my client, my client, Mr. Mark Manoogian.

11         Mark, stand up, please.

12         Mr. Mark Manoogian lives currently in Carlsbad.  He is

13    married to his wife, Nikki, in the back, there.  And Mark

14    recently came out here from New York, I believe it was, came to

15    San Diego in 2010, as a 26-year-old young man, coming out to

16    the Golden State from New York, with his wife.  And he came out

17    because his wife, Nikki, had gotten a great job out here in

18    San Diego.  And who wants to live in New York when you can live

19    in San Diego, right?

20         He came out here because she is from California and wanted

21    to move back.  He followed his wife out here to San Diego.  And

22    they have established a family here.  They have two children.

23    They have Max.  And Max is four years old, and going on five,

24    and Theo, who is two years old.  So, think about that.

25    Mr. Manoogian has been -- this has been a nine-year

investigation.  Max and Theo weren't even born when he became a
part of this investigation.  So he's not known a day, ladies
and gentlemen, that this investigation -- not had a day with
his kids since they were born that this investigation has not
been hanging over his head.

    And you will hear testimony about Mr. Manoogian.  You will
hear that he is a great guy.  He's honest.  He's hardworking.
You will hear this from government witnesses.  He is
hardworking.  He is trustworthy.  And he's never been in
trouble before.  That he's law abiding.  That he would never do
anything illegal.  That he's an active member of his community
here in Carlsbad.  He's team oriented.  That he admired Kim
Perell.

    And you will hear that from everybody that worked with
her.  She was charismatic.  She was young.  She was a
go-getter.  She built this company from the ground up, into a
multimillion-dollar company.  And everybody loved to work for
her.  This was a bunch of young kids in the Adconion business
who were just working hard and enjoying each other and to do
what they did.

    You will find he had no prior training or experience in
the commercial email industry before he started at ADR.  He was
not a tech guy.  He was not an IT guy.  He was not a computer
expert.  He was hired by Adconion in 2011, in October 2011.  So
he moved out to San Diego in 2010, and he was hired about a

1  year later, October 2011, after the first purchase by the

2  company of these GetAds.  The first purchase by the company of

3  the GetAds netblock, as you will hear, was in March 2011, when

4  Dye sells the OBS netblocks.

5      If you go back further than that, in December 2010, that's

6  when Kevin Wolf, who was an executive at ADR -- I am going to

7  call Adconion ADR sometimes -- who introduced Kim to Daniel

8  Dye.  As you heard, GetAds was an affiliate and a client of

9  Adconion.  GetAds had a great reputation for being honest and

10  competent, and Adconion did a lot of business with GetAds.  And

11  at no time did anyone at Adconion know that Dye was a sheister.

12  I mean, Dye never told anyone he was selling stolen netblocks

13  or that he was not the legitimate owner, or the owner of the

14  legal, legitimate successor-in-interest in the netblocks.

15      Dye, in fact, in 2010, told Kim and Kevin Wolf that

16  Adconion would be buying, quote, "IP space that you own."  IP

17  space that you own.  Not IP space that belongs to someone else

18  but IP space that you own.  "You will be purchasing the full

19  block, domain name, et cetera.  This is not a lease."

20      And the reason that that is important is because Adconion,

21  up to this point, was leasing IPs.  That's how they did it.  In

22  fact, Mr. Manoogian, when he was hired in October 2011, that

23  was primarily his job in acquiring IPs through lease, through

24  preexisting contacts that he had, or with ISP relationships

25  that he had established.  He was a business development

manager.

"Manager" in name only.  All these folks you will hear had titles but they were really not supervising anyone.

So his initial job was lease these IPs on behalf of Adconion at the lowest price possible, and get the IPs announced.  If they are leased IPs, you didn't have to get them announced or activated because the company that leased them to you would get them activated or announced.

So this was the first time they purchased IP addresses. This was from Daniel Dye, who did not tell them anything about the IPs, other than you would be owning them and you would be purchasing the full package.

So, when Mr. Manoogian came on board in October 2011, the train had already left the track.  I mean, he had nothing to do with the purchase of that first IP, back in March.  He had nothing to do with the negotiations that Kim and Kevin Wolf and Daniel Dye did in December 2010.  And why that's important is because, when they purchased these IP addresses from Daniel Dye, Daniel Dye provided the company with all of the documents and all of the documents and instructions on how to use those netblocks.  They included the LOAs.  They included the contracts.  They included the numbers.  They gave everything. This is how -- "I own these netblocks.  I am selling them to you, and here is some stuff that's going to help you to be able to use them."  Nothing wrong with that transaction.  No red

1   flags given.  No notice at all to the company that they were

2   buying anything that was stolen.

3        And that's how it went throughout the rest of these

4   netblocks.  You will hear from Daniel Dye himself, that says

5   how he got this process going and what he did.  And as we

6   mentioned, in *voir dire* -- because, as you have heard, he's

7   pled guilty, he is now a convicted felon and is hoping that he

8   would get his crime reduced to a misdemeanor, the Court is

9   going to instruct you you need to pay careful attention to his

10  testimony.  He has an interest in making sure that the

11  government is happy with what he says.

12       And then you listen to all of the things that he said

13  before he gets on the stand, because they have -- he's talked

14  to the government several times in the past.  And you will hear

15  those statements.  And you decide whether or not he's credible.

16  You decide whether or not he's being inconsistent or he's

17  lying.  Those are the kinds of things that you need to do when

18  you hear from him, and from Mr. Tarney.  Because Mr. Tarney has

19  also pled guilty.  And he's hoping for a reduction, a

20  misdemeanor.  But pay close attention to their testimony.

21       The LOAs are going to be one of the big things you will

22  hear, but Dye provided the LOAs, from the start, to Adconion.

23  He provided templates along the way.  There will be emails

24  where he is telling the individuals involved to use this thing,

25  or use this one, or use that.  He sometimes send LOAs directly

1    to the hosting company, where our guys are not even involved in

2    that.  He provides signed LOAs that were sent, forwarded on to

3    the hosting companies, so keep a look on that.

4        My cocounsel talked about dba's being common in all

5    business, nothing nefarious about that.  You will hear from the

6    witnesses that testify that the company used dba's as part of

7    their regular business practice.  There's nothing nefarious or

8    illegal about that.  You will hear also about the emails and

9    business names that they used.  During this particular time

10   period how that legal counsel had vetted it and legal counsel

11   had developed and implemented the strategies and directed it.

12       So the things that -- all these actions that the

13   government is going to try to show that our clients did, and

14   say that they knew that they were doing something illegal is

15   just not going to be borne out by the facts in this case,

16   ladies and gentlemen.

17       These guys, as I said, were doing their job, and they were

18   relying on management.  They were relying on leadership.  They

19   were relying on the legal advice that was given to the company

20   about this.  And, most importantly, they were relying on Daniel

21   Dye, who never once -- there will not be one shred of evidence

22   that will show that he told these individuals that what they

23   were doing was illegal, that he told these individuals that

24   these netblocks were stolen.  None of that.  You won't hear any

25   of that.

1    Finally, with respect to the property thing -- because I

2    think this is very important -- is that I said you are going to

3    hear from government witnesses that IP addresses are not

4    property.  You are going to hear testimony about other

5    government agencies, including the Department of Commerce and

6    the FCC, that says IP addresses are not property.  And just

7    because something is valuable and people will spend money for

8    it, that doesn't make it property.

9    And then, finally, with respect to the motive, there's an

10   old saying when you talk about a fraud case, you have to follow

11   the money.  And the government says that the company made

12   $5 million, that the company made $5 million from these

13   millions and billions of emails.  But you won't hear any

14   evidence, not one shred of evidence, that Mr. Bychak,

15   Mr. Manoogian, Mr. Qayyum, or Mr. Pacas made one penny, one

16   penny, not a single penny from the emails that were sent by the

17   GetAds.  They were not commissioned on them, nothing.  And

18   Mr. Manoogian had a modest salary, at best.

19   Finally, ladies and gentlemen, I guess what I have to say

20   is just listen to the evidence.  Just listen to the evidence.

21   And it's going to be challenging, I am sure.  Because, as I

22   said, you are going to hear from 50 witnesses, from the

23   government.  You are going to hear from a Princeton expert who

24   is probably smarter than everybody sitting at defense counsel

25   table right now.  We can't shine a candle to her.  She is going

1    to be so brilliant, I am going to have to wear my sunglasses.

2    But you are going to hear from witnesses like that.

3        But hang in there and listen.  And when you listen, listen

4    for evidence of a crime.  And you won't hear any, not from her

5    or the other 49 or so witnesses that the government is going to

6    present to you.

7        And when you look at these emails that the government is

8    going to show you on this, and it says "fingers crossed" and

9    all this kind of stuff, there will be another explanation on

10   that, so reserve ruling on that.

11       So, the evidence will show that Dye lied about his

12   ownership of these netblocks.  The evidence will show that

13   Adconion and these gentlemen relied in good faith on the

14   representations and actions of Dye, with respect to these

15   GetAds transactions.  At no time, at no time did anyone know

16   that Dye was not the owner or the legitimate

17   successor-in-interest of the netblocks.  And that the

18   government will not be able to prove beyond a reasonable doubt

19   that he did.

20       In other words, there will be no evidence from Dye, from

21   Tarney, or the 48 other witnesses that will say that these men

22   knew that these netblocks were stolen, that Adconion Direct

23   knew that these netblocks were stolen, that Dye told them that

24   these netblocks were stolen.

25       And ladies and gentlemen, based on that, the evidence will

1    show, without a doubt, without any doubt, that the defendants

2    are not guilty, not guilty of the crimes charged in this

3    indictment.  The government got it wrong.  The government is

4    going to try to make a crime where there is no crime.

5        And at the end of this presentation, on behalf of my

6    client, Mr. Mark Manoogian, I am going to ask that you return a

7    verdict of not guilty on all counts.  Thank you.

8            THE COURT:  All right.  Thank you.

9            JUROR:  Your Honor, can we take a bathroom break?

10           THE COURT:  Yeah.  We will take a 15-minute break.

11   We will resume at 25 minutes before the hour of 4:00.  Remember

12   the admonition.

13       (The following proceedings were held in open court out of

14   the presence of the jury:)

15           THE COURT:  You may be seated.  We are outside the

16   presence of the jury.

17       And we will start immediately at 25 minutes until.  At

18   this point, given the length of the openings, it looks like we

19   may have a chance of concluding the openings before the day is

20   over.  So, with that, I want to start immediately at 25 minutes

21   before the hour of 4:00.

22           MS. PIERSON:  Is the Court saying we should not --

23   you are not thinking we are going to get to any witnesses

24   today?  Should we tell our witnesses --

25           THE COURT:  Well, I would think, at this pace, we

1    wouldn't be done until about 4:35 or 4:45, and if that's the

2    case, I can't see we would be starting with a witness.  We

3    would be letting the jury go home early.  I am hoping we can

4    finish the openings today, and then we can start first thing in

5    the morning, fresh, with witnesses.

6            MS. PIERSON:  Very well.

7        (Recess taken from 3:20 p.m. to 3:35 p.m.  The following

8    proceedings were held in open court in the presence of the

9    jury:)

10           THE COURT:  You may be seated.

11       At this point, you may proceed.

12           MR. BIENERT:  Thank you, Your Honor.

13       Good afternoon, everybody.  My name is Tom Bienert, and it

14   is my privilege, along with Whitney Bernstein, to represent

15   Mr. Qayyum, standing right here, this fine-looking young man.

16   Mr. Qayyum is from India.  He is a legal resident of the United

17   States.  He is an immigrant.  He is married.  He has a very

18   young son you all might have seen here earlier today.  They may

19   be in and out, watching things here and there.  And he has

20   spent his entire working life in this country, working at the

21   company we're going to talk about.

22       Let me talk a little bit about that, first of all, a

23   little bit more about Mr. Qayyum.  He immigrated here.  All of

24   these activities, think about it, 2010 to 2014.

25       Now, my devilishly handsome client looks pretty darn good,

1    but we are talking about things -- like all of these guys, who

2    are very young, to this day -- that happened 12 years ago.

3        My client was a babe in the woods when it came to work.

4    He came here to go to grad school in techie stuff, computer

5    systems management.  He immigrated in 2008.  Legal educational

6    visa --

7            MS. PIERSON:  Objection.  Motion *in limine*.

8            THE COURT:  Sustained.

9            MR. BIENERT:  While in school, he got a job at what

10    we will call Adconion.  As you heard earlier, it got bigger and

11    changed names.  We will call it Adconion.

12        It is the only job he's ever had.  He learned, on the job,

13    everything there was to know about everything he does for work,

14    including all of the stuff that we have been hearing about

15    already.  That is pretty dense stuff.  We will see that

16    everything you are going to learn about here, no one falls out

17    of the womb knowing this stuff.  You have to learn it.

18        In his case, he was the low man on the ladder, in the

19    80-something-employee company, run by very prestigious people,

20    as you heard before, with very prestigious clients, a dream job

21    for a young tech guy, like my client.

22        So, when he went to work at Adconion in 2009, he had every

23    reasonable right to rely on the people around him to show him

24    how the business worked and to do his job.  What you are going

25    to see is his job was a narrow lane.  He is a techie guy.  He

made sure the computer systems were working.  He made sure that
these netblocks, when he would be directed to, could be sent
out.  And he would be given other tasks by the other people,
all of whom were above him.

As you heard from the others who spoke before me, the
people in this company were people anybody would and should
reasonably rely on unless and until something was crystal
clear, and that just didn't happen here.  What will be crystal
clear is this.  I want you to -- please pay attention to
pronouns, "they."  "They did this.  They did that."

When the evidence is put on, please listen to who the
evidence is about, who did what.

One of the points the government said was that, "They
stole netblocks."  The one thing that the evidence will show is
there's only one person that stole netblocks, Daniel Dye.  He
didn't work at Adconion.  He ran his own business.  He was in
the business of selling netblocks.  He represented himself out
to people like the guys at this table, everybody at Adconion,
and a bunch of other companies, as buying netblocks from other
people that he then, through his company, had the authority to
sell, and he would sell to Adconion.  That's it.  They would
pay him money.  They would negotiate a price.  Adconion would
pay him money.  And they would use the netblocks.  That's
basically the case.

My client's role, people from above him tell him, "Send

1   out this netblock.  See if this works."  And that's what he

2   does.  Occasionally, he would be tasked with something else,

3   and he would do what he was told.

4        You will see that, culturally, coming from India, being

5   here by himself, just him and his wife -- and now, a young son,

6   but not then -- he wasn't culturally or professionally or

7   business-wise going to be questioning those that ran this

8   well-established company and had no reason to think that any of

9   this was wrong, much less illegal.

10        And by the way, I will submit to you that the evidence

11   will show that, at the end of this entire process, the only one

12   you are going to walk away from here convinced that did

13   something clearly illegal was Daniel Dye.  And Daniel Dye got

14   caught.  And frequently, when people get caught, they try to

15   protect themselves and get a better deal.  That's what this

16   case is about.  Daniel Dye got caught.  He is willing to tell

17   the government, "I want to point the finger at these guys.

18   Please give me a better deal."

19        And while these guys sit here, facing all the charges that

20   His Honor went over with you, many, many years in jail,

21   felonies, the whole bit --

22              MS. PIERSON:  Objection.

23              THE COURT:  Please, don't go into matters involving

24   punishment.  That's not for you to talk about in this trial.

25        The jury is directed to -- I am striking it, and to

 1   disregard those comments.

 2        MR. BIENERT:  Felony charges, as His Honor went over

 3   with you earlier, and Mr. Dye has already got a deal that he

 4   can get a misdemeanor based on what he does here.

 5        And what did Mr. Dye do?  He represented to all of these

 6   men, but I will focus on my client.  Everything that my client

 7   got, never indicated it was improper from Mr. Dye.  Mr. Dye

 8   never said this was illegal, never said they were stolen.

 9        The snippets, the little windows my client saw, was these

10   were netblocks Mr. Dye and GetAds sold to the company, where

11   other people in the company negotiated the deals, paid for the

12   deals, lined it up, and he got the technical end of it.

13        Now, two things will be clear at the end of this case, I

14   assume.  One, that my client had a narrow role, and he did his

15   role properly; two, that he reasonably relied on others, people

16   up the chain.  You heard about the lawyers; the executives,

17   like Ms. Perell, et cetera.

18        And I guess there was never anything that told him what he

19   was doing was improper or these were unauthorized.

20        The government talks about the so-called red flags.

21   First, the evidence will show you that the red flags, even the

22   ones they mentioned, to the degree that any of them are known

23   by my client, they still didn't indicate that he was doing

24   anything illegal.  They didn't indicate he had to do anything

25   different than he did, which was to stay in his lane and do his

1   job in his company.

2       One of the things that you will learn, as even the

3   prosecutor alluded to here, in discussing another defendant, is

4   that the types of issues that would come up would be sent up

5   the chain to the executives and the legal department.  Red

6   flags were raised about Mr. Dye with Ms. Perell.  Yet she

7   continued to be comfortable and send the signals to everyone it

8   was okay to work with him.

9       Indeed, we are going to learn here that as Ms. Perell,

10   through her relationship with Mr. Dye and GetAds, that these

11   defendants -- in particular, my client -- even started handling

12   some of the netblocks that came from GetAds.

13       Again, he reasonably relied on the people above him.  It

14   was not his job to do anything more or less.

15       There was mention of a guy named Scott Richter.  The

16   government said you are going to hear he had some sort of

17   negative reputation and was the predecessor to Daniel Dye.  You

18   will not hear any evidence my client knows anything about a

19   Scott Richter, what his reputation was or wasn't.

20       He gets assignments to work on netblocks and send them

21   out.

22       Another so-called red flag is the fact that she

23   mentioned -- more than a red flag; she mentioned a

24   February 2013 email that she said was a letter of authorization

25   that was false, and she says my client prepared it.  My client

did prepare a document, as he was instructed to do.  You will
note he didn't sign the document.  He doesn't know who signed
the document.  He was sent a bunch of information, given
several tasks, one of which was prepare a letter of
authorization, like the others.  And he did that.  And he sent
it back up the ladder.

     Absolutely nothing wrong with that.  People routinely, in
their jobs, prepare documents for other people.  The issue is
did he sign something that he knew was false?  You will see,
no.  Did he reasonably believe that he and his company had
authority to prepare the letter the way they did?  And the
answer to that will be yes.

     At the end of all this, what you are going to see is, in
his limited role, there's just nothing to indicate that
Mr. Qayyum knowingly did anything improper, and I will submit
to you it's questionable whether anybody at Adconion did or
not, because the only clear wrongdoing is going to be the guy,
the broker, the middleman, who apparently, according to the
government's evidence, was lying to us at Adconion, when
Mr. Dye told everyone there that he had the right to sell these
netblocks.  That's what the case is going to boil down to.

     There's a couple of other things that were thrown out
there as potential red flags and the evidence will show they
are not.  Spamhaus, you heard a lot about that.  The bottom
line is what you will see, over and over again, is Spamhaus and

1    Adconion did not get along.  The powers that be, you will hear,

2    and the messaging at Adconion was, "We don't trust Spamhaus.

3    They are trying to shut our business down even though we are

4    doing it legally."

5        So, when Mr. Qayyum talks about risk, it's Spamhaus risk.

6    At the end of this case, you can decide for yourselves what you

7    think about Spamhaus risk or not, but that is not illegal.

8    That's simply we are not going to look at what a pseudo

9    competitor is saying that could put us out of business when our

10   bosses tell us they are trying to stop our legal business.

11       Similarly, one of the things that is going to be talked

12   about here is look at these IP addresses and there are letters

13   going out that are not in the name of anybody that they know.

14       Well, again, think about this business.  These IP

15   addresses, the ones we are talking about, by definition, they

16   are being sold by middlemen, by brokers, who purport to sell

17   Adconion IP addresses and netblocks that they got from other

18   people.  So, of course, the netblocks and letters of

19   authorization, et cetera, are going to be in the name of

20   someone you don't know.  You deal with a Daniel Dye to get the

21   netblocks that he supposedly got from someone else.

22       At the end of all of this, what the evidence will show is

23   that none of these defendants -- in particular, Mr. Qayyum --

24   were ever made aware that these were stolen netblocks.  They

25   never conspired or agreed with Daniel Dye or anyone to commit

```
 1   illegality.  And as I think a couple of counsel said -- I
 2   forget which one said it most correctly -- they simply got it
 3   wrong, here, with the government.
 4       That's pretty well it.  Nice overview of the case.  And I
 5   look forward to, with Ms. Bernstein, getting to talk to you a
 6   lot in the next few weeks.  Thank you.
 7           THE COURT:  Thank you.
 8       Mr. Lincenberg, you may proceed.
 9           MR. LINCENBERG:  So, I don't know about you, but I
10   can't get out of my mind the vision of my friend, Mr. Jones,
11   walking in here with those skinny jeans that he bought.
12       You may recall, my name is Gary Lincenberg.  Along with my
13   colleagues, Darren Patrick and Alexis Wiseley, we have the
14   pleasure and honor to represent our client, Petr Pacas.
15       Mr. Pacas's wife had hoped to be here.  She was here
16   earlier, Katelyn, with her two little kids.  You may have seen
17   them running around, making a lot of noise, Luke and Olivia,
18   who are three years old and ten months old, and, unfortunately,
19   couldn't keep them in courtroom because of the noise.
20       Mr. Pacas is somebody who had the unpleasant experience of
21   celebrating his 40th birthday yesterday, sitting through jury
22   selection, where his life is on the line, in this case.
23       And I mention that he's 40 years old because, like what
24   Mr. Bienert said about when these events took place, they began
25   when he was in his 20s.  And when we think about where we were
```

11 years ago, and when the government is going to show how some
conversation in a phone call somebody is going to say, "Yeah, I
remember 11 years ago, I had some phone call."  And this is the
type of thing that you, as jurors, are going to have to
evaluate and think in terms of credibility and how is this case
really being put together and what are the motivations of some
of the folks who are saying it.

Now, Mr. Pacas came to this country over 20 years ago,
around the year 2000, on a baseball scholarship to play at
University of New Mexico.  Not a common thing for somebody from
the Czech Republic to be doing, but he had a passion for
baseball.  But he came over and attended the University of
New Mexico for four years, where he got a degree in business
administration.

He then went to work for the predecessor company to
Adconion, Frontline.  He worked there a while and then went
back and got a master's in business administration from the
University of New Mexico.  And after that, he came back and
worked as a marketing analyst for Frontline -- later became
Adconion -- where eventually, he managed a group of about three
to five people, beginning in the year 2009.

His wife, Kate, worked as a surgical technologist.  She is
now a homemaker, dealing with the two little ones.

And I am going to be focusing my comments primarily on the
evidence that I believe will come in that does or does not

1  relate to Mr. Pacas, but I want to start out by saying there's

2  one thing that Mr. Pacas has completely in common with

3  Mr. Bychak and Manoogian and Mr. Qayyum, which is that they

4  were all victimized and lied to by Daniel Dye, and that's why

5  they are here today.  They never were involved in any illegal

6  obtaining of IP addresses from somebody.  They were made

7  representations from a legitimate company, and Adconion

8  purchased netblocks from that company, just as they had leased

9  or purchased netblocks from other companies, and used them in

10 the normal course of business.

11     Now, His Honor, Judge Curiel, yesterday, twice read to you

12 the indictment, and I know it's late in the afternoon and this

13 is going to be a little bit detailed, but I want to go through

14 parts of the indictment that I am going to ask you to keep in

15 the back of your mind as you are listening to the evidence as

16 to whether this evidence applies to a charge against my client.

17     You may recall that Judge Curiel first read to you a

18 conspiracy charge, and as part of that, Judge Curiel noted that

19 the indictment contains two overt acts, two actions that my

20 colleagues in the U.S. Attorney's Office claim were made in

21 furtherance of the conspiracy.

22     First is August 25th of 2013, and it involved a letter of

23 authorization, to announce a Sierra Semiconducter netblock.

24          THE COURT:  Mr. Lincenberg, let me ask you to back up

25 just a bit.

MR. LINCENBERG:  Sure.  How is this?

It involves a Sierra Semiconducter netblock.  And I guarantee that you will not hear any evidence from the government that Mr. Pacas had anything to do with an August 2013 letter of authorization to announce Sierra Semiconducter.  In fact, the evidence will show he was not even working at Adconion at the time.

The second act that's contained in the conspiracy count is dated January 13 of 2014, and it involves the preparation of a netblock that was returned, referenced as the OBS netblock, which we are going to talk a little bit more about in a moment. But you will hear zero evidence that the announcement, the preparation of this netblock, that Mr. Pacas had any involvement with it.

I am not talking about you may hear evidence you can believe or not believe and you have to go back and decide who is telling the truth, is it corroborated.  You will hear zero evidence Mr. Pacas was involved in that.

And that's not to say there was anything illegal about any of these gentlemen because the evidence will show there was not.  But with respect to Mr. Pacas, it's not just weight of the evidence but zero evidence.

The judge then read to you what's called the wire fraud counts.  And the wire fraud counts involve language about creating letters to internet hosting companies.  You will hear

1    zero evidence of Mr. Pacas creating any letters to internet

2    hosting companies.  That is an allegation that they -- the

3    proverbial "they" -- knew that these -- that they did not

4    obtain control of the IP addresses from the true registrant.

5    You will hear zero evidence in that regard, and I will discuss

6    that.

7        And, more specifically, getting into the four counts, they

8    involve a November 11, 2013 wire payment for the announcement

9    of an ECT netblock; a January 9th, 2014 wire payment for the

10   hosting of a Telalink netblock; a February 28th, 2014 wire for

11   the hosting of a Moore Solutions netblock; and a March 10, 2014

12   wire transfer of $600 for the hosting of a Telalink netblock.

13       No evidence that Mr. Pacas was involved in any of those

14   wire transfers.  In fact, no evidence that he was involved with

15   any purchase from GetAds whatsoever of an ECT, Telalink or

16   Moore Solutions netblock.  In fact, you will -- I will discuss

17   it in a moment.  At this point, he was working back at

18   Adconion, had his own team.  It was a different team, and they

19   weren't using any of these netblocks.

20       So I am not talking about the evidence, you can come to

21   some decision, credibility or not credibility.  I am talking

22   about no evidence of my client's involvement whatsoever.

23       The last charges involve electronic fraud, electronic mail

24   fraud charge.  Here, counts six, seven, eight, nine, ten, the

25   final five counts charged against Mr. Pacas involving the

1    sending of commercial emails in November 2013 on through

2    January of 2014, through netblocks that were purchased by --

3    if -- involving Sierra Semiconducter, Moore Solutions,

4    Telalink, Open Business Systems, and ECT.  And you will hear

5    zero evidence that Mr. Pacas or his team had any involvement

6    whatsoever in November of 2013 or January of 2014 involving the

7    sending of commercial emails through these netblocks.

8         Those are the ten counts in the indictment.  Those are the

9    overt acts that are mentioned in the conspiracy count as well

10   as nine other counts.

11        We are going to be here for weeks.  We are going to be

12   sitting here in the back of the courtroom, and you are going to

13   hear zero evidence of Mr. Pacas being involved in any of these

14   particular wires and announcements of netblocks that I

15   mentioned.  That's the indictment against my client.

16        Now, I would like to break down Mr. Pacas' work history in

17   this 2010-2014 time frame that government counsel spoke about

18   into three time periods.  The first is January through April of

19   2011.  This time period is relevant and important to their case

20   because it was in this time period when the CEO of Adconion,

21   Kim Perell, was in communication with a senior executive or

22   owner of GetAds named George Avery.

23        And, remember, those companies had done business together

24   for years, legitimate business partners.

25        And then they -- and then Kim Perell sends an email to and

1   has conversations with a couple of folks at Adconion.  One of

2   them was Pete, saying, "Hey, these guys have IP space to sell."

3   And you will see an email from Kim Perell to the GetAds folks,

4   "We are interested in buying IP space."

5       And she assigns Mr. Pacas to get in touch with this

6   fellow, Daniel Dye, who he had never met before.  Mr. Pacas had

7   never been involved in the purchase of any IP netblocks before.

8   And he followed through and spoke to Mr. Dye, and at the time,

9   Mr. Pacas didn't know anything about netblocks.

10       The government spoke about market prices, which is

11  interesting, and I want you to make a note, to keep track of

12  that.  Ms. Pierson made a comment about how the price of this

13  OBS netblock was way below the marketplace.

14       And I believe that the expert that the government will

15  call to talk about market prices will tell you that there

16  really was no commercial market for the purchase of IP

17  netblocks at this time.  It's only sometime in 2011, a little

18  later on in the year after this purchase, that this person that

19  they are going to call, Ms. Brown, I expect, will testify that

20  there was a Nortel purchase involving Microsoft, and there was

21  this price, and then she will track for you over the upcoming

22  years different prices.

23       But Mr. Pacas doesn't know anything about any sales market

24  prices, and I think even the expert who they are going to call

25  in to -- come in to talk to you about market prices was going

1    to tell you there wasn't even, necessarily, a commercial market

2    at the time.

3         So, what happens then is Mr. Pacas has his first dealings

4    with Mr. Dye.  And GetAds at that time sells what's called a

5    pre-ARIN netblock to Adconion.

6         I don't want to get into the details because you are going

7    to hear about this.  But ARIN is this organization that you

8    heard about that deals with the registry of internet netblocks.

9    ARIN hasn't existed the whole time.  Do you remember, we were

10   kind of in the wild west of the internet in the '90s, moving

11   out of it in the early 2000s.  And ARIN would try to get

12   companies to register, but there are all these netblocks

13   floating out there from -- particularly from defunct companies

14   or all these different companies that had them in the past, and

15   they are called pre-ARIN netblocks.

16        And yes, there is less that you can do with pre-ARIN

17   netblocks in terms of your ability to use them.  Probably one

18   of the reasons why the price of them would be lower, because

19   you can't do as much with them.

20        And then what happens is GetAds supplies a letter of

21   authorization to the hosting company.  Now, the reason I

22   mention this is because government counsel will talk about and

23   they spoke about how GetAds would supply letters of

24   authorization to Adconion for use in dealing with netblocks

25   down the road.  And that is true.  But I point this out because

1   the OBS netblock at the beginning is a little bit different and

2   kind of important.  Because to the extent that you want to

3   place some burden on my client to get behind and figure out who

4   sold this -- remember, we were talking to one of the jurors, do

5   you go and find who sold the used car to the Ford dealership

6   beforehand?  Nobody has that burden.  But if you wanted to

7   place that burden, and if you wanted to place the burden of due

8   diligence on them, what comes back to Mr. Pacas and his

9   colleagues is that this netblocks -- this netblock is accepted

10  by the hosting company; it works; and here is a copy of it for

11  further use.  So it comes back to us, "Everything seems

12  hunky-dory.  Everything seems fine."

13       Now, we will deal with all of the evidence later on, that

14  my colleagues will be examining witnesses on, dealing with the

15  transactions at Adconion over the next two years or so.  But I

16  do want you to keep that in mind, that that is the limit of

17  Mr. Pacas' involvement, in early 2014.  He is involved with

18  these fellows at OBS -- at GetAds involving this OBS netblock.

19  It's told to him that it's already announced and everything is

20  fine.

21       Now, my colleague, Ms. Pierson, mentioned that Mr. Pacas

22  was on a phone call with Scott Richter.  Mr. Richter is a guy

23  who apparently supplied this netblock to Daniel Dye.  So this

24  raises an important point that I want you to pay attention to

25  throughout this trial.  You will hear, the evidence will show,

1    Mr. Dye was interviewed many times by the FBI agent and the

2    prosecutors over the years.  Not unusual to do that.  They are

3    trying to make him into their star witness.  And they are going

4    over things.  2017, 2018, and the like.

5        And even in 2017 and 2018, you wonder how somebody is

6    really going to remember a phone call from 2011.

7        But the fact is there's no mention of any phone call

8    involving Scott Richter and Pete Pacas in any of that time

9    period.  And all of a sudden, Mr. Dye is interviewed a couple

10   of weeks ago as we are jamming towards trial and building up

11   the case, and for the first time, he says that he recalls

12   setting up a call with Richter and a bunch of guys.

13       And then -- I can envision it; I have sat through those

14   interviews on the government side of the table -- and the

15   prosecutors say, "Was Pete Pacas on that?"

16       "I don't know.  Maybe."

17       Now, we go from "possibly" -- this is an 11-year-old phone

18   call.  He doesn't remember.  But we go from "possibly," to

19   Ms. Pierson, in her opening statement, saying to you that Pete

20   Pacas was on a phone call with Mr. Richter and Mr. Dye and the

21   like.

22       And I point this out because you see how, over time,

23   things get twisted, things get solidified.  And I won't be

24   surprised if now Mr. Dye comes into court and says more like

25   what Ms. Pierson said he will say, even different from three

1   weeks ago, way different than his lack of saying anything in

2   this regard over the years, and something that the facts don't

3   support.

4        Ms. Pierson, in her opening statement, also said there was

5   a contract -- that the contract was for a domain name, not IP

6   addresses.  I am not sure how important it is, but I think it's

7   important to point out what my colleague said because if the

8   government is going to come into court and tell you what they

9   expect the evidence to show, and all of a sudden, you hear

10  something different during the trial, I want you to pause and

11  say, "Why did they say this if that wasn't the case?"

12       So, my belief, my understanding is the evidence will show

13  that there was no contract for the OBS netblock.  We will see;

14  my memory may be wrong.  That's my understanding.

15       More importantly, you will see that there's an invoice

16  from GetAds to Adconion, dated March 4 of 2011, for the

17  following IP address.  And it's important because this was part

18  of Dye's story, that "I never said I was selling them IP

19  addresses, just domain names."

20       So for example, we expect Mr. Dye will come in and

21  testify, "I told Adconion they would be purchasing only the

22  domain and not the IP netblock."

23       You will see an email from Mr. Dye to Kim Perell in which

24  he says, "You will be purchasing the full netblock."

25       His testimony, when he is coming into court now, versus

1    what actually happened 11 years ago, we expect he will testify,

2    "I told Adconion they would be purchasing only this IP

3    netblock."  And yet, there's going to be an invoice that says

4    that the purchase is for /16-168.129.0.0, and then a range of

5    IP addresses.

6         We expect that Mr. Dye will come into court and say, "I

7    told Adconion they would not own the IP space."  Why?  Because

8    that's consistent with his story that he can go to the

9    government and say, "You see?  Go after them.  I can deliver

10   somebody for you.  Just let me off the hook on something like

11   that."

12        In fact, you will also see a March 1st, 2011 email from

13   Mr. Dye to Mr. Pacas saying, "This would be IP space that you

14   own."  Expected testimony, based upon reviews and interviews,

15   "I told Adconion, they would not own the IP space."  Actual

16   email back at the time:  "This would be IP space that you own."

17   Night and day.

18        So, Mr. Pacas leaves Adconion end of April, because

19   there's somebody named Jeff Morgan, who had formed a company a

20   year earlier, called Telic.  And Kim Perell was a 50 percent

21   owner of Telic.  She was essentially a silent investor.  Morgan

22   was the CEO.  You will hear about a guy named Chris Young, who

23   was the CTO, technology officer, and the like.

24        Different company, completely different company.  They did

25   business together at times, just as a lot of advertising

1    companies.  GetAds and Adconion do business back and forth.

2    They were also competitors at times.

3         The government wants to merge them together to try to wrap

4    Mr. Pacas in for some responsibility for things that they

5    allege occurred at Adconion when he wasn't there.

6         Mr. Pacas worked at Telic, not a company that you heard

7    the judge mention when he read the indictment.  It is not in

8    the indictment.  He worked at Telic from May 2011 through

9    August of 2013.  During some two years, he had no interactions

10   with Mr. Dye or GetAds whatsoever.

11        In around March of 2013, Telic -- some of the guys at

12   Telic, Mr. Pacas, maybe a Mr. Blank, Jeff Morgan -- these

13   advertising companies are always in need of IP space, and they

14   talk about, "Let's maybe look to purchase as opposed to leasing

15   some."  And at that point, Mr. Pacas remembers that he had

16   bought some IP space from Daniel Dye a couple of years ago.

17        OBS, right?  He wasn't there when the blocks were

18   announced.  To the extent there were or were not problems with

19   the blocks, he wasn't there for them.

20        So he calls up Dye and asked if there are any netblocks to

21   be purchased.  And the government mentioned two netblocks.

22   There are two netblocks purchased in around March of 2013 by

23   Telic.  Nothing to do with the indictment, but we are going to

24   discuss them, and you will hear evidence.  One involving what

25   we refer to as Canada Air and one MediaVis.  Neither in the

1    indictment, but let's discuss them.

2         First of all, GetAds provides letters of authorization,

3    purportedly signed by Canada Air and MediaVis.  In fact, at one

4    point as they are going back and forth and GetAds sends to

5    Mr. Pacas a draft, a form letter of authorization, Mr. Pacas

6    gets back and says, "We need a signed letter of authorization

7    if we are going to do any business.  We need a signed letter of

8    authorization from Canada Air."  And Mr. Dye returns with a

9    signed letter of authorization from a Grant Fengstad, or

10   something like that, from Canada Air.

11        This is then announced through this hosting company called

12   Cogent.

13        So what happens next?  Around March 26 of 2013, Cogent

14   informs Telic there is a competing claim for the netblock.  So

15   this is the fraud and abuse department from Cogent saying, "We

16   announced this, and Canada Air said, 'This is our netblock.'"

17        So the letter that comes to Telic is saying "There's

18   competing claims.  You provided me a letter of authorization,

19   but Canada Air is saying we didn't give you that

20   authorization."

21        So, what does Mr. Pacas do?  Again, not alleged in the

22   indictment, but it's important that you understand exactly what

23   he did at this time.  Because the government summarized it as

24   saying that Mr. -- Ms. Pierson said Mr. Pacas said, "I now see

25   how this works.  We can monetize it if we bring it in-house."

1    You will see language to that effect in an email.

2         But if you were left thinking that's the story of the

3    evidence involving Mr. Pacas, you would be wrongly misled.  So

4    I want to present to you what the full evidence will be

5    relating to that.

6         What Mr. Pacas does is he does what you hope he would do.

7    He contacts Daniel Dye and says, "Canada Air just told Cogent

8    that the letter of authorization that you supplied to us from

9    Canada Air was not authorized by them.  Can we get on a call

10   today?  I want to know what is happening."

11        Doesn't sound like a conversation between two

12   coconspirators.  Two coconspirators kind of know what each

13   other is up to.  This is, "What is going on here?  I want to

14   know what is happening."

15        Mr. Dye responds, "Canada Air doesn't have any claim to

16   that space.  Your letter of authorization came from the

17   controlling domain as is stated with ARIN."

18        You didn't hear that as a summary from Ms. Pierson, but

19   that's how Mr. Pacas responded, and that's what Mr. Dye then

20   tried to continue to mislead him about.

21        What happens next?  We have one person saying one thing.

22   Cogent says they are going to investigate it, audit it.  Dye is

23   saying, "We are right; they are wrong; everything we did was

24   kosher and legitimate."  For the next week or so, he

25   investigates this, as much as he can, which is largely getting

1    back and forth, talking to people in his office, going back and

2    forth, following up with Mr. Dye.

3        And you will see, as part of email chain that Ms. Pierson

4    referenced, Mr. Pacas says, "I now see what is going on here."

5    He is starting to understand a little bit what is going on;

6    that Dye must have said "This was abandoned" or "We obtained

7    it" or whatever, but there's a risk of competing claims from

8    the original holder of the space.  Think about it.  If Dye and

9    GetAds are obtaining space from a company, let's say, that was

10   defunct or out of business, they think -- maybe Dye's figuring

11   nobody is going to claim it.  All of a sudden, we are first

12   learning -- and Ms. Pierson noted, Mr. Pacas is first learning

13   what is going on here.

14       And he -- you will hear government witnesses testify that

15   it's common for ad companies to try to stay off of Spamhaus's

16   radar screen.  And Mr. Pacas learns -- this sort of comes up in

17   his conversation with Daniel Dye, where he says that GetAds

18   structured the transaction in a way that would enable them to

19   stay off of Spamhaus's radar screen.  This is discussed not

20   just with Mr. Pacas but the chief technology officer and the

21   other executives at Telic.  They are trying to figure out what

22   is going on here.  All right?

23       Still not the end of the story.  You should be asking,

24   "What did they do?  Did they continue to pursue that?"  Let's

25   see what the email chains will show.

    April 4, Cogent comes back.  It says they did their audit,

and that the GetAds letter of authorization is fraudulent.

Mr. Pacas again confronts GetAds and Daniel Dye.  He writes to

Mr. Dye, "Did Grant Fengstad" -- this is the guy who signs the

letter of authorization, apparently.  "Hey, Daniel, did Grant

Fengstad really sign the LOA, or is it actually fraudulent?"

    You know, people in business often don't confront their

people they are dealing with and use the word "fraud," but he

does, because he is starting to see what is going on because

Cogent has audited it and they said this is a fraudulent LOA.

    Dye comes back and says, "Nothing fraudulent has been

done."  So, again, coconspirators don't continue to lie to

their coconspirators, but because they are not coconspirators,

because Dye is victimizing my client and his company and is

trying to continue with this sale and not admit the truth, he

is saying, "Nothing fraudulent has been done."

    Quote, "At no time have we engaged in any type of

fraudulent activity."

    Well, I would submit to you that when Mr. Dye takes this

witness stand, and one of us asks him, "At any time did you

engage in fraudulent activity?"  He is going to, at this point,

say "Yes."

    But it's the opposite of what he was telling Mr. Pacas and

our clients.

    April 4, my client gets in touch with the CEO of the

company, and he says, "GetAds has provided us with a fraudulent

LOA.  We had assumed it was signed by the actual director of

IT, but Cogent is saying it is not the case.  Dye is digging in

his heels.  He's continuing to lie to us, but I don't believe

him."

Mr. Pacas does not accept Dye's denial.

Next day, Pete writes to George Avery, Daniel Dye's boss.

He says, "Hey, we are getting taken by you guys.  You should

know what is going on here."

And the same day, he writes and emails and has

conversations with his CEO and CTO at his company and says, "We

need to stop working with GetAds," and he does stop working

with GetAds.  That's April 5 of 2013.

All of these charges in this indictment deal with activity

afterwards.  Again, none of that means that any of these

gentlemen did anything wrong.  They, likewise, were lied to by

Daniel Dye.  But on behalf of my client, I will point out, he

is not even involved in the mix.  He has zero to do with what

is in this indictment.  And he never worked with GetAds again.

Now, in part, because of what Daniel Dye did and Telic

then becoming Spamhaus blocked, it put him in a situation where

they basically decided they couldn't even continue in business.

You want to talk about that somebody made $5 million in

connection with netblocks.  Telic was a profitable company.

Mr. Pacas had a good job.  He even had something like 5 percent

```
 1   of the ownership of the company.  All that was out the window.
 2       So, September of 2013, Adconion acquires Telic's
 3   commercial email operation.  So now Mr. Pacas has to be shifted
 4   back to work back for Adconion, which he does.  But he has his
 5   own team.  They call it the Fiter, F-I-T-E-R, Fiter data team.
 6   And that team leases IT space; involved in commercial email
 7   business.  But his team never deals with Daniel Dye or any
 8   GetAds netblocks.  No involvement whatsoever.
 9       And that's it.  It's that simple.  Three time frames.
10   One, a couple of early back-and-forth, where a contract with
11   GetAds is being set up, being reviewed by the lawyers.
12       Dye is going to come in.  And you will hear one of many of
13   Dye's lies, where he talks about what was said.  And we expect
14   him to testify to all these lies because we have seen the
15   interview reports, and see how they contradict what we see in
16   the emails in terms of the representations.  And all this
17   activity when Mr. Pacas isn't even around.  He is at Telic.
18   And then, when he comes back to Adconion, he is running his own
19   team, and they have nothing to do with any GetAds netblocks.
20       Ladies and gentlemen, Mr. Pacas shouldn't even be here.
21   He shouldn't even have to go through this trial, but he will.
22           MS. PIERSON:  Argument.
23           THE COURT:  Overruled.
24           MR. LINCENBERG:  He is here, and he will go through
25   it, and like I said at the beginning of the case, remember what
```

 1    he is charged with.  Look back and see if there was any

 2    evidence whatsoever.  You will hear Mr. Dye try to smear him a

 3    bit.  That's going to happen in this case.  But you are going

 4    to see no corroboration for those smears.  In fact, you are

 5    going to see that the evidence is the opposite and that there

 6    is zero evidence.

 7         Mr. Pacas and not simply not going to be proven guilty

 8    beyond a reasonable doubt; he is 100 percent innocent.  This

 9    has nothing to do with proof.  He is innocent of these charges.

10         Thank you.

11              THE COURT:  All right.  Thank you.

12         And ladies and gentlemen, you have now heard all of the

13    opening statements from the government and each of the

14    defendants through their attorneys.  And so, I have told you

15    throughout that what the attorneys had to say was not evidence,

16    and, in fact, now -- well, not now, this moment, but now, as

17    the next stage, we will have witnesses called, and we will have

18    evidence that is submitted by each side.

19         It's almost 4:30.  It seems like it's been a longer day

20    than that because so many things have been happening.

21         So, rather than begin with a witness and just kind of get

22    them started, I am going to excuse you at this moment, and I

23    will just remind you of the admonition.  And in fact, there's a

24    special admonition I will give at this moment.

25         As I indicated before this trial started, you, as jurors,

1    will decide this case based solely on the evidence presented in

2    the courtroom.  This means after you leave here for the night,

3    you must not conduct any independent research about the case,

4    the matters in the case, the legal issues in the case, or the

5    individuals or other entities involved in the case.

6        This is important be for the same reasons that jurors have

7    long been instructed to limit their exposure to traditional

8    forms of media information, such as television and newspapers.

9    You also must not communicate with anyone in any way about this

10   case, and you must ignore any information about the case that

11   you might see while browsing the internet or your social media

12   feeds.

13       And so, at this point, I think you have your rapid tests.

14   Please take them home with you.

15       Tomorrow, we will start at 8:30.  And hopefully this

16   morning you got a taste of what traffic is like coming in and

17   so you will kind of respond accordingly in terms of what time

18   you leave home to be here.  We will aim to start promptly at

19   8:30.

20       I will at this time be meeting with the attorneys to go

21   over matters that we anticipate would be coming up in the next

22   day or two, so we will be making the best use of our time to,

23   again, avoid infringing upon your time, to avoid as much as

24   possible, as much as possible, to have you wasting your time

25   while we are tackling other weighty issues.

```
 1          So, with that, have a good evening.  See you tomorrow
 2    morning.  You can leave the notebooks right there, on your
 3    chair or underneath the chair.  No one will touch them.
 4               JUROR:  Do we have to?  Can we take them home?
 5               THE COURT:  Don't take them, because if by chance you
 6    were to leave them in the bus, then that would give a window
 7    into what you all consider to be important, and we would not
 8    want to have that.
 9          (The following proceedings were held in open court out of
10    the presence of the jury:)
11               THE COURT:  You may be seated.  We do have
12    Mr. Goodrich here, so let me go into something that actually
13    has, I think, been addressed maybe my Ms. Bernstein, but
14    relates to the 902(11) and (13) certificates of authenticity.
15    And there's two basic groups of entities that are the subject
16    of these 902(11) or (13) certifications.
17          There are the ones where the defense is claiming that the
18    certification is deficient on its face, and that would consist
19    of the Broadcloud at ECF 207, I believe; Mata Group -- or
20    Exhibit 226, I should say; Cogent, Exhibit 227; Hostwinds,
21    Exhibit 229; GoDaddy, 237; PayPal, 233; name.com, 234; Tucows,
22    Inc., Exhibit 238; Enom, 239; and the Amobee, 240.
23          As to those numbered exhibits, there are two assertions.
24    One is that they are deficient on their face; and then,
25    secondly, that there's a failure to attach or identify the
```

 1   exhibits, materials that make up the exhibit.

 2       And the defense has claimed that there was a failure to

 3   attach or to identify.  The government responded by asserting

 4   that, in fact, they did provide and produce the COAs and the

 5   documents together, and they identify a number of productions.

 6       Let me inquire of the defense; is that correct, that these

 7   documents have in fact been produced and so have been

 8   identified?

 9           MS. BERNSTEIN:  Sure, Your Honor.  Could I perhaps

10   either pass up or direct you or put on the Elmo -- for example,

11   I am looking at document 397-1.

12           THE COURT:  397-1?

13           MS. BERNSTEIN:  Yes.  Page 1 of 24.  And this is the

14   certificate of authenticity that the government filed for Brian

15   Turbow.

16           THE COURT:  For what?

17           MS. BERNSTEIN:  For Brian Turbow, to authenticate the

18   Broadcloud record.

19           THE COURT:  Let me ask, is that one of the COAs that

20   you have challenged?

21           MS. BERNSTEIN:  Yes.  And I was going to contrast

22   that with the second page of the filing, which is the one from

23   Linda Goodman.

24           THE COURT:  So, I am looking at your response filed

25   May 19, which is found at ECF Number 431.

```
 1              MS. BERNSTEIN:  Yes.

 2              THE COURT:  That is your response to the government's

 3    notice regarding these COAs?

 4              MS. BERNSTEIN:  Yes, Your Honor.

 5              THE COURT:  And then, as to this specific exhibit

 6    that you are raising, you list it at pages seven or eight?

 7              MS. BERNSTEIN:  Perhaps I misunderstood.  I thought

 8    the Court was asking if it was correct that the custodian of

 9    records didn't identify the documents they correlated to.

10    That's the basis of the objection for the records you just went

11    through.  Broadcloud --

12              THE COURT:  There's two objections, as I stated.  One

13    is that the COA is deficient, and then, second of all, that the

14    others did not have the attached records.

15         But I didn't see the one that's referenced at 397, I

16    guess.

17              MS. BERNSTEIN:  Docket 397 is the government's motion

18    that moves to authenticate these records.  And Docket 397-1

19    included a number of the certificate of authenticity

20    signatures, the declarations themselves.

21              THE COURT:  Okay.  And, I guess, given that we have a

22    number of moving parts, we have the government giving notice in

23    March, and then an amended notice in April relating to these

24    documents, that it seeks to have authenticated, under 902(11)

25    and (13), and there was no response until May 19th.  And the
```

1    response is this one that I am looking at.  And in the

2    response, the defense takes a position that they don't believe

3    that a proper authentication has been provided for any of these

4    offered exhibits.  The defense is prepared to stipulate to a

5    number of them, and then move forward in opposing others.

6         And so then, in the course of that, they, as I understand

7    it, identify the documents that or exhibits that they have

8    issues with, that you all have issues with.  And that is found

9    at seven and eight.

10        So that's kind of how I devised or arrived at the universe

11   of exhibits that are at issue.

12             MS. BERNSTEIN:  Yes, and that's correct, Your Honor.

13   I was trying to answer the question that I thought I was asked,

14   which perhaps I wasn't asked.

15             THE COURT:  Maybe I didn't ask it artfully.

16        I guess you have asserted, at pages 7 and 8, that -- well,

17   actually, it may be found elsewhere.  Let me see.

18             MS. BERNSTEIN:  But yes, Your Honor.  Pages 7 and 8

19   of our filing, at docket 431, do include the chart of which

20   ones we agree to and disagree with, and the issues we lay out

21   there.

22             THE COURT:  Okay.  So, at page 6, line 3, you say,

23   "Other certifications simply fail to attach or otherwise

24   identify the documents purportedly being certified.  No records

25   are attached or identified with the COAs of Broadcloud, Mata

1    Group, Cogent, Hostwinds, GoDaddy, PayPal, name.com, Tucows

2    Inc., and Enom"; is that correct?

3              MS. BERNSTEIN:  That's correct, Your Honor.

4              THE COURT:  And then the government comes back and

5    says no, in fact, they have provided these documents, and then

6    they point to these discovery blocks.

7              MS. BERNSTEIN:  The way I think it's easier to

8    understand -- and I am happy to pass these up, if I may, is

9    that -- I will get to the podium.

10        If you were looking at Government's Exhibit 207, that is

11   the Broadcloud certificate of authenticity, page 1, I passed

12   up.  I am contrasting that with page 2, which is the Goodman

13   law firm.  And I printed front/back.

14             THE COURT:  Which is 218?

15             MS. BERNSTEIN:  Which is 218.

16        If you look at the Goodman law firm records, there's a

17   certificate of authenticity that lays out what is necessary to

18   authenticate something with reference to a chart, which is on

19   the back of that, that says, "And I, the signatory on this

20   stipulation" -- excuse me -- "I, the signatory on this

21   declaration, certify that these records, identified herein, at

22   this chart, are the ones I am authenticating."

23        That identification is absent for Broadcloud, Mata Group,

24   Cogent, Hostwinds, GoDaddy, PayPal, name.com, Enom -- Tucows,

25   and Enom.

1          As an aside, Your Honor, since we are all very interested

2     in streamlining things, while these are deficient, we are

3     willing to agree on GoDaddy, PayPal and name.com.  We don't

4     need to fight about those.  We don't particularly care what

5     those records say.  We are willing to let those arguments fall

6     to the wayside, but that is by no means a concession to the

7     rest of them are remotely authentic or these COAs are

8     appropriate.  We believe those are still entirely deficient

9     because I have no idea what records are being certified.

10         I have a chart that the government provided that says,

11    "With this COA, we are going to introduce Exhibits 1 through

12    200," but that's different.  I don't know what the person

13    signing the Broadcloud COA said was authentic.  I don't know if

14    that's every document that's ever existed in the history of the

15    company.

16         And 902 indicates that the document needs to stand on its

17    own and needs to show -- you need to be able to look at that

18    and know what is being authenticated, and we have no idea for

19    many of these.

20             THE COURT:  All right.  And I see that many of these

21    certifications were prepared back in 2017, when I expect that

22    the investigation was moving forward, and it is not clear to me

23    whether or not these certifications then were placed on top of

24    materials that were provided to the government and that's --

25    that's the way they came about; is that correct?

1          MS. FEVE:  Your Honor, what happens, when we -- when

2     the government sends out legal process, most providers at this

3     point will return a 902(11).  Because it's so common to do it

4     in response to legal process, sometimes they use a 902(11)

5     provided by the government; sometimes they use one that that

6     company just produces automatically, and they produce it with

7     the documents that are attached to it.

8          Now, not everybody has an in-house legal department that

9     will Bates stamp the documents.  They typically just give it

10    back to us.  So, part of what we do -- and we did it here -- is

11    we would put a Bates number.  So all of the documents we

12    received from Broadcloud have a Bates number that identify

13    Broadcloud and the Bates, so that you know which ones were from

14    Broadcloud and which ones were Cogent.

15         THE COURT:  But the Bates stamps were affixed or

16    created by the government?

17         MS. FEVE:  In general, unless there was a grand jury

18    subpoena that was a little bit unusual, where they would go get

19    outside counsel and outside counsel would review them and Bates

20    stamp them.  But generally, for a GoDaddy or Tucow or name.com

21    or PayPal, they get subpoenas and legal process every day.  So

22    they are always pushing out process, so they are basically,

23    "Here is the process; here is the 902(11)."  They give it to

24    us.

25         THE COURT:  So, Ms. Bernstein, to the extent that one

1    can observe that Ms. Goodman's certificate may, as a best

2    practices matter, be preferable versus the certificates that

3    were otherwise provided by these other entities, do you have

4    any reason to question that the materials that the government

5    has referenced as having been produced by these custodian of

6    records is in fact what was turned over?

7            MS. BERNSTEIN:  Well, I don't know.  And unless

8    Ms. Feve is now a witness in the case, these are not

9    self-authenticating records the way the COAs have been provided

10   to us.  Even if the government Bates stamps things, I would

11   think the government could go to the witness and say, "This is

12   accurate, right?"  And affix it to the COA.

13       We have 20-some-odd COAs here, all at docket 397-1, most

14   of which have no reference to anything.  Some of them

15   indicate -- I forget off the top of my head which one, but I

16   think it's Hostwinds -- indicates, "Here, I am giving you

17   records consisting of 21,000 kilobytes," but there's no

18   indication as to what those are.

19       And like I think the Court noted, a lot of these were

20   produced -- that one was signed in 2022.  Some are signed in

21   2017.  Certainly no discovery was produced to us in 2017.

22           THE COURT:  They had not been indicted in 2017.

23           MS. BERNSTEIN:  Right.  And that's the issue, Your

24   Honor.

25       Like I said, for name.com, PayPal, and GoDaddy, we can

1    just take that out of the equation.  We do believe that these

2    COAs are still deficient but we don't need to fight about those

3    if that helps streamline things.  If it doesn't, we are happy

4    to stand on those objections.

5        But Broadcloud, for Mata Group, Cogent, for Hostwinds, and

6    for Enom, and Tucows, the COA is deficient, and it matters

7    because there's a large swath of what Ms. Feve indicated are

8    critical documents the government is trying to get in there and

9    these are not standalone COAs.

10            THE COURT:  If it matters so much, why didn't the

11   defense file a response or an opposition to these notices back

12   in March or in April?

13            MS. BERNSTEIN:  I don't have all of the email

14   correspondence, but the government has known for a long time we

15   don't agree.  Before they filed, they said, "Do you agree?"

16   And we said, "No."

17            THE COURT:  But they provided notices that they

18   filed, correct, in March?

19            MS. BERNSTEIN:  They did.  And we also, in March,

20   filed a motion *in limine* that indicated that we did object to

21   the authenticity of it.  It was in a footnote which the

22   government has brought up to suggest we didn't object, but we

23   did.  We asked them a number of times to provide us the

24   exhibits in the chart.

25            THE COURT:  You objected in a footnote?

1              MS. BERNSTEIN:  I don't have the pleading, Your

2    Honor, but it was in one of the motions *in limine*, we did

3    include an objection to these certificates of authenticity.

4              THE COURT:  Based upon those reasons; that is, that

5    the documents weren't attached?

6              MS. BERNSTEIN:  No.  It was not laid out the way it

7    is in document 431, by any means.

8         But to the Court's question, as to why this wasn't raised,

9    the government certainly knew we objected --

10             THE COURT:  But not for those reasons?

11             MS. BERNSTEIN:  There was never any meaningful

12   discussion about it.  We actually kept saying, "Can you give us

13   your exhibits so we can look at them and then we can let you

14   know what we think," and they never did.

15             THE COURT:  And the reason I am pressing you is,

16   under 902(11) and (13), there's a requirement that the

17   government provide notice, and the purpose of the notice is

18   that so that you are aware, all the defendants are aware of

19   what the government is proposing to do under the rules of

20   evidence so that you have sufficient time to review,

21   investigate, and determine whether or not there's a basis to

22   challenge what otherwise might appear to be a *prima facie*

23   showing of authenticity.

24        So, then, we were denied the opportunity to, in a

25   rational, deliberate fashion, address these issues, instead, as

 1    with a lot of other matters, they end up kind of lining up.
 2    And as air traffic controller, I go, "Okay.  I can't get to
 3    that today because I have this motion to dismiss; I have that
 4    motion to suppress; I have this.  Let me get to it once we
 5    begin trial."  But, again, there's all these moving parts, and
 6    I am trying to get up to speed and understand the issues.
 7         And, then, the fact that the original notice was given in
 8    March and we didn't have a response in opposition until May 19
 9    makes me wonder whether or not the defense has, to some extent,
10    forfeited or waived a challenge to these exhibits being
11    authenticated under 902(11) and (13).  As to the --
12             MS. BERNSTEIN:  Your Honor, could I respond to some
13    of that?
14         What got filed on March 18 is at docket 347.
15         And, to back up, I fully appreciate all of the issues
16    coming up and the way it is impacting everyone's case.  I do
17    understand that, but I don't think it's fair that we first
18    raised this on May 19.
19         The government files this on March 18 of 2022, and this
20    notice to submit records simply says, "We are going to submit
21    all of these records," it lists a laundry list of records it
22    intends to authenticate through custodian decs and says, "They
23    have been provided in discovery.  Additional certificates will
24    be produced as soon as they are received."
25         Most of the COAs -- not most -- a significant number of

1   COAs are signed March 22 of 2022, so they didn't even exist

2   when the government made this filing.  They existed in the

3   government's head to say, "You will get them on a rolling

4   basis," but we certainly didn't have a hard copy of them.

5          THE COURT:  Although, you would have the 2017 ones,

6   and from what I can tell, most of these are from 2017.

7          MS. BERNSTEIN:  They would have been peppered among

8   the 2 million pages of discovery, but they are not identified,

9   as far as I can tell, from this filing.

10      And the next filing the government has is docket 397, and

11  this includes a chart.  And this chart does identify, "Here is

12  our COA.  Here is the COA exhibit.  And these are the trial

13  exhibits we intend to introduce through that COA."

14      When we got this chart, we said to them, "Can you please

15  send this to us?"  There's 200 exhibits here, roughly.  I tried

16  counting, but there's a lot of ranges.  But there's over 200

17  exhibits in this chart.

18      So we said, "Send us those exhibits.  Then we can evaluate

19  them, and then we are in a position to tell you and to tell the

20  Court how we feel about them."  I sent that email and I know it

21  is in my inbox somewhere, and I am sure they won't dispute that

22  they received that.

23      We don't get the exhibits from them.  As Your Honor might

24  recall, there was an issue with the exhibits because their

25  exhibit list they filed had over 700 exhibits on it.  They did

1    produce that to us -- I forget the date -- and these numbers

2    didn't track with that.  I didn't realize that it was only a

3    handful of ones that didn't track, but we knew that this list

4    and the list they had given us didn't totally track because

5    they changed things.

6        Ms. Munk sent an email and said, "Can you please send us

7    the exhibits, instead of having us on this fishing expedition

8    while we have a million other last-minute things before trial?

9    Send us the exhibits so we can meaningfully look at them and

10   figure out our position."

11       The response we got was, "You have our chart.  Go plug in

12   the formulas.  Figure out what changed where."

13       To be fair, it didn't affect every single one of these.

14   To be honest, I hadn't tuned into that.  I just knew the

15   numbers were not accurate.

16       So it was brought up, and as it got closer to trial, the

17   filing occurred on March 19, at your direction.  But it wasn't

18   as though we slept on this until March 19th.  So I certainly

19   don't think anything has been waived.  This all could have gone

20   faster if they had just given us the exhibits, which they

21   clearly have, loaded in Trial Director.

22       In the interest of efficiency, we don't care about PayPal,

23   GoDaddy, and name.com.  We will just give those because we just

24   don't really care.

25       But the rest of them are deficient.  And when I look at a

1   Hostwinds COA that says, "I gave the government 21,000 pages,"

2   and Hostwinds is all over this discovery, I don't really know

3   what that COA is purporting to authenticate.

4        There's other issues with the GetAds records, and the CPH

5   records, but as -- while we are still on this first chunk,

6   that's the issue, Your Honor.

7            THE COURT:  Response?

8            MS. FEVE:  Your Honor, it is unfair to you that every

9   time you have to hear an argument you hear a new set of

10   arguments that hasn't been written down, and it's also really

11   hard because it's very hard to respond when the first time we

12   hear a defect, it wasn't even specified and clarified in the

13   May 19 filing, which was untimely.

14        The point is there's nothing in 902(11) that says we have

15   a give you our trial exhibits.  That's not what 902(11)

16   anticipates.

17            THE COURT:  But, I guess, to Ms. Bernstein's point,

18   her concern is that this general language, about "records

19   attached hereto is the original or a duplicate," ends up not

20   providing someone with sufficient amount of specificity, would

21   not produce the amount of clarity that one would want for

22   purposes of having documents authenticated.

23        Certainly, best business practices would suggest something

24   like what Ms. Goodman did in terms of Attachment A, and then

25   the attachment makes reference specifically to what has been

 1   provided.  That is more clear.

 2        And so, the argument by Ms. Bernstein, as I understand it,

 3   is we don't have anything like that for a number of these

 4   certificates.  And the question is whether or not it matters,

 5   whether or not there's been an adequate opportunity for the

 6   defense to be pointed to what the documents are, have been

 7   provided with enough information to inform the defendants that

 8   these are the documents that were turned over by these

 9   affiants.

10        And so, I understand in your response, you said that, "No,

11   here is what corresponds to these different COAs."  And the

12   question would be why should we believe that?

13             MS. FEVE:  Well, why couldn't they ask us that

14   question in March or April?  That's the first question.

15        And the second question is why do they keep telling the

16   Court that they have no idea what is the Hostwinds COA when we

17   specifically attached screenshots?

18        Yes, he references kilobytes.  He doesn't reference pages.

19   So what we did is we asked his attorney to please take screen

20   shots of every file, with the file name, that was part of the

21   21 kilobytes, so they would know, because we understood, at

22   that point, that Hostwinds was a concern to them.  And we

23   produced it.  And no one is mentioning to you we gave the

24   detailed screen shots with the COA so they would know what

25   records corresponded to the 21 kilobytes.

1    With regard to the Broadcloud documents, it says attached,

2    and they have the Broadcloud files, and they have them as load

3    files and not as PDF, Your Honor, because that's how they were

4    given to us.  When we gave them Broadcloud, it was

5    electronically in the format that we got from Broadcloud, with

6    the COA.  And that's why, when you look at the COA, on the

7    bottom, it says that it's Broadcloud.  So they know which are

8    the Broadcloud records because of how they were produced to

9    them.  And I can keep going through these.

10   Tucows was really straightforward.  I think it was five

11   pages they gave us, and we produced them as we got them, with

12   them in order, and that's why we keep giving them the Bates

13   numbers, because they are sequential and together.

14   THE COURT:  All right.  At this point, I am going to

15   provide my ruling.  You all may disagree with it, and to the

16   extent that you do, if it comes to that, the matter can be

17   raised on appeal.

18   But ultimately, the Court finds that these certificates

19   all, on their face, are adequate.  They are sufficient for

20   purposes of 803, subsection 6, records of a regularly conducted

21   activity.  They provide *prima facie* indications, evidence, that

22   the records were made at or near the time, by or from

23   information transmitted by someone with knowledge; the record

24   was kept in the course of regularly conducted activity of the

25   business, organization, occupation or calling; that the making

1    of the record was a regular practice of that activity; and that

2    the individuals identified are qualified; and that the

3    certificates that are provided comply with Rule 902(11) and

4    (13); that defense has not demonstrated that the source of

5    information or the method or circumstances of preparation

6    indicate a lack of trustworthiness.

7        And with respect to the attachments and whether or not

8    they are sufficiently identified and provided, the Court finds

9    that, based upon the government's response, that the defense is

10   aware and has been aware of what documents specifically were

11   obtained.  That, at this point, the defense is free to raise

12   challenges they believe may exist and that otherwise can be

13   presented given that we are just, at this moment, accepting the

14   authenticity.  Hearsay objections can be raised, 403 objections

15   can be raised and other available objections can be raised.

16       With respect to the other exhibits, those exhibits are a

17   little bit trickier because in the case of, I think, Native

18   Rank, which is a successor for GetAds, CPH Resources, which

19   eventually became Amobee, there's five or six of these exhibits

20   that are referenced.

21       As to the successor companies, from the declarations of

22   the certificates, it seems to me that they don't take the

23   additional step of showing, kind of, continuity of how Amobee

24   would have taken these -- I am sorry -- yeah -- Amobee from

25   Adconion, and Native, as far as GetAds; it doesn't address the

 1    passing of the baton.

 2        It seems that that is a matter that the declarant should

 3    be prepared to address because otherwise it is just, "Here is

 4    these documents, and I am with Native Rank," and keeping in

 5    mind that the documents relate to GetAds.  And to the extent

 6    there's no indication at all that these documents, which

 7    include GetAds materials, were obtained in the course of Native

 8    Rank assuming or absorbing GetAds.

 9        So that's my concern as it relates to these others.  Can

10    you address that?

11            MS. FEVE:  Yes, Your Honor.

12        I think the first time -- nothing in 902(11) anticipates

13    or requires that a company recite its corporate genealogy, that

14    many U.S. companies have acquired many successors, and the

15    notion is not that the 902(11) to be authentic says that you

16    have to identify every subsidiary and every predecessor in

17    interest, and there's no case law that has ever suggested that.

18        And the only time when it has been raised, the courts have

19    not required that it be in 902(11) but found that it was

20    satisfied.

21        And here, you literally just heard opening statements

22    where it's uncontested based on everything you heard that no

23    one disputes that Frontline Direct became Adconion, became

24    Amobee; that the same employees went across it.  And the

25    technology and the employees moved between them.

```
1          There's never been any contention that these emails that
2     you have heard -- and frankly, the defendants referred to as
3     much as we did -- were not acquired or not transferred.
4              THE COURT:  I guess, then, we set up the prospect
5     where we are no longer looking at the certificates versus
6     looking at the certificates and surrounding circumstances.  And
7     I know one of the cases, I don't know if it was United States
8     Bank --
9              MS. FEVE:  It was Childs.  I think you are talking
10    about the Ninth Circuit Childs decision.
11             THE COURT:  I think it was the First Circuit, Justice
12    Souter may have offered by the First Circuit, sitting by
13    designation.  But there was a successor --
14             MS. FEVE:  Was it J.P. Morgan that acquired --
15             THE COURT:  I think that was it, and there was
16    reference to reliance that the new parent would have relied
17    upon the authenticity, upon reliability of these records that
18    they absorbed.  And so, at least there, the Court would have
19    found some additional effects -- which I think here we do have
20    them and they are not disputed.  And the only question is
21    whether or not they should be in the certificate itself rather
22    than exist outside.
23             MS. BERNSTEIN:  And we do dispute this, actually,
24    Your Honor.  There's two sets of records, GetAds and CPH.  The
25    CPH records are not the Amobee records.  If the government was
```

1    trying to authenticate Amobee records but the certificate was

2    signed by someone at Adconion, that's not the objection.  These

3    are CPH records, and the certificate is Jonathan Harrill,

4    employed by Amobee, as global general counsel.

5        So I don't know the relationship between CPH and Amobee,

6    and perhaps I should at this point in time, but I don't, and it

7    is certainly not clear from here.

8        And the other thing is Chris Guy works at Native Rank.

9    Native Rank did not acquire GetAds.  GetAds did not become

10   Native Rank.  Chris Guy never worked at GetAds.

11           THE COURT:  Let me ask, Ms. Feve, what is the

12   explanation, rationale, between Jonathan Harrill, from Amobee,

13   being able to certify documents from CPH?

14           MS. FEVE:  Because CPH was a legal fiction.  It was a

15   dba.

16           THE COURT:  Legal fiction, and it was utilized by --

17           MS. FEVE:  It was one of Amobee's dba's.

18       And the grand jury transcript where Christy Hines

19   (phonetic) speaks about this, just like the grand jury

20   transcript where Christopher Guy testifies, they specifically

21   state, under penalty of perjury, that they have acquired the

22   asset.

23       Christy Hines testified it was a dba and that she was

24   reporting to Jonathan Harrill at Amobee, and that it was set

25   up by Amobee.

1     And Christopher Guy says the same thing, that GetAds

2     became Native Rank.

3     But honestly, Your Honor, given that it's 5:05, and what

4     we really, really need to have established before we start

5     putting witnesses on is the Amobee, I am happy to talk about

6     the Amobee records tonight.  That's the one where there's never

7     been any dispute.  And for people who are literally employed by

8     Amobee who are seeing their own emails, whether it was

9     Frontline Direct or Adconion Direct, to come forward and say,

10    "Your Honor, I can't possibly know what Frontline Direct and

11    who Adconion Direct are unless you put something in a 902(11),"

12    that is not there in the statute and that no case law

13    specifically calls for, is to run afoul of the very spirit of

14    902(11), which is to streamline the process.

15    It's also totally inconsistent with the evidentiary

16    threshold that any moving party, civil or criminal, prosecutor

17    or defense, needs to meet under 901, which is -- and you hear

18    it constantly, weight not admissibility but it is just a *prima

19    facie* showing.  Not to say you can't ask questions, but it is

20    way short of the showing that we require for hearsay for

21    803(6).  It's far shorter than anything like probable cause or

22    proof beyond a reasonable doubt.  It is saying is it more

23    likely than not that this document is authentic.

24    And if you want to have your quibbles or concerns or say

25    you haven't heard from so-and-so, counsel can argue it, but

1  really, what the Ninth Circuit in *Tank* (phonetic) made really

2  clear is this is a low bar.  We are not getting to the heart of

3  the hearsay and the 401 and 402.

4          THE COURT:  Let me ask you, with respect to Jonathan

5  Harrill, he is identified as global general counsel, and he is

6  employed by Amobee, at least he was.

7          MS. FEVE:  Your Honor, which COA are you looking at?

8          THE COURT:  I am looking at 235 and 236.  These are

9  both challenged by the defense, as I understand it.

10         MS. FEVE:  Right.  But the issue is -- the one that

11  takes care of everything and that really matters is 240.

12         THE COURT:  Which is Mario Samonte?  What do you

13  mean?  The Jonathan Harrill ones don't matter?

14         MS. FEVE:  The Jonathan Harrill ones don't matter.

15  We produced all of them to show we had been giving them as we

16  got them.

17         THE COURT:  Let me ask, then, in the April 22, 2022

18  certification by Mario Samonte, does he, then, once again

19  certify documents that otherwise were certified in these

20  previous September and October 2017 certificates?

21         MS. FEVE:  He -- because when we went back,

22  anticipating this issue, what Mario Samonte did, with his

23  counsel and counsel for Amobee, is that they literally went

24  back over the beginning Bates number range that is Attachment A

25  to his.  So the reason why the CPH Resources ones are separate

1    is we didn't ask Mario Samonte, "We need you to go back

2    electronically and authenticate it," because we understand that

3    they kept -- for their dba, they did something different for

4    CPH Resources, and that's why it has a different Bates number.

5          But really, for tonight and for tomorrow, all I am asking

6    the Court to consider is Government's Exhibit 240, which is --

7          THE COURT:  All right.  So, as I understand it, Mario

8    Samonte worked with Adconion?

9          MS. FEVE:  He still does.

10          THE COURT:  But, then, Adconion and Amobee are

11    related?

12          MS. FEVE:  Yes.  They are the same thing.  They were

13    acquired.  Just like everyone just said to the jury.  Frontline

14    Direct got acquired by Adconion, and Adconion got acquired by

15    Amobee.

16          THE COURT:  So, in the case of Mario Samonte, we are

17    not talking about a successor organization, like Washington

18    Mutual, that takes over the accounts of someone else.  We have

19    someone that was, in real time, working with Adconion --

20          MS. FEVE:  Yes.

21          THE COURT:  -- back when they were Adconion, in the

22    2015, 2017 time frame and is now employed by Amobee?

23          MS. FEVE:  He's been there throughout the process.

24          THE COURT:  It seems to me this is someone qualified

25    to be able to authenticate the materials he otherwise has

1   stated, provided the *prima facie* showing of authenticity.

2           MS. BERNSTEIN:  I guess, Your Honor, the COA is

3   signed on April 22nd of 2002, and it's purporting to

4   authenticate 1.3 million pages of documents and I just find

5   that to be unbelievable on its face.

6           THE COURT:  Ultimately, what he is attesting to is

7   there was a process, there was a system in place at Adconion,

8   at Amobee, which permits Adconion/Amobee to spit out, to

9   provide materials that are contained within their records, and

10  that's what he is saying.

11      To the extent that you want to challenge him or challenge

12  some of this at trial, then you may.  But as far as a *prima*

13  *facie* showing, he's established it.

14      As far as something that shows that, technologically, this

15  is impossible; that what he has pointed to is in fact made up

16  and is invented, then I would be looking for you to point me to

17  what is it about this system, this methodology, that makes it

18  unreliable.

19          MS. BERNSTEIN:  Because, Your Honor, he is not saying

20  that Adconion/Amobee, this company, has a system in place that

21  generates these records.

22          THE COURT:  He is somebody that would be qualified to

23  weigh in on whether or not these records were made at the time

24  the matter is set forth, whether or not they were kept in the

25  regular course, whether or not they were made in the regular

1   practice, and whether or not they are originals or duplicates

2   of originals, right?

3          MS. BERNSTEIN:  His certificate of authenticity is

4   substantively saying all 1.3 million records, the following

5   occurred for them.  So when Your Honor says he's made a *prima*

6   *facie* showing, that's because he parrots back 902(11).

7       We respect the Court's ruling, but the argument here is

8   1.3 million documents certified as authentic in April of 2022,

9   we find to be somewhat unbelievable on its face.

10          THE COURT:  And I think that 608 and 902 require more

11   than just kind of this idea that it seems that's not

12   plausible -- I am sorry, 803.  If I said something else, 803

13   and 902.  I am sorry.

14       803 speaks of the opponent showing the source of

15   information or the method or circumstances of preparation

16   indicated a lack of trustworthiness.  And I don't find that

17   that showing has been made.

18       I find that a *prima facie* showing of authenticity has been

19   established, and that otherwise there has not been sufficient

20   to show a lack of trustworthiness.

21       So, with that, the Court will be prepared to find that the

22   government has met its burden as to 240 on the COA.

23       On the 207, 226, 227, 229, 237, 233, 234, 238, and 239,

24   which we had discussed, regarding whether or not they are

25   deficient, the COAs are deficient on their face, or whether or

1    not there was a failure to attach, I am overruling those

2    objections, and those will be authenticated.

3        As to --

4        MS. FEVE:  Your Honor, I am so sorry.  We couldn't

5    write fast enough.  Would you mind giving us the list again.

6        THE COURT:  The group that we were first talking

7    about, right?  207, 226, 227, 229, 232, 233, 234, 238, 239.

8    And then we addressed separately 240.

9        And then I haven't weighed in yet on 230 or 231.  And then

10   as to these other Amobee COAs prepared by Jonathan Harrill, as

11   I understand it, it's a moot point; you are not going to seek

12   to have those approved?  Is that right?

13       MS. FEVE:  We are just trying to check, Your Honor.

14       MS. BERNSTEIN:  I would note for the Court I have one

15   housekeeping matter after this.

16       MS. FEVE:  Your Honor, can I represent that, for the

17   purposes of tomorrow and early next week, we need to get to the

18   remainder of the COAs.  We can pull it up right now, but that

19   was part of why we were so concerned about just establishing

20   240.

21       THE COURT:  The Jonathan Harrill exhibits that

22   reference materials are 235 and 236.

23       So, Ms. Bernstein, you have another matter?

24       MS. BERNSTEIN:  Yes, Your Honor.  And I have the

25   transcript over there.  It's the transcript of the April 26th

```
 1    hearing.  I believe it is in the docket, Docket Number 400.

 2         One of the things we addressed at that hearing was

 3    Mr. Wiechert asked the Court to order the government to provide

 4    24-hour notice.  Mr. Lincenberg said, "I need 48-hour notice."

 5              THE COURT:  Yes.  Yes.

 6              MS. BERNSTEIN:  You said to the government, "Can you

 7    do that?  Can you identify the witness and exhibits?"

 8         They said yes.

 9         I wanted to clarify at this point, because we have had a

10    lot of back-and-forth today.  That's not their position.

11         We wanted to clarify it with the Court that, to streamline

12    trial, we are requesting for at least 48 hours' notice of the

13    witness and the exhibits that government intends to introduce

14    through the witness.  That will allow us to evaluate and raise

15    any objections to that and could streamline the testimony.

16              THE COURT:  Let me hear from the government.

17              MS. PIERSON:  We didn't really have any objection to

18    the process.  We simply said we could do it 24 hours in advance

19    and not 48 hours in advance.  We have been really struggling --

20    this case is different than most of the cases in this district

21    because virtually all of our witnesses are from outside the

22    district, and so -- because it's an internet case and people

23    are everywhere.  We have been really struggling with, you know,

24    lining up witnesses and knowing who is going to be where.

25         We are prepared to give them the names of the witnesses
```

1   and the exhibits that we are using.  We just don't think that

2   we can reasonably do it in 48 hours.  But we certainly can do

3   it in 24.

4         THE COURT:  Here is what I will do -- and let me ask,

5   do you have the witnesses for tomorrow?

6         MS. BERNSTEIN:  This is how the issue came up.

7   We know the four witnesses they intend to start with.  And

8   I think I have the rough order, and I fully appreciate they are

9   out of town and things change, of course.

10   But we also got just a laundry list of exhibits, and I

11   think I have asked three times which exhibits go with which

12   witness, because there's been a gross misunderstanding on our

13   part.  We thought, for example, that Ms. Brooks had two

14   exhibits, and in fact, I think, there's more.

15   So we have a sense of the four, assuming that's still the

16   order; but we do not know the exhibits that correspond to those

17   witnesses.

18         MS. PIERSON:  I wanted to say we did provide them the

19   names and the exhibit numbers on Sunday.  We did not tell them

20   specifically which exhibits went with which witnesses, but on

21   Sunday, we did send an email with the names of the witnesses

22   and approximately 30 exhibits that went with the three

23   witnesses.

24         THE COURT:  Is there a reason why you can't provide

25   the names of the witnesses and the corresponding exhibits?

```
 1           MS. PIERSON:  I think we can to that.  We had

 2    provided it.  I think there was a miscommunication with us,

 3    perhaps, and the paralegal who was doing it, and I think that

 4    the -- they then changed the exhibits to be in numerical order

 5    of the exhibits rather than -- we weren't trying to do that.

 6           THE COURT:  I have to believe that, at this point,

 7    the government would have -- if not a crystal-clear

 8    understanding, a very good idea of what exhibits go to what

 9    witnesses.

10           MS. HEATH:  Right.  And we have no objection.

11           THE COURT:  I would hope not, because that's totally

12    reasonable.  And as far as 24 hours or 48 hours, I would ask

13    this, for the government to kind of project or to look forward

14    and go, "Okay.  At this point, if we get these four in, who are

15    the next ones?"  Because I know you are already working on that

16    because you have so many moving parts that you are having your

17    case agent, contacting people.  "Are you available this date?

18    Are you available that date?"

19       So you already have an idea of how you present the case.

20       If it turns out that you have to change course, I am not

21    going to hold it against the government.  But at the same time,

22    I do believe that it's not unreasonable to end up trying to

23    provide 48 hours of witnesses.  And in that way to help me --

24    because I am sure that once the attorneys come up with these

25    names, quickly, there may be things that are filed and
```

1  presented to me, and that will make things challenging for me,

2  and I know the government wants me to get it right.  The

3  government doesn't want me to, because I look at something too

4  quickly or too hastily, that I don't give it the attention it

5  deserves and I get something wrong.  Nobody wants that,

6  especially me.  So I think it helps the process along.

7       I will ask you to do that.

8            MR. LINCENBERG:  I am just going to add, for over the

9  weekends -- even if it's one business day, hopefully by

10 Wednesday night or Thursday morning, to let us know who is

11 going to be on the stand next Tuesday.

12           THE COURT:  And here is the other thing, I get it,

13 Ms. Bernstein.  When you ended up responding to my concern

14 about why it took so long to file a response to the notices

15 regarding COAs that, "You know what?  There's been a thousand

16 things that have been coming down the pike as we are preparing

17 for jury selection."

18      We now can take a deep breath and say, "Okay.  We have a

19 jury."

20      We have now -- when I look at the government's trial

21 brief, which I appreciate they prepared it, and it lets me know

22 how far we have come in terms of all of the work we have done.

23 We have done a lot of work.

24      And the good news is that we don't have to revisit a lot

25 of things once the Court has made a decision.  And so I think

1  now we can start to focus on the witnesses and the evidence.

2       And to the extent that that's where we are now, I am

3  looking forward to the parties to help me streamline this case,

4  to get it to the jury as soon as we practically can.  All

5  right?

6            MS. BERNSTEIN:  Thank you, Your Honor.

7       The only other thing I would raise is we are a little

8  cramped.  If we can have permission to bring a table, to add it

9  to the end, because our trial tech --

10           THE COURT:  Yes.  Yes.

11      Anything from the government?

12           MS. PIERSON:  Nothing on behalf of the United States.

13           MR. WIECHERT:  Two quick things, Your Honor.  This is

14 a function of what occurred during opening statements.  There

15 was a reference, when we were debating the admissibility of the

16 expert testimony based on the joint defense privilege.  Towards

17 the end of it, the question was raised whether or not the

18 $4.9 million number should be admissible at all since it's not

19 an element of the offense.

20      The Court left open the door, that it would be excluded

21 under 403.  The government, in their opening statement, then

22 puts before the jury the 4.9 number.

23      It is still our position that that 4.9 number shouldn't

24 come in, even though two of the lawyers on our side responded

25 to it and wanted to leave it open.

 1          But at the end of the day, as the Court noted when it was

 2     talking to us before the openings, that someone can promise

 3     something and if it doesn't come through because of evidentiary

 4     rules, that's on them; that's not any kind of waiver notion.

 5          So it is our view, still, that that number shouldn't be

 6     presented to the jury, and we don't want the Court to consider

 7     that we are waiving that argument.  And it's something we can

 8     file a short bench brief on, too, if the Court wants.

 9          And then the second issue is I understand punishment of

10     the defendants is not an issue for the jury to consider.  The

11     Court sustained the objection when there was a reference to

12     that.

13          However, Daniel Dye faces the same potential charges --

14          THE COURT:  They would be able to sort it out and

15     figure it out themselves, but they would be engaging in

16     conjecture that they are not allowed to because there won't be

17     evidence about that that makes its way to the jury.

18          MR. WIECHERT:  Right.  Daniel Dye's exposure and what

19     he got out from under when he faces one year instead of 100

20     years --

21          MR. BIENERT:  We are allowed to talk about that?

22          THE COURT:  Of course.  Absolutely.

23          MR. LINCENBERG:  And Your Honor, I think this is on

24     the record, but so we don't all have to jump up, an objection

25     by one is an objection by all for the record?

1        THE COURT:  I am prepared to permit that to be the

2   protocol as we go forward.

3      All right.  So then, tomorrow, I will ask you to be here a

4   couple of minutes early.  I don't expect that there will be any

5   issues that we have to address, but at any time during the

6   trial if something develops overnight, then I would like for

7   you to contact my clerk as soon as possible and then we may end

8   up having you come in at eight o'clock or 8:15; again, all with

9   the understanding that I don't want to inconvenience our jury.

10  All right?

11       MS. PIERSON:  I just want to put on the record that

12  the prosecution team had no knowledge of any discussions about

13  whether or not the $5 million might or might not be admissible.

14       THE COURT:  I think I have may have left the door

15  open.  I don't think -- and I think part of it is many times

16  there's motions *in limine* to admit, and I will always push back

17  and go, "You know what?  We admit things at trial, not before

18  trial."

19      So, to the extent that that is the case, it may be that,

20  in the course of where we are in the trial, when the government

21  offers something, at that point, if there's an objection, I may

22  sustain the objection.

23      My take on it is more based upon what a motion *in limine*

24  should and shouldn't be.  And in general, my view is motions *in*

25  *limine* should exclude evidence that is likely to be unduly

```
 1   prejudicial and will be hard to unwind.

 2        I did not grant a motion in limine along those lines as to

 3   the $5 million.  At the same time, I also reserve the right to

 4   exclude that evidence in the course of the trial.

 5        All right?  Have a good evening.

 6        (End of proceedings at 5:26 p.m.)

 7                          -o0o-

 8              C-E-R-T-I-F-I-C-A-T-I-O-N

 9

10             I hereby certify that I am a duly appointed,

11   qualified and acting official Court Reporter for the United

12   States District Court; that the foregoing is a true and correct

13   transcript of the proceedings had in the aforementioned cause;

14   that said transcript is a true and correct transcription of my

15   stenographic notes; and that the format used herein complies

16   with rules and requirements of the United States Judicial

17   Conference.

18             DATED:  May 27, 2022, at San Diego, California.

19

20                        /s/  Chari L. Bowery

21                        _____
                          Chari L. Bowery
22                        CSR No. 9944, RPR, CRR

23

24

25
```